# Exhibit 1

US006374231B1

## (12) United States Patent
### Bent et al.

(10) Patent No.: **US 6,374,231 B1**
(45) Date of Patent: **\*Apr. 16, 2002**

(54) **MONEY FUND BANKING SYSTEM**

(76) Inventors: **Bruce Bent**, 18 Heights Rd., Manhasset, NY (US) 11030; **Bruce Bent, II**, 99 Jane St., Apt. 11B, New York, NY (US) 10014

( * ) Notice: This patent issued on a continued prosecution application filed under 37 CFR 1.53(d), and is subject to the twenty year patent term provisions of 35 U.S.C. 154(a)(2).

Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/176,340**

(22) Filed: **Oct. 21, 1998**

(51) Int. Cl.$^7$ ............................................. G06F 17/60

(52) U.S. Cl. ............................ **705/40**; 705/36; 705/37; 705/38

(58) Field of Search ............................. 705/36, 37, 38, 705/40

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,232,367 A | * 11/1980 | Youden et al. | .................. 705/38 |
| 4,346,442 A | 8/1982 | Musmanno | |
| 4,376,978 A | 3/1983 | Musmanno | |
| 4,597,046 A | 6/1986 | Musmanno | |
| 4,674,044 A | 6/1987 | Kalmus | |
| 4,694,397 A | 9/1987 | Grant | |
| 4,700,297 A | 10/1987 | Hagel | |
| 4,751,640 A | * 6/1988 | Lucas et al. | .................. 705/36 |
| 4,774,663 A | 9/1988 | Musmanno | |
| 4,953,085 A | 8/1990 | Atkins | |
| 5,126,936 A | 6/1992 | Champion | |
| 5,206,803 A | 4/1993 | Vitagliano | |
| 5,235,507 A | 8/1993 | Sackler | |
| 5,262,942 A | * 11/1993 | Earle | ............................ 705/37 |
| 5,270,922 A | 12/1993 | Higgins | |
| 5,297,032 A | 3/1994 | Trojan | |

| | | | |
|---|---|---|---|
| 5,671,363 A | 9/1997 | Christofich | |
| 5,689,650 A | * 11/1997 | McClelland et al. | .......... 705/36 |
| 5,710,889 A | 1/1998 | Clark | |
| 5,765,144 A | 6/1998 | Larche | |
| 5,774,880 A | 6/1998 | Ginsberg | |
| 5,781,654 A | 7/1998 | Carney | |
| 5,806,049 A | 9/1998 | Petruzzi | |
| 5,812,987 A | 9/1998 | Luskin | |
| 5,826,243 A | 10/1998 | Musmanno | |
| 5,878,258 A | 3/1999 | Pizi | |
| 5,890,141 A | 3/1999 | Carney | |

(List continued on next page.)

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| JP | 10049590 | * 2/1998 | ........... G06F/17/60 |
| WO | 95/23379 | * 8/1995 | ........... G06F/17/00 |

#### OTHER PUBLICATIONS

Britt, Phil; "Struggling with sweep accounts", America's Community Banker, v6, n12, p18–23, Dec. 1997.*
News article; "Regulators Support Demand Deposit Bill", Regulatory Compliance Watch–Mar. 9, 1998; p 1; vol. 9, No. 10.*

*Primary Examiner*—Vincent Millin
*Assistant Examiner*—Jagdish N Patel
(74) *Attorney, Agent, or Firm*—Hopgood, Calimafde, Judlowe & Mondolino, LLP

(57) **ABSTRACT**

Providing interest to clients' deposited finds without the legal limitation on the number of demand withdrawals from deposit accounts is accomplished by an administration system that keeps all of the records for the clients' deposits and withdrawals, calculates the total of the deposits and withdrawals for all clients, and uses the calculation to determine whether funds are deposited to or withdrawn from a single deposit account in which all clients' deposit funds are kept. Clients can make unlimited withdrawals, such as by check, credit card, debit card, or electronic transfer, through the administrator. By placing the administrator as the holder of a single account, legal exemptions to the limitation on earning interest in demand accounts is facilitated.

**19 Claims, 2 Drawing Sheets**



**US 6,374,231 B1**
Page 2

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 5,893,078 A | 4/1999 | Paulson |
| 5,905,974 A | 5/1999 | Fraser |
| 5,940,809 A | 8/1999 | Musmanno |
| 5,941,996 A | 8/1999 | Smith |
| 5,950,175 A | 9/1999 | Austin |
| 5,978,779 A | 11/1999 | Stein |
| 6,014,642 A | 1/2000 | El-Kadi |
| 6,016,482 A | 1/2000 | Molinari |
| 6,026,438 A | 2/2000 | Piazza |
| 6,044,371 A | 3/2000 | Person |
| 6,047,324 A | 4/2000 | Ford |
| 6,105,005 A | 8/2000 | Fuhrer |
| 6,108,641 A | 8/2000 | Kenna |
| 6,131,810 A | 10/2000 | Weiss |
| 6,154,770 A | 11/2000 | Kostakos |

* cited by examiner



FIG. 1

*FIG. 2*



US 6,374,231 B1

**1**

# MONEY FUND BANKING SYSTEM

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The novel system is in the field of account transaction processing and provides an administered money fund banking system that is integrated with an insured deposit account.

2. State of the Art

The Federal Deposit Insurance Corporation ("FDIC") is a federal governmental entity that provides insurance for deposits in most banks and savings institutions in the United States. Bank deposits are insured by the FDIC's Bank Insurance Fund ("BIF") and savings institutions' deposits are insured by the FDIC's Savings Association Insurance Fund ("SAIF"). The rules governing insurance of deposits of institutions insured by the BIF and the SAIF are the same. The FDIC bases insurance coverage on the concept of ownership rights and capacities: finds held in different ownership categories are insured separately from each other, and funds of the same ownership but held in different accounts are subsumed under the same insurance coverage. The amount of insurance covered provided to depositors of each institution insured by BIF and SAIF is the same: $100,000.00 to the owner(s) of the funds in the account(s), including principal and interest.

Title 12, Part 329, of the Code of Federal Regulations ("CFR") specifies that "no bank shall, directly or indirectly, by any device whatsoever, pay interest on any demand deposit."(12 C.F.R. § 329.2.) A "deposit" is any money put into a savings account, a checking account, or time account such as a certificate of deposit. A "demand" account is one from which the owner of the account can demand that funds be drawn and paid elsewhere, either to another account (of the same or a different owner) or to a third party. These payments are typically made via a bank draft or check, or a credit or debit card. A account different than a demand account is an account where all or a fixed amount of the principal must be maintained in the account for a period of time to achieve the particular benefits offered by that account. As stated in this section of the CFR, a "demand deposit" includes any deposit in account under which terms the depositor is authorized to make, during any month or statement cycle of at least four weeks, more than six transfers by means of a preauthorized or automatic transfer of telephone (including data transmission) agreement, order or instruction, which transfers are made to another account of the depositor at the same bank, to the bank itself, or to a third party provided that such an account will be deemed a demand deposit if more than three of the six authorized transfers are authorized to be made by check, draft, debit card or similar order made by the depositor. (12 C.F.R. § 329.1(b)(3).) On the other hand, withdrawals from a deposit account are not deemed to be included within the six transfers permitted for a nondemand account when the withdrawals are made by mail, messenger, telephone (via check mailed to the depositor), automated teller machine, or in person. In essence, unless the funds of a deposit are held in a NOW account (18 U.S.C. 1832(a)), an account in which a depositor has the ability to make at least six transfers will be deemed a demand account and no interest will be payable on the funds therein. Therefore, owners of demand accounts are denied interest on their funds.

## SUMMARY OF THE INVENTION

In light of this regulatory scheme, it would be beneficial to provide depositors of demand accounts with interest from

**2**

the funds on deposit while simultaneously providing unlimited (or at least six) transfers of the funds therein. For example, it would be beneficial to provide such depositors with the ability to deposit funds into the demand account from various sources, and to make payments from the demand account via different instruments, without limitation as to the number of transfers, and still earn interest on the funds in the clients' accounts.

To accomplish these and other objectives, this invention provides a system for managing a plurality of accounts for multiple clients by administering at a banking institution a single insured deposit account in which all of the funds for the insured deposit accounts are held, providing a database having client information for each client's account, administering clients' deposits to and withdrawals from each of their accounts, authorizing whether funds in a particular clients account can be used for each payment requested from that client's account, determining as the net transaction of the sum of the insured money market account deposits and withdrawals from the plurality of insured money market accounts on a regular periodic basis, using the determination of the net transaction to deposit funds to or withdraw funds from the single insured deposit account, distributing interest earned on the single deposit account to each of the clients in proportion to their portion of funds in the deposit account, and updating the database for each client's deposits and authorized demand payments.

## BRIEF DESCRIPTION OF DRAWINGS

FIGS. **1** and **2** show flow chart depicting certain processing steps the system follows at the administrator's end.

## DESCRIPTION OF SPECIFIC EMBODIMENTS OF THE INVENTION

The present system will be described with reference to an administrator, which can be brokerage, a bank, or another entity with which clients can institute financial transactions such as deposits and demand payments. The administrator appears to each client as if it were, in part, a bank, by accepting deposits for the client's account and by authorizing (and then making) payments demanded by the client from his account. The funds for all of the clients are pooled into a single fund that is maintained as an insured deposit account at a licensed banking institution. This system is preferably implemented in combination with a brokerage account so that the client can centralize all of his financial needs: deposit of funds; demand orders for payment (checking); payment authorization by debit card; securities transactions; retirement plans; and the like.

The following description of the hardware and software is for exemplification of a working system; other architectures can be fashioned to make the systems and perform the methods claimed herein. The system has been implemented on a mainframe computer (e.g., an IBM Application Starterpac 3000 model A20, which is capable of processing 63 million instructions per second) with an operating system such as OS/390 and MVS/ESA running a relational database (e.g., DB2 type database). The programing languages are IBM COBOL, CICS languages along with IBM's CSP screen generation language. For such a system, memory requirements are satisfied with 768 Gigabytes of storage (preferably, e.g., 1024G with a disk storage and recovery system, such as RAID). Communications generally are run on a mixed SNA and TCP/IP network. Communications with a local area network via a local control unit can be implemented using a token ring. Connection to an internal

<div style="column-count:2">

3

network has been made via an IBM open systems adapter (OSA) running TCP/IP, which allows File Transfer Protocol (ftp) via a firewall. Bisynchronous and synchronous file transfer protocols are made through various dial-up media. Terminal Access runs on an Ethernet local area network, using an SAA gateway, and other gateways (e.g., Cytrix and Netsoft) for remote access. Additionally, several lease lines for several applications and terminal access are supported by the system.

FIGS. 1 and 2 show flowchart depicting certain processing steps the system follows at the administrator's end. It should be understood that the order in which these steps are performed may be varied without impairing the achievement of the aforementioned objects of the invention. The client adds funds ("deposits") to his account typically via check 101, sweeps 103 of funds from another account (e.g., a broker/dealer account), and/or by wire and other transfers 105 (such as fed funds wire and direct deposit via ACH) for investment in an FDIC insured money fund account. These funds are deposited in a deposit account with a bank on behalf of the participant. The amount of each of the deposited items is summed 107 to determine the deposit for each client, preferably on a regular periodic basis (e.g., daily) or instantaneously. On the other side, the administrator provides the participant with access to his funds by various methods: payments can be made from funds drawn from the account by check 109; electronic funds transfer 110; debit card 111 authorized by the client (and ACH debit); sweeps of funds 113 to another account (e.g., a broker/dealer account); and electronic and voice access 114 (e.g., internet on-line banking, banking by telephone) for automated transaction requests; and transactions authorized by mail. A "sweep" is an automated movement of funds between a client's other account (e.g., a broker/dealer account) and his insured deposits account (in either direction). The registration on the other account and the insured deposit account are identical; there is a one for one relationship between the brokerage account and the insured deposits account.

The sum of the deposits is processed 117 with information 119 from a database (described later) that stores information about the demand account for each client. Each client's account is credited 121 with the sum of the deposits for that particular account, which may amount to zero on a particular day. Similarly, the sum and of withdrawals are processed 123 to determine what should be debited from the account, which may also amount to zero on a particular day. The deposits and withdrawals for each account during a given period are compared 125 to determine whether sufficient funds are present in the client's account, including the added funds, to pay the withdrawals requested by the client. In other words, processing determines which client accounts to credit or debit for the various transactions (sweep, checks, debit cards, ACH, etc.) received each business period (e.g., daily). These transactions can be received from one or more sources, such as brokerage firms (sweep transactions), banks (deposits made by wire trasfer, checks presented for payment, ACH, debit card transactions), the mail (check deposits, redemption requests), and telephone requests. "Telephone" requests can be performed by voice, conversing with an operator/broker or a voice response system, or via a touch-tone phone using a menu system, or electronically via the internet using email or the World Wide Web (e.g., a web page, preferably secure, onto which users can log in and conduct on-line banking). The final step in the day's processing is to determine the net credit or debit for the deposit account at the bank; the net activity represents all transactions that were processed that day for all insured deposit accounts.

4

If sufficient funds are not available for drafts and other orders to pay, the requested withdrawal(s) are denied and the client's total account information is again accessed to determine 129 if the client has sufficiently available margin to cover the requested withdrawal(s) (other than, preferably, sweep transactions). If insufficient funds and insufficient margin are available, then the requested withdrawal is denied 131. The client's margin typically is determined by the value of the clients funds held in the client's broker/dealer (securities) account. When sufficient funds are available in the insured deposit account, or a sufficient margin is available in the client's securities account with the administrator, then a debit is made 133 to the client's insured deposit account in the amount of the withdrawal(s) allowed (based on the funds and margin then available) and the processed and authorized withdrawals are paid as directed by the client. The sum of the processed credits 121 and the processed debits 133 are determined for all of the administrator's clients to arrive at a net account activity determination 135. The order in which credits and debits are processed depends upon a subjective protocol and/or operation of law. For example, transactions that are pre-approved (such as authorized debit card transactions, and sweeps) are likely to be processed when received; transactions requiring authorization or acceptance by a third party (such as a bank draft or check) may be credited to the insured deposit account but not available for withdrawal until authorization or acceptance.

The net account activity determination 135 is then used to determine a net credit/debit 139 for the single deposit account held at the bank that contains all of the funds of all of the administrator's clients; the deposit account must be debited or credited to account for all clients' deposits and withdrawals during the period. If the net result is positive (e.g., amount of deposits processed minus amount of authorized withdrawals processed is positive), then the calculated amount is deposited 141 to the single account. If the net result is negative (e.g., amount of deposits processed minus amount of withdrawals processed is negative), then the calculated amount is withdrawn 143 from the single deposit account. An individual insured money market account is maintained for each client on a administrator's database. Each transaction received for an account is individually posted against the client's account on the database. Funds are exchanged between the appropriate parties to cover transactions (broker for sweep transactions; bank for debit cards, checks, ACH, etc.). These transactions are posted and settled prior to any activity taking place in the insured deposit account at the bank. In a preferred embodiment, the last movement of funds on each day is the net movement of funds (credit or debit) that takes place in the deposit account at the bank. The sum of the account balances (principle plus interest) for clients participating in the this system equals the balance in the deposit account at the bank.

The information from the calculations of a net credit/debit 139 are used to implement the processing of the actual deposit or withdrawal (141, 143) to the deposit account, and that information (and funds, if required) is sent to the bank 145 to execute the actual deposit or withdrawal required. If the deposit account is to be credited, then deposits are transferred to the bank and credited to the deposit account 147; conversely, if funds are to be withdrawn from the deposit account, a bulk withdrawal is made from the deposit account to account for the withdrawals that have been authorized from the clients' accounts; in essence, the withdrawal from the deposit account need only make up the difference between the authorized withdrawals and the

</div>

5

deposits. If the client wishes to use his excess margin buying power for overdraft protection, the broker/dealer transmits the client's available margin line to the administrator regularly (preferably daily). The available margin line will be taken into consideration when checks, debit card, and other draft and order to pay transactions (e.g., ACH debits, on-line banking withdrawals, and other electronic payments) are processed. If the client's margin line is used to process a check or debit card transaction, a loan will be created and transmitted to the broker dealer by the administrator. Preferably, the broker dealer maintains the margin loan on his system and will pay the administrator for all funds advanced. Using this methodology for margin accounts, there is no effect on the deposit account at the bank.

The bank pays interest **149** on the single deposit account to the administrator. Based on the amount of each client's funds in the deposit account as a function of the total amount in the deposit account, the administrator determines the interest amount (if any) each client is owed (based also on the period during which the interest was determined on a particular account balance). Because all of the clients' finds are in a single account under the name of the administrator, the administrator earns the interest and distributes the interest earned to each of the clients. Further, the limitation on transfers from a interest-bearing account is inapplicable to the clients because their funds are held by the administrator in a demand account and interest for the client is determined only on that portion of those finds maintained in the bank's deposit account. Preferably, if necessary, the administrator makes any withdrawals from the deposit account in person.

After the deposit account has been credited or debited in accordance with the determination for that period of the sum of the deposits and withdrawals from clients, and the interest earned on the single deposit account, this information is transferred back to the administrator's deposits database **151**. This database includes information about each client (such as name, address, and other important or desired demographic and tax information about each client's account), as well as financial information regarding the client's holdings on deposit in the bank (i.e., that client's portion of the single deposit account) and holdings with the administrator (e.g., securities and the like).

As seen, the administrator maintains several relationships that provide services for the insured money market accounts. These various entities provide transaction data that is transmitted to the administrator and processed. Preferably, the administrator is its own transfer agent and provides a shareholder accounting system. Preferably, accounts may be opened through a broker dealer that is a client of the administrator, or directly with an application and check.

The administrator may allow a client with an account under the present system to access his funds by check or with a debit card; in such a case, the administrator has arranged for these services and maintains these relationships which are separate and apart from the deposit account. Banks that provide check and card services will transmit a file each day to the administrator that contains the checks presented for payment and/or the debit card transactions. The transactions that apply to his account under the present system are out sorted and processed against the administrator's database. The administrator will settle with each bank for the transactions that were processed.

The administrator may accept direct deposit of payroll, social security, or pensions for accounts. The clients' accounts are updated as these files are received and processed. The administrator may also accepts ACH debit

6

transactions, which are initiated by the client's bank or a third party at the client's request.

The administrator may also provide the participants with automated bill paying services. Participants preferably provided with a touchtone bill paying system and/or an internet on line banking service. Bill payment requests may be downloaded each morning for processing.

The foregoing description is meant to be illustrative and not limiting. Various changes, modifications, and additions may become apparent to the skilled artisan upon a perusal of this specification, and such are meant to be within the scope and spirit of the invention as defined by the claims.

What is claimed is:

1. A method for managing a plurality of demand accounts for multiple clients whose funds are held at a banking institution in a single insured money market deposit account, comprising:

   providing a database having client information for each account;

   administering clients' deposits to and withdrawals from each of their demand accounts;

   authorizing or rejecting the use of funds in a particular client's demand account for each demand payment requested from that client's account;

   determining the net transaction aggregated across all said demand account deposits and withdrawals on a regular periodic basis;

   using the determination of the net transaction to deposit funds to or withdraw funds from said single insured money market deposit account;

   distributing interest paid on said single money market deposit account to said clients' demand accounts; and

   updating the database for each client's deposit and authorized demand payment.

2. The method of claim **1**, wherein withdrawals are made by at least one method selected from the group consisting of drafts (checks), credit card, debit card, sweeps, electronic transfer, and combinations thereof.

3. The method of claim **1**, wherein deposits are made by at least one method selected from the group consisting of drafts (checks), sweeps, electronic transfers, and combinations thereof.

4. A system for managing a plurality of demand accounts for multiple clients whose funds are held at a banking institution in a single insured money market deposit account, comprising:

   a database having client information for each demand account;

   a device for administering clients' deposits to and withdrawals from each of their demand accounts;

   a device for authorizing or rejecting the use of funds in a particular client's demand account to be used for each demand payment requested to be paid drawn on funds from that client's demand account;

   a device for determining the net transaction aggregated across all said demand account deposits and withdrawals on a regular periodic basis;

   a comparison device for determining from the net transaction whether to deposit funds to or withdraw funds from said single insured money market deposit account;

   a device for distributing interested earned on said money market deposit account among the clients; and

   a device for updating the database for each client's; deposits and authorized demand payments.

7

**5**. The system of claim **4**, wherein withdrawals are in the form of at least one type selected from the group consisting of drafts (checks), credit card, debit card, sweeps, electronic transfers, and combinations thereof.

**6**. The system of claim **1**, wherein deposits are in the form of least one type selected from the group consisting of drafts (checks), sweeps, electronic transfers, and combinations thereof.

**7**. A data processing system for implementing and managing plural client transaction accounts providing a return to each of said clients, by aggregating the assets associated with said client transaction accounts for deposit in a corresponding insured deposit account and providing a return on assets held therein, said system comprising:

    a. transaction input processor for receiving transactions, including deposits and/or withdrawals to one or more of said plural client accounts;

    b. account computation processor responsive to said transactions and capable of calculating a corresponding balance for each said client transaction account, including determining and crediting said transaction account with a return associated with said balance of each said client accounts;

    c. memory module storing data on said plural client accounts, wherein account balances are periodically updated to include said corresponding return to each of said client accounts; and

    d. said computation processor assessing the aggregate activity of said plural client transaction accounts for a respective period, and calculating an asset adjustment to said insured deposit account, to permit adjustment of the amount in said insured deposit account by a method consistent with maintaining the insured and interest bearing status of said insured deposit account.

**8**. The system of claim **7**, wherein said transaction input processor accesses a client account by one or more transaction methods selected from the group consisting of check, withdrawal, credit card, electronic fund transfer, debit card, sweep, internet communication, voice activation, and banking by telephone.

**9**. The system of claim **8**, wherein said transaction input processor accesses said account by three or more of said methods.

**10**. The system of claim **8**, wherein said transaction input processor accesses said account by five or more of said methods.

**11**. The system of claim **7**, wherein said computational processor responds to withdrawal transactions for a client's account by assessing fund availability and based, in whole or in part, thereon approving or denying said withdrawal transaction.

**12**. The system of claim **11**, wherein said computational processor applies margin requirements to said client's account in assessing a withdrawal transaction therefrom.

8

**13**. The system of claim **7**, wherein the return for the insured deposit account is used to determine the returns for the plural client accounts.

**14**. The system of claim **8**, wherein transactions further include automated bill paying.

**15**. The system of claim **7**, wherein periodic deposits to a client's account include one or more of the following: direct automated payroll; direct social security; automated sweep from another of that client's accounts; electronic funds transfer; and manual check deposit.

**16**. A data processing method for tracking and managing a plurality of client transaction accounts and providing a return to each of said accounts, the funds associated with said accounts aggregated for deposit in a corresponding insured deposit account providing a return on assets held therein, comprising the steps of:

    a. creating one or more account memory ledgers and storing therein select data for one or more of said plurality of client transaction accounts;

    b. storing in said memory ledgers account data including a current or periodic account balance as well as an identification of an account owner or beneficiary;

    c. tracking deposits to and withdrawals from each of said client transaction accounts and adjusting the balance for each in response to such transactions;

    d. creating an insured deposit account in which funds from a plurality of said client transaction accounts are deposited, and managing said insured deposit account by assessing the aggregate activity of said plural client transaction accounts for a respective period and calculating an asset adjustment to said insured deposit account to permit adjustment of the amount in said insured deposit account by a method consistent with maintaining the insured and return bearing status of said insured deposit account; and

    e. calculating an aggregate transactional value for said client accounts having funds held in said insured deposit account over a selected period of time and determining a net asset adjustment for said insured account, to be implemented in a manner consistent with retaining its status as insured and providing a return on the assets.

**17**. The method of claim **16**, wherein said transactions into or out of a client's transaction account include sweeps into or sweeps out of said account.

**18**. The method of claim **16**, further comprising calculating a corresponding return for each client transaction account having funds maintained in said insured account based on the return on the assets held in the insured deposit account.

**19**. The method of claim **18**, wherein withdrawal transactions resulting in a negative net balance for a client's account trigger a margin approval process for such account.

\* \* \* \* \*

# Exhibit 2

(12) **United States Patent**
Bent et al.

(10) Patent No.: **US 7,519,551 B2**
(45) Date of Patent: *Apr. 14, 2009

(54) **SYSTEMS AND METHODS FOR ADMINISTERING RETURN SWEEP ACCOUNTS**

(75) Inventors: **Bruce Bent**, Manhasset, NY (US); **Bruce Bent, II**, New York, NY (US)

(73) Assignee: **Island Intellectual Property LLC**, New York, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 785 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **10/071,053**

(22) Filed: **Feb. 8, 2002**

(65) **Prior Publication Data**

US 2002/0091637 A1    Jul. 11, 2002
US 2006/0212389 A2    Sep. 21, 2006
US 2008/0046361 A2    Feb. 21, 2008

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/176,340, filed on Oct. 21, 1998, now Pat. No. 6,374,231, and a continuation-in-part of application No. 09/677,535, filed on Oct. 2, 2000.

(51) **Int. Cl.**
**G06Q 40/00**    (2006.01)

(52) **U.S. Cl.** ............................................. **705/35**; 707/1

(58) **Field of Classification Search** ................... 705/30, 705/35, 38–40, 42; 707/1, 10, 100–104; 902/24, 41

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,232,367 A    11/1980   Youden et al.
(Continued)

FOREIGN PATENT DOCUMENTS

JP          10049590       2/1998
(Continued)

OTHER PUBLICATIONS

Womack, EFT '99 Spawns Methods for Reaching the "unbanked", Jun. 1998, Bank Marketing, v30n6, pp. 8-11, ISSN: 0888-3149.*
(Continued)

*Primary Examiner*—Mary Cheung
(74) *Attorney, Agent, or Firm*—Foley & Lardner LLP

(57) **ABSTRACT**

Novel systems and methods for managing a plurality of client demand accounts so as to allow a banking institution to retain client deposits on the bank's balance sheets while, at the same time, providing the client with the capability of implementing up to an unlimited number of transactions per month and also providing the client with interest on their account balances. These objectives are achieved through the use of a pooled deposit account at the client's savings institution or bank. Funds are transferred from individual client demand accounts to the pooled insured deposit account. All or a portion of the interest accrued from the pooled deposit account is then distributed to individual clients. The interest may, but need not, be distributed according to the relative proportions of each client's funds in the pooled deposit account. A database keeps track of deposits to, and withdrawals from, each of the client demand accounts, as well as each client's proportionate and/or monetary share in the pooled deposit account. On a regular, periodic, or recurring basis, a net transaction is calculated as the sum of individual client deposits and withdrawals from the plurality of demand accounts. The net transaction calculation is used to determine an amount of funds that need to be deposited into the pooled deposit account to cover client deposits, or an amount of funds that needs to be withdrawn from the pooled deposit account to cover client withdrawals. Individual account management calculations are performed to determine whether to deposit or withdraw funds from the pooled deposit account to each of a plurality of individual client demand accounts. The database is updated for each client's deposit and withdrawal activities. The invention permits funds to be deposited into a demand account from various sources, and also provides for the tendering of payments from the demand account via different instruments, without limitation as to the number of transfers, and with accrual of interest on the deposited funds.

**51 Claims, 6 Drawing Sheets**



**US 7,519,551 B2**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,346,442 | A | 8/1982 | Musmannot |
| 4,376,978 | A | 3/1983 | Musmannot |
| 4,597,046 | A | 6/1986 | Musmannot |
| 4,674,044 | A | 6/1987 | Kamusl |
| 4,694,397 | A | 9/1987 | Grantd |
| 4,700,297 | A | 10/1987 | Hagelr |
| 4,751,640 | A | 6/1988 | Lucas et al. |
| 4,774,663 | A | 9/1988 | Musmannot |
| 4,953,085 | A | 8/1990 | Atkins |
| 4,985,833 | A | * | 1/1991 | Oncken ...................... 705/42 |
| 5,126,936 | A | 6/1992 | Champion et al. |
| 5,206,803 | A | 4/1993 | Vitagliano |
| 5,235,507 | A | 8/1993 | Sacklera |
| 5,262,942 | A | 11/1993 | Earled |
| 5,270,922 | A | 12/1993 | Higgins |
| 5,291,398 | A | 3/1994 | Hagan |
| 5,297,032 | A | 3/1994 | Trojand |
| 5,424,938 | A | 6/1995 | Wagner et al. |
| 5,631,828 | A | 5/1997 | Hagan |
| 5,671,363 | A | 9/1997 | Christofich |
| 5,689,650 | A | 11/1997 | McClelland |
| 5,710,889 | A | 1/1998 | Clark |
| 5,765,144 | A | 6/1998 | Larche |
| 5,774,880 | A | 6/1998 | Ginsberg |
| 5,781,654 | A | 7/1998 | Carney |
| 5,806,048 | A | 9/1998 | Kiron et al. |
| 5,806,049 | A | 9/1998 | Petruzzi |
| 5,812,987 | A | 9/1998 | Luskin |
| 5,826,243 | A | 10/1998 | Musmanno |
| 5,852,811 | A | 12/1998 | Atkins |
| 5,864,685 | A | 1/1999 | Hagan |
| 5,878,258 | A | 3/1999 | Pizia |
| 5,878,405 | A | 3/1999 | Grant et al. |
| 5,890,141 | A | 3/1999 | Carney |
| 5,893,078 | A | 4/1999 | Paulson |
| 5,903,881 | A | 5/1999 | Schrader et al. |
| 5,905,974 | A | 5/1999 | Fraser |
| 5,940,809 | A | 8/1999 | Musmanno |
| 5,941,996 | A | 8/1999 | Smith |
| 5,946,667 | A | 8/1999 | Tull et al. |
| 5,950,175 | A | 9/1999 | Austin |
| 5,974,390 | A | 10/1999 | Ross |
| 5,978,779 | A | 11/1999 | Stein |
| 6,014,642 | A | 1/2000 | El-Kadi et al. |
| 6,016,482 | A | 1/2000 | Molinari |
| 6,026,438 | A | 2/2000 | Piazza |
| 6,041,314 | A | 3/2000 | Davis |
| 6,044,371 | A | 3/2000 | Person |
| 6,047,324 | A | 4/2000 | Ford |
| 6,052,673 | A | 4/2000 | Leon et al. |
| 6,088,685 | A | 7/2000 | Kiron et al. |
| 6,092,056 | A | 7/2000 | Tull et al. |
| 6,105,005 | A | 8/2000 | Fuhrer |
| 6,108,641 | A | 8/2000 | Kenna |
| 6,112,191 | A | 8/2000 | Burke |
| 6,131,810 | A | 10/2000 | Weiss |
| 6,154,770 | A | 11/2000 | Kostakos |
| 6,189,785 | B1 | 2/2001 | Lowery |
| 6,226,623 | B1 | 5/2001 | Schein et al. |
| 6,374,231 | B1 | 4/2002 | Bent et al. |
| 7,103,556 | B2 | 8/2006 | Del Rey et al. |
| 7,133,840 | B1 | 11/2006 | Kenna |
| 7,206,761 | B2 | 4/2007 | Colvin |
| 7,216,100 | B2 | 5/2007 | Elliott |
| 7,376,606 | B2 | 5/2008 | Jacobsen |
| 2001/0032182 | A1 | 10/2001 | Kumar et al. |
| 2002/0007330 | A1 | 1/2002 | Kumar et al. |
| 2002/0069147 | A1 | 6/2002 | Sheehan et al. |
| 2002/0091637 | A1 | 7/2002 | Bent |
| 2002/0128951 | A1 | 9/2002 | Kiron et al. |
| 2002/0161707 | A1 | 10/2002 | Cole et al. |
| 2002/0165757 | A1 | 11/2002 | Lisser |
| 2002/0178098 | A1 | 11/2002 | Beard |
| 2003/0023529 | A1 | 1/2003 | Jacobsen |
| 2003/0135437 | A1 | 7/2003 | Jacobsen |
| 2003/0149646 | A1 | 8/2003 | Chen et al. |
| 2003/0163403 | A1 | 8/2003 | Chen et al. |
| 2003/0177092 | A1 | 9/2003 | Paglin |
| 2003/0191702 | A1 | 10/2003 | Hurley |
| 2003/0236728 | A1 | 12/2003 | Sunderji et al. |
| 2004/0039674 | A1 | 2/2004 | Coloma |
| 2004/0107157 | A1 | 6/2004 | Bleunven et al. |
| 2004/0111361 | A1 | 6/2004 | Griffiths et al. |
| 2004/0128229 | A1 | 7/2004 | Raines et al. |
| 2004/0128235 | A1 | 7/2004 | Kemper |
| 2004/0162773 | A1 | 8/2004 | Del Rey et al. |
| 2005/0044038 | A1 | 2/2005 | Whiting et al. |
| 2005/0091137 | A1 | 4/2005 | Woeber |
| 2005/0102225 | A1 | 5/2005 | Oppenheimer et al. |
| 2005/0102226 | A1 | 5/2005 | Oppenheimer et al. |
| 2005/0108120 | A1 | 5/2005 | Malka et al. |
| 2005/0108149 | A1 | 5/2005 | Bent et al. |
| 2005/0114246 | A1 | 5/2005 | Coloma |
| 2005/0154662 | A1 | 7/2005 | Langenwalter |
| 2005/0228733 | A1 | 10/2005 | Bent et al. |
| 2006/0106703 | A1 | 5/2006 | Del Rey et al. |
| 2006/0155644 | A1 | 7/2006 | Reid et al. |
| 2006/0167773 | A1 | 7/2006 | Yang et al. |
| 2006/0273152 | A1 | 12/2006 | Fields |
| 2007/0043666 | A1 | 2/2007 | Burdette |
| 2007/0255655 | A1 | 11/2007 | Kemper et al. |
| 2007/0276752 | A1 | 11/2007 | Whiting et al. |
| 2007/0288400 | A1 | 12/2007 | Menon |
| 2008/0015985 | A1 | 1/2008 | Abhari et al. |
| 2008/0046358 | A1 | 2/2008 | Holm-Blagg et al. |
| 2008/0065532 | A1 | 3/2008 | De La Motte |
| 2008/0097899 | A1 | 4/2008 | Jackson et al. |
| 2008/0133280 | A1 | 6/2008 | Ziegler |

## FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO 95/23379 | 8/1995 |
| WO | WO-99/18529 | 4/1999 |
| WO | WO-03/012580 | 2/2003 |
| WO | WO-2005/006111 | 1/2005 |

## OTHER PUBLICATIONS

ABA to Approve System for Sharing Deposit Coverage, American Banker (Feb. 11, 2003).

American Banker Online—New Pitch: Deposit Insurance Sharing, p. 1-4 (Jan. 21, 2003).

Blackwell, Rob, "New Pitch: Deposit Insurance Sharing", American Banker Online, Jan. 21, 2003.

Britt, Phil; "Struggling with Sweep Accounts,", American's Community Banker, Dec. 1997, v.6, n.12, p. 18-23.

Certificate of Deposit Registry Service: Keeping deposits in the corn patch; Banknews/Mar. 2003.

Heavyweight Funding, Bankers News, vol. II, Issue 5, p. 1-2 Mar. 4, 2003.

News article: "Regulators Support Demand Deposit Bill,", Regulatory Compliance Watch,Mar. 9, 1998; p. 1, vol. 9, No. 10.

Promontory Interfinancial Network; http://www.promnetwork.com/index.html (2003).

Bent, "Bruce Bent Makes Money Market Funds Act Like Bank Accounts," Equity BBDP, Oct. 5, 1998, 3 Sheets.

Anderson et al. "Retail Sweep Programs and Bank Reserves," Federal Reserve Bank of St. Louis Review, Bell & Howell Information and Learning Company, vol. 83, Issue 1, 24 Sheets, Jan. 1, 2001.

Declaration of Mr. Bruce Bent II, Vice Chairman and Registrant of Applicant on the date of first commercial use of the service providing interest and FDIC insurance for checking accounts by means of a system using money market deposit accounts (MMDA's) of Oct. 23, 1997.

## US 7,519,551 B2

Page 3

Britt, "Struggling with Sweep Accounts," America's Community Banker, vol. 6, No. 12, 11 Sheets, Dec. 1, 1997.

Chapelle, "Merrill's Rivals Say They, Too. Offer Services Beyond Banking," Securities Data Publishing On Wall Street, 2 Sheets, Feb. 1, 2003.

Chapelle et al. "Peering Into Tomorrow: At the Threshold of a New Century, Brokers and Others Discuss Where They were Going," Securities Data Publishing on Wall Street, 6 Sheets, Dec. 1, 1999.

Coyle, "A Look at commercial Demand Deposit Options," America's Community Banker, vol. 9, Issue 2, Bell & Howell Information and Learning Company, 9 Sheets, Feb. 1, 2000.

Crockett, "Big Banks Found Stepping Up Marketing of 'Sweep' Accounts," American Banker, vol. 159, No. 198, American Banker Inc., 3 Sheets, Oct. 13, 1994.

Fredrickson, "Rising Rates Rescue Money Fund Firm Reserve Profits by Picking Niches," Crain's New York Business, Crain Communications Inc., vol. 20, Issue 51, 2 Sheets, Dec. 20, 2004.

Hoffman, "Reserve's FDIC-Insured Account Draws Regionals; But some see little need for insurance," Crain Communications Inc., Investment News, 2 Sheets, Jun. 4, 2001.

Keenan, "Tapping Brokerages for Alternative to CDs," American Banker, The Financial Services Daily, 3 Sheets, Feb. 18, 2004.

Lavine, "Check Out High-Yield Checking Accounts," Broward Daily Business Review, vol. 39, No. 102, 2 Sheets, Apr. 27, 1998.

McReynolds, "The Power of Cash: Ho-hum cash can be great product (and lead to more business) in troubled times," Securities Data Publishing on Wall Street, 3 Sheets, Jun. 1, 2002.

McReynolds et al. "Unusual Products for Unusual Times," Securities Data Publishing on Wall Street, 6 Sheets, May 1, 2001.

Potter, "As Sweep Accounts Continue to Grow, So do Community Bank Options," America's Community Banker, vol. 9, Issue 8, Bell & Howell Information and Learning Company, 3 Sheets, Aug. 1, 2000.

Share, "New Service Skirts FDIC's $100K Limit," Dialog Web Command Mode, 2 Sheets, Jun. 13, 2003, http://www.dialogweb.com/cgi/dwclient.

Smith, "IBAA Won't Push Interest-Bearing Checking For Business; Says Too Few Members Want It," The American Banker, 2 Sheets, Apr. 18, 1996.

Stafford, "New Bank Program Allows $1 Million in Insured Deposits," Dialog Web Command Mode, 3 Sheets, Aug. 24, 2003, http://www.dialogweb.com/cgi/dwclient.

Wilson, "How Cash Management Services Can Help Your Bank Cultivate New Relationships with Commercial Customers," America's Community Banker, vol. 10, Issue 5, Bell & Howell Information and Learning Company, 8 Sheets, May 1, 2001.

"Man Bites Dog: Funds Move Into Banking," IBC's Money Fund Selector, 2 Sheets, Nov. 6, 1998.

About iMoneyNet, Inc., About iMoneyNet's Money Funds Division, 4 Sheets, Aug. 21, 2003, http://www.ibcdata.com/about.htm.

"Reverse Ups Insurance Limit On Money Market Account," Thomson Financial Inc., Mutual Fund Market News, 1 Sheet, Aug. 26, 2002.

"The Reverse Funds to Offer up to $600,000 of FDIC Insurance on Reserve Insured Deposits; Addressing Investor Needs for Increased Safety, Flexibility and a Competitive Yield," Business Wire, Inc. Business Wire, 2 Sheets, Aug. 13, 2002.

"The Bank of New York adds a $300,000 FDIC-Insured Money Market Account Option to its Dividend Income Checking Account," PR Newswire Associations, Inc., PR Newswire, 2 Sheets, Apr. 18, 2002.

The Reserve Fund, Study of U.S. Patent No. 6,374,231, 1 Sheet.

"Bank of Oak Ridge to Offer FDIC Insurance on up to $1.5 Million," Dialog Web Command Mode, 2 Sheets, Sep. 25, 2003, http://www.dialogweb.com/cgi/dwclient.

Reserve Management Corporation, Reserve Insured Deposits, U.S. Appl. No. 76/315,600, Issued.

The Reserve, "What Sets Us Apart," 2 Sheets, Oct. 4, 2006, http://www.ther.com/bank/bank_wsua.shtml.

The Reserve, "Reserve Insured Deposits," 2 Sheets, Oct. 4, 2006, http://www.ther.com/ps/ps_fif.shtml.

The Reserve, "Company History," 3 Sheets, Oct. 4, 2006, http://www.ther.com/aboutus/history.shtml.

The Reserve, "Reserve Insured Deposits Program," 2 Sheets, Oct. 4, 2006, http://www.ther.com/bank/bank_insdep.shtml.

Reserve Insured Deposits, United States Patent and Trademark Office, Reg. No. 2,694,910, Registered Mar. 11, 2003, 1 Sheet.

The Reserve Funds Press Release "The Reserve Funds and Frontier Bank Partner to Offer Revolutionary Banking Product," 5 Sheets, Aug. 1, 2000.

Mutual Funds Magazine, Bargain Basement Funds, Oct. 1997, 2 Sheets.

Mutual Funds Magazine, Bargain Basement Funds, Oct. 1997, 1 Sheet.

Money Fund Report, IBC Financial Data, Inc., Nov. 6, 1998, 1 Sheet.

Liberman et al., Market Watch, "How Important are Banks?" FDIC Insurance on Deposits Just One Continuing Advantage, Oct. 17, 2006, 3 Sheets.

Declaration of Mr. Bruce Bent II, Vice Chairman and Registrant of Applicant. (3 Sheets) and Exhibits A, B, C and D (6 Sheets).

Capital Briefs: Corporate Checking Account Relief Sought, American Banker, vol. 162, Jul. 28, 1997, 1 Sheet.

U.S. Appl. No. 10/825,440, filed Apr. 14, 2004, Bent et al.

Announcing Changes in Automatic "Sweep" Investment Options, LPL Financial Services, Linsco/Private Ledger, Member NASD/SIPC, 26 Sheets.

Insured Cash Account Program Disclosure Booklet, LPL Financial Services, Linsco/Private Ledger, Member NASD/SIPC, 14 Sheets.

California Independent Bankers, ICBA Independent Community Bankers of America, Banker Bulletin, 2006, CIB 16th Annual Convention, vol. 4, Issue 6, http://www.cib.org/banker bulletin.htm, 2 Shhets.

AB 2011 Assembly Bill—Chaptered, http://www.leginfo.ca.gov/pub/bill/asm/ab_2001-2050/ab_2011_bill_20060925_chaptered.html, 2006, pp. 1-3.

AB 2011 Assembly Bill—Enrolled, http://www.leginfo.ca.gov/pub/bill/asm/ab_2001-2050/ab_2011_bill_20060816_enrolled.html, 2006, pp. 1-3.

AB 2011 Assembly Bill—History, Complete Bill History, http://www.leginfo.ca.gov/pub/bill/asm/ab_2001-2050/ab_2011_bill_20060925_history.html, 2006, p. 1.

AB 2011 Assembly Bill—Bill Analysis, Senate Amendments, http://www.leginfo.ca.gov/pub/bill/asm/ab                    2001-2050/ab_2011_cfa_20060811_161755_asm_floor.html, 2006, pp. 1-3.

AB 2011 Assembly Bill—Bill Analysis, Senate Rules Committee, Third Reading, http://www.leginfo.ca.gov/pub/bill/asm/ab_2001-2050/ab_2011_cfa_20060705_161454_sen_floor.html, 2006, pp. 1-7.

Letter From Jamey Basham, Attorney, LEXSEE 1990 FDIC Interp. Ltr., Lexis 1, Federal Deposit Insurance Corporation, FDIC-90-02, Jan. 3, 1990, 2 Sheets.

Letter From Colleen Curran Harvey, Deputy Chief Counsel, Jan. 8, 1985; Letter From Merle Y. Waldman, Nov. 14, 1984; Letter From Merle Y. Waldman, Sep. 24, 1984; Letter From Merle Y. Waldman, Aug. 8, 1984, LEXSEE 1985 Sec No- Act., Lexis 1593, Securities Exchange Act of 1934—Section 15(a), 11 Sheets.

The Insured Savings Account, Issuer Guide to Offering MMDAs Through Merrill Lynch, Merrill Lynch Money Markets, Inc., "Operational Guide To The Merrill Lynch MMDA Program 1986", Sep. 1986 3 Sheets.

FDIC Federal Register Citations: Email from Bert Ely to Comments, Mar. 8, 2006, Subject: Large-Bank Deposit Insurance Determination Proposal- RIN 3064-AC98—Regs@fdic.gov. Attached, also from FDIC Federal Register Citations: Email From American Banker, by Bert Ely, Feb. 24, 2006, Viewpoint: FDIC's Account-Link Plan a Pointless, Costly Threat.

Letter To Mr. Jonathan L. Levin, Esq., From Oliver Ireland, Associate General Counsel, Oct. 18, 1996, 2 Sheets.

Letter To Mr. L.P. Fleming, Jr., Esq., From Oliver Ireland, Associate General Counsel, Feb. 7, 1995, 3 sheets.

**US 7,519,551 B2**

Page 4

Letter To Mr. James E. Creekman, Group Vice President, From Oliver Ireland, Associate General Counsel, Aug. 1, 1995, 4 Sheets.

Letter To Ms. Brenda L. Skidmore, Senoir Vice President, From Oliver Ireland, Associate General Counsel, Aug. 30, 1995, 4 Sheets.

Part: 2, Monetary Policy and Reserve Requirements, Subpart—Regulation D, Board Interpretations of Regulation D, Transaction Accounts—Linked to Time Deposits, vol. 1, Federal Reserve Regulatory Service, 2 Sheets.

U.S. Appl. No. 60/307,815, filed Jul. 27, 2001.

U.S. Appl. No. 60/323,365, filed Sep. 20, 2001.

Letter From William W. Wiles, Secretary of the Board, Board of Governors of the Federal Reserve System, Jun. 22, 1983, 6 Sheets.

DI 48, Excerpts of Transcript of Hearing, U.S. Dist. Ct., District of Delaware, Civil Action No. 82-680, Apr. 8, 1983, 5 sheets.

DI 56, Interrog. Response, U.S. Dist. Ct. District of Delaware, Civil Action No. 82-680, May 20, 1983, 15 Sheets.

DI 99, Suppl. Interrogatory Response, U.S. Dist. Ct., District of Delaware, Civil Action No. 82-630, May 30, 1984, 6 Sheets.

Letter from Michael Bradfield, General Counsel, Board of Governors of the Federal Reserve System, Nov. 16, 1984, 4 Sheets.

Board of Governors of the Federal Reserve System, 1984 Fed. Res. Interp. Ltr. Lexis 56, Nov. 16, 1984, 3 Sheets.

Letter From Oliver I. Ireland, Associate General Counsel, Board of Governors of the Federal Reserve System, Jun. 22, 1988, 3 Sheets.

Board of Governors of the Federal Reserve System, 1988 Fed. Res. Interp. Ltr. Lexis 141, Jun. 22, 1988, 3 Sheets.

Board of Governors of the Federal Reserve System, 1989 Fed. Res. Interp. Ltr. Lexis 77, Mar. 14, 1989, 2 Sheets.

Board of Governors of the Federal Reserve System, 1989 Fed. Res. Interp. Ltr. Lexis 154, Jun. 21, 1989, 2 Sheets.

Board of Governors of the Federal Reserve System, 1990 Fed. Res. Interp. Ltr. Lexis 94, Feb. 1, 1990, 1 Sheet.

Board of Governors of the Federal Reserve System, 1991 Fed. Res. Interp. Ltr. Lexis 232, Jan. 30, 1991, 2 Sheets.

CMA, The Merrill Lynch Cash Management Account Financial Service, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Nov. 1992, 2 Sheets.

Board of Governors of the Federal Reserve System, 1994 Fed. Res. Interp. Ltr. Lexis 156, Jun. 24, 1994, 3 Sheets.

CMA, Insured Savings Account Fact Sheet, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Jul. 1994, pp. 47-54.

Board of Governors of the Federal Reserve System, 1994 Fed. Res. Interp. Ltr. Lexis 314, Oct. 17, 1994, 2 Sheets.

Board of Governors of the Federal Reserve System, 1994 Fed. Res. Interp. Ltr. Lexis 419, Oct. 14, 1994, 4 Sheets.

CMA, The Merrill Lynch Cash Management Account Financial Service, Insured Savings Account Participating Depository Institutions, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Mar. 1995, 2 Sheets.

Letter from Stephanie Martin, Assoc. General Counsel, Board of Governors of the Federal Reserve System, Apr. 22, 2004, 8 Sheets.

Bank Deposit Program, Online http://web.archive.org/web/20030620100115/http://www.smithbarney.com/products__serv, Jan. 19, 2001, 4 Sheets.

* cited by examiner



FIG. 1



FIG. 2



FIG. 3



## FIG. 4



FIG. 5



# FIG. 6

US 7,519,551 B2

**1**

# SYSTEMS AND METHODS FOR ADMINISTERING RETURN SWEEP ACCOUNTS

## RELATED CASES

This is a Continuation-in-Part of patent application Ser. No. 09/176,340, filed on Oct. 21, 1998 now U.S. Pat. No. 6,374,231, and patent application Ser. No. 09/677,535, filed on Oct. 2, 2000, the disclosures of which are both incorporated by reference herein.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The invention relates generally to computerized banking techniques and, more specifically, to techniques by which deposits are kept on a bank's balance sheet while being administered as sweep account funds by a third party.

2. Background Art

It would be desirable if investors could obtain fully-insured, interest-bearing bank accounts that offer an unlimited number of fund transfers per month. However, present statutory restrictions prevent banks and savings institutions from paying interest on certain types of deposit accounts. More specifically, Title 12, Part 329, of the Code of Federal Regulations (CFR) provides that "no bank shall, directly or indirectly, by any device whatsoever, pay interest on any demand deposit". (12 CFR 329.2). A "deposit" is any money placed into a checking account, savings account, Certificate of Deposit (CD), or the like. In a "demand" account, the owner can demand that funds be drawn and paid to another account (having the same or a different owner), or to a third party. These demand payments are typically implemented via bank drafts, checks, credit cards, and debit cards.

Not all bank accounts are considered to be demand accounts. If all, or a fixed amount, of the principal must be maintained in order to achieve the particular benefits afforded by that account, then the account is not a "demand" account. According to the CFR, a "demand deposit" includes any deposit for which the depositor is authorized to make more than six fund "transfers" during any month or statement cycle of at least four weeks. Not all fund transfers will be counted towards the allotted maximum of six; rather, it is necessary to examine the specific type of fund transfer under consideration. A deposit will be considered a "demand" deposit if the transfer takes place by means of a preauthorized, automatic, or telephonic order specifying the transfer of funds to another account of the depositor at the same bank, to the bank itself, or to a third party. Likewise, a deposit is a "demand" deposit if more than three of the six transfers are authorized to be made by check, draft or debit card (12 CFR 329.1(b)(3). On the other hand, an unlimited number of transfers is allowed between two accounts registered to the same person or entity, provided that the transfers are made by messenger, mail, telephone (but only via check mailed to the depositor), automated teller machine, or in person. Unless the funds of a deposit are held in a money market account (18 USC 1832 (a)), an account for which a depositor has the ability to make at least six transfers will be deemed a demand account, and no interest will be payable on the funds therein. Therefore, owners of demand accounts do not obtain interest on their funds.

One exemplary approach to offering investors fully-insured, interest-bearing accounts that provide up to an unlimited number of fund transfers was disclosed in U.S. patent application Ser. No. 09/176,340, referenced above. This application describes a system for managing a plurality of

**2**

accounts for multiple clients. These accounts, which may originate from a variety of sources, banks, brokerage firms, and/or clients, are held at any of a plurality of savings institutions or banks. The system provides an aggregate insured money market deposit account at a bank or savings institution that is not necessarily an institution at which any of the client accounts are held. The aggregate insured deposit account is linked to each of the demand accounts in a manner so as to permit deposit funds to be placed into a demand account from various sources, and also so as to provide for the tendering of payments from the demand account via different instruments, without limitation as to the number of transfers. Interest is earned on deposits because funds are transferred from individual client accounts to the managed aggregate insured deposit account.

While a substantial advance over other prior art systems, the above noted system requires the transfer of oftentimes significant funds to comply with various banking regulations. This may be difficult in the case of smaller, community-based banks, as these institutions depend upon such funds as a source for loans. Moreover, some bank clients are not comfortable with arrangements that transfer client funds to unfamiliar third parties.

Pursuant to Regulation Q, banks are prohibited from paying interest on commercial accounts. However, banks have developed several approaches in an effort to compete with brokers who offer interest on cash balances for their commercial customers. These approaches, which include money fund sweeps and repo sweeps, are disadvantageous in that they involve a removal of commercial customer deposits from the bank's balance sheets.

A substantial market exists for an interest-bearing return sweep account that can be readily integrated into the existing infrastructure of a bank or savings institution, while, at the same time, permitting account funds to remain on the bank's balance sheet, with minimal disruption of existing bank-client relationships. It was with the foregoing realizations in mind that the present invention was developed.

## OBJECTS AND SUMMARY OF THE INVENTION

It is an object of the invention to provide bank and/or savings institution clients with the ability to implement up to an unlimited number of transfers while, at the same time, permitting the bank and/or savings institution to retain client-deposited funds.

It is another object of the invention to provide bank and/or savings institution clients with interest from funds on deposit while simultaneously providing the ability to implement up to an unlimited number of transfers.

It is a further object of the invention to permit the bank and/or savings institution to retain client-deposited funds on its books so that these funds can be used as a source for loans.

It is yet a further object of the invention to provide a banking method that enables clients to deposit funds into an account from any of various sources, and to make payments from the account via any of various instruments, without limitation as to the number of transfers, while still earning interest on the funds in the account.

It is another object of the present invention to provide a banking method that manages a plurality of demand accounts for multiple clients whose funds are held in an aggregate insured deposit account at the client's banking institution but managed by a third party agent.

US 7,519,551 B2

3

It is another object of the invention to provide a money market banking method that has a minimal impact on presently-existing, bank-to-client relationships.

It is a further object of the invention to provide a money market banking method which is readily integrable into the existing infrastructure of a bank or savings institution.

These and other objects of the invention are realized in the form of novel systems and methods for managing a plurality of client demand accounts so as to allow a banking institution to retain client deposits on the bank's balance sheets while at the same time, providing the client with the capability of implementing up to an unlimited number of transactions per month and also providing the client with interest on their account balance. These objectives are achieved through the use of an aggregate money market deposit account and an aggregate demand deposit account. These accounts are held on the books of the client's savings institution or bank, but are managed by a third party agent for the client. In response to client deposits and withdrawals, the agent initiates a transfer of funds between the aggregate demand deposit account and the aggregate money market deposit account. If client deposits exceed client withdrawals, then all or some of the funds in the aggregate demand deposit account may be transferred to the aggregate money market deposit account. On the other hand, if client withdrawals exceed client deposits, then all or some of the funds in the aggregate money market deposit account are transferred to the aggregate demand deposit account. The aggregate money market deposit account is an interest-bearing deposit account, where the aggregate balances for all clients are deposited.

One purpose of the aggregate demand deposit account is to facilitate the movement of funds. On a regular, periodic, or recurring basis, the agent calculates a net transaction as the sum of individual client deposits and withdrawals from the plurality of individual client demand accounts. The net transaction calculation is used to determine an amount of funds that need to be deposited into the aggregate money market deposit account to cover client deposits, or an amount of funds that needs to be withdrawn from the aggregate money market deposit account to cover client withdrawals. Individual account management calculations are performed to determine whether to deposit or withdraw funds from the aggregate demand deposit account to each of a plurality of individual client return sweep and/or money market accounts. The agent updates its database for each client's deposit and withdrawal activities.

The individual client has two accounts, a client demand deposit account on the bank's books, and a return sweep account or money market account on the agent's books. Individual transactions for the client occur between these two client accounts.

The agent distributes all or a portion of the interest accrued from the aggregate deposit account to individual clients. The interest is distributed according to the relative proportions of each client's funds in the aggregate deposit account. The agent maintains a database that keeps track of deposits to, and withdrawals from, each of the client demand accounts, as well as each client's proportionate and/or monetary share in the aggregate money market deposit account.

The invention permits funds to be deposited into a demand account from various sources, and also provides for the tendering of payments from the demand account via different instruments, without limitation as to the number of transfers, and with accrual of interest on the deposited funds. Moreover, the deposited funds are retained at the client's bank or savings institution. Optionally, the debiting of funds from each of the

4

client accounts is monitored, and debits are selectively authorized or rejected based upon the client's account balance and/or their current share in the aggregate deposit account.

BRIEF DESCRIPTION OF THE DRAWINGS

The following is a brief description of the drawings, in which:

FIG. **1** is an information flow diagram showing the transfer of client finds among a plurality of accounts pursuant to the techniques of the present invention;

FIG. **2** is a flowchart showing an illustrative operational sequence for implementing the techniques of the present invention; and

FIGS. **3**-**6** together comprise a flowchart depicting processing steps to be performed on behalf of an administrator pursuant to a further embodiment of the present invention.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Refer now to FIG. **1**, which is a flow diagram showing the transfer of client funds among a plurality of accounts pursuant to the techniques of the present invention. A plurality of client demand accounts, including Client "A" DDA (Demand Deposit Account) **501** and Client "B" DDA Account **503** are managed through the use of an insured pooled deposit account at the client's savings institution or bank. In FIG. **1**, this pooled deposit account is provided in the form of a Pooled MMDA (Money Market Deposit Account) **509**. Excess funds are swept from client DDA accounts (Client "A" DDA **501** and Client "B" DDA **503**, respectively) to corresponding client Money Market Accounts (Client "A" Money Market Account **505** and Client "B" Money Market Account **507**, respectively). Excess funds may be calculated in terms of a desired or target minimum balance for each of the client DDA accounts. The same target minimum balance could be applied to all DDA accounts, or an account-specific target balance could be assigned to a certain account based upon the past history and/or the expected usage of that account. Alternatively, all finds could be swept from the client DDA accounts to the Money Market Accounts. After recording the amount of funds swept into a client Money Market Account, the funds are then transferred to the Pooled MMDA Account **509**.

The net result of the aforementioned fund transfer activity is that funds are effectively transferred from individual client demand accounts, including Client "A" DDA **501** and Client "B" DDA **503**, to a pooled insured deposit account (Pooled MMDA Account **509**) at the client's bank or savings institution. This is advantageous in that the Pooled MMDA account **509** is an interest-bearing "non-demand" account pursuant to 12 CFR 329.2 et seq. Moreover, the Pooled MMDA Account is eligible for full FDIC insurance protection. This protection covers each client whose deposits are placed into the pooled account, up to a maximum of $100,000 per client. As the Pooled MMDA Account **509** accrues interest, all or a portion of this interest is distributed to individual clients. The interest may, but need not, be distributed according to the relative proportions of each client's funds in the Pooled MMDA Account **509**.

A database keeps track of deposits to, and withdrawals from, each of the client demand accounts (Client "A" DDA Account **501** and Client "B" DDA Account **503**), as well as each client's proportionate and/or monetary share in the Pooled MMDA Account **509**. On a regular, periodic, or recurring basis, a net transaction is calculated as the sum of indi-

US 7,519,551 B2

5

6

vidual client deposits and withdrawals from the plurality of demand accounts. The net transaction calculation is used to determine an amount of funds, if any, that needs to be deposited into the Pooled MMDA Account **509** from the individual client Money Market Accounts (Client "A" Money Market Account **505** and/or Client "B" Money Market Account **507**) to cover client deposits. The net transaction calculation is also used to determine an amount, if any, of funds that need to be withdrawn from the Pooled MMDA Account **509** to cover client withdrawals from respective client DDA Accounts (Client "A" DDA Account **501** and/or Client "B" DDA Account **503**). In the event that fund withdrawals are required, the necessary funds are first transferred from the Pooled MMDA Account **509** to a Pooled DDA (Demand Deposit Account) **511** which is held at the same savings institution or bank as Pooled MMDA Account **509**. On an as-needed basis, funds are then transferred from the Pooled MMDA Account **509** to individual client DDA accounts (Client "A" DDA Account **501** or Client "B" DDA Account **503**) to cover checks written by these clients, as well as any fund withdrawals or transfers that clients wish to implement on behalf of their respective DDA Accounts.

Individual account management calculations are performed to determine whether to deposit or withdraw funds from the Pooled DDA Account **511** to each of a plurality of individual client demand accounts. The database is updated for each client's deposit and withdrawal activities. The invention permits funds to be deposited into a client demand account from various sources, and also provides for the tendering of payments from the client demand account via different instruments, without limitation as to the number of transfers, and with accrual of interest on the deposited funds. Optionally, the debiting of funds from each of the client demand accounts is monitored, and debits are selectively authorized or rejected based upon the client's demand account balance and/or their current share in the pooled deposit account.

The foregoing procedures are structured in a manner so as to permit banks and savings institutions to continue servicing their clients as they have done in the past. Moreover, if desired, these procedures could be implemented by an agent acting on behalf of one or more clients. In this manner, the invention would be virtually transparent to presently-existing banks and savings institutions. Bank personnel would not be burdened with the requirement to perform unfamiliar and potentially time-consuming procedures. Pursuant to this "agency" approach, the agent effectively provides a "sweep interface" between a client's existing DDA account (i.e., Client "A" DDA Account **501**) and a fully-insured, interest-bearing pooled account (i.e., the Pooled MMDA Account **509**). The agent opens up the Pooled MMDA Account **509** and the Pooled DDA Account **511** at the client's bank or savings institution. The agent is responsible for several administrative activities, including: (1) recordkeeping in connection with the individual Client Money Market accounts (Client "A" Money Market Account **505** and Client "B" Money Market Account **507**); (2) determining each client's proportionate share in the Pooled MMDA Account **509**; (3) determining an appropriate balance for the Pooled DDA Account **511**; and (4) determining appropriate transfers from the Pooled DDA Account **511** to any of the client DDA accounts.

Although banks and savings institutions can provide DDA, MMDA and checking account services to clients without utilizing a third-party agent, under the current statutory scheme, these institutions cannot pay interest on account balances, and at the same time, allow for an unlimited number

of transactions. Pursuant to Regulation D, banks and savings institutions are prohibited from automatically allowing unlimited fund transfers between DDAs and MMDAs on behalf of clients. A client could open up his own DDA and MMDA accounts, evaluate daily DDA activities, determine if funds should be moved between the DDA and the MMDA, and instruct the bank to transfer the appropriate funds. However, it would be time consuming and inefficient. The use of an agent provides administrative expediency, rendering the entire operational scheme more attractive to the client as well as the banking institution.

Advantageously, the agent maintains the client's original DDA account number that uniquely identifies that client's account at his or her bank or savings institution. This account number is used as a cross-reference to keep track of each client's proportionate interest in the Pooled MMDA Account **509**. The client Money Market Account numbers (for Client "A" Money Market Account **505** and Client "B" Money Market Account **506**) are transparent to these clients, as is the account number for the Pooled MMDA Account **509**.

Effectively, a "sweep interface" exists between each respective individual client DDA Accounts (Client "A" DDA Account **501** and Client "B" DDA Account **503**) and corresponding individual client Money Market Accounts (Client "A" Money Market Account **505** and Client "B" Money Market Account **507**). Excess funds in the individual client DDA accounts are swept to the individual client Money Market accounts to be further credited to the Pooled MMDA Account **509**. If funds are needed to pay for a check or handle a withdrawal, funds are redeemed via the Pooled DDA Account **511**. The sweep interface may be governed by any of a number of established or specified parameters. For example, the bank may choose to leave a certain dollar amount in each of the client DDA accounts to cover checks and only sweep funds in excess of that amount. Or the bank may decide to sweep everything and redeem funds based upon the checks presented for payment. From the standpoint of the bank or savings institution, no additional work is required. The bank merely maintains the client's existing individual DDA account along with the client's profile (name, address, check reorders, signature on file, stop payment orders, etc). Bank clients will be able to keep their existing checks, and to continue using their existing DDA accounts. Deposits are credited to these DDA accounts and then swept to the pooled MMDA account. Many of the required administrative activities are performed by the agent on behalf of designated client accounts. These administrative activities basically involve the monitoring of fund sweeping to and from individual client DDA accounts and corresponding individual Money Market accounts, as well as transfers among the individual Money Market, Pooled MMDA and Pooled DDA Accounts maintained by the agent. On a daily, regular, repeated, or periodic basis, the bank or savings institution transmits a transaction sweep data file to the agent that includes deposit and withdrawal information for each of a plurality of clients. The bank and the agent periodically or repeatedly reconcile the sweep data file and agree upon a net settlement figure. If the net settlement figure is a credit, the bank or savings institution credits the Pooled DDA Account **511**. During routine, day-to-day system operations, the only transactions that occur in the Pooled MMDA Account **509** are transfers either to or from the Pooled DDA Account. Pursuant to an optional alternative approach, the bank could allocate credits to the Pooled MMDA Account **509**. In any event, if the net settlement figure is a debit, the bank or savings institution debits the Pooled DDA Account **511**. The agent provides instructions by messenger to transfer funds from the Pooled MMDA Account **509**

US 7,519,551 B2

7

8

to the Pooled DDA Account **511** to cover the debit balance in the account. At the end of a predetermined period of time (such as a month), the agent can provide a monthly statement file to the bank or savings institution. This file may include activity for a client's individual money market account as maintained in an agent database. The bank or savings institution can then use this monthly statement file to generate month end statements for its clients. According to one preferred embodiment of the invention, activity pertaining to other accounts is tracked and maintained by the bank or savings institution. However, pursuant to an alternate embodiment, this statement file could optionally include Pooled MMDA, Pooled DDA, individual Money Market, and/or individual DDA account activity.

Refer now to FIG. **2**, which is a flowchart showing an illustrative operational sequence for implementing the techniques of the present invention. The procedure commences at block **701**, where a client makes a deposit to their individual DDA Account (i.e., Client "A" DDA **501**, FIG. **1**), or at block **703**, where a client makes a withdrawal from their individual DDA Account. Irrespective of whether the transaction is a withdrawal or a deposit, a sweep process is performed (block **707**) to sweep any excess account funds out of the client's individual DDA account, or to sweep required funds into this DDA account. A test is performed at block **709** to ascertain whether or not there are excess funds in the individual client's DDA account. If so, program control jumps ahead to block **713**, whereas if not, the program continues on to block **711**. At block **713**, the excess funds are swept to the agent, who then updates the individual client Money Market account (block **717**).

The negative branch from block **709** leads to block **711**, where a test is performed to ascertain whether or not there is an insufficient minimum balance in the individual client's DDA account. If not, the program exits. If so, program control advances to block **715** where funds are swept from the agent. The agent then updates the individual client Money Market account (block **717**). Next, on a periodic, repeated, or scheduled basis, the agent calculates the net sweep account activity (block **719**). A test is performed at block **721** to ascertain whether or not the net sweep activity is a credit. If so, program control advances to block **723** and, if not, program control continues to block **725**. At block **723**, the agent receives payment from the bank for the credit. Payment can be received, for example, in the form of a wire transfer or a credit to the pooled DDA account. Next, the agent instructs the bank to deposit the received funds into the pooled MMDA account (block **727**). Funds are transferred into the pooled MMDA account (block **731**), and the program exits.

The negative branch from block **721** leads to block **725** where a test is performed to ascertain whether or not the net sweep activity is a debit. If not, the program exits and, if so, the program continues to block **729**. At block **729**, a messenger is instructed to initiate a fund transfer from the pooled MMDA account to the pooled DDA account. The funds are transferred from the pooled MMDA to the pooled DDA (block **733**), and the agent pays the bank or savings institution from the pooled DDA account for the sweep debit. The program then exits.

FIGS. **3** and **4** together comprise a flowchart depicting processing steps to be performed on behalf of an agent or administrator pursuant to a further embodiment of the present invention. This agent or administrator can be a brokerage firm, a bank, or another financial entity with which clients can institute financial transactions such as deposits, withdrawals and on-demand payments. The administrator or agent appears to each client as if it were, at least in part, a bank, by accepting deposits for the client's account, and, subsequently, by authorizing (and then implementing) payments demanded by the client from his or her account. The funds for all of the clients are pooled into a single deposit account that is maintained as an insured deposit account at a licensed bank or savings institution.

Referring to FIG. **3**, financial entity **100** may be a bank, savings institution, brokerage firm, or other entity where financial transactions take place or can be facilitated. This financial entity **100** creates transaction files **101** which are transmitted to Reserve **105**. Reserve **105** (or the Reserve System) is the administrator or other entity in charge of administering at least one of the deposit accounts. New account files **102** can be transmitted to Reserve **105**. For example, a new investor account may need to be opened. This activity necessitates organizing and coordinating information to service a new investor for the present system, even though that investor may already be a client of a financial entity **100** for other investment vehicles. A new account **102** effectively becomes part of an existing pooled bank deposit account **129** that collects earned income **130**, all or a portion of which is eventually conveyed to the client's accounts **131**. Of course, at some point in time, the deposit account must first be established with clients' funds. The transaction files represent the addition of funds by check (to be drawn on another institution, or to be drawn from a different demand account at the same institution), wire or electronic transfer, ACH, credits (such as from a debit or credit card merchant), or a sweep from one of the client's other accounts. Accordingly, encompassed in the transaction file are deposits **103** and withdrawals **104**. A "sweep" includes the automatic transfer of funds, such as the automated transfer of interest from one account into the client's account, as well as the automated transfer of funds out of the client's account (such as for payment of a securities trade); thus, a sweep may be from one of the client's accounts to another. The responsibility for maintaining the deposit account can be assigned by the administrator to a third party.

Referring now to FIG. **4**, Reserve System **50** contains an insured deposit database **75** where a position file for debit/ credit card users is created **132** and transmitted to a bank for a debit/credit card network **133** where the bank then updates the network **134**. The system updates the data base **75** and processes transactions **106** (from **105**, FIG. **3**) and opens a new account **107** where application and check deposits are processed **110**. The bank preference **107**A is the list of banks and the order of preference for deposits and withdrawals held on the account, including a list of banks to be excluded (if any), and the maximum percentage and/or amount of funds to be held in each bank. The client's bank preference data is added to the account at **107**B. If the client does not select values for any of these variables, the system can provide default values for the banks and their order at **107**C sufficient for all of the client's funds. When possible, the system can be configured to assign a bank that is in the state in which the client resides. Referring to FIG. **5**, it can be seen that when a deposit, either a check deposit **111**, federal wire deposit **112**, ACH deposit, sweep, or other deposit is credited to the client's account **108**, the system will review where the existing funds of the accounts are deposited **108**A. If the client's balance has reached the maximum allowable balance for the existing bank **108**B, as shown in FIG. **6**, the system will then select the next bank on the preference list attached to the account **108**C. If the maximum allowable balance has not been reached in the existing bank, the system will credit the additional funds to that bank **108**D.

Still referring to FIG. **5**, the procedure for processing withdrawals can be seen. Various methods of withdrawing funds

US 7,519,551 B2

9     10

are debit withdrawal **109**, processing debit or credit card transactions such as debit/credit card files **115**, direct debit accounts **215**, and processing of files **121**. Processing of a debit/credit card file **115** utilizes data accumulated from debit/credit card transactions received from the banks **114**. The processing of file **121** procedure utilizes one of various sources of data such as a check presented for payment **116**, ACH debits **117**, touch tone bill paying **118**, and/or internet bill paying **119**.

After processing the debit procedure, the system will review the bank preference list and select the appropriate bank to debit **125**A. The system will sort all the daily trans-actions by the bank **125**B (see FIG. **6**). The activity for each bank will be netted **126** and the appropriate deposit or withdrawals made.

The system will then determine whether funds are avail-able **122**, which function is also associated with other partici-pant withdrawals **120**. If the funds are available, the account is debited **225**. If the funds are not available, however, the system determines whether a credit line is available **123**. If a credit line is available, then funds are advanced **230** to cover the debit; if not the transaction is rejected **124**.

Referring to FIG. **6**, as previously stated, the system deter-mines whether the client's balance reaches its maximum **108**B. If so, the next bank on the list selected by the client is credited **108**C. If the maximum is not reached, then the exist-ing bank is credited **108**D. Information and activities associ-ated with processed debits and credits of the client's accounts from **125**A are sorted by the bank **125**B and the net activity by the bank is determined **126**. The system then determines whether the deposits and credits were greater than the with-drawals and debits **240**. If so, the excess funds are deposited into a deposit account **127**. If the debits and withdrawals were greater than the credits, the difference is redeemed from the deposit account **128**.

Thus, by practicing the embodiment of the invention described in connection with FIGS. **3**-**6**, an individual client is effectively provided with FDIC insurance in excess of $ 100, 000. This result is brought about because the individual cli-ent's holdings are maintained in multiple insured deposit accounts, which may be in multiple banks.

The foregoing description is intended to be illustrative and not limiting. Any of various changes, modifications, and/or additions may become apparent to the skilled artisan upon a perusal of this specification, and, as such, are intended to be within the scope and spirit of the invention as defined by the claims.

What is claimed is:

**1**. A computer-implemented method for managing funds for a plurality of client accounts for a plurality of clients whose funds were accepted for deposit in respective client accounts held in the names of the respective clients at a first banking institution, the method comprising:

(a) maintaining a plurality of FDIC-insured and interest-bearing aggregated deposit accounts, each aggregated deposit account held in a different respective bank of a different respective banking institution including an FDIC-insured and interest-bearing aggregated deposit account held at the first banking institution;

(b) maintaining or having maintained an electronic data-base, on one or more computer-readable media, contain-ing information on funds held by each client in the plurality of aggregated deposit accounts;

(c) administering the aggregated deposit accounts to trans-fer or have transferred client funds that had been accepted into respective client accounts held in the names of the respective clients at the first banking insti-tution to the aggregated deposit account at the first bank-ing institution except that for clients with a balance of funds in the aggregated deposit account at the first bank-ing institution that equal or exceed a specified amount depositing or having deposited additional funds of that client to one of the aggregated deposit accounts in a different one of the banking institutions;

(d) withdrawing or having withdrawn client funds from the FDIC-insured and interest-bearing aggregated deposit account held at one of the banks of one of the banking institutions more than six (6) times during a month while preserving an insured and interest-bearing status of the FDIC-insured and interest-bearing aggregated deposit account held at the one bank; and

(e) updating or having updated the electronic database based on the transfers to and withdrawals in the plurality of aggregated deposit accounts.

**2**. The method of claim **1**, wherein the withdrawing or having withdrawn step is made from an aggregated deposit account at one of the banking institutions through an aggre-gated demand deposit account at that banking institution.

**3**. The method of claim **2**, further comprising selecting the different one of the banking institutions to deposit the addi-tional funds to the aggregated deposit account held thereby based at least on one or more exclusions of banking institu-tions made by the client.

**4**. The method of claim **1**, further including the step of, on a regular, periodic, or recurring basis, calculating a net trans-action as the sum of individual client deposits and withdraw-als from each of the plurality of the client accounts; and, further including the step of utilizing the net transaction cal-culation to determine an amount of funds that need to be deposited into one or more of the aggregated deposit accounts to cover client deposits, or an amount of funds that needs to be withdrawn from one or more of the aggregated deposit accounts to cover client withdrawals.

**5**. The method of claim **1**, further including the steps of: (a) monitoring requested debits of funds from each of the client accounts, and (b) selectively authorizing or rejecting each of the requested debits based upon an account balance in a client account or a client's proportionate share in the plurality of aggregated deposit accounts or based upon both the account balance in the client account and the client's proportionate share in the plurality of aggregated deposit accounts.

**6**. The method of claim **1**, wherein the withdrawing or having withdrawn step is substantially performed only by one or more of the following methods: in person, or by mail, or by messenger, or by telephone and distributed by mail, or by automated teller machine, or a combination thereof so that the insured and interest-bearing status of the aggregated deposit accounts is preserved.

**7**. The method of claim **1**, further comprising selecting the different one of the banking institutions to deposit the addi-tional funds to the aggregated deposit account held thereby based at least on one or more exclusions of banking institu-tions made by the client.

**8**. The method of claim **1**, further comprising selecting the different one of the banking institutions to deposit the excess over the specified amount to the aggregated deposit account held thereby based on an exclusion of banking institutions located in a state where the client resides.

**9**. The method of claim **1**, withdrawing or having with-drawn client funds from the FDIC-insured and interest-bear-ing aggregated deposit account held at a second one of the banks of a second one of the banking institutions more than six (6) times during a month while preserving an insured and

US 7,519,551 B2

11

interest-bearing status of the FDIC-insured and interest-bearing aggregated deposit account held at the second one of the banks.

**10**. The method of claim **1**, withdrawing or having withdrawn client funds from the FDIC-insured and interest-bearing aggregated deposit account held at a second one of the banks of a second one of the banking institutions more than six (6) times during a month while preserving an insured and interest-bearing status of the FDIC-insured and interest-bearing aggregated deposit account held at the second one of the banks.

**11**. A computer-implemented method for managing funds for a plurality of client accounts for a plurality of clients whose funds were accepted for deposit in respective client accounts held in the names of the respective different clients at a first banking institution, the method comprising:

(a) accepting client funds from each of a plurality of the clients, with funds from each different client being accepted into a respective client account held in the name of that respective client at the first banking institution;

(b) maintaining or having maintained an FDIC-insured and interest-bearing aggregated deposit account at the first banking institution;

(c) maintaining or having maintained or receiving access by computer to an electronic database, on one or more computer-readable media containing information on funds held by each client in a plurality of FDIC-insured and interest-bearing aggregated deposit accounts, each aggregated deposit account held at a different banking institution;

(d) transferring or have transferred client funds of a plurality of the client accounts to the aggregated deposit account at the first banking institution except that for clients with a balance of funds in the aggregated deposit account at the first banking institution that equal or exceed a specified amount depositing or having deposited additional funds of that client to one of the aggregated deposit accounts in a different one of the banking institutions;

(e) withdrawing or having withdrawn client funds from the aggregated deposit account held in one of the banks of one of the banking institutions more than six (6) times during a month while preserving an insured and interest-bearing status of that aggregated deposit account in the one bank; and

(f) updating the electronic database based on the transfers to and withdrawals in the plurality of aggregated deposit accounts or receiving electronic access.

**12**. The method of claim **11**, wherein the withdrawing or having withdrawn step is made from an aggregated deposit account at the first banking institutions through an aggregated demand deposit account at the first banking institution.

**13**. The method of claim **12**, further comprising receiving a selection from one or more clients of exclusions of one or more banking institutions, and providing such exclusions to assist in selecting the different one of the banking institutions to deposit the additional funds to the aggregated deposit account held thereby.

**14**. The method of claim **11**, further comprising receiving a selection from one or more clients of exclusions of one or more banking institutions, and providing such exclusions to assist in selecting the different one of the banking institutions to deposit the additional funds to the aggregated deposit account held thereby.

**15**. The method of claim **11**, further comprising receiving from one or more clients an exclusion of banking institutions

12

located in a state where the client resides, and providing such exclusion to assist in selecting the different one of the banking institutions to deposit the additional funds to the aggregated deposit account held thereby.

**16**. The method of claim **11**, further including the step of, on a regular, periodic, or recurring basis, calculating a net transaction as the sum of individual client deposits and withdrawals from each of the plurality of the client accounts; and, further including the step of utilizing the net transaction calculation to determine an amount of funds that need to be deposited into one or more of the aggregated deposit accounts to cover client deposits, or an amount of funds that needs to be withdrawn from one or more of the aggregated deposit accounts to cover client withdrawals.

**17**. The method of claim **11**, wherein the withdrawing or having withdrawn step is substantially performed only by one or more of the following methods: in person, or by mail, or by messenger, or by telephone and distributed by mail, or by automated teller machine, or a combination thereof so that the insured and interest-bearing status of the aggregated deposit account at the first banking institution is preserved.

**18**. A computer-implemented method for managing funds for a plurality of client accounts for a plurality of clients whose funds were accepted for deposit in respective client accounts held in the names of the respective clients at a first banking institution that includes a first bank in its infrastructure, the method comprising:

(a) maintaining a plurality of FDIC-insured and interest-bearing aggregated deposit accounts, each aggregated deposit account held in a different respective bank of a different respective banking institution including an FDIC-insured and interest-bearing aggregated deposit account held at the first bank in the first banking institution;

(b) maintaining or having maintained an electronic database, on one or more computer-readable media, containing information on funds held by each client in the plurality of aggregated deposit accounts;

(c) administering the aggregated deposit accounts to transfer or have transferred client funds that had been accepted into respective client accounts held in the names of the respective clients at the first banking institution to the aggregated deposit account at the first bank except that for clients with a balance of funds in the aggregated deposit account at the first bank that equal or exceed a specified amount depositing or having deposited additional funds of that client to one of the aggregated deposit accounts in one of the different banks in one of the different banking institutions;

(d) withdrawing or having withdrawn client funds from the FDIC-insured and interest-bearing aggregated deposit account held at one of the banks of one of the banking institutions more than six (6) times during a month while preserving an insured and interest-bearing status of the FDIC-insured and interest-bearing aggregated deposit account held at the one bank; and

(e) updating or having updated the electronic database based on the transfers to and withdrawals in the plurality of aggregated deposit accounts.

**19**. The method of claim **18**, wherein the withdrawing or having withdrawn step is made from an aggregated deposit account at one of the banks at one of the banking institutions through an aggregated demand deposit account at that bank.

**20**. The method of claim **19**, further comprising selecting the different one of the banks to deposit the additional funds to the aggregated deposit account held thereby based at least on an exclusion of one or more banks made by the client.

US 7,519,551 B2

13

**21**. The method of claim **18**, further including the step of, on a regular, periodic, or recurring basis, calculating a net transaction as the sum of individual client deposits and withdrawals from each of the plurality of the client accounts; and, further including the step of utilizing the net transaction calculation to determine an amount of funds that need to be deposited into one or more of the aggregated deposit accounts to cover client deposits, or an amount of funds that needs to be withdrawn from one or more of the aggregated deposit accounts to cover client withdrawals.

**22**. The method of claim **18**, further including the steps of: (a) monitoring requested debits of funds from each of the client accounts, and (b) selectively authorizing or rejecting each of the requested debits based upon an account balance in a client account or a client's proportionate share in the plurality of aggregated deposit accounts or based upon both the account balance in the client account and the client's proportionate share in the plurality of aggregated deposit accounts.

**23**. The method of claim **18**, wherein the withdrawing or having withdrawn step is substantially performed only by one or more of the following methods: in person, or by mail, or by messenger, or by telephone and distributed by mail, or by automated teller machine, or a combination thereof so that the insured and interest-bearing status of the aggregated deposit accounts is preserved.

**24**. The method of claim **18**, further comprising selecting the different one of the banks to deposit the additional funds to the aggregated deposit account held thereby based at least on an exclusion of one or more banks made by the client.

**25**. The method of claim **18**, further comprising selecting the different one of the banking institutions to deposit the excess over the specified amount to the aggregated deposit account held thereby based on an exclusion of one or more banks located in a state where the client resides.

**26**. The method of claim **18**, withdrawing or having withdrawn client funds from the FDIC-insured and interest-bearing aggregated deposit account held at a second one of the banks of a second one of the banking institutions more than six (6) times during a month while preserving an insured and interest-bearing status of the FDIC-insured and interest-bearing aggregated deposit account held at the second one of the banks.

**27**. A computer-implemented method for managing funds for a plurality of client accounts for a plurality of clients whose funds were accepted for deposit in respective client accounts held in the names of the respective different clients at a first banking institution that includes a first bank in its infrastructure, the method comprising:

(a) accepting client funds from each of a plurality of the clients, with funds from each different client being accepted into a respective client account held in the name of that respective client at the first banking institution;

(b) maintaining or having maintained an FDIC-insured and interest-bearing aggregated deposit account at the first bank in the first banking institution;

(c) maintaining or having maintained or receiving access by computer to an electronic database, on one or more computer-readable media, containing information on funds held by each client in a plurality of FDIC-insured and interest-bearing aggregated deposit accounts, each aggregated deposit account held in a different respective bank of a different respective banking institution;

(d) transferring or have transferred client funds of a plurality of the client accounts to the aggregated deposit account at the first bank except that for clients with a balance of funds in the aggregated deposit account at the

14

first bank that equal or exceed a specified amount depositing or having deposited additional funds of that client to one of the aggregated deposit accounts in one of the different banks in one of the different banking institutions;

(e) withdrawing or having withdrawn client funds from the aggregated deposit account held at one of the banks of one of the banking institutions more than six (6) times during a month while preserving an insured and interest-bearing status of the FDIC-insured and interest-bearing aggregated deposit account held at the one bank; and

(f) updating the electronic database based on the transfers to and withdrawals in the plurality of aggregated deposit accounts or receiving electronic access.

**28**. The method of claim **27**, wherein the withdrawing or having withdrawn step is made from an aggregated deposit account at the first bank through an aggregated demand deposit account at the first bank.

**29**. The method of claim **28**, further comprising receiving one or more exclusions of one of the clients of one or more banks, and using such exclusions to assist in selecting the different one of the banks to deposit the additional funds to the aggregated deposit account held thereby.

**30**. The method of claim **27**, further comprising receiving one or more exclusions of one of the clients of one or more banks, and using such exclusions to assist in selecting the different one of the banks to deposit the additional funds to the aggregated deposit account held thereby.

**31**. The method of claim **27**, further comprising receiving one or more exclusions of one of the clients of one or more banks located in a state where the client resides, and providing such exclusion to assist in selecting the different one of the banks to deposit the additional funds to the aggregated deposit account held thereby.

**32**. The method of claim **27**, further including the step of, on a regular, periodic, or recurring basis, calculating a net transaction as the sum of individual client deposits and withdrawals from each of the plurality of the client accounts; and, further including the step of utilizing the net transaction calculation to determine an amount of funds that need to be deposited into one or more of the aggregated deposit accounts to cover client deposits, or an amount of funds that needs to be withdrawn from one or more of the aggregated deposit accounts to cover client withdrawals.

**33**. The method of claim **27**, wherein the withdrawing or having withdrawn step is substantially performed only by one or more of the following methods: in person, or by mail, or by messenger, or by telephone and distributed by mail, or by automated teller machine, or a combination thereof so that the insured and interest-bearing status of the aggregated deposit account at the first banking institution is preserved.

**34**. The method of claim **27**, withdrawing or having withdrawn client funds from the FDIC-insured and interest-bearing aggregated deposit account held at a second one of the banks of a second one of the banking institutions more than six (6) times during a month while preserving an insured and interest-bearing status of the FDIC-insured and interest-bearing aggregated deposit account held at the second one of the banks.

**35**. A computer-implemented method for managing funds for a plurality of client accounts for a plurality of clients of a first banking institution that includes a first bank in its infrastructure, wherein the respective client funds were accepted for deposit in respective client accounts held in the names of the respective clients, the method comprising:

(a) maintaining a plurality of FDIC-insured and interest-bearing aggregated deposit accounts, each aggregated

US 7,519,551 B2

15

deposit account held in a different respective bank of a different respective banking institution including an FDIC-insured and interest-bearing aggregated deposit account held at the first bank in the first banking institution;

(b) maintaining or having maintained an electronic database, on one or more computer-readable media, containing information on funds held by each client in the plurality of aggregated deposit accounts;

(c) administering the aggregated deposit accounts to transfer or have transferred client funds that had been accepted into respective client accounts held in the names of the respective clients at the first banking institution to the aggregated deposit account at the first bank except that for clients with a balance of funds in the aggregated deposit account at the first bank that equal or exceed a specified amount depositing or having deposited additional funds of that client to one of the aggregated deposit accounts in one of the different banks in one of the different banking institutions;

(d) withdrawing or having withdrawn client funds from the FDIC-insured and interest-bearing aggregated deposit account held at one of the banks of one of the banking institutions more than six (6) times during a month while preserving an insured and interest-bearing status of the FDIC-insured and interest-bearing aggregated deposit account held at the one bank; and

(e) updating or having updated the electronic database based on the transfers to and withdrawals in the plurality of aggregated deposit accounts.

36. The method of claim 35, wherein the withdrawing or having withdrawn step is made from an aggregated deposit account at one of the banks at one of the banking institutions through an aggregated demand deposit account at that bank.

37. The method of claim 36, further comprising selecting the different one of the banks to deposit the additional funds to the aggregated deposit account held thereby based at least on an exclusion of one or more banks made by the client.

38. The method of claim 35, further including the step of, on a regular, periodic, or recurring basis, calculating a net transaction as the sum of individual client deposits and withdrawals from each of the plurality of the client accounts; and, further including the step of utilizing the net transaction calculation to determine an amount of funds that need to be deposited into one or more of the aggregated deposit accounts to cover client deposits, or an amount of funds that needs to be withdrawn from one or more of the aggregated deposit accounts to cover client withdrawals.

39. The method of claim 35, further including the steps of: (a) monitoring requested debits of funds from each of the client accounts, and (b) selectively authorizing or rejecting each of the requested debits based upon an account balance in a client account or a client's proportionate share in the plurality of aggregated deposit accounts or based upon both the account balance in the client account and the client's proportionate share in the plurality of aggregated deposit accounts.

40. The method of claim 35, wherein the withdrawing or having withdrawn step is substantially performed only by one or more of the following methods: in person, or by mail, or by messenger, or by telephone and distributed by mail, or by automated teller machine, or a combination thereof so that the insured and interest-bearing status of the aggregated deposit accounts is preserved.

41. The method of claim 35, further comprising selecting the different one of the banks to deposit the additional funds to the aggregated deposit account held thereby based at least on an exclusion of one or more banks made by the client.

16

42. The method of claim 35, further comprising selecting the different one of the banking institutions to deposit the excess over the specified amount to the aggregated deposit account held thereby based on an exclusion of one or more banks located in a state where the client resides.

43. The method of claim 35, withdrawing or having withdrawn client funds from the FDIC-insured and interest-bearing aggregated deposit account held at a second one of the banks of a second one of the banking institutions more than six (6) times during a month while preserving an insured and interest-bearing status of the FDIC-insured and interest-bearing aggregated deposit account held at the second one of the banks.

44. A computer-implemented method for managing funds for a plurality of client accounts for a plurality of clients whose funds were accepted for deposit in respective client accounts held in the names of the respective different clients at a first banking institution that includes a first bank in its infrastructure, the method comprising:

(a) accepting client funds from each of a plurality of the clients, with funds from each different client being accepted into a respective client account held in the name of that respective client at the first banking institution;

(b) maintaining or having maintained an FDIC-insured and interest-bearing aggregated deposit account at the first bank in the first banking institution;

(c) maintaining or having maintained or receiving access by computer to an electronic database, on one or more computer-readable media, containing information on funds held by each client in a plurality of FDIC-insured and interest-bearing aggregated deposit accounts, each aggregated deposit account held in a different respective bank of a different respective banking institution;

(d) transferring or have transferred client funds of a plurality of the client accounts to the aggregated deposit account at the first bank except that for clients with a balance of funds in the aggregated deposit account at the first bank that equal or exceed a specified amount depositing or having deposited additional funds of that client to one of the aggregated deposit accounts in one of the different banks in one of the different banking institutions;

(e) withdrawing or having withdrawn client funds from the aggregated deposit account held at one of the banks of one of the banking institutions more than six (6) times during a month while preserving an insured and interest-bearing status of that aggregated deposit account held at the one bank; and

(f) updating the electronic database based on the transfers to and withdrawals in the plurality of aggregated deposit accounts or receiving electronic access.

45. The method of claim 44, wherein the withdrawing or having withdrawn step is made from an aggregated deposit account at the first bank through an aggregated demand deposit account at the first bank.

46. The method of claim 45, further comprising receiving one or more exclusions of one of the clients of one or more banks, and using such exclusions to assist in selecting the different one of the banks to deposit the additional funds to the aggregated deposit account held thereby.

47. The method of claim 44, further comprising receiving one or more exclusions of one of the clients of one or more banks, and using such exclusions to assist in selecting the different one of the banks to deposit the additional funds to the aggregated deposit account held thereby.

US 7,519,551 B2

17

**48**. The method of claim **44**, further comprising receiving one or more exclusions of one of the clients of one or more banks located in a state where the client resides, and providing such exclusion to assist in selecting the different one of the banks to deposit the additional funds to the aggregated deposit account held thereby.

**49**. The method of claim **44**, further including the step of, on a regular, periodic, or recurring basis, calculating a net transaction as the sum of individual client deposits and withdrawals from each of the plurality of the client accounts; and, further including the step of utilizing the net transaction calculation to determine an amount of funds that need to be deposited into one or more of the aggregated deposit accounts to cover client deposits, or an amount of funds that needs to be withdrawn from one or more of the aggregated deposit accounts to cover client withdrawals.

18

**50**. The method of claim **44**, wherein the withdrawing or having withdrawn step is substantially performed only by one or more of the following methods: in person, or by mail, or by messenger, or by telephone and distributed by mail, or by automated teller machine, or a combination thereof so that the insured and interest-bearing status of the aggregated deposit account at the first banking institution is preserved.

**51**. The method of claim **44**, withdrawing or having withdrawn client funds from the FDIC-insured and interest-bearing aggregated deposit account held at a second one of the banks of a second one of the banking institutions more than six (6) times during a month while preserving an insured and interest-bearing status of the FDIC-insured and interest-bearing aggregated deposit account held at the second one of the banks.

*    *    *    *    *

# Exhibit 3

US007680734B1

## (12) United States Patent
### Bent et al.

| | |
|---|---|
| (10) **Patent No.:** | **US 7,680,734 B1** |
| (45) **Date of Patent:** | **Mar. 16, 2010** |

(54) **MONEY FUND BANKING SYSTEM**

(75) Inventors: **Bruce Bent**, New York, NY (US); **Bruce Bent, II**, New York, NY (US)

(73) Assignee: **Island Intellectual Property LLC**, New York, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 886 days.

(21) Appl. No.: **10/305,439**

(22) Filed: **Nov. 26, 2002**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 10/071,053, filed on Feb. 8, 2002, now Pat. No. 7,519,551, and a continuation-in-part of application No. 09/677,535, filed on Oct. 2, 2000, and a continuation of application No. 09/176,340, filed on Oct. 21, 1998, now Pat. No. 6,374,231.

(51) **Int. Cl.**
   *G06Q 40/00* (2006.01)
(52) **U.S. Cl.** .................... **705/40**; 235/379; 235/380; 235/385; 235/437; 235/470; 705/42; 705/45; 705/4; 705/35
(58) **Field of Classification Search** .............. 705/36–42
   See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,232,367 A | | 11/1980 | Youden et al. | 364/408 |
| 4,346,442 A | | 8/1982 | Musmanno | 364/408 |
| 4,376,978 A | | 3/1983 | Musmanno | 364/408 |
| 4,597,046 A | | 6/1986 | Musmanno | 364/408 |
| 4,674,044 A | | 6/1987 | Kalmus et al. | 364/408 |
| 4,694,397 A | | 9/1987 | Grant | 364/408 |
| 4,700,297 A | | 10/1987 | Hagel | 364/408 |
| 4,751,640 A | | 6/1988 | Lucas et al. | 364/408 |
| 4,774,663 A | * | 9/1988 | Musmanno et al. | 705/36 R |
| 4,953,085 A | | 8/1990 | Atkins | 364/408 |
| 4,985,833 A | * | 1/1991 | Oncken | 705/42 |
| 5,126,936 A | | 6/1992 | Champion et al. | 364/408 |
| 5,206,803 A | | 4/1993 | Vitagliano et al. | 364/408 |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 10049590 | 2/1998 |

(Continued)

OTHER PUBLICATIONS

ABA to Approve System for Sharing Deposit Coverage, American Banker (Feb. 11, 2003).

(Continued)

*Primary Examiner*—Daniel S Felten
(74) *Attorney, Agent, or Firm*—Foley & Lardner LLP

(57) **ABSTRACT**

Providing interest to clients' deposited funds without the legal limitation on the number of demand withdrawals from deposit accounts is accomplished by an administration system that keeps all of the records for the clients' deposits and withdrawals, calculates the total of the deposits and withdrawals for all clients, and uses the calculation to determine whether funds are deposited to or withdrawn from a single deposit account in which all clients' deposit funds are kept. Clients can make unlimited withdrawals, such as by check, credit card, debit card, or electronic transfer, through the administrator. By placing the administrator as the holder of a single account, legal exemptions to the limitation on earning interest in demand accounts is facilitated.

**16 Claims, 2 Drawing Sheets**



**US 7,680,734 B1**

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,220,501 | A | 6/1993 | Lawlor et al. |
| 5,235,507 | A | 8/1993 | Sackler ........................ 364/401 |
| 5,262,942 | A | 11/1993 | Earle ............................. 364/408 |
| 5,270,922 | A | 12/1993 | Higgins ......................... 364/408 |
| 5,291,398 | A | 3/1994 | Hagan |
| 5,297,032 | A | 3/1994 | Trojan ........................... 364/408 |
| 5,424,938 | A | 6/1995 | Wagner et al. |
| 5,631,828 | A | 5/1997 | Hagan |
| 5,644,727 | A | 7/1997 | Atkins |
| 5,671,363 | A | 9/1997 | Cristofich .................... 395/237 |
| 5,689,650 | A | 11/1997 | McClelland et al. .......... 705/36 |
| 5,710,889 | A | 1/1998 | Clark ............................. 395/244 |
| 5,765,144 | A | 6/1998 | Larche ............................ 705/38 |
| 5,774,880 | A | 6/1998 | Ginsberg ........................ 705/36 |
| 5,781,654 | A | 7/1998 | Carney ........................... 382/137 |
| 5,806,048 | A | 9/1998 | Kiron et al. .................... 705/36 |
| 5,806,049 | A | 9/1998 | Petruzzi ......................... 705/36 |
| 5,812,987 | A | 9/1998 | Luskin ........................... 705/36 |
| 5,826,243 | A | 10/1998 | Musmanno ..................... 705/35 |
| 5,852,811 | A | 12/1998 | Atkins ............................ 705/35 |
| 5,864,685 | A | 1/1999 | Hagan |
| 5,878,258 | A | 3/1999 | Pizi ............................... 395/682 |
| 5,878,405 | A | 3/1999 | Grant et al. |
| 5,884,285 | A | 3/1999 | Atkins |
| 5,890,141 | A | 3/1999 | Carney ........................... 705/45 |
| 5,893,078 | A | 4/1999 | Paulson .......................... 705/35 |
| 5,903,881 | A | 5/1999 | Schrader et al. ............... 705/42 |
| 5,905,974 | A | 5/1999 | Fraser ............................ 705/37 |
| 5,940,809 | A | 8/1999 | Musmanno ..................... 705/35 |
| 5,941,996 | A | 8/1999 | Smith ............................. 714/47 |
| 5,946,667 | A | 8/1999 | Tull, Jr. et al. ................ 705/36 |
| 5,950,175 | A | 9/1999 | Austin ............................ 705/35 |
| 5,974,390 | A | 10/1999 | Ross ................................. 705/4 |
| 5,978,779 | A | 11/1999 | Stein .............................. 705/37 |
| 6,014,642 | A | 1/2000 | El-Kadi et al. ................ 705/36 |
| 6,016,482 | A | 1/2000 | Molinari ......................... 705/35 |
| 6,026,438 | A | 2/2000 | Piazza ............................ 709/221 |
| 6,041,314 | A | 3/2000 | Davis |
| 6,044,371 | A | 3/2000 | Person .............................. 707/6 |
| 6,047,324 | A | 4/2000 | Ford .............................. 709/227 |
| 6,049,782 | A | 4/2000 | Gottesman et al. |
| 6,052,673 | A | 4/2000 | Leon et al. |
| 6,088,685 | A | 7/2000 | Kiron et al. ...................... 705/1 |
| 6,092,056 | A | 7/2000 | Tull, Jr. et al. ................ 705/36 |
| 6,105,005 | A | 8/2000 | Fuhrer ........................... 705/35 |
| 6,108,641 | A | 8/2000 | Kenna ............................ 705/35 |
| 6,112,191 | A | 8/2000 | Burke |
| 6,119,093 | A | 9/2000 | Walker et al. |
| 6,131,810 | A | 10/2000 | Weiss ........................... 235/379 |
| 6,154,770 | A | 11/2000 | Kostakos ....................... 709/217 |
| 6,189,785 | B1 | 2/2001 | Lowery |
| 6,226,623 | B1 | 5/2001 | Schein et al. ................. 705/35 |
| 6,317,783 | B1 | 11/2001 | Freishtat et al. |
| 6,374,231 | B1 | 4/2002 | Bent et al. ..................... 705/40 |
| 6,970,843 | B1 | 11/2005 | Forte |
| 7,089,202 | B1 | 8/2006 | McNamar et al. |
| 7,103,556 | B2 | 9/2006 | Del Rey et al. |
| 7,133,840 | B1 | 11/2006 | Kenna et al. |
| 7,206,761 | B2 | 4/2007 | Colvin |
| 7,216,100 | B2 | 5/2007 | Elliott |
| 7,376,606 | B2 | 5/2008 | Jacobsen |
| 7,383,223 | B1 | 6/2008 | Dilip et al. |
| 7,440,914 | B2 | 10/2008 | Jacobsen |
| 2001/0032182 | A1 | 10/2001 | Kumar et al. |
| 2002/0007330 | A1 | 1/2002 | Kumar et al. |
| 2002/0069147 | A1 | 6/2002 | Sheehan et al. |
| 2002/0091637 | A1 | 7/2002 | Bent et al. |
| 2002/0128951 | A1 | 9/2002 | Kiron et al. |
| 2002/0161707 | A1 | 10/2002 | Cole et al. |
| 2002/0165757 | A1 | 11/2002 | Lisser |
| 2002/0178098 | A1 | 11/2002 | Beard |

| | | | |
|---|---|---|---|
| 2003/0023529 | A1 | 1/2003 | Jacobsen |
| 2003/0135437 | A1 | 7/2003 | Jacobsen |
| 2003/0149646 | A1 | 8/2003 | Chen et al. |
| 2003/0163403 | A1 | 8/2003 | Chen et al. |
| 2003/0177092 | A1 | 9/2003 | Paglin |
| 2003/0191702 | A1 | 10/2003 | Hurley |
| 2003/0236728 | A1 | 12/2003 | Sunderji et al. |
| 2004/0039674 | A1 | 2/2004 | Coloma |
| 2004/0107157 | A1 | 6/2004 | Bleunven et al. |
| 2004/0111361 | A1 | 6/2004 | Griffiths et al. |
| 2004/0128229 | A1 | 7/2004 | Raines et al. |
| 2004/0128235 | A1 | 7/2004 | Kemper et al. |
| 2004/0138974 | A1 | 7/2004 | Shimamura et al. |
| 2004/0153398 | A1 | 8/2004 | Baumgartner et al. |
| 2004/0162773 | A1 | 8/2004 | Del Rey et al. |
| 2004/0177036 | A1 | 9/2004 | Nutahara et al. |
| 2005/0044038 | A1 | 2/2005 | Whiting et al. |
| 2005/0091137 | A1 | 4/2005 | Woeber |
| 2005/0102225 | A1 | 5/2005 | Oppenheimer et al. |
| 2005/0102226 | A1 | 5/2005 | Oppenheimer et al. |
| 2005/0108120 | A1 | 5/2005 | Malka et al. |
| 2005/0108149 | A1 | 5/2005 | Bent et al. |
| 2005/0114246 | A1 | 5/2005 | Coloma |
| 2005/0154662 | A1 | 7/2005 | Langenwalter |
| 2005/0228733 | A1 | 10/2005 | Bent et al. |
| 2006/0047593 | A1 | 3/2006 | Naratil et al. |
| 2006/0106703 | A1 | 5/2006 | Del Rey et al. |
| 2006/0155644 | A1 | 7/2006 | Reid et al. |
| 2006/0167773 | A1 | 7/2006 | Yang et al. |
| 2006/0213980 | A1 | 9/2006 | Geller et al. |
| 2006/0273152 | A1 | 12/2006 | Fields |
| 2007/0043666 | A1 | 2/2007 | Burdette |
| 2007/0118449 | A1 | 5/2007 | De La Motte |
| 2007/0255655 | A1 | 11/2007 | Kemper et al. |
| 2007/0271174 | A2 | 11/2007 | Bent et al. |
| 2007/0276752 | A1 | 11/2007 | Whiting et al. |
| 2007/0288400 | A1 | 12/2007 | Menon |
| 2008/0015985 | A1 | 1/2008 | Abhari et al. |
| 2008/0046358 | A1 | 2/2008 | Holm-Blagg et al. |
| 2008/0065532 | A1 | 3/2008 | De La Motte |
| 2008/0097899 | A1 | 4/2008 | Jackson et al. |
| 2008/0120228 | A1 | 5/2008 | Bent et al. |
| 2008/0133280 | A1 | 6/2008 | Ziegler |
| 2008/0133396 | A1 | 6/2008 | De La Motte |
| 2008/0222053 | A1 | 9/2008 | Jacobsen |
| 2009/0006985 | A1 | 1/2009 | Fong et al. |
| 2009/0012899 | A1 | 1/2009 | Friesen |
| 2009/0138412 | A1 | 5/2009 | Jacobsen |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO 95/23379 | 8/1995 |
| WO | WO-99/18529 | 4/1999 |
| WO | WO-02/42952 | 5/2002 |
| WO | WO-03/012580 | 2/2003 |
| WO | WO-2005/006111 | 1/2005 |

### OTHER PUBLICATIONS

American Banker Online—New Pitch: Deposit Insurance Sharing, p. 1-4 (Jan. 21, 2003).

Blackwell, Rob, "New Pitch: Deposit Insurance Sharing", American Banker Online, Jan. 21, 2003.

Certificate of Deposit Registry Service: Keeping deposits in the corn patch; Banknews/Mar. 2003.

Heavyweight Funding, Bankers News, vol. II, Issue 5, p. 1-2 Mar. 4, 2003.

Promontory Interfinancial Network; http://www.promnetwork.com/index.html (2003).

Mutual Funds Magazine, Bargain Basement Funds, Oct. 1997, 2 sheets.

Mutual Funds Magazine, Bargain Basement Funds, Oct. 1997, 1 Sheet.

Money Fund Report, IBC Financial Data, Inc., Nov. 6, 1998, 1 Sheet.

**US 7,680,734 B1**

Page 3

Liberman et al., Market Watch, "How Important are Banks?" FDIC Insurance on Deposits Just One Continuing Advantage, Oct. 17, 2006, 3 Sheets.

Declaration of Mr. Bruce Bent, II, Vice Chairman and Registrant of Applicant. (3 Sheets) and Exhibits A, B, C and D (6 Sheets).

Britt, Phil; "Struggling with Sweep Accounts", American's Community Banker, v6, n12, p. 18-23, Dec. 1997.

News Article: "Regulators Support Demand Deposit Bill", Regulatory Compliance Watch—Mar. 9, 1998; p. 1; vol. 9, No. 10.

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC, against Promontory Interfinancial Network, LLC, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Complaint, Apr. 14, 2009, Case No. 09 CV 3750.

Lawsuit by Promontory Interfinancial Network, LLC against Double Rock Corporation, p/k/a Reserve Management Corporation, Island Intellectual Property LLC and Lids Capital LLC, including Cover Sheet, Summons and Complaint, Apr. 14, 2009, Civil Action No. 3:09 CV 217.

Lawsuit by Promontory Interfinancial Network, LLC against Double Rock Corporation p/k/a Reserve Management Corporation, Island Intellectual Property LLC, Lids Capital LLC and Intrasweep LLC, Amended Complaint, Apr. 15, 2009, Civil Action No. 3:09 CV 217.

Financial Services Industry, "Web Watch: Trading Company Bundles CDs For Better Rates," Community Banker, Jun. 2002, Online http://findarticles.com/articles/mi_qa5344/is_200206/ai_n21313883/.

Letter From Joseph A. DiNuzzo, Counsel, Oct. 20, 1999, FDIC, Federal Deposit Insurance Corporation, 1 Sheet.

Letter From Roger A. Hood, Assistant General Counsel, Jul. 16, 1986, FDIC, Federal Deposit Insurance Corporation, Legal Division, 1 Sheet.

The Depository Trust Company, B#: 3875, Oct. 1, 2002, Settlement/Underwriting, From: Denise Russo, Director, Underwriting, 6 Sheets.

Online, www.usabancshares.com, Brave New World, 1999, 2 Sheets.

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, and Double Rock Corporation against Promontory Interfinancial Network, LLC and MBSC Securities Corporation, including Cover Sheet, Summons, Complaint and Rule 7.1 Statement, Case No. 09 CV 2675.

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, and Double Rock Corporation against Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, including Cover Sheet, Summons, Complaint and Rule 7.1 Statement, Case No. 09 CV 2677.

Lawsuit by Promontory Interfinancial Network, LLC against Double Rock Corporation p/k/a Reserve Management Corporation, Complaint, Civil Action No. 1:09 CV 316.

Lawsuit by Promontory Interfinancial Network, LLC against Double Rock Corporation p/k/a Reserve Management Corporation and Lids Capital LLC, Amended Complaint, Civil Action No. 1:09 CV 316.

CMA, Insured Savings Account Fact Sheet, Merrill Lynch, Pierce, Fenner & Smith Incorporated, 1997, pp. 49-57.

CMA, The Investor Credit Line Service, Cost-Effective Financing for the '90s, Merrill Lynch, Pierce, Fenner & Smith Incorporated, 1997, pp. 36-46.

CMA, The Merrill Lynch Cash Management Account Financial Service, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Jan. 1997, 35 Sheets.

Deposit Growth Strategies For Financial Institutions, New Sweep Account Helps Retain $40 Million in Business Deposits, vol. 7, No. 12, The Reserve Funds, May 2001, 1 Sheet.

FDIC Federal Deposit Insurance Corporation, Letter to Mr. Ronald Rexter, Feb. 28, 2003, From Michelle M. Borzillo, Counsel Supervision and Legislation Section, 2 Sheets.

Finistar, Providing FDIC Insured Funds as a Stable Source of Deposits to Commercial Banking Institutions, 16 Sheets, www.Finistar.com.

Frost Bank, Member FDIC, Checking Accounts, 1 Sheet, Sep. 19, 2003, https://www.frostbank.com/cgi-bin/ecomm/frost1/scripts/products/product_detail.jsp?BV . . . .

In The Know, Important Information About Your Account, Smith Barney Citigroup, 2005, 6 Sheets.

Merrill Lynch Announces Beyond Banking, The Power of Advice For Smarter Cash Management, Jan. 8, 2 Sheets.

Merrill Moves CMA Cash to Bank, Street Talk, On Wall Street, Nov. 2000, p. 26.

Money Fund Report, Insured Cash Sweep Options Proliferate, Friday, Jun. 1, 2001, The Reserve Funds, 1 Sheet.

Money Fund Report, Bank of New York Adds Insured Sweeps Option, Friday, May 3, 2002, the Reserve Funds, 1 Sheet.

Money Market Insight's, Goldman Sachs May Create Bank to Offer Insured Cash Sweeps, Aug. 2002 Issue, 3 Sheets.

On Wall Street, Helping Brokers Build A More Successful Business, Usual Products For Usual Times, May 2001, 2 Sheets.

On Wall Street, Helping Brokers Build A More Successful Business, The Power of CASH, Jun. 2002, 2 Sheets.

Sweeping Your Firm Into FDIC Insured Deposits, Harken Financial Services, Aug. 4, 2006, 8 Sheets.

Testimony of Bruce R. Bent, CEO of The Reservce Funds, Before The Financial Institutions and Consumer Credit Subcommittee House Financial Services Committee U.S. House of Representative, Hearing On H.R. 758 and H.R. 859, Mar. 5, 2003, 4 Sheets.

The Reserve Funds, NJBA Endorses New Sweep Account Offers New Jersey Banks Deposit Growth, Retention, For Immediate Release, May 23, 2001, 1 Sheet.

The Reserve Funds, Reserve Management and Irwin Union Bank and Trust Company Partner to Offer The Reserve Return Sweep, For Immediate Release, Mar. 8, 2001, 2 Sheets.

The Unmatched Sweep Solution From The Cash Management Expert, 2 Sheets.

Munk, Merrill Makes New Push Into Traditional Banking, Dow Jones Newswires, Jan. 3, 2003, 1 Sheet.

O'Brian, "Money-Market Funds Suit Many Investors, But Proud Creator Frets About Extra Risk," Re-Printed From The Wall Street Journal, Monday, Nov. 6, 2000, Dow Jones & Company, Inc., 2 Sheets.

Waddell, "Sweeping Clean," Advisor, The Advisor to Advisors, 2 Sheets.

Merrill Lynch & You, "Financial Services The Way You Want, When You Want Them," Jan. 2000 4 Sheets.

Merrill Lynch, Pierce, Fenner & Smith Incorporated, "Information Statement," 2000, 12 Sheets.

12 C.F.R. Part 329—Interest on Deposit, Source: 51 FR 10808, Mar. 31, 1986, 5 Sheets.

Merriam-Webster Online Dictionary, 10th Edition, Definition of "Associated", 2 Sheets.

Merrill Lynch & You, "Financial Services The Way You Want, When You Want Them," Jan. 2000.

Merrill Lynch, Pierce, Fenner & Smith Incorporated, "Information Statement," 2000, 12 Sheets.

Letter to Mr. Jonathan L. Levin, Esq., From Oliver Ireland, Associate General Counsel, Oct. 18, 1996, 2 Sheets.

Letter To Mr. L.P. Fleming, Jr., Esp., From Oliver Ireland, Associate General Counsel, Feb. 7, 1995, 3 Sheets.

Letter To Mr. James E. Creekman, Group Vice Presidnet, From Oliver Ireland, Associate General Counsel, Aug. 1, 1995, 4 Sheets.

Letter to Ms. Brenda L. Skidmore, Senior Vice President, From Oliver Ireland, Associate General Counsel, Aug. 30, 1995, 4 Sheets.

Part: 2, Monetary Policy and Reserve Requirements, Subpart—Regulation D, Board Interpretations of Regulation D, Transaction Accounts—Linked to Time Deposits, vol. 1, Federal Reserve Regulatory Service, 2 Sheets.

Letter From Jamey Basham, Attorney, LEXSEE 1990 FDIC Interp. Ltr., Lexis 1, Federal Deposit Insurance Corporation, FDIC-90-02, Jan. 3, 1990, 2 Sheets).

Letter From Colleen Curran Harvey, Deputy Chief Counsel, Jan. 8, 1985; Letter From Merle Y. Waldman, Nov. 14, 1984; Letter From Merle Y. Waldman, Sep. 24, 1984; Letter From Merle Y. Waldman, Aug. 8, 1984, LEXSEE 1985 Sec No-. Act., Lexis 1593, Securities Exchange Act of 1934—Section 15(a), 11 Sheets.

The Insured Savings Account, Issuer Guide to Offering MMDAs Through Merrill Lynch, Merrill Lynch Money Markets, Inc., "Operational Guide To The Merrill Lynch MMDA Program 1986", Sep. 1986 3 Sheets.

**US 7,680,734 B1**

Page 4

FDIC Federal Register Citations: Email from Bert Ely to Comments, Mar. 8, 2006, Subject: Large-Bank Deposit Insurance Determination Proposal-RIN 3064-AC98—Regs@fdic.gov. Attached, also from FDIC Federal Register Citations: Email From American Banker, by Bert Ely, Feb. 24, 2006, Viewpoint: FDIC's Account-Link Plan a Pointless, Costly Threat.

U.S. Appl. No. 60/307,815, filed Jul. 27, 2001.

U.S. Appl. No. 60/323,365, filed Sep. 20, 2001.

Letter From William W. Wiles, Secretary of the Board, Board of Governors of the Federal Reserve System, Jun. 22, 1983, 6 Sheets.

DI 48, Excerpts of Transcript of Hearing, U.S. Dist. Ct., District of Delaware, Civil Action No. 82-680, Apr. 8, 1983, 5 sheets.

DI 56, Interrog. Response, U.S. Dist. Ct. District of Delaware, Civil Action No. 82-680, May 20, 1983, 15 Sheets.

DI 99, Suppl. Interrogatory Response, U.S. Dist. Ct., District of Delaware, Civil Action No. 82-630, May 30, 1984, 6 Sheets.

Letter from Michael Bradfield, General Counsel, Board of Governors of the Federal Reserve System, Nov. 16, 1984, 4 Sheets.

Board of Governors of the Federal Reserve System, 1984 Fed. Res. Interp. Ltr. LEXIS 56, Nov. 16, 1984, 3 Sheets.

Letter From Oliver I. Ireland, Associate General Counsel, Board of Governors of the Federal Reserve System, Jun. 22, 1988, 5 Sheets.

Board of Governors of the Federal Reserve System, 1988 Fed. Res. Interp. Ltr. LEXIS 141, Jun. 22, 1988, 3 Sheets.

Board of Governors of the Federal Reserve System, 1989 Fed. Res. Interp. Ltr. LEXIS 77, Mar. 14, 1989, 2 Sheets.

Board of Governors of the Federal Reserve System, 1989 Fed. Res. Interp. Ltr. LEXIS 154, Jun. 21, 1989, 2 Sheets.

Board of Governors of the Federal Reserve System, 1990 Fed. Res. Interp. Ltr. LEXIS 94, Feb. 1, 1990, 1 Sheet.

Board of Governors of the Federal Reserve System, 1991 Fed. Res. Interp. Ltr. LEXIS 232, Jan. 30, 1991, 2 Sheets.

CMA, The Merrill Lynch Cash Management Account Financial Service, Insured Savings Account Participating Depository Institutions, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Nov. 1992, 2 Sheets.

Board of Governors of the Federal Reserve System, 1994 Fed. Res. Interp. Ltr. Lexis 156, Jun. 24, 1994, 3 Sheets.

CMA, Insured Savings Account Fact Sheet, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Jul. 1994, pp. 47-54.

Board of Governors of the Federal Reserve System, 1994 Fed. Res. Interp. Ltr. LEXIS 314, Oct. 17, 1994, 2 Sheets.

Board of Governors of the Federal Reserve System, 1994 Fed. Res. Interp. Ltr. LEXIS 419, Oct. 14, 1994, 4 Sheets.

CMA, The Merrill Lynch Cash Management Account Financial Service, Insured Savings Account Participating Depository Institutions, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Mar. 1995, 2 Sheets.

Letter from Stephanie Martin, Assoc. General Counsel, Board of Governors of the Federal Reserve System, Apr. 22, 2004, 8 Sheets.

Bank Deposit Program, Online http://web.archive.org/web/20030620100115/http:/www.smithbarney.com/products__servi, Jan. 19, 2001, 4 Sheets.

Capital Briefs: Corporate Checking Account Relief Sought, American Banker, vol. 162, Jul. 28, 1997, 1 Sheet.

Declaration of Mr. Bruce Bent II, Vice Chairman and Registrant of Applicant. (3 Sheets) and Exhibits A, B, C and D (6 Sheets).

Anderson et al. "Retail Sweep Programs and Bank Reserves," Federal Reserve Bank of St. Louis Review, Bell & Howell Information and Learning Company, vol. 83, Issue 1, 24 Sheets, Jan. 1, 2001.

Declaration of Mr. Bruce Bent II, Vice Chairman and Registrant of Applicant on the date of first commercial use of the service providing interest and FDIC insurance for checking accounts by means of a system using money market deposit accounts (MMDA's) of Oct. 23, 1997.

Britt, "Struggling with Sweep Accounts," America's Community Banker, vol. 6, No. 12, 11 Sheets, Dec. 1, 1997.

Chapelle, "Merrill's Rivals Say They, Too. Offer Services Beyond Banking," Securities Data Publishing On Wall Street, 2 Sheets, Feb. 1, 2003.

Chapelle et al. "Peering Into Tomorrow: At the Threshold of a New Century, Brokers and Others Discuss Where They were Going," Securities Data Publishing on Wall Street, 6 Sheets, Dec. 1, 1999.

Coyle, "A Look at commercial Demand Deposit Options," America's Community Banker, vol. 9, Issue 2, Bell & Howell Information and Learning Company, 9 Sheets, Feb. 1, 2000.

Crockett, "Big Banks Found Stepping Up Marketing of 'Sweep' Accounts," American Banker, vol. 159, No. 198, American Banker Inc., 3 Sheets, Oct. 13, 1994.

Fredrickson, "Rising Rates Rescue Money Fund Firm Reserve Profits by Picking Niches," Crain's New York Business, Crain Communications Inc., vol. 20, Issue 51, 2 Sheets, Dec. 20, 2004.

Hoffman, "Reserve's FDIC-Insured Account Draws Regionals; But some see little need for insurance," Crain Communications Inc., Investment News, 2 Sheets, Jun. 4, 2001.

Keenan, "Tapping Brokerages for Alternative to CDs," American Banker, The Financial Services Daily, 3 Sheets, Feb. 18, 2004.

Lavine, "Check Out High-Yield Checking Accounts," Broward Daily Business Review, vol. 39, No. 102, 2 Sheets, Apr. 27, 1998.

McReynolds, "The Power of CASH: Ho-hum cash can be great product (and lead to more business) in troubled times," Securities Data Publishing on Wall Street, 3 Sheets, Jun. 1, 2002.

McReynolds et al. "Unusual Products for Unusual Times," Securities Data Publishing on Wall Street, 6 Sheets, May 1, 2001.

Potter, "As Sweep Accounts Continue to Grow, So do Community Bank Options," America's Community Banker, vol. 9, Issue 8, Bell & Howell Information and Learning Company, 3 Sheets, Aug. 1, 2000.

Share, "New Service Skirts FDIC's $100K Limit," Dialog Web Command Mode, 2 Sheets, Jun. 13, 2003, http://www.dialogweb.com/cgi/dwclient.

Smith, "IBAA Won't Push Interest-Bearing Checking For Business; Says Too Few Members Want It," The American Banker, 2 Sheets, Apr. 18, 1996.

Stafford, "New Bank Program Allows $1 Million in Insured Deposits," Dialog Web Command Mode, 3 Sheets, Aug. 24, 2003, http://www.dialogweb.com/cgi/dwclient.

Wilson, "How Cash Management Services Can Help Your Bank Cultivate New Relationships with Commercial Customers," America's Community Banker, vol. 10, Issue 5, Bell & Howell Information and Learning Company, 8 Sheets, May 1, 2001.

"Man Bites Dog: Funds Move Into Banking," IBC's Money Fund Selector, 2 Sheets, Nov. 6, 1998.

About iMoneyNet, Inc., About iMoneyNet's Money Funds Division, 4 Sheets, Aug. 21, 2003, http://www.ibcdata.com/about.htm.

"Reverse Ups Insurance Limit On Money Market Account," Thomson Financial Inc., Mutual Fund Market News, 1 Sheet, Aug. 26, 2002.

"The Reverse Funds to Offer up to $600,000 of FDIC Insurance on Reserve Insured Deposits; Addressing Investor Needs for Increased Safety, Flexibility and a Competitive Yield," Business Wire, Inc. Business Wire, 2 Sheets, Aug. 13, 2002.

"The Bank of New York adds a $300,000 FDIC-Insured Money Market Account Option to its Dividend Income Checking Account," PR Newswire Associations, Inc., PR Newswire, 2 Sheets, Apr. 18, 2002.

The Reserve Fund, Study of U.S. Patent No. 6,374,231, 1 Sheet.

"Bank of Oak Ridge to Offer FDIC Insurance on up to $1.5 Million," Dialog Web Command Mode, 2 Sheets, Sep. 25, 2003, http://www.dialogweb.com/cgi/dwclient.

Reserve Management Corporation, Reserve Insured Deposits, U.S. Appl. No. 76/315,600 Issued.

The Reserve, "What Sets Us Apart," 2 Sheets, Oct. 4, 2006, http://www.ther.com/bank/bank__wsua.shtml.

The Reserve, "Reserve Insured Deposits," 2 Sheets, Oct. 4, 2006, http://www.ther.com/ps/ps__fif.shtml.

The Reserve, "Company History," 3 Sheets, Oct. 4, 2006, http://www.ther.com/aboutus/history.shtml.

The Reserve, "Reserve Insured Deposits Program," 2 Sheets, Oct. 4, 2006, http://www.ther.com/bank/bank__insdep.shtml.

Reserve Insured Deposits, United States Patent and Trademark Office, Reg. No. 2,694,910, Registered Mar. 11, 2003, 1 Sheet.

Bent, "Bruce Bent Makes Money Markey Funds Act Like Bank Accounts," Equity BBDP, Oct. 5, 1998, 3 Sheets.

**US 7,680,734 B1**

Page 5

AB 2011 Assembly Bill - Bill Analysis, Senate Amendments, http://www.leginfo.ca.gov/pub/bill/asm/ab_2001-2050/ab_2011_cfa_20060811_161755_asm_floor.html, 2006, pp. 1-3.

AB 2011 Assembly Bill - Bill Analysis, Senate Rules Committee, Third Reading, http://www.leginfo.ca.gov/pub/bill/asm/ab_2001-2050/ab_2011_cfa_20060705_161454 sen floor.html, 2006, pp. 1-7.

AB 2011 Assembly Bill - Chartered, http://www.leginfo.ca.gov/pub/bill/asm/ab_2001-2050/ab_2011_bill_20060925_chaptered.html, 2006, pp. 1-3.

AB 2011 Assembly Bill - Enrolled, http://www.leginfo.ca.gov/pub/bill/asm/ab_2001-2050/ab_2011_bill_20060816_enrolled.html, 2006, pp. 1-3.

AB 2011 Assembly Bill - History, Complete Bill History, http://www.leginfo.ca.gov/pub/bill/asm/ab_2001-2050/ab_2011_bill_20060925_history.html, 2006, p. 1.

Announcing Changes in Automatic "Sweep" Investment Options, LPL Financial Services, Linsco/Private Ledger, Member NASD/SIPC, 26 Sheets.

California Independent Bankers, ICBA Independent Community Bankers of America, Banker Bulletin, 2006, CIB 16th Annual Convention, vol. 4, issue 6, http://www.cib.org/banker_bulletin.htm.

Dreyfus Insured Deposit Program, Disclosure Statement and Terms and Conditions, Dreyfus A BNY Mellon Company, 8 Sheets.

Dreyfus Insured Deposit Program, Multiple List Program—Effective May 11, 2009, 1 Sheet.

Federal Register: Oct. 9, 1997 (vol. 62, No. 196), pp. 52809-52868. http://www.fdic.gov/news/news/inactivefinancial/1997/fil97111b.html.

Garmhausen, "Matching Small Banks with Large Muni Deposits," American Banker, Online The Financial Services Resource, Oct. 4, 2005, 4 pages, http://www.finstar.com/docs/AmericanBanker.html.

Introducing our MaxSafe CD with up to $700,000 of FDIC Insurance, 4 Sheets.

Lake Forest Bank & Trust Company, Introducing MaxSafe Deposit Accounts with up to $3.75 Million in FDIC Insurance, www.lakeforestbank.com/maxsafe, 2 Sheets.

Lawsuit by Island Intellectual Property LLC, Intrasweep LLC and Double Rock Corporation against Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Complaint for Patent Infringement, May 19, 2009, Case No. 09 CIV 4673.

Lawsuit by Promontory Interfinancial Network, LLC against Double Rock Corporation p/k/a Reserve Management Corporation, Island Intellectual Property LLC, Lids Capital LLC and Intrasweep LLC, Complaint, May 19, 2009, Civil Action No. 3:09 CV 322.

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Consolidated First Amended Complaint, Jury Trial Demanded, Jun. 11 2009, Civil Action No. 09 CIV 2675 (VM).

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Answer and Counter Claims, Answer of Defendant Promontory Interfinancial Network, LLC, Jun. 25, 2009, Case No. 09 CIV 2675.

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Intel-financial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and

Total Bank Solutions, LLC, Answer and Counter Claims, Answer of Defendant MBSC Securities Corporation Jun. 25, 2009, Case No. 09 CV 2675.

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Jury Trial Demanded, Total Bank Solutions, LLC's Answer to Consolidated First Amended Complaint and Counter Claims, Jun. 25, 2009, Civil Action No. 09 CIV 2675.

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Jury Trial Demanded, Deutsche Bank Trust Company Americas' Answer to Consolidated First Amended Complaint and Counter Claims, Jun. 25, 2009, Civil Action No. 09 CIV 2675.

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Jury Trial Demanded, Deutsche Bank AG's Answer to Consolidated First Amended Complaint, Jun. 25, 2009, Civil Action No. 09 CIV 2675.

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, The Island Plaintiffs' Reply to Defendant Promontory Interfinancial Network LLC's Counterclaims, Jul. 9, 2009, Civil Action No. 09 CIV 2675 (VM).

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, The Island Plaintiffs' Reply to Defendant MBSC Securities Corporation's Counterclaims, Jul. 9, 2009, Civil Action No. 09 CIV 2675 (VM).

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, The Island Plaintiffs' Reply to Defendant Total Bank Solutions, LLC's Counterclaims, Jul. 9, 2009, Civil Action No. 09 CIV 2675 (VM).

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, The Island Plaintiffs' Reply to Defendant Deutsche Bank Trust Company Americas' Counterclaims, Jul. 9, 2009, Civil Action No. 09 CIV 2675 (VM).

Ring, Niamh, National /Global, "Amex Spans The Globe in Retail Bank Buildup," Nov. 27, 2000, 1 Sheet.

Northbrook Bank & Trust Company, Seven Times the Security of a Normal CD, Introducing our MaxSafe CD, 4 Sheets,.

The Pershing Press, Dreyfus Insured Deposit Program, Issue 2, Aug. 2008, http://www.pershing.com/news/pershing_press/news_466244.html, 1 Sheet.

The Reserve Funds Press Release, "The Reserve Funds and Frontier Bank Partner to Offer Revolutionary Banking Product," 5 Sheets, Aug. 1, 2000.

The Reserve Funds, Objectives, Observations & Strategies For American Enterprises Inv., Oct. 18, 2000, 11 Sheets.

* cited by examiner



FIG. 1

*FIG. 2*



US 7,680,734 B1

**1**

## MONEY FUND BANKING SYSTEM

The present application is a continuation-in-part of application Ser. No. 09/677,535 filed Oct. 2, 2000, and of 10/071, 053 filed Feb. 8, 2002 now U.S. Pat. No. 7,519,551, and a continuation of Ser. No. 09,176,340 filed Oct. 21, 1998 (U.S. Pat. No. 6,374,231 B1); all these applications are incorporated herein by reference in their entireties for all purposes.

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The novel system is in the field of account transaction processing and provides an administered money fund banking system that is integrated with an insured deposit account.

2. State of the Art

The Federal Deposit Insurance Corporation ("FDIC") is a federal governmental entity that provides insurance for deposits in most banks and savings institutions in the United States. Bank deposits are insured by the FDIC's Bank Insurance Fund ("BIF") and savings institutions' deposits are insured by the FDIC's Savings Association Insurance Fund ("SAIF"). The rules governing insurance of deposits of institutions insured by the BIF and the SAIF are the same. The FDIC bases insurance coverage on the concept of ownership rights and capacities: funds held in different ownership categories are insured separately from each other, and funds of the same ownership but held in different accounts are subsumed under the same insurance coverage. The amount of insurance covered provided to depositors of each institution insured by BIF and SAIF is the same: $100,000.00 to the owner(s) of the finds in the account(s), including principal and interest.

Title 12, Part 329, of the Code of Federal Regulations ("CFR") specifies that "no bank shall, directly or indirectly, by any device whatsoever, pay interest on any demand deposit." (12 C.F.R. § 329.2.) A "deposit" is any money put into a savings account, a checking account, or time account such as a certificate of deposit. A "demand" account is one from which the owner of the account can demand that funds be drawn and paid elsewhere, either to another account (of the same or a different owner) or to a third party. These payments are typically made via a bank draft or check, or a credit or debit card. A account different than a demand account is an account where all or a fixed amount of the principal must be maintained in the account for a period of time to achieve the particular benefits offered by that account. As stated in this section of the CFR, a "demand deposit" includes any deposit in account under which terms

the depositor is authorized to make, during any month or statement cycle of at least four weeks, more than six transfers by means of a preauthorized or automatic transfer of telephone (including data transmission) agreement, order or instruction, which transfers are made to another account of the depositor at the same bank, to the bank itself, or to a third party

provided that such an account will be deemed a demand deposit if more than three of the six authorized transfers are authorized to be made by check, draft, debit card or similar order made by the depositor. (12 C.F.R. § 329.1(b)(3).) On the other hand, withdrawals from a deposit account are not deemed to be included within the six transfers permitted for a nondemand account when the withdrawals are made by mail, messenger, telephone (via check mailed to the depositor), automated teller machine, or in person. In essence, unless the funds of a deposit are held in a NOW account (18 U.S.C.

**2**

1832(a)), an account in which a depositor has the ability to make at least six transfers will be deemed a demand account and no interest will be payable on the funds therein. Therefore, owners of demand accounts are denied interest on their funds.

### SUMMARY OF THE INVENTION

In light of this regulatory scheme, it would be beneficial to provide depositors of demand accounts with interest from the funds on deposit while simultaneously providing unlimited (or at least six) transfers of the funds therein. For example, it would be beneficial to provide such depositors with the ability to deposit funds into the demand account from various sources, and to make payments from the demand account via different instruments, without limitation as to the number of transfers, and still earn interest on the funds in the clients' accounts.

To accomplish these and other objectives, this invention provides a system for managing a plurality of accounts for multiple clients by administering at a banking institution a single insured deposit account in which all of the funds for the insured deposit accounts are held, providing a database having client information for each client's account, administering clients' deposits to and withdrawals from each of their accounts, authorizing whether funds in a particular client's account can be used for each payment requested from that client's account, determining as the net transaction of the sum of the insured money market account deposits and withdrawals from the plurality of insured money market accounts on a regular periodic basis, using the determination of the net transaction to deposit funds to or withdraw funds from the single insured deposit account, distributing interest earned on the single deposit account to each of the clients in proportion to their portion of funds in the deposit account, and updating the database for each client's deposits and authorized demand payments.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. **1** and **2** illustrates a flow chart depicting certain processing steps the system follows.

### DESCRIPTION OF SPECIFIC EMBODIMENTS OF THE INVENTION

The present system will be described with reference to an administrator, which can be brokerage, a bank, or another entity with which clients can institute financial transactions such as deposits and demand payments. The administrator appears to each client as if it were, in part, a bank, by accepting deposits for the client's account and by authorizing (and then making) payments demanded by the client from his account. The funds for all of the clients are pooled into a single fund that is maintained as an insured deposit account at a licensed banking institution. This system is preferably implemented in combination with a brokerage account so that the client can centralize all of his financial needs: deposit of funds; demand orders for payment (checking); payment authorization by debit card; securities transactions; retirement plans; and the like.

The following description of the hardware and software is for exemplification of a working system; other architectures can be fashioned to make the systems and perform the methods claimed herein. The system has been implemented on a mainframe computer (e.g., an IBM Application Starterpac 3000 model A20, which is capable of processing 63 million

US 7,680,734 B1

3

instructions per second) with an operating system such as OS/390 and MVS/ESA running a relational database (e.g., DB2 type database). The programming languages are IBM COBOL, CICS languages along with IBM's CSP screen generation language. For such a system, memory requirements are satisfied with 768 Gigabytes of storage (preferably, e.g., 1024G with a disk storage and recovery system, such as RAID). Communications generally are run on a mixed SNA and TCP/IP network. Communications with a local area network via a local control unit can be implemented using a token ring. Connection to an internal network has been made via an IBM open systems adapter (OSA) running TCP/IP, which allows File Transfer Protocol (frp) via a firewall. Bisynchronous and synchronous file transfer protocols are made through various dial-up media. Terminal Access runs on an Ethernet local area network, using an SAA gateway, and other gateways (e.g., Cytrix and Netsoft) for remote access. Additionally, several lease lines for several applications and terminal access are supported by the system.

FIG. 1 is a flowchart depicting certain processing steps the system follows at the administrator's end. It should be understood that the order in which these steps are performed may be varied without impairing the achievement of the aforementioned objects of the invention. The client adds funds ("deposits") to his account typically via check 101, sweeps 103 of funds from another account (e.g., a broker/dealer account), and/or by wire and other transfers 105 (such as fed funds wire and direct deposit via ACH) for investment in an FDIC insured money fund account. These funds are deposited in a deposit account with a bank on behalf of the participant. The amount of each of the deposited items is summed 107 to determine the deposits for each client, preferably on a regular periodic basis (e.g., daily) or instantaneously. On the other side, the administrator provides the participant with access to his funds by various methods: payments can be made from funds drawn from the account by check 109; electronic funds transfer 110; debit card 111 authorized by the client (and ACH debit); sweeps of funds 113 to another account (e.g., a broker/dealer account); and electronic and voice access 114 (e.g., internet on-line banking, banking by telephone) for automated transaction requests; and transactions authorized by mail. A "sweep" is an automated movement of funds between a client's other account (e.g., a broker/dealer account) and his insured deposits account (in either direction). The registration on the other account and the insured deposit account are identical; there is a one for one relationship between the brokerage account and the insured deposits account.

The sum of the deposits is processed 117 with information 119 from a database (described later) that stores information about the demand account for each client. Each client's account is credited 121 with the sum of the deposits for that particular account, which may amount to zero on a particular day. Similarly, the sum and of withdrawals are processed 123 to determine what should be debited from the account, which may also amount to zero on a particular day. The deposits and withdrawals for each account during a given period are compared 125 to determine whether sufficient funds are present in the client's account, including the added funds, to pay the withdrawals requested by the client. In other words, processing determines which client accounts to credit or debit for the various transactions (sweep, checks, debit cards, ACH, etc.) received each business period (e.g., daily). These transactions can be received from one or more sources, such as brokerage firms (sweep transactions), banks (deposits made by wire transfer, checks presented for payment, ACH, debit card transactions), the mail (check deposits, redemption requests),

4

and telephone requests. "Telephone" requests can be performed by voice, conversing with an operator/broker or a voice response system, or via a touch-tone phone using a menu system, or electronically via the internet using email or the World Wide Web (e.g., a web page, preferably secure, onto which users can log in and conduct on-line banking). The final step in the day's processing is to determine the net credit or debit for the deposit account at the bank; the net activity represents all transactions that were processed that day for all insured deposit accounts.

If sufficient funds are not available for drafts and other orders to pay, the requested withdrawal(s) are denied and the client's total account information is again accessed to determine 129 if the client has sufficiently available margin to cover the requested withdrawal(s) (other than, preferably, sweep transactions). If insufficient funds and insufficient margin are available, then the requested withdrawal is denied 131. The client's margin typically is determined by the value of the client's funds held in the client's broker/dealer (securities) account. When sufficient funds are available in the insured deposit account, or a sufficient margin is available in the client's securities account with the administrator, then a debit is made 133 to the client's insured deposit account in the amount of the withdrawal(s) allowed (based on the funds and margin then available) and the processed and authorized withdrawals are paid as directed by the client. The sum of the processed credits 121 and the processed debits 133 are determined for all of the administrator's clients to arrive at a net account activity determination 135. The order in which credits and debits are processed depends upon a subjective protocol and/or operation of law. For example, transactions that are pre-approved (such as authorized debit card transactions, and sweeps) are likely to be processed when received; transactions requiring authorization or acceptance by a third party (such as a bank draft or check) may be credited to the insured deposit account but not available for withdrawal until authorization or acceptance.

The net account activity determination 135 is then used to determine a net credit/debit 139 for the single deposit account held at the bank that contains all of the funds of all of the administrator's clients; the deposit account must be debited or credited to account for all clients' deposits and withdrawals during the period. If the net result is positive (e.g., amount of deposits processed minus amount of authorized withdrawals processed is positive), then the calculated amount is deposited 141 to the single account. If the net result is negative (e.g., amount of deposits processed minus amount of withdrawals processed is negative), then the calculated amount is withdrawn 143 from the single deposit account. An individual insured money market account is maintained for each client on a administrator's database. Each transaction received for an account is individually posted against the client's account on the database. Funds are exchanged between the appropriate parties to cover transactions (broker for sweep transactions; bank for debit cards, checks, ACH, etc.). These transactions are posted and settled prior to any activity taking place in the insured deposit account at the bank. In a preferred embodiment, the last movement of finds on each day is the net movement of funds (credit or debit) that takes place in the deposit account at the bank. The sum of the account balances (principle plus interest) for clients participating in the this system equals the balance in the deposit account at the bank.

The information from the calculations of a net credit/debit 139 are used to implement the processing of the actual deposit or withdrawal (141, 143) to the deposit account, and that information (and funds, if required) is sent to the bank 145 to execute the actual deposit or withdrawal required. If the

US 7,680,734 B1

5

deposit account is to be credited, then deposits are transferred to the bank and credited to the deposit account 147; conversely, if funds are to be withdrawn from the deposit account, a bulk withdrawal is made from the deposit account to account for the withdrawals that have been authorized from the clients' accounts; in essence, the withdrawal from the deposit account need only make up the difference between the authorized withdrawals and the deposits. If the client wishes to use his excess margin buying power for overdraft protection, the broker/dealer transmits the client's available margin line to the administrator regularly (preferably daily). The available margin line will be taken into consideration when checks, debit card, and other draft and order to pay transactions (e.g., ACH debits, on-line banking withdrawals, and other electronic payments) are processed. If the client's margin line is used to process a check or debit card transaction, a loan will be created and transmitted to the broker dealer by the administrator. Preferably, the broker dealer maintains the margin loan on his system and will pay the administrator for all funds advanced. Using this methodology for margin accounts, there is no effect on the deposit account at the bank.

The bank pays interest 149 on the single deposit account to the administrator. Based on the amount of each client's funds in the deposit account as a function of the total amount in the deposit account, the administrator determines the interest amount (if any) each client is owed (based also on the period during which the interest was determined on a particular account balance). Because all of the clients' funds are in a single account under the name of the administrator, the administrator earns the interest and distributes the interest earned to each of the clients. Further, the limitation on transfers from a interest-bearing account is inapplicable to the clients because their funds are held by the administrator in a demand account and interest for the client is determined only on that portion of those funds maintained in the bank's deposit account. Preferably, if necessary, the administrator makes any withdrawals from the deposit account in person.

After the deposit account has been credited or debited in accordance with the determination for that period of the sum of the deposits and withdrawals from clients, and the interest earned on the single deposit account, this information is transferred back to the administrator's deposits database 151. This database includes information about each client (such as name, address, and other important or desired demographic and tax information about each client's account), as well as financial information regarding the client's holdings on deposit in the bank (i.e., that client's portion of the single deposit account) and holdings with the administrator (e.g., securities and the like).

As seen, the administrator maintains several relationships that provide services for the insured money market accounts. These various entities provide transaction data that is transmitted to the administrator and processed. Preferably, the administrator is it's own transfer agent and provides a shareholder accounting system. Preferably, accounts may be opened through a broker dealer that is a client of the administrator, or directly with the administrator with an application and check.

The administrator may allow a client with an account under the present system to access his funds by check or with a debit card; in such a case, the administrator has arranged for these services and maintains these relationships which are separate and apart from the deposit account. Banks that provide check and card services will transmit a file each day to the administrator that contains the checks presented for payment and/or the debit card transactions. The transactions that apply to his account under the present system are out sorted and processed

6

against the administrator's database. The administrator will settle with each bank for the transactions that were processed.

The administrator may accept direct deposit of payroll, social security, or pensions for accounts. The clients' accounts are updated as these files are received and processed. The administrator may also accepts ACH debit transactions, which are initiated by the client's bank or a third party at the client's request.

The administrator may also provide the participants with automated bill paying services. Participants preferably provided with a touchtone bill paying system and/or an internet on line banking service. Bill payment requests may be downloaded each morning for processing.

The foregoing description is meant to be illustrative and not limiting. Various changes, modifications, and additions may become apparent to the skilled artisan upon a perusal of this specification, and such are meant to be within the scope and spirit of the invention as defined by the claims.

What is claimed is:

1. A method for managing a plurality of client accounts for a plurality of clients, comprising:

accessing, by one or more computers, a database comprising information for each client account that has client account funds aggregated with funds of a plurality of other of the client accounts and are held in one or more FDIC-insured and interest-bearing aggregated deposit accounts held in one or more FDIC insured banking institutions, with the information for each of the client accounts including information on each client's funds held in said one or more insured and interest-bearing aggregated deposit accounts; and

administering, by the one or more computers, deposits to and withdrawals from each of a plurality of said client accounts, including more than six withdrawals in a month from each of a plurality of the client accounts, with one or more of said withdrawals made by debit card;

determining, by the one or more computers, on a regular basis one or more net transactions as sums of said deposits to and withdrawals from said client accounts;

determining, by the one or more computers, from said net transactions whether to deposit funds to or withdraw funds from said one or more FDIC-insured and interest-bearing aggregated deposit accounts;

making or having made more than six withdrawals in a month of funds from one of the FDIC-insured and interest-bearing aggregated deposit accounts via at least one intermediate bank that is different from the one or more FDIC insured banking institutions; and

updating, by the one or more computers, the database with deposits to and withdrawals from said each client account.

2. The method of claim 1, further comprising after accrual in the aggregated deposit account, distributing interest, by the one or more computers, to each of the client accounts in dependence on a balance of that respective client account held in the one or more FDIC-insured interest-bearing aggregated accounts.

3. The method of claim 1, further comprising

receiving a draft or check, credit card, sweeps, wire or electronic transfer from one or more sources that are not performing the method with respect to the plurality of client accounts; and

the administering withdrawals from each of the plurality of said client accounts step comprises administering withdrawals received from the one or more sources made by

US 7,680,734 B1

7

draft or check, credit card, debit card, sweeps, wire or electronic transfer and combinations thereof.

4. The method of claim **1**, further comprising holding client account funds from the client accounts of a plurality of different clients in only one FDIC-insured and interest-bearing aggregated deposit account.

5. The method of claim **1**, further comprising holding client account funds for at least one of the client accounts in a plurality of the FDIC-insured and interest-bearing aggregated deposit accounts, each of the plurality of aggregated deposit accounts held in a different FDIC insured banking institution.

6. The method of claim **1**, further comprising denying, by the one or more computers, a withdrawal transaction from one of the client accounts with funds held in a plurality of the aggregated deposit accounts if that client account does not have sufficient funds to cover that withdrawal transaction, or access to sufficient margin or line of credit.

7. The method of claim **1**, further comprising holding client account funds for at least one of the client accounts in a plurality of the different FDIC-insured and interest-bearing aggregated deposit accounts among a fixed plurality of FDIC-insured banking institutions.

8. A method for managing a plurality of client accounts for a plurality of clients, comprising:

accessing, by one or more computers, a database comprising information for each client account that has client account funds aggregated with funds of a plurality of other of the client accounts and are held in one or more FDIC-insured and interest-bearing aggregated deposit accounts held in one or more FDIC-insured banking institutions, with the information for each of the client accounts including information on each client's funds held in said one or more insured and interest-bearing aggregated deposit accounts; and

administering, by the one or more computers, deposits to and withdrawals from each of a plurality of said client accounts, including more than six withdrawals in a month by check or debit card or ACH from each of a plurality of the client accounts, with one or more of said withdrawals made by debit card;

determining, by the one or more computers, on a regular basis one or more net transactions as sums of said deposits to and withdrawals from said client accounts;

determining, by the one or more computers, from said net transactions whether to deposit funds to or withdraw funds from said one or more FDIC-insured and interest-bearing aggregated deposit accounts;

making or having made more than six withdrawals in a month of funds from one of the FDIC-insured and interest-bearing aggregated deposit accounts via at least one intermediate bank that is different from the one or more FDIC insured banking institutions; and

updating, by the one or more computers, the database with deposits to and withdrawals from said each client account.

9. The method of claim **8**, further comprising after accrual in the aggregated deposit account, distributing interest, by the one or more computers, to each of the client accounts in

8

dependence on a balance of that respective client account held in the one or more FDIC-insured interest-bearing aggregated accounts.

10. The method of claim **8**, further comprising

receiving a draft or check, credit card, sweeps, wire or electronic transfer from one or more sources that are not performing the method with respect to the plurality of client accounts; and

the administering withdrawals from each of the plurality of said client accounts step comprises administering withdrawals received from the one or more sources made by draft or check, credit card, debit card, sweeps, wire or electronic transfer and combinations thereof.

11. The method of claim **8**, further comprising holding client account funds from the client accounts of a plurality of different clients in only one FDIC-insured and interest-bearing aggregated deposit account.

12. The method of claim **8**, further comprising holding client account funds for at least one of the client accounts in a plurality of the FDIC-insured and interest-bearing aggregated deposit accounts, each of the plurality of aggregated deposit accounts held in a different FDIC-insured banking institution.

13. The method of claim **12**, further comprising denying, by the one or more computers, a withdrawal transaction from one of the client accounts with funds held in a plurality of the aggregated deposit accounts if that client account does not have sufficient funds to cover that withdrawal transaction, or access to sufficient margin or line of credit.

14. The method of claim **8**, further comprising holding client account funds for at least one of the client accounts in a plurality of the different FDIC-insured and interest-bearing aggregated deposit accounts among a fixed plurality of FDIC-insured banking institutions.

15. The method as defined in claim **8**,

further comprising holding some client account funds for at least one of the client accounts in at least one interest-bearing aggregated deposit account that is not FDIC-insured, and further comprising

maintaining in the database information on the client's funds held in said at least one interest-bearing aggregated deposit account that is not FDIC-insured; and

determining from said net transactions whether to deposit funds to or withdraw funds from the at least one interest-bearing aggregated deposit account that is not FDIC-insured.

16. The method as defined in claim **1**,

further comprising holding some client account funds for at least one of the client accounts in at least one interest-bearing aggregated deposit account that is not FDIC-insured, and further comprising

maintaining in the database information on the client's funds held in said at least one interest-bearing aggregated deposit account that is not FDIC-insured; and

determining from said net transactions whether to deposit funds to or withdraw funds from the at least one interest-bearing aggregated deposit account that is not FDIC-insured.

*   *   *   *   *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.           : 7,680,734 B1                                          Page 1 of  1
APPLICATION NO. : 10/305439
DATED                   : March 16, 2010
INVENTOR(S)       : Bruce Bent and Bruce Bent, II

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Col. 1, line 6, delete "Ser. No. 09, 176,340" and replace it with --Ser. No. 09/176,340--.

Col. 1, line 32, delete "finds" and replace it with --funds--.

Col. 2, line 41, delete "illustrates" and replace it with --illustrate--.

Col. 3, line 42, delete "a".

Col. 3, line 54, delete "and".

Signed and Sealed this

Twentieth Day of April, 2010

*David J. Kappos*

David J. Kappos
*Director of the United States Patent and Trademark Office*

# Exhibit 4

US007716131B2

(12) **United States Patent**
Bent et al.

(10) Patent No.: **US 7,716,131 B2**
(45) Date of Patent: **May 11, 2010**

(54) **MONEY FUND BANKING SYSTEM WITH MULTIPLE BANKS AND/OR RATES**

(75) Inventors: **Bruce Bent**, Manhasset, NY (US); **Bruce Bent, II**, New York, NY (US)

(73) Assignee: **Island Intellectual Property LLC**, New York, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **11/932,762**

(22) Filed: **Oct. 31, 2007**

(65) **Prior Publication Data**

US 2008/0120228 A1    May 22, 2008
US 2009/0150283 A2    Jun. 11, 2009

**Related U.S. Application Data**

(63) Continuation of application No. 09/677,535, filed on Oct. 2, 2000, which is a continuation-in-part of application No. 09/176,340, filed on Oct. 21, 1998, now Pat. No. 6,374,231.

(51) **Int. Cl.**
*G06Q 40/00*          (2006.01)
(52) **U.S. Cl.** ........................................ **705/40**; 235/379
(58) **Field of Classification Search** .................. 705/40; 235/379
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,232,367 A | 11/1980 | Youden et al. | |
| 4,346,442 A | 8/1982 | Musmanno | |
| 4,376,978 A | 3/1983 | Musmanno | |
| 4,597,046 A | 6/1986 | Musmanno et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

JP          10-049590          2/1998

(Continued)

OTHER PUBLICATIONS

AB 2011 Assembly Bill—Bill Analysis, Senate Amendments, http://www.leginfo.ca.gov/pub/bill/asm/ab_2001-2050/ab_2011_cfa_20060811_161755_asm_floor.html, 2006, pp. 1-3.

(Continued)

*Primary Examiner*—Daniel S Felten
(74) *Attorney, Agent, or Firm*—Foley & Lardner LLP

(57)          **ABSTRACT**

Providing interest to clients' deposited funds without limitation on the number of demand withdrawals from deposit accounts is accomplished by an administration system that keeps all of the records for the clients' deposits and withdrawals, calculates the total of the deposits and withdrawals for all clients, and uses the calculation to determine whether funds are deposited to or withdrawn from one or more deposit accounts in which all clients' deposit funds are kept. Clients can make unlimited withdrawals, such as by check, credit card, debit card, or electronic transfer, through the administrator. By placing the administrator as the holder of the deposit account(s), exemptions to the limitation on earning interest in demand accounts is facilitated; additionally, dispersing the deposit account funds among multiple banks allows the client to obtain FDIC insurance for all of the deposited funds, which may amount to insurance in excess of the statutory maximum allowed (presently $100,000.00).

**14 Claims, 4 Drawing Sheets**



**US 7,716,131 B2**

Page 2

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,674,044 A | 6/1987 | Kalmus et al. |
| 4,694,397 A | 9/1987 | Grant et al. |
| 4,700,297 A | 10/1987 | Hagel et al. |
| 4,751,640 A | 6/1988 | Lucas et al. |
| 4,774,663 A | 9/1988 | Musmanno et al. |
| 4,953,085 A | 8/1990 | Atkins |
| 4,985,833 A | 1/1991 | Oncken |
| 5,126,936 A | 6/1992 | Champion et al. |
| 5,206,803 A | 4/1993 | Vitagliano et al. |
| 5,220,501 A | 6/1993 | Lawlor et al. |
| 5,235,507 A | 8/1993 | Sackler et al. |
| 5,262,942 A | 11/1993 | Earle |
| 5,270,922 A | 12/1993 | Higgins |
| 5,291,398 A | 3/1994 | Hagan |
| 5,297,032 A | 3/1994 | Trojan et al. |
| 5,424,938 A | 6/1995 | Wagner et al. |
| 5,631,828 A | 5/1997 | Hagan |
| 5,644,727 A | 7/1997 | Atkins |
| 5,671,363 A | 9/1997 | Cristofich et al. |
| 5,689,650 A | 11/1997 | McClelland et al. |
| 5,710,889 A | 1/1998 | Clark et al. |
| 5,765,144 A | 6/1998 | Larche et al. |
| 5,774,880 A | 6/1998 | Ginsberg |
| 5,781,654 A | 7/1998 | Carney |
| 5,806,048 A | 9/1998 | Kiron et al. |
| 5,806,049 A | 9/1998 | Petruzzi |
| 5,812,987 A | 9/1998 | Luskin et al. |
| 5,826,243 A | 10/1998 | Musmanno et al. |
| 5,852,811 A | 12/1998 | Atkins |
| 5,864,685 A | 1/1999 | Hagan |
| 5,878,258 A | 3/1999 | Pizi et al. |
| 5,878,405 A | 3/1999 | Grant et al. |
| 5,884,285 A | 3/1999 | Atkins |
| 5,890,141 A | 3/1999 | Carney et al. |
| 5,893,078 A | 4/1999 | Paulson |
| 5,903,881 A | 5/1999 | Schrader et al. |
| 5,905,974 A | 5/1999 | Fraser et al. |
| 5,940,809 A | 8/1999 | Musmanno et al. |
| 5,941,996 A | 8/1999 | Smith et al. |
| 5,946,667 A | 8/1999 | Tull et al. |
| 5,950,175 A | 9/1999 | Austin |
| 5,974,390 A | 10/1999 | Ross |
| 5,978,779 A | 11/1999 | Stein et al. |
| 6,014,642 A | 1/2000 | El-Kadi et al. |
| 6,016,482 A | 1/2000 | Molinari et al. |
| 6,026,438 A | 2/2000 | Piazza et al. |
| 6,041,314 A | 3/2000 | Davis |
| 6,044,371 A | 3/2000 | Person et al. |
| 6,047,324 A | 4/2000 | Ford et al. |
| 6,049,782 A | 4/2000 | Gottesman et al. |
| 6,052,673 A | 4/2000 | Leon et al. |
| 6,088,685 A | 7/2000 | Kiron et al. |
| 6,092,056 A | 7/2000 | Tull et al. |
| 6,105,005 A | 8/2000 | Fuhrer |
| 6,108,641 A | 8/2000 | Kenna et al. |
| 6,112,191 A | 8/2000 | Burke |
| 6,119,093 A | 9/2000 | Walker et al. |
| 6,131,810 A | 10/2000 | Weiss et al. |
| 6,154,770 A | 11/2000 | Kostakos |
| 6,189,785 B1 | 2/2001 | Lowery |
| 6,226,623 B1 | 5/2001 | Schein et al. |
| 6,317,783 B1 | 11/2001 | Freishtat et al. |
| 6,374,231 B1 | 4/2002 | Bent et al. |
| 6,970,843 B1 | 11/2005 | Forte |
| 7,089,202 B1 | 8/2006 | McNamar et al. |
| 7,103,556 B2 | 9/2006 | Del Rey et al. |
| 7,133,840 B1 | 11/2006 | Kenna |
| 7,206,761 B2 | 4/2007 | Colvin |
| 7,216,100 B2 | 5/2007 | Elliott |
| 7,376,606 B2 | 5/2008 | Jacobsen |
| 7,383,223 B1 | 6/2008 | Dilip et al. |

| | | | |
|---|---|---|---|
| 7,440,914 B2 | 10/2008 | Jacobsen |
| 2001/0032182 A1 | 10/2001 | Kumar et al. |
| 2002/0007330 A1 | 1/2002 | Kumar et al. |
| 2002/0069147 A1 | 6/2002 | Sheehan et al. |
| 2002/0091637 A1 | 7/2002 | Bent |
| 2002/0128951 A1 | 9/2002 | Kiron et al. |
| 2002/0161707 A1 | 10/2002 | Cole et al. |
| 2002/0165757 A1 | 11/2002 | Lisser |
| 2002/0178098 A1 | 11/2002 | Beard |
| 2003/0023529 A1 | 1/2003 | Jacobsen |
| 2003/0135437 A1 | 7/2003 | Jacobsen |
| 2003/0149646 A1 | 8/2003 | Chen et al. |
| 2003/0163403 A1 | 8/2003 | Chen et al. |
| 2003/0177092 A1 | 9/2003 | Paglin |
| 2003/0191702 A1 | 10/2003 | Hurley |
| 2003/0236728 A1 | 12/2003 | Sunderji et al. |
| 2004/0039674 A1 | 2/2004 | Coloma |
| 2004/0107157 A1 | 6/2004 | Bleunven et al. |
| 2004/0111361 A1 | 6/2004 | Griffiths et al. |
| 2004/0128229 A1 | 7/2004 | Raines et al. |
| 2004/0128235 A1 | 7/2004 | Kemper et al. |
| 2004/0138974 A1 | 7/2004 | Shimamura et al. |
| 2004/0153398 A1 | 8/2004 | Baumgartner et al. |
| 2004/0162773 A1 | 8/2004 | Del Rey et al. |
| 2004/0177036 A1 | 9/2004 | Nutahara et al. |
| 2005/0044038 A1 | 2/2005 | Whiting et al. |
| 2005/0091137 A1 | 4/2005 | Woeber |
| 2005/0102225 A1 | 5/2005 | Oppenheimer et al. |
| 2005/0102226 A1 | 5/2005 | Oppenheimer et al. |
| 2005/0108120 A1 | 5/2005 | Malka et al. |
| 2005/0108149 A1 | 5/2005 | Bent et al. |
| 2005/0114246 A1 | 5/2005 | Coloma |
| 2005/0154662 A1 | 7/2005 | Langenwalter |
| 2005/0228733 A1 | 10/2005 | Bent et al. |
| 2006/0047593 A1 | 3/2006 | Naratil et al. |
| 2006/0475593 | 3/2006 | Naratil et al. |
| 2006/0106703 A1 | 5/2006 | Del Rey et al. |
| 2006/0155644 A1 | 7/2006 | Reid et al. |
| 2006/0167773 A1 | 7/2006 | Yang et al. |
| 2006/0213980 A1 | 9/2006 | Geller et al. |
| 2006/0273152 A1 | 12/2006 | Fields |
| 2007/0043666 A1 | 2/2007 | Burdette |
| 2007/0118449 A1 | 5/2007 | De La Motte |
| 2007/0255655 A1 | 11/2007 | Kemper et al. |
| 2007/0271174 A2 | 11/2007 | Bent et al. |
| 2007/0276752 A1 | 11/2007 | Whiting et al. |
| 2007/0288400 A1 | 12/2007 | Menon |
| 2008/0015985 A1 | 1/2008 | Abhari et al. |
| 2008/0046358 A1 | 2/2008 | Holm-Blagg et al. |
| 2008/0065532 A1 | 3/2008 | De La Motte |
| 2008/0097899 A1 | 4/2008 | Jackson et al. |
| 2008/0120228 A1 | 5/2008 | Bent et al. |
| 2008/0133280 A1 | 6/2008 | Ziegler |
| 2008/0133396 A1 | 6/2008 | De La Motte |
| 2008/0222053 A1 | 9/2008 | Jacobsen |
| 2009/0006985 A1 | 1/2009 | Fong et al. |
| 2009/0012899 A1 | 1/2009 | Friesen |
| 2009/0138412 A1 | 5/2009 | Jacobsen |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| WO | WO-95/23379 | 8/1995 |
| WO | WO-99/18529 | 4/1999 |
| WO | WO-02/42952 | 5/2002 |
| WO | WO-03/012580 | 2/2003 |
| WO | WO-2005/006111 | 1/2005 |

OTHER PUBLICATIONS

AB 2011 Assembly Bill—Bill Analysis, Senate Rules Committee, Third Reading, http://www.leginfo.ca.gov/pub/bill/asm/ab_2001-2050/ab_2011_cfa_20060705_161454_sen_floor.html, 2006, pp. 1-7.

**US 7,716,131 B2**

Page 3

AB 2011 Assembly Bill—Chaptered, http://www.leginfo.ca.gov/pub/bill/asm/ab_2001-2050/ab_2011_bill_20060925_chaptered.html, 2006, pp. 1-3.

AB 2011 Assembly Bill—Enrolled, http://www.leginfo.ca.gov/pub/bill/asm/ab_2001-2050/ab_2011_bill_20060816_enrolled.html, 2006, pp. 1-3.

AB 2011 Assembly Bill—History, Complete Bill History, http://www.leginfo.ca.gov/pub/bill/asm/ab_2001-2050/ab_2011_bill_20060925_history.html, 2006, p. 1.

About iMoneyNet, Inc., About iMoneyNet's Money Funds Division, 4 Sheets, Aug. 21, 2003, http://www.ibcdata.com/about.htm.

Anderson et al. "Retail Sweep Programs and Bank Reserves," Federal Reserve Bank of St. Louis Review, Bell & Howell Information and Learning Company, vol. 83, Issue 1, 24 Sheets, Jan. 1, 2001.

Announcing Changes in Automatic "Sweep" Investment Options, LPL Financial Services, Linsco/Private Ledger, Member NASD/SIPC, 26 Sheets.

Bent, "Bruce Bent Makes Money Market Funds Act Like Bank Accounts," Equity BBDP, Oct. 5, 1998, 3 Sheets.

Blackwell, "ABA to Approve System for Sharing Deposit Coverage," American Banker, 2 Sheets, Feb. 11, 2003.

Blackwell, "New Pitch: Deposit Insurance Sharing," American Banker Online, 4 Sheets, Jan. 21, 2003.

Britt, "Struggling with Sweep Accounts," America's Community Banker, vol. 6, No. 12, 11 Sheets, Dec. 1, 1997.

California Independent Bankers, OCBA Independent Community Bankers of America, Banker Bulletin, 2006, CIB 16th Annual Convention, vol. 4, issue 6, http://www.cib.org/banker_bulletin.htm.

Capital Briefs: Corporate Checking Account Relief Sought, American Banker, vol. 162, Jul. 28, 1997, 1 Sheet.

Certificate of Deposit Registry Service: Keeping Deposits in the Corn Patch, Banknews, 2 Sheets. Mar. 2003.

Chapelle et al. "Peering Into Tomorrow: At the Threshold of a New Century, Brokers and Others Discuss Where They were Going," Securities Data Publishing on Wall Street, 6 Sheets, Dec. 1, 1999.

Chapelle, "Merrill's Rivals Say They, Too. Offer Services Beyond Banking," Securities Data Publishing on Wall Street, 2 Sheets, Feb. 1, 2003.

Coyle, "A Look at commercial Demand Deposit Options," America's Community Banker, vol. 9, Issue 2, Bell & Howell Information and Learning Company, 9 Sheets, Feb. 1, 2000.

Crockett, "Big Banks Found Stepping Up Marketing of 'Sweep' Accounts," American Banker, vol. 159, No. 198, American Banker Inc., 3 Sheets, Oct. 13, 1994.

Declaration of Mr. Bruce Bent II, Vice Chairman and Registrant of Applicant on the date of first commercial use of the service providing interest and FDIC insurance for checking accounts by means of a system using money market deposit accounts (MMDA's) of Oct. 23, 1997.

Declaration of Mr. Bruce Bent II, Vice Chairman and Registrant of Applicant. (3 Sheets) and Exhibits A, B, C and D (6 Sheets).

Fredrickson, "Rising Rates Rescue Money Fund Firm Reserve Profits by Picking Niches," Crain's New York Business, Crain Communications Inc., vol. 20, Issue 51, 2 Sheets, Dec. 20, 2004.

Heavyweight Funding, Bankers News, Mar. 4, 2003, vol. II, Issue No. 5, 2 Sheets.

Hoffman, "Reserve's FDIC-Insured Account Draws Regionals; But some see little need for insurance," Crain Communications Inc., Investment News, 2 Sheets, Jun. 4, 2001.

Insured Cash Account Program Disclosure Booklet, LPL Financial Services, Linsco/Private Ledger, Member NASD/SIPC.

Keenan, "Tapping Brokerages for Alternative to CDs," American Banker, The Financial Services Daily, 3 Sheets, Feb. 18, 2004.

Lavine, "Check Out High-Yield Checking Accounts," Broward Daily Business Review, vol. 39, No. 102, 2 Sheets, Apr. 27, 1998.

Liberman et al., Market Watch, "How Important are Banks?" FDIC Insurance on Deposits Just One Continuing Advantage, Oct. 17, 2006, 3 Sheets.

McReynolds et al. "Unusual Products for Unusual Times," Securities Data Publishing on Wall Street, 6 Sheets, May 1, 2001.

McReynolds, "The Power of CASH: Ho-hum cash can be great product (and lead to more business) in troubled times," Securities Data Publishing on Wall Street, 3 Sheets, Jun. 1, 2002.

Money Fund Report, IBC Financial Data, Inc., Nov. 6, 1998, 1 Sheet.

Mutual Funds Magazine, Bargain Basement Funds, Oct. 1997, 1 Sheet.

Mutual Funds Magazine, Bargain Basement Funds, Oct. 1997, 1 Sheet.

Mutual Funds Magazine, Bargain Basement Funds, Oct. 1997, 2 Sheets.

News Article: "Regulators Support Demand Deposit Bill", Regulatory Compliance Watch—Mar. 9, 1998; 2 Sheets, vol. 9, No. 10.

Potter, "As Sweep Accounts Continue to Grow, So do Community Bank Options," America's Community Banker, vol. 9, Issue 8, Bell & Howell Information and Learning Company, 3 Sheets, Aug. 1, 2000.

Promontory Interfinancial Network: http://www.promnetwork.com/index.html, 2003.

Reserve Insured Deposits, United States Patent and Trademark Office, Reg. No. 2,694,910, Registered Mar. 11, 2003, 1 Sheet.

Reserve Management Corporation, Reserve Insured Deposits, U.S. Appl. No. 76/315,600, Issued.

Share, "New Service Skirts FDIC's $100K Limit," Dialog Web Command Mode, 2 Sheets, Jan. 13, 2003, http://www.dialogweb.com/cgi/dwclient.

Smith, "IBAA Won't Push Interest-Bearing Checking For Business; Says Too Few Members Want It," The American Banker, 2 Sheets, Apr. 18, 1996.

Stafford, "New Bank Program Allows $1 Million in Insured Deposits," Dialog Web Command Mode, 3 Sheets, Aug. 24, 2003, http://www.dialogweb.com/cgi/dwclient.

The Reserve Fund, Study of U.S. Patent No. 6,374,231, 1 Sheet.

The Reserve Funds Press Release, "The Reserve Funds and Frontier Bank Partner to Offer Revolutionary Banking Product," 5 Sheets, Aug. 1, 2000.

The Reserve, "Company History," 3 Sheets, Oct. 4, 2006, http://www.ther.com/aboutus/history.shtml.

The Reserve, "Reserve Insured Deposits Program," 2 Sheets, Oct. 4, 2006, http://www.ther.com/bank/bank_insdep.shtml.

The Reserve, "Reserve Insured Deposits," 2 Sheets, Oct. 4, 2006, http://www.ther.com/ps/ps_fif.shtml.

The Reserve, "What Sets Us Apart," 2 Sheets, Oct. 4, 2006, http://www.ther.com/bank/bank_wsua.shtml.

Wilson, "How Cash Management Services Can Help Your Bank Cultivate New Relationships with Commercial Customers," America's Community Banker, vol. 10, Issue 5, Bell & Howell Information and Learning Company, 8 Sheets, May 1, 2001.

"Bank of Oak Ridge to Offer FDIC Insurance on up to $1.5 Million," Dialog Web Command Mode, 2 Sheets, Sep. 25, 2003, http://www.dialogweb.com/cgi/dwclient.

"Man Bites Dog: Funds Move Into Banking," IBC's Money Fund Selector, 2 Sheets, Nov. 6, 1998.

"Reverse Ups Insurance Limit On Money Market Account," Thomson Financial Inc., Mutual Fund Market News, 1 Sheet, Aug. 26, 2002.

"The Bank of New York adds a $300,000 FDIC-Insured Money Market Account Option to its Dividend Income Checking Account," PR Newswire Associations, Inc., PR Newswire, 2 Sheets, Apr. 18, 2002.

"The Reverse Funds to Offer up to $600,000 of FDIC Insurance on Reserve Insured Deposits; Addressing Investor Needs for Increased Safety, Flexibility and a Competitive Yield," Business Wire, Inc. Business Wire, 2 Sheets, Aug. 13, 2002.

U.S. Appl. No. 60/307,815, filed Jul. 2., 2001.

U.S. Appl. No. 60/323,365, filed Sep. 20, 2001.

Letter From William W. Wiles, Secretary of the Board, Board of Governors of the Federal Reserve System, Jun. 22, 1983, 6 Sheets.

DI 48, Excerpts of Transcript of Hearing, U.S. Dist. Ct., District of Delaware, Civil Action No. 82-680, Apr. 8, 1983, 5 Sheets.

DI 56, Interrog. Response, U.S. Dist. Ct. District of Delaware, Civil Action No. 82-680, May 20, 1983, 15 Sheets.

DI 99, Suppl. Interrogatory Response, U.S. Dist. Ct., District of Delaware, Civil Action No. 82-630, May 30, 1984, 6 Sheets.

Letter from Michael Bradfield, General Counsel, Board of Governors of the Federal Reserve System, Nov. 16,1984, 4 Sheets.

Board of Governors of the Federal Reserve System, 1984 Fed. Res. Interp. Ltr. LEXIS 56, Nov. 16, 1984,3 Sheets.

## US 7,716,131 B2

Page 4

Letter From Oliver I. Ireland, Associate General Counsel, Board of Governors of the Federal Reserve System, Jun. 22, 1988, 5 Sheets.

Board of Governors of the Federal Reserve System, 1988 Fed. Res. Interp. Ltr. LEXIS 141, Jun. 22, 1988, 3 Sheets.

Board of Governors of the Federal Reserve System, 1989 Fed. Res. Interp. Ltr. LEXIS 77, Mar. 14, 1989, 2 Sheets.

Board of Governors of the Federal Reserve System, 1989 Fed. Res. Interp. Ltr. LEXIS 154, Jun. 21, 1989, 2 Sheets.

Board of Governors of the Federal Reserve System, 1990 Fed. Res. Interp. Ltr. LEXIS 94, Feb. 1, 1990, 1 Sheet.

Board of Governors of the Federal Reserve System, 1991 Fed. Res. Interp. Ltr. LEXIS 232, Jan. 30, 1991, 2 Sheets.

CMA, The Merrill Lynch Cash Management Account Financial Service, Insured Savings Account Participating Depository Institutions, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Nov. 1992, 2 Sheets.

Board of Governors of the Federal Reserve System, 1994 Fed. Res. Interp. Ltr. LEXIS 156, Jun. 24, 1994, 3 Sheets.

CMA, Insured Savings Account Fact Sheet, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Jul. 1994, pp. 47-54.

Board of Governors of the Federal Reserve System, 1994 Fed. Res. Interp. Ltr. LEXIS 314, Oct. 17, 1994, 2 Sheets.

Board of Governors of the Federal Reserve System, 1994 Fed. Res. Interp. Ltr. LEXIS 419, Oct. 14, 1994, 4 Sheets.

CMA, The Merrill Lynch Cash Management Account Financial Service, Insured Savings Account Participating Depository Institutions, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Mar. 1995, 2 Sheets.

Letter from Stephanie Martin, Assoc. General Counsel, Board of Governors of the Federal Reserve System, Apr. 22, 2004, 8 Sheets.

Bank Deposit Program, Online http://web.archive.org/web/20030620100115/http:/www.smithbarney.com/products_servi, Jan. 19, 2001, 4 Sheets.

Letter From Jamey Basham, Attorney, LEXSEE 1990 FDIC Interp. Ltr., Lexis 1, Federal Deposit Insurance Corporation, FDIC-90-02, Jan. 3, 1990, 2 Sheets.

Letter From Colleen Curran Harvey, Deputy Chief Counsel, Jan. 8, 1985; Letter From Merle Y. Waldman, Nov. 14, 1984; Letter From Merle Y. Waldman, Sep. 24, 1984; Letter From Merle Y. Waldman, Aug. 8, 1984, LEXSEE 1985 Sec No- Act., Lexis 1593, Securities Exchange Act of 1934—Section 15(a), 11 Sheets.

The Insured Savings Account, Issuer Guide to Offering MMDAs Through Merrill Lynch, Merrill Lynch Money Markets, Inc., "Operational Guide To The Merrill Lynch MMDA Program 1986", Sep. 1986 3 Sheets.

FDIC Federal Register Citations: Email from Bert Ely to Comments, Mar. 8, 2006, Subject: Large-Bank Deposit Insurance Determination Proposal- RIN 3064-AC98—Regs@fdic.gov. Attached, also from FDIC Federal Register Citations: Email From American Banker, by Bert Ely, Feb. 24, 2006, Viewpoint: FDIC's Account-Link Plan a Pointless, Costly Threat.

Letter To Mr. Jonathan L. Levin, Esq., From Oliver Ireland, Associate General Counsel, Oct. 18, 1996, 2 Sheets.

Letter To Mr. L.P. Fleming, Jr., Esq., From Oliver Ireland, Associate General Counsel, Feb. 7, 1995, 3 Sheets.

Letter To Mr. James E. Creekman, Group Vice President, From Oliver Ireland, Associate General Counsel, Aug. 1, 1995, 4 Sheets.

Letter To Ms. Brenda L. Skidmore, Senior Vice President, From Oliver Ireland, Associate General Counsel, Aug. 30, 1995, 4 Sheets.

Part: 2, Monetary Policy and Reserve Requirements, Subpart—Regulation D, Board Interpretations of Regulation D, Transaction Accounts—Linked to Time Deposits, vol. 1, Federal Reserve Regulatory Service, 2 Sheets.

U.S. Appl. No. 10/825,440, filed Apr. 14, 2004, Bent et al.

Online, www.usabancshares.com, Brave New World, 1999,2 Sheets. 12 CFR Part 329—Interest on Deposit, Source: 51 FR 10808, Mar. 31, 1986, 5 Sheets.

Merriam-Webster Online Dictionary, 10th Edition, Definition of "Associated", 2 Sheets.

Merrill Lynch & You, "Financial Services The Way You Want, When You Want Them," Jan. 2000 4 Sheets.

Merrill Lynch, Pierce, Fenner & Smith Incorporated, "Information Statement," 2000, 12 Sheets.

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, and Double Rock Corporation against Promontory Interfinancial Network, LLC and MBSC Securities Corporation, including Cover Sheet, Summons, Complaint and Rule 7.1 Statement, Case No. 09 CV 2675.

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, and Double Rock Corporation against Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC including Cover Sheet, Summons, Complaint and Rule 7.1 Statement, Case No. 09 CV 2677.

Lawsuit by Promontory Interfinancial Network, LLC against Double Rock Corporation p/k/a Reserve Management Corporation, Complaint, Civil Action No. 1:09 CV 316.

Lawsuit by Promontory Interfinancial Network, LLC against Double Rock Corporation p/k/a Reserve Management Corporation and Lids Capital LLC, Amended Complaint, Civil Action No. 1:09 CV 316.

CMA, Insured Savings Account Fact Sheet, Merrill Lynch, Pierce, Fenner & Smith Incorporated, 1997, pp. 49-57.

CMA, The Investor Credit Line Service, Cost-Effective Financing for the '90s, Merrill Lynch, Pierce, Fenner & Smith Incorporated, 1997, pp. 36-46.

CMA, The Merrill Lynch Cash Management Account Financial Service, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Jan. 1997, 35 Sheets.

Deposit Growth Strategies for Financial Institutions, New Sweep Account Helps Retain $40 Million in Business Deposits, Vol. 7, No. 12, the Reserve Funds, May 2001, 1 Sheet.

FDIC, Federal Deposit Insurance Corporation, Letter to Mr. Ronald Rexter, Feb. 28, 2003, From Michelle M. Borzillo, Counsel Supervision and Legislation Section, 2 Sheets.

Finistar, Providing FDIC Insured Funds as a Stable Source of Deposits to Commercial Banking Institutions, 16 Sheets, www.Finistar.com.

Frost Bank, Member FDIC, Checking Accounts, 1 Sheet, Sep. 19, 2003, https://www.frostbank.com/cgi-bin/ecomm/frost1/scripts/products/product_detail.isp?BV_ . . . .

In The Know, Important Information About Your Account, Smith Barney Citigroup, 2005, 6 Sheets.

Merrill Lynch Announces Beyond Banking, The Power of Advice for Smarter Cash Management, Jan. 8, 2 Sheets.

Merrill Moves CMA Cash to Bank, Street Talk, On Wall Street, Nov. 2000, p. 26.

Money Fund Report, Insured Cash Sweep Options Proliferate, Friday, Jun. 1, 2001, The Reserve Funds, 1 Sheet.

Money Fund Report, Bank of New York Adds Insured Sweeps Option, Friday, May 3, 2002, The Reserve Funds, 1 Sheet.

Money Market Insight's, Goldman Sachs May Create Bank to Offer Insured Cash Sweeps, Aug. 2002 Issue, 3 Sheets.

On Wall Street, Helping Brokers Build A More Successful Business, Usual Products for Usual Times, May 2001, 2 Sheets.

On Wall Street, Helping Brokers Build A More Successful Business, The Power of CASH, Jun. 2002, 2 Sheets.

Sweeping Your Firm Into FDIC Insured Deposits, Harken Financial Services, Aug. 4, 2006, 8 Sheets.

Testimony of Bruce R. Bent, CEO of The Reserve Funds, Before the Financial Institutions and Consumer Credit Subcommittee House Financial Services Committee U.S. House of Representative, Hearing on H.R. 758 and H.R. 859, Mar. 5, 2003, 4 Sheets.

The Reserve Funds, NJBA Endorses New Sweep Account Offers New Jersey Banks Deposit Growth, Retention, for Immediate Release, May 23, 2001, 1 Sheet.

The Reserve Funds, Reserve Management and Irwin Union Bank and Trust Company Partner to Offer the Reserve Return Sweep, for Immediate Release, Mar. 8, 2001, 2 Sheets.

The Unmatched Sweep Solution From The Cash Management Expert, 2 Sheets.

Munk, Merrill Makes New Push Into Traditional Banking, Dow Jones Newswires, Jan. 3, 2003, 1 Sheet.

O'Brian, "Money-Market Funds Suit Many Investors, But Proud Creator Frets About Extra Risk," Re-Printed From The Wall Street Journal, Monday, Nov. 6, 2000, Dow Jones & Company, Inc., 2 Sheets.

Waddell, "Sweeping Clean," Advisor, The Advisor to Advisors, 2 Sheets.

Lawsuit by Island Intellectual Property LLC, Lids Capital. LLC, Double Rock Corporation and Intrasweep LLC, against Promontory Interfinancial Network, LLC, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Complaint, Apr. 14, 2009, Case No. 09 CV 3750.

Lawsuit by Promontory Interfinancial Network, LLC against Double Rock Corporation, p/k/a Reserve Management Corporation, Island Intellectual Property LLC and Lids Capital LLC, including Cover Sheet, Summons and Complaint, Apr. 14, 2009, Civil Action No. 3:09 CV 217.

Lawsuit by Promontory Interfinancial Network, LLC against Double Rock Corporation p/k/a Reserve Management Corporation, Island Intellectual Property LLC, Lids Capital LLC and Intrasweep LLC, Amended Complaint, Apr. 15, 2009, Civil Action No. 3:09 CV 217.

Financial Services Industry, "Web Watch: Trading Company Bundles CDs for Better Rates," Community Banker, Jun. 2002, online, http://findarticles.com/p/articles/mi_qa5344/is_200206/ai_n21313883/.

Letter From Joseph A. DiNuzzo, Counsel, Oct. 20, 1999, FDIC, Federal Deposit Insurance Corporation, 1 Sheet.

Letter From Roger A. Hood, Assistant General Counsel, Jul. 16, 1986, FDIC, Federal Deposit Insurance Corporation, Legal Division, 1 Sheet.

The Depository Trust Company, B#: 3875, Oct. 1, 2002, Settlement\Underwriting, From: Denise Russo, Director, Underwriting, 6 Sheets.

Lawsuit by Island Intellectual Property LLC, Intrasweep LLC and Double Rock Corporation against Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Complaint for Patent Infringement, May 19, 2009, Case No. 09 CIV 4673.

Lawsuit by Promontory Interfinancial Network, LLC against Double Rock Corporation p/k/a Reserve Management Corporation, Island Intellectual Property LLC, Lids Capital LLC and Intrasweep LLC, Complaint, May 19, 2009, Civil Action No. 3:09 CV 322.

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Answer and Counter Claims, Answer of Defendant MBSC Securities Corporation., Jun. 25, 2009, Case No. 09 CV 2675.

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Answer and Counter Claims, Answer of Defendant Promontory Interfinancial Network, LLC, Jun. 25, 2009, Case No. 09 CV 2675.

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Jury Trial Demanded, Total Bank Solutions, LLC's Answer To Consolidated First Amended Complaint and Counter Claims, Jun. 25, 2009, Civil Action No. 09 CIV 2675.

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Jury Trial Demanded, Deutsche Bank AG's Answer To Consolidated First Amended Complaint, Jun. 25, 2009, Civil Action No. 09 CIV 2675.

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Jury Trial Demanded, Deutsche Bank Trust Company Americas' Answer To Consolidated First Amended Complaint and Counter Claims, Jun. 25, 2009, Civil Action No. 09 CIV 2675.

Dreyfus Insured Deposit Program, Disclosure Statement and Terms and Conditions, Dreyfus A BNY Mellon Company, 8 Sheets.

Dreyfus Insured Deposit Program, Multiple List Program—Effective May 11, 2009, 1 Sheet.

Introducing our MaxSafe CD with up to $700,000 of FDIC Insurance, 4 Sheets.

Lake Forest Bank & Trust Company, Introducing MaxSafe Deposit Accounts with up to $3.75 Million in FDIC Insurance, www.lakeforestbank.com/maxsafe, 2 Sheets.

Ring, National /Global, "Amex Spans The Globe in Retail Bank Buildup," Nov. 27, 2000, 1 Sheet.

Seven Times the Security of a Normal CD, Introducing our MaxSafe CD, 4 Sheets.

The Pershing Press, Dreyfus Insured Deposit Program, Issue 2, Aug. 2008, http://www.pershing.com/news/pershing_press/news_466244.html, 1 Sheet.

The Reserve Funds, Objectives, Observations & Strategies For American Enterprises Inv., Oct. 18, 2000, 11 Sheets.



FIG. 1A



FIG. 1B



FIG. 2



FIG. 3

US 7,716,131 B2

| 1 | 2 |

**MONEY FUND BANKING SYSTEM WITH MULTIPLE BANKS AND/OR RATES**

CROSS-REFERENCE TO RELATED PATENT APPLICATIONS

This application is a Continuation of U.S. application Ser. No. 09/677,535, filed Oct. 2, 2000, incorporated herein by reference in its entirety, which is a Continuation-In-Part of U.S. application Ser. No. 09/176,340, filed Oct. 21, 1998, incorporated herein by reference in its entirety.

BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention generally relates to the field of account transaction processing, and more specifically, an improved system for processing and administering a demand account or money market account in combination with an insured deposit account, and optionally where the accounts are distributed over a plurality of banking institutions.

2. The State of the Art

The Federal Deposit Insurance Corporation ("FDIC") is a federal governmental entity that provides insurance for deposits in most banks and savings institutions in the United States Bank; deposits are insured by the FDIC's Bank Insurance Fund ("BIF") and savings Institutions' deposits are insured by the FDIC's Savings Association Insurance Fund ("SAIF"). The rules governing insurance of deposits of institutions insured by the BIF and the SAIF are the same. The FDIC bases insurance coverage on the concept of ownership rights and capacities: funds held in different ownership categories are insured separately from each other; and funds owned by the same entity but held in different accounts are subsumed under the same insurance coverage. The amount of insurance coverage provided to depositors of each institution insured by BIF and SAIF is the same: $100,000.00 to the owners(s) of the funds in the account(s), including principal and interest.

As disclosed in our prior application Ser. No. 09/176,340 referenced above, a system is provided for managing a plurality of demand accounts for multiple clients whose funds are held at a banking institution in a single insured deposit account. That system provides an entity with the ability to deposit funds into a demand account from various sources, and to make payments from the demand account via different instruments, without the limitation as to the number of transfers, and still earn interest on the funds in the clients' accounts because the funds are effectively maintained in a single account. Even with the above-mentioned innovative system, investors carrying amounts in excess of $100,000 in their accounts are disadvantaged because the FDIC insurance is limited to $100,000, so any amount over $100,000 is not protected by FDIC insurance. It was with this realization that the present invention was made.

OBJECTS AND SUMMARY OF THE INVENTION

One object of the present invention is to provide a system for managing a plurality of demand accounts for multiple clients whose funds are held at a banking institution in a single insured deposit account.

Another object of the present invention to is provide a system for managing a plurality of demand accounts for multiple clients whose funds are held at one or more banking institutions in one or more single insured deposit accounts that, from the viewpoint of the investor, removes the $100,000 limitation of FDIC insurance for that individual investor.

Still a further object of the present invention is to provide a system for administering a plurality of accounts containing in excess of $100,000 and continue to qualify for FDIC insurance.

These and other objects are achieved by providing a system that administers individual client deposits to and withdrawals from each of their demand accounts. The system includes a database having each client's information for each account administered. The system monitors the use of the funds from each account by selectively authorizing or rejecting each demand payment request for each account of a particular client. Periodically, net transaction information is determined from the sum of the demand account deposits and withdrawals. The net transaction information is used to determine whether to deposit funds or to withdraw funds from a single deposit account to a client's demand account(s) while updating the database for each client's deposit and authorized demand payment. The system then determines whether each client's account contains more than a specified amount (e.g., $90,000) and distributes any amounts over the specified amount into another account at a preselected banking institution.

In practice, when an investor's account balance exceeds $90,000 in any one account, the excess funds are automatically moved to a second deposit account at another preselected bank. The client will maintain one insured deposit clearance account while the multiple deposit accounts will be transparent to the investor. All transactions to and from the accounts will post to the investor's insured deposit account, although they may be debited from multiple deposit accounts held at various banks. At the time an Insured Deposit Account is opened, the investor is given the option to choose a preferred bank, to choose a list of preferred banks in a desired (or random) order of preference, and to exclude one or more banks. The system will debit and credit the multiple deposit accounts on the investor's behalf, and in the event that the investor does not preselect a bank, the system will automatically designate a bank or banks. The client may also select the order of preference for deposits and withdrawals. For example, if the investor opened his Insured Deposit Account with $170,000, he could also indicate that his assets should be invested in Bank A and Bank C. He may also indicate that bank C is preferred. In this example, $90,000 would be deposited into Bank C and $80,000 into Bank A. If a check were written or the investor chose to redeem funds directly, the withdrawals would be made from Bank A. Withdrawals would not be made from Bank C until all funds had been redeemed from Bank A. Similarly, if the investor chose Bank C as preferred and chose to exclude Bank B, then $90,000 would be deposited into Bank C and $80,000 into Bank A. The investor also can choose the deposit cap for each of multiple banks selected, or can specify deposit caps for default banks chosen by the system (e.g., no bank to hold more than 40% of the investor's funds). Of course, the investor can also specify that all funds be held in a single bank, even if the amount exceeds $100,000. The report the investor receives may refer to all of the assets and transactions in the investor's Insured Clearance Account (a single account), or the investor may be shown a report listing all of the sub-accounts (if any) where the funds are held and in which transactions occurred.

The choice of Banks is held on the investor's account and the system will read the Bank indicator and determine which bank deposit account should be debited or credited. The system will automatically group together all transactions for

3      4

each bank. At the end of the business day the deposit accounts at the various banks will be either debited or credited. The debit or credit to the deposit account is the net transaction for all activity that occurred that day.

As a result of the present invention the investor earns interest on the balance in his Insured Deposit Account where the interest rate earned can be the same regardless of the bank(s) selected, or may vary depending on the banks selected, while continuing to qualify his account funds for FDIC insurance.

### BRIEF DESCRIPTION OF THE DRAWINGS

In the drawings, in which like references or characters designate like or corresponding parts throughout the several views, the views are:

FIG. 1A is a flowchart depicting processing steps the system follows at the administrator's end.

FIG. 1B is a flow chart depicting additional processing steps according to the present invention.

FIG. 2 is a flowchart depicting processing steps regarding the determination of a available funds according to the present invention.

FIG. 3 is a flow chart depicting processing steps associated with the completion of the banking system process according to the present invention.

### DETAILED DESCRIPTION OF SPECIFIC EMBODIMENTS

The present invention will be described with reference to an administrator, which can be a brokerage firm, a bank, or another financial entity with which clients can institute financial transactions such as deposits and demand payments. The administrator appears to each client as if it were, at least in part, a bank, by accepting deposits for the client's accounts and by authorizing (and then making) payments demanded by the client from his or her account. The funds for all of the clients are pooled into a single deposit account that is maintained as an insured deposit account at a licensed banking institution.

Referring to FIG. 1A, the financial entity 100, which may be a bank, a brokerage or another entity where financial transactions take place or can be facilitated, creates transaction files 101 which are transmitted to Reserve 105; Reserve (or the Reserve System) is the administrator or other entity in charge of administering at least one of the deposit accounts. New account files 102 can be transmitted to Reserve; a new investor account may need to be opened; a new account means organizing and coordinating information to service a new investor for the present system, even though that investor may already be a client of a financial entity 100 for other investment vehicles. A new account 102 becomes part of an existing bank deposit account 129 that collects earned income 130 which transfers the client's income to the client's accounts 131; of course at some time the deposit account must be established with clients' funds. The transaction files represent the addition of funds by check (such as drawn on another institution, or a different demand account from the same institution), wire or electronic transfer, ACH, credits (such as from a debit or credit card merchant), or a sweep from one of the client's other accounts. Accordingly, encompassed in the transaction file are deposits 103 and withdrawals 104. A "sweep" includes the automatic transfer of funds, such as the automated transfer of interest from one account to the client's account, as well as the automated transfer of funds out of the client's account (such as for payment of a securities trade); thus, a sweep may be from one of the client's

to another. The responsibility for maintaining the deposit account can be assigned by the administrator to a third party.

Referring now to FIG. 1B, the Reserve System 50 contains an insured deposit database 75 where a position file for debit/credit card users is created 132 and transmitted to a bank for a debit/credit card network 133 where the bank then updates the network 134. The system updates the data base 75 and processes transactions 106 (from 105, FIG. 1A) and opens a new account 107 where application and check deposits are processed 110. The bank preference 107A is the list of banks and the order of preference for deposits and withdrawals held on the account, including a list of banks to be excluded (if any), and the maximum percentage and/or amount of funds to be held in each bank. The client's bank preference data is added to the account at 107B. If the client does not select values for any of these variables, the system can provide default values for the banks and their order at 107C sufficient for all of the client's funds. When possible the system will not assign a bank that is in the same state in which the client resides.

Referring to FIG. 2 it can be seen that when a deposit, either a check deposit 111, federal wire deposit 112, ACH deposit, sweep, or other deposit is credited to the client's account 108, the system will review where the existing funds of the accounts are deposited 108A. If the client's balance has reached the maximum allowable balance for the existing bank 108B, as shown in FIG. 3, the system will then select the next bank on the preference list attached to the account 108C. If the maximum allowable balance has not been reached in the existing bank, the system will credit the additional funds to that bank 108D.

Still referring to FIG. 2, the procedure for processing withdrawals can be seen. Various methods of withdrawing funds are debit withdrawal 109, processing debit or credit card transactions such as debit/credit card files 115, direct debit accounts 215, and processing of files 121. Processing of a debit/credit card file 115 utilizes data accumulated from debit/credit card transactions received from the banks 114. The processing of file 121 procedure utilizes one of various sources of data such as a check presented for payment 116, ACH debits 117, touch tone bill paying 118, and/or internet bill paying 119.

After processing the debit procedure, the system will review the bank preference list and select the appropriate bank to debit 125A. The system will sort all the daily transactions by the bank 125B (see FIG. 3). The activity for each bank will then be netted 126 and the appropriate deposit or withdrawals made.

The system will then determine whether funds are available 122, which function is also associated with other participant withdrawals 120. If the funds are available, the account is debited 225. If the funds are not available, however, the system determines whether a credit line is available 123. If a credit line is available, then funds are advanced 230 to cover the debit; if not the transaction is rejected 124.

Referring to FIG. 3, as previously stated the system determines whether the client's balance reaches its maximum 108B and if so the next bank on the list selected by the client is credited 108C. If the maximum is not reached the existing bank is credited 108D. Information and activities associated with processed debits and credits of the client's accounts from 125A are sorted by the bank 125B and the net activity by the bank is determined 126. The system then determines whether the deposits and credits were greater than the withdrawals and debits 240 and if so, the excess funds are depos-

US 7,716,131 B2

5

ited into a deposit account 127. If the debits and withdrawals were greater than the credits the difference is redeemed from the deposit account 128.

Thus, by practicing this invention, the client is provided with FDIC insurance in excess of $100,000.00 because the client's holdings are maintained in multiple deposit accounts, which may be in multiple banks.

The foregoing description is meant to be illustrative and not limiting. Various changes, modifications, and additions may become apparent to the skilled artisan upon a perusal of this specification, and as such are meant to be within the scope and spirit of the invention as defined by the claims.

What is claimed is:

1. A method for managing a plurality of respective client transaction accounts associated with a plurality of respective clients for a plurality of transactions, said method comprising:

(a) accessing, by one or more computers, a database maintained on one or more computer readable media for carrying out one or more of the following steps, wherein the database comprises information for each client transaction account, wherein client transaction account funds for the client transaction accounts are aggregated with funds of other client transaction accounts in one or more of a plurality of FDIC-insured and interest-bearing aggregated deposit accounts held at one or more of a plurality of banking institutions, and wherein the information for each of the client transaction accounts includes information on each client's funds held in said insured and interest-bearing aggregated deposit accounts, with one or more of the aggregated deposit accounts held in each different one of the plurality of banking institutions;

(b) administering clients' deposits/transfers to and withdrawals/transfers from each of said client transaction accounts using the one or more computers, said administering step comprising processing, by one or more computers, transaction data associated with each of more than six (6) withdrawals/transfers by check and/or debit card within a month from each of a plurality of said client transaction accounts, with the transaction data comprising a respective amount for each respective withdrawal/transfer;

(c) determining, by one or more computers, on a regular basis one or more net transactions, with each net transaction comprising a sum of said client deposits/transfers to and/or withdrawals/transfers from a plurality of said client transaction accounts of a plurality of clients;

(d) determining, by one or more computers, based at least in part on one or more of said net transactions, whether to deposit/transfer funds to or withdraw/transfer funds from said one or more FDIC-insured and interest-bearing aggregated deposit accounts, said determining step comprising:

(i) determining by the one or more computers whether each client's funds held in one of the banking institutions in the one or more FDIC-insured interest bearing aggregated deposit accounts held therein is more than a specified amount; and

(ii) generating data by the one or more computers for distribution of any amounts over said specified amount into at least one other FDIC-insured interest bearing aggregated deposit account at at least one other of the banking institutions in which the total of said client's funds therein will not exceed the specified amount;

6

(e) processing needed deposits/transfers to, or needed withdrawals/transfers from said one or more FDIC-insured and interest-bearing aggregated deposit accounts based on said determining from said at least one aggregated net transaction step, so that more than six (6) withdrawals/transfers are made during a month from each of a plurality of said FDIC-insured and interest-bearing aggregated deposit accounts; and

(f) updating by computer the database with each client's deposits/transfers to and withdrawals/transfers from said each client's respective transaction account.

2. The method of claim 1, wherein more than six (6) withdrawals/transfers are made during a month from each of two of said FDIC-insured interest-bearing aggregated deposit accounts.

3. The method of claim 1, further comprising:

receiving from respective one or more computers associated with respective banking institutions from the plurality of the banking institutions interest earned data on funds of the clients held in the FDIC-insured interest-bearing aggregated deposit accounts held therein;

processing the interest earned data to cause distribution of interest earned from said FDIC-insured interest-bearing aggregated deposit accounts to said transaction accounts; and

updating the database based on interest paid to and client's deposits/transfers to and withdrawals/transfers from each of their respective transaction accounts.

4. The method of claim 1, wherein one or more of said withdrawals/transfers from at least one of said one or more FDIC-insured interest-bearing aggregated deposit accounts are requested in person.

5. The method of claim 1, wherein one or more of said withdrawals/transfers from at least one of said one or more FDIC-insured interest-bearing aggregated deposit accounts are requested by mail.

6. The method of claim 1, wherein one or more of said withdrawals/transfers from at least one of said one or more FDIC-insured interest-bearing aggregated deposit accounts are requested by messenger.

7. The method of claim 1, wherein one or more of said withdrawals/transfers from at least one of said one or more FDIC-insured interest-bearing aggregated deposit accounts are requested by telephone and distributed by mail.

8. The method of claim 1, wherein one or more of said withdrawals/transfers from at least one of said one or more FDIC-insured interest-bearing aggregated deposit accounts are requested by automated teller machine.

9. The method of claim 1, wherein the client transaction account funds for at least one client are held in FDIC-insured interest-bearing aggregated deposit accounts among a fixed plurality of banking institutions so that FDIC insurance coverage greater than the maximum FDIC insurance coverage available for deposits of a client held in a single banking institution is obtained for that client.

10. The method of claim 1, further comprising:

determining a client's preferences for banking institutions to hold its funds; and

causing distribution of any amounts over said specified amount by depositing/transferring to or withdrawing/transferring from said FDIC-insured interest-bearing aggregated deposit accounts in dependence on the client preferences for banking institutions.

11. The method of claim 1, wherein clients' funds are deposited and/or transferred to said client demand accounts by at least one method selected from the group consisting of

US 7,716,131 B2

7

check or draft, debit card, wire or electronic transfer, ACH credit, third party credits, and a sweep from another account.

**12**. The method of claim **1**, where the processing is of transaction data comprising six (6) or more withdrawals/transfers by check, within a month from each of a plurality of said client transaction accounts.

**13**. The method of claim **1**, where the processing is of transaction data comprising six (6) or more withdrawals/

8

transfers by debit card, within a month from each of a plurality of said client transaction accounts.

**14**. The method of claim **1**, wherein one or more of the FDIC-insured and interest-bearing aggregated deposit accounts are aggregated money market deposit accounts.

\* \* \* \* \*

# Exhibit 5

(12) **United States Patent**　　　　　(10) **Patent No.:**　**US 7,769,688 B1**

Bent et al.　　　　　　　　　　　　　　(45) **Date of Patent:**　　**Aug. 3, 2010**

(54) **MONEY FUND BANKING SYSTEM**

(75) Inventors: **Bruce Bent**, Manhasset, NY (US);
**Bruce Bent, II**, New York, NY (US)

(73) Assignee: **Island Intellectual Property LLC**, New
York, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this
patent is extended or adjusted under 35
U.S.C. 154(b) by 0 days.

(21) Appl. No.: **11/840,060**

(22) Filed: **Aug. 16, 2007**

**Related U.S. Application Data**

(60) Division of application No. 10/305,439, filed on Nov.
26, 2002, which is a continuation-in-part of applica-
tion No. 09/677,535, filed on Oct. 2, 2000, which is a
continuation-in-part of application No. 09/176,340,
filed on Oct. 21, 1998, now Pat. No. 6,374,231, said
application No. 10/305,439 is a continuation-in-part of
application No. 10/071,053, filed on Feb. 8, 2002, now
Pat. No. 7,519,551, which is a continuation-in-part of
application No. 09/176,340, filed on Oct. 21, 1998,
now Pat. No. 6,374,231.

(51) **Int. Cl.**
*G06Q 40/00*　　　(2006.01)

(52) **U.S. Cl.** ........................................ **705/40**; 235/379

(58) **Field of Classification Search** .................... 705/40
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,232,367 | A | 11/1980 | Youden et al. |
| 4,346,442 | A | 8/1982 | Musmanno |
| 4,376,978 | A | 3/1983 | Musmanno |
| 4,597,046 | A | 6/1986 | Musmanno |
| 4,674,044 | A | 6/1987 | Kalmus |
| 4,694,397 | A | 9/1987 | Grant |
| 4,700,297 | A | 10/1987 | Hagel |
| 4,751,640 | A | 6/1988 | Lucas et al. |
| 4,774,663 | A | 9/1988 | Musmanno |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 10-049590 | 2/1998 |

(Continued)

OTHER PUBLICATIONS

Anderson et al. "Retail Sweep Programs and Bank Reserves," Fed-
eral Reserve Bank of St. Louis Review, Bell & Howell Information
and Learning Company, vol. 83, Issue 1, 24 Sheets, Jan. 1, 2001.
ABA to Approve System for Sharing Deposit Coverage, American
Banker, Feb. 11, 2003.

(Continued)

*Primary Examiner*—Daniel S Felten
(74) *Attorney, Agent, or Firm*—Foley & Lardner LLP

(57)　　　　**ABSTRACT**

Providing interest to clients' deposited funds without the
legal limitation on the number of demand withdrawals from
deposit accounts is accomplished by an administration sys-
tem that keeps all of the records for the clients' deposits and
withdrawals, calculates the total of the deposits and with-
drawals for all clients, and uses the calculation to determine
whether funds are deposited to or withdrawn from a single
deposit account in which all clients' deposit funds are kept.
Clients can make unlimited withdrawals, such as by check,
credit card, debit card, or electronic transfer, through the
administrator. By placing the administrator as the holder of a
single account, legal exemptions to the limitation on earning
interest in demand accounts is facilitated.

**5 Claims, 2 Drawing Sheets**



**US 7,769,688 B1**

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,953,085 | A | 8/1990 | Atkins |
| 4,985,833 | A | 1/1991 | Oncken |
| 5,126,936 | A | 6/1992 | Champion et al. |
| 5,206,803 | A | 4/1993 | Vitagliano |
| 5,220,501 | A | 6/1993 | Lawlor et al. |
| 5,235,507 | A | 8/1993 | Sackler |
| 5,262,942 | A | 11/1993 | Earle |
| 5,270,922 | A | 12/1993 | Higgins |
| 5,291,398 | A | 3/1994 | Hagan |
| 5,297,032 | A | 3/1994 | Trojan |
| 5,424,938 | A | 6/1995 | Wagner et al. |
| 5,631,828 | A | 5/1997 | Hagan |
| 5,644,727 | A | 7/1997 | Atkins |
| 5,671,363 | A | 9/1997 | Cristofich |
| 5,689,650 | A | 11/1997 | McClelland et al. |
| 5,710,889 | A | 1/1998 | Clark |
| 5,765,144 | A | 6/1998 | Larche |
| 5,774,880 | A | 6/1998 | Ginsberg |
| 5,781,654 | A | 7/1998 | Carney |
| 5,806,048 | A | 9/1998 | Kiron et al. |
| 5,806,049 | A | 9/1998 | Petruzzi |
| 5,812,987 | A | 9/1998 | Luskin |
| 5,826,243 | A | 10/1998 | Musmanno |
| 5,852,811 | A | 12/1998 | Atkins |
| 5,864,685 | A | 1/1999 | Hagan |
| 5,878,258 | A | 3/1999 | Pizi |
| 5,878,405 | A | 3/1999 | Grant et al. |
| 5,890,141 | A | 3/1999 | Carney |
| 5,893,078 | A | 4/1999 | Paulson |
| 5,903,881 | A | 5/1999 | Schrader et al. |
| 5,905,974 | A | 5/1999 | Fraser |
| 5,940,809 | A | 8/1999 | Musmanno |
| 5,941,996 | A | 8/1999 | Smith |
| 5,946,667 | A | 8/1999 | Tull et al. |
| 5,950,175 | A | 9/1999 | Austin |
| 5,974,390 | A | 10/1999 | Ross |
| 5,978,779 | A | 11/1999 | Stein |
| 6,014,642 | A | 1/2000 | El-Kadi et al. |
| 6,016,482 | A | 1/2000 | Molinari |
| 6,026,438 | A | 2/2000 | Piazza |
| 6,041,314 | A | 3/2000 | Davis |
| 6,044,371 | A | 3/2000 | Person |
| 6,047,324 | A | 4/2000 | Ford |
| 6,052,673 | A | 4/2000 | Leon et al. |
| 6,088,685 | A | 7/2000 | Kiron et al. |
| 6,092,056 | A | 7/2000 | Tull et al. |
| 6,105,005 | A | 8/2000 | Fuhrer |
| 6,108,641 | A | 8/2000 | Kenna |
| 6,112,191 | A | 8/2000 | Burke |
| 6,119,093 | A | 9/2000 | Walker et al. |
| 6,131,810 | A | 10/2000 | Weiss |
| 6,154,770 | A | 11/2000 | Kostakos |
| 6,189,785 | B1 | 2/2001 | Lowery |
| 6,226,623 | B1 | 5/2001 | Schein et al. |
| 6,374,231 | B1 | 4/2002 | Bent et al. |
| 7,103,556 | B2 | 9/2006 | Del Rey |
| 7,133,840 | B1 | 11/2006 | Kenna et al. |
| 7,206,761 | B2 | 4/2007 | Colvin |
| 7,216,100 | B2 | 5/2007 | Elliott |
| 7,376,606 | B2 | 5/2008 | Jacobsen |
| 7,440,914 | B2 | 10/2008 | Jacobsen |
| 2001/0032182 | A1 | 10/2001 | Kumar et al. |
| 2002/0007330 | A1 | 1/2002 | Kumar et al. |
| 2002/0069147 | A1 | 6/2002 | Sheehan et al. |
| 2002/0091637 | A1 | 7/2002 | Bent |
| 2002/0128951 | A1 | 9/2002 | Kiron et al. |
| 2002/0161707 | A1 | 10/2002 | Cole et al. |
| 2002/0165757 | A1 | 11/2002 | Lisser |
| 2002/0178098 | A1 | 11/2002 | Beard |
| 2003/0023529 | A1 | 1/2003 | Jacobsen |
| 2003/0135437 | A1 | 7/2003 | Jacobsen |

| | | | |
|---|---|---|---|
| 2003/0149646 | A1 | 8/2003 | Chen et al. |
| 2003/0163403 | A1 | 8/2003 | Chen et al. |
| 2003/0177092 | A1 | 9/2003 | Paglin |
| 2003/0191702 | A1 | 10/2003 | Hurley |
| 2003/0236728 | A1 | 12/2003 | Sunderji et al. |
| 2004/0039674 | A1 | 2/2004 | Coloma |
| 2004/0107157 | A1 | 6/2004 | Bleunven et al. |
| 2004/0111361 | A1 | 6/2004 | Griffiths et al. |
| 2004/0128229 | A1 | 7/2004 | Raines et al. |
| 2004/0128235 | A1 | 7/2004 | Kemper et al. |
| 2004/0162773 | A1 | 8/2004 | Del Rey et al. |
| 2004/0177036 | A1 | 9/2004 | Nutahara et al. |
| 2005/0044038 | A1 | 2/2005 | Whiting |
| 2005/0091137 | A1 | 4/2005 | Woeber |
| 2005/0102225 | A1 | 5/2005 | Oppenheimer et al. |
| 2005/0102226 | A1 | 5/2005 | Oppenheimer et al. |
| 2005/0108120 | A1 | 5/2005 | Malka et al. |
| 2005/0108149 | A1 | 5/2005 | Bent et al. |
| 2005/0114246 | A1 | 5/2005 | Coloma |
| 2005/0154662 | A1 | 7/2005 | Langenwalter |
| 2005/0228733 | A1 | 10/2005 | Bent et al. |
| 2006/0047593 | A1 | 3/2006 | Naratil et al. |
| 2006/0106703 | A1 | 5/2006 | Del Rey et al. |
| 2006/0155644 | A1 | 7/2006 | Reid et al. |
| 2006/0167773 | A1 | 7/2006 | Yang et al. |
| 2006/0273152 | A1 | 12/2006 | Fields |
| 2007/0043666 | A1 | 2/2007 | Burdette |
| 2007/0255655 | A1 | 11/2007 | Kemper et al. |
| 2007/0271174 | A2 | 11/2007 | Bent et al. |
| 2007/0276752 | A1 | 11/2007 | Whiting et al. |
| 2007/0288400 | A1 | 12/2007 | Menon |
| 2008/0015985 | A1 | 1/2008 | Abhari et al. |
| 2008/0046358 | A1 | 2/2008 | Holm-Blagg et al. |
| 2008/0065532 | A1 | 3/2008 | De La Motte |
| 2008/0097899 | A1 | 4/2008 | Jackson et al. |
| 2008/0133280 | A1 | 6/2008 | Ziegler |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO - 95/23379 | 8/1995 |
| WO | WO - 99/18529 | 4/1999 |
| WO | WO - 03/012580 | 2/2003 |
| WO | WO - 2005/006111 | 1/2005 |

### OTHER PUBLICATIONS

American Banker Online—New Pitch: Deposit Insurance Sharing, Jan. 21, 2003, pp. 1-4.

Bent, "Bruce Bent Makes Money Market Funds Act Like Bank Accounts," Equity BBDP, Oct. 5, 1998, 3 Sheets.

Blackwell, Rob, "New Pitch: Deposit Insurance Sharing", American Banker Online, Jan. 21, 2003.

Britt, "Struggling with Sweep Accounts," America's Community Banker, vol. 6, No. 12, 11 Sheets, Dec. 1, 1997.

Certificate of Deposit Registry Service: Keeping deposits in the corn patch, Banknews, Mar. 2003.

Chapelle, "Merrill's Rivals Say They, Too. Offer Services Beyond Banking," Securities Data Publishing on Wall Street, 2 Sheets, Feb. 1, 2003.

Chapelle et al. "Peering Into Tomorrow: At the Threshold of a New Century, Brokers and Others Discuss Where They were Going," Securities Data Publishing on Wall Street, 6 Sheets, Dec. 1, 1999.

Coyle, "A Look at commercial Demand Deposit Options," America's Community Banker, vol. 9, Issue 2, Bell & Howell Information and Learning Company, 9 Sheets, Feb. 1, 2000.

Crockett, "Big Banks Found Stepping Up Marketing of 'Sweep' Accounts," American Banker, vol. 159, No. 198, American Banker Inc., 3 Sheets, Oct. 13, 1994.

Declaration of Mr. Bruce Bent II, Vice Chairman and Registrant of Applicant on the date of first commercial use of the service providing interest and FDIC insurance for checking accounts by means of a system using money market deposit accounts (MMDA's) of Oct. 23, 1997.

Fredrickson, "Rising Rates Rescue Money Fund Firm Reserve Profits by Picking Niches," Crain's New York Business, Crain Communications Inc., vol. 20, Issue 51, 2 Sheets, Dec. 20, 2004.
Heavyweight Funding, Bankers News, Mar. 4, 2003, pp. 1-2, vol. II, issue No. 5.
Hoffman, "Reserve's FDIC-Insured Account Draws Regionals; But some see little need for insurance," Crain Communications Inc., Investment News, 2 Sheets, Jun. 4, 2001.
Keenan, "Tapping Brokerages for Alternative to CDs," American Banker, The Financial Services Daily, 3 Sheets, Feb. 18, 2004.
Lavine, "Check Out High-Yield Checking Accounts," Broward Daily Business Review, vol. 39, No. 102, 2 Sheets, Apr. 27, 1998.
McReynolds, "The Power of Cash: Ho-hum cash can be great product (and lead to more business) in troubled times," Securities Data Publishing on Wall Street, 3 Sheets, Jun. 1, 2002.
McReynolds et al. "Unusual Products for Unusual Times," Securities Data Publishing on Wall Street, 6 Sheets, May 1, 2001.
News article: "Regulators Support Demand Deposit Bill", Regulatory Compliance Watch—Mar. 9, 1998; p. 1; vol. 9, No. 10.
Potter, "As Sweep Accounts Continue to Grow, So do Community Bank Options," America's Community Banker, vol. 9, Issue 8, Bell & Howell Information and Learning Company, 3 Sheets, Aug. 1, 2000.
Promontory Interfinancial Network: http://www.promnetwork.com/index.html, 2003.
Share, "New Service Skirts FDIC's $100K Limit," Dialog Web Command Mode, 2 Sheets, Jun. 13, 2003, http://www.dialogweb.com/cgi/dwclient.
Smith, "IBAA Won't Push Interest-Bearing Checking for Business; Says Too Few Members Want It," The American Banker, 2 Sheets, Apr. 18, 1996.
Stafford, "New Bank Program Allows $1 Million in Insured Deposits," Dialog Web Command Mode, 3 Sheets, Aug. 24, 2003, http://www.dialogweb.com/cgi/dwclient.
Wilson, "How Cash Management Services Can Help Your Bank Cultivate New Relationships with Commercial Customers," America's Community Banker, vol. 10, Issue 5, Bell & Howell Information and Learning Company, 8 Sheets, May 1, 2001.
"Man Bites Dog: Funds Move Into Banking," IBC's Money Fund Selector, 2 Sheets, Nov. 6, 1998.
About iMoneyNet, Inc., About iMoneyNet's Money Funds Division, 4 Sheets, Aug. 21, 2003, http://www.ibcdata.com/about.htm.
"Reverse Ups Insurance Limit on Money Market Account," Thomson Financial Inc., Mutual Fund Market News, 1 Sheet, Aug. 26, 2002.
"The Reverse Funds to Offer up to $600,000 of FDIC Insurance on Reserve Insured Deposits; Addressing Investor Needs for Increased Safety, Flexibility and a Competitive Yield," Business Wire, Inc. Business Wire, 2 Sheets, Aug. 13, 2002.
"The Bank of New York adds a $300,000 FDIC-Insured Money Market Account Option to its Dividend Income Checking Account," PR Newswire Associations, Inc., PR Newswire, 2 Sheets, Apr. 18, 2002.
The Reserve Fund, Study of U.S. Patent No. 6,374,231, 1 Sheet.
"Bank of Oak Ridge to Offer FDIC Insurance on up to $1.5 Million," Dialog Web Command Mode, 2 Sheets, Sep. 25, 2003, http://www.dialogweb.com/cgi/dwclient.
Reserve Management Corporation, Reserve Insured Deposits, U.S. Appl. No. 76/315,600, Issued.
The Reserve, "What Sets Us Apart," 2 Sheets, Oct. 4, 2006, http://www.ther.com/bank/bank_wsua.shtml.
The Reserve, "Reserve Insured Deposits," 2 Sheets, Oct. 4, 2006, http://www.ther.com/ps/ps_fif.shtml.
The Reserve, "Company History," 3 Sheets, Oct. 4, 2006, http://www.ther.com/aboutus/history.shtml.
The Reserve, "Reserve Insured Deposits Program," 2 Sheets, Oct. 4, 2006, http://www.ther.com/bank/bank_insdep.shtml.
Reserve Insured Deposits, United States Patent and Trademark Office, Reg. No. 2,694,910, Registered Mar. 11, 2003, 1 Sheet.
Capital Briefs: Corporate Checking Account Relief Sought, American Banker, vol. 162, Jul. 28, 1997, 1 Sheet.
Letter From William W. Wiles, Secretary of the Board, Board of Governors of the Federal Reserve System, Jun. 22, 1983, 6 Sheets.
DI 48, Excerpts of Transcript of Hearing, U.S. Dist. Ct., District of Delaware, Civil Action No. 82-680, Apr. 8, 1983, 5 sheets.

DI 56, Interrog. Response, U.S. Dist. Ct. District of Delaware, Civil Action No. 82-680, May 20, 1983, 15 Sheets.
DI 99, Suppl. Interrogatory Response, U.S. Dist. Ct., District of Delaware, Civil Action No. 82-630, May 30, 1984, 6 Sheets.
Letter from Michael Bradfield, General Counsel, Board of Governors of the Federal Reserve System, Nov. 16, 1984, 4 Sheets.
Board of Governors of the Federal Reserve System, 1984 Fed. Res. Interp. Ltr. Lexis 56, Nov. 16, 1984, 3 Sheets.
Letter From Oliver I. Ireland, Associate General Counsel, Board of Governors of the Federal Reserve System, Jun. 22, 1988, 5 Sheets.
Board of Governors of the Federal Reserve System, 1988 Fed. Res. Interp. Ltr. Lexis 141, Jun. 22, 1988, 3 Sheets.
U.S. Appl. No. 60/307,815, filed Jul. 27, 2001.
U.S. Appl. No. 60/323,365, filed Sep. 20, 2001.
Board of Governors of the Federal Reserve System, 1989 Fed. Res. Interp. Ltr. Lexis 77, Mar. 14, 1989, 2 Sheets.
Board of Governors of the Federal Reserve System, 1989 Fed. Res. Interp. Ltr. Lexis 154, Jun. 21, 1989, 2 Sheets.
Board of Governors of the Federal Reserve System, 1990 Fed. Res. Interp. Ltr. Lexis 94, Feb. 1, 1990, 1 Sheet.
Board of Governors of the Federal Reserve System, 1991 Fed. Res. Interp. Ltr. Lexis 232, Jan. 30, 1991, 2 Sheets.
CMA, The Merrill Lynch Cash Management Account Financial Service, Insured Savings Account Participating Depository Institutions, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Nov. 1992, 2 Sheets.
Board of Governors of the Federal Reserve System, 1994 Fed. Res. Interp. Ltr. Lexis 156, Jun. 24, 1994, 3 Sheets.
CMA, Insured Savings Account Fact Sheet, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Jul. 1994, pp. 47-54.
Board of Governors of the Federal Reserve System, 1994 Fed. Res. Interp. Ltr. Lexis 314, Oct. 17, 1994, 2 Sheets.
Board of Governors of the Federal Reserve System, 1994 Fed. Res. Interp. Ltr. Lexis 419, Oct. 14, 1994, 4 Sheets.
CMA, The Merrill Lynch Cash Management Account Financial Service, Insured Savings Account Participating Depository Institutions, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Mar. 1995, 2 Sheets.
Letter from Stephanie Martin, Assoc. General Counsel, Board of Governors of the Federal Reserve System, Apr. 22, 2004, 8 Sheets.
Bank Deposit Program, Online http://web.archive.org/web/20030620100115/http://www.smithbarney.com/products_servi, Jan. 19, 2001, 4 Sheets.
Declaration of Mr. Bruce Bent II, Vice Chairman and Registrant of Applicant. (3 Sheets) and Exhibits A, B, C and D (6 Sheets).
Letter From Jamey Basham, Attorney, LEXSEE 1990 FDIC Interp. Ltr., Lexis 1, Federal Deposit Insurance Corporation, FDIC-90-02, Jan. 3, 1990, 2 Sheets.
Letter From Colleen Curran Harvey, Deputy Chief Counsel, Jan. 8, 1985; Letter From Merle Y. Waldman, Nov. 14, 1984; Letter From Merle Y. Waldman, Sep. 24, 1984; Letter From Merle Y. Waldman, Aug. 8, 1984, LEXSEE 1985 Sec No- Act., Lexis 1593, Securities Exchange Act of 1934—Section 15(a), 11 Sheets.
The Insured Savings Account, Issuer Guide to Offering MMDAs Through Merrill Lynch, Merrill Lynch Money Markets, Inc., "Operational Guide to the Merrill Lynch MMDA Program 1986", Sep. 1986 3 Sheets.
FDIC Federal Register Citations: Email from Bert Ely to Comments, Mar. 8, 2006, Subject: Large-Bank Deposit Insurance Determination Proposal- RIN 3064-AC98—Regs@fdic.gov. Attached, also from FDIC Federal Register Citations: Email From American Banker, by Bert Ely, Feb. 24, 2006, Viewpoint: FDIC's Account-Link Plan a Pointless, Costly Threat.
Letter to Mr. Jonathan L. Levin, Esq., From Oliver Ireland, Associate General Counsel, Oct. 18, 1996, 2 Sheets.
Letter to Mr. L.P. Fleming, Jr., Esq., From Oliver Ireland, Associate General Counsel, Feb. 7, 1995, 3 Sheets.
Letter to Mr. James E. Creekman, Group Vice President, From Oliver Ireland, Associate General Counsel, Aug. 1, 1995, 4 Sheets.
Letter to Ms. Brenda L. Skidmore, Senior Vice President, From Oliver Ireland, Associate General Counsel, Aug. 30, 1995, 4 Sheets.

**US 7,769,688 B1**

Page 4

Part: 2, Monetary Policy and Reserve Requirements, Subpart—Regulation D, Board Interpretations of Regulation D, Transaction Accounts—Linked to Time Deposits, vol. 1, Federal Reserve Regulatory Service, 2 Sheets.

12 C.F.R. Part 329—Interest on Deposit, Source: 51 FR 10808, Mar. 31, 1986, 5 Sheets.

Merriam-Webster Online Dictionary, 10th Edition, Definition of "Associated", 2 Sheets.

Merrill Lynch & You, "Financial Services the Way You Want, When You Want Them," Jan. 2000 4 Sheets.

Merrill Lynch, Pierce, Fenner & Smith Incorporated, "Information Statement," 2000, 12 Sheets.



*FIG. 1*

*FIG. 2*



US 7,769,688 B1

1

## MONEY FUND BANKING SYSTEM

The present application is a Divisional of application Ser. No. 10/305,439 filed Nov. 26, 2002, which is a Continuation-in-Part of application Ser. No. 09/677,535 filed Oct. 2, 2000, and Ser. No. 10/071,053 filed Feb. 8, 2002, which are Continuations of application Ser. No. 09/176,340 filed Oct. 21, 1998 (U.S. Pat. No. 6,374,231 B1); all these applications are incorporated herein by reference in their entireties for all purposes.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The novel system is in the field of account transaction processing and provides an administered money fund banking system that is integrated with an insured deposit account.

### 2. State of the Art

The Federal Deposit Insurance Corporation ("FDIC") is a federal governmental entity that provides insurance for deposits in most banks and savings institutions in the United States. Bank deposits are insured by the FDIC's Bank Insurance Fund ("BIF") and savings institutions' deposits are insured by the FDIC's Savings Association Insurance Fund ("SAIF"). The rules governing insurance of deposits of institutions insured by the BIF and the SAIF are the same. The FDIC bases insurance coverage on the concept of ownership rights and capacities: funds held in different ownership categories are insured separately from each other, and funds of the same ownership but held in different accounts are subsumed under the same insurance coverage. The amount of insurance covered provided to depositors of each institution insured by BIF and SAIF is the same: $100,000.00 to the owner(s) of the funds in the account(s), including principal and interest.

Title 12, Part 329, of the Code of Federal Regulations ("CFR") specifies that "no bank shall, directly or indirectly, by any device whatsoever, pay interest on any demand deposit." (12 C.F.R. §329.2.) A "deposit" is any money put into a savings account, a checking account, or time account such as a certificate of deposit. A "demand" account is one from which the owner of the account can demand that funds be drawn and paid elsewhere, either to another account (of the same or a different owner) or to a third party. These payments are typically made via a bank draft or check, or a credit or debit card. A account different than a demand account is an account where all or a fixed amount of the principal must be maintained in the account for a period of time to achieve the particular benefits offered by that account. As stated in this section of the CFR, a "demand deposit" includes any deposit in account under which terms the depositor is authorized to make, during any month or statement cycle of at least four weeks, more than six transfers by means of a preauthorized or automatic transfer of telephone (including data transmission) agreement, order or instruction, which transfers are made to another account of the depositor at the same bank, to the bank itself, or to a third party provided that such an account will be deemed a demand deposit if more than three of the six authorized transfers are authorized to be made by check, draft, debit card or similar order made by the depositor. (12 C.F.R. §329.1 (b)(3).) On the other hand, withdrawals from a deposit account are not deemed to be included within the six transfers permitted for a non-demand account when the withdrawals are made by mail, messenger, telephone (via check mailed to the depositor), automated teller machine, or in person. In essence, unless the funds of a deposit are held in a NOW account (18 U.S.C. 1832(a)), an account in which a depositor

2

has the ability to make at least six transfers will be deemed a demand account and no interest will be payable on the funds therein. Therefore, owners of demand accounts are denied interest on their funds.

## SUMMARY OF THE INVENTION

In light of this regulatory scheme, it would be beneficial to provide depositors of demand accounts with interest from the funds on deposit while simultaneously providing unlimited (or at least six) transfers of the funds therein. For example, it would be beneficial to provide such depositors with the ability to deposit funds into the demand account from various sources, and to make payments from the demand account via different instruments, without limitation as to the number of transfers, and still earn interest on the funds in the clients' accounts.

To accomplish these and other objectives, this invention provides a system for managing a plurality of accounts for multiple clients by administering at a banking institution a single insured deposit account in which all of the funds for the insured deposit accounts are held, providing a database having client information for each client's account, administering clients' deposits to and withdrawals from each of their accounts, authorizing whether funds in a particular client's account can be used for each payment requested from that clients account, determining as the net transaction of the sum of the insured money market account deposits and withdrawals from the plurality of insured money market accounts on a regular periodic basis, using the determination of the net transaction to deposit funds to or withdraw funds from the single insured deposit account, distributing interest earned on the single deposit account to each of the clients in proportion to their portion of funds in the deposit account, and updating the database for each client's deposits and authorized demand payments.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. **1** and **2** illustrates a flow chart depicting certain processing steps the system follows.

## DESCRIPTION OF SPECIFIC EMBODIMENTS OF THE INVENTION

The present system will be described with reference to an administrator, which can be brokerage, a bank, or another entity with which clients can institute financial transactions such as deposits and demand payments. The administrator appears to each client as if it were, in part, a bank, by accepting deposits for the client's account and by authorizing (and then making) payments demanded by the client from his account. The funds for all of the clients are pooled into a single fund that is maintained as an insured deposit account at a licensed banking institution. This system is preferably implemented in combination with a brokerage account so that the client can centralize all of his financial needs: deposit of funds; demand orders for payment (checking); payment authorization by debit card; securities transactions; retirement plans; and the like.

The following description of the hardware and software is for exemplification of a working system; other architectures can be fashioned to make the systems and perform the methods claimed herein. The system has been implemented on a mainframe computer (e.g., an IBM Application Starterpac 3000 model A20, which is capable of processing 63 million instructions per second) with an operating system such as

US 7,769,688 B1

**3**

OS/390 and MVS/ESA running a relational database (e.g., DB2 type database). The programming languages are IBM COBOL, CICS languages along with IBM's CSP screen generation language. For such a system, memory requirements are satisfied with 768 Gigabytes of storage (preferably, e.g., 1024G) with a disk storage and recovery system, such as RAID), Communications generally are run on a mixed SNA and TCPAP network. Communications with a local area network via a local control unit can be implemented using a token ring. Connection to an internal network has been made via an IBM open systems adapter (OSA) running TCP/IP, which allows File Transfer Protocol (ftp) via a firewall. Bisynchronous and synchronous file transfer protocols are made through various dial-up media. Terminal Access runs on an Ethernet local area network, using an SAA gateway, and other gateways (e.g., Cytrix and Netsoft) for remote access. Additionally, several lease lines for several applications and terminal access are supported by the system.

FIG. **1** is a flowchart depicting certain processing steps the system follows at the administrators end. It should be understood that the order in which these steps are performed may be varied without impairing the achievement of the aforementioned objects of the invention. The client adds funds ("deposits") to his account typically via check **101**, sweeps **103** of funds from another account (e.g., a broker/dealer account), and/or by wire and other transfers **105** (such as fed funds wire and direct deposit via ACH) for investment in an FDIC insured money fund account. These funds are deposited in a deposit account with a bank on behalf of the participant. The amount of each of the deposited items is summed **107** to determine the deposits for each client, preferably on a regular periodic basis (e.g., daily) or instantaneously. On the other side, the administrator provides the participant with access to his funds by various methods: payments can be made from funds drawn from the account by check **109**; electronic funds transfer **110**; debit card **111** authorized by the client (and ACH debit); sweeps of funds **113** to another account (e.g., a broker/dealer account); and electronic and voice access **114** (e.g., interne online banking, banking by telephone) for automated transaction requests; and transactions authorized by mail A "sweep" is an automated movement of funds between a client's other account (e.g., a broker/dealer account) and his insured deposits account (in either direction). The registration on the other account and the insured deposit account are identical; there is a one for one relationship between the brokerage account and the insured deposits account.

The sum of the deposits is processed **117** with information **119** from a database (described later) that stores information about the demand account for each client. Each clients account is credited **121** with the sum of the deposits for that particular account, which may amount to zero on a particular day. Similarly, the sum of withdrawals are processed **123** to determine what should be debited from the account, which may also amount to zero on a particular day. The deposits and withdrawals for each account during a given period are compared **125** to determine whether sufficient funds are present in the client's account, including the added funds, to pay the withdrawals requested by the client. In other words, processing determines which client accounts to credit or debit for the various transactions (sweep, checks, debit cards, ACH, etc.) received each business period (e.g., daily). These transactions can be received from one or more sources, such as brokerage firms (sweep transactions), banks (deposits made by wire transfer, checks presented for payment, ACH, debit card transactions), the mail (check deposits, redemption requests), and telephone requests. "Telephone" requests can be per-

**4**

formed by voice, conversing with an operator/broker or a voice response system, or via a touch-tone phone using a menu system, or electronically via the interne using email or the World Wide Web (e.g., a web page, preferably secure, onto which users can log in and conduct on-line banking). The final step in the day's processing is to determine the net credit or debit for the deposit account at the bank; the net activity represents all transactions that were processed that day for all insured deposit accounts.

If sufficient funds are not available for drafts and other orders to pay, the requested withdrawal(s) are denied and the client's total account information is again accessed to determine **129** if the client has sufficiently available margin to cover the requested withdrawal(s) (other than, preferably, sweep transactions),If insufficient funds and insufficient margin are available, then the requested withdrawal is denied **131**. The client's margin typically is determined by the value of the client's funds held in the client's broker/dealer (securities) account. When sufficient funds are available in the insured deposit account, or a sufficient margin is available in the client's securities account with the administrator, then a debit is made **133** to the client's insured deposit account in the amount of the withdrawal(s) allowed (based on the funds and margin then available) and the processed and authorized withdrawals are paid as directed by the client. The sum of the processed credits **121** and the processed debits **133** are determined for all of the administrators clients to arrive at a net account activity determination **135**. The order in which credits and debits are processed depends upon a subjective protocol and/or operation of law. For example, transactions that are pre-approved (such as authorized debit card transactions, and sweeps) are likely to be processed when received; transactions requiring authorization or acceptance by a third party (such as a bank draft or check) may be credited to the insured deposit account but not available for withdrawal until authorization or acceptance.

The net account activity determination **135** is then used to determine a net credit/debit **139** for the single deposit account held at the bank that contains all of the funds of all of the administrator's clients; the deposit account must be debited or credited to account for all clients' deposits and withdrawals during the period. If the net result is positive (e.g., amount of deposits processed minus amount of authorized withdrawals processed is positive), then the calculated amount is deposited **141** to the single account. If the net result is negative(e.g., amount of deposits processed minus amount of withdrawals processed is negative), then the calculated amount is withdrawn **143** from the single deposit account. An individual insured money market account is maintained for each client on a administrator's database. Each transaction received for an account is individually posted against the client's account on the database. Funds are exchanged between the appropriate parties to cover transactions (broker for sweep transactions; bank for debit cards, checks, ACH, etc.). These actions are posted and settled prior to any activity taking place in the insured deposit account at the bank. In a preferred embodiment, the last movement of funds on each day is the net movement of funds (credit or debit) that takes place in the deposit account at the bank. The sum of the account balances (principle plus interest) for clients participating in this system equals the balance in the deposit account at the bank.

The information from the calculations of a net credit/debit **139** are used to implement the processing of the actual deposit or withdrawal (**141**, **143**) to the deposit account, and that information (and funds, if required) is sent to the bank **143** to execute the actual deposit or withdrawal required. If the deposit account is to be credited, then deposits are transferred

US 7,769,688 B1

| 5 | 6 |

to the bank and credited to the deposit account 147; conversely, if funds are to be withdrawn from the deposit account, a bulk withdrawal is made from the deposit account to account for the withdrawals that have been authorized from the clients' accounts; in essence, the withdrawal from the deposit account need only make up the difference between the authorized withdrawals and the deposits. If the client wishes to use his excess margin buying power for overdraft protection, the broker/dealer transmits the client's available margin line to the administrator regularly (preferably daily), The available margin line will be taken into consideration when checks, debit card, and other draft and order to pay transactions (e.g., ACH debits, on-line banking withdrawals, and other electronic payments) are processed. If the client's margin line is used to process a check or debit card transaction, a loan will be created and transmitted to the broker dealer by the administrator. Preferably, the broker dealer maintains the margin loan on his system and will pay the administrator for all funds advanced. Using this methodology for margin accounts, there is no effect on the deposit account at the bank.

The bank pays interest 149 on the single deposit account to the administrator. Based on the amount of each client's funds in the deposit account as a function of the total amount in the deposit account, the administrator determines the interest amount (if any) each client is owed (based also on the period during which the interest was determined on a particular account balance). Because all of the clients' funds are in a single account under the name of the administrator, the administrator earns the interest and distributes the interest earned to each of the clients. Further, the limitation on transfers from an interest-bearing account is inapplicable to the clients because their funds are held by the administrator in a demand account and interest for the client is determined only on that portion of those funds maintained in the bank's deposit account. Preferably, if necessary, the administrator makes any withdrawals from the deposit account in person.

After the deposit account has been credited or debited in accordance with the determination for that period of the sum of the deposits and withdrawals from clients, and the interest earned on the single deposit account, this information is transferred back to the administrator's deposits database 151. This database includes information about each client (such as name, address, and other important or desired demographic and tax information about each client's account), as well as financial information regarding the client's holdings on deposit in the bank (i.e., that client's portion of the single deposit account) and holdings with the administrator (e.g., securities and the like).

As seen, the administrator maintains several relationships that provide services for the insured money market accounts. These various entities provide transaction data that is transmitted to the administrator and processed. Preferably, the administrator is it's own transfer agent and provides a shareholder accounting system. Preferably, accounts may be opened through a broker dealer that is a client of the administrator, or directly with an application and check.

The administrator may allow a client with an account under the present system to access his funds by check or with a debit card; in such a case, the administrator has arranged for these services and maintains these relationships which are separate and apart from the deposit account. Banks that provide check and card services will transmit a file each day to the administrator that contains the checks presented for payment and/or the debit card transactions. The transactions that apply to his account under the present system are out sorted and processed against the administrator's database. The administrator will settle with each bank for the transactions that were processed.

The administrator may accept direct deposit of payroll, social security, or pensions for accounts. The clients' accounts are updated as these files are received and processed. The administrator may also accepts ACH debit transactions, which are initiated by the client's bank or a third party at the client's request.

The administrator may also provide the participants with automated bill paying services. Participants preferably provided with a touchtone bill paying system and/or an on line banking service. Bill payment requests may be downloaded each morning for processing.

The foregoing description is meant to be illustrative and not limiting. Various changes, modifications, and additions may become apparent to the skilled artisan upon a perusal of this specification, and such are meant to be within the scope and spirit of the invention as defined by the claims.

What is claimed is:

1. A system for managing a plurality of client transaction accounts of a banking institution associated with a plurality of respective clients of the banking institution for a plurality of transactions, comprising:

one or more computers programmed to be capable of performing the following operations:

(a) accessing one or more databases for carrying out one or more of the following steps, wherein the database comprises information for each client transaction account, wherein client transaction account funds for the client transaction accounts are aggregated in one or more FDIC-insured and interest-bearing aggregated deposit accounts held at the banking institution, and wherein the information for each of the client transaction accounts includes information on each client's funds held in said one or more insured and interest-bearing aggregated deposit accounts;

(b) administering client deposits/transfers to and withdrawals/transfers from said client transaction accounts using the one or more computers, said administering step comprising processing more than six (6) withdrawals/transfers selected from the group consisting of check, debit card, ACH, and credit card within a month from each of a plurality of said client transaction accounts;

(c) determining by the one or more computers on a regular basis at least one aggregated net transaction for a plurality of said clients comprising a sum of said clients' deposits/transfers to and withdrawals/transfers from said respective clients' transaction accounts at the banking institution;

(d) determining by the one or more computers from said at least one aggregated net transaction whether to deposit/transfer funds to or withdraw/transfer funds from said one or more FDIC-insured and interest-bearing aggregated deposit accounts;

(e) processing needed deposits/transfers to, or needed withdrawals/transfers from said one or more FDIC-insured and interest-bearing aggregated deposit accounts based on said determining from said at least one aggregated net transaction step, so that more than six (6) withdrawals/transfers are made during a month from one of said one or more FDIC-insured and interest-bearing aggregated deposit accounts via at least one intermediate bank that is different from the banking institution; and

(f) updating by the one or more computers the database with each client's deposits/transfers to and withdrawals/transfers from said each client's respective transaction account.

US 7,769,688 B1

7

**2**. The system of claim **1**, wherein said one or more computers are programmed to make withdrawals by draft or check, credit card, sweeps, wire or electronic transfer and combinations thereof.

**3**. The system of claim **1**, wherein the one or more computers are further programmed to deny a withdrawal transaction from one of the client transaction accounts if that client transaction account does not have sufficient funds to cover that withdrawal transaction, or access to sufficient margin or line of credit.

**4**. The system of claim **1**,

wherein said one or more computers are programmed to facilitate a manner of making said withdrawals/transfers

8

and/or deposits/transfers from at least one of said one or more FDIC-insured and interest-bearing deposit accounts to preserve that account's interest-bearing status regardless of the number of said withdrawals and/or transfers from said at least one of said one or more FDIC-insured and interest-bearing deposit accounts.

**5**. The system of claim **1**, further comprising the one or more computers programmed to be capable of performing the step of, after accrual in the one or more aggregate deposit accounts, distributing interest to each of the client transaction accounts in dependence on a balance in that respective client transaction account.

\* \* \* \* \*

# Exhibit 6

US007809640B1

(12) **United States Patent**
Bent et al.

(10) **Patent No.:** US 7,809,640 B1
(45) **Date of Patent:** Oct. 5, 2010

(54) **MONEY FUND BANKING SYSTEM**

(75) Inventors: **Bruce Bent**, Manhasset, NY (US);
**Bruce Bent, II**, Manhasset, NY (US)

(73) Assignee: **Island Intellectual Property LLC**, New
York, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this
patent is extended or adjusted under 35
U.S.C. 154(b) by 0 days.

(21) Appl. No.: **11/840,052**

(22) Filed: **Aug. 16, 2007**

**Related U.S. Application Data**

(60) Division of application No. 10/305,439, filed on Nov.
26, 2002, which is a continuation-in-part of applica-
tion No. 09/677,535, filed on Oct. 2, 2000, which is a
continuation-in-part of application No. 09/176,340,
filed on Oct. 21, 1998, now Pat. No. 6,374,231, said
application No. 10/305,439 is a continuation-in-part of
application No. 10/071,053, filed on Feb. 8, 2002, now
Pat. No. 7,519,551, which is a continuation-in-part of
application No. 09/176,340, filed on Oct. 21, 1998.

(51) **Int. Cl.**
**G06Q 40/00** (2006.01)

(52) **U.S. Cl.** ........................................ **705/40**; 235/379

(58) **Field of Classification Search** .................... 705/40
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,232,367 A | 11/1980 | Youden et al. | |
| 4,346,442 A | 8/1982 | Musmanno | |
| 4,376,978 A | 3/1983 | Musmanno | |
| 4,597,046 A | 6/1986 | Musmanno | |
| 4,674,044 A | 6/1987 | Kamus | |
| 4,694,397 A | 9/1987 | Grant | |
| 4,700,297 A | 10/1987 | Hagel | |
| 4,751,640 A | 6/1988 | Lucas et al. | |
| 4,774,663 A | 9/1988 | Musmanno | |

(Continued)

FOREIGN PATENT DOCUMENTS

JP        10-049590        2/1998

(Continued)

OTHER PUBLICATIONS

Anderson et al. "Retail Sweep Programs and Bank Reserves," Fed-
eral Reserve Bank of St. Louis Review, Bell & Howell Information
and Learning Company, vol. 83, Issue 1, 24 Sheets, Jan. 1, 2001.

(Continued)

*Primary Examiner*—Daniel S Felten
(74) *Attorney, Agent, or Firm*—Foley & Lardner LLP

(57) **ABSTRACT**

Providing interest to clients' deposited funds without the
legal limitation on the number of demand withdrawals from
deposit accounts is accomplished by an administration sys-
tem that keeps all of the records for the clients' deposits and
withdrawals, calculates the total of the deposits and with-
drawals for all clients, and uses the calculation to determine
whether funds are deposited to or withdrawn from a single
deposit account in which all clients' deposit funds are kept.
Clients can make unlimited withdrawals, such as by check,
credit card, debit card, or electronic transfer, through the
administrator. By placing the administrator as the holder of a
single account, legal exemptions to the limitation on earning
interest in demand accounts is facilitated.

**7 Claims, 2 Drawing Sheets**



**US 7,809,640 B1**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,953,085 | A | 8/1990 | Atkins |
| 4,985,833 | A | 1/1991 | Oncken |
| 5,126,936 | A | 6/1992 | Champion |
| 5,206,803 | A | 4/1993 | Vitagliano |
| 5,220,501 | A | 6/1993 | Lawlor et al. |
| 5,235,507 | A | 8/1993 | Sackler |
| 5,262,942 | A | 11/1993 | Earle |
| 5,270,922 | A | 12/1993 | Higgins |
| 5,291,398 | A | 3/1994 | Hagan |
| 5,297,032 | A | 3/1994 | Trojan |
| 5,424,938 | A | 6/1995 | Wagner et al. |
| 5,631,828 | A | 5/1997 | Hagan |
| 5,644,727 | A | 7/1997 | Atkins |
| 5,671,363 | A | 9/1997 | Cristofich |
| 5,689,650 | A | 11/1997 | McClelland et al. |
| 5,710,889 | A | 1/1998 | Clark |
| 5,765,144 | A | 6/1998 | Larche |
| 5,774,880 | A | 6/1998 | Ginsberg |
| 5,781,654 | A | 7/1998 | Carney |
| 5,806,048 | A | 9/1998 | Kiron et al. |
| 5,806,049 | A | 9/1998 | Petruzzi |
| 5,812,987 | A | 9/1998 | Luskin |
| 5,826,243 | A | 10/1998 | Musmanno |
| 5,852,811 | A | 12/1998 | Atkins |
| 5,864,685 | A | 1/1999 | Hagan |
| 5,878,258 | A | 3/1999 | Pizi |
| 5,878,405 | A | 3/1999 | Grant et al. |
| 5,890,141 | A | 3/1999 | Carney |
| 5,893,078 | A | 4/1999 | Paulson |
| 5,903,881 | A | 5/1999 | Schrader et al. |
| 5,905,974 | A | 5/1999 | Fraser |
| 5,940,809 | A | 8/1999 | Musmanno |
| 5,941,996 | A | 8/1999 | Smith |
| 5,946,667 | A | 8/1999 | Tull et al. |
| 5,950,175 | A | 9/1999 | Austin |
| 5,974,390 | A | 10/1999 | Ross |
| 5,978,779 | A | 11/1999 | Stein |
| 6,014,642 | A | 1/2000 | El-Kadi et al. |
| 6,016,482 | A | 1/2000 | Molinari |
| 6,026,438 | A | 2/2000 | Piazza |
| 6,041,314 | A | 3/2000 | Davis |
| 6,044,371 | A | 3/2000 | Person |
| 6,047,324 | A | 4/2000 | Ford |
| 6,049,782 | A | 4/2000 | Gottesman et al. |
| 6,052,673 | A | 4/2000 | Leon et al. |
| 6,088,685 | A | 7/2000 | Kiron et al. |
| 6,092,056 | A | 7/2000 | Tull et al. |
| 6,105,005 | A | 8/2000 | Fuhrer |
| 6,108,641 | A | 8/2000 | Kenna |
| 6,112,191 | A | 8/2000 | Burke |
| 6,119,093 | A | 9/2000 | Walker et al. |
| 6,131,810 | A | 10/2000 | Weiss |
| 6,154,770 | A | 11/2000 | Kostakos |
| 6,189,785 | B1 | 2/2001 | Lowery |
| 6,226,623 | B1 | 5/2001 | Schein et al. |
| 6,374,231 | B1 | 4/2002 | Bent et al. |
| 7,103,556 | B2 | 9/2006 | Del Rey |
| 7,133,840 | B1 | 11/2006 | Kenna et al. |
| 7,206,761 | B2 | 4/2007 | Colvin |
| 7,216,100 | B2 | 5/2007 | Elliott |
| 7,376,606 | B2 | 5/2008 | Jacobsen |
| 7,440,914 | B2 | 10/2008 | Jacobsen |
| 2001/0032182 | A1 | 10/2001 | Kumar et al. |
| 2002/0007330 | A1 | 1/2002 | Kumar et al. |
| 2002/0069147 | A1 | 6/2002 | Sheehan et al. |
| 2002/0091637 | A1 | 7/2002 | Bent |
| 2002/0128951 | A1 | 9/2002 | Kiron et al. |
| 2002/0161707 | A1 | 10/2002 | Cole et al. |
| 2002/0165757 | A1 | 11/2002 | Lisser |
| 2002/0178098 | A1 | 11/2002 | Beard |
| 2003/0023529 | A1 | 1/2003 | Jacobsen |

| | | | |
|---|---|---|---|
| 2003/0135437 | A1 | 7/2003 | Jacobsen |
| 2003/0149646 | A1 | 8/2003 | Chen et al. |
| 2003/0163403 | A1 | 8/2003 | Chen et al. |
| 2003/0177092 | A1 | 9/2003 | Paglin |
| 2003/0191702 | A1 | 10/2003 | Hurley |
| 2003/0236728 | A1 | 12/2003 | Sunderji et al. |
| 2004/0039674 | A1 | 2/2004 | Coloma |
| 2004/0107157 | A1 | 6/2004 | Bleunven et al. |
| 2004/0111361 | A1 | 6/2004 | Griffiths et al. |
| 2004/0128229 | A1 | 7/2004 | Raines et al. |
| 2004/0128235 | A1 | 7/2004 | Kemper et al. |
| 2004/0162773 | A1 | 8/2004 | Del Rey et al. |
| 2004/0177036 | A1 | 9/2004 | Nutahara et al. |
| 2005/0044038 | A1 | 2/2005 | Whiting |
| 2005/0091137 | A1 | 4/2005 | Woeber |
| 2005/0102225 | A1 | 5/2005 | Oppenheimer et al. |
| 2005/0102226 | A1 | 5/2005 | Oppenheimer et al. |
| 2005/0108120 | A1 | 5/2005 | Malka et al. |
| 2005/0108149 | A1 | 5/2005 | Bent et al. |
| 2005/0114246 | A1 | 5/2005 | Coloma |
| 2005/0154662 | A1 | 7/2005 | Langenwalter |
| 2005/0228733 | A1 | 10/2005 | Bent et al. |
| 2006/0047593 | A1 | 3/2006 | Naratil et al. |
| 2006/0106703 | A1 | 5/2006 | Del Rey et al. |
| 2006/0155644 | A1 | 7/2006 | Reid et al. |
| 2006/0167773 | A1 | 7/2006 | Yang et al. |
| 2006/0273152 | A1 | 12/2006 | Fields |
| 2007/0043666 | A1 | 2/2007 | Burdette |
| 2007/0255655 | A1 | 11/2007 | Kemper et al. |
| 2007/0271174 | A2 | 11/2007 | Bent et al. |
| 2007/0276752 | A1 | 11/2007 | Whiting et al. |
| 2007/0288400 | A1 | 12/2007 | Menon |
| 2008/0015985 | A1 | 1/2008 | Abhari et al. |
| 2008/0046358 | A1 | 2/2008 | Holm-Blagg et al. |
| 2008/0065532 | A1 | 3/2008 | De La Motte |
| 2008/0097899 | A1 | 4/2008 | Jackson et al. |
| 2008/0133280 | A1 | 6/2008 | Ziegler |

## FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO-95/23379 | 8/1995 |
| WO | W-99/18529 | 4/1999 |
| WO | WO-03/012580 | 2/2003 |
| WO | WO-2005/006111 | 1/2005 |

## OTHER PUBLICATIONS

ABA to Approve System for Sharing Deposit Coverage, American Banker, Feb. 11, 2003.

American Banker Online—New Pitch: Deposit Insurance Sharing, Jan. 21, 2003, pp. 1-4.

Bent, "Bruce Bent Makes Money Market Funds Act Like Bank Accounts," Equity BBDP, Oct. 5, 1998, 3 Sheets.

Blackwell, Rob, "New Pitch: Deposit Insurance Sharing", American Banker Online, Jan. 21, 2003.

Britt, "Struggling with Sweep Accounts," America's Community Banker, vol. 6, No. 12, 11 Sheets, Dec. 1, 1997.

Certificate of Deposit Registry Service: Keeping deposits in the corn patch, Banknews, Mar. 2003.

Chapelle, "Merrill's Rivals Say They, Too. Offer Services Beyond Banking," Securities Data Publishing On Wall Street, 2 Sheets, Feb. 1, 2003.

Chapelle et al. "Peering into Tomorrow: At the Threshold of a New Century, Brokers and Others Discuss Where They were Going," Securities Data Publishing on Wall Street, 6 Sheets, Dec. 1, 1999.

Coyle, "A Look at commercial Demand Deposit Options," America's Community Banker, vol. 9, Issue 2, Bell & Howell Information and Learning Company, 9 Sheets, Feb. 1, 2000.

Crockett, "Big Banks Found Stepping Up Marketing of 'Sweep' Accounts," American Banker, vol. 159, No. 198, American Banker Inc., 3 Sheets, Oct. 13, 1994.

Declaration of Mr. Bruce Bent II, Vice Chairman and Registrant of Applicant on the date of first commercial use of the service providing

# US 7,809,640 B1

Page 3

interest and FDIC insurance for checking accounts by means of a system using money market deposit accounts (MMDA's) of Oct. 23, 1997.

Fredrickson, "Rising Rates Rescue Money Fund Firm Reserve Profits by Picking Niches," Crain's New York Business, Crain Communications Inc., vol. 20, Issue 51, 2 Sheets, Dec. 20, 2004.

Heavyweight Funding, Bankers News, Mar. 4, 2003, pp. 1-2, vol. II, issue No. 5.

Hoffman, "Reserve's FDIC-Insured Account Draws Regionals; But some see little need for insurance," Crain Communications Inc., Investment News, 2 Sheets, Jun. 4, 2001.

Keenan, "Tapping Brokerages for Alternative to CDs," American Banker, The Financial Services Daily, 3 Sheets, Feb. 18, 2004.

Lavine, "Check Out High-Yield Checking Accounts," Broward Daily Business Review, vol. 39, No. 102, 2 Sheets, Apr. 27, 1998.

McReynolds, "The Power of CASH: Ho-hum cash can be great product (and lead to more business) in troubled times," Securities Data Publishing on Wall Street, 3 Sheets, Jun. 1, 2002.

McReynolds et al. "Unusual Products for Unusual Times," Securities Data Publishing on Wall Street, 6 Sheets, May 1, 2001.

News article: "Regulators Support Demand Deposit Bill", Regulatory Compliance Watch—Mar. 9, 1998; p. 1; vol. 9, No. 10.

Potter, "As Sweep Accounts Continue to Grow, So do Community Bank Options," America's Community Banker, vol. 9, Issue 8, Bell & Howell Information and Learning Company, 3 Sheets, Aug. 1, 2000.

Promontory Interfinancial Network: http://www.promnetwork.com/index.html, 2003.

Share, "New Service Skirts FDIC's $100K Limit," Dialog Web Command Mode, 2 Sheets, Jun. 13, 2003, http://www.dialogweb.com/cgi/dwclient.

Smith, "IBAA Won't Push Interest-Bearing Checking for Business; Says Too Few Members Want It," The American Banker, 2 Sheets, Apr. 18, 1996.

Stafford, "New Bank Program Allows $1 Million in Insured Deposits," Dialog Web Command Mode, 3 Sheets, Aug. 24, 2003, http://www.dialogweb.com/cgi/dwclient.

Wilson, "How Cash Management Services Can Help Your Bank Cultivate New Relationships with Commercial Customers," America's Community Banker, vol. 10, Issue 5, Bell & Howell Information and Learning Company, 8 Sheets, May 1, 2001.

"Man Bites Dog: Funds Move Into Banking," IBC's Money Fund Selector, 2 Sheets, Nov. 6, 1998.

About iMoneyNet, Inc., About iMoneyNet's Money Funds Division, 4 Sheets, Aug. 21, 2003, http://www.ibcdata.com/about.htm.

"Reverse Ups Insurance Limit On Money Market Account," Thomson Financial Inc., Mutual Fund Market News, 1 Sheet, Aug. 26, 2002.

"The Reverse Funds to Offer up to $600,000 of FDIC Insurance on Reserve Insured Deposits; Addressing Investor Needs for Increased Safety, Flexibility and a Competitive Yield," Business Wire, Inc. Business Wire, 2 Sheets, Aug. 13, 2002.

"The Bank of New York adds a $300,000 FDIC-Insured Money Market Account Option to its Dividend Income Checking Account," PR Newswire Associations, Inc., PR Newswire, 2 Sheets, Apr. 18, 2002.

The Reserve Fund, Study of U.S. Patent No. 6,374,231, 1 Sheet.

"Bank of Oak Ridge to Offer FDIC Insurance on up to $1.5 Million," Dialog Web Command Mode, 2 Sheets, Sep. 25, 2003, http://www.dialogweb.com/cgi/dwclient.

Reserve Management Corporation, Reserve Insured Deposits, Serial No. 76/315,600, Issued.

The Reserve, "What Sets Us Apart," 2 Sheets, Oct. 4, 2006, http://www.ther.com/bank/bank_wsua.shtml.

The Reserve, "Reserve Insured Deposits," 2 Sheets, Oct. 4, 2006, http://www.ther.com/ps/ps_fif.shtml.

The Reserve, "Company History," 3 Sheets, Oct. 4, 2006, http://www.ther.com/aboutus/history.shtml.

The Reserve, "Reserve Insured Deposits Program," 2 Sheets, Oct. 4, 2006, http://www.ther.com/bank/bank_insdep.shtml.

Reserve Insured Deposits, United States Patent and Trademark Office, Reg. No. 2,694,910, Registered Mar. 11, 2003, 1 Sheet.

Capital Briefs: Corporate Checking Account Relief Sought, American Banker, vol. 162, Jul. 28, 1997, 1 Sheet.

Letter From William W. Wiles, Secretary of the Board, Board of Governors of the Federal Reserve System, Jun. 22, 1983, 6 Sheets.

DI 48, Excerpts of Transcript of Hearing, U.S. Dist. Ct., District of Delaware, Civil Action No. 82-680, Apr. 8, 1983, 5 sheets.

DI 56, Interrog. Response, U.S. Dist. Ct. District of Delaware, Civil Action No. 82-680, May 20, 1983, 15 Sheets.

DI 99, Suppl. Interrogatory Response, U.S. Dist. Ct., District of Delaware, Civil Action No. 82-630, May 30, 1984, 6 Sheets.

Letter from Michael Bradfield, General Counsel, Board of Governors of the Federal Reserve System, Nov. 16, 1984, 4 Sheets.

Board of Governors of the Federal Reserve System, 1984 Fed. Res. Interp. Ltr. LEXIS 56, Nov. 16, 1984, 3 Sheets.

Letter From Oliver I. Ireland, Associate General Counsel, Board of Governors of the Federal Reserve System, Jun. 22, 1988, 5 Sheets.

Board of Governors of the Federal Reserve System, 1988 Fed. Res. Interp. Ltr. LEXIS 141, Jun. 22, 1988, 3 Sheets.

U.S. Appl. No. 60/307,815, filed Jul. 27, 2001.

U.S. Appl. No. 60/323,365, filed Sep. 20, 2001.

Board of Governors of the Federal Reserve System, 1989 Fed. Res. Interp. Ltr. LEXIS 77, Mar. 14, 1989, 2 Sheets.

Board of Governors of the Federal Reserve System, 1989 Fed. Res. Interp. Ltr. LEXIS 154, Jun. 21, 1989, 2 Sheets.

Board of Governors of the Federal Reserve System, 1990 Fed. Res. Interp. Ltr. LEXIS 94, Feb. 1, 1990, 1 Sheet.

Board of Governors of the Federal Reserve System, 1991 Fed. Res. Intern. Ltr. LEXIS 232, Jan. 30, 1991, 2 Sheets.

CMA, The Merrill Lynch Cash Management Account Financial Service, Insured Savings Account Participating Depository Institutions, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Nov. 1992, 2 Sheets.

Board of Governors of the Federal Reserve System, 1994 Fed. Res. Interp. Ltr. LEXIS 156, Jun. 24, 1994, 3 Sheets.

CMA, Insured Savings Account Fact Sheet, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Jul. 1994, pp. 47-54.

Board of Governors of the Federal Reserve System, 1994 Fed. Res. Interp. Ltr. LEXIS 314, Oct. 17, 1994, 2 Sheets.

Board of Governors of the Federal Reserve System, 1994 Fed. Res. Interp. Ltr. LEXIS 419, Oct. 14, 1994, 4 Sheets.

CMA, The Merrill Lynch Cash Management Account Financial Service, Insured Savings Account Participating Depository Institutions, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Mar. 1995, 2 Sheets.

Letter from Stephanie Martin, Assoc. General Counsel, Board of Governors of the Federal Reserve System, Apr. 22, 2004, 8 Sheets.

Bank Deposit Program, Online http://web.archive.org/web/20030620100115/http:/www.smithbarney.com/products_servi, Jan. 19, 2001, 4 Sheets.

Declaration of Mr. Bruce Bent II, Vice Chairman and Registrant of Applicant. (3 Sheets) and Exhibits A, B, C and D (6 Sheets).

Letter From Jamey Basham, Attorney, LEXSEE 1990 FDIC Interp. Ltr., Lexis 1, Federal Deposit Insurance Corporation, FDIC-90-02, Jan. 3, 1990, 2 Sheets.

Letter From Colleen Curran Harvey, Deputy Chief Counsel, Jan. 8, 1985; Letter From Merle Y. Waldman, Nov. 14, 1984; Letter From Merle Y. Waldman, Sep. 24, 1984; Letter From Merle Y. Waldman, Aug. 8, 1984, LEXSEE 1985 Sec No- Act., Lexis 1593, Securities Exchange Act of 1934—Section 15(a), 11 Sheets.

The Insured Savings Account, Issuer Guide to Offering MMDAs Through Merrill Lynch, Merrill Lynch Money Markets, Inc., "Operational Guide To The Merrill Lynch MMDA Program 1986", Sep. 1986 3 Sheets.

FDIC Federal Register Citations: Email from Bert Ely to Comments, Mar. 8, 2006, Subject: Large-Bank Deposit Insurance Determination Proposal- RIN 3064-AC98—Regs@fdic.gov. Attached, also from FDIC Federal Register Citations: Email From American Banker, by Bert Ely, Feb. 24, 2006, Viewpoint: FDIC's Account-Link Plan a Pointless, Costly Threat.

Letter to Mr. Jonathan L. Levin, Esq., From Oliver Ireland, Associate General Counsel, Oct. 18, 1996, 2 Sheets.

Letter to Mr. L.P. Fleming, Jr., Esq., From Oliver Ireland, Associate General Counsel, Feb. 7, 1995, 3 Sheets.

Letter to Mr. James E. Creekman, Group Vice President, From Oliver Ireland, Associate General Counsel, Aug. 1, 1995, 4 Sheets.

## US 7,809,640 B1

Letter to Ms. Brenda L. Skidmore, Senior Vice President, From Oliver Ireland, Associate General Counsel, Aug. 30, 1995, 4 Sheets.

Part: 2, Monetary Policy and Reserve Requirements, Subpart—Regulation D, Board Interpretations of Regulation D, Transaction Accounts—Linked to Time Deposits, vol. 1, Federal Reserve Regulatory Service, 2 Sheets.

12 C.F.R. Part 329—Interest on Deposit, Source: 51 FR 10808, Mar. 31, 1986, 5 Sheets.

Merriam-Webster Online Dictionary, 10th Edition, Definition of "Associated", 2 Sheets.

Merrill Lynch & You, "Financial Services The Way You Want, When You Want Them," Jan. 2000 4 Sheets.

Merrill Lynch, Pierce, Fenner & Smith Incorporated, "Information Statement," 2000, 12 Sheets.

Memorandum from Ken Johnson re: Insured Deposit Products, Aug. 18, 1992, 3 pgs.

Memorandum from John E. Oncken re: Insured Savings Update, Jun. 15, 1990, 7 pgs.

Memorandum from John E. Oncken re: Brokered Deposit Issue vs. Insured Savings, Mar. 22, 1990, 8 pgs.

Memorandum from Ed Piner re: Insured Savings Product Update, Feb. 1, 1990, 4 pgs.

Insured Savings Correspondent Agreement with Exhibits A-D, 28 pgs.

First City, Texas Insured Savings Agency Agreement with Exhibits A-B and Insured Savings Program, 10 pgs.

Product Bulletin from Bill McCain, Subject: Insured Savings Product Announcement, May 8, 1989, 7 pgs.

Insured Savings Project Team Meeting, Feb. 2, 1989, 16 pgs.

Insured Savings Product Description, Product Name: Insured Savings, Product Description: U.S. Patent #4,985,833, 3 pgs.

Letter to Tim C. Lear, Sep. 20, 1988, 1 pg., with Memorandum from Ed Piner, re: Insured Savings Product, Nov. 9, 1988, and Letter from Tara L. Cyr, Dec. 9, 1988, 1 pg.

Automatic Insured Deposit Method, Patent Application Information, Jul. 11, 1988, 17 pgs.

Insured Savings, Overview & Marketing Plan, Dec. 6, 1988, 23 pgs.

Memorandum from Dick Zinser, re: A First City-Austin deposit program to hold existing customers' deposits, Mar. 17, 1988, 7 pgs.

Insured Savings Remote Site Sweep Procedures, 3 pgs.

Letter to Malcolm L. Duke, Dec. 27, 1989 with Insured Savings Correspondent Agreement, Exhibits A-D, and Letter to Malcolm L. Drake, Nov. 21, 1989, 37 pgs.

Memorandum from Ken Johnson, re: Attached Insured Savings Letters, Jul. 5, 1990, 1 pg.

Letter to Jerry Crutsinger, Jul. 3, 1990, 1 pg.

Letter to Bill Goertz, Jul. 3, 1990, 1 pg.

Letter to Susan Goodwin, Jul. 3, 1990, 1 pg.

Insured Savings Rate Change Notice, 1 pg.

Addendum to Insured Savings Agency Agreement, 1 pg.

Letter to Paula Martin, Jul. 3, 1990, 1 pg.

Letter to John Lovell, Jul. 3, 1990, 1 pg.

Insured Savings Balance Limits form, 1 sheet.

Email from John Oncken re: Depository Levels at Insured Savings Depositories, Nov. 2, 1989, 1 pg.

Cash Management Balance Monitoring Agreement Form 1 sheet.

Memorandum from Ed Piner, Subject: Discontinuation of Automatic Balance Monitoring in conjunction with Insured Savings Accounts, May 21, 1991, 1 pg.

Blank form letter from Edward N. Piner, May 24, 1991, 1 pg.

Letter from First City National Bank of Austin, Sep. 20, 1982, 5 pgs.

First City, Texas—Austin, Special Products, Feb. 20, 1992, with Schedule A & Schedule B, 6 pgs.

Letter From William W. Wiles, Secretary of the Board, Board of Governors of the Federal Reserve System, Jun. 22, 1983, 6 Sheets, (Previously disclosed).

Letter From Oliver I. Ireland, Associate General Counsel, Board of Governors of the Federal Reserve System, Jun. 22, 1988, 5 Sheets, (Previously disclosed).

Alliance Insured Account, Information Statement, Sep. 1999, 6 sheets.

Lawsuit by Carlo DeBlasio et al. and Merrill Lynch & Co., Inc. et al., Opinion and Order, Jul. 27, 2009, Civil Action No. 07 CIV. 318, 47 pgs.

Lawsuit by Carlo DeBlasio et al. and Merrill Lynch & Co., Inc. et al., Second Amended Class Action Complaint, Jury Trial Demanded, Jun. 11, 2007, Civil Action No. 07 cv 318, 137 pgs.

Investors MoneyAccount$^{SM}$ and Insurance Plus Service Agreement, Schedule A, 3 sheets.

Investors MoneyAccount$^{SM}$ (an FDIC-insured money market account), 4 sheets.

Investors MoneyAccount$^{SM}$ The FDIC-Insured Money Market with an Important Plus., 2 sheets.

Investment Company Act of 1940—Section 3(a)(1), 2(a)(36); Securities Act of 1933—Section 2(1), Nov. 29, 1985, Kempter Financial Services, Inc., 9 pgs.

Insured Money Account Program Agreement and Disclosure Statement, 11 sheets.

First National Bank in Brookings, Certificates of Deposit, 5 sheets.

Summary of Commentary on Current Economic Conditions by Federal Reserve Districts, Jan. 1985, 44 pgs.

Board of Governors of the Federal Reserve System, Blank Form Letter, Apr. 22, 2004, 8 pgs.

FDIC Law, Regulations, Related Acts, 4000—Advisory Opinions, FDIC-93—35, Jun. 28, 1993, 2 sheets.

§204.134, 12 CFR Ch. 11 (Jan. 1, 2009 Edition), 2 sheets.

Money Fund \$\$ Moving to Bank Deposits, 6 FRC Monitor, Dec. 2003, 2 sheets.

Crane, P. & Krasner, Mike, An iMoney Net Special Report™, "Brokerage Cash Sweep Options: The Shift from Money Funds to FDIC-Insured Bank Deposit Accounts", Nov. 2004, 64 pgs.

The May 1998 Senior Financial Officer Survey, Board of Govenors of the Federal Reserve System, with Appendix A, 48 pgs.

Interest Rate Review© A Publication of Meyer Weekly Interest Rate Survey, A Look At Tiers, Vol. II, No. 4, Apr. 1987, 6 pgs.

Interest Rate Review© A Publication of Meyer Weekly Interest Rate Survey, A Study of Historical Rates and Yields, Vol. II, No. 6, Jun. 1987, 8 pgs.

Blank form letter to Oliver Ireland, Oct. 7, 1994, 1 pg.

Letter to L.P. Fleming, Jr. Esq., Feb. 7, 1995, 3 pgs.

Letter to James E. Creekman, Aug. 1, 1995, 4 pgs.

Letter to Brenda L. Skidmore, Aug. 30, 1995, 4 pgs.

Merrill Lynch & Co., Inc. Form 10-K405 (Annual Report (Regulation S-K, item 405)), Filed Mar. 14, 2002 for the Period Ending Dec. 28, 2001, with Schedules, Exhibits, and 2001 Annual Report, 248 pgs.

Merrill Lynch & You, "Financial Services The Way You Want, When You Want Them," Jan. 2000 4 Sheets, (Previously disclosed).

Merrill Lynch, Pierce, Fenner & Smith Incorporated, "Information Statement," 2000, 12 Sheets, (Previously disclosed).

Merrill Lynch, Information Statement Regarding Changes to Interest Rates on Deposits in the Merrill Lynch Banks, Document 64-14, Nov. 12, 2007, Case 1:07-cv-00318, 2 sheets.

Street Talk, "Merrill Moves CMA Cash to Bank", On Wall Street, Nov. 2000, 1 sheet.

Quest Insured Account, QUESTessentials, 3 sheets.

Quest Insured Account, Information Statement, 5 sheets.

OCC Insured Bank Deposit Account, 3 sheets.

Insured Bank Deposit Account, Information Statement, Jul. 1, 2000, 2 sheets.

Letter from Marilyn J. Hensle, announcing Salomon Smith Barney Bank Deposit Program,$^{SM}$, with Q&A, 14 sheets.

Bank Deposit program Disclosure Statement, Salomon Smith Barney, 3 sheets.

FDIC Law, Regulations, Related Acts, 4000—Advisory Opinions, FDIC-87-25, Oct. 22, 1987, 1 sheet.

FDIC Law, Regulations, Related Acts, 4000—Advisory Opinions, FDIC-86-21, Jul. 23, 1986, 2 sheets.

The Merrill Lynch Cash Management Account, Financial Service, 18 pgs.

The Insured Savings Account, Issuer Guide to Offering MMDAs through Merrill Lynch, 27 pgs.

Insured Savings Account Fact Sheet, The Merrill Lynch Cash Management Account Financial Service, 1987, 11 pgs.

**US 7,809,640 B1**

Page 5

CMA Insured Savings Account Fact Sheet, 1994, 9 pgs.

A Guide to Your CMA Account, 1995, 19 pgs.

Insured Savings Account Fact Sheet, The Merrill Lynch Cash Management Account Financial Service, 1985, 4 pgs.

CMA Insured Savings Account Fact Sheet, 1997, 13 pgs.

Blackwell, Rob, Salomon's Sweep Plan Raises FDIC Fund Alarm, *American Banker*, Dec. 6, 2000, 2 pgs.

Insured Deposit Account (IDA), May 21, 1996, 11 pgs.

An Introduction to the Smith Barney *Insured Deposit Account*, 1995, 8 pgs.

Memorandum from Ted Hamilton re: Insured Deposit Account, Oct. 10, 1995, 13 pgs.

The Insured Deposit Account: "*Money in the Bank*", 1997, 2 sheets.

Merrill Joins Money Market Account, CMA; Broker Begins Testing With 12 Institutions, *Lexis Nexis*, Sep. 23, 1983, 4 pgs.

Form 8-K Merrill Lynch & Co Inc—MER, Filed: Mar. 7, 2002, Report of unscheduled material events or corporate changes, 41 pgs.

Lawsuit by Island Intellectual Property LLC and Intrasweep LLC against Deutsche Bank Trust Company Americas and Total Bank Solutions, Complaint for Patent Infringement, Jury Trial Demanded, Feb. 23, 2010, Case No. 10 CV 1518, (Document 1).

Lawsuit by Island Intellectual Property LLC and Lids Capital LLC against Deutsche Bank Trust Company Americas and Total Bank Solutions, Complaint for Patent Infringement, Jury Trial Demanded, Mar. 16, 2010, Case No. 10 CV 2268.



FIG. 1

FIG. 2



US 7,809,640 B1

1

# MONEY FUND BANKING SYSTEM

The present application is a Divisional of application Ser. No. 10/305,439 filed Nov. 26, 2002, which is a Continuation-in-Part of application Ser. No. 09/677,535 filed Oct. 2, 2000, and 10/071,053 filed Feb. 8, 2002, which are Continuations of application Ser. No. 09/176,340 filed Oct. 21, 1998 (U.S. Pat. No. 6,374,231 B1); all these applications are incorporated herein by reference in their entireties for all purposes.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The novel system is in the field of account transaction processing and provides an administered money fund banking system that is integrated with an insured deposit account.

2. State of the Art

The Federal Deposit Insurance Corporation ("FDIC") is a federal governmental entity that provides insurance for deposits in most banks and savings institutions in the United States. Bank deposits are insured by the FDIC's Bank Insurance Fund ("BIF") and savings institutions' deposits are insured by the FDIC's Savings Association Insurance Fund ("SAIF"). The rules governing insurance of deposits of institutions insured by the BIF and the SAIF are the same. The FDIC bases insurance coverage on the concept of ownership rights and capacities: funds held in different ownership categories are insured separately from each other, and funds of the same ownership but held in different accounts are subsumed under the same insurance coverage. The amount of insurance coverage provided to depositors of each institution insured by BIF and SAIF is the same: $100,000.00 to the owner(s) of the funds in the account(s), including principal and interest.

Title 12, Part 329, of the Code of Federal Regulations ("CFR") specifies that "no bank shall, directly or indirectly, by any device whatsoever, pay interest on any demand deposit." (12 C.F.R. §329.2.) A "deposit" is any money put into a savings account, a checking account, or time account such as a certificate of deposit. A "demand" account is one from which the owner of the account can demand that funds be drawn and paid elsewhere, either to another account (of the same or a different owner) or to a third party. These payments are typically made via a bank draft or check, or a credit or debit card. A account different than a demand account is an account where all or a fixed amount of the principal must be maintained in the account for a period of time to achieve the particular benefits offered by that account. As stated in this section of the CFR, a "demand deposit" includes any deposit in account under which terms the depositor is authorized to make, during any month or statement cycle of at least four weeks, more than six transfers by means of a preauthorized or automatic transfer of telephone (including data transmission) agreement, order or instruction, which transfers are made to another account of the depositor at the same bank, to the bank itself, or to a third party provided that such an account will be deemed a demand deposit if more than three of the six authorized transfers are authorized to be made by check, draft, debit card or similar order made by the depositor. (12 C.F.R. §329.1 (b)(3).) On the other hand, withdrawals from a deposit account are not deemed to be included within the six transfers permitted for a non-demand account when the withdrawals are made by mail, messenger, telephone (via check mailed to the depositor), automated teller machine, or in person. In essence, unless the funds of a deposit are held in a NOW account (18 U.S.C. 1832(a)), an account in which a depositor has the ability to make at least six transfers will be deemed a

2

demand account and no interest will be payable on the funds therein. Therefore, owners of demand accounts are denied interest on their funds.

## SUMMARY OF THE INVENTION

In light of this regulatory scheme, it would be beneficial to provide depositors of demand accounts with interest from the funds on deposit while simultaneously providing unlimited (or at least six) transfers of the funds therein. For example, it would be beneficial to provide such depositors with the ability to deposit funds into the demand account from various sources, and to make payments from the demand account via different instruments, without limitation as to the number of transfers, and still earn interest on the funds in the clients' accounts.

To accomplish these and other objectives, this invention provides a system for managing a plurality of accounts for multiple clients by administering at a banking institution a single insured deposit account in which all of the funds for the insured deposit accounts are held, providing a database having client information for each client's account, administering clients' deposits to and withdrawals from each of their accounts, authorizing whether funds in a particular client's account can be used for each payment requested from that clients account, determining as the net transaction of the sum of the insured money market account deposits and withdrawals from the plurality of insured money market accounts on a regular periodic basis, using the determination of the net transaction to deposit funds to or withdraw funds from the single insured deposit account, distributing interest earned on the single deposit account to each of the clients in proportion to their portion of funds in the deposit account, and updating the database for each client's deposits and authorized demand payments.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. **1** and **2** illustrates a flow chart depicting certain processing steps the system follows.

## DESCRIPTION OF SPECIFIC EMBODIMENTS OF THE INVENTION

The present system will be described with reference to an administrator, which can be brokerage, a bank, or another entity with which clients can institute financial transactions such as deposits and demand payments. The administrator appears to each client as if it were, in part, a bank, by accepting deposits for the client's account and by authorizing (and then making) payments demanded by the client from his account. The funds for all of the clients are pooled into a single fund that is maintained as an insured deposit account at a licensed banking institution. This system is preferably implemented in combination with a brokerage account so that the client can centralize all of his financial needs: deposit of funds; demand orders for payment (checking); payment authorization by debit card; securities transactions; retirement plans; and the like.

The following description of the hardware and software is for exemplification of a working system; other architectures can be fashioned to make the systems and perform the methods claimed herein. The system has been implemented on a mainframe computer (e.g., an IBM Application Starterpac 3000 model A20, which is capable of processing 63 million instructions per second) with an operating system such as OS/390 and MVS/ESA running a relational database (e.g.,

US 7,809,640 B1

3

DB2 type database). The programming languages are IBM COBOL, CICS languages along with IBM's CSP screen generation language. For such a system, memory requirements are satisfied with 768 Gigabytes of storage (preferably, e.g., 1024G with a disk storage and recovery system, such as RAID), Communications generally are run on a mixed SNA and TCPAP network. Communications with a local area network via a local control unit can be implemented using a token ring. Connection to an internal network has been made via an IBM open systems adapter (OSA) running TCP/IP, which allows File Transfer Protocol (ftp) via a firewall. Bisynchronous and synchronous file transfer protocols are made through various dial-up media. Terminal Access runs on an Ethernet local area network, using an SAA gateway, and other gateways (e.g., Cytrix and Netsoft) for remote access. Additionally, several lease lines for several applications and terminal access are supported by the system.

FIG. 1 is a flowchart depicting certain processing steps the system follows at the administrators end. It should be understood that the order in which these steps are performed may be varied without impairing the achievement of the aforementioned objects of the invention. The client adds funds ("deposits") to his account typically via check 101, sweeps 103 of funds from another account (e.g., a broker/dealer account), and/or by wire and other transfers 105 (such as fed funds wire and direct deposit via ACH) for investment in an FDIC insured money fund account. These funds are deposited in a deposit account with a bank on behalf of the participant. The amount of each of the deposited items is summed 107 to determine the deposits for each client, preferably on a regular periodic basis (e.g., daily) or instantaneously. On the other side, the administrator provides the participant with access to his funds by various methods: payments can be made from funds drawn from the account by check 109; electronic funds transfer 110; debit card 111 authorized by the client (and ACH debit); sweeps of funds 113 to another account (e.g., a broker/dealer account); and electronic and voice access 114 (e.g., interne online banking, banking by telephone) for automated transaction requests; and transactions authorized by mail. A "sweep" is a an automated movement of funds between a client's other account (e.g., a broker/dealer account) and his insured deposits account (in either direction). The registration on the other account and the insured deposit account are identical; there is a one for one relationship between the brokerage account and the insured deposits account.

The sum of the deposits is processed 117 with information 119 from a database (described later) that stores information about the demand account for each client. Each clients account is credited 121 with the sum of the deposits for that particular account, which may amount to zero on a particular day. Similarly, the sum of withdrawals are processed 123 to determine what should be debited from the account, which may also amount to zero on a particular day. The deposits and withdrawals for each account during a given period are compared 125 to determine whether sufficient funds are present in the client's account, including the added funds, to pay the withdrawals requested by the client. In other words, processing determines which client accounts to credit or debit for the various transactions (sweep, checks, debit cards, ACH, etc.) received each business period (e.g., daily). These transactions can be received from one or more sources, such as brokerage firms (sweep transactions), banks (deposits made by wire transfer, checks presented for payment, ACH, debit card transactions), the mail (check deposits, redemption requests), and telephone requests. "Telephone" requests can be performed by voice, conversing with an operator/broker or a voice response system, or via a touch-tone phone using a

4

menu system, or electronically via the internet using email or the World Wide Web (e.g., a web page, preferably secure, onto which users can log in and conduct on-line banking). The final step in the day's processing is to determine the net credit or debit for the deposit account at the bank; the net activity represents all transactions that were processed that day for all insured deposit accounts.

If sufficient funds are not available for drafts and other orders to pay, the requested withdrawal(s) are denied and the client's total account information is again accessed to determine 129 if the client has sufficiently available margin to cover the requested withdrawal(s) (other than, preferably, sweep transactions). If insufficient funds and insufficient margin are available, then the requested withdrawal is denied 131. The client's margin typically is determined by the value of the client's funds held in the client's broker/dealer (securities) account. When sufficient funds are available in the insured deposit account, or a sufficient margin is available in the client's securities account with the administrator, then a debit is made 133 to the client's insured deposit account in the amount of the withdrawal(s) allowed (based on the funds and margin then available) and the processed and authorized withdrawals are paid as directed by the client. The sum of the processed credits 121 and the processed debits 133 are determined for all of the administrators clients to arrive at a net account activity determination 135. The order in which credits and debits are processed depends upon a subjective protocol and/or operation of law. For example, transactions that are pre-approved (such as authorized debit card transactions, and sweeps) are likely to be processed when received; transactions requiring authorization or acceptance by a third party (such as a bank draft or check) may be credited to the insured deposit account but not available for withdrawal until authorization or acceptance.

The net account activity determination 135 is then used to determine a net credit/debit 139 for the single deposit account held at the bank that contains all of the funds of all of the administrator's clients; the single deposit account must be debited or credited to account for all clients' deposits and withdrawals during the period. If the net result is positive (e.g., amount of deposits processed minus amount of authorized withdrawals processed is positive), then the calculated amount is deposited 141 to the single account. If the net result is negative (e.g., amount of deposits processed minus amount of withdrawals processed is negative), then the calculated amount is withdrawn 143 from the single deposit account. An individual insured money market account is maintained for each client on a administrator's database. Each transaction received for an account is individually posted against the client's account on the database. Funds are exchanged between the appropriate parties to cover transactions (broker for sweep transactions; bank for debit cards, checks, ACH, etc.). These transactions are posted and settled prior to any activity taking place in the insured deposit account at the bank. In a preferred embodiment, the last movement of funds on each day is the net movement of funds (credit or debit) that takes place in the deposit account at the bank. The sum of the account balances (principle plus interest) for clients participating in the this system equals the balance in the deposit account at the bank.

The information from the calculations of a net credit/debit 139 are used to implement the processing of the actual deposit or withdrawal (141, 143) to the deposit account, and that information (and funds, if required) is sent to the bank 143 to execute the actual deposit or withdrawal required. If the deposit account is to be credited, then deposits are transferred to the bank and credited to the deposit account 147; conversely, if funds are to be withdrawn from the deposit

US 7,809,640 B1

5

account, a bulk withdrawal is made from the deposit account to account for the withdrawals that have been authorized from the clients' accounts; in essence, the withdrawal from the deposit account need only make up the difference between the authorized withdrawals and the deposits. If the client wishes to use his excess margin buying power for overdraft protection, the broker/dealer transmits the client's available margin line to the administrator regularly (preferably daily). The available margin line will be taken into consideration when checks, debit card, and other draft and order to pay transactions (e.g., ACH debits, on-line banking withdrawals, and other electronic payments) are processed. If the client's margin line is used to process a check or debit card transaction, a loan will be created and transmitted to the broker dealer by the administrator. Preferably, the broker dealer maintains the margin loan on his system and will pay the administrator for all funds advanced. Using this methodology for margin accounts, there is no effect on the deposit account at the bank.

The bank pays interest 149 on the single deposit account to the administrator. Based on the amount of each client's funds in the deposit account as a function of the total amount in the deposit account, the administrator determines the interest amount (if any) each client is owed (based also on the period during which the interest was determined on a particular account balance). Because all of the clients' funds are in a single account under the name of the administrator, the administrator earns the interest and distributes the interest earned to each of the clients. Further, the limitation on transfers from an interest-bearing account is inapplicable to the clients because their funds are held by the administrator in a demand account and interest for the client is determined only on that portion of those funds maintained in the bank's deposit account. Preferably, if necessary, the administrator makes any withdrawals from the deposit account in person.

After the deposit account has been credited or debited in accordance with the determination for that period of the sum of the deposits and withdrawals from clients, and the interest earned on the single deposit account, this information is transferred back to the administrator's deposits database 151. This database includes information about each client (such as name, address, and other important or desired demographic and tax information about each client's account), as well as financial information regarding the client's holdings on deposit in the bank (i.e., that client's portion of the single deposit account) and holdings with the administrator (e.g., securities and the like).

As seen, the administrator maintains several relationships that provide services for the insured money market accounts. These various entities provide transaction data that is transmitted to the administrator and processed. Preferably, the administrator is it's own transfer agent and provides a shareholder accounting system. Preferably, accounts may be opened through a broker dealer that is a client of the administrator, or directly with the administrator with an application and check.

The administrator may allow a client with an account under the present system to access his funds by check or with a debit card; in such a case, the administrator has arranged for these services and maintains these relationships which are separate and apart from the deposit account. Banks that provide check and card services will transmit a file each day to the administrator that contains the checks presented for payment and/or the debit card transactions. The transactions that apply to his account are then present from the present system are out sorted and processed against the administrator's database. The administrator will settle each bank for the transactions that were processed.

The administrator may accept direct deposit of payroll, social security, or pensions for accounts. The clients'

6

accounts are updated as these files are received and processed. The administrator may also accepts ACH debit transactions, which are initiated by the client's bank or a third party at the client's request.

The administrator may also provide the participants with automated bill paying services. Participants preferably provided with a touchtone bill paying system and/or an internet on line banking service. Bill payment requests may be downloaded each morning for processing.

The foregoing description is meant to be illustrative and not limiting. Various changes, modifications, and additions may become apparent to the skilled artisan upon a perusal of this specification, and such are meant to be within the scope and spirit of the invention as defined by the claims.

What is claimed is:

1. A computer program product for managing a plurality of client transaction accounts for a plurality of clients at a banking institution, comprising:

at least one computer-readable medium having computer readable program code embodied therein or among them if there is more than one computer-readable medium, to be executed by a computer, the computer readable program code comprising

computer code for accessing a database maintained on one or more computer readable media and accessible by one or more computers for carrying out one or more of the following operations, wherein the database comprises information for each client transaction account, wherein client transaction account funds for the client transaction accounts are aggregated in one or more FDIC-insured and interest-bearing aggregated deposit accounts held at the banking institution, and wherein the information for each of the client transaction accounts includes information on each client's funds held in said one or more insured and interest-bearing aggregated deposit accounts;

computer code for administering client deposits/transfers to and withdrawals/transfers from said client transaction accounts using the one or more computers, said administering step comprising processing more than six (6) withdrawals/transfers selected from the group consisting of check, debit card, ACH, and credit card within a month from each of a plurality of said client transaction accounts;

computer code for determining by the one or more computers on a regular basis at least one aggregated net transaction for a plurality of said clients comprising a sum of said clients' deposits/transfers to and withdrawals/transfers from said respective clients' transaction accounts at the banking institution;

computer code for determining by the one or more computers from said at least one aggregated net transaction whether to deposit/transfer funds to or withdraw/transfer funds from said one or more FDIC-insured and interest-bearing aggregated deposit accounts;

computer code for processing needed deposits/transfers to, or needed withdrawals/transfers from said one or more FDIC-insured and interest-bearing aggregated deposit accounts based on said determining from said at least one aggregated net transaction step, so that more than six (6) withdrawals/transfers are made during a month from one of said one or more FDIC-insured and interest-bearing aggregated deposit accounts via at least one intermediate bank that is different from the banking institution; and

computer code for updating by the one or more computers the database with each client's deposits/transfers

US 7,809,640 B1

7

to and withdrawals/transfers from said each client's respective transaction account.

**2**. The program product of claim **1**, wherein said computer code for administering client withdrawals/transfers is designed to facilitate withdrawals by draft or check, credit card, sweeps, wire or electronic transfer and combinations thereof.

**3**. The program product of claim **1**, further comprising computer code for denying a withdrawal transaction from one of the client transaction accounts if that client transaction account does not have sufficient funds to cover that withdrawal transaction, or access to sufficient margin or line of credit.

**4**. The program product of claim **1**,

further comprising computer code for facilitating a manner of making said withdrawals/transfers and/or deposits/transfers from at least one of said one or more FDIC-insured and interest-bearing deposit accounts to preserve that account's interest-bearing status regardless of the number of said withdrawals/transfers from said at least one of said one or more FDIC-insured and interest-bearing deposit accounts.

8

**5**. The program product of claim **1**, further comprising computer code for distributing interest to each of the client transaction accounts in dependence on a balance in that respective client transaction account after accrual in the one or more aggregated deposit accounts.

**6**. The program product of claim **1**,

wherein each of the plurality of clients has his/her funds accepted for deposit in the respective client transaction account held in the name of the respective client at the banking institution, the banking institution comprises a bank in infrastructure of the banking institution, and the one or more FDIC-insured and interest-bearing aggregated deposit accounts are held in the bank in the infrastructure of the banking institution.

**7**. The program product of claim **1**,

wherein the banking institution comprises a bank in infrastructure of the banking institution, wherein the respective client funds were accepted for deposit in the respective client transaction account held in the name of the respective client, and the one or more FDIC-insured and interest-bearing aggregated deposit accounts are held in the bank in the infrastructure of the banking institution.

\* \* \* \* \*

# Exhibit 7

US007933821B1

(12) **United States Patent**
Bent et al.

(10) Patent No.: **US 7,933,821 B1**
(45) Date of Patent: **\*Apr. 26, 2011**

(54) **SYSTEMS AND METHODS FOR ADMINISTERING RETURN SWEEP ACCOUNTS**

(75) Inventors: **Bruce Bent**, Manhasset, NY (US);
**Bruce Bent, II**, New York, NY (US)

(73) Assignee: **Island Intellectual Property LLC**, New York, NY (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/385,522**

(22) Filed: **Apr. 10, 2009**

**Related U.S. Application Data**

(63) Continuation of application No. 10/071,053, filed on Feb. 8, 2002, now Pat. No. 7,519,551, which is a continuation-in-part of application No. 09/677,535, filed on Oct. 2, 2000, and a continuation-in-part of application No. 09/176,340, filed on Oct. 21, 1998, now Pat. No. 6,374,231.

(51) **Int. Cl.**
*G06Q 40/00* (2006.01)

(52) **U.S. Cl.** ......................................... **705/35**; 707/705

(58) **Field of Classification Search** ................... 705/30, 705/35, 38–40, 42; 707/1, 10, 100–104, 707/705; 902/24, 41
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,232,367 | A | 11/1980 | Youden et al. |
| 4,346,442 | A | 8/1982 | Musmanno |
| 4,376,978 | A | 3/1983 | Musmanno |
| 4,597,046 | A | 6/1986 | Musmanno et al. |
| 4,674,044 | A | 6/1987 | Kalmus et al. |
| 4,694,397 | A | 9/1987 | Grant et al. |
| 4,700,297 | A | 10/1987 | Hagel et al. |
| 4,751,640 | A | 6/1988 | Lucas et al. |
| 4,774,663 | A | 9/1988 | Musmanno et al. |
| 4,953,085 | A | 8/1990 | Atkins |

(Continued)

FOREIGN PATENT DOCUMENTS

| JP | 10-049590 | 2/1998 |
|---|---|---|

(Continued)

OTHER PUBLICATIONS

Hencke, "New Rules for FDIC deposit Insurance", ABA Bank Compliance, v20n7, pp. 31-37, Jul./Aug. 1999.\*

(Continued)

*Primary Examiner* — Mary Cheung
(74) *Attorney, Agent, or Firm* — Foley & Lardner LLP

(57) **ABSTRACT**

A method, system, and program product for managing funds for a plurality of client accounts at a first banking institution, the system comprising: one or more electronic databases, comprising: (i) client account information; (ii) aggregated transaction account information for a plurality of FDIC-insured and interest-bearing aggregated deposit accounts held in a plurality of banks in a program including the first banking institution; and (iii) subaccount information; and one or more computers configured for (a) accessing the electronic database and administering clients' deposits and withdrawals from the client accounts, comprising processing transaction data for more than six (6) withdrawals and/or transfers from each of at least two of the client accounts; (b) determining, whether the balance of funds for the respective client in the aggregated deposit account at the first bank equals or exceeds a specified amount, and if not, then designating the first bank to receive the deposit, and if it does, determining another bank in the program and designating the deposit for the other bank.

**36 Claims, 6 Drawing Sheets**



**US 7,933,821 B1**

Page 2

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,985,833 | A | 1/1991 | Oncken |
| 5,126,936 | A | 6/1992 | Champion et al. |
| 5,206,803 | A | 4/1993 | Vitagliano et al. |
| 5,220,501 | A | 6/1993 | Lawlor et al. |
| 5,235,507 | A | 8/1993 | Sackler et al. |
| 5,262,942 | A | 11/1993 | Earle |
| 5,270,922 | A | 12/1993 | Higgins |
| 5,291,398 | A | 3/1994 | Hagan |
| 5,297,032 | A | 3/1994 | Trojan et al. |
| 5,424,938 | A | 6/1995 | Wagner et al. |
| 5,631,828 | A | 5/1997 | Hagan |
| 5,644,727 | A | 7/1997 | Atkins |
| 5,671,363 | A | 9/1997 | Cristofich et al. |
| 5,689,650 | A | 11/1997 | McClelland et al. |
| 5,710,889 | A | 1/1998 | Clark et al. |
| 5,765,144 | A | 6/1998 | Larche et al. |
| 5,774,880 | A | 6/1998 | Ginsberg |
| 5,781,654 | A | 7/1998 | Carney |
| 5,802,499 | A | * 9/1998 | Sampson et al. ................ 705/35 |
| 5,806,048 | A | 9/1998 | Kiron et al. |
| 5,806,049 | A | 9/1998 | Petruzzi |
| 5,812,987 | A | 9/1998 | Luskin et al. |
| 5,826,243 | A | 10/1998 | Musmanno et al. |
| 5,852,811 | A | 12/1998 | Atkins |
| 5,864,685 | A | 1/1999 | Hagan |
| 5,875,437 | A | * 2/1999 | Atkins ............................ 705/40 |
| 5,878,258 | A | 3/1999 | Pizi et al. |
| 5,878,405 | A | 3/1999 | Grant et al. |
| 5,884,285 | A | 3/1999 | Atkins |
| 5,890,141 | A | 3/1999 | Carney et al. |
| 5,893,078 | A | 4/1999 | Paulson |
| 5,903,881 | A | 5/1999 | Schrader et al. |
| 5,905,974 | A | 5/1999 | Fraser et al. |
| 5,940,809 | A | 8/1999 | Musmanno et al. |
| 5,941,996 | A | 8/1999 | Smith et al. |
| 5,946,667 | A | 8/1999 | Tull et al. |
| 5,950,175 | A | 9/1999 | Austin |
| 5,974,390 | A | 10/1999 | Ross |
| 5,978,779 | A | 11/1999 | Stein et al. |
| 6,014,642 | A | 1/2000 | El-Kadi et al. |
| 6,016,482 | A | 1/2000 | Molinari et al. |
| 6,026,438 | A | 2/2000 | Piazza et al. |
| 6,041,314 | A | 3/2000 | Davis |
| 6,044,371 | A | 3/2000 | Person et al. |
| 6,047,324 | A | 4/2000 | Ford et al. |
| 6,049,782 | A | 4/2000 | Gottesman et al. |
| 6,052,673 | A | 4/2000 | Leon et al. |
| 6,088,685 | A | 7/2000 | Kiron et al. |
| 6,092,056 | A | 7/2000 | Tull et al. |
| 6,105,005 | A | 8/2000 | Fuhrer |
| 6,108,641 | A | 8/2000 | Kenna et al. |
| 6,112,191 | A | 8/2000 | Burke |
| 6,119,093 | A | 9/2000 | Walker et al. |
| 6,131,810 | A | 10/2000 | Weiss et al. |
| 6,154,770 | A | 11/2000 | Kostakos |
| 6,189,785 | B1 | 2/2001 | Lowery |
| 6,192,347 | B1 | 2/2001 | Graff |
| 6,226,623 | B1 | 5/2001 | Schein et al. |
| 6,317,783 | B1 | 11/2001 | Freishtat et al. |
| 6,324,523 | B1 | * 11/2001 | Killeen et al. .............. 705/36 R |
| 6,363,360 | B1 | 3/2002 | Madden |
| 6,374,231 | B1 | 4/2002 | Bent et al. |
| 6,513,020 | B1 | 1/2003 | Weiss et al. |
| 6,970,843 | B1 | 11/2005 | Forte |
| 7,089,202 | B1 | 8/2006 | McNamar et al. |
| 7,103,556 | B2 | 9/2006 | Del Rey et al. |
| 7,124,101 | B1 | 10/2006 | Mikurak |
| 7,133,840 | B1 | 11/2006 | Kenna et al. |
| 7,206,761 | B2 | 4/2007 | Colvin |
| 7,216,100 | B2 | 5/2007 | Elliott |
| 7,328,179 | B2 | 2/2008 | Sheehan et al. |
| 7,376,606 | B2 | 5/2008 | Jacobsen |
| 7,383,223 | B1 | 6/2008 | Dilip et al. |
| 7,440,914 | B2 | 10/2008 | Jacobsen |
| 7,509,286 | B1 | 3/2009 | Bent et al. |
| 7,519,551 | B2 | 4/2009 | Bent et al. |
| 7,536,350 | B1 | 5/2009 | Bent et al. |
| 7,596,522 | B1 | 9/2009 | Jacobsen |

| | | | |
|---|---|---|---|
| 7,603,307 | B2 | 10/2009 | Jacobsen |
| 7,668,772 | B1 | 2/2010 | Bent et al. |
| 7,672,886 | B2 | 3/2010 | Bent et al. |
| 7,680,734 | B1 | 3/2010 | Bent et al. |
| 7,716,131 | B2 | 5/2010 | Bent et al. |
| 7,769,688 | B1 | 8/2010 | Bent et al. |
| 2001/0032182 | A1 | 10/2001 | Kumar et al. |
| 2002/0007330 | A1 | 1/2002 | Kumar et al. |
| 2002/0046144 | A1 | 4/2002 | Graff |
| 2002/0069147 | A1 | 6/2002 | Sheehan et al. |
| 2002/0082981 | A1 | 6/2002 | Madden |
| 2002/0087454 | A1 | 7/2002 | Calo et al. |
| 2002/0091637 | A1 | 7/2002 | Bent et al. |
| 2002/0128951 | A1 | 9/2002 | Kiron et al. |
| 2002/0161707 | A1 | 10/2002 | Cole et al. |
| 2002/0165757 | A1 | 11/2002 | Lisser |
| 2002/0178098 | A1 | 11/2002 | Beard |
| 2002/0194099 | A1 | 12/2002 | Weiss |
| 2003/0023529 | A1 | 1/2003 | Jacobsen |
| 2003/0041003 | A1 | 2/2003 | Kayser, III |
| 2003/0135437 | A1 | 7/2003 | Jacobsen |
| 2003/0149646 | A1 | 8/2003 | Chen et al. |
| 2003/0163403 | A1 | 8/2003 | Chen et al. |
| 2003/0177092 | A1 | 9/2003 | Paglin |
| 2003/0191702 | A1 | 10/2003 | Hurley |
| 2003/0200174 | A1 | 10/2003 | Star |
| 2003/0208438 | A1 | 11/2003 | Rothman |
| 2003/0236728 | A1 | 12/2003 | Sunderji et al. |
| 2004/0039674 | A1 | 2/2004 | Coloma |
| 2004/0107157 | A1 | 6/2004 | Bleunven et al. |
| 2004/0111361 | A1 | 6/2004 | Griffiths et al. |
| 2004/0128229 | A1 | 7/2004 | Raines et al. |
| 2004/0128235 | A1 | 7/2004 | Kemper et al. |
| 2004/0138974 | A1 | 7/2004 | Shimamura et al. |
| 2004/0153398 | A1 | 8/2004 | Baumgartner et al. |
| 2004/0162773 | A1 | 8/2004 | Del Rey et al. |
| 2004/0177036 | A1 | 9/2004 | Nutahara et al. |
| 2005/0044038 | A1 | 2/2005 | Whiting et al. |
| 2005/0091137 | A1 | 4/2005 | Woeber |
| 2005/0102225 | A1 | 5/2005 | Oppenheimer et al. |
| 2005/0102226 | A1 | 5/2005 | Oppenheimer et al. |
| 2005/0108120 | A1 | 5/2005 | Malka et al. |
| 2005/0108149 | A1 | 5/2005 | Bent et al. |
| 2005/0114246 | A1 | 5/2005 | Coloma |
| 2005/0154662 | A1 | 7/2005 | Langenwalter |
| 2005/0228733 | A1 | 10/2005 | Bent et al. |
| 2006/0047593 | A1 | 3/2006 | Naratil et al. |
| 2006/0106703 | A1 | 5/2006 | Del Rey et al. |
| 2006/0155644 | A1 | 7/2006 | Reid et al. |
| 2006/0167773 | A1 | 7/2006 | Yang et al. |
| 2006/0213980 | A1 | 9/2006 | Geller et al. |
| 2006/0273152 | A1 | 12/2006 | Fields |
| 2007/0043666 | A1 | 2/2007 | Burdette |
| 2007/0118449 | A1 | 5/2007 | De La Motte |
| 2007/0255655 | A1 | 11/2007 | Kemper et al. |
| 2007/0271174 | A2 | 11/2007 | Bent et al. |
| 2007/0276752 | A1 | 11/2007 | Whiting et al. |
| 2007/0288400 | A1 | 12/2007 | Menon |
| 2008/0015985 | A1 | 1/2008 | Abhari et al. |
| 2008/0046358 | A1 | 2/2008 | Holm-Blagg et al. |
| 2008/0065532 | A1 | 3/2008 | De La Motte |
| 2008/0097899 | A1 | 4/2008 | Jackson et al. |
| 2008/0120228 | A1 | 5/2008 | Bent et al. |
| 2008/0133280 | A1 | 6/2008 | Ziegler |
| 2008/0133396 | A1 | 6/2008 | De La Motte |
| 2008/0222053 | A1 | 9/2008 | Jacobsen |
| 2009/0006985 | A1 | 1/2009 | Fong et al. |
| 2009/0012899 | A1 | 1/2009 | Friesen |
| 2009/0138412 | A1 | 5/2009 | Jacobsen |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO-95/23379 | 8/1995 |
| WO | WO-99/18529 | 4/1999 |
| WO | WO-02/42952  A1 | 5/2002 |
| WO | WO-03/012580 | 2/2003 |
| WO | WO-2005/006111 | 1/2005 |

OTHER PUBLICATIONS

U.S. Appl. No. 60/307,815, filed Jul. 27, 2001.

U.S. Appl. No. 60/323,365, filed Sep. 20, 2001.
U.S. Appl. No. 10/825,440, filed Apr. 4, 2004, Bent et al.
"Bank of Oak Ridge to Offer FDIC Insurance on up to $1.5 Million," Dialog Web Command Mode, 2 Sheets, Sep. 25, 2003, http://www.dialogweb.com/cgi/dwclient.
"Man Bites Dog: Funds Move Into Banking," IBC's Money Fund Selector, 2 Sheets, Nov. 6, 1998.
"Reverse Ups Insurance Limit On Money Market Account," Thomson Financial Inc., Mutual Fund Market News, 1 Sheet, Aug. 26, 2002.
"The Bank of New York adds a $300,000 FDIC-Insured Money Market Account Option to its Dividend Income Checking Account," PR Newswire Associations, Inc., PR Newswire, 2 Sheets, Apr. 18, 2002.
"The Reverse Funds to Offer up to $600,000 of FDIC Insurance on Reserve Insured Deposits: Addressing Investor Needs for Increased Safety, Flexibility and a Competitive Yield," Business Wire, Inc. Business Wire, 2 Sheets, Aug. 13, 2002.
12 CFR Part 329—Interest on Deposit, Source: 51 FR 10808, Mar. 31, 1986, 5 Sheets.
AB 2011 Assembly Bill—Bill Analysis, Senate Amendments, http://www.leginfo.ca.gov/pub/bill/asm/ab_2001-2050/ab_2011_cfa_20060811_161755_asm_floor.html, 2006, pp. 1-3.
AB 2011 Assembly Bill—Bill Analysis, Senate Rules Committee, Third Reading, http://www.leginfo.ca.gov/pub/bill/asm/ab_2001-2050/ab_2011_cfa_20060705_161454_sen_floor.html, 2006, pp. 1-7.
AB 2011 Assembly Bill—Chaptered, http://www.leginfo.ca.gov/pub/bill/asm/ab_2001-2050/ab_2011_bill_20060925_chaptered.html, 2006, pp. 1-3.
AB 2011 Assembly Bill—Enrolled, http://www.leginfo.ca.gov/pub/bill/asm/ab_2001-2050/ab_2011_bill_20060816_enrolled.html, 2006, pp. 1-3.
AB 2011 Assembly Bill—History, Complete Bill History, http://www.leginfo.ca.gov/pub/bill/asm/ab_2001-2050/ab_2011_bill_20060925_history.html, 2006, p. 1.
About iMoneyNet, Inc., About iMoneyNet's Money Funds Division, 4 Sheets, Aug. 21, 2003, http://www.ibcdata.com/about.htm.
Anderson et al. "Retail Sweep Programs and Bank Reserves," Federal Reserve Bank of St. Louis Review, Bell & Howell Information and Learning Company, vol. 83, Issue 1, 24 Sheets, Jan. 1, 2001.
Announcing Changes in Automatic "Sweep" Investment Options, LPL Financial Services, Linsco/Private Ledger, Member NASD/SIPC, 26 Sheets.
Bank Deposit Program, Online http://web.archive.org/web/20030620100115/http://www.smithbarney.com/products_servi, Jan. 19, 2001, 4 Sheets.
Bent, "Bruce Bent Makes Money Market Funds Act Like Bank Accounts," Equity BBDP, Oct. 5, 1998, 3 Sheets.
Blackwell, "ABA to Approve System for Sharing Deposit Coverage," American Banker, 2 Sheets, Feb. 11, 2003.
Blackwell, "New Pitch: Deposit Insurance Sharing," American Banker Online, 4 Sheets, Jan. 21, 2003.
Board of Governors of the Federal Reserve System, 1984 Fed. Res. Interp. Ltr. LEXIS 56, Nov. 16, 1984, 3 Sheets.
Board of Governors of the Federal Reserve System, 1988 Fed. Res. Interp. Ltr. LEXIS 141, Jun. 22, 1988, 3 Sheets.
Board of Governors of the Federal Reserve System, 1989 Fed. Res. Interp. Ltr. LEXIS 154, Jan. 21, 1989, 2 Sheets.
Board of Governors of the Federal Reserve System, 1989 Fed. Res. Interp. Ltr. LEXIS 77, Mar. 14, 1989, 2 Sheets.
Board of Governors of the Federal Reserve System, 1990 Fed. Res. Interp. Ltr. LEXIS 94, Feb. 1, 1990, 1 Sheet.
Board of Governors of the Federal Reserve System, 1991 Fed. Res. Interp. Ltr. LEXIS 232, Jan. 30, 1991, 2 Sheets.
Board of Governors of the Federal Reserve System, 1994 Fed. Res. Interp. Ltr. LEXIS 156, Jun. 24, 1994, 3 Sheets.
Board of Governors of the Federal Reserve System, 1994 Fed. Res. Interp. Ltr. LEXIS 314, Oct. 17, 1994, 2 Sheets.
Board of Governors of the Federal Reserve System, 1994 Fed. Res. Interp. Ltr. LEXIS 419, Oct. 14, 1994, 4 Sheets.
Britt, "Struggling with Sweep Accounts," America's Community Banker, vol. 6, No. 12, 11 Sheets, Dec. 1, 1997.
California Independent Bankers, ICBA Independent Community Bankers of America, Banker Bulletin, 2006, CIB 16th Annual Convention, vol. 4, issue 6, http://www.cib.org/banker_bulletin.htm.
Capital Briefs: Corporate Checking Account Relief Sought, American Banker, vol. 162, Jul. 28, 1997, 1 Sheet.
Certificate of Deposit Registry Service: Keeping Deposits in the Corn Patch, Banknews, 2 Sheets. Mar. 2003.
Chapelle et al. "Peering Into Tomorrow: At the Threshold of a New Century, Brokers and Others Discuss Where They were Going," Securities Data Publishing on Wall Street, 6 Sheets, Dec. 1, 1999.
Chapelle, "Merrill's Rivals Say They, Too. Offer Services Beyond Banking," Securities Data Publishing On Wall Street, 2 Sheets, Feb. 1, 2003.
CMA, Insured Savings Account Fact Sheet, Merrill Lynch, Pierce, Fenner & Smith Incorporated, 1997, pp. 49-57.
CMA, Insured Savings Account Fact Sheet, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Jul. 1994, pp. 47-54.
CMA, The Investor Credit Line Service, Cost-Effective Financing for the '90s, Merrill Lynch, Pierce, Fenner & Smith Incorporated, 1997, pp. 36-46.
CMA, The Merrill Lynch Cash Management Account Financial Service, Insured Savings Account Participating Depository Institutions, Merrill Lynch, Pierce & Fenner & Smith Incorporated, Mar. 1995, 2 Sheets.
CMA, The Merrill Lynch Cash Management Account Financial Service, Insured Savings Account Participating Depository Institutions, Merrill Lynch, Pierce & Smith Incorporated, Nov. 1992, 2 Sheets.
CMA, The Merrill Lynch Cash Management Account Financial Service, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Jan. 1997, 35 Sheets.
Coyle, "A Look at commercial Demand Deposit Options," America's Community Banker, vol. 9, Issue 2, Bell & Howell Information and Learning Company, 9 Sheets, Feb. 1, 2000.
Crockett, "Big Banks Found Stepping Up Marketing of 'Sweep' Accounts," American Banker, vol. 159, No. 198, American Banker Inc., 3 Sheets, Oct. 13, 1994.
Declaration of Mr. Bruce Bent II, Vice Chairman and Registrant of Applicant on the date of first commercial use of the service providing interest and FDIC insurance for checking accounts by means of a system using money market deposit accounts (MMDA's) of Oct. 23, 1997.
Declaration of Mr. Bruce Bent II, Vice Chairman and Registrant of Applicant. (3 Sheets) and Exhibits A, B, C and D (6 Sheets).
Deposit Growth Strategies For Financial Institutions, New Sweep Account Helps Retain $40 Million in Business Deposits, vol. 7, No. 12, The Reserve Funds, May 2001, 1 Sheet.
DI 48, Excerpts of Transcript of Hearing, U.S. Dist. Ct., District of Delaware, Civil Action No. 82-680, Apr. 8, 1983, 5 sheets.
DI 56, Interrog. Response, U.S. Dist. Ct. District of Delaware, Civil Action No. 82-680, May 20, 1983, 15 Sheets.
DI 99, Suppl. Interrogatory Response, U.S. Dist. Ct., District of Delaware, Civil Action No. 82-630, May 30, 1984, 6 Sheets.
FDIC Federal Register Citations: Email from Bert Ely to Comments. Mar. 8, 2006, Subject: Large-Bank Deposit Insurance Determination Proposal- RIN 3064-AC98—Regs@fdic.gov. Attached, also from FDIC Federal Register Citations: Email From American Banker, by Bert Ely, Feb. 24, 2006, Viewpoint: FDIC's Account-Link Plan a Pointless, Costly Threat.
FDIC, Federal Deposit Insurance Corporation. Letter to Mr. Ronald Rexter, Feb. 28, 2003, From Michelle M. Borzillo, Counsel Supervision and Legislation Section, 2 Sheets.
FINISTAR, Providing FDIC Insured Funds as a Stable Source of Deposits to Commercial Banking Institutions, 16 Sheets, www.Finistar.com.
Fredrickson, "Rising Rates Rescue Money Fund Firm Reserve Profits by Picking Niches," Crain's New York Business, Crain Communications Inc., vol. 20, Issue 51, 2 Sheets, Dec. 20, 2004.
Frost Bank, Member FDIC, Checking Accounts, 1 Sheet, Sep. 19, 2003, https://www.frostbank.com/cgi-bin/ecomm/frost1/scripts/products/product_detail.jsp?BV_.
Heavyweight Funding, Bankers News, Mar. 4, 2003, vol. II, Issue No. 5. 2 Sheets.

**US 7,933,821 B1**

Page 4

Hoffman, "Reserve's FDIC-Insured Account Draws Regionals; But some see little need for insurance," Crain Communications Inc., Investment News, 2 Sheets, Jun. 4, 2001.

In The Know, Important Information About Your Account, Smith Barney Citigroup, 2005, 6 Sheets.

Insured Cash Account Program Disclosure Booklet, LPL Financial Services, Linsco/Private Ledger, Member NASD/SIPC.

Keenan, "Tapping Brokerages for Alternative to CDs," American Banker, The Financial Services Daily, 3 Sheets, Feb. 18, 2004.

Lavine, "Check Out High-Yield Checking Accounts," Broward Daily Business Review, vol. 39, No. 102, 2 Sheets, Apr. 27, 1998.

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, and Double Rock Corporation against Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, including Cover Sheet, Summons, Complaint and Rule 7.1 Statement, Case No. 09 CV 2677.

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, and Double Rock Corporation against Promontory Interfinancial Network, LLC and MBSC Securities Corporation, including Cover Sheet, Summons, Complaint and Rule 7.1 Statement, Case No. 09 CV 2675.

Lawsuit by Promontory Interfinancial Network, LLC against Double Rock Corporation p/k/a Reserve Management Corporation and Lids Capital LLC, Amended Complaint, Civil Action No. 1:09 CV 316.

Lawsuit by Promontory Interfinancial Network, LLC against Double Rock Corporation p/k/a Reserve Management Corporation, Complaint, Civil Action No. 1:09 CV 316.

Letter From Jamey Basham, Attorney, LEXSEE 1990 FDIC Interp. Ltr., Lexis 1, Federal Deposit Insurance Corporation, FDIC-90-02, Jan. 3, 1990, 2 Sheets.

Letter From Merle Y. Waldman, LEXSEE 1985 Sec No- Act., Lexis 1593, Securities Exchange Act of 1934—Section 15(a), Jan. 8, 1985, 11 Sheets.

Letter From Michael Bradfield, General Counsel, Board of Governors of the Federal Reserve System, Nov. 16, 1984, 4 Sheets.

Letter From Oliver I. Ireland, Associate General Counsel, Board of Governors of the Federal Reserve System, Jun. 22, 1988, 5 Sheets.

Letter from Stephanie Martin, Assoc. General Counsel, Board of Governors of the Federal Reserve System, Apr. 22, 2004, 8 Sheets.

Letter From William W. Wiles, Secretary of the Board, Board of Governors of the Federal Reserve System, Jun. 22, 1983, 6 Sheets.

Letter To Mr. James E. Creekman, Group Vice President, From Oliver Ireland, Associate General Counsel, Aug. 1, 1995, 4 Sheets.

Letter To Mr. Jonathan L. Levin, Esq., From Oliver Ireland, Associate General Counsel, Oct. 18, 1996, 2 Sheets.

Letter To Mr. L.P. Fleming, Jr., Esq., From Oliver Ireland, Associate General Counsel, Feb. 7, 1995, 3 Sheets.

Letter To Ms. Brenda L. Skidmore, Senior Vice President, From Oliver Ireland, Associate General Counsel, Aug. 30. 1995, 4 Sheets.

Liberman et al., Market Watch, "How Important are Banks?" FDIC Insurance on Deposits Just One Continuing Advantage, Oct. 17, 2006, 3 Sheets.

McReynolds et al. "Unusual Products for Unusual Times," Securities Data Publishing on Wall Street, 6 Sheets, May 1, 2001.

McReynolds, "The Power of Cash: Ho-hum cash can be great product (and lead to more business) in troubled times," Securities Data Publishing on Wall Street, 3 Sheets, Jun. 1, 2002.

Merriam-Webster Online Dictionary, 10th Edition, Definition of "Associated", 2 Sheets.

Merrill Lynch & You, "Financial Services The Way You Want, When You Want Them," Jan. 2000 4 Sheets.

Merrill Lynch Announces Beyond Banking, The Power of Advice For Smarter Cash Management, Jan. 8, 2 Sheets.

Merrill Lynch, Pierce, Fenner & Smith Incorporated, "Information Statement," 2000, 12 Sheets.

Merrill Moves CMA Cash to Bank, Street Talk, On Wall Street, Nov. 2000, p. 26.

Money Fund Report, Bank of New York Adds Insured Sweeps Option, Friday, May 3, 2002, The Reserve Funds, 1 Sheet.

Money Fund Report, IBC Financial Data, Inc., Nov. 6, 1998, 1 Sheet.

Money Fund Report, Insured Cash Sweep Options Proliferate, Friday, Jun. 1, 2001, The Reserve Funds, 1 Sheet.

Money Market Insight's, Goldman Sachs May Create Bank to Offer Insured Cash Sweeps, Aug. 2002 Issue, 3 Sheets.

Munk, Merrill Makes New Push Into Traditional Banking, Dow Jones Newswires, Jan. 3, 2003, 1 Sheet.

Mutual Funds Magazine, Bargain Basement Funds, Oct. 1997, 2 Sheets.

News Article: "Regulators Support Demand Deposit Bill", Regulatory Compliance Watch—Mar. 9, 1998; 2 Sheets, vol. 9, No. 10.

O'Brian, "Money-Market Funds Suit Many Investors, But Proud Creator Frets About Extra Risk," Re-Printed From The Wall Street Journal, Monday, Nov. 6, 2000, Dow Jones & Company, Inc., 2 Sheets.

On Wall Street, Helping Brokers Build A More Successful Business, The Power of CASH Jun. 2002, 2 Sheets.

On Wall Street, Helping Brokers Build A More Successful Business, Usual Products For Usual Times, May 2001, 2 Sheets.

Online, www.usabancshares.com, Brave New World, 1999, 2 Sheets.

Part- 2, Monetary Policy and Reserve Requirements, Subpart—Regulation D, Board Interpretations of Regulation D, Transaction Accounts—Linked To Time Deposits, vol. 1, Federal Reserve Regulatory Service, 2 Sheets.

Potter, "As Sweep Accounts Continue to Grow, So do Community Bank Options," America's Community Banker, vol. 9, Issue 8, Bell & Howell Information and Learning Company, 3 Sheets, Aug. 1, 2000.

Promontory Interfinancial Network: http://www.promnetwork.com/index.html, 2003.

Reserve Insured Deposits, United States Patent and Trademark Office, Reg. No. 2,694,910, Registered Mar. 11, 2003., 1 Sheet.

Reserve Management Corporation, Reserve Insured Deposits, U.S. Appl. No. 76/315,600, Issued.

Share, "New Service Skirts FDIC's $100K Limit," Dialog Web Command Mode, 2 Sheets, Jun. 13, 2003, http://www.dialogweb.com/cgi/dwclient.

Smith, "IBAA Won't Push Interest-Bearing Checking for Business; Says Too Few Members Want It," The American Banker, 2 Sheets, Apr. 18, 1996.

Stafford, "New Bank Program Allows $1 Million in Insured Deposits," Dialog Web Command Mode, 3 Sheets, Aug. 24, 2003, http://www.dialogweb.com/cgi/dwclient.

Sweeping Your Firm Into FDIC Insured Deposits, Harken Financial Services, Aug. 4, 2006, 8 Sheets.

Testimony of Bruce R. Bent, CEO of The Reserve Funds, Before The Financial Institutions and Consumer Credit Subcommittee House Financial Services Committee U.S. House of Representative, Hearing On H.R. 758 and H.R. 859, Mar. 5, 2003, 4 Sheets.

The Insured Savings Account, Issuer Guide to Offering MMDAs Through Merrill Lynch, Merrill Lynch Money Markets, Inc., "Operational Guide To The Merrill Lynch MMDA Program 1986", Sep. 1986 3 Sheets.

The Reserve Fund, Study of U.S. Patent No. 6,374,231, 1 Sheet.

The Reserve Funds Press Release, "The Reserve Funds and Frontier Bank Partner to Offer Revolutionary Banking Product," 5 Sheets, Aug. 1, 2000.

The Reserve Funds, NJBA Endorses New Sweep Account Offers New Jersey Banks Deposit Growth, Retention, For Immediate Release, May 23, 2001, 1 Sheet.

The Reserve Funds, Reserve Management and Irwin Union Bank and Trust Company Partner to Offer the Reserve Return Sweep, For Immediate Release, Mar. 8, 2001, 2 Sheets.

The Reserve, "Company History," 3 Sheets, Oct. 4, 2006, http://www.ther.com/aboutus/history.shtml.

The Reserve, "Reserve Insured Deposits Program," 2 Sheets, Oct. 4, 2006, http://www.ther.com/bank/bank__insdep.shtml.

The Reserve, "Reserve Insured Deposits," 2 Sheets, Oct. 4, 2006, http://www.ther.com/ps/ps__fif.shtml.

The Reserve, "What Sets Us Apart," 2 Sheets, Oct. 4, 2006, http://www.ther.com/bank/bank__wsua.shtml.

The Unmatched Sweep Solution From the Cash Management Expert, 2 Sheets.

Waddell, "Sweeping Clean," Advisor, The Advisor to Advisors, 2 Sheets.

Wilson, "How Cash Management Services Can Help Your Bank Cultivate New Relationships with Commercial Customers," Ameri-

# US 7,933,821 B1

Page 5

Memorandum from Ken Johnson re: Insured Deposit Products, Aug. 18, 1992, 3 pgs.

Memorandum from John E. Oncken re: Insured Savings Update, Jun. 15, 1990, 7 pgs.

Memorandum from John E. Oncken re: Brokered Deposit Issue vs. Insured Savings, Mar. 22, 1990, 8 pgs.

Memorandum from Ed Piner re: Insured Savings Product Update, Feb. 1, 1990, 4 pgs.

Insured Savings Correspondent Agreement with Exhibits A-D, 28 pgs.

First City, Texas Insured Savings Agency Agreement with Exhibits A-B and Insured Savings Program, 10 pgs.

Product Bulletin from Bill McCain, Subject: Insured Savings Product Announcement, May 8, 1989, 7 pgs.

Insured Savings Project Team Meeting, Feb. 2, 1989, 16 pgs.

Insured Savings Product Description, Product Name: Insured Savings, Product Description: U.S. Patent #4,985,833, 3 pgs.

Letter to Tim C. Lear, Sep. 20, 1988, 1 pg., with Memorandum from Ed Piner, re: Insured Savings Product, Nov. 9, 1988, and Letter from Tara L. Cyr, Dec. 9, 1988, 1 pg.

Automatic Insured Deposit Method, Patent Application Information, Jul. 11, 1988, 17 pgs.

Insured Savings, Overview & Marketing Plan, Dec. 6, 1988, 23 pgs.

Memorandum from Dick Zinser, re: A First City-Austin deposit program to hold existing customers' deposits, Mar. 17, 1988, 7 pgs.

Insured Savings Remote Site Sweep Procedures, 3 pgs.

Letter to Malcolm l. Duke, Dec. 27, 1989 with Insured Savings Correspondent Agreement, Exhibits A-D, and Letter to Malcolm L. Drake, Nov. 21, 1989, 37 pgs.

Memorandum from Ken Johnson, re: Attached Insured Savings Letters, Jul. 5, 1990, 1 pg.

Letter to Jerry Crutsinger, Jul. 3, 1990, 1 pg.

Letter to Bill Goertz, Jul. 3, 1990, 1 pg.

Letter to Susan Goodwin, Jul. 3, 1990, 1 pg.

Insured Savings Rate Change Notice, 1 pg.

Addendum to Insured Savings Agency Agreement, 1 pg.

Letter to Paula Martin, Jul. 3, 1990, 1 pg.

Letter to John Lovell, Jul. 3, 1990, 1 pg.

Insured Savings Balance Limits form, 1 sheet.

Email from John Oncken re: Depository Levels at Insured Savings Depositories, Nov. 2, 1989, 1 pg.

Cash Management Balance Monitoring Agreement Form 1 sheet.

Memorandum from Ed Piner, Subject: Discontinuation of Automatic Balance Monitoring in conjunction with Insured Savings Accounts, May 21, 1991, 1 pg.

Blank form letter from Edward N. Piner, May 24, 1991, 1 pg.

Letter from First City National Bank of Austin, Sep. 20, 1982, 5 pgs.

First City, Texas—Austin, Special Products, Feb. 20, 1992, with Schedule A & Schedule B, 6 pgs.

Letter From William W. Wiles, Secretary of the Board, Board of Governors of the Federal Reserve System, Jun. 22, 1983, 6 Sheets. (Previously disclosed).

Letter From Oliver I. Ireland, Associate General Counsel, Board of Governors of the Federal Reserve System, Jun. 22, 1988, 5 Sheets. (Previously disclosed).

Alliance Insured Account, Information Statement, Sep. 1999, 6 sheets.

Lawsuit by Carlo DeBlasio et al. and Merrill Lynch & Co., Inc. et al., Opinion and Order, Jul. 27, 2009, Civil Action No. 07 CIV. 318, 47 pgs.

Lawsuit by Carlo DeBlasio et al. and Merrill Lynch & Co., Inc. et al., Second Amended Class Action Complaint, Jury Trial Demanded, Jun. 11, 2007, Civil Action No. 07 cv 318, 137 pgs.

Investors MoneyAccount$^{SM}$ and Insurance Plus Service Agreement, Schedule A, 3 sheets.

Investors MoneyAccount$^{SM}$ (an FDIC-insured money market account), 4 sheets.

Investors MoneyAccount$^{SM}$ The FDIC-Insured Money Market with an Important Plus., 2 sheets.

Investment Company Act of 1940—Section 3(a)(1), 2(a)(36); Securities Act of 1933—Section 2(1), Nov. 29, 1985, Kempter Financial Services, Inc., 9 pgs.

Insured Money Account Program Agreement and Disclosure Statement, 11 sheets.

First National Bank in Brookings, Certificates of Deposit, 5 sheets.

Summary of Commentary on Current Economic Conditions by Federal Reserve Districts, Jan. 1985, 44 pgs.

Board of Governors of the Federal Reserve System, Blank Form Letter, Apr. 22, 2004, 8 pgs.

FDIC Law, Regulations, Related Acts, 4000—Advisory Opinions, FDIC-93—35, Jun. 28, 1993, 2 sheets.

§204.134, 12 CFR Ch. 11 (Jan. 1, 2009 Edition), 2 sheets.

Money Fund $$ Moving to Bank Deposits, 6 *FRC Monitor*, Dec. 2003, 2 sheets.

Crane, P. & Krasner, Mike, *An iMoney Net Special Report*™, "Brokerage Cash Sweep Options: The Shift from Money Funds to FDIC-Insured Bank Deposit Accounts", Nov. 2004, 64 pgs.

The May 1998 Senior Financial Officer Survey, *Board of Govenors of the Federal Reserve System*, with Appendix A, 48 pgs.

Interest Rate Review © A Publication of *Meyer Weekly Interest Rate Survey*, A Look At Tiers, Vol. II, No. 4, Apr. 1987, 6 pgs.

Interest Rate Review© A Publication of *Meyer Weekly Interest Rate Survey*, A Study of Historical Rates and Yields, vol. II, No. 6, Jun. 1987, 8 pgs.

Blank form letter to Oliver Ireland, Oct. 7, 1994, 1 pg.

Letter to L.P. Fleming, Jr. Esq., Feb. 7, 1995, 3 pgs.

Letter to James E. Creekman, Aug. 1, 1995, 4 pgs.

Letter to Brenda L. Skidmore, Aug. 30, 1995, 4 pgs.

Merrill Lynch & Co., Inc. Form 10-K405 (Annual Report (Regulation S-K, item 405)), Filed Mar. 14, 2002 for the Period Ending Dec. 28, 2001, with Schedules, Exhibits, and 2001 Annual Report, 248 pgs.

Merrill Lynch & You, "Financial Services The Way You Want, When You Want Them," Jan. 2000 4 Sheets. (Previously disclosed).

Merrill Lynch, Pierce, Fenner & Smith Incorporated, "Information Statement," 2000, 12 Sheets. (Previously disclosed).

Merrill Lynch, Information Statement Regarding Changes to Interest Rates on Deposits in the Merrill Lynch Banks, Document 64-14, Nov. 12, 2007, Case 1:07-cv-00318, 2 sheets.

Street Talk, "Merrill Moves CMA Cash to Bank", *On Wall Street*, Nov. 2000, 1 sheet.

Quest Insured Account, *QUESTessentials*, 3 sheets.

Quest Insured Account, *Information Statement*, 5 sheets.

OCC Insured Bank Deposit Account, 3 sheets.

Insured Bank Deposit Account, *Information Statement*, Jul. 1, 2000, 2 sheets.

Letter from Marilyn J. Hensle, announcing Salomon Smith Barney Bank Deposit Program. ™, with Q&A, 14 sheets.

Bank Deposit program Disclosure Statement, Salomon Smith Barney, 3 sheets.

FDIC Law, Regulations, Related Acts, 4000—Advisory Opinions, FDIC-87-25, Oct. 22, 1987, 1 sheet.

FDIC Law, Regulations, Related Acts, 4000—Advisory Opinions, FDIC-86-21, Jul. 23, 1986, 2 sheets.

The Merrill Lynch Cash Management Account, Financial Service, 18 pgs.

The Insured Savings Account, Issuer Guide to Offering MMDAs through Merrill Lynch, 27 pgs.

Insured Savings Account Fact Sheet, The Merrill Lynch Cash Management Account Financial Service, 1987, 11 pgs.,

CMA Insured Savings Account Fact Sheet, 1994, 9 pgs.

A Guide to Your CMA Account, 1995, 19 pgs.

Insured Savings Account Fact Sheet, The Merrill Lynch Cash Management Account Financial Service, 1985, 4 pgs.

CMA Insured Savings Account Fact Sheet, 1997, 13 pgs.

Blackwell, Rob, Salomon's Sweep Plan Raises FDIC Fund Alarm, *American Banker*, Dec. 6, 2000, 2 pgs.

Insured Deposit Account (IDA), May 21, 1996, 11 pgs.

An Introduction to the Smith Barney *Insured Deposit Account*, 1995, 8 pgs.

Memorandum from Ted Hamilton re: Insured Deposit Account, Oct. 10, 1995, 13 pgs.

# US 7,933,821 B1

Page 6

The Insured Deposit Account: "*Money in the Bank*", 1997, 2 sheets.
Merrill Joins Money Market Account, CMA; Broker Begins Testing With 12 Institutions, *Lexis Nexis*, Sep. 23, 1983, 4 pgs.
Form 8-K Merrill Lynch & Co Inc—MER, Filed: Mar. 7, 2002, Report of unscheduled material events or corporate changes, 41 pgs.
Quest Cash Management Services Memorandum from Everett Alcenat re: Quest Insured Account, Nov. 16, 1993, 1 sheet.
Lawsuit by Island Intellectual Property LLC and Intrasweep LLC against Deutsche Bank Trust Company Americas and Total Bank Solutions, Complaint for Patent Infringement, Jury Trial Demanded, Feb. 23, 2010, Case No. 10 CV 1518, (Document 1).
Lawsuit by Island Intellectual Property LLC and Lids Capital LLC against Deutsche Bank Trust Company Americas and Total Bank Solutions, Complaint for Patent Infringement, Jury Trial Demanded, Mar. 16, 2010, Case No. 10 CV 2268.
Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation, and Intrasweep LLC against Deutsche Bank Trust Company Americas, and Total Bank Solutions, LLC, Defendants' Preliminary Invalidity Contentions, Mar. 12, 2010, Civil Action No. 09 Civ. 2675 (VM) (AJP).
Lawsuit by Island Intellectual Property LLC and Intrasweep LLC against Institutional Deposits Corp., Defendant Institutional Deposits Corp.'s Preliminary Invalidity Contentions, Case No. 09-CV-03079-JEC.
Exhibit 1, Invalidity Chart: IMA and Insurance Plus Service Agreement, U.S. Patent No. 7,509,286, 21 pgs.
Exhibit 2, Invalidity Chart: Investors Money Accounts$^{SM}$ System, U.S. Patent No. 7,509,286, 26 pgs.
Exhibit 3, Invalidity Chart: Insured Money Account System, U.S. Patent No. 7,509,286, 26 pgs.
Exhibit 4, Invalidity Chart: U.S. Patent No. 4,985,833 (Oncken), U.S. Patent 7,509,286, 21 pgs.
Exhibit 5, Invalidity Chart: First City Bank of Texas' Insured Savings Program, U.S. Patent No. 7,509,286, 39 pgs.
Exhibit 6, Invalidity Chart: Quest Insured Account, U.S. Patent No. 7,509,286, 19 pgs.
Exhibit 7, Invalidity Chart: CIBC World Markets—Insured Bank Deposit Account, U.S. Patent No. 7,509,286, 16 pgs.
Exhibit 8, Invalidity Chart: Merrill Lynch CMA/ISA Service, U.S. Patent No. 7,509,286, 72 pgs.
Exhibit 9, Invalidity Chart: 1983 Fed Letter, U.S. Patent No. 7,509,286, 16 pgs.
Exhibit 10, Invalidity Chart: Merrill Lynch Banking Advantage Program ("MLBA Program"), U.S. Patent No. 7,509,286, 22 pgs.
Exhibit 11, Invalidity Chart: Merrill Lynch & You + MLBA Information Statement, U.S. Patent No. 7,509,286, 18 pgs.
Exhibit 12, Invalidity Chart: Smith Barney Insured Deposit Account, U.S. Patent No. 7,509,286, 22 pgs.
Exhibit 13, Invalidity Chart: Smith Barney Bank Deposit Program, U.S. Patent No. 7,509,286, 18 pgs.
Exhibit 14, Invalidity Chart: Alliance Insured Account, U.S. Patent No. 7,509,286, 16 pgs.
Exhibit 15, Invalidity Chart: Reserve's American Express Presentation, U.S. Patent No. 7,509,286, 16 pgs.
Exhibit 16, Invalidity Chart: U.S. Patent No. 7,376,606 (Jacobsen), U.S. Patent No. 7,536,350, 6 pgs.
Exhibit 17, Obviousness Combinations Chart, U.S. Patent No. 7,509,286, 351 pgs.
U.S. Appl. No. 09/677,535, filed Oct. 2, 2000, Bent et al.
U.S. Appl. No. 10/305,439, filed Nov. 26, 2002, Bent et al.
U.S. Appl. No. 11/149,278, filed Jun. 10, 2005, Bent et al.
U.S. Appl. No. 11/641,046, filed Dec. 19, 2006, Bent et al.
U.S. Appl. No. 11/689,247, filed Mar. 21, 2007, Bent et al.
U.S. Appl. No. 11/767,827, filed Jun. 25, 2007, Bent et al.
U.S. Appl. No. 11/767,837, filed Jun. 25, 2007, Bent et al.
U.S. Appl. No. 11/767,846, filed Jun. 25, 2007, Bent et al.
U.S. Appl. No. 11/767,856, filed Jun. 25, 2007, Bent et al.
U.S. Appl. No. 11/840,064, filed Aug. 16, 2007, Bent et al.
U.S. Appl. No. 11/840,060, filed Aug. 16, 2007, Bent et al.
U.S. Appl. No. 11/840,052, filed Aug. 16, 2007, Bent et al.
U.S. Appl. No. 11/932,762, filed Oct. 31, 2007, Bent et al.
U.S. Appl. No. 12/271,705, filed Nov. 14, 2008, Bent et al.
U.S. Appl. No. 12/025,402, filed Feb. 4, 2008, Bent et al.

U.S. Appl. No. 12/340,026, filed Dec. 19, 2008, Bent et al.
U.S. Appl. No. 12/385,522, filed Apr. 10, 2009, Bent et al.
U.S. Appl. No. 12/408,507, filed Mar. 20, 2009, Bent et al.
U.S. Appl. No. 12/408,511, filed Mar. 20, 2009, Bent et al.
U.S. Appl. No. 12/408,523, filed Mar. 20, 2009, Bent et al.
U.S. Appl. No. 12/453,387, filed May 8, 2009, Bent et al.
U.S. Appl. No. 12/453,388, filed May 8, 2009, Bent et al.
U.S. Appl. No. 12/453,389, filed May 8, 2009, Bent et al.
U.S. Appl. No. 12/453,390, filed May 8, 2009, Bent et al.
U.S. Appl. No. 12/622,979, filed Nov. 20, 2009, Bent et al.
U.S. Appl. No. 12/638,544, filed Dec. 15, 2009, Bent et al.
U.S. Appl. No. 12/684,071, filed Jan. 7, 2010, Bent et al.
U.S. Appl. No. 12/686,797, filed Jan. 13, 2010, Bent et al.
Deutsche Bank Insured Deposit Program, Marketing Literature 2007, 3 pages.
Dreyfus Insured Deposit Program, Disclosure Statement and Terms and Conditions, Dreyfus A BNY Mellon Company, 8 Sheets.
Dreyfus Insured Deposit Program, Multiple List Program—Effective May 11, 2009, 1 Sheet.
Federal Register: Oct. 9, 1997 (vol. 62, No. 196), pp. 52809-52868. www.fdic.gov/news/news/inactivefinancial/1997/fil9711b.html.
Financial Services Industry, "Web Watch: Trading Company Bundles CDs For Better Rates," Community Banker, Jun. 2002, online, http://findarticles.com/p/articles/mi_qa5344/is_200206/ai_n21313883.
Finistar Reg. No. 2,939,558, Registered Apr. 12, 2005.
Garmhausen, "Matching Small Banks with Large Muni Deposits," American Banker, Online The Financial Services Resource, Oct. 4, 2005, 4 pages, http://www.finstar.com/docs/AmericanBanker.html.
IDC Deposits, online, http://idcdeposits.com/ 2 Sheets.
Jong et al., "The Valuation and Hedging of Variable Rate Savings Accounts," University of Amsterdam, Nov. 15, 2001, 23 Sheets.
Lake Forest Bank & Trust Company, Introducing MaxSafe Deposit Accounts with up to $3.75 Million in FDIC Insurance, www.lakeforestbank.com/maxsafe, 2 Sheets.
Lawsuit by Island Intellectual Property LLC, Lids Capital. LLC, Double Rock Corporation and Intrasweep LLC, against Promontory Interfinancial Network, LLC, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Complaint, Apr. 14, 2009, Case No. 09 CV 3750.
Lawsuit by Carlo DeBlasio et al. against Merrill Lynch & Co., Inc. et al., Declaration of Andrew W. Stem, including Exhibits A, B, C, D, E and F, Nov. 11 2007, Case No. 07-cv-318 (RJS) (Document 59).
Lawsuit by Carlo DeBlasio et al. against Merrill Lynch & Co., Inc. et al., Declaration of Joel P. Laitman in Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion For Dismissal of the Second Amended Class Action Complaint, Including: . . . Feb. 5, 2008 (Document 72).
Lawsuit by Carlo DeBlasio et al. against Merrill Lynch & Co., Inc. et al., Declaration of Joel P. Laitman in Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion For Dismissal of the Second Amended Class Action Complaint, Including: "Client Commitment"; "Get Started Today"; "Total Merrill"; "Guideline For Business Conduct"; "Commitment To Clarity"; "Cash Management Account"; "Information Statement Regarding Changes To Interest Rates On Deposits in Merrill Lynch Banks"; . . . Feb. 5, 2008 (Document 71).
Lawsuit by Carlo DeBlasio et al. against Merrill Lynch & Co., Inc. et al., Declaration of Joel P. Laitman in Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion For Dismissal of the Second Amended Class Action Complaint, Including: . . . Feb. 5, 2008 (Document 73).
Lawsuit by Carlo DeBlasio et al. against Merrill Lynch & Co., Inc. et al., Declaration of Joel P. Laitman in Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion For Dismissal of the Second Amended Class Action Complaint, Including: . . . Feb. 5, 2008 (Document 74).
Lawsuit by Carlo DeBlasio et al. against Merrill Lynch & Co., Inc. et al., Declaration of Joel P. Laitman in Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion For Dismissal of the Second Amended Class Action Complaint, Including: . . . Feb. 5, 2008 (Document 75).

Lawsuit by Carlo DeBlasio et al. against Merrill Lynch & Co., Inc. et al., Declaration of Kenneth I. Schacter, including Exhibits A, B, C, D, F, G, H, I, J, K, L, M, N, O, P, Q and R, Nov. 14, 2007, Case No. 07-cv-318 (RJS) (Document 69).

Lawsuit by Carlo DeBlasio et al. against Merrill Lynch & Co., Inc. et al., Declaration of Mathew J. Terry in Support of Motion to Dismiss by Defendants Wachovia Corporation, Wachovia Securities, LLC, Wachovia Bank, N.A., and Wachovia Bank of Delaware, N.A., including Exhibits A, B, C and D, Nov. 14, 2007, Case No. 07-318 (RJS) (Document 67).

Lawsuit by Carlo DeBlasio et al. against Merrill Lynch & Co., Inc. et al., Declaration of Scott D. Musoff in Support of The Merrill Lynch Defendants' Motion to Dismiss The Second Amended Class Action Complaint, ECF Case, Nov. 12, 2007, Case No. 07-cv-318 (RJS) (Document 64).

Lawsuit by Carlo DeBlasio et al. against Merrill Lynch & Co., Inc. et al., Reply Declaration of Kenneth Schacter including Exhibits S and T, Mar. 6, 2008, Case No. 07-cv-318 (RJS) (Document 81).

Lawsuit by Carlo DeBlasio et al. against Merrill Lynch & Co., Inc. et al., Second Amended Class Action Complaint, Jury Trial Demanded, Introduction and Summary of Allegations, Jun. 11, 2007, Case No. 07-cv-318-VM.

Lawsuit by Carlo DeBlasio et al. against Merrill Lynch & Co., Inc. et al., Supplemental Declaration of Matthew J. Terry in Support of Motion to Dismiss by Defendants Wachovia Corp., Wachova Securities, LLC, Wachovia Bank N.A., and Wachovia Bank of Delaware, N.A., including Exhibits A and B, Mar. 6, 2008, Case No. 07-cv-318 (RJS) (Document 79).

Lawsuit by Carlo DeBlasio, et al. against Merrill Lynch & Co., Inc., et al., Opinion and Order Regarding Motions, Jul. 27, 2009, Case No. 07 CIV 318(RJS).

Lawsuit by Island Intellectual Property LLC and Intrasweep LLC against Institutional Deposits Corp., Complaint for Patent Infringement, Jury Trial Demanded, Nov. 4, 2009, Civil Action No. 09 CV 3079.

Lawsuit by Island Intellectual Property LLC and Intrasweep LLC, Answer of Defendant Institutional Deposits Corp. to Complaint for Patent Infringement, Dec. 10, 2009, Case No. 09 CV 03079 (JEC), (Document 16).

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Stipulated Dismissal of Deutsche Bank AG Without Prejudice, Nov. 19, 2009, Civil Action No. 09 CIV 2675 (VM) (AJP) (Document 79).

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Deutsche Bank Trust Company Americas' First Amended Answer to Consolidated First Amended Complaint and Counterclaims, Dec. 4, 2009, Civil Action No. 09 CIV 2675 (VM) (AJP), (Document 86).

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Total Bank Solutions, LLC's First Amended Answer to Consolidated First Amended Complaint and Counterclaims Dec. 4, 2009, Civil Action No. 09 CIV 2675 (VM) (AJP) (Document 87).

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Answer and Counter Claims, Answer of Defendant MBSC Securities Corporation, Jun. 25, 2009, Case No. 09CV 2675.

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Answer and Counter Claims, Answer of Defendant Promontory Interfinancial Network, LLC, Jun. 25, 2009, Case No. 09 CIV 2675.

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory

Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Consolidated First Amended Complaint, Jury Trial Demanded, Jun. 11, 2009, Civil Action No. 09 CIV 2675 (VM).

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Jury Trial Demanded, Deutsche Bank AG's Answer To Consolidated First Amended Complaint, Jun. 25, 2009, Civil Action No. 09 CIV 2675.

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Jury Trial Demanded, Deutsche Bank Trust Company Americas' Answer to Consolidated First Amended Complaint and Counter Claims, Jun. 25, 2009, Civil Action No. 09 CIV 2675.

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Jury Trial Demanded, Total Bank Solutions, LLC's Answer to Consolidated First Amended Complaint and Counter Claims, Jun. 25, 2009, Civil Action No. 09 CIV 2675.

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Stipulated Dismissal of Counts I-III of Defendant Promontory Interfinancial Network, LLC's, Counterclaim with Prejudice, Oct. 19, 2009, (Document 68).

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Stipulation and Order, Oct. 29, 2009, Case No. 09 CV 2675 (VM) (AJP) (Document 73).

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, The Island Plaintiffs' Reply to Deutsche Bank Trust Company Americas' Counterclaims, Jul. 9, 2009, Civil Action No. 09 CIV 2675 (VM).

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, The Island Plaintiffs' Reply to Defendant MBSC Securities Corporation's Counterclaims, Jul. 9, 2009, Civil Action No. 09 CIV 2675 (VM).

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, The Island Plaintiffs' Reply to Defendant Promontory Interfinancial Network LLC's Counterclaims, Jul. 9, 2009, Civil Action No. 09 CIV 2675 (VM).

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, The Island Plaintiffs' Reply to Defendant Total Bank Solutions, LLC's Counterclaims, Jul. 9, 2009, Civil Action No. 09 CIV 2675 (VM).

Lawsuit by Promontory Interfinancial Network, LLC against Double Rock Corporation p/k/a Reserve Management Corporation, Island Intellectual Property LLC, Lids Capital LLC and Intrasweep LLC, Amended Complaint, Apr. 15, 2009, Civil Action No. 3:09 CV 217.

Lawsuit by Promontory Interfinancial Network, LLC against Double Rock Corporation p/k/a Reserve Management Corporation, Island Intellectual Property LLC, Lids Capital LLC and Intrasweep LLC, Complaint, May 19, 2009, Civil Action No. 3:09 CV 322.

Lawsuit by Promontory Interfinancial Network, LLC against Double Rock Corporation, p/k/a Reserve Management Corporation, Island Intellectual Property LLC and Lids Capital LLC, including Cover Sheet, Summons and Complaint, Apr. 14, 2009, Civil Action No. 3:09 CV 217.

Letter From Joseph A. DiNuzzo, Counsel, Oct. 20, 1999, FDIC, Federal Deposit Insurance Corporation, 1 Sheet.

Letter From Roger A. Hood, Assistant General Counsel, Jul. 16, 1986, FDIC, Federal Deposit Insurance Corporation, Legal Division, 1 Sheet.

Letter to William R. Burdette, CEO, Apr. 6, 2009, FDIC, Federal Deposit Insurance Corporation, 2 pages.

Letter to William R. Burdette, CEO, Nov. 15, 2007, FDIC, Federal Deposit Insurance Corporation, 5 Sheets.

Northbrook Bank & Trust Company, Introducing our MaxSafe CD with up to $700,000 of FDIC Insurance, 4 Sheets.

Northbrook Bank & Trust Company, Seven Times the Security of a Normal CD, Introducing our MaxSafe CD, 4 Sheets.

Promontory Interfinancial Network, Promontory Interfinancial Network Announces New Deposit Placement Service, Jan. 21, 2003, 3 Sheets.

Ring, National /Global, "Amex Spans The Globe in Retail Bank Buildup," Nov. 27, 2000, 1 Sheet.

The Depository Trust Company, B#: 3875, Oct. 1, 2002, Settlement\Underwriting, From: Denise Russo, Director, Underwriting, 6 Sheets.

The Pershing Press, Dreyfus Insured Deposit Program, Issue 2, Aug. 2008, http://www.pershing.com/news/pershing_press/news_466244.html, 2 Sheets.

The Reserve Funds, Objectives, Observations & Strategies For American Enterprises Inv., Oct. 18, 2000, 11 Sheets.

Total Bank Solutions, Bank Sweep FAQs.http://www.totalbanksolutions.com/sweepbnkfaqs.htm, Sep. 23, 2005, 2 pages.

Total Bank Solutions, Bank Sweep FAQs, http://www.totalbanksolutions.com/sweepbnkfaqs.htm, Nov. 2, 2005, 3 pages.

Total Bank Solutions, Bank Sweep Products, Deutsche Bank, http://www.totalbanksolutions.com/banksweep.htm, Sep. 23, 2005, 1 page.

Total Bank Solutions, Bank Sweep Products, http://www.totalbanksolutions.com/banksweep.htm, Appendix 3, Oct. 18, 2005, 2 pages.

Total Bank Solutions, Bank Sweep Products, http://www.totalbanksolutions.com/banksweep.htm, Nov. 2, 2005, 2 pages.

Total Bank Solutions, Brokerage Sweep FAQs, http://www.totalbanksolutions.com/brokerfaqs.htm, Nov. 2, 2005, 3 pages.

Total Bank Solutions, Brokerage Sweep, http://www.totalbanksolutions.com/brokersweep.htm, November 2, 2005, 1 page.

Total Bank Solutions, Deposit Bank FAQs, http://www.totalbanksolutions.com/depositbnkfaqs.htm, Nov. 2, 2005, 2 pages.

Total Bank Solutions, Deposits, Deutsche Bank, http://www.totalbanksolutions.com/deposits.htm, Sep. 23, 2005, 1 page.

Total Bank Solutions, Deposits, http://www.totalbanksolutions.com/deposits.htm, Nov. 2, 2005, 2 pages.

Total Bank Solutions, Deutsche Bank Insured Deposit Program, DB Insured Deposit Program Features, http://www.totalbanksolutions.com/features.htm, Sep. 23, 2005, 2 pages.

Total Bank Solutions, Deutsche Bank Insured Deposit Program, http://www.totalbanksolutions.com/, Sep. 23, 2005, 1 page.

Total Bank Solutions, http://www.totalbanksolutions.com/, Mar. 16, 2007, 8 pages.

Total Bank Solutions, http://www.totalbanksolutions.com/overview.htm, Nov. 2, 2005, 1 page.

Total Bank Solutions, Insured Deposit Program Features, http://www.totalbanksolutions.com/features.htm, Nov. 2, 2005, 2 pages.

Total Bank Solutions, Insured Deposit Program, http://www.totalbanksolutions.com/Insureddeposits.htm, Nov. 2, 2005, 2 pages.

Total Bank Solutions, Partners & Affiliates, http://www.totalbanksolutions.com/partners.htm, Nov. 2, 2005, 3 pages.

Total Bank Solutions, Partners & Affiliates, http://www.totalbanksolutions.com/partners.htm, Oct. 25, 2005, 3 pages.

Total Bank Solutions, Strategic Partners, Nov. 2, 2005, 1 page.

Total Bank Solutions, TBS Deposit Account, About Our Broker Products, http://www.totalbanksolutions.com/brokerproducts.htm, Sep. 7, 2005, 2 pages.

Total Bank Solutions, TBS Management Team, http://www.totalbanksolutions.com/management.htm, Appendix 1, Oct. 18, 2005, 1 page.

Total Bank Solutions, TBS Management Team, http://www.totalbanksolutions.com/management.htm, Nov. 2, 2005, 2 pages.

Total Bank Solutions, TBS Management Team, http://www.totalbanksolutions.com/management.htm, Oct. 25, 2005, 2 pages.

TotalBank Solutions, TBS Bank Deposit Account, Oct. 2004, 6 pgs.

Total Bank Solutions, web.archive.org/web/20050126044216/http://totalbanksolutions.com, Jan. 26, 2005, 2 pgs.

USA Mutual Partners Insured Cash Shelter Account Terms and Conditions, 11 pages, 2009 USA Mutuals Partners, Inc.

Wachovia Securities, Important Information for Clients Concerning Changes in Automatic "Sweep" Arrangements, Oct. 1, 2003, 6 sheets.

Litigation Notice After Payment of Issue Fee with Attachments filed in Parent U.S. Appl. No. 10/071,053, filed Apr. 2, 2009, 160 pages.

U.S. Appl. No. 09/677,535, filed Oct. 2, 2000, Bruce Bent et al.

U.S. Appl. No. 10/825,440, filed Apr. 14, 2004, Bruce Bent et al.

U.S. Appl. No. 11/641,046, filed Dec. 19, 2006, Bruce Bent et al.

U.S. Appl. No. 11/840,052, filed Aug. 16, 2007, Bruce Bent et al.

U.S. Appl. No. 11/840,060, filed Aug. 16, 2007, Bruce Bent et al.

U.S. Appl. No. 12/385,522, filed Apr. 10, 2009, Bruce Bent et al.

U.S. Appl. No. 12/408,507, filed Mar. 20, 2009, Bruce Bent et al.

U.S. Appl. No. 12/408,511, filed Mar. 20, 2009, Bruce Bent et al.

U.S. Appl. No. 12/408,523, filed Mar. 20, 2009, Bruce Bent et al.

U.S. Appl. No. 12/453,387, filed May 8, 2009, Bruce Bent et al.

U.S. Appl. No. 12/453,388, filed May 8, 2009, Bruce Bent et al.

U.S. Appl. No. 12/453,389, filed May 8, 2009, Bruce Bent et al.

U.S. Appl. No. 12/453,390, filed May 8, 2009, Bruce Bent et al.

U.S. Appl. No. 12/622,979, filed Nov. 20, 2009, Bruce Bent et al.

Adler, Joe, "Promontory to Roll Out Deposit Service Insuring Liquid Funds", American Banker, Feb. 22, 2010, 1 sheet.

An iMoneyNet Special Report, Brokerage Cash Sweep Options: The Shift from Money Funds to FDIC-Insured Bank Deposit Accounts, by Peter G. Crane & Michael F. Krasner, iMoneyNet, Nov. 2004, 66 pages.

Litigation Notice After Payment of Issue Fee filed in Parent U.S. Appl. No. 10/382,946, filed Apr. 3, 2009, 6 pages.

Federal Register: Oct. 9, 1997 (vol. 62, No. 196), pp. 52809-52868. http://www.fdic.gov/news/news/inactivefinancial/1997/fil9711lb.html.

FINTRAC's Guidelines, 1 page, (http://www.fintrac.gc.ca/publications/guide/guide-eng.asp).

Hencke, "New Rules for FDIC deposit Insurance", ABA Bank Compliance, vol. 20, No. 7, Jul./Aug. 1999, pp. 31-37.

Insured Cash Account Program Disclosure Booklet, LPL Financial Services, Linsco/Private Ledger, Member NASD/SIPC.

Lawsuit by Island Intellectual Property LLC and Intrasweep LLC against Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Deutsche Bank Trust Company Americas' answer to plaintiffs' Feb. 23, 2010 complaint and counterclaims, May 4, 2010, Civil Action No 09 Civ. 2675 (VM) (AJP)(Document 111).

Lawsuit by Island Intellectual Property LLC and Intrasweep LLC against Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Total Bank Solutions, LLC's answer to plaintiffs' Feb. 23, 2010 complaint and counterclaims, May 4, 2010, Civil Action No. 09 Civ. 2675 (VM) (AJP)(Document 112).

Lawsuit by Island Intellectual Property LLC and Intrasweep LLC against Institutional Deposits Corp. The Island Plaintiffs' Complaint against Defendant Institutional Deposits Corp., Nov. 4, 2009, Civil Action No. 1 09-CV-3079.

Lawsuit by Island Intellectual Property LLC and Intrasweep LLC against Institutional Deposits Corp., Consent Order, Apr. 21, 2010, Case No. 09-CV-3079 (Document 44).

Lawsuit by Island Intellectual Property LLC and Lids Capital LLC against Deutsche Bank Trust Company Americas and Total Bank

Solutions, LLC, Deutsche Bank Trust Company answer to plaintiffs' Mar. 16, 2010 complaint and counterclaims, May 4, 2010, Civil Action No. 09 Civ. 2675 (VM) (AJP) (Document 113).

Lawsuit by Island Intellectual Property LLC and Lids Capital LLC against Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Total Bank Solutions, LLC's answer to plaintiffs' Mar. 16, 2010 complaint and counterclaims, May 4, 2010, Civil Action No. 09 Civ. 2675 (VM)(Document 114).

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Answer and Counter Claims, Answer of Defendant Promontory Interfinancial Network, LLC, Jun. 25, 2009, Case No. 09 CV 2675.

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Jury Trial Demanded, Total Bank Solutions, LLC's Answer to Consolidated First Amended Complaint and Counter Claims, Jun. 25, 2009, Civil Action No. 09 CIV 2675.

Mutual Fund Dealers Association, 1 page, (http://www.mfda.ca/.

Email from Olivia Kim to Charles Macedo on May 13, 2010 with attachment of Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation, and Intrasweep LLC against Deutshe Bank Trust Company Americas and Total Bank Solutions, LLC, Defendant Total Bank Solutions, LLC's responses to Double Rock's Common interrogatory Nos. 1-10 to defendants, Reservation of Right, Civil Action No. 09 Civ. 2675 (VM) (AJP).

Email from Olivia Kim to Charles Macedo on May 13, 2010 with attachment of Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation, and Intrasweep LLC against Deutshe Bank Trust Company Americas and Total Bank Solutions, LLC, Defendant Deutsche Bank Trust Company America's responses to Double Rock's Common interrogatory No. 1-10 to defendants Reservation of Right, Civil Action No. 09 Civ. 2675 (VM) (AJP).

U.S. Appl. No. 12/794,448, filed Jun. 4, 2010, Bent et al.

U.S. Appl. No. 12/794,545, filed Jun. 4, 2010, Bent et al.

U.S. Appl. No. 12/816,092, filed Jun. 15, 2010, Bent et al.

Email from Kim Olivia to Charles Macedo on Jun. 9, 2010 with attachment of Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation, and Intrasweep LLC against Deutshe Bank Trust Company Americas and Total Bank Solutions, LLC, Defendant Deutsche Bank Trust Company America's responses to Intrasweep's common interrogatory Nos. 1-5, Confidential-Attorneys only, Civil Action No. 09 Civ. 2675 (VM) (AJP).

Insured Bank Deposit Program Summary Information Statement, Information Statement, and list of Eligible Program Banks Effective Feb. 10, 2005, 11 pages.

Promontory Interfinancial Network: Frequently Asked Questions (FAQs), Feb. 5, 2003, 5 pages.

Lawsuit by *Island Intellectual Property LLC, et al.* v. *Deutsch Bank Trust Company Americas, et al.*; Defendant Deutsche Bank Trust Company Americas' Second Supplemental Responses to Double Rock's Interrogatories Nos. 2, 8 and 9, Jul. 2010, 65 pages.

Exhibit 2, Invalidity Chart: U.S. Pat. No. 4,985,833 (Oncken)—U.S. Pat. 7,668,771, Jul. 2010, 14 pages.

Exhibit 5, Invalidity Chart: Merrill Lynch Business Advantage Program—U.S. Pat. No. 7,668,772, Jul. 2010, 7 pages.

Exhibit 8, Invalidity Chart: Harken Financial Services Sweep Product—U.S. Pat. No. 7,668,771, Jul. 2010, 9 pages.

Exhibit 9, Invalidity Chart: Wayne Hummer—Insured Bank Deposit Program—U.S. Pat. No. 7,668,771, Jul. 2010, 12 pages.

Exhibit 10, Invalidity Chart: U.S. Patent Application Publication No. 2007/0043666 (Burdette), U.S. Pat. No. 7,668,771, Jul. 2010, 9 pages.

2 CDs (1) Non-Confidential Exhibits and Material regarding Deutsch Bank Trust Company Americas' (DBTCA) 2nd Supp Res to Double Rock's Interrogatory No. 2; (2) Prior Art for IC Non-Confidential Material—Bates-numbered documents for Exhibits 2, 5, 8, 9, and 10 Invalidity Charts, Jul. 2010.

Letter to R.M. Zaitzeff, from W.W. Wiles, dated Jun. 22, 1983 (response to May 10, 1983 letter re: offering of MMDAs), 6 pages.

Letter to G.T. Schwartz, from O.I. Ireland, dated Jun. 22, 1988 (response to Dec. 18, 1987 letter re: proposed modifications to Merrill Lynch's CMA Program), 5 pages.

Information Statement, "Alliance Insured Account," Sep. 1999; 6 pages.

Investors Money Account$^{SM}$ and Insurance Plus Service Agreement, attached Schedule A (List of Banks Participating in the Insurance Plus Service), Imad Mar. 1994, 3 pages.

Investors Money Accounts$^{SM}$ (an FDIC-insured money market account), IMA-1 (Mar. 1994), 4 pages.

Investors MoneyAccount$^{SM}$, "The FDIC-Insured Money Market Investment with an Important Plus," IMA Oct. 1995, 2 pages.

1985 SEC No-Act. Lexis 2756, Investment Company Act of 1940—Section 3(a)(1), 2(a)(36); Securities Act of 1933—Section 2(1), Nov. 29, 1985, Kemper Financial Services, Inc., 9 pages.

Insured Money Account Program Agreement and Disclosure Statement, (attached Schedule A—Deposit Account Terms), faxed Mar. 28, 2000; 10 pages.

First National Bank in Brookings, Certificates of Deposit [online] [retrieved on Jul. 17, 2009]. Retrieved from the Internet: Certificates of Deposit, <URL: http://web.archive.org/web/20000524121111/www.firstnb.com/cd.htm>; Multi-Bank CDs, <URL: http://web.archive.org/web/20000524132934/www.firstnb.com/mbcd.htm>, 5 pages.

Summary of Commentary on Current Economic Conditions by Federal Reserve Districts, Jan. 1985, 44 pages.

12 CFR Ch. II (Jan. 1, 2009 Edition), pp. 124-125.

Product Strategy, "Money Fund $$ Moving to Bank Deposits, Distributors Start to Install Bank Deposit Accounts to Replace Money Funds," 6 FRC Monitor, Dec. 2003, 2 pages.

Board of Governors of the Federal Reserve System, "The May 1998 Senior Financial Officer Survey," May 1998, (attached Appendix A: Survey Questions and Responses; Appendix B: Glossary; Appendix C: Examples of Key Reserve Concepts), 48 pages.

Interest Rate Review, A Publication of the Meyer Weekly Interest Rate Survey, "A Look at Tiers," Apr. 1987, 6 pages, vol. 11, No. 4.

LexisNexis, The American Banker, "Merrill Lynch Money Market Account, CMA; Broker Begins Testing With 12 Institutions," Sep. 23, 1983, 4 pages.

Bent et al., Office Action, U.S. Appl. No. 10/071,053, with attached SB08, date considered Mar. 10, 2009, 2 pages.

Merrill Lynch & You, "Financial Services The Way You Want, When You Want Them," Jan. 2000, 16 pages.

Exhibit 1, "FA/FB Account 1997 First Transactions, TRX Types: PU, PP, TA, PT," Aug. 2003, p. 1-2.

Advertisement: Where Your Interest is?, Mutual Funds, Oct. 1997; 1 page.

Advertisement: It's 1997, Do You Know Where Your Interest Is?, Mutual Funds, Dec. 1993; p. 46.

USPTO Office Action, Interview Summary, U.S. Appl. No. 11/767,827, Date Mailed Sep. 23, 2009, 4 pages.

USPTO Office Action, Office Action Summary, U.S. Appl. No. 11/767,827, Date Mailed Jun. 5, 2009, 35 pages.

Service Mark Application, Applicant: Reserve Management Corporation, Mark: Reserve Insured Deposits, (attached Power of Attorney, Declaration, Drawing page, 9-21-01, 6 pages.

Letter to R.L. Kratzer, from T.J. Vezeau, Re: United States Patent No. 6,374,231, dated Jan. 10, 2003, 1 page.

Letter to C.R. Macedo, from R.L. Rainey, Re: Promontory Interfinancial Network, LLC, dated Jul. 22, 2008, (attached Attachments A-E), 35 pages.

Letter to C.R. Macedo, from R.L. Rainey, Re: Promontory Interfinancial Network, LLC, dated Oct. 16, 2008, (attached Attachments A-C), 22 pages.

Letter to C.R. Macedo, from R.L. Rainey, Re: Promontory Interfinancial Network, LLC, dated Feb. 23, 2009, (attached Exhibit A-B), 21 pages.

Letter to R.L. Kratzer, from T.J. Vezeau, Re: United States Patent No. 6,374,231, dated Jan. 10, 2003 (with various attachments), 128 pages.

## US 7,933,821 B1

Page 10

Memo to Bruce Bent, from Bruce Bent II, Re: S&M Status, Oct. 15, 1997 (cc: Arthur, Mary, Marianne, Joe, Pat, Cathy, Michelle), 1 page.
Memo to Marianne, Ralph, Customer Service, from Bruce Bent II, Re: Reserve IDA, Sep. 4, 1997, 1 page.
Memo to Marianne, Pat, Bruce Bent, from Bruce Bent II, Re: Reserve Insured Deposit Account, Sep. 4, 1997, 1 page.
American Express—Meeting Notes, Sep. 26, 2000, 2 pages.
American Express Financial Advisors Customized FDIC Product with Tiered Balances, Jan. 24, 2001, 2 pages.
American Express Conference Call Minutes, Topic: Tiered Balances, Jan. 25, 2001 @ 3:00pm-4:00pm, 2 pages.
Letter to A.J. Bufalino, from C.R. Macedo, Re: Reserve Management Corporation, Wayne Hummer Investments LLC, May 8, 2007, (enclosing Jan. 3, 2006 letter to A.J. Bufalino, Feb. 23, 2006 letter to A.J. Bufalino, Mar. 16, 2006 letter to C. Macedo, U.S. Patent No. 6,374,231, U.S. Publication No. 2002/0091637 A1, U.S. Publication No. 2005/0108149 A1, U.S. Publication No. 2005/0228733 A1, U.S. Publication No. 2006/0212385 A2, U.S. Publication No. 2006/0212389 A2), 510 pages.
Merrill Lynch & Co., Inc., Form 10-K405 (Annual Report (Regulation S-K, item 405)), Filed Mar. 14, 2002 for the Period Ending Dec. 28, 2001, 248 pages.
Merrill Lynch, "Information Statement Regarding changes to Interest Rates on Deposits in the Merrill Lynch Banks," Nov. 12, 2007, 2 pages.
QUESTessentials, "Quest Insured Account," May 17, 1994, 3 pages.
Information Statement, "Quest Insured Account," (attached Appendix A), 5 pages.
OCC Insured Bank Deposit Account (attached are p. 2 of Quest for Value Funds Daily Data, Jun. 1993; OCC Insured Account Rate Table), 3 pages.
CIBC World Markets, "Insured Bank Deposit Account," Information Statement, Jul. 1, 2000, 2 pages.
Letter to Client, from M.J. Hensle, Re: Salomon Smith Barney Bank Deposit Program$^{SM}$, (attached Q&A: Important Information about the New Salomon Smith Barney Bank Deposit Program), Aug. 16, 2020, 14 pages.
Salomon Smith Barney, "Bank Deposit Program Disclosure Statement," 3 pages.
FDIC, FDIC Law, Regulations, Related Acts—4000—Advisory Opinions, Oct. 22, 1987, J. W. Via, Jr., Counsel [online] [Retrieved on Jan. 22, 2010]. Retrieved from the Internet: URL: <http://www.fdic.gov/regulations/laws/rules/4000-2560.html>, 1 page.
FDIC, FDIC Law, Regulations, Related Acts—4000—Advisory Opinions, Jun. 28, 1993, J. A. DiNuzzo, [online] [Retrieved on Jan. 22, 2010]. Retrieved from the Internet: URL: <www.fdic.gov/regulations/laws/rules/4000-8240.html>, 2 pages.
FDIC, FDIC Law, Regulations, Related Acts—4000—Advisory Opinions, Jul. 23, 1986, D. H. Jones [online] [Retrieved on Jan. 22, 2010]. Retrieved from the Internet: URL: <www.fdic.gov/regulations/laws/rules/4000-2120.html#fdic400086-21>, 2 pages.
Merrill Lynch—Pierce, Fenner & Smith, Inc., "The Merrill Lynch Cash Management Account®," Financial Service, Jan. 1985, 18 pages.
Merrill Lynch, "Insured Savingsm™ Account Fact Sheet," The Merrill Lynch Cash Management Account® Financial Service, 11 pages.
CMA, "A Guide to Your CMA Account," Jan. 1995, 38 pages.
American Banker, Salomon's Sweep Plan Raises FDIC Fund Alarm [online], Dec. 6, 2000 [retrieved on Apr. 13, 2009]. Retrieved form the Internet: <URL: http://www.americanbanker.com/printthis.html?id=2000120603YJGEZD>, 2 pages.
The Insured Deposit Account: "Money in the Bank," p. 5; Three Little Letters. Three Big Ways to Save in 1998, p. 4.
LexisNexis, The American Banker, Sep. 23, 1983, Merrill Joins Money Market Account, CMA; Broker Begins Testing With 12 Institutions, Byline: A. Aryan, 4 pages.
Merrill Lynch & Co Inc—MER, 10k Wizard, Form 8-K, "Report of Unscheduled Material Events or Corporated Changes," Filed Mar. 7, 2002, 51 pages.
Federal Reserve System, LEXSEE 51 FR 9632, "Definition of Deposit and Technical Amendments," Action: Final Rule, Mar. 20, 1986, 13 pages.

Federal Reserve System, LEXSEE 56 FR 15494, "Regulation D—Reserve Requirements of Depository Institutions," Action: Final Rule, Apr. 17, 1991, 5 pages.
Federal Reserve System, Part 201—Reserve Requirements of Depository Institutions (Regulation D)12 CFR Ch. II (Jan. 1, 2010 Edition), pp. 94-128, Pt. 204-Pt. 205.
Letter to G.T. Schwartz, from O.I. Ireland, dated Jun. 22, 1988, Re: response to letter of Dec. 18, 1987 regarding proposed modifications to Merrill Lynch's CMA Program, 5 pages.
Federal Reserve System, Lexsee 47 FR 55207, "Reserve Requirements of Depository Institutions; Money Market Deposit Account," Dec. 8, 1982, Action: Final Rule, 5 pages.
Insured Bank Deposits™ Program Summary Information Statement, 11 pages.
Insured Bank Deposits™ Program Information Statement, (attached List of Eligible Program Banks, Effective May 9, 2002; New Account Application, Joint Account Agreement), 11 pages.
Wayne Hummer Investments, "Insured Bank Deposits™ Program, Frequently Asked Questions," 4 pages.
American Express—Meeting Notes Sep. 26, 2000, 2 pages.
American Express Conference Call Minutes, Jan. 25, 2001 @ 3:OOpm-4:OOpm, Topic: Tiered Balances, 2 pages.
Memorandum to M. Peterson, J. Whitt, R. Wroten, E. Naumes, E. Deal, B. McCain, from J.E. Oncken, Jun. 15, 1990, Re: Insured Savings Update (with attachments), 7 pages.
Insured Savings, "Correspondent Agreement," including Exhibits A-D, 28 pages.
Insured Savings, "Project Team Meeting," Feb. 2, 1989, 21 pages.
Insured Savings, "Overview & Marketing Plan," Presented by: J.E. Oncken, Dec. 6, 1988, (including Exhibit A), 23 pages.
Letter to V.J. Best, from J.E. Oncken, dated Apr. 18, 1988, 2 pages.
Letter to M.L. Duke from K. Johnson, dated Dec. 27, 1989, (attached Insured Savings Correspondent Agreement, Exhibits A-D, letter to M.L. Duke from K. Johnson dated Nov. 21, 1989 and Account Information Sheet), 39 pages.
Memorandum to J. Oncken, J. Scurlock, B. Standefer, E. Piner, T. Cyr, from K. Johnson, dated Jul. 5, 1990, Re: Attached Insured Savings Letters (with attachments), 9 pages.
E.D.S.—First City Austin Electronic Mail, from J. Oncken, to T. Cyr, Re: Depository Levels at Insured Savings Depositories, Nov. 2, 1989, 1 page.
Cash Management Balance Monitoring Agreement and Memorandum from Ed Piner to Cash management Line of Business Representatives dated May 21, 1991(with attachments), 8 pages.
Merrill Lynch, Insured Savings Account Fact Sheet, the Merrill Lynch Cash Management Account® Financial Service, Jan. 1986, 4 pages.
Merrill Lynch Money Markets, Inc., Merrill Lynch Capital Markets, "The Insured Savings Account, Issuer Guide to Offering MMDAs through Merrill Lynch," Sep. 1986, 36 pages.
Merrill Lynch, The Merrill Lynch Capital Builders$^{SM}$ Account Financial Service, Insured Savings$^{SM}$ Account Participating Depository Institutions, 1996, 2 pages.
Insured Deposit Account, May 21, 1996, 14 pages.
An Introduction to the Smith Barney Insured Deposit Account, 8 pages.
Smith Barney Inc. Capital Markets, Debt Origination Group Memo, to J. Mandelbaum, from T. Hamilton, cc: R. Holloman, H. Bald, S. Becton, Re: Insured Deposit Account, Oct. 10, 1995; Smith Barney Inc. Capital Markets, Debt Origination Group Memo, to B. Holloman, from T. Hamilton, cc: W. Heinzerling, H. Morris, COPs, Re: New Product Proposal for Insured Deposit Account, Sep. 18, 1995, 2 pages.
Insured Deposit Account, Product Description for the Investor, Draft as of Sep. 20, 1995, 8 pages.
Lawsuit by *Island Intellectual Property LLC, et al.*, against *Deutsche Bank Trust Company Americas, et al.*; Defendant Deutsche Bank Trust Company Americas' Fifth Supplemental Responses to Island IP's First Set of Common Interrogatories to All Defendants (No. 7); Case No. 09 Civ. 2675 (VM)(AJP); Sep. 16, 2010; 9 pages.
Lawsuit by *Island Intellectual Property LLC, et al.*, against *Deutsche Bank Trust Company Americas, et al.*; Defendant Total Bank Solutions, LLC's Fifth Supplemental Responses to Island IP's First Set of

**US 7,933,821 B1**

Page 11

Common Interrogatories to All Defendants (No. 7); Case No. 09 Civ. 2675 (Vm)(Ajp); Sep. 16, 2010; 9 pages.

Letter from Gilbert T. Schwartz, Skadden, Arts, Slate, Meagher & Flom to Oliver Ireland, Associate General Counsel, Board of Governors of the Federal Reserve System; Dec. 18, 1987; 19 sheets.

Letter from Roger M. Zaitzeff, Seward & Kissel to Gilbert T. Schwartz, Associate General Counsel, Board of Governors of the Federal Reserve System; May 10, 1983, 5 sheets.

Wayne Hummer Money Market Fund Brochure, Performance Data as of Mar. 31, 2003, including Commentary page (attached http://www.whummer.com/funds/money.asp and http://www.whummer.com/fund_dis.htm), 4 pages.

Wayne Hummer Money Market Fund, "Annual Financial Statements," Mar. 31, 2003, 12 pages.

Wayne Hummer Investment Trust, Investment Company Act File No. 811-3880, "Start Investing Today . . . ," Prospectus, Jul. 31, 2002, 44 pages.

Wayne Hummer Management Company, retrieved from the Internet: "Organization & Clients," http://www.whmgmtco.com; "Assets Under Management—Dec. 31, 2002," http://www.whmgmtco.com/asset.htm; "Equity & Mid Cap Growth Investment Philosophy," http://www.whmgmtco.com/equ-phil.htm; "Economic & Market Commentary—Jan. 2003," http://www.whmgmtco.com/commentary.htm; "Management Team," http://www.whmgmtco.com/team.htm; "Fixed Income Performance," http://www.whmgmtco.com/fixedperf.htm; "Mid-Cap Equity Performance," http://www.whmgmtco.com/mid-perf.htm; "All Equity Performance," http://www.whmgmtco.com/all-perf.htm, 11 pages [retrieved on Jul. 2, 2003].

Wayne Hummer Market Letter, Jul./Aug. 2003, 2 pages.

Wayne Hummer Investments, "Wintrust Financial Corporation Reports Second Quarter Earnings; Second Quarter Net Earnings Up 45%," Jul. 18, 1 page.

Weber Shandwick Worldwide, News: for Immediate Release, "Wayne Hummer Investments Names New President & CEO," Apr. 2003, 2 pages.

Wayne Hummer Investments, retrieved from the Internet: "Our People Focused On Your Investments," Jul. 2, 2003, http://www.whummer.com/; "Stocks & Bonds," http://www.whummer.com/stocks_bonds.htm; "Mutual Funds," http://www.whummer.com/mutual_funds.htm; "Morning Comments," http://www.whummer.com/morningcomments.asp, 6 pages [retrieved on Jul. 2, 2003].

Wayne Hummer Investments, "Investment Executives," retrieved from the Internet: http://www.whummer.com/investment_executives.htm, 2 pages [retrieved on Jul. 2, 2003].

Wayne Hummer Investments LLC, "Consolidated Statement of Financial Condition," with Report of Independent Auditors, Dec. 31, 2002, 12 pages.

Wintrust Financial Corporation, "Wintrust Financial Corporation Reports Record Earnings for the Fourth Quarter and Year; Fourth Quarter Net Earnings Up 53%," 22 pages.

Wayne Hummer Investments, "A Letter to Wayne Hummer Investments Clients & Friends," Jul. 18, retrieved from the Internet: http://www.whummer.com/wintrust2qEarnings.html, 1 page [retrieved on Jul. 3, 2003].

Wayne Hummer Investments; Insured Bank Deposits Program—Frequently Asked Questions; obtained Dec. 26, 2002; 4 pages.

Wayne Hummer Investments, "Contact Us," retrieved from the Internet: http://www.waynehummer.com/contact_us.htm, 6 pages [retrieved on Jan. 8, 2003].

Wayne Hummer Investments for Life, Booklet, 2003, 25 pages.

Wayne Hummer, "For Time-Proven Professionalism," Booklet, 2003, 13 pages.

Wayne Hummer, "Insured Bank Deposits™ Program Information Statement," obtained Dec. 26, 2002; 12 pages.

Lawsuit by *Island Intellectual Property LLC et al.*, against *Deutsche Bank Trust Company Americas, et al.*; Expert Report of Richard T. Powers Concerning Invalidity of U.S. Pat. Nos. 7,509,286; 7,519,551; 7,536,350; 7,668,771; 7,668,772, 7,672,886; and 7,680,734; and Exhibits A-R; Civil Action No. 09 Civ. 2675(VM)(AJP), Oct. 28, 2010; 1,119 pages.

Lawsuit by *Island Intellectual Property LLC et al.*, against *Deutsche Bank Trust Company Americas, et al.*; Expert Report of Richard T. Powers Concerning Invalidity of U.S. Pat. Nos. 7,509,286; 7,519,551; 7,536,350; 7,668,771; 7,668,772, 7,672,886; and 7,680,734; and Exhibits A-R; Civil Action No. 09 Civ. 2675(VM)(AJP), October 28, 2010; 1025 pages.

Lawsuit by *Island Intellectual Property LLC et al.*, against *Deutsche Bank Trust Company Americas, et al.*; Expert Report of Ivan Zatkovich Regarding Validity and Enforceability of the Asserted Claims of the Patents-in-Suit; Civil Action No. 09 Civ. 2675 (VM)(AJP); Nov. 23, 2010; 192 pages. The redacted items were designated as confidential in a Protective Order in this case.

Lawsuit by *Island Intellectual Property LLC et al.*, against *Deutsche Bank Trust Company Americas, et al.*; Expert Report of the Honorable Gerald J. Mossinghoff and Exhibits A-E; Civil Action No. 09 Civ. 2675 (VM)(AJP); Nov. 23, 2010; 107 pages.

Case for "CORE" Deposits, Historic Degree of Stability, 2006, 1 page.

* cited by examiner



FIG. 1



FIG. 2



FIG. 3



FIG. 4



FROM BOX
107 FIG. 4

TO BOX
108B FIG. 6

CHECK
DEPOSITS — 111

FED WIRE
DEPOSITS — 112

ACH
DEPOSITS — 113

CREDIT
DEPOSITS — 108

REVIEW BALANCE
& SELECT BANK — 108A

DEBIT
WITHDRAWL — 109

DEBIT/CREDIT
CARD
TRANSACTIONS
FILE REC'D FOR
BANK — 114

PROCESS
DEBIT/CREDIT
CARD FILE — 115

SELECT
BANK TO DEBIT — 125A

TO BOX
125B FIG. 6

CHECKS
PRESENTED
FOR PAYMENT — 116

DEBIT
ACCOUNTS — 215

ACH
DEBITS — 117

TOUCH TONE
BILL PAYING — 118

PROCESS
FILE — 121

CREDIT
LINE
AVAILABLE — 123

NO

INTERNET BILL
PAYING — 119

FUNDS
AVAIL-
ABLE — 122

NO

YES

REJECT
CHECK — 124

PARTICIPANT
WITHDRAWLS — 120

YES

DEBIT
ACCOUNT — 225

ADVANCE
FUNDS — 230

## FIG. 5



FIG. 6

US 7,933,821 B1

**1**

## SYSTEMS AND METHODS FOR ADMINISTERING RETURN SWEEP ACCOUNTS

This application is a Continuation of application Ser. No. 10/071,053, filed on Feb. 2, 2002, which is a Continuation-in-Part of application Ser. No. 09/677,535, filed on Oct. 2, 2000, and is a Continuation-in-Part of application Ser. No. 09/176,340, filed on Oct. 21, 1998. The entirety of the disclosure of each of these applications is incorporated herein by reference for all purposes.

### FIELD OF THE INVENTION

The invention relates generally to computerized banking techniques and, more specifically, to techniques by which deposits are kept on a bank's balance sheet while being administered as sweep account funds by a third party.

### BACKGROUND OF THE INVENTION

It would be desirable if investors could obtain fully-insured, interest-bearing bank accounts that offer an unlimited number of fund transfers per month. However, present statutory restrictions prevent banks and savings institutions from paying interest on certain types of deposit accounts. More specifically, Title 12, Part 329, of the Code of Federal Regulations (CFR) provides that "no bank shall, directly or indirectly, by any device whatsoever, pay interest on any demand deposit". (12 CFR 329.2). A "deposit" is any money placed into a checking account, savings account, Certificate of Deposit (CD), or the like. In a "demand" account, the owner can demand that funds be drawn and paid to another account (having the same or a different owner), or to a third party. These demand payments are typically implemented via bank drafts, checks, credit cards, and debit cards.

Not all bank accounts are considered to be demand accounts. If all, or a fixed amount, of the principal must be maintained in order to achieve the particular benefits afforded by that account, then the account is not a "demand" account. According to the CFR, a "demand deposit" includes any deposit for which the depositor is authorized to make more than six fund "transfers" during any month or statement cycle of at least four weeks. Not all fund transfers will be counted towards the allotted maximum of six; rather, it is necessary to examine the specific type of fund transfer under consideration. A deposit will be considered a "demand" deposit if the transfer takes place by means of a preauthorized, automatic, or telephonic order specifying the transfer of funds to another account of the depositor at the same bank, to the bank itself, or to a third party. Likewise, a deposit is a "demand" deposit if more than three of the six transfers are authorized to be made by check, draft or debit card (12 CFR 329.1(b)(3). On the other hand, an unlimited number of transfers is allowed between two accounts registered to the same person or entity, provided that the transfers are made by messenger, mail, telephone (but only via check mailed to the depositor), automated teller machine, or in person. Unless the funds of a deposit are held in a money market account (18 USC 1832 (a)), an account for which a depositor has the ability to make at least six transfers will be deemed a demand account, and no interest will be payable on the funds therein. Therefore, owners of demand accounts do not obtain interest on their funds.

One exemplary approach to offering investors fully-insured, interest-bearing accounts that provide up to an unlimited number of fund transfers was disclosed in U.S. patent application Ser. No. 09/176,340, referenced above. This

**2**

application describes a system for managing a plurality of accounts for multiple clients. These accounts, which may originate from a variety of sources, banks, brokerage firms, and/or clients, are held at any of a plurality of savings institutions or banks. The system provides an aggregate insured money market deposit account at a bank or savings institution that is not necessarily an institution at which any of the client accounts are held. The aggregate insured deposit account is linked to each of the demand accounts in a manner so as to permit deposit funds to be placed into a demand account from various sources, and also so as to provide for the tendering of payments from the demand account via different instruments, without limitation as to the number of transfers. Interest is earned on deposits because funds are transferred from individual client accounts to the managed aggregate insured deposit account.

While a substantial advance over other prior art systems, the above noted system requires the transfer of oftentimes significant funds to comply with various banking regulations. This may be difficult in the case of smaller, community-based banks, as these institutions depend upon such funds as a source for loans. Moreover, some bank clients are not comfortable with arrangements that transfer client funds to unfamiliar third parties.

Pursuant to Regulation Q, banks are prohibited from paying interest on commercial accounts. However, banks have developed several approaches in an effort to compete with brokers who offer interest on cash balances for their commercial customers. These approaches, which include money fund sweeps and repo sweeps, are disadvantageous in that they involve a removal of commercial customer deposits from the bank's balance sheets.

A substantial market exists for an interest-bearing return sweep account that can be readily integrated into the existing infrastructure of a bank or savings institution, while, at the same time, permitting account funds to remain on the bank's balance sheet, with minimal disruption of existing bank-client relationships. It was with the foregoing realizations in mind that the present invention was developed.

### OBJECTS AND SUMMARY OF THE INVENTION

It is an object of the invention to provide bank and/or savings institution clients with the ability to implement up to an unlimited number of transfers while, at the same time, permitting the bank and/or savings institution to retain client-deposited funds.

It is another object of the invention to provide bank and/or savings institution clients with interest from funds on deposit while simultaneously providing the ability to implement up to an unlimited number of transfers.

It is a further object of the invention to permit the bank and/or savings institution to retain client-deposited funds on its books so that these funds can be used as a source for loans.

It is yet a further object of the invention to provide a banking method that enables clients to deposit funds into an account from any of various sources, and to make payments from the account via any of various instruments, without limitation as to the number of transfers, while still earning interest on the funds in the account.

It is another object of the present invention to provide a banking method that manages a plurality of demand accounts for multiple clients whose funds are held in an aggregate insured deposit account at the client's banking institution but managed by a third party agent.

US 7,933,821 B1

3

It is another object of the invention to provide a money market banking method that has a minimal impact on presently-existing, bank-to-client relationships.

It is a further object of the invention to provide a money market banking method which is readily integrable into the existing infrastructure of a bank or savings institution.

These and other objects of the invention are realized in the form of novel systems and methods for managing a plurality of client demand accounts so as to allow a banking institution to retain client deposits on the bank's balance sheets while at the same time, providing the client with the capability of implementing up to an unlimited number of transactions per month and also providing the client with interest on their account balance. These objectives are achieved through the use of an aggregate money market deposit account and an aggregate demand deposit account. These accounts are held on the books of the client's savings institution or bank, but are managed by a third party agent for the client. In response to client deposits and withdrawals, the agent initiates a transfer of funds between the aggregate demand deposit account and the aggregate money market deposit account, If client deposits exceed client withdrawals, then all or some of the funds in the aggregate demand deposit account may be transferred to the aggregate money market deposit account. On the other hand, if client withdrawals exceed client deposits, then all or some of the funds in the aggregate money market deposit account are transferred to the aggregate demand deposit account. The aggregate money market deposit account is an interest-bearing deposit account, where the aggregate balances for all clients are deposited.

One purpose of the aggregate demand deposit account is to facilitate the movement of funds. On a regular, periodic, or recurring basis, the agent calculates a net transaction as the sum of individual client deposits and withdrawals from the plurality of individual client demand accounts. The net transaction calculation is used to determine an amount of funds that need to be deposited into the aggregate money market deposit account to cover client deposits, or an amount of funds that needs to be withdrawn from the aggregate money market deposit account to cover client withdrawals. Individual account management calculations are performed to determine whether to deposit or withdraw funds from the aggregate demand deposit account to each of a plurality of individual client return sweep and/or money market accounts. The agent updates its database for each client's deposit and withdrawal activities.

The individual client has two accounts, a client demand deposit account on the bank's books, and a return sweep account or money market account on the agent's books. Individual transactions for the client occur between these two client accounts.

The agent distributes all or a portion of the interest accrued from the aggregate deposit account to individual clients. The interest is distributed according to the relative proportions of each client's funds in the aggregate deposit account. The agent maintains a database that keeps track of deposits to, and withdrawals from, each of the client demand accounts, as well as each client's proportionate and/or monetary share in the aggregate money market deposit account.

The invention permits funds to be deposited into a demand account from various sources, and also provides for the tendering of payments from the demand account via different instruments, without limitation as to the number of transfers, and with accrual of interest on the deposited funds. Moreover, the deposited funds are retained at the client's bank or savings institution. Optionally, the debiting of funds from each of the client accounts is monitored, and debits are selectively autho-

4

rized or rejected based upon the client's account balance and/or their current share in the aggregate deposit account.

## BRIEF DESCRIPTION OF THE DRAWINGS

The following is a brief description of the drawings, in which:

FIG. 1 is an information flow diagram showing the transfer of client funds among a plurality of accounts pursuant to the techniques of the present invention;

FIG. 2 is a flowchart showing an illustrative operational sequence for implementing the techniques of the present invention; and

FIGS. 3-6 together comprise a flowchart depicting processing steps to be performed on behalf of an administrator pursuant to a further embodiment of the present invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Refer now to FIG. 1, which is a flow diagram showing the transfer of client funds among a plurality of accounts pursuant to the techniques of the present invention. A plurality of client demand accounts, including Client "A" DDA (Demand Deposit Account) 501 and Client "B" DDA Account 503 are managed through the use of an insured pooled deposit account at the client's savings institution or bank. In FIG. 1, this pooled deposit account is provided in the form of a Pooled MMDA (Money Market Deposit Account) 509. Excess funds are swept from client DDA accounts (Client "A" DDA 501 and Client "B" DDA 503, respectively) to corresponding client Money Market Accounts (Client "A" Money Market Account 505 and Client "B" Money Market Account 507, respectively). Excess funds may be calculated in terms of a desired or target minimum balance for each of the client DDA accounts. The same target minimum balance could be applied to all DDA accounts, or an account-specific target balance could be assigned to a certain account based upon the past history and/or the expected usage of that account. Alternatively, all funds could be swept from the client DDA accounts to the Money Market Accounts. After recording the amount of funds swept into a client Money Market Account, the funds are then transferred to the Pooled MMDA Account 509.

The net result of the aforementioned fund transfer activity is that funds are effectively transferred from individual client demand accounts, including Client "A" DDA 501 and Client "B" DDA 503, to a pooled insured deposit account (Pooled MMDA Account 509) at the client's bank or savings institution. This is advantageous in that the Pooled MMDA account 509 is an interest-bearing "nondemand" account pursuant to 12 CFR 329.2 et seq. Moreover, the Pooled MMDA Account is eligible for full FDIC insurance protection. This protection covers each client whose deposits are placed into the pooled account, up to a maximum of $100,000 per client. As the Pooled MMDA Account 509 accrues interest, all or a portion of this interest is distributed to individual clients. The interest may, but need not, be distributed according to the relative proportions of each client's funds in the Pooled MMDA Account 509.

A database keeps track of deposits to, and withdrawals from, each of the client demand accounts (Client "A" DDA Account 501 and Client "B" DDA Account 503), as well as each client's proportionate and/or monetary share in the Pooled MMDA Account 509. On a regular, periodic, or recurring basis, a net transaction is calculated as the sum of individual client deposits and withdrawals from the plurality of

US 7,933,821 B1

5

demand accounts. The net transaction calculation is used to determine an amount of funds, if any, that needs to be deposited into the Pooled MMDA Account **509** from the individual client Money Market Accounts (Client "A" Money Market Account **505** and/or Client "B" Money Market Account **507**) to cover client deposits. The net transaction calculation is also used to determine an amount, if any, of funds that need to be withdrawn from the Pooled MMDA Account **509** to cover client withdrawals from respective client DDA Accounts (Client "A" DDA Account **501** and/or Client "B" DDA Account **503**). In the event that fund withdrawals are required, the necessary funds are first transferred from the Pooled MMDA Account **509** to a Pooled DDA (Demand Deposit Account) **511** which is held at the same savings institution or bank as Pooled MMDA Account **509**. On an as-needed basis, funds are then transferred from the Pooled MMDA Account **509** to individual client DDA accounts (Client "A" DDA Account **501** or Client "B" DDA Account **503**) to cover checks written by these clients, as well as any fund withdrawals or transfers that clients wish to implement on behalf of their respective DDA Accounts.

Individual account management calculations are performed to determine whether to deposit or withdraw funds from the Pooled DDA Account **511** to each of a plurality of individual client demand accounts. The database is updated for each client's deposit and withdrawal activities. The invention permits funds to be deposited into a client demand account from various sources, and also provides for the tendering of payments from the client demand account via different instruments, without limitation as to the number of transfers, and with accrual of interest on the deposited funds. Optionally, the debiting of funds from each of the client demand accounts is monitored, and debits are selectively authorized or rejected based upon the client's demand account balance and/or their current share in the pooled deposit account.

The foregoing procedures are structured in a manner so as to permit banks and savings institutions to continue servicing their clients as they have done in the past. Moreover, if desired, these procedures could be implemented by an agent acting on behalf of one or more clients. In this manner, the invention would be virtually transparent to presently-existing banks and savings institutions. Bank personnel would not be burdened with the requirement to perform unfamiliar and potentially time-consuming procedures. Pursuant to this "agency" approach, the agent effectively provides a "sweep interface" between a client's existing DDA account (i.e., Client "A" DDA Account **501**) and a fully-insured, interest-bearing pooled account (i.e., the Pooled MMDA Account **509**). The agent opens up the Pooled MMDA Account **509** and the Pooled DDA Account **511** at the client's bank or savings institution. The agent is responsible for several administrative activities, including: (1) recordkeeping in connection with the individual Client Money Market accounts (Client "A" Money Market Account **505** and Client "B" Money Market Account **507**); (2) determining each client's proportionate share in the Pooled MMDA Account **509**; (3) determining an appropriate balance for the Pooled DDA Account **511**; and (4) determining appropriate transfers from the Pooled DDA Account **511** to any of the client DDA accounts.

Although banks and savings institutions can provide DDA, MMDA and checking account services to clients without utilizing a third-party agent, under the current statutory scheme, these institutions cannot pay interest on account balances, and at the same time, allow for an unlimited number of transactions. Pursuant to Regulation D, banks and savings

6

institutions are prohibited from automatically allowing unlimited fund transfers between DDAs and MMDAs on behalf of clients. A client could open up his own DDA and MMDA accounts, evaluate daily DDA activities, determine if funds should be moved between the DDA and the MMDA, and instruct the bank to transfer the appropriate funds. However, it would be time consuming and inefficient. The use of an agent provides administrative expediency, endering the entire operational scheme more attractive to the client as well as the banking institution.

Advantageously, the agent maintains the client's original DDA account number that uniquely identifies that client's account at his or her bank or savings institution. This account number is used as a cross-reference to keep track of each client's proportionate interest in the Pooled MMDA Account **509**. The client Money Market Account numbers (for Client "A" Money Market Account **505** and Client "B" Money Market Account **506**) are transparent to these clients, as is the account number for the Pooled MMDA Account **509**.

Effectively, a "sweep interface" exists between each of respective individual client DDA Accounts (Client "A" DDA Account **501** and Client "B" DDA Account **503**) and corresponding individual client Money Market Accounts (Client "A" Money Market Account **505** and Client "B" Money Market Account **507**). Excess funds in the individual client DDA accounts are swept to the individual client Money Market accounts to be further credited to the Pooled MMDA Account **509**. If funds are needed to pay for a check or handle a withdrawal, funds are redeemed via the Pooled DDA Account **511**. The sweep interface may be governed by any of a number of established or specified parameters. For example, the bank may choose to leave a certain dollar amount in each of the client DDA accounts to cover checks and only sweep funds in excess of that amount. Or the bank may decide to sweep everything and redeem funds based upon the checks presented for payment. From the standpoint of the bank or savings institution, no additional work is required. The bank merely maintains the client's existing individual DDA account along with the client's profile (name, address, check reorders, signature on file, stop payment orders, etc). Bank clients will be able to keep their existing checks, and to continue using their existing DDA accounts. Deposits are credited to these DDA accounts and then swept to the pooled MMDA account. Many of the required administrative activities are performed by the agent on behalf of designated client accounts. These administrative activities basically involve the monitoring of fund sweeping to and from individual client DDA accounts and corresponding individual Money Market accounts, as well as transfers among the individual Money Market, Pooled MMDA and Pooled DDA Accounts maintained by the agent. On a daily, regular, repeated, or periodic basis, the bank or savings institution transmits a transaction sweep data file to the agent that includes deposit and withdrawal information for each of a plurality of clients. The bank and the agent periodically or repeatedly reconcile the sweep data file and agree upon a net settlement figure. If the net settlement figure is a credit, the bank or savings institution credits the Pooled DDA Account **511**. During routine, day-to-day system operations, the only transactions that occur in the Pooled MMDA Account **509** are transfers either to or from the Pooled DDA Account. Pursuant to an optional alternative approach, the bank could allocate credits to the Pooled MMDA Account **509**. In any event, if the net settlement figure is a debit, the bank or savings institution debits the Pooled DDA Account **511**. The agent provides instructions by messenger to transfer funds from the Pooled MMDA Account **509** to the Pooled DDA Account **511** to cover the debit balance in

US 7,933,821 B1

7

the account. At the end of a predetermined period of time (such as a month), the agent can provide a monthly statement file to the bank or savings institution. This file may include activity for a client's individual money market account as maintained in an agent database. The bank or savings institution can then use this monthly statement file to generate month end statements for its clients. According to one preferred embodiment of the invention, activity pertaining to other accounts is tracked and maintained by the bank or savings institution. However, pursuant to an alternate embodiment, this statement file could optionally include Pooled MMDA, Pooled DDA, individual Money Market, and/or individual DDA account activity.

Refer now to FIG. **2**, which is a flowchart showing an illustrative operational sequence for implementing the techniques of the present invention. The procedure commences at block **701**, where a client makes a deposit to their individual DDA Account (i.e., Client "A" DDA **501**, FIG. **1**), or at block **703**, where a client makes a withdrawal from their individual DDA Account. Irrespective of whether the transaction is a withdrawal or a deposit, a sweep process is performed (block **707**) to sweep any excess account funds out of the client's individual DDA account, or to sweep required funds into this DDA account. A test is performed at block **709** to ascertain whether or not there are excess funds in the individual client's DDA account. If so, program control jumps ahead to block **713**, whereas if not, the program continues on to block **711**. At block **713**, the excess funds are swept to the agent, who then updates the individual client Money Market account (block **717**).

The negative branch from block **709** leads to block **711**, where a test is performed to ascertain whether or not there is an insufficient minimum balance in the individual client's DDA account. If not, the program exits. If so, program control advances to block **715** where funds are swept from the agent. The agent then updates the individual client Money Market account (block **717**). Next, on a periodic, repeated, or scheduled basis, the agent calculates the net sweep account activity (block **719**). A test is performed at block **721** to ascertain whether or not the net sweep activity is a credit. If so, program control advances to block **723** and, if not, program control continues to block **725**. At block **723**, the agent receives payment from the bank for the credit. Payment can be received, for example, in the form of a wire transfer or a credit to the pooled DDA account. Next, the agent instructs the bank to deposit the received funds into the pooled MMDA account (block **727**). Funds are transferred into the pooled MMDA account (block **731**), and the program exits.

The negative branch from block **721** leads to block **725** where a test is performed to ascertain whether or not the net sweep activity is a debit. If not, the program exits and, if so, the program continues to block **729**. At block **729**, a messenger is instructed to initiate a fund transfer from the pooled MMDA account to the pooled DDA account. The funds are transferred from the pooled MMDA to the pooled DDA (block **733**), and the agent pays the bank or savings institution from the pooled DDA account for the sweep debit. The program then exits.

FIGS. **3** and **4** together comprise a flowchart depicting processing steps to be performed on behalf of an agent or administrator pursuant to a further embodiment of the present invention. This agent or administrator can be a brokerage firm, a bank, or another financial entity with which clients can institute financial transactions such as deposits, withdrawals and on-demand payments. The administrator or agent appears to each client as if it were, at least in part, a bank, by accepting deposits for the client's account, and, subsequently, by autho-

8

rizing (and then implementing) payments demanded by the client from his or her account. The funds for all of the clients are pooled into a single deposit account that is maintained as an insured deposit account at a licensed bank or savings institution.

Referring to FIG. **3**, financial entity **100** may be a bank, savings institution, brokerage firm, or other entity where financial transactions take place or can be facilitated. This financial entity **100** creates transaction files **101** which are transmitted to Reserve **105**. Reserve **105** (or the Reserve System) is the administrator or other entity in charge of administering at least one of the deposit accounts. New account files **102** can be transmitted to Reserve **105**. For example, a new investor account may need to be opened. This activity necessitates organizing and coordinating information to service a new investor for the present system, even though that investor may already be a client of a financial entity **100** for other investment vehicles. A new account **102** effectively becomes part of an existing pooled bank deposit account **129** that collects earned income **130**, all or a portion of which is eventually conveyed to the client's accounts **131**. Of course, at some point in time, the deposit account must first be established with clients' fluids. The transaction files represent the addition of funds by check (to be drawn on another institution, or to be drawn from a different demand account at the same institution), wire or electronic transfer, ACH, credits (such as from a debit or credit card merchant), or a sweep from one of the client's other accounts. Accordingly, encompassed in the transaction file are deposits **103** and withdrawals **104**. A "sweep" includes the automatic transfer of funds, such as the automated transfer of interest from one account into the client's account, as well as the automated transfer of funds out of the client's account (such as for payment of a securities trade); thus, a sweep may be from one of the client's accounts to another. The responsibility for maintaining the deposit account can be assigned by the administrator to a third party.

Referring now to FIG. **4**, Reserve System **50** contains an insured deposit database **75** where a position file for debit/credit card users is created **132** and transmitted to a bank for a debit/credit card network **133** where the bank then updates the network **134**. The system updates the data base **75** and processes transactions **106** (from **105**, FIG. **3**) and opens a new account **107** where application and check deposits are processed **110**. The bank preference **107**A is the list of banks and the order of preference for deposits and withdrawals held on the account, including a list of banks to be excluded (if any), and the maximum percentage and/or amount of funds to be held in each bank. The client's bank preference data is added to the account at **107**B. If the client does not select values for any of these variables, the system can provide default values for the banks and their order at **107**C sufficient for all of the client's funds. When possible, the system can be configured to assign a bank that is in the state in which the client resides. Referring to FIG. **5**, it can be seen that when a deposit, either a check deposit **111**, federal wire deposit **112**, ACH deposit, sweep, or other deposit is credited to the client's account **108**, the system will review where the existing funds of the accounts are deposited **108**A. If the client's balance has reached the maximum allowable balance for the existing bank **108**B, as shown in FIG. **6**, the system will then select the next bank on the preference list attached to the account **108**C. If the maximum allowable balance has not been reached in the existing bank, the system will credit the additional funds to that bank **108**D.

Still referring to FIG. **5**, the procedure for processing withdrawals can be seen. Various methods of withdrawing funds are debit withdrawal **109**, processing debit or credit card

US 7,933,821 B1

9

transactions such as debit/credit card files **115**, direct debit accounts **215**, and processing of files **121**. Processing of a debit/credit card file **115** utilizes data accumulated from debit/credit card transactions received from the banks **114**. The processing of file **121** procedure utilizes one of various sources of data such as a check presented for payment **116**, ACH debits **117**, touch tone bill paying **118**, and/or interne bill paying **119**.

After processing the debit procedure, the system will review the bank preference list and select the appropriate bank to debit **125**A. The system will sort all the daily transactions by the bank **125**B (see FIG. **6**). The activity for each bank will then be netted **126** and the appropriate deposit or withdrawals made.

The system will then determine whether funds are available **122**, which function is also associated with other participant withdrawals **120**. If the funds are available, the account is debited **225**. If the funds are not available, however, the system determines whether a credit line is available **123**. If a credit line is available, then funds are advanced **230** to cover the debit; if not the transaction is rejected **124**.

Referring to FIG. **6**, as previously stated, the system determines whether the client's balance reaches its maximum **108**B. If so, the next bank on the list selected by the client is credited **108**C. If the maximum is not reached, then the existing bank is credited **108**D. Information and activities associated with processed debits and credits of the client's accounts from **125**A are sorted by the bank **125**B and the net activity by the bank is determined **126**. The system then determines whether the deposits and credits were greater than the withdrawals and debits **240**. If so, the excess funds are deposited into a deposit account **127**. If the debits and withdrawals were greater than the credits, the difference is redeemed from the deposit account **128**.

Thus, by practicing the embodiment of the invention described in connection with FIGS. **3**-**6**, an individual client is effectively provided with FDIC insurance in excess of $100,000. This result is brought about because the individual client's holdings are maintained in multiple insured deposit accounts, which may be in multiple banks.

The foregoing description is intended to be illustrative and not limiting. Any of various changes, modifications, and/or additions may become apparent to the skilled artisan upon a perusal of this specification, and, as such, are intended to be within the scope and spirit of the invention as defined by the claims.

What is claimed is:

**1**. A system for managing funds for a plurality of client transaction accounts for a plurality of clients whose funds were accepted for deposit in respective client transaction accounts held in the names of the respective clients at a first banking institution, the system comprising:

one or more electronic databases, stored on one or more computer-readable media, comprising:

(i) client account information for each of the respective client transaction accounts;

(ii) aggregated transaction account information for a plurality of Federal Deposit Insurance Corporation (FDIC)-insured and interest-bearing aggregated deposit accounts held in a plurality of banks in a program including the first banking institution; and

(iii) subaccount information on each client's funds held in said plurality of the insured and interest-bearing aggregated deposit accounts; and

10

one or more computers comprising memory wherein the memory stores computer-readable instructions that, when executed, cause the one or more computers to perform the steps:

(a) accessing the electronic database and administering clients' deposits and/or transfers to and withdrawals and/or transfers from each of a plurality of said client transaction accounts, said administering step comprising processing transaction data comprising data for one or more deposits and/or transfers for one or more client transaction accounts and data for each of more than six (6) withdrawals and/or transfers by check and/or debit card within a month from each of at least two of said client transaction accounts, with the transaction data comprising a respective amount for each respective deposit and/or transfer and for each respective withdrawal and/or transfer;

(b) determining, for one or more transaction deposits and/or transfers to a respective client transaction account held in the name of the respective client at the first banking institution, whether the balance of funds for the respective client in the aggregated deposit account at the first banking institution equals or exceeds a specified amount, and if not, designating the first banking institution to receive the deposit and/or transfer, and if it does, determining another bank in the program and designating the deposit and/or transfer for the other bank;

(c) determining and designating, for one or more withdrawals and/or transfers, including by check and/or debit card, from a respective client transaction account, one or more of the banks in the program for the one or more withdrawals and/or transfers;

(d) determining, for each of a plurality of the banks in the program, one or more net transactions, with each net transaction comprising a sum of a plurality of clients' deposits and/or transfers designated for the respective bank and/or clients' withdrawals and/or transfers designated for the respective bank, from a plurality of said respective client transaction accounts of a plurality of the clients;

(e) generating, one or more instructions to transfer funds to the respective one or more FDIC-insured and interest-bearing aggregated deposit accounts in the respective banks in the program in accordance with the respective net transactions determined for the respective banks in the program, and further comprising making a withdrawal and/or transfer from the FDIC-insured and interest-bearing aggregated deposit account held at one of the banks in the program more than six (6) times during a month, while maintaining an insured and interest-bearing status of the FDIC-insured and interest-bearing aggregated deposit account held at the one bank; and

(f) updating or having updated, the electronic database based on the deposits and/or transfers to and withdrawals and/or transfers from the plurality of aggregated deposit accounts.

**2**. The system defined in claim **1**, wherein one or more of the electronic databases further comprise aggregated transaction account information for a plurality aggregated demand accounts in the plurality of banks in a program, and

wherein the computer-readable instructions further comprise instructions to facilitate the withdrawal and/or transfer of client funds from one of the FDIC-insured and interest-bearing aggregated deposit accounts at one of the banks in the program through a respective aggregated demand deposit account at the respective bank.

US 7,933,821 B1

11

**3**. The system defined in claim **1**, further comprising computer-readable instructions stored in the memory for performing the steps:

monitoring requested debits of funds from each of a plurality of the client transaction accounts; and

selectively authorizing or rejecting each of the requested debits based upon an account balance in a client transaction account for the client or a client's funds in the plurality of aggregated deposit accounts, or based upon both the account balance in the client transaction account for the client and the client's funds in the plurality of aggregated deposit accounts.

**4**. The system defined in claim **1**, further comprising computer-readable instructions stored in the memory for:

causing distribution of interest from said FDIC-insured interest-bearing aggregated deposit accounts to said client transaction accounts; and

updating one or more of the electronic databases with client's deposits and/or transfers to and withdrawals and/or transfers from each of their respective client transaction accounts.

**5**. The system defined in claim **1**, wherein the one or more electronic databases maintain aggregated transaction account information for a plurality of Federal Deposit Insurance Corporation (FDIC)-insured and interest-bearing aggregated deposit accounts held in a fixed number of banks in the program, and

wherein the steps are performed using the fixed number of banks in the program.

**6**. The system as defined in claim **1**, wherein one or more of the electronic databases includes client preference and/or exclusion information comprising a client's one or more preferences and/or one or more exclusions of one or more banks to hold its funds; and

wherein the computer-readable instructions stored in the memory determines the other bank in the program for distribution of the deposit and/or transfer, when the balance of funds for the respective client in the aggregated deposit account at the first bank equals or exceeds the specified amount, based at least in part on the client preference and/or exclusion information.

**7**. The system as defined in claim **1**, wherein at least one of the one or more FDIC-insured and interest-bearing aggregated deposit accounts is a money market deposit account.

**8**. The system defined in claim **1**, further comprising computer-readable instructions that, when executed, cause the one or more computers to perform at least four of the steps:

receiving electronic check deposit data;
receiving electronic Fed wire deposit data;
receiving electronic ACH deposit data;
receiving electronic debit card transaction files;
receiving electronic credit card transaction files;
receiving electronic check presentment data;
receiving electronic ACH debit data;
receiving electronic touch tone bill paying data;
receiving electronic Internet bill paying data.

**9**. The system as defined in claim **1**, further comprising computer-readable instructions that, when executed, cause the one or more computers to perform the step of receiving the client transaction data from an Internet telecommunications network.

**10**. A system for managing funds for a plurality of client transaction accounts for a plurality of clients whose funds were accepted for deposit in respective client transaction

12

accounts held in the names of the respective clients at a first banking institution that includes a first bank in its infrastructure, the system comprising:

one or more electronic databases, stored on one or more computer-readable media, comprising:

(i) client account information for each of the respective client transaction accounts;

(ii) aggregated transaction account information for a plurality of Federal Deposit Insurance Corporation (FDIC)-insured and interest-bearing aggregated deposit accounts held in a plurality of banks in a program including the first bank in the first banking institution and a second bank in infrastructure of a different banking institution; and

(iii) subaccount information on each client's funds held in said plurality of the insured and interest-bearing aggregated deposit accounts; and

one or more computers comprising memory wherein the memory stores computer-readable instructions that, when executed, cause the one or more computers to perform the steps:

(a) accessing the electronic database and administering clients' deposits and/or transfers to and withdrawals and/or transfers from each of a plurality of said client transaction accounts, said administering step comprising processing transaction data comprising data for one or more deposits and/or transfers for one or more client transaction accounts and data for each of more than six (6) withdrawals and/or transfers by check and/or debit card within a month from each of at least two of said client transaction accounts, with the transaction data comprising a respective amount for each respective deposit and/or transfer and for each respective withdrawal and/or transfer;

(b) determining, for one or more transaction deposits and/or transfers to a respective client transaction account held in the name of the respective client at the first banking institution, whether the balance of funds for the respective client in the aggregated deposit account at the first bank equals or exceeds a specified amount, and if not, then designating the first bank to receive the deposit and/or transfer, and if it does, determining another bank in the program and designating the deposit and/or transfer for the other bank;

(c) determining and designating, for one or more withdrawals and/or transfers, including by check and/or debit card, from a respective client transaction account, one or more of the banks in the program for the one or more withdrawals and/or transfers;

(d) determining, for each of a plurality of the banks in the program, one or more net transactions, with each net transaction comprising a sum of a plurality of clients' deposits and/or transfers designated for the respective bank and/or clients' withdrawals and/or transfers designated for the respective bank, from a plurality of said respective client transaction accounts of a plurality of the clients;

(e) generating, one or more instructions to transfer funds to the respective one or more FDIC-insured and interest-bearing aggregated deposit accounts in the respective banks in the program in accordance with the respective net transactions determined for the respective banks in the program, and further comprising making a withdrawal and/or transfer from the FDIC-insured and interest-bearing aggregated deposit account held at one of the banks in the program more than six (6) times during a month, while maintaining

US 7,933,821 B1

13

an insured and interest-bearing status of the FDIC-insured and interest-bearing aggregated deposit account held at the one bank; and

(f) updating or having updated, the electronic database based on the deposits and/or transfers to and with-drawals and/or transfers from the plurality of aggregated deposit accounts.

**11**. The system defined in claim **10**, wherein one or more of the electronic databases further comprise aggregated transaction account information for a plurality aggregated demand accounts in the plurality of banks in a program, and

wherein the computer-readable instructions further comprise instructions to facilitate the withdrawal and/or transfer of client funds from one of the FDIC-insured and interest-bearing aggregated deposit accounts at one of the banks in the program through a respective aggregated demand deposit account at the respective bank.

**12**. The system defined in claim **10**, further comprising computer-readable instructions stored in the memory for performing the steps:

monitoring requested debits of funds from each of a plurality of the client transaction accounts; and

selectively authorizing or rejecting each of the requested debits based upon an account balance in a client transaction account for the client or a client's funds in the plurality of aggregated deposit accounts, or based upon both the account balance in the client transaction account for the client and the client's funds in the plurality of aggregated deposit accounts.

**13**. The system defined in claim **10**, further comprising computer-readable instructions stored in the memory for:

causing distribution of interest from said FDIC-insured interest-bearing aggregated deposit accounts to said client transaction accounts; and

updating one or more of the electronic databases with client's deposits and/or transfers to and withdrawals and/or transfers from each of their respective client transaction accounts.

**14**. The system defined in claim **10**, wherein the one or more electronic databases maintain aggregated transaction account information for a plurality of Federal Deposit Insurance Corporation (FDIC)-insured and interest-bearing aggregated deposit accounts held in a fixed number of banks in the program, and

wherein the steps are performed using the fixed number of banks in the program.

**15**. The system as defined in claim **10**, wherein one or more of the electronic databases includes client preference and/or exclusion information comprising a client's one or more preferences and/or one or more exclusions of one or more banks to hold its funds; and

wherein the computer-readable instructions stored in the memory determines the other bank in the program for distribution of the deposit and/or transfer, when the balance of funds for the respective client in the aggregated deposit account at the first bank equals or exceeds the specified amount, based at least in part on the client preference and/or exclusion information.

**16**. The system as defined in claim **10**, wherein at least one of the one or more FDIC-insured and interest-bearing aggregated deposit accounts is a money market deposit account.

**17**. The system as defined in claim **10**, further comprising computer-readable instructions that, when executed, cause the one or more computers to perform at least four of the steps:

receiving electronic check deposit data;

receiving electronic Fed wire deposit data;

14

receiving electronic ACH deposit data;

receiving electronic debit card transaction files;

receiving electronic credit card transaction files;

receiving electronic check presentment data;

receiving electronic ACH debit data;

receiving electronic touch tone bill paying data;

receiving electronic Internet bill paying data.

**18**. The system as defined in claim **10**, further comprising computer-readable instructions that, when executed, cause the one or more computers to perform the step of receiving the client transaction data from an Internet telecommunications network.

**19**. A computer-implemented method, comprising:

(a) maintaining or having maintained or accessing an electronic database, on one or more computer readable media, containing client account information for a plurality of client accounts for a plurality of clients whose funds had been accepted for deposit in the names of the respective clients at a first banking institution that includes a first bank in its infrastructure;

(b) maintaining or having maintained or accessing the same or a different electronic database, on one or more computer-readable media, containing aggregated deposit account information for a plurality of Federal Deposit Insurance Corporation (FDIC)-insured and interest-bearing aggregated deposit accounts, held in a plurality of banks of a plurality of banking institutions and including at least one FDIC-insured and interest-bearing aggregated deposit account held at the first bank in the first banking institution, wherein each aggregated deposit account hold funds of a plurality of client accounts, wherein a client account represents funds of a client held in one or more of the aggregated deposit accounts held by the banks,

(c) allocating, by one or more computers, for more than one of the client accounts, the client funds from these respective client accounts, among more than one of aggregated deposit accounts, so that at least a portion of these client funds are maintained in the aggregated deposit account in the first bank and at least a portion of the client funds are maintained in an aggregated deposit account held in at least one of the banks in one of the different banking institutions;

(d) determining, by the one or more computers, client funds to be withdrawn from the FDIC-insured and interest-bearing aggregated deposit account held at one of the banks of one of the banking institutions more than six (6) times during a month while preserving an insured and interest-bearing status of the FDIC-insured and interest-bearing aggregated deposit account held at the one bank; and

(e) updating or having updated, by the one or more computers, the electronic database based on the allocation of client funds to or from the plurality of aggregated deposit accounts.

**20**. The computer-implemented method defined in claim **19**,

wherein the withdrawing or having withdrawn client funds from one of the FDIC-insured and interest-bearing aggregated deposit accounts at one of the banks is through a respective aggregated demand deposit account at the respective one bank.

**21**. The computer-implemented method defined in claim **19**, further comprising:

causing distribution of interest, by the one or more computers, from said FDIC-insured interest-bearing aggregated deposit accounts to said client accounts; and

US 7,933,821 B1

15

updating or having updated, by the one or more computers, one or more of the electronic databases with information about the interest distributed to said client accounts.

22. The computer-implemented method as defined in claim 19, wherein the electronic database includes client preference and/or exclusion information comprising a client's one or more preferences and/or one or more exclusions of one or more banks to hold its funds; and

further comprising:

determining one or more of the different banks in the program for allocating a portion of the client's funds, based at least in part on the client preference and/or exclusion information.

23. The computer-implemented method as defined in claim 19, wherein at least one of the one or more FDIC-insured and interest-bearing aggregated deposit accounts is a money market deposit account.

24. The computer-implemented method as defined in claim 19, further comprising performing, by the one or more computers, one or more of the following steps:

accessing electronic check deposit data;
accessing electronic Fed wire deposit data;
accessing electronic ACH deposit data;
accessing electronic debit card transaction files;
accessing electronic credit card transaction files;
accessing electronic check presentment data;
accessing electronic ACH debit data;
accessing electronic touch tone bill paying data;
accessing electronic Internet bill paying data.

25. The computer-implemented method as defined in claim 19, further comprising computer-readable instructions that, when executed, allow the one or more computers to receive client data for deposits and/or transfers to and withdrawals and/or transfers from each of their respective client accounts from an Internet telecommunications network.

26. The method of claim 19, further comprising the step:

on a regular, periodic, or recurring basis, calculating or having calculated, by the one or more computers, a net transaction amount as the sum of individual client deposits and/or transfers to and withdrawals and/or transfers from each of a plurality of the client accounts; and,

utilizing, by the one or more computers, the net transaction amount to determine an amount or amounts of funds that need to be deposited into one or more of the aggregated deposit accounts to cover client deposits, or an amount or amounts of funds that needs to be withdrawn from one or more of the aggregated deposit accounts to cover client withdrawals.

27. The method of claim 19, wherein the client accounts comprise corporate client accounts.

28. A system, comprising:

(a) one or more electronic databases, stored on one or more computer-readable media, comprising:

(i) client account information for a plurality of client accounts for a plurality of clients whose funds were accepted for deposit in the names of the respective clients at a first banking institution that includes a first bank in its infrastructure;

(ii) aggregated deposit account information for a plurality of Federal Deposit Insurance Corporation (FDIC)-insured and interest-bearing aggregated deposit accounts, held in a plurality of banks of a plurality of banking institutions and including at least one FDIC-insured and interest-bearing aggregated deposit account held at the first bank in the first banking institution, wherein each aggregated deposit account

16

hold funds of a plurality of client accounts, wherein a client account represents funds of a client held in one or more of the aggregated deposit accounts held by the banks,

(b) one or more computers comprising memory wherein the memory stores computer-readable instructions that, when executed, cause the one or more computers to access the one or more electronic databases and perform the steps:

(i) allocating, by the one or more computers, for more than one of the client accounts, the client funds from these respective client accounts, among more than one of the aggregated deposit accounts, so that at least a portion of these client funds are maintained in the aggregated deposit account in the first bank and at least a portion of the client funds are maintained in an aggregated deposit account held in at least one of the banks in one of the different banking institutions;

(ii) determining, by the one or more computers, client funds to be withdrawn from the FDIC-insured and interest-bearing aggregated deposit account held at one of the banks of one of the banking institutions more than six (6) times during a month while preserving an insured and interest-bearing status of the FDIC-insured and interest-bearing aggregated deposit account held at the one bank; and

(iii) updating or having updated, by the one or more computers, the electronic database based on the allocation of client funds to or from the plurality of aggregated deposit accounts.

29. The system defined in claim 28, wherein the computer-readable instructions further comprise instructions to facilitate the withdrawing or having withdrawn client funds from one of the FDIC-insured and interest-bearing aggregated deposit accounts at one of the banks through a respective aggregated demand deposit account at the respective one bank.

30. The system defined in claim 28, further comprising computer-readable instructions stored in the memory for:

causing distribution of interest from said FDIC-insured interest-bearing aggregated deposit accounts to said client accounts; and

updating one or more of the electronic databases with information about the interest distributed to said client accounts.

31. The system as defined in claim 28, wherein one or more of the electronic databases includes client preference and/or exclusion information comprising a client's one or more preferences and/or one or more exclusions of one or more banks to hold its funds; and

wherein the computer-readable instructions stored in the memory determine one or more of the different banks in the program for allocating a portion of the client's funds, based at least in part on the client preference and/or exclusion information.

32. The system as defined in claim 28, wherein at least one of the one or more FDIC-insured and interest-bearing aggregated deposit accounts is a money market deposit account.

33. The system as defined in claim 28, further comprising computer-readable instructions that, when executed, cause the one or more computers to perform one or more of the steps:

accessing electronic check deposit data;
accessing electronic Fed wire deposit data;
accessing electronic ACH deposit data;
accessing electronic debit card transaction files;
accessing electronic credit card transaction files;

US 7,933,821 B1

17

accessing electronic check presentment data;

accessing electronic ACH debit data;

accessing electronic touch tone bill paying data;

accessing electronic Internet bill paying data.

**34**. The system as defined in claim **28**, further comprising computer-readable instructions that, when executed, cause the one or more computers to receive client data for deposits and/or transfers to and withdrawals and/or transfers from each of their respective client accounts from an Internet telecommunications network.

**35**. The system as defined in claim **28**, further comprising computer-readable instructions that, when executed, cause the one or more computers to perform the steps:

18

on a regular, periodic, or recurring basis, calculating or having calculated, a net transaction amount as the sum of individual client deposits and/or transfers to and withdrawals and/or transfers from each of a plurality of the client accounts; and,

utilizing the net transaction amount to determine an amount or amounts of funds that need to be deposited into one or more of the aggregated deposit accounts to cover client deposits, or an amount or amounts of funds that needs to be withdrawn from one or more of the aggregated deposit accounts to cover client withdrawals.

**36**. The system as defined in claim **28**, wherein the client accounts comprise corporate client accounts.

* * * * *

# Exhibit 8

(12) **United States Patent**
    Bent et al.

(10) Patent No.: **US 8,311,916 B1**

(45) Date of Patent: *Nov. 13, 2012

(54) **SYSTEMS AND METHODS FOR ADMINISTERING RETURN SWEEP ACCOUNTS**

(75) Inventors: **Bruce Bent**, Manhasset, NY (US); **Bruce Bent, II**, Manhasset, NY (US)

(73) Assignee: **Island Intellectual Property LLC**, Manhasset, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 26 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/052,696**

(22) Filed: **Mar. 21, 2011**

**Related U.S. Application Data**

(63) Continuation of application No. 12/385,522, filed on Apr. 10, 2009, now Pat. No. 7,933,821, which is a continuation of application No. 10/071,053, filed on Feb. 8, 2002, now Pat. No. 7,519,551, which is a continuation-in-part of application No. 09/677,535, filed on Oct. 2, 2000, now Pat. No. 7,752,129, which is a continuation-in-part of application No. 09/176,340, filed on Oct. 21, 1998, now Pat. No. 6,374,231.

(51) Int. Cl.
*G06Q 40/00* (2012.01)

(52) U.S. Cl. .......................................... 705/35; 707/705

(58) Field of Classification Search ................... 705/30, 705/35, 38–40, 42; 707/607, 609, 705, 821–828; 902/24, 41
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,232,367 A | 11/1980 | Youden et al. | |
| 4,346,442 A | 8/1982 | Musmanno | |
| 4,376,978 A | 3/1983 | Musmanno | |
| 4,597,046 A | 6/1986 | Musmanno et al. | |
| 4,674,044 A | 6/1987 | Kalmus et al. | |
| 4,694,397 A | 9/1987 | Grant et al. | |
| 4,700,297 A | 10/1987 | Hagel et al. | |
| 4,751,640 A | 6/1988 | Lucas et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

EP    0 608 322    7/1998

(Continued)

OTHER PUBLICATIONS

U.S. Appl. No. 10/825,440, filed Apr. 14, 2006, Bruce Bent et al.

(Continued)

*Primary Examiner* — Mary Cheung
(74) *Attorney, Agent, or Firm* — Foley & Lardner LLP

(57) **ABSTRACT**

A method, system, and program product, the method comprising: accessing one or more electronic databases, comprising: (i) aggregated transaction account information; and (ii) client account information; allocating client funds of respective client accounts among more than one of aggregated deposit accounts, so that at least a portion of these client funds are maintained in the aggregated deposit account in a first depository institution and at least a portion of the client funds are maintained in an aggregated deposit account held in a second depository institution in a different financial institution; determining client funds to be withdrawn from the aggregated deposit account more than six (6) times during a month while preserving an insured and interest-bearing status of the aggregated deposit account; generating one or more instructions to transfer funds to or from one or more of the respective aggregated deposit accounts in the respective depository institutions in the program through an aggregated demand deposit and making a withdrawal and/or transfer from the one aggregated deposit account more than six (6) times during the month period; and updating the one or more electronic databases.

**13 Claims, 6 Drawing Sheets**



**US 8,311,916 B1**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,774,663 | A | 9/1988 | Musmanno et al. |
| 4,953,085 | A | 8/1990 | Atkins |
| 4,985,833 | A | 1/1991 | Oncken |
| 5,126,936 | A | 6/1992 | Champion et al. |
| 5,206,803 | A | 4/1993 | Vitagliano et al. |
| 5,220,501 | A | 6/1993 | Lawlor et al. |
| 5,235,507 | A | 8/1993 | Sackler et al. |
| 5,262,942 | A | 11/1993 | Earle |
| 5,270,922 | A | 12/1993 | Higgins |
| 5,291,398 | A | 3/1994 | Hagan |
| 5,297,032 | A | 3/1994 | Trojan et al. |
| 5,424,938 | A | 6/1995 | Wagner et al. |
| 5,631,828 | A | 5/1997 | Hagan |
| 5,644,727 | A | 7/1997 | Atkins |
| 5,671,363 | A | 9/1997 | Cristofich et al. |
| 5,689,650 | A | 11/1997 | McClelland et al. |
| 5,710,889 | A | 1/1998 | Clark et al. |
| 5,765,144 | A | 6/1998 | Larche et al. |
| 5,774,880 | A | 6/1998 | Ginsberg |
| 5,781,654 | A | 7/1998 | Carney |
| 5,802,499 | A | 9/1998 | Sampson et al. |
| 5,806,048 | A | 9/1998 | Kiron et al. |
| 5,806,049 | A | 9/1998 | Petruzzi |
| 5,812,987 | A | 9/1998 | Luskin et al. |
| 5,826,243 | A | 10/1998 | Musmanno et al. |
| 5,852,811 | A | 12/1998 | Atkins |
| 5,864,685 | A | 1/1999 | Hagan |
| 5,875,437 | A | 2/1999 | Atkins |
| 5,878,258 | A | 3/1999 | Pizi et al. |
| 5,878,405 | A | 3/1999 | Grant et al. |
| 5,884,285 | A | 3/1999 | Atkins |
| 5,890,141 | A | 3/1999 | Carney et al. |
| 5,893,078 | A | 4/1999 | Paulson |
| 5,903,881 | A | 5/1999 | Schrader et al. |
| 5,905,974 | A | 5/1999 | Fraser et al. |
| 5,940,809 | A | 8/1999 | Musmanno et al. |
| 5,941,996 | A | 8/1999 | Smith et al. |
| 5,946,667 | A | 8/1999 | Tull et al. |
| 5,950,175 | A | 9/1999 | Austin |
| 5,974,390 | A | 10/1999 | Ross |
| 5,978,779 | A | 11/1999 | Stein et al. |
| 6,014,642 | A | 1/2000 | El-Kadi et al. |
| 6,016,482 | A | 1/2000 | Molinari et al. |
| 6,026,438 | A | 2/2000 | Piazza et al. |
| 6,032,133 | A | 2/2000 | Hilt et al. |
| 6,041,314 | A | 3/2000 | Davis |
| 6,044,371 | A | 3/2000 | Person et al. |
| 6,047,324 | A | 4/2000 | Ford et al. |
| 6,049,782 | A | 4/2000 | Gottesman et al. |
| 6,052,673 | A | 4/2000 | Leon et al. |
| 6,088,685 | A | 7/2000 | Kiron et al. |
| 6,092,056 | A | 7/2000 | Tull et al. |
| 6,105,005 | A | 8/2000 | Fuhrer |
| 6,108,641 | A | 8/2000 | Kenna et al. |
| 6,112,191 | A | 8/2000 | Burke |
| 6,119,093 | A | 9/2000 | Walker et al. |
| 6,131,810 | A | 10/2000 | Weiss et al. |
| 6,154,770 | A | 11/2000 | Kostakos |
| 6,189,785 | B1 | 2/2001 | Lowery |
| 6,192,347 | B1 | 2/2001 | Graff |
| 6,226,623 | B1 | 5/2001 | Schein et al. |
| 6,317,783 | B1 | 11/2001 | Freishtat et al. |
| 6,324,523 | B1 | 11/2001 | Killeen et al. |
| 6,363,360 | B1 | 3/2002 | Madden |
| 6,374,231 | B1 | 4/2002 | Bent et al. |
| 6,513,020 | B1 | 1/2003 | Weiss et al. |
| 6,970,843 | B1 | 11/2005 | Forte |
| 7,089,202 | B1 | 8/2006 | McNamar et al. |
| 7,103,556 | B2 | 9/2006 | Del Rey et al. |
| 7,124,101 | B1 | 10/2006 | Mikurak |
| 7,133,840 | B1 | 11/2006 | Kenna et al. |
| 7,203,845 | B2 | 4/2007 | Sokolic et al. |
| 7,206,761 | B2 | 4/2007 | Colvin |
| 7,216,100 | B2 | 5/2007 | Elliott |
| 7,321,874 | B2 | 1/2008 | Dilip et al. |
| 7,321,875 | B2 | 1/2008 | Dilip et al. |
| 7,328,179 | B2 | 2/2008 | Sheehan et al. |
| 7,376,606 | B2 | 5/2008 | Jacobsen |
| 7,383,223 | B1 | 6/2008 | Dilip et al. |
| 7,383,227 | B2 | 6/2008 | Weinflash et al. |
| 7,392,222 | B1 | 6/2008 | Hamilton et al. |
| 7,401,037 | B2 | 7/2008 | Arena et al. |
| 7,440,914 | B2 | 10/2008 | Jacobsen |
| 7,505,937 | B2 | 3/2009 | Dilip et al. |
| 7,509,286 | B1 | 3/2009 | Bent et al. |
| 7,519,551 | B2 | 4/2009 | Bent et al. |
| 7,529,709 | B2 | 5/2009 | Volchek et al. |
| 7,536,340 | B2 | 5/2009 | Dheer et al. |
| 7,536,350 | B1 | 5/2009 | Bent et al. |
| 7,596,522 | B1 | 9/2009 | Jacobsen |
| 7,603,307 | B2 | 10/2009 | Jacobsen |
| 7,640,199 | B1 | 12/2009 | Hyland |
| 7,657,761 | B2 | 2/2010 | Sokolic et al. |
| 7,668,771 | B1 | 2/2010 | Bent et al. |
| 7,668,772 | B1 | 2/2010 | Bent et al. |
| 7,672,886 | B2 | 3/2010 | Bent et al. |
| 7,672,901 | B1 | 3/2010 | Bent et al. |
| 7,672,902 | B1 | 3/2010 | Bent et al. |
| 7,680,716 | B1 | 3/2010 | Bent et al. |
| 7,680,734 | B1 | 3/2010 | Bent et al. |
| 7,716,131 | B2 | 5/2010 | Bent et al. |
| 7,720,755 | B1 | 5/2010 | Coyle |
| 7,729,987 | B1 | 6/2010 | Wakim et al. |
| 7,752,107 | B1 | 7/2010 | Bent et al. |
| 7,752,129 | B2 | 7/2010 | Bent et al. |
| 7,756,767 | B2 | 7/2010 | Cluse et al. |
| 7,769,688 | B1 | 8/2010 | Bent et al. |
| 7,797,207 | B1 | 9/2010 | Dilip et al. |
| 7,809,640 | B1 | 10/2010 | Bent et al. |
| 7,814,017 | B2 | 10/2010 | Vancini et al. |
| 7,837,100 | B2 | 11/2010 | Bonalle et al. |
| 7,860,771 | B2 | 12/2010 | Colvin |
| 7,873,571 | B1 | 1/2011 | Wehmer |
| 7,873,573 | B2 | 1/2011 | Realini |
| 7,873,677 | B2 | 1/2011 | Messing et al. |
| 7,886,969 | B2 | 2/2011 | Antoo et al. |
| 7,895,098 | B2 | 2/2011 | Beard |
| 7,895,099 | B2 | 2/2011 | Whiting et al. |
| 7,899,743 | B2 | 3/2011 | Jacobsen |
| 7,899,745 | B1 | 3/2011 | Jacobsen |
| 7,899,746 | B1 | 3/2011 | Jacobsen |
| 7,899,747 | B1 | 3/2011 | Jacobsen |
| 7,904,372 | B2 | 3/2011 | Whiting et al. |
| 7,917,433 | B2 | 3/2011 | Jacobsen |
| 7,921,057 | B1 | 4/2011 | Jacobsen |
| 7,933,821 | B1 | 4/2011 | Bent et al. |
| 7,945,511 | B2 | 5/2011 | O'Brien et al. |
| 7,996,308 | B1 | 8/2011 | Bent et al. |
| 8,015,085 | B2 | 9/2011 | Blagg et al. |
| 8,019,667 | B1 | 9/2011 | Bent et al. |
| 8,019,668 | B1 | 9/2011 | Bent et al. |
| 8,032,456 | B1 | 10/2011 | Bent et al. |
| 8,036,986 | B2 | 10/2011 | Jacobsen |
| 8,051,004 | B2 | 11/2011 | Bent et al. |
| 8,051,005 | B2 | 11/2011 | Bent et al. |
| 8,086,508 | B2 | 12/2011 | Dheer et al. |
| 8,090,651 | B2 | 1/2012 | Winslow et al. |
| RE43,246 | E | 3/2012 | Bent et al. |
| 2001/0023414 | A1 | 9/2001 | Kumar et al. |
| 2001/0032182 | A1 | 10/2001 | Kumar et al. |
| 2002/0007330 | A1 | 1/2002 | Kumar et al. |
| 2002/0046144 | A1 | 4/2002 | Graff |
| 2002/0069147 | A1 | 6/2002 | Sheehan et al. |
| 2002/0082981 | A1 | 6/2002 | Madden |
| 2002/0087454 | A1 | 7/2002 | Calo et al. |
| 2002/0091637 | A1 | 7/2002 | Bent |
| 2002/0128951 | A1 | 9/2002 | Kiron et al. |
| 2002/0161707 | A1 | 10/2002 | Cole et al. |
| 2002/0165757 | A1 | 11/2002 | Lisser |
| 2002/0174048 | A1 | 11/2002 | Dheer et al. |
| 2002/0178098 | A1 | 11/2002 | Beard |
| 2002/0194099 | A1 | 12/2002 | Weiss |
| 2003/0023529 | A1 | 1/2003 | Jacobsen |
| 2003/0041003 | A1 | 2/2003 | Kayser, III |
| 2003/0080185 | A1 | 5/2003 | Werther |
| 2003/0135437 | A1 | 7/2003 | Jacobsen |
| 2003/0149646 | A1 | 8/2003 | Chen et al. |

**US 8,311,916 B1**

Page 3

| 2003/0163403 | A1 | 8/2003 | Chen et al. |
| 2003/0177092 | A1 | 9/2003 | Paglin |
| 2003/0191702 | A1 | 10/2003 | Hurley |
| 2003/0200174 | A1 | 10/2003 | Star |
| 2003/0208438 | A1 | 11/2003 | Rothman |
| 2003/0236728 | A1 | 12/2003 | Sunderji et al. |
| 2004/0039674 | A1 | 2/2004 | Coloma |
| 2004/0107157 | A1 | 6/2004 | Bleunven et al. |
| 2004/0111361 | A1 | 6/2004 | Griffiths et al. |
| 2004/0128229 | A1 | 7/2004 | Raines et al. |
| 2004/0128235 | A1 | 7/2004 | Kemper et al. |
| 2004/0138974 | A1 | 7/2004 | Shimamura et al. |
| 2004/0153398 | A1 | 8/2004 | Baumgartner et al. |
| 2004/0162773 | A1 | 8/2004 | Del et al. |
| 2004/0177036 | A1 | 9/2004 | Nutahara et al. |
| 2004/0249741 | A1 | 12/2004 | Understein |
| 2005/0044038 | A1 | 2/2005 | Whiting et al. |
| 2005/0091137 | A1 | 4/2005 | Woeber |
| 2005/0102225 | A1 | 5/2005 | Oppenheimer et al. |
| 2005/0102226 | A1 | 5/2005 | Oppenheimer et al. |
| 2005/0108120 | A1 | 5/2005 | Malka et al. |
| 2005/0108149 | A1 | 5/2005 | Bent et al. |
| 2005/0114246 | A1 | 5/2005 | Coloma |
| 2005/0154662 | A1 | 7/2005 | Langenwalter |
| 2005/0228733 | A1 | 10/2005 | Bent et al. |
| 2006/0047593 | A1 | 3/2006 | Naratil et al. |
| 2006/0106703 | A1 | 5/2006 | Del et al. |
| 2006/0155644 | A1 | 7/2006 | Reid et al. |
| 2006/0167773 | A1 | 7/2006 | Yang et al. |
| 2006/0212389 | A2 | 9/2006 | Bent et al. |
| 2006/0213980 | A1 | 9/2006 | Geller et al. |
| 2006/0273152 | A1 | 12/2006 | Fields |
| 2007/0043666 | A1 | 2/2007 | Burdette |
| 2007/0118449 | A1 | 5/2007 | De La Motte |
| 2007/0130065 | A1 | 6/2007 | Staab et al. |
| 2007/0143196 | A1 | 6/2007 | Colvin |
| 2007/0255655 | A1 | 11/2007 | Kemper et al. |
| 2007/0271174 | A2 | 11/2007 | Bent et al. |
| 2007/0276752 | A1 | 11/2007 | Whiting et al. |
| 2007/0288400 | A1 | 12/2007 | Menon |
| 2008/0015985 | A1 | 1/2008 | Abhari et al. |
| 2008/0046358 | A1 | 2/2008 | Holm-Blagg et al. |
| 2008/0065532 | A1 | 3/2008 | De La Motte |
| 2008/0097899 | A1 | 4/2008 | Jackson et al. |
| 2008/0120228 | A1 | 5/2008 | Bent et al. |
| 2008/0133280 | A1 | 6/2008 | Ziegler |
| 2008/0133396 | A1 | 6/2008 | De La Motte |
| 2008/0222053 | A1 | 9/2008 | Jacobsen |
| 2008/0288398 | A1 | 11/2008 | Maricondi |
| 2009/0006985 | A1 | 1/2009 | Fong et al. |
| 2009/0012899 | A1 | 1/2009 | Friesen |
| 2009/0138412 | A1 | 5/2009 | Jacobsen |
| 2009/0327154 | A1 | 12/2009 | Van Vooren et al. |
| 2011/0106703 | A1 | 5/2011 | Jay et al. |
| 2011/0208640 | A1 | 8/2011 | Geoghegan et al. |
| 2011/0246359 | A1 | 10/2011 | O'Brien et al. |

### FOREIGN PATENT DOCUMENTS

| JP | 10-049590 | A | 2/1998 |
| WO | WO-95/23379 | A1 | 8/1995 |
| WO | WO-99/18529 | A1 | 4/1999 |
| WO | WO-02/42952 | A1 | 5/2002 |
| WO | WO-03/012580 | A2 | 2/2003 |
| WO | WO-2005/006111 | A2 | 1/2005 |

### OTHER PUBLICATIONS

U.S. Appl. No. 11/641,046, filed Dec. 19, 2006, Bruce Bent et al.
U.S. Appl. No. 12/408,507, filed Mar. 20, 2009, Bruce Bent et al.
U.S. Appl. No. 12/408,511, filed Mar. 20, 2009, Bruce Bent et al.
U.S. Appl. No. 12/408,523, filed Mar. 20, 2009, Bruce Bent et al.
U.S. Appl. No. 12/453,387, filed May 8, 2009, Bruce Bent et al.
U.S. Appl. No. 12/453,388, filed May 8, 2009, Bruce Bent et al.
U.S. Appl. No. 12/453,389, filed May 8, 2009, Bruce Bent et al.
U.S. Appl. No. 12/453,390, filed May 8, 2009, Bruce Bent et al.
U.S. Appl. No. 12/622,979, filed Nov. 20, 2009, Bruce Bent et al.
Dreyfus Insured Deposit Program Disclosure Statement and Terms and Conditions, received Mar. 2008, 12 pages.

FDIC Federal Register Citations: Email from Bert Ely to Comments, Mar. 8, 2006, Subject: Large-Bank Deposit Insurance Determination Proposal- RIN 3064-AC98—Regs@fdic.gov. Attached, also from FDIC Federal Register Citations: Email From American Banker, by Bert Ely, Feb. 24, 2006, Viewpoint: FDIC's Account-Link Plan a Pointless, Costly Threat.
Lawsuit by *Island Intellectual Property LLC* against *Clearview Correspondent Services, LLC, et al.*; Complaint for Patent Infringement; Civil Action No. 1:11-cv-448 (LO/TRJ); Apr. 26, 2011; 55 pages.
Lawsuit by *Island Intellectual Property LLC* against *First Southwest Company*; Complaint for Patent Infringement; Civil Action No. 1:11-cv-00371-UNA; Apr. 26, 2011; 42 pages.
Lawsuit by *Island Intellectual Property LLC, et al.* v. *Deutsch Bank Trust Company Americas, et al.*; Defendant Deutsche Bank Trust Company Americas' Second Supplemental Responses to Double Rock's Interrogatories Nos. 2, 8 and 9, Jul. 2010, 65 pages.
Exhibit 2, Invalidity Chart: U.S. Pat. No. 4,985,833 (Oncken)—U.S. Pat. 7,668,771, Jul. 2010, 14 pages.
Exhibit 5, Invalidity Chart: Merrill Lynch Business Advantage Program—U.S. Pat. No. 7,668,772, Jul. 2010, 7 pages.
Exhibit 8, Invalidity Chart: Harken Financial Services Sweep Product—U.S. Pat. No. 7,668,771, Jul. 2010, 9 pages.
Exhibit 9, Invalidity Chart: Wayne Hummer—Insured Bank Deposit Program—U.S. Pat. No. 7,668,771, Jul. 2010, 12 pages.
Exhibit 10, Invalidity Chart: U.S. Patent Application Publication No. 2007/0043666 (Burdette), U.S. Pat. No. 7,668,771, Jul. 2010, 9 pages.
Letter to R.M. Zaitzeff, from W.W. Wiles, dated Jun. 22, 1983 (response to May 10, 1983 letter re: offering of MMDAs), 6 pages.
Letter to G.T. Schwartz, from O.I. Ireland, dated Jun. 22, 1988 (response to Dec. 18, 1987 letter re: proposed modifications to Merrill Lynch's CMA Program), 5 pages.
Information Statement, "Alliance Insured Account," Sep. 1999; 6 pages.
Investors MoneyAccountSM and Insurance Plus Service Agreement, attached Schedule A (List of Banks Participating in the Insurance Plus Service), IMAD Mar. 1994, 3 pages.
Investors Money AccountSM (an FDIC-insured money market account), IMA-1 (Mar. 1994), 4 pages.
Investors MoneyAccountSM, "The FDIC-Insured Money Market Investment with an Important Plus," IMA Oct. 1995, 2 pages.
1985 SEC No-Act. LEXIS 2756, Investment Company Act of 1940—Section 3(a)(1), 2(a)(36); Securities Act of 1933—Section 2(1), Nov. 29, 1985, Kemper Financial Services, Inc., 9 pages.
Insured Money Account Program Agreement and Disclosure Statement, (attached Schedule A—Deposit Account Terms), faxed Mar. 28, 2000; 10 pages.
First National Bank in Brookings, Certificates of Deposit [online] [retrieved on Jul. 17, 2009]. Retrieved from the Internet: Certificates of Deposit, <URL: http://web.archive.org/web/20000524121111/www.firstnb.com/cd.htm>; Multi-Bank CDs, <URL: http://web.archive.org/web/20000524132934/www.firstnb.com/mbcd.htm>, 5 pages.
Summary of Commentary on Current Economic Conditions by Federal Reserve Districts, Jan. 1985, 44 pages.
12 CFR Ch. II (Jan. 1, 2009 Edition), pp. 124-125.
Product Strategy, "Money Fund $$ Moving to Bank Deposits, Distributors Start to Install Bank Deposit Accounts to Replace Money Funds," 6 FRC Monitor, Dec. 2003, 2 pages.
Board of Governors of the Federal Reserve System, "The May 1998 Senior Financial Officer Survey," May 1998, (attached Appendix A: Survey Questions and Responses; Appendix B: Glossary; Appendix C: Examples of Key Reserve Concepts), 48 pages.
Interest Rate Review, A Publication of the Meyer Weekly Interest Rate Survey, "A Look at Tiers," Apr. 1987, 6 pages, vol. 11, No. 4.
LexisNexis, The American Banker, "Merrill Joins Money Market Account, CMA; Broker Begins Testing With 12 Institutions," Sep. 23, 1983, 4 pages.
Bent et al., Office Action, U.S. Appl. No. 10/071,053, with attached SB08, date considered Mar. 10, 2009, 2 pages.
Merrill Lynch & You, "Financial Services The Way You Want, When You Want Them," Jan. 2000, 16 pages.

## US 8,311,916 B1

Page 4

Exhibit 1, "FA/FB Account 1997 First Transactions, TRX Types: PU, PP, TA, PT," Aug. 2003, p. 1-2.

Advertisement: Where Your Interest is?, Mutual Funds, Oct. 1997; 1 page.

Advertisement: It's 1997, Do You Know Where Your Interest Is?, Mutual Funds, Dec. 1993, p. 46.

USPTO Office Action, Interview Summary, U.S. Appl. No. 11,767,827, Date Mailed Sep. 23, 2009, 4 pages.

USPTO Office Action, Office Action Summary, U.S. Appl. No. 11/767,827, Date Mailed Jun. 5, 2009, 35 pages.

Service Mark Application, Applicant: Reserve Management Corporation, Mark: Reserve Insured Deposits, (attached Power of Attorney, Declaration, Drawing Page, Sep. 21, 2001, 6 pages.

Letter to C.R. Macedo, from R.L. Rainey, Re: Promontory Interfinancial Network, LLC, dated Jul. 22, 2008, (attached Attachments A-E), 35 pages.

Letter to C.R. Macedo, from R.L. Rainey, Re: Promontory Interfinancial Network, LLC, dated Oct. 16, 2008, (attached Attachments A-C), 22 pages.

Letter to C.R. Macedo, from R.L. Rainey, Re: Promontory Interfinancial Network, LLC, dated Feb. 23, 2009, (attached Exhibit A-B), 21 pages.

Merrill Lynch & Co., Inc., Form 10-K405 (Annual Report (Regulation S-K, item 405)), Filed Mar. 14, 2002 for the Period Ending Dec. 28, 2001, 248 pages.

Merrill Lynch, "Information Statement Regarding changes to Interest Rates on Deposits in the Merrill Lynch Banks," Nov. 12, 2007, 2 pages.

QUESTessentials, "Quest Insured Account," May 17, 1994, 3 pages. Information Statement, "Quest Insured Account," (attached Appendix A), 5 pages.

OCC Insured Bank Deposit Account (attached are p. 2 of Quest for Value Funds Daily Data, Jun. 1993; OCC Insured Account Rate Table), 3 pages.

CIBC World Markets, "Insured Bank Deposit Account," Information Statement, Jul. 1, 2000, 2 pages.

Letter to Client, from M.J. Hensle, Re: Salomon Smith Barney Bank Deposit ProgramSM, (attached Q&A: Important Information about the New Salomon Smith Barney Bank Deposit Program), Aug. 16, 2002, 14 pages.

Salomon Smith Barney, "Bank Deposit Program Disclosure Statement," 3 pages.

FDIC, FDIC Law, Regulations, Related Acts—4000—Advisory Opinions, Oct. 22, 1987, J. W. Via, Jr., Counsel [online] [Retrieved on Jan. 22, 2010]. Retrieved from the Internet: URL: <http://www.fdic.gov/regulations/laws/rules/4000-2560.html>, 1 page.

FDIC, FDIC Law, Regulations, Related Acts—4000—Advisory Opinions, Jun. 28, 1993, J. A. DiNuzzo, [online] [Retrieved on Jan. 22, 2010]. Retrieved from the Internet: URL: <www.fdic.gov/regulations/laws/rules/4000-8240.html>, 2 pages.

FDIC, FDIC Law, Regulations, Related Acts—4000—Advisory Opinions, Jul. 23, 1986, D. H. Jones [online] [Retrieved on Jan. 22, 2010]. Retrieved from the Internet: URL: <www.fdic.gov/regulations/laws/rules/4000-2120.html#fdic400086-21>, 2 pages.

Merrill Lynch—Pierce, Fenner & Smith, Inc., "The Merrill Lynch Cash Management Account®," Financial Service, Jan. 1985, 18 pages.

Merrill Lynch, "Insured Savings™ Account Fact Sheet," The Merrill Lynch Cash Management Account® Financial Service, 11 pages.

CMA, "A Guide to Your CMA Account," Jan. 1995, 18 pages.

American Banker, Salomon's Sweep Plan Raises FDIC Fund Alarm [online], Dec. 6, 2000 [retrieved on Apr. 13, 2009]. Retrieved from the Internet: <URL: http://www.americanbanker.com/printthis.html?id=2000120603YJGEZD>, 2 pages.

The Insured Deposit Account: "Money in the Bank," p. 5; Three Little Letters. Three Big Ways to Save in 1998, p. 4.

LexisNexis, The American Banker, Sep. 23, 1983, Merrill Joins Money Market Account, CMA; Broker Begins Testing With 12 Institutions, Byline: A. Arvan, 4 pages.

Merrill Lynch & Co Inc—MER, 10k WIZARD, Form 8-K, "Report of Unscheduled Material Events or Corporate Changes," Filed Mar. 7, 2002, 51 pages.

Federal Reserve System, LEXSEE 51 FR 9632, "Definition of Deposit and Technical Amendments," Action: Final Rule, Mar. 20, 1986, 13 pages.

Federal Reserve System, LEXSEE 56 FR 15494, "Regulation D-Reserve Requirements of Depository Institutions," Action: Final Rule, Apr. 17, 1991, 5 pages.

Federal Reserve System, Part 201—Reserve Requirements of Depository Institutions (Regulation D)12 CFR Ch. II (Jan. 1, 2010 Edition), pp. 94-128, Pt. 204-Pt. 205.

Letter to G.T. Schwartz, from O.I. Ireland, dated Jun. 22, 1988, Re: response to letter of Dec. 18, 1987 regarding proposed modifications to Merrill Lynch's CMA Program, 5 pages.

Federal Reserve System, LEXSEE 47 FR 55207, "Reserve Requirements of Depository Institutions; Money Market Deposit Account," Dec. 8, 1982, Action: Final Rule, 5 pages.

Insured Bank Deposits™ Program Summary Information Statement, 11 pages.

Insured Bank Deposits™ Program Information Statement, (attached List of Eligible Program Banks, Effective May 9, 2002; New Account Application, Joint Account Agreement), 11 pages.

Wayne Hummer Investments, "Insured Bank Deposits™ Program, Frequently Asked Questions," 4 pages.

Memorandum to M. Peterson, J. Whitt, R. Wroten, E. Naumes, E. Deal, B. McCain, from J.E. Oncken, Jun. 15, 1990, Re: Insured Savings Update (with attachments), 7 pages.

Insured Savings, "Correspondent Agreement," including Exhibits A-D, 28 pages.

Insured Savings, "Project Team Meeting," Feb. 2, 1989, 21 pages.

Insured Savings, "Overview & Marketing Plan," Presented by: J.E. Oncken, Dec. 6, 1988, (including Exhibit A), 23 pages.

Letter to V.J. Best, from J.E. Oncken, dated Apr. 18, 1988, 2 pages.

Letter to M.L. Duke from K. Johnson, dated Dec. 27, 1989, (attached Insured Savings Correspondent Agreement, Exhibits A-D, letter to M.L. Duke from K. Johnson dated Nov. 21, 1989 and Account Information Sheet), 39 pages.

Memorandum to J. Oncken, J. Scurlock, B. Standefer, E. Piner, T. Cyr, from K. Johnson, dated Jul. 5, 1990, Re: Attached Insured Savings Letters (with attachments), 9 pages.

E.D.S.—First City Austin Electronic Mail, from J. Oncken, to T. Cyr, Re: Depository Levels at Insured Savings Depositories, Nov. 2, 1989, 1 page.

Cash Management Balance Monitoring Agreement and Memorandum from Ed Piner to Cash management Line of Business Representatives dated May 21, 1991(with attachments), 8 pages.

Merrill Lynch, Insured Savings Account Fact Sheet, The Merrill Lynch Cash Management Account® Financial Service, Jan. 1986, 4 pages.

Merrill Lynch Money Markets, Inc., Merrill Lynch Capital Markets, "The Insured Savings Account, Issuer Guide to Offering MMDAs through Merrill Lynch," Sep. 1986; 36 pages.

Merrill Lynch, The Merrill Lynch Capital BuilderSM Account Financial Service, Insured SavingsSM Account Participating Depository Institutions, 1996, 2 pages.

Insured Deposit Account, May 21, 1996, 14 pages.

An Introduction to the Smith Barney Insured Deposit Account, 8 pages.

Smith Barney Inc. Capital Markets, Debt Origination Group Memo, to J. Mandelbaum, from T. Hamilton, cc: R. Holloman, H. Bald, S. Becton, Re: Insured Deposit Account, Oct. 10, 1995; Smith Barney Inc. Capital Markets, Debt Origination Group Memo, to B. Holloman, from T. Hamilton, cc: W. Heinzerling, H. Morris, COPs, Re: New Product Proposal for Insured Deposit Account, Sep. 18, 1995, 2 pages.

Insured Deposit Account, Product Description for the Investor, Draft as of Sep. 20, 1995, 8 pages.

"Bank of Oak Ridge to Offer FDIC Insurance on up to $1.5 Million," Dialog Web Command Mode, 2 Sheets, Sep. 25, 2003, http://www.dialogweb.com/cgi/dwclient.

"Man Bites Dog: Funds Move Into Banking," IBC's Money Fund Selector, 2 Sheets, Nov. 6, 1998.

"Reverse Ups Insurance Limit on Money Market Account," Thomson Financial Inc., Mutual Fund Market News, 1 Sheet, Aug. 26, 2002.

## US 8,311,916 B1

Page 5

"The Bank of New York adds a $300,000 FDIC-Insured Money Market Account Option to its Dividend Income Checking Account," PR Newswire Associations, Inc., PR Newswire, 2 Sheets, Apr. 18, 2002.

"The Reverse Funds to Offer up to $600,000 of FDIC Insurance on Reserve Insured Deposits; Addressing Investor Needs for Increased Safety, Flexibility and a Competitive Yield," Business Wire, Inc. Business Wire, 2 Sheets, Aug. 13, 2002.

12 CFR Part 329—Interest on Deposit, Source: 51 FR 10808, Mar. 31, 1986, 5 Sheets.

U.S. Appl. No. 12/025,402, filed Feb. 4, 2008, Bent.

U.S. Appl. No. 12/794,448, filed Jun. 4, 2010, Bruce Bent et al.

U.S. Appl. No. 12/794,545, filed Jun. 4, 2010, Bruce Bent et al.

U.S. Appl. No. 12/816,092, filed Jun. 15, 2010, Bruce Bent, II et al.

U.S. Appl. No. 12/829,961, filed Jul. 2, 2010, Bruce Bent et al.

AB 2011 Assembly Bill—Bill Analysis, Senate Amendments, http://www.leginfo.ca.gov/pub/bill/asm/ab_2001-2050/ab_2011_cfa_20060811_161755_asm_floor.html, 2006, pp. 1-3.

AB 2011 Assembly Bill—Bill Analysis, Senate Rules Committee, Third Reading, http://www.leginfo.ca.gov/pub/bill/asm/ab_2001-2050/ab_2011_cfa_20060705_161454_sen_floor.html, 2006, pp. 1-7.

AB 2011 Assembly Bill—Chaptered, http://www.leginfo.ca.gov/pub/bill/asm/ab_2001-2050/ab_2011_bill_20060925_chaptered.html, 2006, pp. 1-3.

AB 2011 Assembly Bill—Enrolled, http://www.leginfo.ca.gov/pub/bill/asm/ab_2001-2050/ab_2011_bill_20060816_enrolled.html, 2006, pp. 1-3.

AB 2011 Assembly Bill—History, Complete Bill History, http://www.leginfo.ca.gov/pub/bill/asm/ab_2001-2050/ab_2011_bill_20060925_history.html, 2006, p. 1.

About iMoneyNet, Inc., About iMoneyNet's Money Funds Division, 4 Sheets, Aug. 21, 2003, http://www.ibcdata.com/about.htm.

Adler, Joe, "Promontory to Roll Out Deposit Service Insuring Liquid Funds", American Banker, Feb. 22, 2010, 1 sheet.

An iMoneyNet Special Report, Brokerage Cash Sweep Options: The Shift from Money Funds to FDIC-Insured Bank Deposit Accounts, by Peter G. Crane & Michael F. Krasner, iMoneyNet, Nov. 2004, 66 pages.

Anderson et al. "Retail Sweep Programs and Bank Reserves," Federal Reserve Bank of St. Louis Review, Bell & Howell Information and Learning Company, vol. 83, Issue 1, 24 Sheets, Jan. 1, 2001.

Announcing Changes in Automatic "Sweep" Investment Options, LPL Financial Services, Linsco/Private Ledger, Member NASD/SIPC, 26 Sheets.

Bank Deposit Program, Online http://web.archive.org/web/20030620100115/http://www.smithbarney.com/products_servi, Jan. 19, 2001, 4 Sheets.

Bent, "Bruce Bent Makes Money Market Funds Act Like Bank Accounts," Equity BBDP, Oct. 5, 1998, 3 Sheets.

Blackwell, "ABA to Approve System for Sharing Deposit Coverage," American Banker, 2 Sheets, Feb. 11, 2003.

Blackwell, "New Pitch: Deposit Insurance Sharing," American Banker Online, 4 Sheets, Jan. 21, 2003.

Board of Governors of the Federal Reserve System, 1984 Fed. Res. Interp. Ltr. LEXIS 56, Nov. 16, 1984, 3 Sheets.

Board of Governors of the Federal Reserve System, 1988 Fed. Res. Interp. Ltr. LEXIS 141, Jun. 22, 1988, 3 Sheets.

Board of Governors of the Federal Reserve System, 1989 Fed. Res. Interp. Ltr. LEXIS 154, Jun. 21, 1989, 2 Sheets.

Board of Governors of the Federal Reserve System, 1989 Fed. Res. Interp. Ltr. LEXIS 77, Mar. 14, 1989, 2 Sheets.

Board of Governors of the Federal Reserve System, 1990 Fed. Res. Interp. Ltr. LEXIS 94, Feb. 1, 1990, 1 Sheet.

Board of Governors of the Federal Reserve System, 1991 Fed. Res. Interp. Ltr. LEXIS 232, Jan. 30, 1991, 2 Sheets.

Board of Governors of the Federal Reserve System, 1994 Fed. Res. Interp. Ltr. LEXIS 156, Jun. 24, 1994, 3 Sheets.

Board of Governors of the Federal Reserve System, 1994 Fed. Res. Interp. Ltr. LEXIS 314, Oct. 17, 1994, 2 Sheets.

Board of Governors of the Federal Reserve System, 1994 Fed. Res. Interp. Ltr. LEXIS 419, Oct. 14, 1994, 4 Sheets.

Britt, "Struggling with Sweep Accounts," America's Community Banker, vol. 6, No. 12, 11 Sheets, Dec. 1, 1997.

California Independent Bankers, ICBA Independent Community Bankers of America, Banker Bulletin, 2006, CIB 16th Annual Convention, vol. 4, issue 6, http://www.cib.org/banker_bulletin.htm.

Capital Briefs: Corporate Checking Account Relief Sought, American Banker, vol. 162, Jul. 28, 1997, 1 Sheet.

Certificate of Deposit Registry Service: Keeping Deposits in the Corn Patch, Banknews, 2 Sheets. Mar. 2003.

Chapelle et al. "Peering Into Tomorrow: At the Threshold of a New Century, Brokers and Others Discuss Where They were Going," Securities Data Publishing on Wall Street, 6 Sheets, Dec. 1, 1999.

Chapelle, "Merrill's Rivals Say They, Too. Offer Services Beyond Banking," Securities Data Publishing On Wall Street, 2 Sheets, Feb. 1, 2003.

CMA, Insured Savings Account Fact Sheet, Merrill Lynch, Pierce, Fenner & Smith Incorporated, 1997, pp. 49-57.

CMA, Insured Savings Account Fact Sheet, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Jul. 1994, pp. 47-54.

CMA, The Investor Credit Line Service, Cost-Effective Financing for the '90s, Merrill Lynch, Pierce, Fenner & Smith Incorporated, 1997, pp. 36-46.

CMA, The Merrill Lynch Cash Management Account Financial Service, Insured Savings Account Participating Depository Institutions, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Mar. 1995, 2 Sheets.

CMA, The Merrill Lynch Cash Management Account Financial Service, Insured Savings Account Participating Depository Institutions, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Nov. 1992, 2 Sheets.

CMA, The Merrill Lynch Cash Management Account Financial Service, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Jan. 1997, 35 Sheets.

Litigation Notice After Payment of Issue Fee filed in Parent U.S. Appl. No. 10/382,946, Apr. 3, 2009, 160 pages.

Coyle, "A Look at commercial Demand Deposit Options," America's Community Banker, vol. 9, Issue 2, Bell & Howell Information and Learning Company, 9 Sheets, Feb. 1, 2000.

Crockett, "Big Banks Found Stepping Up Marketing of 'Sweep' Accounts," American Banker, vol. 159, No. 198, American Banker Inc., 3 Sheets, Oct. 13, 1994.

Declaration of Mr. Bruce Bent II, Vice Chairman and Registrant of Applicant on the date of first commercial use of the service providing interest and FDIC insurance for checking accounts by means of a system using money market deposit accounts (MMDA's) of Oct. 23, 1997.

Declaration of Mr. Bruce Bent II, Vice Chairman and Registrant of Applicant. (3 Sheets) and Exhibits A, B, C and D, Mar. 1, 2007, (6 Sheets).

Deposit Growth Strategies for Financial Institutions, New Sweep Account Helps Retain $40 Million in Business Deposits, vol. 7, No. 12, The Reserve Funds, May 2001, 1 Sheet.

Deutsche Bank Insured Deposit Program, Marketing Literature 2007, 3 pages.

DI 48, Excerpts of Transcript of Hearing, U.S. Dist. Ct., District of Delaware, Civil Action No. 82-680, Apr. 8, 1983, 5 sheets.

DI 56, Interrog. Response, U.S. Dist. Ct. District of Delaware, Civil Action No. 82-680, May 20, 1983, 15 Sheets.

DI 99, Suppl. Interrogatory Response, U.S. Dist. Ct., District of Delaware, Civil Action No. 82-630, May 30, 1984, 6 Sheets.

Dreyfus Insured Deposit Program, Disclosure Statement and Terms and Conditions, Dreyfus A BNY Mellon Company, Jan. 2008, 8 Sheets.

Dreyfus Insured Deposit Program, Multiple List Program—Effective May 11, 2009, 1 Sheet.

Email from Olivia Kim to Charles Macedo on Jun. 9, 2010 with attachment of Lawsuit by *Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation, and Intrasweep LLC* against *Deutshe Bank Trust Company Americas and Total Bank Solutions, LLC*, Defendant Deutsche Bank Trust Company America's responses to Intrasweep's common interrogatory Nos. 1-5, Confidential-Attorneys only, Civil Action No. 09 Civ. 2675 (VM) (AJP).

Email from Olivia Kim to Charles Macedo on May 13, 2010 with attachment of Lawsuit by *Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation, and Intrasweep LLC* against *Deutshe Bank Trust Company Americas and Total Bank Solutions, LLC,* Defendent Deutsche Bank Trust Company America's responses to Double Rock's Common interrogatory Nos. 1-10 to defendents Reservation of Right, Civil Action No. 09 Civ. 2675 (VM) (AJP).

Email from Olivia Kim to Charles Macedo on May 13, 2010 with attachment of Lawsuit by *Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation, and Intrasweep LLC* against *Deutshe Bank Trust Company Americas and Total Bank Solutions, LLC,* Defendent Total Bank Solutions, LLC's responses to Double Rock's Common interrogatory Nos. 1-10 to defendents, Reservation of Right, Civil Action No. 09 Civ. 2675 (VM) (AJP).

FDIC Federal Deposit Insurance Corporation, Letter to Mr. Ronald Rexter, Feb. 28, 2003, From Michelle M. Borzillo, Counsel Supervision and Legislation Section, 2 Sheets.

Federal Register: Oct. 9, 1997 (vol. 62, No. 196), pp. 52809-52868. http://www.fdic.gov/news/news/inactivefinancial/1997/fil97111b.html.

Financial Services Industry, "Web Watch: Trading Company Bundles CDs For Better Rates," Community Banker, Jun. 2002, online, http://findarticles.com/p/articles/mi_qa5344/is_200206/ai_n21313883/.

Finistar Reg. No. 2,939,558, Registered Apr. 12, 2005.

Finistar, Providing FDIC Insured Funds as a Stable Source of Deposits to Commercial Banking Institutions, 16 Sheets, www.Finistar.com.

Fredrickson, "Rising Rates Rescue Money Fund Firm Reserve Profits by Picking Niches," Crain's New York Business, Crain Communications Inc., vol. 20, Issue 51, 2 Sheets, Dec. 20, 2004.

Frost Bank, Member FDIC, Checking Accounts, 1 Sheet, Sep. 19, 2003, https://www.frostbank.com/cgi-bin/ecomm/frost1/scripts/products/product_detail.jsp?BV_. . . .

Garmhausen, "Matching Small Banks with Large Muni Deposits," American Banker, Online The Financial Services Resource, Oct. 4, 2005, 4 pages, http://www.finstar.com/docs/AmericanBanker.html.

Heavyweight Funding, Bankers News, Mar. 4, 2003, vol. II, Issue No. 5, 2 Sheets.

Hencke, "New Rules for FDIC deposit Insurance", ABA Bank Compliance, vol. 20, No. 7, Jul./Aug. 1999, pp. 31-37.

Hoffman, "Reserve's FDIC-Insured Account Draws Regionals; But some see little need for insurance," Crain Communications Inc., Investment News, 2 Sheets, Jun. 4, 2001.

IDC Deposits, online, http://idcdeposits.com/ , 2009, 1 Sheet.

In The Know, Important Information About Your Account, Smith Barney Citigroup, 2005, 6 Sheets.

Insured Bank Deposit Program Summary Information Statement, Information Statement, and list of Eligible Program Banks Effective Feb. 10, 2005, 11 pages.

Insured Cash Account Program Disclosure Booklet, LPL Financial Services, Linsco/Private Ledger Member NASD/SIPC, Apr. 2006, 14 pages.

Jong et al., "The Valuation and Hedging of Variable Rate Savings Accounts," University of Amsterdam, Nov. 15, 2001, 23 Sheets.

Keenan, "Tapping Brokerages for Alternative to CDs," American Banker, The Financial Services Daily, 3 Sheets, Feb. 18, 2004.

Lake Forest Bank & Trust Company, Introducing MaxSafe Deposit Accounts with up to $3.75 Million in FDIC Insurance, www.lakeforestbank.com/maxsafe, Nov. 21, 2008, 2 Sheets.

Lavine, "Check Out High-Yield Checking Accounts," Broward Daily Business Review, vol. 39, No. 102, 2 Sheets, Apr. 27, 1998.

Lawsuit by *Island Intellectual Property Intrasweep LLC, Lids Capital. LLC, Double Rock Corporation and Intrasweep LLC,* against *Promontory Interfinancial Network, LLC, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC,* Complaints, Apr. 14, 2009, Case No. 09 CV 3750.

Lawsuit by *Carlo DeBlasio et al.* against *Merill Lynch & Co., Inc. et al.,* Declaration of Andrew W. Stern, Including Exhibits A, B, C, D, E and F, Nov. 12, 2007, Case No. 07-cv-318 (RJS) (Document 59).

Lawsuit by *Carlo DeBlasio et al.* against *Merrill Lynch & Co., Inc. et al.,* Declaration of Joel P. Laitman in Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Dismissal of the Second Amended Class Action Complaint, Including: "Client Commitment"; "Get Started Today"; "Total Merrill"; "Guideline for Business Conduct"; "Commitment to Clarity"; "Cash Management Account"; "Information Statement Regarding Changes to Interest Rates on Deposits in Merrill Lynch Banks", Feb. 5, 2008.

Lawsuit by *Carlo DeBlasio et al.* against *Merrill Lynch & Co., Inc. et al.,* Declaration of Joel P. Laitman in Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Dismissal of the Second Amended Class Action Complaint, Including: . . . Feb. 5, 2008 (Document 72).

Lawsuit by *Carlo DeBlasio et al.* against *Merrill Lynch & Co., Inc. et al.,* Declaration of Joel P. Laitman in Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Dismissal of the Second Amended Class Action Complaint, Including: . . . Feb. 5, 2008 (Document 73).

Lawsuit by *Carlo DeBlasio et al.* against *Merrill Lynch & Co., Inc. et al.,* Declaration of Joel P. Laitman in Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Dismissal of the Second Amended Class Action Complaint, Including: . . . Feb. 5, 2008 (Document 74).

Lawsuit by *Carlo DeBlasio et al.* against *Merrill Lynch & Co., Inc. et al.,* Declaration of Joel P. Laitman in Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Dismissal of the Second Amended Class Action Complaint, Including: . . . Feb. 5, 2008 (Document 75).

Lawsuit by *Carlo DeBlasio et al.* against *Merrill Lynch & Co., Inc. et al.,* Declaration of Kenneth I. Schacter, including Exhibits A, B, C, D, F, G, H, I, J, K, L, M, N, O, P, Q and R, Nov. 14, 2007, Case No. 07-cv-318 (RJS) (Document 69).

Lawsuit by *Carlo DeBlasio et al.* against *Merrill Lynch & Co., Inc. et al.,* Declaration of Mathew J. Terry in Support of Motion to Dismiss by Defendants Wachovia Corporation, Wachovia Securities, LLC, Wachovia Bank, N.A., and Wachovia Bank of Delaware, N.A., including Exhibits A, B, C and D, Nov. 14, 2007, Case No. 07-318 (RJS) (Document 67).

Lawsuit by *Carlo DeBlasio et al.* against *Merrill Lynch & Co., Inc. et al.,* Declaration of Scott D. Musoff in Support of The Merrill Lynch Defendants' Motion to Dismiss The Second Amended Class Action Complaint, ECF Case, Nov. 12, 2007, Case No. 07-cv-318 (RJS) Document 64).

Lawsuit by *Carlo DeBlasio et al.* against *Merrill Lynch & Co., Inc. et al.,* Reply Declaration of Kenneth Schacter including Exhibits S and T, Mar. 6, 2008, Case No. 07-cv-318 (RJS) (Document 81).

Lawsuit by *Carlo DeBlasio et al.* against *Merrill Lynch & Co., Inc. et al.,* Second Amended Class Action Complaint, Jury Trial Demanded, Introduction and Summary of Allegations, Jun. 11, 2007, Case No. 07-cv-318-VM.

Lawsuit by *Carlo DeBlasio et al.* against *Merrill Lynch & Co., Inc. et al.,* Supplemental Declaration of Matthew J. Terry in Support of Motion to Dismiss by Defendants Wachovia Corp., Wachoa Securities, LLC, Wachovia Bank N.A., and Wachovia Bank of Delaware, N.A., including Exhibits A and B, Mar. 6, 2008, Case No. 07-cv-318 (RJS) (Document 79).

Lawsuit by *Carlo DeBlasio et al.* against *Merrill Lynch & Co., Inc., et al.,* Opinion and Order Regarding Motions, Jul. 27, 2009, Case No. 07 CIV 318(RJS).

Lawsuit by *Island Intellectual Property LLC and Intrasweep LLC* against *Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC,* Deutsche Bank Trust Company Americas' answer to plaintiffs' Feb. 23, 2010 complaint and counterclaims, May 4, 2010, Civil Action No. 09 Civ. 2675 (VM)(AJP)(Document 111).

Lawsuit by *Island Intellectual Property LLC and Intrasweep LLC* against *Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC,* Total Bank Solutions, LLC's answer to plaintiffs' Feb. 23, 2010 complaint and counterclaims, May 4, 2010, Civil Action No. 09 Civ. 2675 (VM)(AJP)(Document 112).

Lawsuit by *Island Intellectual Property LLC and Intrasweep LLC* against *Institutional Deposits Corp.* The Island Plaintiffs' Complaint against Defendant Institutional Deposits Corp., Nov. 4, 2009, Civil Action No. 1 09-Cv-3079.

## US 8,311,916 B1

Lawsuit by *Island Intellectual Property LLC and Intrasweep LLC* against *Institutional Deposits Corp.*, Complaint for Patent Infringement, Jury Trial Demanded, Nov. 4, 2009, Civil Action No. 09 CV 3079.

Lawsuit by *Island Intellectual Property LLC and Intrasweep LLC* against *Institutional Deposits Corp.*, Consent Order, Apr. 21, 2010, Case No. 09-CV-3079 (Document 44).

Lawsuit by *Island Intellectual Property LLC and Intrasweep LLC*, Answer of Defendant Institutional Deposits Corp. to Complaint for Patent Infringement, Dec. 10, 2009, Case No. 09 CV 03079 (JEC), (Document 16).

Lawsuit by *Island Intellectual Property LLC and Lids Capital LLC* against *Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC*, Deutsche Bank Trust Company answer to plaintiffs' Mar. 16, 2010 complaint and counterclaims, May 4, 2010, Civil Action No. 09 Civ. 2675 (VM) (Document 113).

Lawsuit by *Island Intellectual Property LLC and Lids Capital LLC* against *Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC*, Total Bank Solutions, LLC's answer to plaintiffs' Mar. 16, 2010 complaint and counterclaims, May 4, 2010, Civil Action No. 09 Civ. 2675 (VM)(Document 114).

Lawsuit by *Island Intellectual Property LLC et al.*, against *Deutsche Bank Trust Company Americas, et al.*; Expert Report of Richard T. Powers Concerning Invalidity of U.S. Pat. Nos. 7,509,286; 7,519,551; 7,536,350; 7,668,771; 7,668,772, 7,672,886; and 7,680,734; and Exhibits A-R; Civil Action No. 09 Civ. 2675(VM)(AJP), Oct. 28, 2010; 1,119 pages.

Lawsuit by *Island Intellectual Property LLC, et al.* against *Deutsche Bank Trust Company Americas, et al,*. Defendant Deutsch Bank Trust Company Americas' Responses to Double Rock's Interrogatories Nos. 1-10; May 2010; Civil Action No. 09 Civ. 2675 (VM)(AJP).

Lawsuit by *Island Intellectual Property LLC, et al.* against *Deutsche Bank Trust Company Americas, et al.*; Expert Report of Ivan Zatkovich Regarding Validity and Enforceability of the Asserted Claims of the Patents-in-Suit; Civil Action No. 09 Civ. 2675 (VM)(AJP); Nov. 23, 2010; 192 pages. The redacted items were designated as confidential in a Protective Order in this case.

Lawsuit by *Island Intellectual Property LLC, et al.* against *Deutsche Bank Trust Company Americas, et al.*; Expert Report of the Honorable Gerald J. Mossinghoff and Exhibits A-E; Civil Action No. 09 Civ. 2675 (VM)(AJP); Nov. 23, 2010; 107 pages.

Lawsuit by *Island Intellectual Property LLC. et al.* against *Deutsche Bank Trust Company Americas;* Defendant Total Bank Solutions, LLC's Responses to Double Rock's Common Interrogatory Nos. 1-10 to Defendants; May 2010; Civil Action No. 09 civ. 2675 (VM)(AJP).

Lawsuit by *Island Intellectual Property LLC, et al.*, against *Deutsche Bank Trust Company Americas, et al.*; Defendant Deutsche Bank Trust Company Americas' Fifth Supplemental Responses to Island IP's First Set of Common Interrogatories to All Defendants (No. 7); Case No. 09 Civ. 2675 (VM)(AJP); Sep. 16, 2010; 9 pages.

Lawsuit by *Island Intellectual Property LLC, et al.* against *Deutsche Bank Trust Company Americas, et al.*; Defendant Total Bank Solutions, LLC's Fifth Supplemental Responses to Island IP's First Set of Common Interrogatories to All Defendants (No. 7); Case No. 09 Civ. 2675 (VM)(AJP); Sep. 16, 2010; 9 pages.

Lawsuit by *Island Intellectual Property LLC, Intrasweep LLC and Double Rock Corporation* against *Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC*, Complaint for Patent Infringement, May 19, 2009, Case No. 09 CIV 4673.

Lawsuit by *Island Intellectual Property LLC, Lids Capital LLC, and Double Rock Corporation* against *Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC*, including Cover Sheet, Summons, Complaint and Rule 7.1 Statement, Mar. 24, 2009, Case No. 09 CV 2677.

Lawsuit by *Island Intellectual Property LLC, Lids Capital LLC, and Double Rock Corporation* against *Promontory Interfinancial Network, LLC and MBSC Securities Corporation*, including Cover Sheet, Summons, Complaint and Rule 7.1 Statement, Mar. 24, 2009, Case No. 09 CV 2675.

Lawsuit by *Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC* against *Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC*, Stipulated Dismissal of Deutsche Bank AG Without Prejudice, Nov. 19, 2009, Civil Action No. 09 CIV 2675 (VM) (AJP) (Document 79).

Lawsuit by *Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC* against *Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC*, Deutsche Bank Trust Company Americas' First Amended Answer to Consolidated First Amended Complaint and Counterclaims, Dec. 4, 2009, Civil Action No. 09 CIV 2675 (VM) (AJP), (Document 86).

Lawsuit by *Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC* against *Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC*, Total Bank Solutions, LLC's First Amended Answer to Consolidated First Amended Complaint and Counterclaims Dec. 4, 2009, Civil Action No. 09 CIV 2675 (VM) (AJP) (Document 87).

Lawsuit by *Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC* against *Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC*, Answer and Counter Claims, Answer of Defendant MBSC Securities Corporation, Jun. 25, 2009, Case No. 09 CV 2675.

Lawsuit by *Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC* against *Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC*, Answer and Counter Claims, Answer of Defendant Promontory Interfinancial Network, LLC, Jun. 25, 2009, Case No. 09 CV 2675.

Lawsuit by *Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC* against *Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC*, Consolidated First Amended Complaint, Jury Trial Demanded, Jun. 11, 2009, Civil Action No. 09 CIV 2675 (VM).

Lawsuit by *Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC* against *Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC*, Jury Trial Demanded, Deutsche Bank AG's Answer to Consolidated First Amended Complaint, Jun. 25, 2009, Civil Action No. 09 CIV 2675.

Lawsuit by *Island Intellectual Property LLC, Lids Capital LLC, Double Intrasweep LLC* against *Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC*, Jury Trial Demanded, Deutsche Bank Trust Company Americas' Answer To Consolidated First Amended Complaint and Counter Claims, Jun. 25, 2009, Civil Action No. 09 CIV 2675.

Lawsuit by *Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation Intrasweep LLC* against *Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC*, Jury Trial Demanded, Total Bank Solutions, LLC's Answer To Consolidated First Amended Complaint and Counterclaims, Jun. 25, 2009, Civil Action No. 09 CIV 2675.

Lawsuit by *Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC* against *Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC*, Stipulated Dismissal of Counts I-III of Defendant Promontory Interfinancial Network, LLC's, Counter-claim with Prejudice, Oct. 19, 2009, (Document 68).

Lawsuit by *Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC* against *Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC*, Stipulation and Order, Oct. 29, 2009, Case No. 09 CV 2675 (VM) (AJP) (Document 73).

**US 8,311,916 B1**

Page 8

Lawsuit by *Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC* against *Promontory Interfinancial Network LLC, MBSC Securities Corporation Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC*, The Island Plaintiffs' Reply to Defendant Deutsche Bank Trust Company Americas' Counterclaims, Jul. 9, 2009, Civil Action No. 09 CIV 2675 (VM).

Lawsuit by *Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC* against *Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC*, The Island Plaintiffs' Reply to Defendant MBSC Securities Corporation's Counterclaims, Jul. 9, 2009, Civil Action No. 09 CIV 2675 (VM).

Lawsuit by *Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC* against *Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC*, The Island Plaintiffs' Reply to Defendant Promontory Interfinancial Network LLC's Counterclaims, Jul. 9, 2009, Civil Action No. 09 CIV 2675 (VM).

Lawsuit by *Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC* against *Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC*, The Island Plaintiffs' Reply to Defendant Total Bank Solutions, LLC's Counterclaims, Jul. 9, 2009, Civil Action No. 09 CIV 2675 (VM).

Lawsuit by *Promontory Interfinancial Network, LLC* against *Double Rock Corporation p/k/a Reserve Management Corporation and Lids Capital LLC*, Amended Complaint, Mar. 27, 2009, Civil Action No. 1:09 CV 316.

Lawsuit by *Promontory Interfinancial Network, LLC* against *Double Rock Corporation p/k/a Reserve Management Corporation*, Complaint, Mar. 24, 2009, Civil Action No. 1:09 CV 316.

Lawsuit by *Promontory Interfinancial Network, LLC* against *Double Rock Corporation p/k/a Reserve Management Corporation, Island Intellectual Property LLC, Lids Capital LLC and Intrasweep LLC*, Amended Complaint, Apr. 15, 2009, Civil Action No. 3:09 CV 217.

Lawsuit by *Promontory Interfinancial Network, LLC* against *Double Rock Corporation p/k/a Reserve Management Corporation, Island Intellectual Property LLC, Lids Capital LLC and Intrasweep LLC*, Complaint, May 19, 2009, Civil Action No. 3:09 CV 322.

Lawsuit by *Promontory Interfinancial Network, LLC* against *Double Rock Corporation, p/k/a Reserve Management Corporation and Island Intellectual Property LLC and Lids Capital LLC*, including Cover Sheet, Summons and Complaint, Apr. 14, 2009, Civil Action No. 3:09 CV 217.

Letter from Gilbert T. Schwartz, Skadden, Arts, Slate, Meagher & Flom to Oliver Ireland, Associate General Counsel, Board of Governors of the Federal Reserve System; Dec. 18, 1987; 19 sheets.

Letter From Jamey Basham, Attorney, LEXSEE 1990 FDIC Interp. Ltr., Lexis 1, Federal Deposit Insurance Corporation, FDIC-90-02, Jan. 3, 1990, 2 Sheets.

Letter From Joseph A. DiNuzzo, Counsel, Oct. 20, 1999, FDIC, Federal Deposit Insurance Corporation, 1 Sheet.

Letter From Merle Y. Waldman, LEXSEE 1985 Sec No—Act., Lexis 1593, Securities Exchange Act of 1934—Section 15(a), Jan. 8, 1985, 11 Sheets.

Letter from Michael Bradfield, General Counsel, Board of Governors of the Federal Reserve System, Nov. 16, 1984, 4 Sheets.

Letter From Oliver I. Ireland, Associate General Counsel, Board of Governors of the Federal Reserve System, Jun. 22, 1988, 5 Sheets.

Letter From Roger A. Hood, Assistant General Counsel, Jul. 16, 1986, FDIC, Federal Deposit Insurance Corporation, Legal Division, 1 Sheet.

Letter from Roger M. Zaitzeff, Seward & Kissel to Gilbert T. Schwartz, Associate General Counsel, Board of Governors of the Federal Reserve System; May 10, 1983, 5 sheets.

Letter from Stephanie Martin, Assoc. General Counsel, Board of Governors of the Federal Reserve System, Apr. 22, 2004, 8 Sheets.

Letter From William W. Wiles, Secretary of the Board, Board of Governors of the Federal Reserve System, Jun. 22, 1983, 6 Sheets.

Letter to Mr. James E. Creekman, Group Vice President, From Oliver Ireland, Associate General Counsel, Aug. 1, 1995, 4 Sheets.

Letter to Mr. Jonathan L. Levin, Esq., From Oliver Ireland, Associate General Counsel, Oct. 18, 1996, 2 Sheets.

Letter to Mr. L.P. Fleming, Jr., Esq., From Oliver Ireland, Associate General Counsel, Feb. 7, 1995, 4 Sheets.

Letter to Ms. Brenda L. Skidmore, Senior Vice President, From Oliver Ireland, Associate General Counsel, Aug. 30, 1995, 4 Sheets.

Letter to William R. Burdette, CEO, Apr. 6, 2009, FDIC, Federal Deposit Insurance Corporation, 2 pages.

Letter to William R. Burdette, CEO, Nov. 15, 2007, FDIC, Federal Deposit Insurance Corporation, 5 Sheets.

Liberman et al., Market Watch, "How Important are Banks?" FDIC Insurance on Deposits Just One Continuing Advantage, Oct. 17, 2006, 3 Sheets.

McReynolds et al. "Unusual Products for Unusual Times," Securities Data Publishing on Wall Street, 6 Sheets, May 1, 2001.

McReynolds, "The Power of Cash: Ho-hum cash can be great product (and lead to more business) in troubled times," Securities Data Publishing on Wall Street, 3 Sheets, Jun. 1, 2002.

Merriam-Webster Online Dictionary, 10th Edition, Definition of "Associated", Jan. 30, 2009, 2 Sheets.

Merrill Lynch & You, "Financial Services The Way You Want, When You Want Them," Jan. 2000 4 Sheets.

Merrill Lynch Announces Beyond Banking, The Power of Advice for Smarter Cash Management, Jan. 8, 2 Sheets.

Merrill Lynch, Pierce, Fenner & Smith Incorporated, "Information Statement," 2000, 12 Sheets.

Merrill Moves CMA Cash to Bank, Street Talk, On Wall Street, Nov. 2000, p. 26.

Money Fund Report, Bank of New York Adds Insured Sweeps Option, Friday, May 3, 2002, The Reserve Funds, 1 Sheet.

Money Fund Report, IBC Financial Data, Inc., Nov. 6, 1998, 1 Sheet.

Money Fund Report, Insured Cash Sweep Options Proliferate, Friday, Jun. 1, 2001, The Reserve Funds, 1 Sheet.

Money Market Insight's, Goldman Sachs May Create Bank to Offer Insured Cash Sweeps, Aug. 2002 Issue, 3 Sheets.

Munk, Merrill Makes New Push Into Traditional Banking, Dow Jones Newswires, Jan. 3, 2003, 1 Sheet.

Mutual Fund Dealers Association, 1 page, (http://www.mfda,ca/.

Mutual Funds Magazine, Bargain Basement Funds, Oct. 1997, 1 Sheet.

Mutual Funds Magazine, Bargain Basement Funds, Oct. 1997, 2 Sheets.

News Article, "Regulators Support Demand Deposit Bill", Regulatory Compliance Watch—Mar. 9, , 1998; 2 Sheets, vol. 9, No. 10.

Northbrook Bank & Trust Company, Introducing our MaxSafe CD with up to $700,000 of FDIC Insurance, 4 Sheets.

Northbrook Bank & Trust Company, Seven Times the Security of a Normal CD, Introducing our MaxSafe CD, Nov. 12, 2002, 4 Sheets.

O'Brian, "Money-Market Funds Suit Many Investors, But Proud Creator Frets About Extra Risk," Re-Printed From The Wall Street Journal, Monday, Nov. 6, 2000, Dow Jones & Company, Inc., Nov. 25, 2002, 2 Sheets.

On Wall Street, Helping Brokers Build A More Successful Business, The Power of Cash, Jun. 2002, 2 Sheets.

On Wall Street, Helping Brokers Build a More Successful Business, Unusual Products For Unusal Times, May 2001, 2 Sheets.

Online, www.usabancshares.com, Brave New World, 1999, 2 Sheets.

Part: 2, Monetary Policy and Reserve Requirements, Subpart—Regulation D, Board Interpretations of Regulation D, Transaction Accounts—Linked to Time Deposits, vol. 1, Federal Reserve Regulatory Service, 2 Sheets.

Potter, "As Sweep Accounts Continue to Grow, So do Community Bank Options," America's Community Banker, vol. 9, Issue 8, Bell & Howell Information and Learning Company, 3 Sheets, Aug. 1, 2000.

Promontory Interfinancial Network, Promontory Interfinancial Network Announces New Deposit Placement Service, Jan. 21, 2003, 3 Sheets.

Promontory Interfinancial Network: http://www.promnetwork.com/index.html, 2003.

Promontory Interfinancial Network: Frequently Asked Questions (FAQs), Feb. 5, 2003, 5 pages.

Promontory to Roll Out Deposit Service Insuring Liquid Funds, American Banker, by Joe Adler, Feb. 22, 2010, 2 sheets.

Reserve Insured Deposits, United States Patent and Trademark Office, Reg. No. 2,694,910, Registered Mar. 11, 2003, 1 Sheet.

Reserve Management Corporation, Reserve Insured Deposits, U.S. Appl. No. 76/315,600, Issued.

Ring, National /Global, "Amex Spans The Globe in Retail Bank Buildup," Nov. 27, 2000, 1 Sheet.

Share, "New Service Skirts FDIC's $100K Limit," Dialog Web Command Mode, 2 Sheets, Jun. 13, 2003, http://www.dialogweb.com/cgi/dwclient.

Smith, "IBAA Won't Push Interest-Bearing Checking for Business; Says Too Few Members Want It," The American Banker, 2 Sheets, Apr. 18, 1996.

Stafford, "New Bank Program Allows $1 Million in Insured Deposits," Dialog Web Command Mode, 3 Sheets, Aug. 24, 2003, http://www.dialogweb.com/cgi/dwclient.

Sweeping Your Firm Into FDIC Insured Deposits, Harken Financial Services, Aug. 4, 2006, 8 Sheets.

Testimony of Bruce R. Bent, CEO of The Reserve Funds, Before the Financial Institutions and Consumer Credit Subcommittee House Financial Services Committee U.S. House of Representative, Hearing on H.R. 758 and H.R. 859, Mar. 5, 2003, 4 Sheets.

The Depository Trust Company, B#: 3875, Oct. 1, 2002, Settlement\Underwriting, From: Denise Russo, Director, Underwriting, 6 Sheets.

The Insured Savings Account, Issuer Guide to Offering MMDAs Through Merrill Lynch, Merrill Lynch Money Markets, Inc., "Operational Guide to The Merrill Lynch MMDA Program 1986", Sep. 1986 3 Sheets.

The Pershing Press, Dreyfus Insured Deposit Program, Issue 2, Aug. 2008, http://www.pershing.com/news/pershing_press/news_466244.html, 1 Sheets.

The Reserve Fund, Study of U.S. Patent No. 6,374,231, 1 Sheet.

The Reserve Funds Press Release, "The Reserve Funds and Frontier Bank Partner to Offer Revolutionary Banking Product," 5 Sheets, Aug. 1, 2000.

The Reserve Funds, Objectives, Observations & Strategies for American Enterprises Inv., Oct. 18, 2000, 11 Sheets.

The Reserve Funds, NJBA Endorses New Sweep Account Offers New Jersey Banks Deposit Growth, Retention, for Immediate Release, May 23, 2001, 1 Sheet.

The Reserve Funds, Reserve Management and Irwin Union Bank and Trust Company Partner to Offer The Reserve Return Sweep, for Immediate Release, Mar. 8, 2001, 2 Sheets.

The Reserve, "Company History," 3 Sheets, Oct. 4, 2006, http://www.ther.com/aboutus/history.shtml.

The Reserve, "Reserve Insured Deposits Program," 2 Sheets, Oct. 4, 2006, http://www.ther.com/bank/bank_insdep.shtml.

The Reserve, "Reserve Insured Deposits," 2 Sheets, Oct. 4, 2006, http://www.ther.com/ps/ps_fif.shtml.

The Reserve, "What Sets Us Apart," 2 Sheets, Oct. 4, 2006, http://www.ther.com/bank/bank_wsua.shtml.

The Unmatched Sweep Solution From The Cash Management Expert, 2 Sheets.

Total Bank Solutions, Bank Sweep FAQs http://www.totalbanksolutions.com/sweepbnkfaqs.htm, Sep. 23, 2005, 2 pages.

Total Bank Solutions, Bank Sweep FAQs, http://www.totalbanksolutions.com/sweepbnkfaqs.htm, Nov. 2, 2005, 3 pages.

Total Bank Solutions, Bank Sweep Products, Deutsche Bank, http://www.totalbanksolutions.com/banksweep.htm, Sep. 23, 2005, 1 page.

Total Bank Solutions, Bank Sweep Products, http://www.totalbanksolutions.com/banksweep.htm, Appendix 3, Oct. 18, 2005, 2 pages.

Total Bank Solutions, Bank Sweep Products, http://www.totalbanksolutions.com/banksweep.htm, Nov. 2, 2005, 2 pages.

Total Bank Solutions, Brokerage Sweep FAQs, http://www.totalbanksolutions.com/brokerfaqs.htm, Nov. 2, 2005, 3 pages.

Total Bank Solutions, Brokerage Sweep, http://www.totalbanksolutions.com/brokersweep.htm, Nov. 2, 2005, 1 page.

Total Bank Solutions, Deposit Bank FAQs, http://www.totalbanksolutions.com/depositbnkfaqs.htm, Nov. 2, 2005, 2 pages.

Total Bank Solutions, Deposits, Deutsche Bank, http://www.totalbanksolutions.com/deposits.htm, Sep. 23, 2005, 1 page.

Total Bank Solutions, Deposits, http://www.totalbanksolutions.com/deposits.htm, Nov. 2, 2005, 2 pages.

Total Bank Solutions, Deutsche Bank Insured Deposit Program, DB Insured Deposit Program Features, http://www.totalbanksolutions.com/features.htm, Sep. 23, 2005, 2 pages.

Total Bank Solutions, Deutsche Bank Insured Deposit Program, http://www.totalbanksolutions.com/, Sep. 23, 2005, 1 page.

Total Bank Solutions, http://www.totalbanksolutions.com/, Mar. 16, 2007, 8 pages.

Total Bank Solutions, http://www.totalbanksolutions.com/overview.htm, Nov. 2, 2005, 2 pages.

Total Bank Solutions, Insured Deposit Program Features, http://www.totalbanksolutions.com/features.htm, Nov. 2, 2005, 2 pages.

Total Bank Solutions, Insured Deposit Program, http://www.totalbanksolutions.com/Insureddeposits.htm, Nov. 2, 2005, 2 pages.

Total Bank Solutions, Partners & Affiliates, http://www.totalbanksolutions.com/partners.htm, Nov. 2, 2005, 3 pages.

Total Bank Solutions, Partners & Affiliates, http://www.totalbanksolutions.com/partners.htm, Oct. 25, 2005, 3 pages.

Total Bank Solutions, Strategic Partners, Nov. 2, 2005, 1 page.

Total Bank Solutions, TBS Deposit Account, About Our Broker Products, http://www.totalbanksolutions.com/brokerproducts.htm, Sep. 7, 2005, 2 pages.

Total Bank Solutions, TBS Management Team, http://www.totalbanksolutions.com/management.htm, Appendix 1, Oct. 18, 2005, 1 page.

Total Bank Solutions, TBS Management Team, http://www.totalbanksolutions.com/management.htm, Nov. 2, 2005, 2 pages.

Total Bank Solutions, TBS Management Team, http://www.totalbanksolutions.com/management.htm, Oct. 25, 2005, 2 pages.

TotalBank Solutions, TBS Bank Deposit Account, Oct. 2004, 7 pgs.

TotalBank Solutions, web.archive.org/web/20050126044216/http://totalbanksolutions.com, Jan. 26, 2005, 2 pgs.

USA Mutual Partners Insured Cash Shelter Account Terms and Conditions, 11 pages, 2009 USA Mutuals Partners, Inc.

Wachovia Securities, Important Information for Clients Concerning Changes in Automatic "Sweep" Arrangements, Oct. 1, 2003, 6 sheets.

Waddell, "Sweeping Clean," Advisor, The Advisor to Advisors, 2 sheets.

Wilson, "How Cash Management Services Can Help Your Bank Cultivate New Relationships with Commercial Customers," America's Community Banker, vol. 10, Issue 5, Bell & Howell Information and Learning Company, 8 Sheets, May 1, 2001.

Memorandum from Ken Johnson re: Insured Deposit Products, Aug. 18, 1992, 3 pgs.

Memorandum from John E Oncken re: Insured Savings Update, Jun. 15, 1990, 7 pgs.

Memorandum from John E. Oncken re: Brokered Deposit Issue vs. Insured Savings, Mar. 22, 1990, 8 pgs.

Memorandum from Ed Piner re: Insured Savings Product Update, Feb. 1, 1990, 4 pgs.

Insured Savings Correspondent Agreement with Exhibits A-D, 28 pgs.

First City, Texas Insured Savings Agency Agreement with Exhibits A-B and Insured Savings Program, 10 pgs.

Product Bulletin from Bill McCain, Subject: Insured Savings Product Announcement, May 8, 1989, 7 pgs.

Insured Savings Project Team Meeting, Feb. 2, 1989, 16 pgs.

Insured Savings Product Description, Product Name: Insured Savings, Product Description: U.S. Patent #4,985,833, 3 pgs.

Letter to Tim C. Lear, Sep. 20, 1988, 1 pg., with Memorandum from Ed Piner, re: Insured Savings Product, Nov. 9, 1988, and Letter from Tara L. Cyr, Dec. 9, 1988, 1 pg.

Automatic Insured Deposit Method, Patent Application Information, Jul. 11, 1988, 17 pgs.

Insured Savings, Overview & Marketing Plan, Dec. 6, 1988, 23 pgs.

Memorandum from Dick Zinser, re: A First City-Austin deposit program to hold existing customers' deposits, Mar. 17, 1988, 7 pgs.

Insured Savings Remote Site Sweep Procedures, 3 pgs.

**US 8,311,916 B1**

Page 10

Letter to Malcolm L. Duke, Dec. 27, 1989 with Insured Savings Correspondent Agreement, Exhibits A-D, and Letter to Malcolm L. Drake, Nov. 21, 1989, 37 pgs.

Memorandum from Ken Johnson, re: Attached Insured Savings Letters, Jul. 5, 1990, 1 pg.

Letter to Jerry Crutsinger, Jul. 3, 1990, 1 pg.

Letter to Bill Goertz, Jul. 3, 1990, 1 pg.

Letter to Susan Goodwin, Jul. 3, 1990, 1 pg.

Insured Savings Rate Change Notice, Jul. 17, 1990, 1 pg.

Addendum to Insured Savings Agency Agreement, Jul. 17, 1990, 1 pg.

Letter to Paula Martin, Jul. 3, 1990, 1 pg.

Letter to John Lovell, Jul. 3, 1990, 1 pg.

Insured Savings Balance Limits form, 1 sheet.

Email from John Oncken re: Depository Levels at Insured Savings Depositories, Nov. 2, 1989, 1 pg.

Cash Management Balance Monitoring Agreement Form 1 sheet.

Memorandum from Ed Piner, Subject: Discontinuation of Automatic Balance Monitoring in conjunction with Insured Savings Accounts, May 21, 1991, 1 pg.

Blank form letter from Edward N. Piner, May 24 1991, 1 pg.

Letter from First City National Bank of Austin, Sep. 20, 1982, 5 pgs.

First City, Texas—Austin, Special Products, Feb. 20, 1992, with Schedule A & Schedule B, 6 pgs.

Alliance Insured Account, Information Statement, Sep. 1999, 6 sheets.

Lawsuit by Carlo DeBlasio et al. and Merrill Lynch & Co., Inc. et al., Opinion and Order, Jul. 27, 2009, Civil Action No. 07 CIV. 318, 47 pgs.

Lawsuit by Carlo DeBlasio et al. and Merrill Lynch & Co., Inc. et al., Second Amended Class Action Complaint, Jury Trial Demanded, Jun. 11, 2007, Civil Action No. 07 cv 318, 137 pgs.

Investors MoneyAccountSM and Insurance Plus Service Agreement, Schedule A, 3 sheets.

Investors MoneyAccountSM (an FDIC-insured money market account), 4 sheets.

Investors MoneyAccountSM The FDIC-Insured Money Market with an Important Plus., 2 sheets.

Investment Company Act of 1940—Section 3(a)(1), 2(a)(36); Securities Act of 1933—Section 2(1), Nov. 29, 1985, Kempter Financial Services, Inc., 9 pgs.

Insured Money Account Program Agreement and Disclosure Statement, 11 sheets.

First National Bank in Brookings, Certificates of Deposit, Jul. 17, 2009, 5 sheets.

Summary of Commentary on Current Economic Conditions by Federal Reserve Districts, Jan. 1985, 44 pgs.

Board of Governors of the Federal Reserve System, Blank Form Letter, Apr. 22, 2004, 8 pgs.

FDIC Law, Regulations, Related Acts, 4000—Advisory Opinions, FDIC-93-35, Jun. 28, 1993, 2 sheets.

§204.134, 12 CFR Ch. 11 (Jan. 1, 2009 Edition), 2 sheets.

Money Fund $$ Moving to Bank Deposits, 6 FRC Monitor, Dec. 2003, 2 sheets.

Crane, P. & Krasner, Mike, An iMoney Net Special ReportTM , "Brokerage Cash Sweep Options: The Shift from Money Funds to FDIC-Insured Bank Deposit Accounts", Nov. 2004, 64 pgs.

The May 1998 Senior Financial Officer Survey, Board of Govenors of the Federal Reserve System, with Appendix A, 48 pgs.

Interest Rate Review © A Publication of Meyer Weekly Interest Rate Survey, A Look At Tiers, vol. II, No. 4, Apr. 1987, 6 pgs.

Interest Rate Review © A Publication of Meyer Weekly Interest Rate Survey, A Study of Historical Rates and Yields, vol. II, No. 6, Jun. 1987, 8 pgs.

Blank form letter to Oliver Ireland, Oct. 7, 1994, 1 pg.

Letter to L.P. Fleming, Jr. Esq., Feb. 7, 1995, 3 pgs.

Letter to James E. Creekman, Aug. 1, 1995, 4 pgs.

Letter to Brenda L. Skidmore, Aug. 30, 1995, 4 pgs.

Merrill Lynch & Co., Inc. Form 10-K405 (Annual Report (Regulation S-K, item 405)), Filed Mar. 14, 2002 for the Period Period Ending Dec. 28, 2001, with Schedules, Exhibits, and 2001 Annual Report, 248 pgs.

Merrill Lynch, Information Statement Regarding Changes to Interest Rates on Deposits in the Merrill Lynch Banks, Document 64-14, Nov. 12, 2007, Case 1:07-cv-00318, 2 sheets.

Street Talk, "Merrill Moves CMA Cash to Bank", On Wall Street, Nov. 2000, 1 sheet.

Quest Insured Account, QUESTessentials, 3 sheets.

Quest Insured Account, Information Statement, 5 sheets.

OCC Insured Bank Deposit Account, 3 sheets.

Insured Bank Deposit Account, Information Statement, Jul. 1, 2000, 2 sheets.

Letter from Marilyn J. Hensle, announcing Salomon Smith Barney Bank Deposit Program. SM, with Q&A, 14 sheets.

Bank Deposit program Disclosure Statement, Salomon Smith Barney, 3 sheets.

FDIC Law, Regulations, Related Acts, 4000—Advisory Opinions, FDIC-87-25, Oct. 22, 1987, 1 sheet.

FDIC Law, Regulations, Related Acts, 4000—Advisory Opinions, FDIC-86-21, Jul. 23, 1986, 2 sheets.

The Merrill Lynch Cash Management Account, Financial Service, 18 pgs.

The Insured Savings Account, Issuer Guide to Offering MMDAs through Merrill Lynch, 27 pgs.

Insured Savings Account Fact Sheet, The Merrill Lynch Cash Management Account Financial Service, 1987, 11 pgs.

CMA Insured Savings Account Fact Sheet, 1994, 9 pgs.

A Guide to Your CMA Account, 1995, 19 pgs.

Insured Savings Account Fact Sheet, The Merrill Lynch Cash Management Account Financial Service, 1985, 4 pgs.

CMA Insured Savings Account Fact Sheet, 1997, 13 pgs.

Blackwell, Rob, Salomon's Sweep Plan Raises FDIC Fund Alarm, American Banker, Dec. 6, 2000, 2 pgs.

Insured Deposit Account (IDA), May 21, 1996, 11 pgs.

An Introduction to the Smith Barney insured Deposit Account, 1995, 8 pgs.

Memorandum from Ted Hamilton re: Insured Deposit Account, Oct. 10, 1995, 13 pgs.

The Insured Deposit Account: "Money in the Bank", 1997, 2 sheets.

Merrill Joins Money Market Account, CMA; Broker Begins Testing With 12 Institutions, Lexis Nexis, Sep. 23, 1983, 4 pgs.

Form 8-K Merrill Lynch & Co Inc—MER, Filed: Mar. 7, 2002, Report of unscheduled material events or corporate changes, 41 pgs.

Lawsuit by Island Intellectual Property LLC and Intrasweep LLC against Deutsche Bank Trust Company Americas and Total Bank Solutions, Complaint for Patent Infringement, Jury Trial Demanded, Feb. 23, 2010, Case No. 10 CV 1518, (Document 1).

Lawsuit by Island Intellectual Property LLC and Lids Capital LLC against Deutsche Bank Trust Company Americas and Total Bank Solutions, Complaint for Patent Infringement, Jury Trial Demanded, Mar. 16, 2010, Case No. 10 CV 2268.

Quest Cash Management Services Memorandum to Tom Duggan, Re: Quest Insure Account, Nov. 16, 1993.

Bank Services, AmVest Financial ability for banker's and their clients, 6 pgs.

Federally "Insured Deposit Program", AmVest Capital, 1 sheet.

Federally Insured Deposit Program for Banks, AmVest capital, Jan. 15, 2010, 2 sheets.

Flow Chart, AmVest Capital, Dec. 9, 2009, 1 sheet.

Flow of Business for Federally Insured Deposit Program "FIDP", Deutsche Bank & Trust Company of the Americas, 1 sheet.

Participation Criteria for the FIDP, Federally Insured Deposit Program Participation Criteria, AmVest Capital, Jan. 15, 2010, 4 pgs.

Federally Insured Deposits/FAQ, Frequently Asked Questions on the Federally Insured Deposit Program, AmVest Capital, Jan. 15, 2010, 2 sheets.

Money Market Rates, Jan. 18, 2010, 2 sheets.

Money Market Rates, Jan. 6, 2010, 3 pgs.

Money Market Rates, Nov. 12, 2009, 3 pgs.

Scott & Stringfellow starts correspondent clearing business, News Release BB&T, Nov. 13, 2007, 2 sheets.

Curian Capital Introduces Custom Wealth Platform, Market Watch, Aug. 18, 2009, 3 pgs.

Ellie Behling, Curian Capital Introduces Custom Wealth Platform, Nov. 10, 2009, 3 sheets.

## US 8,311,916 B1
Page 11

Curian Capital Introduces Custom Wealth Platform, Reuters, Aug. 18, 2009, 3 pgs.
Curian Capital Introduces Custom Wealth Platform, WSJ.com, Aug. 18, 2009, 3 pgs.
Curian Capital, LLC: Private Company Information, Business Week, Nov. 10, 2009, 2 pgs.
Curian Capital Introduces Custom Wealth Platform, Yahoo! Finance, Aug. 18, 2009, 3 pgs.
Bank Insured Deposit Program, D.A. Davidson & Co., Jan. 15, 2010, 2 sheets.
Bank Insured Deposit Program, D.A. Davidson & Co., Nov. 2, 2009, 2 sheets.
D.A. Davison & Co., Bank Insured Deposit Program, Disclosure Statement, Jan. 15, 2010, 4 sheets.
First Southwest Company, First Southwest Company Bank Insured Deposit Program, Sep. 28, 2009, 11 pgs.
Manage Cash in an Online Stock Portfolio: Folio Investing, Jan. 15, 2010, 2 sheets.
Folio Investing: Brokerage Features >> Cash Investments>> FDIC. PLUS Program, Jan. 14, 2010, 3 pgs.
Folio Investing: Brokerage Features >> Cash Investments>> Cash Seep Rates, Jan. 14, 2010, 2 sheets.
Folio Investing: Brokerage Features >> Cash Investments>> Cash Seep Banks, Jan. 15, 2010, 3 pgs.
Folio Investing: Brokerage Features >> Cash Investments>> Cash Sweep FAQ, Jan. 14, 2010, 3 pgs.
Folio Investing: Brokerage Features >> Cash Investments>> Cash Sweep FAQ, Jan. 18, 2010, 2 sheets.
Folio Investing: Brokerage Features >> Cash Investments>> Cash Sweep FAQ, Jan. 15, 2010, 2 sheets.
Folio Investing: Brokerage Features >> Cash Investments>> Sweep Terms & Conditions, Jan. 14, 2010, 2 sheets.
H.C. Denision Company, Sheboygan, WI, 1 sheet.
The LYRA Program with H.C. Denison Company, Sheboygan Wisconsin, Jan. 15, 2010, 2 pgs.
Current LYRA Program Rates, H.C. Denison Co., Jan. 15, 2010, 1 sheet.
Current LYRA Program Rates, H.C. Denison Co., Nov. 2, 2009, 1 sheet.
Current LYRA Program Banks, H.C. Denison Co. LYRA Program, Nov. 2, 2009, 1 sheet.
Authorization Form, H.S. Denison Company's Liquidity Insured Reserve Access Program (LYRA Program), Oct. 2009, 1 sheet.
Frequently Asked Questions for the LYRA Program, H.C. Denison Co., Jan. 15, 2010, 3 pgs.
Terms & Conditions for H.C. Denison Company's Liquidity Insured reserve Access Program (LYRA Program), Jan. 15, 2010, 4 pgs.
Terms & Conditions for H.C. Denison Company's Liquidity Insured reserve Access Program (LYRA Program), Nov. 2, 2009, 4 pgs.
The Hilliard Lyons Insured Deposit Program Disclosure Document, Hilliard Lyons, 10 pgs.
Current Rates, http://currentrates.hillard.com/ Jan. 6, 2010, 1 sheet.
Current Rates, http://currentrates.hillard.com/ Nov. 2, 2009, 1 sheet.
Current Rates, Market Info, Hilliard Lyons, Nov. 2, 2009, 4 pgs.
Legent Insured Deposit, www.legentclearinq.co/mmf/phf, Nov. 2, 2009, 2 sheets.
Legent Insured Deposit Program—Summary of Terms and Conditions, Nov. 2008, 4 pgs.
Investment Account Application, Cleared Through Legent Clearing, 2 sheets.
Customer Agreement, Cleared Through Legent Clearing, 3 pgs.
Cash Management, Mesirow Financial—B/D and IA Services, www. mesirowfinancial.com/bdia/cas_mgmt.jsp, Jan. 15, 2010, 2 sheets.
Frequent Asked Questions: FDIC Sweep Program, optionsXpress, www.optionsxpress.com/welcom/faq/aq/fdc.aspx#rate.
Terms & Conditions for optionsXpress' Bank Insured Deposit Program, optionsXpress, 6 pgs.
Frequently Asked Questions: FDIC Sweep Program, optionsXpress, www.optionsxpress.com/welcom/faq/fdic.aspx, Jan. 6, 2010, 3 pgs.
Frequently Asked Questions: FDIC Sweep Program, www. optionsxpress.com/welcom/faq/fdic.aspx, Nov. 12, 2009, 2 sheets.
Money Fund and FDIC-Insured Bank Programs, Pershing, www. pershing.com/money_fund.htm, Jan. 15, 2010, 1 sheet.

Money Market Mutual Fund & FDIC-Insured Deposits Program Rates & Bank Lists, www.pershing.com/rates.html, Jan. 6, 2010m 6 pgs.
Money Market Mutual Fund and FDIC-Insured Deposit Program Rates & Bank List, www.pershing.com/rates.html, 1 sheet.
Clearing firms used by the top independent broker-dealers, Investment News, www.investmentnews.com/article/20081214/CHART/ 812119919, Jan. 15, 2010, 4 sheets.
Objective investment advice Building trust, Wayne Strout, www. waynestrout.com/more)info, Jan. 18, 2010, 5 pgs.
Eagle sweep disclosure, first republic Securities Company, Jun. 1, 2009, 12 pgs.
The financial organizer, ProCash Plus, 12 pgs.
Insured deposit account program disclosure booklet, 16 pgs.
Update New FDIC product at IPI: Deutsche Bank Insured Deposit Program, Investment Professionals Inc, Feb. 4, 2009, 11 pgs.
Insured cash account, , http://lplfinancial.lpl.com/x68.xml, with LPL Financial insured cash account program disclosure booklet, LPL Financial Jan. 15, 2010, 23 pgs.
FAQs about the Deutsche Bank insured Insured deposit program, Securities America, 3 pgs.
Insured deposit program, www.aigadvisorgroup.com/fdic/03.04.09. htm, Jan. 15, 2010, 5 pgs.
FlexInsured AccountSM , PrimeVest, http://primevest.com/ flexInsured_account.asp, Jan. 14, 2010, 1 sheet.
FlexInsuredSM Account disclosure statement, PrimeVest, 2009, 5 pgs.
An independent broker-dealer, Royal Alliance, http://www.royalalliance.com, Jan. 15, 2010, 1 sheet.
Brokerage products and services, www.steerneagee.com/sali/pcq/ pages/products-services.aspx, Nov. 4, 2009, 2 sheets.
Terms and conditions for cash sweep, sterne agee, 2 sheets.
Client account agreement to Sterne Agee Clearing, Inc, Sterne, Agee & Leach, Inc and its authorized agents, Feb. 3, 2009, 5 pgs.
Valet a full service asset management account, http://valetaccount. com/visaTerms.php, Nov. 12, 2009, 6 pgs.
A sweet suite of business products brings our bank to you, AndroscogginBank, www.androscogginbank.com, 1 sheet.
We have your banking nees covered!, Greater Franklin, 2009, 2 sheets.
Insured MMA Seep Program, Circle Bank, www.circlebank.com/ personalbanking)mma.aspx, Jan. 14, 2010, 2 shets.
Insured MMA agency sweep agreement with rate sheet, Circle Bank, Dec. 3, 2009, 6 pgs.
Personal Banking—East West student plus program, East West Bank, www.eastwestbank.com/english/FDIC.asp, Nov. 10, 2009, 1 sheet.
Safe sound secure insured deposit programs, East West Bank, www. eastweatbank.com/Endlish/SS_SIDPrograms.asp, Jan. 15, 2010, 2 sheets.
Money market insured deposit program, East West Bank, www. eastweatbank.com/English/MMarket_insured.asp, Nov. 10, 2009, 1 sheet.
Insured deposit program bank list, www.eastweatbank.com/English/ IDPB_list.htm, Nov. 10, 2009, 1 sheet.
FDIC information of United Commercial Ban, San Francisco, UCB, www.ibankunited.com/home.html, Nov. 12, 2009, 1 sheet.
Money market insured deposit program, Desert Community Bank, www.dck.org/MMarket_insured.html, Nov. 12, 2009, 1 sheet.
Insured deposit program bank list, www.dcbk.org/IDPB_list.htm, Nov. 12, 2009, 1 sheet.
Evolve and others team up with Deutsche Bank to provide higher FDIC coverage limits, www.insureddeposit online.com/content/ view/31/86/, Nov. 12, 2009, 1 sheet.
Protect your cash portfolio!, http://insureddepositsonline.com, Jan. 15, 2010, 1 sheet.
Protect your cash portfolio!, www.insureddepositsonline.com/component/option.com_frontpage/Itemid,1/, Nov. 2, 2009, 1 sheet.
Participating bank analysis, Insured Deposit Program, Evolve Bank & Trust, www.insureddepositsonline.com/content/view/45/113/, Nov. 15, 2010, 1 sheet.
Frequently asked questions, Evolve Bank & Trust, www.insured-depositsonline.com/content/view/38/120/, Jan. 15, 2010, 3 pgs.

## US 8,311,916 B1

Strategic Partners, Insured Deposit Program, Evolve Bank & Trust, www.insureddepositsonline.com/content/view/37/114/, Jan. 15, 2010, 1 sheet.

Who the program Benefits, Insured Deposit Program, Evolve Bank & Trust, www.insureddepositsonline.com/content/view/43/115/, Jan. 15, 2010, 1 sheet.

How the program works, Insured Deposit Program, Evolve Bank & Trust, www.insureddepositsonline.com/content/view/47/112/, Jan. 15, 2010, 1 sheet.

This new bank is over 80 years old, Insured Deposit Program, Evolve Bank & Trust, www.insureddepositsonline.com/content/view/44/116/, Nov. 2, 2009, 1 sheet.

Temporary liquidity guarantee program, Evolve Bank & Trust, www.getevolved.com/index.php?option=com_content&task=view&id=67&itemid=263, Nov. 2, 2009, 1 sheet.

Contact us, Insured Deposit Program, Evolve Bank & Trust, www.insureddepositsonline.com/content/view/40/119/, Nov. 2, 2009, 1 sheet.

Over $12,5 million of FDIC deposit insurance available, Insured Deposit Program, Deutsche Bank, www.insureddepositsonline.com, 1 sheet.

How the program works, Insured deposit program, Evolve Bank & Trust, www.insureddepositsonline.com/content/view/47/112/, Nov. 4, 2009, 11 pgs.

Over $11 million of FDIC deposit insurance available, Insured Deposit Program, Deutsche Bank, www.insureddepositsonline.com, 1 sheet.

Bank insured agency deposit account program custodial account agreement, Evolve Bank & Trust, 8 pgs.

Insured deposit online, Deutsche Bank Insured Deposit Program, list of program banks, 2 sheets.

Insured deposit online, The Insured Deposit Program, Evolve Bank & Trust, 2 sheets.

Insured deposit online, Frequently asked questions, Evolve Bank & Trust, www.insureddepositsonline.com/content/section/3/71, May 14, 2009, 3 pgs.

Insured deposit online, The Insured Deposit Program, Evolve Bank & Trust, Apr. 3, 2009, 2 pgs.

Personal Banking, Insured Deposit Program, Pulaski Bank, www.pulaskibankstl.com/personal/checking-personalinsured.htm, Jan. 26, 2010, 1 sheet.

Personal Banking, Insured Deposit Program, Pulaski Bank, www.pulaskibankstl.com/personal/currentrates.htm, Jan. 26, 2010, 2 sheets.

Up to $10 million of FDIC deposit insurance available, Insured Deposit Program, Pulaski Bank, 1 sheet.

Personal Banking, Insured Deposit Program, Pulaski Bank, www.pulaskibankstl.com/personal/checking-personalinsured.htm, Dec. 8, 2009, 1 sheet.

Personal Banking, Insured Deposit Program, Pulaski Ban, www.pulaskibankstl.com/personal/checking-personalinsured.htm, May 14, 2009, 1 sheet.

Up to $12.5 million of FDIC deposit insurance available, Insured Deposit Program, Pulaski Bank, 1 sheet.

Who can benefit from the insured deposit program?, Insured Deposit Program, Pulaski Bank, 2 sheets.

Insured agency deposit account terms and conditions, Pulaski Bank, 1 sheet.

Banks for DBTCA, 2 sheets.

Total Bank Solutions, Corporate overview, 1 sheet.

Total Bank Solutions, Deposit Institutions, www.totalbanksolutions.com/deposit.cfm, Jan. 15, 2010, 2 sheets.

Total Bank Solutions, Insured Deposit Program, www.totalbanksolutions.com/insured-deposit.cfm, Jan. 15, 2010, 3 pgs.

Total Bank Solutions, Source Institutions, www.totalbanksolutions.com/source.cfm, Jan. 15, 2010, 3 pgs.

Total Bank Solutions, FAQs, www.totalbanksolutions.com/faqs.cfm, Jan. 15, 2010, 2 sheets.

Total Bank Solutions, Insured Deposit Program, TBS overview, www.totalbanksolutions.com/overview.htm, Nov. 3, 2009, 1 sheet.

Total Bank Solutions, Insured Deposit Program, Total Bank Solutions, www.totalbanksolutions.com, Nov. 3, 2009, 1 sheet.

Total Bank Solutions, Insured Deposit Program, Bank Sweep Program, www.totalbanksolutions.com/insured-deposit.cfm, Jan. 15, 2010, 3 pgs.

Total Bank Solutions, Insured Deposit Program, Bank Sweep Program, www.totalbanksolutions.com/banksweep.htm, Nov. 3, 2009, 2 sheets.

Total Bank Solutions, Insured Deposit Program, Brokerage Sweeps, www.totalbanksolutions.com/brokersweep.htm, Nov. 3, 2009, 2 sheets.

Total Bank Solutions, Insured Deposit Program, Deposits, www.totalbanksolutions.com/Deposits.htm, Nov. 3, 2009, 1 sheet.

Total Bank Solutions, Insured Deposit Program, Bank Sweep Program, www.totalbanksolutions.com/banksweep.htm, Mar. 6, 2009, 2 sheets.

Total Bank Solutions, Insured Deposit Program, Broker Sweep Program, www.totalbanksolutions.com/brokerweep.htm, Mar. 6, 2009, 2 sheets.

Total Bank Solutions, Insured Deposit Program, Deposit, www.totalbanksolutions.com/deposit.htm, Mar. 6, 2009, 2 sheets.

Total Bank Solutions, Insured Deposit Program, www.totalbanksolutions.com, Mar. 6, 2009, 2 sheets.

Total Bank Solutions, Insured Deposit Program, Partners & Affiliates, www.totalbanksolutions.com/partners.htm, Sep. 11, 2009, 2 sheets.

Total Bank Solutions, Dennis C. Borecki, President, TBS Bank Deposit Account, 7 pgs.

Christopher McCrum, LinkedIn, http://74.125.93,132/search?=cache:5hs9cebUSiq:www.linkedin.com/pub/christopher-mccrum/ . . . , Nov. 2, 2009, 2 sheets.

Kentucky Bankers Association, Alternative for excess deposit coverage FREE Webinars, http://209.235.145/cgi-bin/website/tcsassnwebsuite.pl? . . . , Nov. 2, 2009, 2 sheets.

Kentucky Bankers Association Detailed listening, http://member.kybanks.com/source/members . . . , Nov. 2, 2009, 1 sheet.

Letter from Ballard W. Cassady, Jr. President and Chief Executive Officer, Kentucky Bankers Association, Mar. 31, 2009, 1 sheet.

Oklahoma bankers association seeks extra security for deposits, http://findarticles.com/p/articles/mi_qn4182/is_20081128/ai_n31055289/, Nov. 2, 2009, 2 sheets.

Fast fax-back reply, Kentucky Bankers Association, 1 sheet.

Deutsche Bank, Deutsche Bank insured deposit program, 3 pgs.

Deutsche Bank Insured Deposits, Bank list as of Dec. 18, 2009, 1 sheet.

DB Advisors, Deutsche Bank Group, Insured Deposit Program, 1 sheet.

Letter to Robert E. Feldman, Federal Deposit Insurance Corporation, re: Proposed rule on risk-based assessments (RIN#3064-AD35), Dec. 17, 2008, 4 pgs.

Deutsche Bank Alex. Brown insured deposit program (IDP), Dec. 1, 2009, 10 pgs.

CD's pass agencies as largest holding in MMFs: Repo plunges in sept., www.cranedata.us/archives/news/2009/10/, Nov. 3, 2009, 14 pgs.

Lawsuit by *Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation, and Intrasweep LLC* against *Deutsche Bank Trust Company Americas, and Total Bank Solutions, LLC*, Defendants' Preliminary Invalidity Contentions, Mar. 12, 2010, Civil Action No. 09 Civ. 2675 (VM) (AJP).

Lawsuit by *Island Intellectual Property LLC and Intrasweep LLC* against *Institutional Deposits Corp.*, Defendant Institutional Deposits Corp.'s Preliminary Invalidity Contentions, Case No. 09-CV-03079-JEC, received in Mar. 2010.

Exhibit 1, Invalidity Chart: IMA and Insurance Plus Service Agreement, U.S. Patent No. 7,509,286, received in Mar. 2010, 21 pgs.

Exhibit 2, Invalidity Chart: Investors Money AccountSM System, U.S. Patent No. 7,509,286, received in Mar. 2010, 26 pgs.

Exhibit 3, Invalidity Chart: Insured Money Account System, U.S. Patent No. 7,509,286, received in Mar. 2010, 26 pgs.

Exhibit 4, Invalidity Chart: U.S. Patent No. 4,985,833 (Oncken), U.S. Patent 7,509,286, received in Mar. 2010, 26 pgs.

Exhibit 5, Invalidity Chart: First City Bank of Texas' Insured Savings Program, U.S. Patent No. 7,509,286, received in Mar. 2010, 39 pgs.

## US 8,311,916 B1

Exhibit 6, Invalidity Chart: Quest Insured Account, U.S. Patent No. 7,509,286, received in Mar. 2010, 19 pgs.

Exhibit 7, Invalidity Chart: CIBC World Markets—Insured Bank Deposit Account, U.S. Patent No. 7,509,286, received in Mar. 2010, 16 pgs.

Exhibit 8, Invalidity Chart: Merrill Lynch CMA/ISA Service, U.S. Patent No. 7,509,286, received in Mar. 2010, 72 pgs.

Exhibit 9, Invalidity Chart: 1983 Fed Letter, U.S. Patent No. 7,509,286, received in Mar. 2010,, 16 pgs.

Exhibit 10, Invalidity Chart: Merrill Lynch Banking Advantage Program ("MLBA Program"), U.S. Patent No. 7,509,286, received in Mar. 2010,, 22 pgs.

Exhibit 11, Invalidity Chart: Merrill Lynch & You + MLBA Information Statement, U.S. Patent No. 7,509,286, received in Mar. 2010,, 18 pgs.

Exhibit 12, Invalidity Chart: Smith Barney Insured Deposit Account, U.S. Patent No. 7,509,286, received in Mar. 2010, 22 pgs.

Exhibit 13, Invalidity Chart: Smith Barney Bank Deposit Program, U.S. Patent No. 7,509,286, received in Mar. 2010, 18 pgs.

Exhibit 14, Invalidity Chart: Alliance Insured Account, U.S. Patent No. 7,509,286, received in Mar. 2010, 16 pgs.

Exhibit 15, Invalidity Chart: Reserve's American Express Presentation, U.S. Patent No. 7,509,286, received in Mar. 2010, 16 pgs.

Exhibit 16, Invalidity Chart: U.S. Patent No. 7,376,606 (Jacobsen), U.S. Patent No. 7,536,350, received in Mar. 2010, 6 pgs.

Exhibit 17, Obviousness Combinations Chart, U.S. Patent No. 7,509,286, received in Mar. 2010, 351 pgs.

U.S. Appl. No. 12/453,390, filed May 8, 2009, Bruce Bent.

Garton, Thomas W.; Are LLC Banks in the Cards? Stay Tuned; Fredrikson & Byron, P.A.; Jun. 2003; http://www.fredlaw.com/articles/banking/bank_0306_twig.html; 2 pages.

Lawsuit by *Island Intellectual Property LLC* v. *Clearview Correspondent Services, LLC, et al.*; Branch Banking & Trust Company's Answer to Complaint and Counterclaims; Civil Action No. 1:11-cv-448-LO-IDD; Jun. 20, 2011; 13 pages.

Lawsuit by *Island Intellectual Property LLC* v. *Clearview Correspondent Services, LLC, et al.*; Clearview Correspondent Services, LLC's Answer to Complaint and Counterclaims; Civil Action No. 1:11-cv-488-LO-IDD; Jun. 20, 2011; 12 pages.

Lawsuit by *Island Intellectual Property LLC* v. *Clearview Correspondent Services, LLC, et al.*; Scott & Stringfellow, LLC's Answer to Complaint and Counterclaims; Civil Action No. 1:11-cv-488-LO-IDD; Jun. 20, 2011; 12 pages.

Lawsuit by *Island Intellectual Property LLC* v. *First Southwest Company*: First Southwest Company's Answer to Complaint and Counterclaims; Civil Action 1:11-cv-371-SD; Jun. 20, 2011; 11 pages.

Lawsuit by *Island Intellectual Property LLC, et al.* v. *Deutsche Bank Trust Company Americas et al.*; Declaration of Olivia M. Kim in Support of Defendants' Motion for Summary Judgment of Invalidity Under 35 U.S.C. § 101; Oct. 6, 2011; Case 1:09-cv-02675-VM, Document 197.

Lawsuit by *Island Intellectual Property LLC, et al.* v. *Deutsche Bank Trust Company Americas, et al.* Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment of Invalidity Under 35 U.S.C. § 101; Nov. 2, 2011; Case 1:09-cv-02675-VM, Document 201.

Lawsuit by *Island Intellectual Property LLC, et al.* v. *Deutsche Bank Trust Company Americas, et al.;* Defendants Reply in Support of Their Motion for Summary Judgment of Invalidity Under 35 U.S.C. § 101; Nov. 15, 2011; Case 1:09-cv-02675-VM, Document 208.

Lawsuit by *Island Intellectual Property LLC, et al.* v. *Deutsche Bank Trust Company Americas, et al.;* Defendants' Response to Plaintiffs' Statement of Additional Material Facts in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment of Invalidity Under 35 U.S.C. § 101; Nov. 15, 2011; Case 1:09-cv-02675-VM, Document 209.

Lawsuit by *Island Intellectual Property LLC, et al.* v. *Deutsche Bank Trust Company Americas, et al.;* Order; Case 1:09-cv-02675-VM, Document 212.

Lawsuit by *Island Intellectual Property LLC, et al.* v. *Deutsche Bank Trust Company Americas, et al.*; Supplemental Declaration of Olivia M. Kim in Support of Defendants' Opening and Reply Claim Construction Briefs; Nov. 15, 2011; Case 1:09-cv-02675-VM, Document 207.

Martens, Don W.; letter to Hon. Victor Merrero re. supplement to letter of Nov. 28, 2011 on tentative rulings on claim construction in *Island Intellectual Property LLC et al.* v. *Deutsche Bank Trust Co., et al.*; Nov. 28, 2011; Case 1:09-cv-02675-VM; Document 211.

Martens, Don W.: Letter to Hon. Victor Marrero re. tentative rulings on claim construction in *Island Intellectual Property LLC et al.v. Deutsche Bank Trust Co., et al.*; Nov. 28, 2011; Case 1:09-cv-02675-VM, Document 210.

*Island Intellectual Property LLC et al.* v. *Deutsche Bank AG, et al.*; Memorandum and Order; Case 1:09-cv-02675-KBF; Doc. 289; Feb. 14, 2012; pp. 1-28.

*Island Intellectual Property LLC et al.* v. *Deutsche Bank AG, et al.*; Order; Case 1:09-cv-02675-KBF; Doc. 221; Feb. 14, 2012; pp. 1-34.

*Island Intellectual Property LLC et al.* v. *Deutsche Bank Trust Company Americas, et al.*; Declaration of Charles R. Macedo 2 in support of Plaintiffs' motions in limine Nos. 4-6; Case 1:09-cv-02675-KBF; Doc. 260; Feb. 3, 2012; pp. 1-3 and Exhibits.

*Island Intellectual Property LLC et al.* v. *Deutsche Bank Trust Company Americas, et al.*; Defendants' opposition to Plaintiffs' motion in limine #3 to preclude defendants' expert Richard T. Powers from testifying that the Merrill Lynch CMA/ISA product includes omnibus accounts. Case 1:09-cv-02675-KBF; Doc. 269; Feb. 6, 2012; pp. 1-18.

*Island Intellectual Property LLC et al.* v. *Deutsche Bank Trust Company Americas, et al.*; Defendants' opposition to Plaintiffs' motion in limine #4 to preclude evidence and argument regarding Plaintiffs' confidential Oct. 18, 2000 presentation to American Enterprises Investment Services at trial; Case 1:09-cv-02675-KBF; Doc. 284; Feb. 10, 2012; pp. 1-12.

*Island Intellectual Property LLC et al.* v. *Deutsche Bank Trust Company Americas, et al.*; Memorandum and Order; Case 1:09-cv-02675-KBF; Doc. 265; Feb. 6, 2012; pp. 1-22.

*Island Intellectual Property LLC et al.* v. *Deutsche Bank Trust Company Americas, et al.*; Plaintiffs' brief in support of their motion in limine #3 to preclude defendants' expert Richard T. Powers from testifying that the Merrill Lynch CMA/ISA product includes omnibus accounts based on 17-year old double hearsay that is uncorroborated and in contravention of documentary and oral evidence of record; Case 1:09-cv-02675-KBF; Doc. 247; Jan. 30, 2012; pp. 1-20.

*Island Intellectual Property LLC et al.* v. *Deutsche Bank Trust Company Americas, et al.*; Plaintiffs' memorandum of law in support of motion in limine #4 to preclude evidence and argument regarding Plaintiffs' confidential Oct. 18, 2000 presentation to American Enterprises Investment Services at trial; Case 1:09-cv-02675-KBF; Doc. 262; Feb. 6, 2012; pp. 1-10.

*Island Intellectual Property LLC et al.* v. *Deutsche Bank Trust Company Americas, et al.*; Plaintiffs' motion in limine #4 to preclude evidence and argument regarding Plaintiffs' confidential Oct. 18, 2000 presentation to American Enterprises Investment Services at trial; Case 1:09-cv-02675-KBF; Doc. 257; Feb. 3, 2012; pp. 1-10.

*Island Intellectual Property LLC et al.* v. *Deutsche Bank Trust Company Americas, et al.*; Plaintiffs' Notice of Motion and Motion in Limine #3 to preclude Defendants' expert Richard T. Powers from testifying that the Merrill Lynch CMA/ISA product includes omnibus accounts based on 17-year old double hearsay that is uncorroborated and in contravention of documentary and oral evidence of record; Case 1:09-cv-02675-KBF; Doc. 246; Jan. 30, 2012; pp. 1-2.

*Island Intellectual Property LLC et al.* v. *Deutsche Bank Trust Company Americas, et al.*; Plaintiffs' notice of motion and motion in limine #3 to preclude testimony of Gilbert Schwartz; Case 1:09-cv02675-KBF; Doc. 259; Feb. 3, 2012; pp. 1-2.

*Island Intellectual Property LLC et al.* v. *Deutsche Bank Trust Company Americas, et al.*; Plaintiffs' notice of motion and motion in limine #4 to preclude evidence and argument regarding Plaintiffs' confidential Oct. 18, 2000 presentation to American Enterprises Investment Services at trial; Case 1:09-cv-02675-KBF; Doc. 256; Feb. 3, 2012; pp. 1-2.

**US 8,311,916 B1**

Page 14

Knight-Ridder; Money Matters, Tips you can use—Limits Apply as FDIC Insurance Covers Depositor, Not Account; Chicago Tribune; Feb. 4, 1998; 2 pages.

Lawsuit by *Island Intellectual Property LLC et al.* v. *Deutsche Bank Trust Company Americas et al.*; Joint Statement of Claims and Defenses to be Presented at Trial Set for Feb. 27, 2012; Jan. 16, 2012; Case 1:09-cv-02675-KBF (Document 227).

Lawsuit by *Island Intellectual Property LLC, et al.* v. *Deutsche Bank Trust Company Americas, et al.*; Special Master's Report and Recommended Decision on Defendants' Summary Judgment Motion of Invalidity Under 35 U.S.C. § 101; Dec. 19, 2011.

Scottrade Bank Deposit Program—Terms, Conditions & Disclosures; Author unknown; 8-11; pp. 1-3, date unknown.



FIG. 1



**FIG. 2**



FIG. 3



## FIG. 4



## FIG. 5



## FIG. 6

US 8,311,916 B1

1

## SYSTEMS AND METHODS FOR ADMINISTERING RETURN SWEEP ACCOUNTS

### CROSS-REFERENCE TO RELATED PATENT APPLICATIONS

This application is a Continuation of U.S. application Ser. No. 12/385,522, filed Apr. 10, 2009, incorporated herein by reference in its entirety, which is a Continuation of U.S. application Ser. No. 10/071,053, filed Feb. 8, 2002, incorporated herein by reference in its entirety, which is a Continuation-In-Part of U.S. application Ser. No. 09/677,535, filed Oct. 2, 2000, incorporated herein by reference in its entirety, which is a Continuation-In-Part of U.S. application Ser. No. 09/176,340, filed Oct. 21, 1998, incorporated herein by reference in its entirety.

### FIELD OF THE INVENTION

The invention relates generally to computerized banking techniques and, more specifically, to techniques by which deposits are kept on a bank's balance sheet while being administered as sweep account funds by a third party.

### BACKGROUND OF THE INVENTION

It would be desirable if investors could obtain fully-insured, interest-bearing bank accounts that offer an unlimited number of fund transfers per month. However, present statutory restrictions prevent banks and savings institutions from paying interest on certain types of deposit accounts. More specifically, Title 12, Part 329, of the Code of Federal Regulations (CFR) provides that "no bank shall, directly or indirectly, by any device whatsoever, pay interest on any demand deposit". (12 CFR 329.2). A "deposit" is any money placed into a checking account, savings account, Certificate of Deposit (CD), or the like. In a "demand" account, the owner can demand that funds be drawn and paid to another account (having the same or a different owner), or to a third party. These demand payments are typically implemented via bank drafts, checks, credit cards, and debit cards.

Not all bank accounts are considered to be demand accounts. If all, or a fixed amount, of the principal must be maintained in order to achieve the particular benefits afforded by that account, then the account is not a "demand" account. According to the CFR, a "demand deposit" includes any deposit for which the depositor is authorized to make more than six fund "transfers" during any month or statement cycle of at least four weeks. Not all fund transfers will be counted towards the allotted maximum of six; rather, it is necessary to examine the specific type of fund transfer under consideration. A deposit will be considered a "demand" deposit if the transfer takes place by means of a preauthorized, automatic, or telephonic order specifying the transfer of funds to another account of the depositor at the same bank, to the bank itself, or to a third party. Likewise, a deposit is a "demand" deposit if more than three of the six transfers are authorized to be made by check, draft or debit card (12 CFR 329.1(b)(3). On the other hand, an unlimited number of transfers is allowed between two accounts registered to the same person or entity, provided that the transfers are made by messenger, mail, telephone (but only via check mailed to the depositor), automated teller machine, or in person. Unless the funds of a deposit are held in a money market account (18 USC 1832 (a)), an account for which a depositor has the ability to make at least six transfers will be deemed a demand account, and no

2

interest will be payable on the funds therein. Therefore, owners of demand accounts do not obtain interest on their funds.

One exemplary approach to offering investors fully-insured, interest-bearing accounts that provide up to an unlimited number of fund transfers was disclosed in U.S. patent application Ser. No. 09/176,340, referenced above. This application describes a system for managing a plurality of accounts for multiple clients. These accounts, which may originate from a variety of sources, banks, brokerage firms, and/or clients, are held at any of a plurality of savings institutions or banks. The system provides an aggregate insured money market deposit account at a bank or savings institution that is not necessarily an institution at which any of the client accounts are held. The aggregate insured deposit account is linked to each of the demand accounts in a manner so as to permit deposit funds to be placed into a demand account from various sources, and also so as to provide for the tendering of payments from the demand account via different instruments, without limitation as to the number of transfers. Interest is earned on deposits because funds are transferred from individual client accounts to the managed aggregate insured deposit account.

While a substantial advance over other prior art systems, the above noted system requires the transfer of oftentimes significant funds to comply with various banking regulations. This may be difficult in the case of smaller, community-based banks, as these institutions depend upon such funds as a source for loans. Moreover, some bank clients are not comfortable with arrangements that transfer client funds to unfamiliar third parties.

Pursuant to Regulation Q, banks are prohibited from paying interest on commercial accounts. However, banks have developed several approaches in an effort to compete with brokers who offer interest on cash balances for their commercial customers. These approaches, which include money fund sweeps and repo sweeps, are disadvantageous in that they involve a removal of commercial customer deposits from the bank's balance sheets.

A substantial market exists for an interest-bearing return sweep account that can be readily integrated into the existing infrastructure of a bank or savings institution, while, at the same time, permitting account funds to remain on the bank's balance sheet, with minimal disruption of existing bank-client relationships. It was with the foregoing realizations in mind that the present invention was developed.

### OBJECTS AND SUMMARY OF THE INVENTION

It is an object of the invention to provide bank and/or savings institution clients with the ability to implement up to an unlimited number of transfers while, at the same time, permitting the bank and/or savings institution to retain client-deposited funds.

It is another object of the invention to provide bank and/or savings institution clients with interest from funds on deposit while simultaneously providing the ability to implement up to an unlimited number of transfers.

It is a further object of the invention to permit the bank and/or savings institution to retain client-deposited funds on its books so that these funds can be used as a source for loans.

It is yet a further object of the invention to provide a banking method that enables clients to deposit funds into an account from any of various sources, and to make payments from the account via any of various instruments, without limitation as to the number of transfers, while still earning interest on the funds in the account.

3

It is another object of the present invention to provide a banking method that manages a plurality of demand accounts for multiple clients whose funds are held in an aggregate insured deposit account at the client's banking institution but managed by a third party agent.

It is another object of the invention to provide a money market banking method that has a minimal impact on presently-existing, bank-to-client relationships.

It is a further object of the invention to provide a money market banking method which is readily integrable into the existing infrastructure of a bank or savings institution.

These and other objects of the invention are realized in the form of novel systems and methods for managing a plurality of client demand accounts so as to allow a banking institution to retain client deposits on the bank's balance sheets while at the same time, providing the client with the capability of implementing up to an unlimited number of transactions per month and also providing the client with interest on their account balance. These objectives are achieved through the use of an aggregate money market deposit account and an aggregate demand deposit account. These accounts are held on the books of the client's savings institution or bank, but are managed by a third party agent for the client. In response to client deposits and withdrawals, the agent initiates a transfer of funds between the aggregate demand deposit account and the aggregate money market deposit account. If client deposits exceed client withdrawals, then all or some of the funds in the aggregate demand deposit account may be transferred to the aggregate money market deposit account. On the other hand, if client withdrawals exceed client deposits, then all or some of the funds in the aggregate money market deposit account are transferred to the aggregate demand deposit account. The aggregate money market deposit account is an interest-bearing deposit account, where the aggregate balances for all clients are deposited.

One purpose of the aggregate demand deposit account is to facilitate the movement of funds. On a regular, periodic, or recurring basis, the agent calculates a net transaction as the sum of individual client deposits and withdrawals from the plurality of individual client demand accounts. The net transaction calculation is used to determine an amount of funds that need to be deposited into the aggregate money market deposit account to cover client deposits, or an amount of funds that needs to be withdrawn from the aggregate money market deposit account to cover client withdrawals. Individual account management calculations are performed to determine whether to deposit or withdraw funds from the aggregate demand deposit account to each of a plurality of individual client return sweep and/or money market accounts. The agent updates its database for each client's deposit and withdrawal activities.

The individual client has two accounts, a client demand deposit account on the bank's books, and a return sweep account or money market account on the agent's books. Individual transactions for the client occur between these two client accounts.

The agent distributes all or a portion of the interest accrued from the aggregate deposit account to individual clients. The interest is distributed according to the relative proportions of each client's funds in the aggregate deposit account. The agent maintains a database that keeps track of deposits to, and withdrawals from, each of the client demand accounts, as well as each client's proportionate and/or monetary share in the aggregate money market deposit account.

The invention permits funds to be deposited into a demand account from various sources, and also provides for the tendering of payments from the demand account via different

4

instruments, without limitation as to the number of transfers, and with accrual of interest on the deposited funds. Moreover, the deposited funds are retained at the client's bank or savings institution. Optionally, the debiting of funds from each of the client accounts is monitored, and debits are selectively authorized or rejected based upon the client's account balance and/or their current share in the aggregate deposit account.

## BRIEF DESCRIPTION OF THE DRAWINGS

The following is a brief description of the drawings, in which:

FIG. **1** is an information flow diagram showing the transfer of client funds among a plurality of accounts pursuant to the techniques of the present invention;

FIG. **2** is a flowchart showing an illustrative operational sequence for implementing the techniques of the present invention; and

FIGS. **3**-**6** together comprise a flowchart depicting processing steps to be performed on behalf of an administrator pursuant to a further embodiment of the present invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Refer now to FIG. **1**, which is a flow diagram showing the transfer of client funds among a plurality of accounts pursuant to the techniques of the present invention. A plurality of client demand accounts, including Client "A" DDA (Demand Deposit Account) **501** and Client "B" DDA Account **503** are managed through the use of an insured pooled deposit account at the client's savings institution or bank. In FIG. **1**, this pooled deposit account is provided in the form of a Pooled MMDA (Money Market Deposit Account) **509**. Excess funds are swept from client DDA accounts (Client "A" DDA **501** and Client "B" DDA **503**, respectively) to corresponding client Money Market Accounts (Client "A" Money Market Account **505** and Client "B" Money Market Account **507**, respectively). Excess funds may be calculated in terms of a desired or target minimum balance for each of the client DDA accounts. The same target minimum balance could be applied to all DDA accounts, or an account-specific target balance could be assigned to a certain account based upon the past history and/or the expected usage of that account. Alternatively, all funds could be swept from the client DDA accounts to the Money Market Accounts. After recording the amount of funds swept into a client Money Market Account, the funds are then transferred to the Pooled MMDA Account **509**.

The net result of the aforementioned fund transfer activity is that funds are effectively transferred from individual client demand accounts, including Client "A" DDA **501** and Client "B" DDA **503**, to a pooled insured deposit account (Pooled MMDA Account **509**) at the client's bank or savings institution. This is advantageous in that the Pooled MMDA account **509** is an interest-bearing "nondemand" account pursuant to 12 CFR 329.2 et seq. Moreover, the Pooled MMDA Account is eligible for full FDIC insurance protection. This protection covers each client whose deposits are placed into the pooled account, up to a maximum of $100,000 per client. As the Pooled MMDA Account **509** accrues interest, all or a portion of this interest is distributed to individual clients. The interest may, but need not, be distributed according to the relative proportions of each client's funds in the Pooled MMDA Account **509**.

A database keeps track of deposits to, and withdrawals from, each of the client demand accounts (Client "A" DDA

US 8,311,916 B1

5

Account **501** and Client "B" DDA Account **503**), as well as each client's proportionate and/or monetary share in the Pooled MMDA Account **509**. On a regular, periodic, or recurring basis, a net transaction is calculated as the sum of individual client deposits and withdrawals from the plurality of demand accounts. The net transaction calculation is used to determine an amount of funds, if any, that needs to be deposited into the Pooled MMDA Account **509** from the individual client Money Market Accounts (Client "A" Money Market Account **505** and/or Client "B" Money Market Account **507**) to cover client deposits. The net transaction calculation is also used to determine an amount, if any, of funds that need to be withdrawn from the Pooled MMDA Account **509** to cover client withdrawals from respective client DDA Accounts (Client "A" DDA Account **501** and/or Client "B" DDA Account **503**). In the event that fund withdrawals are required, the necessary funds are first transferred from the Pooled MMDA Account **509** to a Pooled DDA (Demand Deposit Account) **511** which is held at the same savings institution or bank as Pooled MMDA Account **509**. On an as-needed basis, funds are then transferred from the Pooled MMDA Account **509** to individual client DDA accounts (Client "A" DDA Account **501** or Client "B" DDA Account **503**) to cover checks written by these clients, as well as any fund withdrawals or transfers that clients wish to implement on behalf of their respective DDA Accounts.

Individual account management calculations are performed to determine whether to deposit or withdraw funds from the Pooled DDA Account **511** to each of a plurality of individual client demand accounts. The database is updated for each client's deposit and withdrawal activities. The invention permits funds to be deposited into a client demand account from various sources, and also provides for the tendering of payments from the client demand account via different instruments, without limitation as to the number of transfers, and with accrual of interest on the deposited funds. Optionally, the debiting of funds from each of the client demand accounts is monitored, and debits are selectively authorized or rejected based upon the client's demand account balance and/or their current share in the pooled deposit account.

The foregoing procedures are structured in a manner so as to permit banks and savings institutions to continue servicing their clients as they have done in the past. Moreover, if desired, these procedures could be implemented by an agent acting on behalf of one or more clients. In this manner, the invention would be virtually transparent to presently-existing banks and savings institutions. Bank personnel would not be burdened with the requirement to perform unfamiliar and potentially time-consuming procedures. Pursuant to this "agency" approach, the agent effectively provides a "sweep interface" between a client's existing DDA account (i.e., Client "A" DDA Account **501**) and a fully-insured, interest-bearing pooled account (i.e., the Pooled MMDA Account **509**). The agent opens up the Pooled MMDA Account **509** and the Pooled DDA Account **511** at the client's bank or savings institution. The agent is responsible for several administrative activities, including: (1) recordkeeping in connection with the individual Client Money Market accounts (Client "A" Money Market Account **505** and Client "B" Money Market Account **507**); (2) determining each client's proportionate share in the Pooled MMDA Account **509**; (3) determining an appropriate balance for the Pooled DDA Account **511**; and (4) determining appropriate transfers from the Pooled DDA Account **511** to any of the client DDA accounts.

6

Although banks and savings institutions can provide DDA, MMDA and checking account services to clients without utilizing a third-party agent, under the current statutory scheme, these institutions cannot pay interest on account balances, and at the same time, allow for an unlimited number of transactions. Pursuant to Regulation D, banks and savings institutions are prohibited from automatically allowing unlimited fund transfers between DDAs and MMDAs on behalf of clients. A client could open up his own DDA and MMDA accounts, evaluate daily DDA activities, determine if funds should be moved between the DDA and the MMDA, and instruct the bank to transfer the appropriate funds. However, it would be time consuming and inefficient. The use of an agent provides administrative expediency, endering the entire operational scheme more attractive to the client as well as the banking institution.

Advantageously, the agent maintains the client's original DDA account number that uniquely identifies that client's account at his or her bank or savings institution. This account number is used as a cross-reference to keep track of each client's proportionate interest in the Pooled MMDA Account **509**. The client Money Market Account numbers (for Client "A" Money Market Account **505** and Client "B" Money Market Account **506**) are transparent to these clients, as is the account number for the Pooled MMDA Account **509**.

Effectively, a "sweep interface" exists between each of respective individual client DDA Accounts (Client "A" DDA Account **501** and Client "B" DDA Account **503**) and corresponding individual client Money Market Accounts (Client "A" Money Market Account **505** and Client "B" Money Market Account **507**). Excess funds in the individual client DDA accounts are swept to the individual client Money Market accounts to be further credited to the Pooled MMDA Account **509**. If funds are needed to pay for a check or handle a withdrawal, funds are redeemed via the Pooled DDA Account **511**. The sweep interface may be governed by any of a number of established or specified parameters. For example, the bank may choose to leave a certain dollar amount in each of the client DDA accounts to cover checks and only sweep funds in excess of that amount. Or the bank may decide to sweep everything and redeem funds based upon the checks presented for payment. From the standpoint of the bank or savings institution, no additional work is required. The bank merely maintains the client's existing individual DDA account along with the client's profile (name, address, check reorders, signature on file, stop payment orders, etc). Bank clients will be able to keep their existing checks, and to continue using their existing DDA accounts. Deposits are credited to these DDA accounts and then swept to the pooled MMDA account. Many of the required administrative activities are performed by the agent on behalf of designated client accounts. These administrative activities basically involve the monitoring of fund sweeping to and from individual client DDA accounts and corresponding individual Money Market accounts, as well as transfers among the individual Money Market, Pooled MMDA and Pooled DDA Accounts maintained by the agent. On a daily, regular, repeated, or periodic basis, the bank or savings institution transmits a transaction sweep data file to the agent that includes deposit and withdrawal information for each of a plurality of clients. The bank and the agent periodically or repeatedly reconcile the sweep data file and agree upon a net settlement figure. If the net settlement figure is a credit, the bank or savings institution credits the Pooled DDA Account **511**. During routine, day-to-day system operations, the only transactions that occur in the Pooled MMDA Account **509** are transfers either to or from the Pooled DDA Account. Pursuant to an optional alter-

US 8,311,916 B1

7

native approach, the bank could allocate credits to the Pooled MMDA Account **509**. In any event, if the net settlement figure is a debit, the bank or savings institution debits the Pooled DDA Account **511**. The agent provides instructions by messenger to transfer funds from the Pooled MMDA Account **509** to the Pooled DDA Account **511** to cover the debit balance in the account. At the end of a predetermined period of time (such as a month), the agent can provide a monthly statement file to the bank or savings institution. This file may include activity for a client's individual money market account as maintained in an agent database. The bank or savings institution can then use this monthly statement file to generate month end statements for its clients. According to one preferred embodiment of the invention, activity pertaining to other accounts is tracked and maintained by the bank or savings institution. However, pursuant to an alternate embodiment, this statement file could optionally include Pooled MMDA, Pooled DDA, individual Money Market, and/or individual DDA account activity.

Refer now to FIG. **2**, which is a flowchart showing an illustrative operational sequence for implementing the techniques of the present invention. The procedure commences at block **701**, where a client makes a deposit to their individual DDA Account (i.e., Client "A" DDA **501**, FIG. **1**), or at block **703**, where a client makes a withdrawal from their individual DDA Account. Irrespective of whether the transaction is a withdrawal or a deposit, a sweep process is performed (block **707**) to sweep any excess account funds out of the client's individual DDA account, or to sweep required funds into this DDA account. A test is performed at block **709** to ascertain whether or not there are excess funds in the individual client's DDA account. If so, program control jumps ahead to block **713**, whereas if not, the program continues on to block **711**. At block **713**, the excess funds are swept to the agent, who then updates the individual client Money Market account (block **717**).

The negative branch from block **709** leads to block **711**, where a test is performed to ascertain whether or not there is an insufficient minimum balance in the individual client's DDA account. If not, the program exits. If so, program control advances to block **715** where funds are swept from the agent. The agent then updates the individual client Money Market account (block **717**). Next, on a periodic, repeated, or scheduled basis, the agent calculates the net sweep account activity (block **719**). A test is performed at block **721** to ascertain whether or not the net sweep activity is a credit. If so, program control advances to block **723** and, if not, program control continues to block **725**. At block **723**, the agent receives payment from the bank for the credit. Payment can be received, for example, in the form of a wire transfer or a credit to the pooled DDA account. Next, the agent instructs the bank to deposit the received funds into the pooled MMDA account (block **727**). Funds are transferred into the pooled MMDA account (block **731**), and the program exits.

The negative branch from block **721** leads to block **725** where a test is performed to ascertain whether or not the net sweep activity is a debit. If not, the program exits and, if so, the program continues to block **729**. At block **729**, a messenger is instructed to initiate a fund transfer from the pooled MMDA account to the pooled DDA account. The funds are transferred from the pooled MMDA to the pooled DDA (block **733**), and the agent pays the bank or savings institution from the pooled DDA account for the sweep debit. The program then exits.

FIGS. **3** and **4** together comprise a flowchart depicting processing steps to be performed on behalf of an agent or administrator pursuant to a further embodiment of the present

8

invention. This agent or administrator can be a brokerage firm, a bank, or another financial entity with which clients can institute financial transactions such as deposits, withdrawals and on-demand payments. The administrator or agent appears to each client as if it were, at least in part, a bank, by accepting deposits for the client's account, and, subsequently, by authorizing (and then implementing) payments demanded by the client from his or her account. The funds for all of the clients are pooled into a single deposit account that is maintained as an insured deposit account at a licensed bank or savings institution.

Referring to FIG. **3**, financial entity **100** may be a bank, savings institution, brokerage firm, or other entity where financial transactions take place or can be facilitated. This financial entity **100** creates transaction files **101** which are transmitted to Reserve **105**. Reserve **105** (or the Reserve System) is the administrator or other entity in charge of administering at least one of the deposit accounts. New account files **102** can be transmitted to Reserve **105**. For example, a new investor account may need to be opened. This activity necessitates organizing and coordinating information to service a new investor for the present system, even though that investor may already be a client of a financial entity **100** for other investment vehicles. A new account **102** effectively becomes part of an existing pooled bank deposit account **129** that collects earned income **130**, all or a portion of which is eventually conveyed to the client's accounts **131**. Of course, at some point in time, the deposit account must first be established with clients' fluids. The transaction files represent the addition of funds by check (to be drawn on another institution, or to be drawn from a different demand account at the same institution), wire or electronic transfer, ACH, credits (such as from a debit or credit card merchant), or a sweep from one of the client's other accounts. Accordingly, encompassed in the transaction file are deposits **103** and withdrawals **104**. A "sweep" includes the automatic transfer of funds, such as the automated transfer of interest from one account into the client's account, as well as the automated transfer of funds out of the client's account (such as for payment of a securities trade); thus, a sweep may be from one of the client's accounts to another. The responsibility for maintaining the deposit account can be assigned by the administrator to a third party.

Referring now to FIG. **4**, Reserve System **50** contains an insured deposit database **75** where a position file for debit/credit card users is created **132** and transmitted to a bank for a debit/credit card network **133** where the bank then updates the network **134**. The system updates the data base **75** and processes transactions **106** (from **105**, FIG. **3**) and opens a new account **107** where application and check deposits are processed **110**. The bank preference **107**A is the list of banks and the order of preference for deposits and withdrawals held on the account, including a list of banks to be excluded (if any), and the maximum percentage and/or amount of funds to be held in each bank. The client's bank preference data is added to the account at **107**B. If the client does not select values for any of these variables, the system can provide default values for the banks and their order at **107**C sufficient for all of the client's funds. When possible, the system can be configured to assign a bank that is in the state in which the client resides. Referring to FIG. **5**, it can be seen that when a deposit, either a check deposit **111**, federal wire deposit **112**, ACH deposit, sweep, or other deposit is credited to the client's account **108**, the system will review where the existing funds of the accounts are deposited **108**A. If the client's balance has reached the maximum allowable balance for the existing bank **108**B, as shown in FIG. **6**, the system will then select the next bank on the preference list attached to the

US 8,311,916 B1

9

account 108C. If the maximum allowable balance has not been reached in the existing bank, the system will credit the additional funds to that bank 108D.

Still referring to FIG. 5, the procedure for processing withdrawals can be seen. Various methods of withdrawing funds are debit withdrawal 109, processing debit or credit card transactions such as debit/credit card files 115, direct debit accounts 215, and processing of files 121. Processing of a debit/credit card file 115 utilizes data accumulated from debit/credit card transactions received from the banks 114. The processing of file 121 procedure utilizes one of various sources of data such as a check presented for payment 116, ACH debits 117, touch tone bill paying 118, and/or internet bill paying 119.

After processing the debit procedure, the system will review the bank preference list and select the appropriate bank to debit 125A. The system will sort all the daily transactions by the bank 125B (see FIG. 6). The activity for each bank will then be netted 126 and the appropriate deposit or withdrawals made.

The system will then determine whether funds are available 122, which function is also associated with other participant withdrawals 120. If the funds are available, the account is debited 225. If the funds are not available, however, the system determines whether a credit line is available 123. If a credit line is available, then funds are advanced 230 to cover the debit; if not the transaction is rejected 124.

Referring to FIG. 6, as previously stated, the system determines whether the client's balance reaches its maximum 108B. If so, the next bank on the list selected by the client is credited 108C. If the maximum is not reached, then the existing bank is credited 108D. Information and activities associated with processed debits and credits of the client's accounts from 125A are sorted by the bank 125B and the net activity by the bank is determined 126. The system then determines whether the deposits and credits were greater than the withdrawals and debits 240. If so, the excess funds are deposited into a deposit account 127. If the debits and withdrawals were greater than the credits, the difference is redeemed from the deposit account 128.

Thus, by practicing the embodiment of the invention described in connection with FIGS. 3-6, an individual client is effectively provided with FDIC insurance in excess of $100,000. This result is brought about because the individual client's holdings are maintained in multiple insured deposit accounts, which may be in multiple banks.

The foregoing description is intended to be illustrative and not limiting. Any of various changes, modifications, and/or additions may become apparent to the skilled artisan upon a perusal of this specification, and, as such, are intended to be within the scope and spirit of the invention as defined by the claims.

What is claimed is:

1. A method, comprising:
(A) accessing, using one or more computers, one or more electronic databases, stored on one or more computers-readable media, the one or more databases comprising:
(1) aggregated account information for a plurality of government backed-insured and interest-bearing aggregated deposit accounts held in a plurality of financial institutions participating in a program including a first depository institution in infrastructure of a first financial institution of the plurality of the financial institutions and a second depository institution in infrastructure of a different financial institution of the plurality of the financial institutions, wherein funds from client accounts of a plurality of clients are

10

aggregated with funds of other client accounts in the aggregated deposit accounts held in the financial institutions, with the aggregated deposit accounts providing non-penalized liquidity for the funds held therein;
(2) client account information for funds, for each of a plurality of respective client accounts, held in one or more of the plurality of the financial institutions, with funds accepted for deposit for respective ones of the clients accounts in the names of the respective clients at the first financial institution, with the client account information comprising a respective balance of funds, from the respective client account, held in each of one or more of the aggregated deposit accounts holding funds of the respective client account; and
(B) allocating, using the one or more computers, for multiple of the client accounts, the client funds of these respective client accounts among more than one of aggregated deposit accounts, so that at least a portion of these client funds are maintained in the aggregated deposit account in the first depository institution and at least a portion of the client funds are maintained in the aggregated deposit account held in the second depository institution in the different financial institution;
(C) determining, using the one or more computers, client funds to be withdrawn from the aggregated deposit account held at one of the depository institutions of one of the financial institutions more than six (6) times during a month while preserving an insured and interest-bearing status of the aggregated deposit account held at the one depository institution;
(D) generating one or more instructions to transfer funds to or from one or more of the respective aggregated deposit accounts in the respective depository institutions in the program through an aggregated demand deposit account based at least in part on the respective allocations determined for the respective depository institutions in the program, wherein the one or more instructions comprise making a withdrawal and/or transfer from the one aggregated deposit account more than six (6) times during the month period to correspond at least with the more than six (6) of the allocations determined over the month period that are withdrawals, while maintaining an insured and interest-bearing status of the aggregated deposit account held at the one depository institution; and
(E) updating or having updated, using the one or more computers, the one or more electronic databases based at least in part on the allocation of client funds to or from the plurality of aggregated deposit accounts.

2. The method as defined in claim 1, wherein at least one of the one or more interest-bearing aggregated deposit accounts is insured by the Federal Deposit Insurance Corporation.

3. The method as defined in claim 2, further comprising: transferring or having transferred or arranging for transfer of funds to or from one or more of the respective aggregated deposit accounts in the respective depository institutions in the program in accordance with the one or more instructions.

4. The method as defined in claim 3, further comprising: processing, using the one or more computers, more than six (6) withdrawals and/or transfers from one or more of the client accounts during the month period.

5. The method as defined in claim 2, further comprising: withdrawing or having withdrawn or arranging for withdrawal of funds from at least one of the FDIC-insured

US 8,311,916 B1

**11**

and interest-bearing aggregated deposit accounts more than six (6) times during the month period.

6. The method defined in claim **2**, further comprising:

causing distribution of interest, using the one or more computers, from said FDIC-insured interest-bearing aggregated deposit accounts to said client accounts; and

updating or having updated, using the one or more computers, one or more of the electronic databases with information about the interest distributed to said client accounts.

7. The method as defined in claim **2**, wherein the electronic database includes client preference and/or exclusion information comprising a client's one or more preferences and/or one or more exclusions of one or more banks to hold its funds; and further comprising:

determining, using the one or more computers, one or more of the different banks in the program for allocating a portion of the client's funds, based at least in part on the client preference and/or exclusion information.

8. The method as defined in claim **2**, wherein at least one of the one or more FDIC-insured and interest-bearing aggregated deposit accounts is a money market deposit account.

9. The method as defined in claim **2**, wherein the updating or having updated the one or more databases comprises performing, using the one or more computers, one or more of the following steps:

accessing electronic check deposit data;

accessing electronic Fed wire deposit data;

accessing electronic ACH deposit data;

accessing electronic debit card transaction files;

accessing electronic credit card transaction files;

accessing electronic check presentment data;

accessing electronic ACH debit data;

**12**

accessing electronic touch tone bill paying data;

accessing electronic Internet bill paying data.

10. The method as defined in claim **2**, receiving, using the one or more computers, client data for deposits and/or transfers to and withdrawals and/or transfers from each of their respective client accounts from an Internet telecommunications network.

11. The method of claim **2**, further comprising the step:

on a regular, periodic, or recurring basis, calculating or having calculated, using the one or more computers, a net transaction amount as the sum of individual client deposits and/or transfers to and withdrawals and/or transfers from each of a plurality of the client accounts; and,

determining, using the one or more computers, an amount or amounts of funds that need to be deposited into one or more of the aggregated deposit accounts to cover client deposits, or an amount or amounts of funds that needs to be withdrawn from one or more of the aggregated deposit accounts to cover client withdrawals, utilizing, the net transaction amount.

12. The method of claim **2**, wherein the client accounts comprise corporate client accounts.

13. The method of claim **2**, wherein the instruction for making a withdrawal and/or transfer from the one aggregated deposit account more than six (6) times during a month while preserving an insured and interest-bearing status of the aggregated deposit account held at the one depository institution comprises making requesting that the withdrawal and/or transfer be requested in one or more selected from the group of in person, by mail, by messenger, by telephone and distributed by mail, by automated teller machine.

* * * * *

# Exhibit 9

US008386383B1

(12) **United States Patent**  
Bent et al.

(10) Patent No.: **US 8,386,383 B1**  
(45) Date of Patent: ***Feb. 26, 2013**

(54) **MONEY FUND BANKING SYSTEM WITH MULTIPLE BANKS AND/OR RATES**

(75) Inventors: **Bruce Bent**, Manhasset, NY (US); **Bruce Bent, II**, Manhasset, NY (US)

(73) Assignee: **Island Intellectual Property LLC**, Manhasset, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 129 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/622,979**

(22) Filed: **Nov. 20, 2009**

**Related U.S. Application Data**

(63) Continuation of application No. 09/677,535, filed on Oct. 2, 2000, now Pat. No. 7,752,129, which is a continuation-in-part of application No. 09/176,340, filed on Oct. 21, 1998, now Pat. No. 6,374,231.

(51) **Int. Cl.**  
*G06Q 40/00* (2012.01)

(52) **U.S. Cl.** ............... **705/40**; 705/35; 705/42; 705/45; 235/379; 235/380; 235/385; 235/437; 235/470

(58) **Field of Classification Search** ............ 705/35, 705/42, 45; 235/379, 380, 385, 437, 470  
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,232,367 A | 11/1980 | Youden et al. | |
| 4,346,442 A | 8/1982 | Musmanno | |
| 4,376,978 A | 3/1983 | Musmanno | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 10-049590 A | 2/1998 |
| WO | WO-95/23379 A1 | 8/1995 |

(Continued)

OTHER PUBLICATIONS

U.S. Appl. No. 12/025,402, filed Feb. 4, 2008, Bent.

(Continued)

*Primary Examiner* — Daniel Felten  
(74) *Attorney, Agent, or Firm* — Foley & Lardner LLP

(57) **ABSTRACT**

A method, system and program product for managing a plurality of individual client deposits for multiple clients, the method comprising: accessing, an electronic database, comprising: aggregated account information for a plurality of Federal Deposit Insurance Corporation (FDIC)-insured and interest-bearing aggregated deposit accounts held in a plurality of banking institutions, and client information for each of a plurality of the respective clients, i, comprising (i) a total of a respective client's funds deposited across a plurality of the FDIC-insured interest-bearing aggregated accounts held in a plurality of the banking institutions; and (ii) a maximum deposit percentage of the respective client funds to be held in at least one of the banking institutions; maintaining funds for said individual clients in a plurality of the FDIC-insured, interest-bearing aggregated deposit accounts at a plurality of banking institutions, wherein each of the banking institutions has at least one of the aggregated deposit accounts; processing, by computer, client transaction data comprising data for each of one or more deposits/transfers and/or one or more withdrawals/transfers for one or more of said clients, with the data comprising a respective amount for each respective deposit/transfer and each respective withdrawal/transfer; making needed deposits to, or needed withdrawals from one or more of said aggregated deposit accounts based on the data for one or more of the deposit/transfers and/or the withdrawals/transfers and based, at least in part, on the maximum deposit percentage in the database for one or more of the clients; and updating the database based on the client's deposits/transfers and/or withdrawals/transfers.

**22 Claims, 4 Drawing Sheets**



**US 8,386,383 B1**

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,597,046 | A | 6/1986 | Musmanno et al. |
| 4,674,616 | A | 6/1987 | Kalmus et al. |
| 4,694,397 | A | 9/1987 | Grant et al. |
| 4,700,297 | A | 10/1987 | Hagel et al. |
| 4,751,640 | A | 6/1988 | Lucas et al. |
| 4,774,663 | A | 9/1988 | Musmanno et al. |
| 4,953,085 | A | 8/1990 | Atkins |
| 4,985,833 | A | 1/1991 | Oncken |
| 5,126,936 | A | 6/1992 | Champion et al. |
| 5,206,803 | A | 4/1993 | Vitagliano et al. |
| 5,220,501 | A | 6/1993 | Lawlor et al. |
| 5,235,507 | A | 8/1993 | Sackler et al. |
| 5,262,942 | A | 11/1993 | Earle |
| 5,270,922 | A | 12/1993 | Higgins |
| 5,291,398 | A | 3/1994 | Hagan |
| 5,297,032 | A | 3/1994 | Trojan et al. |
| 5,424,938 | A | 6/1995 | Wagner et al. |
| 5,631,828 | A | 5/1997 | Hagan |
| 5,644,727 | A | 7/1997 | Atkins |
| 5,671,363 | A | 9/1997 | Cristofich et al. |
| 5,689,650 | A | 11/1997 | McClelland et al. |
| 5,710,889 | A | 1/1998 | Clark et al. |
| 5,765,144 | A | 6/1998 | Larche et al. |
| 5,774,880 | A | 6/1998 | Ginsberg |
| 5,781,654 | A | 7/1998 | Carney |
| 5,802,499 | A | 9/1998 | Sampson et al. |
| 5,806,048 | A | 9/1998 | Kiron et al. |
| 5,806,049 | A | 9/1998 | Petruzzi |
| 5,812,987 | A | 9/1998 | Luskin et al. |
| 5,826,243 | A | 10/1998 | Musmanno et al. |
| 5,852,811 | A | 12/1998 | Atkins |
| 5,864,685 | A | 1/1999 | Hagan |
| 5,875,437 | A | 2/1999 | Atkins |
| 5,878,258 | A | 3/1999 | Pizi et al. |
| 5,878,405 | A | 3/1999 | Grant et al. |
| 5,884,285 | A | 3/1999 | Atkins |
| 5,890,141 | A | 3/1999 | Carney et al. |
| 5,893,078 | A | 4/1999 | Paulson |
| 5,903,881 | A | 5/1999 | Schrader et al. |
| 5,905,974 | A | 5/1999 | Fraser et al. |
| 5,940,809 | A | 8/1999 | Musmanno et al. |
| 5,941,996 | A | 8/1999 | Smith et al. |
| 5,946,667 | A | 8/1999 | Tull et al. |
| 5,950,175 | A | 9/1999 | Austin |
| 5,974,390 | A | 10/1999 | Ross |
| 5,978,779 | A | 11/1999 | Stein et al. |
| 6,014,642 | A | 1/2000 | El-Kadi et al. |
| 6,016,482 | A | 1/2000 | Molinari et al. |
| 6,026,438 | A | 2/2000 | Piazza et al. |
| 6,032,133 | A | 2/2000 | Hilt et al. |
| 6,041,314 | A | 3/2000 | Davis |
| 6,044,371 | A | 3/2000 | Person et al. |
| 6,047,324 | A | 4/2000 | Ford et al. |
| 6,049,782 | A | 4/2000 | Gottesman et al. |
| 6,052,673 | A | 4/2000 | Leon et al. |
| 6,088,685 | A | 7/2000 | Kiron et al. |
| 6,092,056 | A | 7/2000 | Tull et al. |
| 6,105,005 | A | 8/2000 | Fuhrer |
| 6,108,641 | A | 8/2000 | Kenna et al. |
| 6,112,191 | A | 8/2000 | Burke |
| 6,119,093 | A | 9/2000 | Walker et al. |
| 6,131,810 | A | 10/2000 | Weiss et al. |
| 6,154,770 | A | 11/2000 | Kostakos |
| 6,189,785 | B1 | 2/2001 | Lowery |
| 6,192,347 | B1 | 2/2001 | Graff |
| 6,226,623 | B1 | 5/2001 | Schein et al. |
| 6,317,783 | B1 | 11/2001 | Freishtat et al. |
| 6,324,523 | B1 | 11/2001 | Killeen et al. |
| 6,363,360 | B1 | 3/2002 | Madden |
| 6,374,231 | B1 | 4/2002 | Bent et al. |
| 6,513,020 | B1 | 1/2003 | Weiss et al. |
| 6,970,843 | B1 | 11/2005 | Forte |
| 7,089,202 | B1 | 8/2006 | McNamar et al. |
| 7,103,556 | B2 | 9/2006 | Del Rey et al. |
| 7,124,101 | B1 | 10/2006 | Mikurak |
| 7,133,840 | B1 | 11/2006 | Kenna et al. |
| 7,203,845 | B2 | 4/2007 | Sokolic et al. |
| 7,206,761 | B2 | 4/2007 | Colvin |

| | | | |
|---|---|---|---|
| 7,216,100 | B2 | 5/2007 | Elliott |
| 7,321,874 | B2 | 1/2008 | Dilip et al. |
| 7,321,875 | B2 | 1/2008 | Dilip et al. |
| 7,328,179 | B2 | 2/2008 | Sheehan et al. |
| 7,376,606 | B2 | 5/2008 | Jacobsen |
| 7,383,223 | B1 | 6/2008 | Dilip et al. |
| 7,383,227 | B2 | 6/2008 | Weinflash et al. |
| 7,392,222 | B1 | 6/2008 | Hamilton et al. |
| 7,401,037 | B2 | 7/2008 | Arena et al. |
| 7,440,914 | B2 | 10/2008 | Jacobsen |
| 7,505,937 | B2 | 3/2009 | Dilip et al. |
| 7,509,286 | B1 | 3/2009 | Bent et al. |
| 7,529,709 | B2 | 5/2009 | Volchek et al. |
| 7,536,340 | B2 | 5/2009 | Dheer et al. |
| 7,536,350 | B1 | 5/2009 | Bent et al. |
| 7,596,522 | B1 | 9/2009 | Jacobsen |
| 7,603,307 | B2 | 10/2009 | Jacobsen |
| 7,640,199 | B1 | 12/2009 | Hyland |
| 7,657,761 | B2 | 2/2010 | Sokolic et al. |
| 7,668,771 | B1 | 2/2010 | Bent et al. |
| 7,672,901 | B1 | 3/2010 | Bent et al. |
| 7,672,902 | B1 | 3/2010 | Bent et al. |
| 7,680,716 | B1 | 3/2010 | Bent et al. |
| 7,720,755 | B1 | 5/2010 | Coyle |
| 7,729,987 | B1 | 6/2010 | Wakim et al. |
| 7,752,107 | B1 | 7/2010 | Bent et al. |
| 7,752,129 | B2 | 7/2010 | Bent et al. |
| 7,756,767 | B2 | 7/2010 | Cluse et al. |
| 7,769,688 | B1 | 8/2010 | Bent et al. |
| 7,797,207 | B1 | 9/2010 | Dilip et al. |
| 7,809,640 | B1 | 10/2010 | Bent et al. |
| 7,814,017 | B2 | 10/2010 | Vancini et al. |
| 7,837,100 | B2 | 11/2010 | Bonalle et al. |
| 7,860,771 | B2 | 12/2010 | Colvin |
| 7,873,571 | B1 | 1/2011 | Wehmer |
| 7,873,573 | B2 | 1/2011 | Realini |
| 7,873,677 | B2 | 1/2011 | Messing et al. |
| 7,886,969 | B2 | 2/2011 | Antoo et al. |
| 7,895,098 | B2 | 2/2011 | Beard |
| 7,895,099 | B2 | 2/2011 | Whiting et al. |
| 7,899,743 | B2 | 3/2011 | Jacobsen |
| 7,899,745 | B1 | 3/2011 | Jacobsen |
| 7,899,746 | B1 | 3/2011 | Jacobsen |
| 7,899,747 | B1 | 3/2011 | Jacobsen |
| 7,904,372 | B2 | 3/2011 | Whiting et al. |
| 7,917,433 | B2 | 3/2011 | Jacobsen |
| 7,921,057 | B1 | 4/2011 | Jacobsen |
| 7,933,821 | B1 | 4/2011 | Bent et al. |
| 7,945,511 | B2 | 5/2011 | O'Brien et al. |
| 7,996,308 | B1 | 8/2011 | Bent et al. |
| 8,015,085 | B2 | 9/2011 | Blagg et al. |
| 8,019,667 | B1 | 9/2011 | Bent et al. |
| 8,019,668 | B1 | 9/2011 | Bent et al. |
| 8,032,456 | B1 | 10/2011 | Bent et al. |
| 8,036,986 | B2 | 10/2011 | Jacobsen |
| 8,051,004 | B2 | 11/2011 | Bent et al. |
| 8,051,005 | B2 | 11/2011 | Jacobsen |
| 8,086,508 | B2 | 12/2011 | Dheer et al. |
| 8,090,651 | B2 | 1/2012 | Winslow et al. |
| RE43,246 | E | 3/2012 | Bent et al. |
| 2001/0023414 | A1 | 9/2001 | Kumar et al. |
| 2001/0032182 | A1 | 10/2001 | Kumar et al. |
| 2002/0007330 | A1 | 1/2002 | Kumar |
| 2002/0046144 | A1 | 4/2002 | Graff |
| 2002/0069147 | A1 | 6/2002 | Sheehan et al. |
| 2002/0082981 | A1 | 6/2002 | Madden |
| 2002/0087454 | A1 | 7/2002 | Calo et al. |
| 2002/0091637 | A1 | 7/2002 | Bent |
| 2002/0128951 | A1 | 9/2002 | Kiron et al. |
| 2002/0161707 | A1 | 10/2002 | Cole et al. |
| 2002/0165757 | A1 | 11/2002 | Lisser |
| 2002/0174048 | A1 | 11/2002 | Dheer et al. |
| 2002/0178098 | A1 | 11/2002 | Beard |
| 2002/0194099 | A1 | 12/2002 | Weiss |
| 2003/0023529 | A1 | 1/2003 | Jacobsen |
| 2003/0041003 | A1 | 2/2003 | Kayser, III |
| 2003/0080185 | A1 | 5/2003 | Werther |
| 2003/0135437 | A1 | 7/2003 | Jacobsen |
| 2003/0149646 | A1 | 8/2003 | Chen et al. |

**US 8,386,383 B1**

Page 3

| | | | |
|---|---|---|---|
| 2003/0163403 | A1 | 8/2003 | Chen et al. |
| 2003/0177092 | A1 | 9/2003 | Paglin |
| 2003/0191702 | A1 | 10/2003 | Hurley |
| 2003/0200174 | A1 | 10/2003 | Star |
| 2003/0208438 | A1 | 11/2003 | Rothman |
| 2003/0236728 | A1 | 12/2003 | Sunderji et al. |
| 2004/0039674 | A1 | 2/2004 | Coloma |
| 2004/0107157 | A1 | 6/2004 | Bleunven et al. |
| 2004/0111361 | A1 | 6/2004 | Griffiths et al. |
| 2004/0128229 | A1 | 7/2004 | Raines et al. |
| 2004/0128235 | A1 | 7/2004 | Kemper et al. |
| 2004/0138974 | A1 | 7/2004 | Shimamura et al. |
| 2004/0153398 | A1 | 8/2004 | Baumgartner et al. |
| 2004/0162773 | A1 | 8/2004 | Del et al. |
| 2004/0177036 | A1 | 9/2004 | Nutahara et al. |
| 2004/0249741 | A1 | 12/2004 | Understein |
| 2005/0044038 | A1 | 2/2005 | Whiting et al. |
| 2005/0091137 | A1 | 4/2005 | Woeber |
| 2005/0102225 | A1 | 5/2005 | Oppenheimer et al. |
| 2005/0102226 | A1 | 5/2005 | Oppenheimer et al. |
| 2005/0108120 | A1 | 5/2005 | Malka et al. |
| 2005/0108149 | A1 | 5/2005 | Bent et al. |
| 2005/0114246 | A1 | 5/2005 | Coloma |
| 2005/0154662 | A1 | 7/2005 | Langenwalter |
| 2005/0228733 | A1 | 10/2005 | Bent et al. |
| 2006/0047593 | A1 | 3/2006 | Naratil et al. |
| 2006/0106703 | A1 | 5/2006 | Del et al. |
| 2006/0155644 | A1 | 7/2006 | Reid et al. |
| 2006/0167773 | A1 | 7/2006 | Yang et al. |
| 2006/0212389 | A2 | 9/2006 | Bent et al. |
| 2006/0213980 | A1 | 9/2006 | Geller et al. |
| 2006/0273152 | A1 | 12/2006 | Fields |
| 2007/0043666 | A1 | 2/2007 | Burdette |
| 2007/0118449 | A1 | 5/2007 | De La Motte |
| 2007/0130065 | A1 | 6/2007 | Staab et al. |
| 2007/0143196 | A1 | 6/2007 | Colvin |
| 2007/0255655 | A1 | 11/2007 | Kemper et al. |
| 2007/0271174 | A2 | 11/2007 | Bent et al. |
| 2007/0276752 | A1 | 11/2007 | Whiting et al. |
| 2007/0288400 | A1 | 12/2007 | Menon |
| 2008/0015985 | A1 | 1/2008 | Abhari et al. |
| 2008/0046358 | A1 | 2/2008 | Holm-Blagg et al. |
| 2008/0065532 | A1 | 3/2008 | De La Motte |
| 2008/0097899 | A1 | 4/2008 | Jackson et al. |
| 2008/0120228 | A1 | 5/2008 | Bent et al. |
| 2008/0133280 | A1 | 6/2008 | Ziegler |
| 2008/0133396 | A1 | 6/2008 | De La Motte |
| 2008/0222053 | A1 | 9/2008 | Jacobsen |
| 2008/0288398 | A1 | 11/2008 | Maricondi |
| 2009/0006985 | A1 | 1/2009 | Fong et al. |
| 2009/0012899 | A1 | 1/2009 | Friesen |
| 2009/0138412 | A1 | 5/2009 | Jacobsen |
| 2009/0327154 | A1 | 12/2009 | Van Vooren et al. |
| 2011/0106703 | A1 | 5/2011 | Jay et al. |
| 2011/0208640 | A1 | 8/2011 | Geoghegan et al. |
| 2011/0246359 | A1 | 10/2011 | O'Brien et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO-99/18529 | 4/1999 |
| WO | WO-02/42952 | 5/2002 |
| WO | WO-03/012580 A2 | 2/2003 |
| WO | WO-2005/006111 | 1/2005 |

OTHER PUBLICATIONS

U.S. Appl. No. 12/794,448, filed Jun. 4, 2010, Bruce Bent et al.
U.S. Appl. No. 12/794,545, filed Jun. 4, 2010, Bruce Bent et al.
U.S. Appl. No. 12/816,092, filed Jun. 15, 2010, Bruce Bent II et al.
U.S. Appl. No. 12/829,961, filed Jul. 2, 2010, Bruce Bent, et al.
Dreyfus Insured Deposit Program Disclosure Statement and Terms and Conditions, 12 pages.
Email from Olivia Kim to Charles Macedo on Jun. 9, 2010 with attachment of Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation, and Intrasweep LLC against Deutshe Bank Trust Company Americas and Total Bank Solutions, LLC, Defendant Deutsche Bank Trust Company America's responses to Intrasweep's common interrogatory Nos. 1-5, Confidential-Attorneys only, Civil Action No. 09 Civ. 2675 (VM) (AJP).

Email from Olivia Kim to Charles Macedo on May 13, 2010 with attachment of Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation, and Intrasweep LLC against Deutshe Bank Trust Company Americas and Total Bank Solutions, LLC, Defendant Deutsche Bank Trust Company America's responses to Double Rock's Common interrogatory Nos. 1-10 to defendants Reservation of Right, Civil Action No. 09 Civ. 2675 (VM)(AJP).
Garton, Thomas W.; Are LLC Banks in the Cards? Stay Tuned; Fredrikson & Byron, P.A.; Jun. 2003; http://www.fredlaw.com/articles/banking/bank_0306_twig.html; 2 pages.
Insured Bank Deposit Program Summary Information Statement, Information Statement, and list of Eligible Program Banks Effective Feb. 10, 2005, 11 pages.
Lawsuit by Island Intellectual Property LLC against Clearview Correspondent Services, LLC, et al.; Complaint for Patent Infringement; Civil Action No. 1:11-cv-448 (LO/TRJ); Apr. 26, 2011; 55 pages.
Lawsuit by Island Intellectual Property LLC against First Southwest Company; Complaint for Patent Infringement; Civil Action No. 1:11-cv-00371-UNA; Apr. 26, 2011; 42 pages.
Lawsuit by Island Intellectual Property LLC et al., against Deutsche Bank Trust Company Americas, et al.; Expert Report of Richard T. Powers Concerning Invalidity of U.S. Pat. Nos. 7,509,286; 7,519,551; 7,536,350; 7,668,771; 7,668,772, 7,672,886; and 7,680,734; and Exhibits A-R; Civil Action No. 09 Civ. 2675(VM)(AJP), Oct. 28, 2010; 1,119 pages.
Lawsuit by Island Intellectual Property LLC v. Clearview Correspondent Services, LLC, et al.; Branch Banking & Trust Company's Answer to Complaint and Counterclaims; Civil Action No. 1:11-cv-448-LO-IDD; Jun. 20, 2011; 13 pages.
Lawsuit by Island Intellectual Property LLC v. Clearview Correspondent Services, LLC, et al.; Clearview Correspondent Services, LLC's Answer to Complaint and Counterclaims; Civil Action No. 1:11-cv-448-LO-IDD; Jun. 20, 2011; 12 pages.
Lawsuit by Island Intellectual Property LLC v. Clearview Correspondent Services, LLC, et al.; Scott & Stringfellow, LLC's Answer to Complaint and Counterclaims; Civil Action No. 1:11-cv-448-LO-IDD; Jun. 20, 2011; 12 pages.
Lawsuit by Island Intellectual Property LLC v. First Southwest Company; First Southwest Company's Answer to Complaint and Counterclaims; Civil Action 1:11-cv-371-SD; Jun. 20, 2011; 11 pages.
Lawsuit by Island Intellectual Property LLC, et al. against Deutsche Bank Trust Company Americas, et al.; Expert Report of Ivan Zatkovich Regarding Validity and Enforceability of the Asserted Claims of the Patents-in-Suit; Civil Action No. 09 Civ. 2675 (VM)(AJP); Nov. 23, 2010; 192 pages. The redacted items were designated as confidential in a Protective Order in this case.
Lawsuit by Island Intellectual Property LLC, et al. against Deutsche Bank Trust Company Americas, et al.; Expert Report of the Honorable Gerald J. Mossinghoff and Exhibits A-E; Civil Action No. 09 Civ. 2675 (VM)(AJP); Nov. 23, 2010; 107 pages.
Lawsuit by Island Intellectual Property LLC, et al., against Deutsche Bank Trust Company Americas, et al.; Defendant Deutsche Bank Trust Company Americas' Fifth Supplemental Responses to Island IP's First Set of Common Interrogatories to All Defendants (No. 7); Case No. 09 Civ. 2675 (VM)(AJP); Sep. 16, 2010; 9 pages.
Lawsuit by Island Intellectual Property LLC, et al., against Deutsche Bank Trust Company Americas, et al.; Defendant Total Bank Solutions, LLC's Fifth Supplemental Responses to Island IP's First Set of Common Interrogatories to All Defendants (No. 7); Case No. 09 Civ. 2675 (VM)(AJP); Sep. 16, 2010; 9 pages.
Letter from Gilbert T. Schwartz, Skadden, Arts, Slate, Meagher & Flom to Oliver Ireland, Associate General Counsel, Board of Governors of the Federal Reserve System; Dec. 18, 1987; 19 sheets.
Letter from Roger M. Zaitzeff, Seward & Kissel to Gilbert T. Schwartz, Associate General Counsel, Board of Governors of the Federal Reserve System; May 10, 1983, 5 sheets.
Promontory Interfinancial Network: Frequently Asked Questions (FAQs), Feb. 5, 2003, 5 pages.
Lawsuit by Island Intellectual Property LLC, et al. v. Deutsch Bank Trust Company Americas, et al.; Defendant Deutsche Bank Trust Company Americas' Second Supplemental Responses to Double Rock's Interrogatories Nos. 2, 8 and 9, Jul. 2010, 65 pages.

Exhibit 2, Invalidity Chart: U.S. Pat. No. 4,985,833 (Oncken)—U.S. Pat. 7,668,771, Jul. 2010, 14 pages.

Exhibit 5, Invalidity Chart: Merrill Lynch Business Advantage Program—U.S. Pat. No. 7,668,772, Jul. 2010, 7 pages.

Exhibit 8, Invalidity Chart: Harken Financial Services Sweep Product—U.S. Pat. No. 7,668,771, Jul. 2010, 9 pages.

Exhibit 9, Invalidity Chart: Wayne Hummer—Insured Bank Deposit Program—U.S. Pat. No. 7,668,771, Jul. 2010, 12 pages.

Exhibit 10, Invalidity Chart: U.S. Patent Application Publication No. 2007/0043666 (Burdette), U.S. Pat. No. 7,668,771, Jul. 2010, 9 pages.

2 CDs (1) Non-Confidential Exhibits and Material regarding Deutsch Bank Trust Company Americas' (DBTCA) 2nd Supp Res to Double Rock's Interrogatory No. 2; (2) Prior Art for IC Non-Confidential Material—Bates-numbered documents for Exhibits 2, 5, 8, 9, and 10 Invalidity Charts, Jul. 2010.

Letter to R.M. Zaitzeff, from W.W. Wiles, dated Jun. 22, 1983 (response to May 10, 1983 letter re: offering of MMDAs), 6 pages.

Letter to G.T. Schwartz, from O.I. Ireland, dated Jun. 22, 1988 (response to Dec. 18, 1987 letter re: proposed modifications to Merrill Lynch's CMA Program), 5 pages.

Information Statement, "Alliance Insured Account," Sep. 1999; 6 pages.

Investors Money Accounts$^{SM}$ and Insurance Plus Service Agreement, attached Schedule A (List of Banks Participating in the Insurance Plus Service), IMAD Mar. 1994, 3 pages.

Investors Money Accounts$^{SM}$ (an FDIC-insured money market account), IMA-1 (Mar. 1994), 4 pages.

Investors MoneyAccount$^{SM}$, "The FDIC-Insured Money Market Investment with an Important Plus," IMA Oct. 1995, 2 pages.

1985 SEC No-Act. Lexis 2756, Investment Company Act of 1940—Section 3(a)(1), 2(a)(36); Securities Act of 1933—Section 2(1), Nov. 29, 1985, Kemper Financial Services, Inc., 9 pages.

Insured Money Account Program Agreement and Disclosure Statement, (attached Schedule A—Deposit Account Terms), faxed Mar. 28, 2000; 10 pages.

First National Bank in Brookings, Certificates of Deposit [online] [retrieved on Jul. 17, 2009]. Retrieved from the Internet: Certificates of Deposit, <URL: http://web.archive.org/web/20000524121111/www.firstnb.com/cd.htm>; Multi-Bank CDs, <URL: http://web.archive.org/web/20000524132934/www.firstnb.com/mbcd.htm>, 5 pages.

Summary of Commentary on Current Economic Conditions by Federal Reserve Districts, Jan. 1985, 44 pages.

12 CFR Ch. II (Jan. 1, 2009 Edition), pp. 124-125.

Product Strategy, "Money Fund $$ Moving to Bank Deposits, Distributors Start to Install Bank Deposit Accounts to Replace Money Funds," 6 FRC Monitor, Dec. 2003, 2 pages.

Board of Governors of the Federal Reserve System, "The May 1998 Senior Financial Officer Survey," May 1998, (attached Appendix A: Survey Questions and Responses; Appendix B: Glossary; Appendix C: Examples of Key Reserve Concepts), 48 pages.

Interest Rate Review, A Publication of the Meyer Weekly Interest Rate Survey, "A Look at Tiers," Apr. 1987, 6 pages, vol. 11, No. 4.

LexisNexis, The American Banker, "Merrill Joins Money Market Account, CMA; Broker Begins Testing With 12 Institutions," Sep. 23, 1983, 4 pages.

Bent et al., Office Action, U.S. Appl. No. 10/071,053, with attached SB08, date considered Mar. 10, 2009, 2 pages.

Merrill Lynch & You, "Financial Services The Way You Want, When You Want Them," Jan. 2000, 16 pages.

Exhibit 1, "FA/FB Account 1997 First Transactions, TRX Types: PU, PP. TA, PT," Aug. 2003, p. 1-2.

Advertisement: Where Your Interest is?, Mutual Funds, Oct. 1997; 1 page.

Advertisement: It's 1997, Do You Know Where Your Interest is?, Mutual Funds, Dec. 1993, p. 46.

USPTO Office Action, Interview Summary, U.S. Appl. No. 11,767,827, Date Mailed Sep. 23, 2009, 4 pages.

USPTO Office Action, Office Action Summary, U.S. Appl. No. 11,767,827, Date Mailed Jun. 5, 2009, 35 pages.

Service Mark Application, Applicant: Reserve Management Corporation, Mark: Reserve Insured Deposits, (attached Power of Attorney, Declaration, Drawing Page, Sep. 21, 2001, 6 pages.

Letter to R.L. Kratzer, from T.J. Vezeau, Re: United States Patent No. 6,374,231, dated Jan. 10, 2003, 1 page.

Letter to C.R. Macedo, from R.L. Rainey, Re: Promontory Interfinancial Network, LLC, dated Jul. 22, 2008, (attached Attachments A-E), 35 pages.

Letter to C.R. Macedo, from R.L. Rainey, Re: Promontory Interfinancial Network, LLC, dated Oct. 16, 2008, (attached Attachments A-C), 22 pages.

Letter to C.R. Macedo, from R.L. Rainey, Re: Promontory Interfinancial Network, LLC, dated Feb. 23, 2009, (attached Exhibit A-B), 21 pages.

Letter to R.L. Kratzer, from T.J. Vezeau, Re: United States Patent No. 6,374,231, dated Jan. 10, 2003 (with various attachments), 128 pages.

Memo to Bruce Bent, from Bruce Bent II, Re: S&M Status, Oct. 15, 1997 (cc: Arthur, Mary, Marianne, Joe, Pat, Cathy, Michelle), 1 page.

Memo to Marianne, Ralph, Customer Service, from Bruce Bent II, Re: Reserve IDA, Sep. 4, 1997, 1 page.

Memo to Marianne, Pat, Bruce Bent, from Bruce Bent II, Re: Reserve Insured Deposit Account, Sep. 4, 1997, 1 page.

American Express—Meeting Notes, Sep. 26, 2000, 2 pages.

American Express Financial Advisors Customized FDIC Product with Tiered Balances, Jan. 24, 2001, 2 pages.

American Express Conference Call Minutes, Topic: Tiered Balances, Jan. 25, 2001 @ 3:00pm-4:00pm, 2 pages.

Letter to A.J. Bufalino, from C.R. Macedo, Re: Reserve Management Corporation, Wayne Hummer Investments LLC, May 8, 2007, (enclosing Jan. 3, 2006 letter to A.J. Bufalino, Feb. 23, 2006 letter to A.J. Bufalino, Mar. 16, 2006 letter to C. Macedo, U.S. Patent No. 6,374,231, U.S. Publication No. 2002/0091637 A1, U.S. Publication No. 2005/0108149 A1, U.S. Publication No. 2005/0228733 A1, U.S. Publication No. 2006/0212385 A2, U.S. Publication No. 2006/0212389 A2), 510 pages.

Merrill Lynch & Co., Inc., Form 10-K405 (Annual Report (Regulation S-K, item 405)), Filed Mar. 14, 2002 for the Period Ending Dec. 18, 2001, 248 pages.

Merrill Lynch, "Information Statement Regarding changes to Interest Rates on Deposits in the Merrill Lynch Banks," Nov. 12, 2007, 2 pages.

QUESTessentials, "Quest Insured Account," May 17, 1994, 3 pages.

Information Statement, "Quest Insured Account," (attached Appendix A), 5 pages.

OCC Insured Bank Deposit Account (attached are p. 2 of Quest for Value Funds Daily Data, Jun. 1993; OCC Insured Account Rate Table), 3 pages.

CIBC World Markets, "Insured Bank Deposit Account," Information Statement, Jul. 1, 2000, 2 pages.

Letter to Client, from M.J. Hensle, Re: Salomon Smith Barney Bank Deposit Program$^{SM}$, (attached Q&A: Important Information about the New Salomon Smith Barney Bank Deposit Program), Aug. 16, 2020, 14 pages.

Salomon Smith Barney, "Bank Deposit Program Disclosure Statement," 3 pages.

FDIC, FDIC Law, Regulations, Related Acts—4000—Advisory Opinions, Oct. 22, 1987, J.W. Via, Jr., Counsel [online] [Retrieved on Jan. 22, 2010]. Retrieved from the Internet: URL: <http://www.fdic.gov/regulations/laws/rules/4000-2560.html>, 1 page.

FDIC, FDIC Law, Regulations, Related Acts—4000—Advisory Opinions, Jun. 28, 1993, J. A. DiNuzzo, [online] [Retrieved on Jan. 22, 2010]. Retrieved from the Internet: URL: <www.fdic.gov/regulations/laws/rules/4000-8240.html>, 2 pages.

FDIC, FDIC Law, Regulations, Related Acts—4000—Advisory Opinions, Jul. 23, 1986, D. H. Jones [online] [Retrieved on Jan. 22, 2010]. Retrieved from the Internet: URL: <www.fdic.gov/regulations/laws/rules/4000-2120.html#fdic400086-21>, 2 pages.

Merrill Lynch—Pierce, Fenner & Smith, Inc., "The Merrill Lynch Cash Management Account®," Financial Service, Jan. 1985, 18 pages.

Merrill Lynch, "Insured Savings™ Account Fact Sheet," The Merrill Lynch Cash Management Account® Financial Service, 11 pages .

CMA, "A Guide to Your CMA Account," Jan. 1995, 38 pages.

American Banker, Salomon's Sweep Plan Raises FDIC Fund Alarm [online], Dec. 6, 2000 [retrieved on Apr. 13, 2009]. Retrieved form the Internet: <URL: http://www.americanbanker.com/printthis.html?id=2000120603YJGEZD>, 2 pages.

The Insured Deposit Account: "Money in the Bank," p. 5; Three Little Letters. Three Big Ways to Save in 1998, p. 4.

LexisNexis, The American Banker, Sep. 23, 1983, Merrill Joins Money Market Account, CMA; Broker Begins Testing With 12 Institutions, Byline: A. Arvan, 4 pages.

Merrill Lynch & Co Inc—MER, 10k Wizard, Form 8-K, "Report of Unscheduled Material Events or Corporate Changes," filed Mar. 7, 2002, 51 pages.

Federal Reserve System, Lexsee 51 FR 9632, "Definition of Deposit and Technical Amendments," Action: Final Rule, Mar. 20, 1986, 13 pages.

Federal Reserve System, Lexsee 56 FR 15494, "Regulation D—Reserve Requirements of Depository Institutions," Action: Final Rule, Apr. 17, 1991, 5 pages.

Federal Reserve System, Part 201—Reserve Requirements of Depository Institutions (Regulation D)12 CFR Ch. II(Jan. 1, 2010 Edition), pp. 94-128, Pt. 204-Pt. 205.

Letter to G.T. Schwartz, from O.I. Ireland, dated Jun. 22, 1988, Re: response to letter of Dec. 18, 1987 regarding proposed modifications to Merrill Lynch's CMA Program, 5 pages.

Federal Reserve System, Lexsee 47 FR 55207, "Reserve Requirements of Depository Institutions; Money Market Deposit Account," Dec. 8, 1982, Action: Final Rule, 5 pages.

Insured Bank Deposits™ Program Summary Information Statement, 11 pages.

Insured Bank Deposits™ Program Information Statement, (attached List of Eligible Program Banks, Effective May 9, 2002; New Account Application, Joint Account Agreement), 11 pages.

Wayne Hummer Investments, "Insured Bank Deposits™ Program, Frequently Asked Questions," 4 pages.

American Express—Meeting Notes Sep. 26, 2000, 2 pages.

American Express Conference Call Minutes, Jan. 25, 2001 @ 3:00pm-4:00pm, Topic: Tiered Balances, 2 pages.

Memorandum to M. Peterson, J. Whitt, R. Wroten, E. Naumes, E. Deal, B. McCain, from J.E. Oncken, Jun. 15, 1990, Re: Insured Savings Update (with attachments), 7 pages.

Insured Savings, "Correspondent Agreement," including Exhibits A-D, 28 pages.

Insured Savings, "Project Team Meeting," Feb. 2, 1989, 21 pages.

Insured Savings, "Overview & Marketing Plan," Presented by: J.E. Oncken, Dec. 6, 1988, (including Exhibit A), 23 pages.

Letter to V.J. Best, from J.E. Oncken, dated Apr. 18, 1988, 2 pages.

Letter to M.L. Duke from K. Johnson, dated Dec. 27, 1989, (attached Insured Savings Correspondent Agreement, Exhibits A-D, letter to M.L. Duke from K. Johnson dated Nov. 21, 1989 and Account Information Sheet), 39 pages.

Memorandum to J. Oncken, J. Scurlock, B. Standefer, E. Piner, T. Cyr, from K. Johnson, dated Jul. 5, 1990, Re: Attached Insured Savings Letters (with attachments), 9 pages.

E.D.S.—First City Austin Electronic Mail, from J. Oncken, to T. Cyr, Re: Depository Levels at Insured Savings Depositories, Nov. 2, 1989, 1 page.

Cash Management Balance Monitoring Agreement and Memorandum from Ed Piner to Cash management Line of Business Representatives dated May 21, 1991(with attachments), 8 pages.

Merrill Lynch, Insured Savings Account Fact Sheet, The Merrill Lynch Cash Management Account® Financial Service, Jan. 1986, 4 pages.

Merrill Lynch Money Markets, Inc., Merrill Lynch Capital Markets, "The Insured Savings Account, Issuer Guide to Offering MMDAs through Merrill Lynch," Sep. 1986; 36 pages.

Merrill Lynch, The Merrill Lynch Capital Builder[SM] Account Financial Service, Insured Savings[SM] Account Participating Depository Institutions, 1996, 2 pages.

Insured Deposit Account, May 21, 1996, 14 pages.

An Introduction to the Smith Barney Insured Deposit Account, 8 pages.

Smith Barney Inc. Capital Markets, Debt Origination Group Memo, to J. Mandelbaum, from T. Hamilton, cc: R. Holloman, H. Bald, S. Becton, Re: Insured Deposit Account, Oct. 10, 1995; Smith Barney Inc. Capital Markets, Debt Origination Group Memo, to B. Holloman, from T. Hamilton, cc: W. Heinzerling, H. Morris, COPs, Re: New Product Proposal for Insured Deposit Account, Sep. 18, 1995, 2 pages.

Insured Deposit Account, Product Description for the Investor, Draft as of Sep. 20, 1995, 8 pages.

Island Intellectual Property LLC et al. v. Deutsche Bank AG, et al.; Memorandum and Order; Case 1:09-cv-02675-KBF; Doc. 289; Feb. 14, 2012; pp. 1-28.

U.S. Appl. No. 12/453,390, filed May 8, 2009, Bruce Bent.

Island Intellectual Property LLC et al. v. Deutsche Bank AG, et al.; Order; Case 1:09-cv-02675-KBS; Doc. 221; Feb. 14, 2012; pp. 1-34.

Island Intellectual Property LLC et al.; Declaration of Charles R. Macedo 2 in support of Plaintiffs' motions in limine Nos. 4-6; Case 1:09-cv-02675-KBF; Doc. 260; Feb. 3, 2012; pp. 1-3 and Exhibits.

Island Intellectual Property LLC et al. v. Deutsche Bank Trust Company Americas, et al.; Defendants' opposition to Plaintiffs' motion in limine #3 to preclude defendants' expert Richard T. Powers from testifying that the Merrill Lynch CMA/ISA product includes omnibus accounts. Case 1:09-cv-02675-KBF; Doc. 269; Feb. 6, 2012; pp. 1-18.

Island Intellectual Property LLC et al. v. Deutsche Bank Trust Company Americas, et al.; Defendants' opposition to Plaintiffs' motion in limine #4 to preclude evidence and argument regarding Plaintiffs' confidential Oct. 18, 2000 presentation to American Enterprises Investment Services at trial; Case 1:09-cv-02675-KBF; Doc. 284; Feb. 10, 2012; pp. 1-12.

Island Intellectual Property LLC et al. v. Deutsche Bank Trust Company Americas, et al.; Memorandum and Order; Case 1:09-cv-02675-KBF; Doc. 265; Feb. 6, 2012; pp. 1-22.

Island Intellectual Property LLC et al. v. Deutsche Bank Trust Company Americas, et al.; Plaintiffs' brief in support of their motion in limine #3 to preclude defendants' expert Richard T. Powers from testifying that the Merrill Lynch CMA/ISA product includes omnibus accounts based on 17-year old double hearsay that is uncorroborated and in contravention of documentary and oral evidence of record; Case 1:09-cv-02675-KBF; Doc. 247; Jan. 30, 2012; pp. 1-20.

Island Intellectual Property LLC et al. v. Deutsche Bank Trust Company Americas, et al.; Plaintiffs' memorandum of law in support of motion in limine #4 to preclude evidence and argument regarding Plaintiffs' confidential Oct. 18, 2000 presentation to American Enterprises Investment Services at trial; Case 1:09-cv-02675-KBF; Doc. 262; Feb. 6, 2012; pp. 1-10.

Island Intellectual Property LLC et al. v. Deutsche Bank Trust Company Americas, et al.; Plaintiffs' motion in limine #4 to preclude evidence and argument regarding Plaintiffs' confidential Oct. 18, 2000 presentation to American Enterprises Investment Services at trial; Case 1:09-cv-02675-KBF; Doc. 257; Feb. 3, 2012; pp. 1-10.

Island Intellectual Property LLC et al. v. Deutsche Bank Trust Company Americas, et al.; Plaintiffs' Notice of Motion and Motion in Limine #3 to preclude Defendants' expert Richard T. Powers from testifying that the Merrill Lynch CMA/ISA product includes omnibus accounts based on 17-year old double hearsay that is uncorroborated and in contravention of documentary and oral evidence of record; Case 1:09-cv-02675-KBF; Doc. 246; Jan. 30, 2012; pp. 1-2.

Island Intellectual Property LLC et al. v. Deutsche Bank Trust Company Americas, et al.; Plaintiffs' notice of motion and motion in limine #3 to preclude testimony of Gilbert Schwartz; Case 1:09-cv-02675-KBF; Doc. 259; Feb. 3, 2012; pp. 1-2.

Island Intellectual Property LLC et al. v. Deutsche Bank Trust Company Americas, et al.; Plaintiffs' notice of motion and motion in limine #4 to preclude evidence and argument regarding Plaintiffs' confidential Oct. 18. 2000 presentation to American Enterprises Investment Services at trial; Case 1:09-cv-02675-KBF; Doc. 256; Feb. 3, 2012; pp. 1-2.

Knight-Ridder; Money Matters, Tips you can use—Limits Apply as FDIC Insurance Covers Depositor, Not Account; Chicago Tribune; Feb. 4, 1998; 2 pages.

**US 8,386,383 B1**

Page 6

Lawsuit by *Island Intellectual Property LLC et al.* v. *Deutsche Bank Trust Company Americas et al.*; Joint Statement of Claims and Defenses to be Presented at Trial Set for Feb. 27, 2012; Jan. 16, 2012; Case 1:09-cv-02675-KBF (Document 227).

Lawsuit by *Island Intellectual Property LLC* v. *Clearview Correspondent Services, LLC, et al.*; Branch Banking & Trust Company's Answer to Complaint and Counterclaims; Civil Acion No. 1:11-cv-448-LO-IDD; Jun. 20, 2011; 13 pages.

Lawsuit by *Island Intellectual Property LLC, et al.* v. *Deutsche Bank Trust Company Americas et al.*; Declaration of Olivia M. Kim in Support of Defendants' Motion for Summary Judgement of Invalidity Under 35 U.S.C. § 101; Oct. 6, 2011; Case 1:09-cv-02675-VM, Document 197.

Lawsuit by *Island Intellectual Property LLC, et al.* v. *Deutsche Bank Trust Company Americas, et al.* Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgement fo Invalidity Under 35 U.S.C. § 101; Nov. 2, 2011: Case 1:09-cv-02675-VM, Document 201.

Lawsuit by *Island Intellectual Property LLC, et al.* v. *Deutsche Bank Trust Company Americas, et al.*; Defendants Reply in Support of Their Motion for Summary Judgement of Invalidity Under 35 U.S.C. § 101; Nov. 15, 2011; Case 1:09-cv-02675-VM, Document 208.

Lawsuit by *Island Intellectual Property LLC, et al.* v. *Deutsche Bank Trust Company Americas. et al.*; Defendants' Response to Plaintiffs' Statement of Additional Material Facts in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgement of Invalidity Under 35 U.S.C. § 101; Nov. 15, 2011; Case 1:09-cv-02675-VM, Document 209.

Lawsuit by *Island Intellectual Property LLC, et al.* v. *Deutsche Bank Trust Company Americas, et al.*; Order; Dec. 7, 2011; Case 1:09-cv-02675-VM, Document 212.

Lawsuit by *Island Intellectual Property LLC, et al.* v. *Deutsche Bank Trust Company Americas, et al.*; Special Master's report and Recommended Decision on Defendants' Summary Judgement Motion of Invalidity Under 35 U.S.C. § 101; Dec. 19, 2011.

Lawsuit by *Island Intellectual Property LLC, et al.* v. *Deutsche Bank Trust Company Americas, et al.*; Supplemental Declaration of Olivia M. Kim in Support of Defendants' Opening and Reply Claim Construction Briefs; Nov. 15, 2011; Case Llc, et al. v. Deutsche Bank Trust Company Americas, et al.; M. Kim1:09-cv-02675-VM, Document 207.

Martnes, Don W.; letter to Hon. Victor Marrero re. supplement to letter of Nov. 28, 2011 on tentative rulings on claim constuction in *Island Intellectual Property LLC et al.* v. *Deutsche Bank Trust Co., et al.*; Nov. 28, 2011; Case 1:09-cv-02675-VM; Document 211.

Martens, Don W.; letter to Hon. Victor Marrero re. tentative rulings on claim construction in *Island Intellectual Property LLC et al.* v. *Deutsche Bank Trust Co., et al.*; Nov. 28, 2011; Case 1:09-cv-02675-VM, Document 210.

Scottrade Bank Deposit Program—Terms, Conditions & Disclosures; Author unknown; 8-11; pp. 1-3.

Anderson et al. "Retail Sweep Programs and Bank Reserves," Federal Reserve Bank of St. Louis Review, Bell & Howell Information and Learning Company, vol. 83, Issue 1, 24 Sheets, Jan. 1, 2001.

Bent, "Bruce Bent Makes Money Market Funds Act Like Bank Accounts," Equity BBDP, Oct. 5, 1998, 3 Sheets.

Declaration of Mr. Bruce Bent II, Vice Chairman and Registrant of Applicant on the date of first commercial use of the service providing interest and FDIC insurance for checking accounts by means of a system using money market deposit accounts (MMDA's) of Oct. 23, 1997.

Britt, "Struggling with Sweep Accounts," America's Community Banker, vol. 6, No. 12, 11 Sheets, Dec. 1, 1997.

Chapelle, "Merrill's Rivals Say They, Too. Offer Services Beyond Banking," Securities Data Publishing on Wall Street, 2 Sheets, Feb. 1, 2003.

Chapelle et al. "Peering Into Tomorrow: At the Threshold of a New Century, Brokers and Others Discuss Where They were Going," Securities Data Publishing on Wall Street, 6 Sheets, Dec. 1, 1999.

Coyle, "A Look at commercial Demand Deposit Options," America's Community Banker, vol. 9, Issue 2, Bell & Howell Information and Learning Company, 9 Sheets, Feb. 1, 2000.

Crockett, "Big Banks Found Stepping Up Marketing of 'Sweep' Accounts," American Banker, vol. 159, No. 198, American Banker Inc., 3 Sheets, Oct. 13, 1994.

Fredrickson, "Rising Rates Rescue Money Fund Firm Reserve Profits by Picking Niches," Crain's New York Business, Crain Communications Inc., vol. 20, Issue 51, 2 Sheets, Dec. 20, 2004.

Hoffman, "Reserve's FDIC-Insured Account Draws Regionals; But some see little need for insurance," Crain Communications Inc., Investment News, 2 Sheets, Jun. 4, 2001.

Keenan, "Tapping Brokerages for Alternative to CDs," American Banker, The Financial Services Daily, 3 Sheets, Feb. 18, 2004.

Lavine, "Check Out High-Yield Checking Accounts," Broward Daily Business Review, vol. 39, No. 102, 2 Sheets, Apr. 27, 1998.

McReynolds, "The Power of CASH: Ho-hum cash can be great product (and lead to more business) in troubled times," Securities Data Publishing on Wall Street, 3 Sheets, Jun. 1, 2002.

McReynolds et al. "Unusual Products for Unusual Times," Securities Data Publishing on Wall Street, 6 Sheets, May 1, 2001.

Potter, "As Sweep Accounts Continue to Grow, So do Community Bank Options," America's Community Banker, vol. 9, Issue 8, Bell & Howell Information and Learning Company, 3 Sheets, Aug. 1, 2000.

SHARE, "New Service Skirts FDIC's $100K Limit," Dialog Web Command Mode, 2 Sheets, Jun. 13, 2003, http://www.dialogweb.com/cgi/dwclient.

Smith, "IBAA Won't Push Interest-Bearing Checking For Business; Says Too Few Members Want It," The American Banker, 2 Sheets, Apr. 18, 1996.

Stafford, "New Bank Program Allows $1 Million in Insured Deposits," Dialog Web Command Mode, 3 Sheets, Aug. 24, 2003 http://www.dialogweb.com/cgi/dwclient.

Wilson, "How Cash Management Services Can Help Your Bank Cultivate New Relationships with Commercial Customers," America's Community Banker, vol. 10, Issue 5, Bell & Howell Information and Learning Company, 8 Sheets, May 1, 2001.

"Man Bites Dog: Funds Move Into Banking," IBC's Money Fund Selector, 2 Sheets, Nov. 6, 1998.

About iMoneyNet, Inc., About iMoneyNet's Money Funds Division, 4 Sheets, Aug. 21, 2003, http://www.ibcdata.com/about.htm.

"Reverse Ups Insurance Limit On Money Market Account," Thomson Financial Inc., Mutual Fund Market News, 1 Sheet, Aug. 26, 2002.

"The Reverse Funds to Offer up to $600,000 of FDIC Insurance on Reserve Insured Deposits; Addressing Investor Needs for Increased Safety, Flexibility and a Competitive Yield," Business Wire, Inc. Business Wire, 2 Sheets, Aug. 13, 2002.

"The Bank of New York adds a $300,000 FDIC-Insured Money Market Account Option to its Dividend Income Checking Account," PR Newswire Associations, Inc., PR Newswire, 2 Sheets, Apr. 18, 2002.

The Reserve Fund, Study of U.S. Patent No. 6,374,231, 1 Sheet.

"Bank of Oak Ridge to Offer FDIC Insurance on up to $1.5 Million," Dialog Web Command Mode, 2 Sheets, Sep. 25, 2003, http://www.dialogweb.com/cgi/dwclient.

Reserve Management Corporation, Reserve Insured Deposits, U.S. Appl. No. 76/315,600, Issued.

The Reserve, "What Sets Us Apart," 2 Sheets, Oct. 4, 2006, http://www.ther.com/bank/bank_wsua.shtml.

The Reserve, "Reserve Insured Deposits," 2 Sheets, Oct. 4, 2006, http://www.ther.com/ps/ps_fif.shtml.

The Reserve, "Company History," 3 Sheets, Oct. 4, 2006, http://www.ther.com/aboutus/history.shtml.

The Reserve, "Reserve Insured Deposits Program," 2 Sheets, Oct. 4, 2006, http://www.ther.com/bank/bank_insdep.shtml.

Reserve Insured Deposits, United States Patent and Trademark Office, Reg. No. 2,694,910, Registered Mar. 11, 2003, 1 Sheet.

Mutual Funds Magazine, Bargain Basement Funds, Oct. 1997, 2 Sheets.

Mutual Funds Magazine, Bargain Basement Funds, Oct. 1997, 1 Sheet.

Money Fund Report, IBC Financial Data, Inc., Nov. 6, 1998, 1 Sheet.

Liberman et al., Market Watch, "How Important are Banks?" FDIC Insurance on Deposits Just One Continuing Advantage, Oct. 17, 2006, 3 Sheets.

**US 8,386,383 B1**

Page 7

DI 48, Excerpts of Transcript of Hearing, U.S. Dist. Ct., District of Delaware, Civil Action No. 82-680, Apr. 8, 1983, 5 sheets.

DI 56, Interrog. Response, U.S. Dist. Ct. District of Delaware, Civil Action No. 82-680, May 20, 1983, 15 sheets.

DI 99, Suppl. Interrogatory Response, U.S. Dist. Ct., District of Delaware, Civil Action No. 82-630, May 30, 1984, 6 Sheets.

Letter from Michael Bradfield, General Counsel, Board of Governors of the Federal Reserve System, Nov. 16, 1984, 4 Sheets.

Board of Governors of the Federal Reserve System, 1984 Fed. Res. Interp. Ltr. LEXIS 56, Nov. 16, 1984, 3 Sheets.

Letter From Oliver I. Ireland, Associate General Counsel, Board of Governors of the Federal Reserve System, Jun. 22, 1988, 5 Sheets.

Board of Governors of the Federal Reserve System, 1988 Fed. Res. Interp. Ltr. LEXIS 141, Jun. 22, 1988, 3 Sheets.

Board of Governors of the Federal Reserve System, 1989 Fed. Res. Interp. Ltr. LEXIS 77, Mar. 14, 1989, 2 Sheets.

Board of Governors of the Federal Reserve System, 1989 Fed. Res. Interp. Ltr. LEXIS 154, Jun. 21, 1989, 2 Sheets.

Board of Governors of the Federal Reserve System, 1990 Fed. Res. Interp. Ltr. LEXIS 94, Feb. 1, 1990, 1 Sheet.

Board of Governors of the Federal Reserve System, 1991 Fed. Res. Interp. Ltr. LEXIS 232, Jan. 30, 1991, 2 Sheets.

CMA, The Merrill Lynch Cash Management Account Financial Service, Insured Savings Account Participating Depository Institutions, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Nov. 1992, 2 Sheets.

Board of Governors of the Federal Reserve System, 1994 Fed. Res. Interp. Ltr. LEXIS 156, Jun. 24, 1994, 3 Sheets.

CMA, Insured Savings Account Fact Sheet, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Jul. 1994, pp. 47-54.

Board of Governors of the Federal Reserve System, 1994 Fed. Res. Interp. Ltr. LEXIS 314, Oct. 17, 1994, 2 Sheets.

Board of Governors of the Federal Reserve System, 1994 Fed. Res. Interp. Ltr. LEXIS 419, Oct. 14, 1994, 4 Sheets.

CMA, The Merrill Lynch Cash Management Account Financial Service, Insured Savings Account Participating Depository Institutions, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Mar. 1995, 2 Sheets.

Letter from Stephanie Martin, Assoc. General Counsel, Board of Governors of the Federal Reserve System, Apr. 22, 2004, 8 Sheets.

Bank Deposit Program, Online http://web.archive.org/web/20030620100115/http:/www.smithbarney.com/products_servi, Jan. 19, 2001, 4 Sheets.

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, and Double Rock Corporation against Promontory Interfinancial Network, LLC and MBSC Securities Corporation, including Cover Sheet, Summons, Complaint and Rule 7.1 Statement, Mar. 24, 2009, Case No. 09 CV 2675.

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, and Double Rock Corporation against Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, including Cover Sheet, Summons, Complaint and Rule 7.1 Statement, Mar. 24, 2009, Case No. 09 CV 2677.

Lawsuit by Promontory Interfinancial Network, LLC against Double Rock Corporation p/k/a Reserve Management Corporation, Complaint, Mar. 24, 2009, Civil Action No. 1:09 CV 316.

Lawsuit by Promontory Interfinancial Network, LLC against Double Rock Corporation p/k/a Reserve Management Corporation and Lids Capital LLC, Amended Complaint, Mar. 27, 2009, Civil Action No. 1:09 CV 316.

Lawsuit by Island Intellectual Property LLC, Lids Capital. LLC, Double Rock Corporation and Intrasweep LLC, against Promontory Interfinancial Network, LLC, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Complaint, Apr. 14, 2009, Case No. 09 CV 3750.

Lawsuit by Promontory Inter-financial Network, LLC against Double Rock Corporation, p/k/a Reserve Management Corporation, Island Intellectual Property LLC and Lids Capital LLC, including Cover Sheet, Summons and Complaint, Apr. 14, 2009, Civil Action No. 3:09 CV 217.

Lawsuit by Promontory Interfinancial Network, LLC against Double Rock Corporation p/k/a Reserve Management Corporation, Island

Intellectual Property LLC, Lids Capital LLC and Intrasweep LLC, Amended Complaint, Apr. 15, 2009, Civil Action No. 3:09 CV 217.

12 CFR Part 329—Interest on Deposit, Source 51 FR 10808, Mar. 31, 1986, 5 Sheets.

AB 2011 Assembly Bill—Bill Analysis, Senate Amendments, http://www.leginfo.ca.gov/pub/bill/asm/ab_2001-2050/ab_2011_cfa_20060811_161755_asm_floor.html, 2006, pp. 1-3.

AB 2011 Assembly Bill—Bill Analysis, Senate Rules Committee, Third Reading, http://www.leginfo.ca.gov/pub/bill/asm/ab_2001-2050/ab_2011_cfa_20060705_161454_sen_floor.html, 2006, pp. 1-7.

AB 2011 Assembly Bill—Chaptered, http://www.leginfo.ca.gov/pub/bill/asm/ab_2001-2050/ab_2011_bill_20060925_chaptered.html, 2008, pp. 1-3.

AB 2011 Assembly Bill—Enrolled, http://www.leginfo.ca.gov/pub/bill/asm/ab_2001-2050/ab_2011_bill_20060816_enrolled.html, 2006, pp. 1-3.

AB 2011 Assembly Bill—History, Complete Bill History, http://www.leginfo.ca.gov/pub/bill/asm/ab_2001-2050/ab_2011_bill_20060925_history.html, 2006, p. 1.

Announcing Changes in Automatic "Sweep" Investment Options, LPL Financial Services, Linsco/Private Ledger, Member NASD/SIPC, 26 Sheets.

California Independent Bankers, ICBA Independent Community Bankers of America, Banker Bulletin, 2006, CIB 16th Annual Convention, vol. 4, issue 6, http://www.cib.org/banker_bulletin.htm.

Capital Briefs: Corporate Checking Account Relief Sought, American Banker, vol. 162, Jul. 28, 1997, 1 Sheet.

CMA, Insured Savings Account Fact Sheet, Merrill Lynch, Pierce, Fenner & Smith Incorporated, 1997, pp. 49-57.

CMA, The Investor Credit Line Service, Cost-Effective Financing for the '90s, Merrill Lynch, Pierce, Fenner & Smith Incorporated, 1997, pp. 36-46.

CMA, The Merrill Lynch Cash Management Account Financial Service, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Jan. 1997, 35 Sheets.

Deposit Growth Strategies For Financial Institutions, New Sweep Account Helps Retain $40 Million in Business Deposits, vol. 7, No. 12, The Reserve Funds, May 2001, 1 Sheet.

FDIC Federal Register Citations: Email from Bert Ely to Comments, Mar. 8, 2006, Subject: Large-Bank Deposit Insurance Determination Proposal—RIN 3064-AC98—Regs@fdic.gov. Attached, also from FDIC Federal Register Citations: Email From American Banker, by Bert Ely, Feb. 24, 2006, Viewpoint: FDIC's Account-Link Plan a Pointless, Costly Threat.

FDIC, Federal Deposit Insurance Corporation, Letter to Mr. Ronald Rexter, Feb. 28, 2003, From Michelle M. Borzillo, Counsel Supervision and Legislation Section, 2 Sheets.

Financial Services Industry, "Web Watch: Trading Company Bundles CDs for Better Rates," Community Banker, Jun. 2002, online, http://findarticles.com/p/articles/mi_qa5344/is_200206/ai_n21313883/.

FINISTAR, Providing FDIC Insured Funds as a Stable Source of Deposits to Commercial Banking Institutions, 16 Sheets, www.Finistar.com.

Frost Bank, Member FDIC, Checking Accounts, 1 Sheet, Sep. 19, 2003, https://www.frostbank.com/cgi-bin/ecomm/frost1/scripts/products/product_detail.jsp?BV_.

Insured Cash Account Program Disclosure Booklet, LPL Financial Services, Linsco/Private Ledger, Member NASD/SIPC, 14 Sheets.

In The Know, Important Information About Your Account, Smith Barney Citigroup, 2005, 6 Sheets.

Letter from Joseph A. DiNuzzo, Counsel, Oct. 20, 1999, FDIC, Federal Deposit Insurance Corporation, 1 Sheet.

Letter From Roger A. Hood, Assistant General Counsel, Jul. 16, 1986, FDIC, Federal Deposit Insurance Corporation, Legal Division, 1 Sheet.

Letter From Jamey Basham, Attorney, LEXSEE 1990 FDIC Interp. Ltr., Lexis 1, Federal Deposit Insurance Corporation, FDIC-90-02, Jan. 3, 1990, 2 Sheets.

Letter From Merle Y. Waldman, LEXSEE 1985 Sec No- Act., Lexis 1593, Securities Exchange Act of 1934—Section 15(a), Jan. 8, 1985, 11 Sheets.

# US 8,386,383 B1

Page 8

Letter to Mr. James E. Creekman, Group Vice President, From Oliver Ireland, Associate General Counsel, Aug. 1, 1995, 4 Sheets.

Letter to Mr. Jonathan L. Levin, Esq., From Oliver Ireland, Associate General Counsel, Oct. 18, 1996, 2 Sheets.

Letter to Mr. L.P. Fleming, Jr., Esq., From Oliver Ireland, Associate General Counsel, Feb. 7, 1995, 3 Sheets.

Letter to Ms. Brenda L. Skidmore, Senior Vice President, From Oliver Ireland, Associate General Counsel, Aug. 30, 1995, 4 Sheets.

Merriam-Webster Online Dictionary, 10th Edition, Definition of "Associated", 2 Sheets.

Merrill Lynch Announces Beyond Banking, The Power of Advice For Smarter Cash Management, Jan. 8, 2 Sheets.

Merrill Moves CMA Cash to Bank, Street Talk, On Wall Street, Nov. 2000, p. 26.

Merrill Lynch & You, Jan. 2000, "Financial Services The Way You Want, When You Want Them," 4 Sheets.

Merrill Lynch, Pierce, Fenner & Smith Incorporated, "Information Statement," 2000, 12 Sheets.

Money Fund Report, Bank of New York Adds Insured Sweeps Option, Friday, May 3, 2002, The Reserve Funds, 1 Sheet.

Money Fund Report, Insured Cash Sweep Options Proliferate, Friday, Jun. 1, 2001, The Reserve Funds, 1 Sheet.

Money Market Insight's, Goldman Sachs May Create Bank to Offer Insured Cash Sweeps, Aug. 2002 Issue, 3 Sheets.

Munk, Merrill Makes New Push Into Traditional Banking, Dow Jones Newswires, Jan. 3, 2003, 1 Sheet.

O'Brian, "Money-Market Funds Suit Many Investors, But Proud Creator Frets About Extra Risk," Re-Printed From The Wall Street Journal, Monday, Nov. 6, 2000, Dow Jones & Company, Inc., 2 Sheets.

On Wall Street, Helping Brokers Build A More Successful Business, The Power of CASH, Jun. 2002, 2 Sheets.

On Wall Street, Helping Brokers Build A More Successful Business, Unusual Products For Unusual Times, May 2001, 2 Sheets.

Online, www.usabancshares.com, Brave New World, 1999, 2 Sheets.

Part: 2, Monetary Policy and Reserve Requirements, Subpart—Regulation D, Board Interpretations of Regulation D, Transaction Accounts—Linked to Time Deposits, vol. 1, Federal Reserve Regulatory Service, 2 Sheets.

RING, National/Global, "Amex Spans The Globe in Retail Bank Buildup," Nov. 27, 2000, 1 Sheet.

Sweeping Your Firm Into FDIC Insured Deposits, Harken Financial Services, Aug. 4, 2006, 8 Sheets.

Testimony of Bruce R. Bent, CEO of The Reserve Funds, Before The Financial Institutions and Consumer Credit Subcommittee House Financial Services Committee U.S. House of Representative, Hearing on H.R. 758 and H.R. 859, Mar. 5, 2003, 4 Sheets.

The Depository Trust Company, B#: 3875, Oct. 1, 2002, Settlement/Underwriting, From: Denise Russo, Director, Underwriting, 6 Sheets.

The Insured Savings Account, Issuer Guide to Offering MMDAs Through Merrill Lynch, Merrill Lynch Money Markets, Inc., "Operational Guide to the Merrill Lynch MMDA Program 1986", Sep. 1986 3 Sheets.

The Reserve Funds, NJBA Endorses New Sweep Account Offers New Jersey Banks Deposit Growth, Retention, for Immediate Release, May 23, 2001, 1 Sheet.

The Reserve Funds, Objectives, Observations & Strategies for American Enterprises Inc., Oct. 18, 2000, 11 Sheets.

The Reserve Funds Press Release, "The Reserve Funds and Frontier Bank Partner to Offer Revolutionary Banking Product," 5 Sheets, Aug. 1, 2000.

The Reserve Funds, Reserve Management and Irwin Union Bank and Trust Company Partner to Offer the Reserve Return Sweep, For Immediate Release, Mar. 8, 2001, 2 Sheets.

The Unmatched Sweep Solution From The Cash Management Expert, 2 Sheets.

Waddell, "Sweeping Clean," Advisor, The Advisor to Advisors, 2 Sheets.

Lawsuit by Island Intellectual Property LLC, Intrasweep LLC and Double Rock Corporation against Deutsche Bank AG, Deutsche

Bank Trust Company Americas and Total Bank Solutions, LLC, Complaint for Patent Infringement, May 19, 2009, Case No. 09 CIV 4673.

Lawsuit by Promontory Interfinancial Network, LLC against Double Rock Corporation p/k/a Reserve Management Corporation, Island Intellectual Property LLC, Lids Capital LLC and Intrasweep LLC, Complaint, May 19, 2009, Civil Action No. 3:09 CV 322.

Lake Forest Bank & Trust Company, Introducing MaxSafe Deposit Accounts with up to $3.75 Million in FDIC Insurance, www.lakeforestbank.com/maxsafe, 2 Sheets.

Seven Times the Safety of a Normal CD, Introducing our MaxSafe CD, 4 Sheets.

Introducing our MaxSafe CD with up to $700,000 of FDIC Insurance, 4 Sheets.

U.S. Appl. No. 09/677,535, filed Oct. 2, 2000, Bruce Bent et al.

U.S. Appl. No. 10/825,440, filed Apr. 14, 2004, Bruce Bent et al.

U.S. Appl. No. 11/641,046, filed Dec. 19, 2006, Bruce Bent et al.

U.S. Appl. No. 11/840,052, filed Aug. 16, 2007, Bruce Bent et al.

U.S. Appl. No. 11/840,060, filed Aug. 16, 2007, Bruce Bent et al.

U.S. Appl. No. 12/385,522, filed Apr. 10, 2009, Bruce Bent et al.

U.S. Appl. No. 12/408,507, filed Mar. 20, 2009, Bruce Bent et al.

U.S. Appl. No. 12/408,511, filed Mar. 20, 2009, Bruce Bent et al.

U.S. Appl. No. 12/408,523, filed Mar. 20, 2009, Bruce Bent et al.

U.S. Appl. No. 12/453,387, filed May 8, 2009, Bruce Bent et al.

U.S. Appl. No. 12/453,388, filed May 8, 2009, Bruce Bent et al.

U.S. Appl. No. 12/453,389, filed May 8, 2009, Bruce Bent et al.

U.S. Appl. No. 12/453,390, filed May 8, 2009, Bruce Bent et al.

Financial Transactions and Reports Analysis Centre of Canada, 1 page, (http://www.fintrac-canafe.gc.ca/inro-eng.asp.

Finistar Reg. No. 2,939,558, Registered Apr. 12, 2005.

FINTRAC's Guidelines, 1 page, (http://www.fintrac.gc.ca/publications/guide/guide-eng.asp).

Garmhausen, "Matching Small Banks with Large Muni Deposits," American Banker, Online The Financial Services Resource, Oct. 4, 2005, 4 pages, http://www.finstar.com/docs/AmericanBanker.html.

Hencke, "New Rules for FDIC deposit Insurance", ABA Bank Compliance, vol. 20, No. 7, Jul./Aug. 1999, pp. 31-37.

IDC Deposits, online, http://idcdeposits.com/ 1 Sheet.

Jong et al., "The Valuation and Hedging of Variable Rate Savings Accounts," University of Amsterdam, Nov. 15, 2001, 23 Sheets.

Lawsuit by Carlo DeBlasio et al. against Merrill Lynch & Co., Inc. et al., Declaration of Andrew W. Stern, including Exhibits A, B, C, D, E and F, Nov. 11 2007, Case No. 07-cv-318 (RJS) (Document 59).

Lawsuit by Carlo DeBlasio et al. against Merrill Lynch & Co., Inc. et al., Declaration of Joel P. Laitman in Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion For Dismissal of the Second Amended Class Action Complaint, Including: "Client Commitment"; "Get Started Today"; "Total Merrill"; "Guideline For Business Conduct"; "Commitment To Clarity"; "Cash Management Account"; "Information Statement Regarding Changes To Interest Rates On Deposits in Merrill Lynch Banks",.

Lawsuit by Carlo DeBlasio et al. against Merrill Lynch & Co., Inc. et al., Declaration of Joel P. Laitman in Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion For Dismissal of the Second Amended Class Action Complaint, Including: . . . Feb. 5, 2008 (Document 72).

Lawsuit by Carlo DeBlasio et al. against Merrill Lynch & Co., Inc. et al., Declaration of Joel P. Laitman in Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion For Dismissal of the Second Amended Class Action Complaint, Including: . . . Feb. 5, 2008 (Document 73).

Lawsuit by Carlo DeBlasio et al. against Merrill Lynch & Co., Inc. et al., Declaration of Joel P. Laitman in Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion For Dismissal of the Second Amended Class Action Complaint, Including: . . . Feb. 5, 2008 (Document 74).

Lawsuit by Carlo DeBlasio et al. against Merrill Lynch & Co., Inc. et al., Declaration of Joel P. Laitman in Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion For Dismissal of the Second Amended Class Action Complaint, Including: . . . Feb. 5, 2008 (Document 75).

Lawsuit by Carlo DeBlasio at al. against Merrill Lynch & Co., Inc. et al., Declaration of Kenneth I. Schacter, including Exhibits A, B, C, D, F, G, H, I, J, K, L, M, N, O, P, Q and R, Nov. 14 2007, Case No. 07-cv-318 (RJS) (Document 69).

Lawsuit by Carlo DeBlasio at al. against Merrill Lynch & Co., Inc. et al., Declaration of Mathew J. Terry in Support of Motion to Dismiss by Defendants Wachovia Corporation, Wachovia Securities, LLC, Wachovia Bank, N.A., and Wachovia Bank of Delaware, N.A., including Exhibits A, B, C and D, Nov. 14 2007, Case No. 07-318 (RJS) (Document 67).

Lawsuit by Carlo DeBlasio et al. against Merrill Lynch & Co., Inc. et al., Declaration of Scott D. Musoff in Support of The Merrill Lynch Defendants' Motion to Dismiss The Second Amended Class Action Complaint, ECF Case, Nov. 12 2007, Case No. 07-cv-318 (RJS) (Document 64).

Lawsuit by Carlo DeBlasio et al. against Merrill Lynch & co., inc. et al., Reply Declaration of Kenneth Schacter including Exhibits S and T, Mar. 6, 2008, Case No. 07-cv-318 (RJS) (Document 81).

Lawsuit by Carlo DeBlasio et al. against Merrill Lynch & Co., Inc. et al., Second Amended Class Action Complaint, Jury Trial Demanded, Introduction and Summary of Allegations, Jun. 11, 2007, Case No. 07-cv-318-VM.

Lawsuit by Carlo DeBlasio et al. against Merrill Lynch & Co., Inc. et al., Supplemental Declaration of Matthew J. Terry in Support of Motion to Dismiss by Defendants Wachovia Corp., Wachova Securities, LLC, Wachovia Bank N.A., and Wachovia Bank of Delaware, N.A., including Exhibits A and B, Mar. 6, 2008, Case No. 07-cv-318 (RJS) (Document 79).

Lawsuit by Carlo DeBlasio, et al. against Merrill Lynch & Co., Inc., et al., Opinion and Order Regarding Motions, Jul. 27, 2008, Case No. 07 CIV 318(RJS).

Lawsuit by Island Intellectual Property LLC and Intrasweep LLC against Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Deutsche Bank Trust Company Americas' answer to plaintiffs' Feb. 23, 2010 complaint and counterclaims, May 4, 2010, Civil Action No. 09 Civ. 2675 (VM) (AJP)(Document 111).

Lawsuit by Island Intellectual Property LLC and Intrasweep LLC against Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Total Bank Solutions, LLC's answer to plaintiffs' Feb. 23, 2010 complaint and counterclaims, May 4, 2010, Civil Action No. 09 Civ. 2675 (VM) (AJP)(Document 112).

Lawsuit by Island Intellectual Property LLC and Intrasweep LLC against Institutional Deposits Corp., Complaint for Patent Infringement, Jury Trial Demanded, Nov. 4, 2009, Civil Action No. 09 CV 3079.

Lawsuit by Island Intellectual Property LLC and Intrasweep LLC against Institutional Deposits Corp., Consent Order, Apr. 21, 2010, Case No. 09-CV-3079 (Document 44).

Lawsuit by Island Intellectual Property LLC and Intrasweep LLC, Answer of Defendant Institutional Deposits Corp. to Complaint for Patent Infringement, Dec. 10, 2009, Case No. 09 CV 03079 (JEC), (Document 16).

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Stipulated Dismissal of Deutsche Bank AG Without Prejudice, Nov. 19, 2009, Civil Action No. 09 CIV 2675 (VM) (AJP) (Document 79).

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Deutsche Bank Trust Company Americas' First Amended Answer to Consolidated First Amended Complaint and Counterclaims, Dec. 4, 2009, Civil Action No. 09 CIV 2675 (VM) (AJP), (Document 86).

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Total Bank Solutions, LLC's First Amended Answer to Consolidated First Amended Complaint and Counterclaims Dec. 4, 2009, Civil Action No. 09 CIV 2675 (VM) (AJP) (Document 87).

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation,

Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Answer and Counter Claims, Answer of Defendant MBSC Securities Corporation., Jun. 25, 2009, Case No. 09 CV 2675.

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Answer and Counter Claims, Answer of Defendant Promontory Interfinancial Network, LLC, Jun. 25, 2009, Case No. 09 CV 2675.

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Consolidated First Amended Complaint, Jury Trial Demanded, Jun. 11 2009, Civil Action No. 09 CIV 2675 (VM).

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation. Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Jury Trial Demanded, Deutsche Bank AG's Answer To Consolidated First Amended Complaint, Jun. 25, 2009, Civil Action No. 09 CIV 2675.

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Jury Trial Demanded, Deutsche Bank Trust Company Americas' Answer To Consolidated First Amended Complaint and Counter Claims, Jun. 25, 2009, Civil Action No. 09 CIV 2675.

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Jury Trial Demanded, Total Bank Solutions, LLC's Answer T o Consolidated First Amended Clomplaint and Counter Claims, Jun. 25, 2009, Civil Action No. 09 CIV 2675.

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Stipulated Dismissal of Counts I-III of Defendant Promontory Interfinancial Network, LLC's, Counter-claim with Prejudice, Oct. 19, 2009, (Document 68).

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Stipulation and Order, Oct. 29, 2009, Case No. 09 CV 2675 (VM) (AJP) (Document 73).

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, The Island Plaintiffs' Reply to Defendant Deutsche Bank Trust Company Americas' Counterclaims, Jul. 9, 2009, Civil Action No. 09 CIV 2675 (VM).

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, The Island Palintiffs' Reply to Defendant MBSC Securities Corporation's Counterclaims, Jul. 9, 2009, Civil Action NO. 09 CIV 2675 (VM).

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securitied Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, The Island Plaintiffs' Reply to Defendant

## US 8,386,383 B1

Promontory Interfinancial Network LLC's Counterclaims, Jul. 9, 2009, Civil Action No. 09 CIV 2675 (VM).

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Intel-financial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, The Island Plaintiffs' Reply to Defendant Total Bank Solutions, LLC's Counterclaims, Jul. 9, 2009, Civil Action No. 09 CIV 2675 (VM).

Letter to William R. Burdette, CEO, Apr. 6, 2009, FDIC, Federal Deposit Insurance Corporation, 2 pages.

Letter to William R. Burdette, CEO, Nov. 15, 2007, FDIC, Federal Deposit Insurance Corporation, 5 Sheets.

Mutual Fund Dealers Association, 1 page, (http://www.mfda.ca/.

Promontory Interfinancial Network, Promontory Interfinancial Network Announces New Deposit Placement Service, Jan. 21, 2003, 3 Sheets.

Promontory Interfinancial Network: http://www.promnetwork.com/index.html, 2003.

The Pershing Press, Dreyfus Insured Deposit Program, Issue 2, Aug. 2008, http://www.pershing.com/news/pershing_press/news_466244.html, 2 Sheets.

Total Bank Solutions, Bank Sweep FAQs, http://www.totalbanksolutions.com/sweepbnkfaqs.htm, Sep. 23, 2005, 2 pages.

Total Bank Solutions, Bank Sweep FAQs, http://www.totalbanksolutions.com/sweepbnkfaqs.htm, Nov. 2, 2005, 3 pages.

Total Bank Solutions, Bank Sweep Products, Deutsche Bank, http://www.totalbanksolutions.com/banksweep.htm, Sep. 23, 2005, 1 page.

Total Bank Solutions, Bank Sweep Products, http://www.totalbanksolutions.com/banksweep.htm, Appendix 3, Oct. 18, 2005, 2 pages.

Total Bank Solutions, Bank Sweep Products, http://www.totalbanksolutions.com/banksweep.htm, Nov. 2, 2005, 2 pages.

Total Bank Solutions, Brokerage Sweep FAQs, http://www.totalbanksolutions.com/brokerfaqs.htm, Nov. 2, 2005, 3 pages.

Total Bank Solutions, Brokerage Sweep, http://www.totalbanksolutions.com/brokersweep.htm, Nov. 2, 2005, 1 page.

Total Bank Solutions, Deposit Bank FAQs, http://www.totalbanksolutions.com/depositbnkfaqs.htm, Nov. 2, 2005, 2 pages.

Total Bank Solutions, Deposits, Deutsche Bank, http://www.totalbanksolutions.com/deposits.htm, Sep. 23, 2005, 1 page.

Total Bank Solutions, Deposits, http://www.totalbanksolutions.com/deposits.htm, Nov. 2, 2005, 2 pages.

Total Bank Solutions, Deutsche Bank Insured Deposit Program, DB Insured Deposit Program Features, http://www.totalbanksolutions.com/features.htm, Sep. 23, 2005, 2 pages.

Total Bank Solutions, Deutsche Bank Insured Deposit Program, http://www.totalbanksolutions.com/, Sep. 23, 2005, 1 page.

Total Bank Solutions, http://www.totalbanksolutions.com/, Mar. 16, 2007, 8 pages.

Total Bank Solutions, http://www.totalbanksolutions.com/overview.htm, Nov. 2, 2005, 1 page.

Total Bank Solutions, Insured Deposit Program Features, http://www.totalbanksolutions.com/features.htm, Nov. 2, 2005, 2 pages.

Total Bank Solutions, Insured Deposit Program, http://www.totalbanksolutions.com/Insureddeposits.htm, Nov. 2, 2005, 2 pages.

Total Bank Solutions, Partners & Affiliates, http://www.totalbanksolutions.com/partners.htm, Nov. 2, 2005, 3 pages.

Total Bank Solutions, Partners & Affiliates, http://www.totalbanksolutions.com/partners.htm, Oct. 25, 2005, 3 pages.

Total Bank Solutions, Strategic Partners, Nov. 2, 2005, 1 page.

Total Bank Solutions, TBS Deposit Account, About Our Broker Products, http://www.totalbanksolutions.com/brokerproducts.htm, Sep. 7, 2005, 2 pages.

Total Bank Solutions, TBS Management Team, http://www.totalbanksolutions.com/management.htm, Appendix 1, Oct. 18, 2005, 1 page.

Total Bank Solutions, TBS Management Team, http://www.totalbanksolutions.com/management.htm, Nov. 2, 2005, 2 pages.

Total Bank Solutions, TBS Management Team, http://www.totalbanksolutions.com/management.htm, Oct. 25, 2005, 2 pages.

TotalBank Solutions, TBS Bank Deposit Account, Oct. 2004, 6 pgs.

TotalBank Solutions, web.archive.org/web/20050126044216/http://totalbanksolutions.com, Jan. 26, 2005, 2 pgs.

USA Mutual Partners Insured Cash Shelter Account Terms and Conditions, 11 pages, 2009 USA Mutuals Partners, Inc.

Wachovia Securities, Important Information for Clients Concerning Changes in Automatic "Sweep" Arrangements, Oct. 1, 2003, 6 sheets.

Email from Olivia Kim to Charles Macedo on May 13, 2010 with attachment of Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation, and Intrasweep LLC against Deutshe Bank Trust Company Americas and Total Bank Solutions, LLC, Defendant Total Bank Solutions, LLC's responses to Double Rock's Common interrogatory Nos. 1-10 to defendants, Reservation of Right, Civil Action No. 09 Civ. 2675 (VM) (AJP).

Email from Olivia Kim to Charles Macedo on May 13, 2010 with attachment of Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation, and Intrasweep LLC against Deutshe Bank Trust Company Americas and Total Bank Solutions, LLC, Defendant Deutsche Bank Trust Company America's responses to Double Rock's Common interrogatory Nos. 1-10 to defendants Reservation of Right, Civil Action No. 09 Civ. 2675 (VM) (AJP).

Blackwell, "ABA to Approve System for Sharing Deposit Coverage," American Banker, 2 Sheets, Feb. 11, 2003.

Certificate of Deposit Registry Service: Keeping Deposits in the Corn Patch, Banknews, 2 Sheets. Mar. 2003.

Heavyweight Funding, Bankers News, Mar. 4, 2003, vol. II, Issue No. 5, 2 Sheets.

News Article: "Regulators Support Demand Deposit Bill", Regulatory Compliance Watch—Mar. 9, 1998; 2 Sheets, vol. 9, No. 10.

Memorandum from Ken Johnson re: Insured Deposit Products, Aug. 18, 1992, 3 pgs.

Memorandum from John E. Oncken re: Insured Savings Update, Jun. 15, 1990, 7 pgs.

Memorandum from John E. Oncken re: Brokered Deposit Issue vs. Insured Savings, Mar. 22, 1990, 8 pgs.

Memorandum from Ed Piner re: Insured Savings Product Update, Feb. 1, 1990, 4 pgs.

Insured Savings Correspondent Agreement with Exhibits A-D, 28 pgs.

First City, Texas Insured Savings Agency Agreement with Exhibits A-B and Insured Savings Program, 10 pgs.

Insured Savings Project Team Meeting, Feb. 2, 1989, 16 pgs.

Insured Savings Product Description, Product Name: Insured Savings, Product Description: U.S. Patent #4,985,833, 3 pgs.

Letter to Tim C. Lear, Sep. 20, 1988, 1 pg., with Memorandum from Ed Piner, re: Insured Savings Product, Nov. 9, 1988, and Letter from Tara L. Cyr, Dec. 9, 1988, 1 pg.

Automatic Insured Deposit Method, Patent Application Information, Jul. 11, 1988, 17 pgs.

Insured Savings, Overview & Marketing Plan, Dec. 6, 1988, 23 pgs.

Memorandum from Dick Zinser, re: A First City-Austin deposit program to hold existing customers' deposits, Mar. 17, 1988, 7 pgs.

Insured Savings Remote Site Sweep Procedures, 3 pgs.

Letter to Malcolm L. Duke, Dec. 27, 1989 with Insured Savings Correspondent Agreement, Exhibits A-D, and Letter to Malcolm L. Drake, Nov. 21, 1989. 37 pgs.

Memorandum from Ken Johnson, re: Attached Insured Savings Letters, Jul. 5, 1990, 1 pg.

Letter to Jerry Crutsinger, Jul. 3, 1990, 1 pg.

Letter to Bill Goertz, Jul. 3, 1990, 1 pg.

Letter to Susan Goodwin, Jul. 3, 1990, 1 pg.

Insured Savings Rate Change Notice, 1 pg.

Addendum to Insured Savings Agency Agreement, 1 pg.

Letter to Paula Martin, Jul. 3, 1990, 1 pg.

Letter to John Lovell, Jul. 3, 1990, 1 pg.

Insured Savings Balance Limits form, 1 sheet.

Email from John Oncken re: Depository Levels at Insured Savings Depositories, Nov. 2, 1989, 1 pg.

Cash Management Balance Monitoring Agreement Form 1 sheet.

**US 8,386,383 B1**

Page 11

Memorandum from Ed Piner, Subject: Discontinuation of Automatic Balance Monitoring in conjunction with Insured Savings Accounts, May 21, 1991, 1 pg.

Blank form letter from Edward N. Piner, May 24 1991, 1 pg.

Letter from First City National Bank of Austin, Sep. 20, 1982, 5 pgs.

First City, Texas—Austin, Special Products, Feb. 20, 1992, with Schedule A & Schedule B, 6 pgs.

Letter From Oliver I. Ireland, Associate General Counsel, Board of Governors fo the Federal Reserve System, Jun. 22, 1988, 5 Sheets.

Alliance Insured Account, Information Statement, Sep. 1999, 6 sheets.

Lawsuit by Carlo DeBlasio et al. and Merrill Lynch & Co., Inc. et al., Opinion and Order, Jul, 27, 2009, Civil Action No. 07 CIV. 318, 47 pgs.

Board of Governors of the Federal Reserve System, Blank Form Letter, Apr. 22, 2004, 8 pgs.

FDIC Law, Regulations, Related Acts, 4000—Advisory Opinions, FDIC—93-35, Jun. 28, 1993, 2 sheets.

§204.134, 12 CFR Ch. 11 (Jan. 1, 2009 Edition), 2 sheets.

Money Fund $$ Moving to Bank Deposits, 6 FRC Monitor, Dec. 2003, 2 sheets.

Crane, P. & Krasner, Mike, *An iMoney Net Special Report*™, "Brokerage Cash Sweep Options: The Shift from Money Funds to FDIC-Insured Bank Deposit Accounts", Nov. 2004, 64 pgs.

The May 1998 Senior Financial Officer Survey, *Board of Govenors of the Federal Reserve System*, with Appendix A, 48 pgs.

Interest Rate Review® A Publication of *Meyer Weekly Interest Rate Survey*, A Look At Tiers, vol. II, No. 4, Apr. 1987, 6 pgs.

Interest Rate Review© A Publication of *Meyer Weekly Interest Rate Survey*, A Study of Historical Rates and Yields, vol. II, No. 6, Jun. 1987, 8 pgs.

Blank form letter to Oliver Ireland, Oct. 7, 1994, 1 pg.

Letter to L.P. Fleming, Jr. Esq., Feb. 7, 1995, 3 pgs.

Letter to James E. Creekman, Aug. 1, 1995, 4 pgs.

Letter to Brenda L. Skidmore, Aug. 30, 1995, 4 pgs.

Merrill Lynch & Co., Inc. Form 10-K405 (Annual Report (Regulation S-K, item 405)), Filed Mar. 14, 2002 for the Period Ending Dec. 28, 2001, with Schedules, Exhibits, and 2001 Annual Report, 248 pgs.

Merrill Lynch & You, "Financial Services The Way You Want, When You Want Them," Jan. 2000 4 Sheets.

Merrill Lynch, Information Statement Regarding Changes to Interest Rates on Deposits in the Merrill Lynch Banks, Document 64-14, Nov. 12, 2007, Case 1:07-cv-00318, 2 sheets.

Street Talk, "Merrill Moves CMA Cash to Bank", *On Wall Street*, Nov. 2000, 1 sheet.

Quest Insured Account, *QUESTessentials*, 3 sheets.

Quest Insured Account, *Information Statement*, 5 sheets.

OCC Insured Bank Deposit Account, 3 sheets.

Insured Bank Deposit Account, *Information Statement*, Jul. 1, 2000, 2 sheets.

Letter from Marilyn J. Hensle, announcing Salomon Smith Barney Bank Deposit Program.*SM*, with Q&A, 14 sheets.

Bank Deposit program Disclosure Statement, *Salomon Smith Barney*, 3 sheets.

FDIC Law, Regulations, Related Acts, 4000—Advisory Opinions, FDIC-87-25, Oct. 22, 1987, 1 sheet.

FDIC Law, Regulations, Related Acts, 4000—Advisory Opinions, FDIC-86-21, Jul. 23, 1986, 2 sheets.

The Merrill Lynch Cash Management Account, Financial Service, 18 pgs.

A Guide to Your CMA Account, 1995, 19 pgs.

Insured Savings Account Fact Sheet, The Merrill Lynch Cash Management Account Financial Service, 1985, 4 pgs.

CMA Insured Savings Account Fact Sheet, 1997, 13 pgs.

Blackwell, Rob, Salomon's Sweep Plan Raises FDIC Fund Alarm, *American Banker*, Dec. 6, 2000, 2 pgs.

Insured Deposit Account (IDA), May 21, 1996, 11 pgs.

An Introduction to the Smith Barney *Insured Deposit Account*, 1995, 8 pgs.

Memorandum from Ted Hamilton re: Insured Deposit Account, Oct. 10, 1995, 13 pgs.

The Insured Deposit Account: "*Money in the Bank*", 1997, 2 sheets.

Merrill Joins Money Market Account, CMA; Broker Begins Testing With 12 Institutions, *Lexis Nexis*, Sep. 23, 1983, 4 pgs.

Form 8-K Merrill Lynch & Co Inc—MER, filed: Mar. 7, 2002, Report of unscheduled material events or corporate changes, 41 pgs.

Lawsuit by Island Intellectual Property LLC and Intrasweep LLC against Deutsche Bank Trust Company Americas and Total Bank Solutions, Complaint for Patent Infringement, Jury Trial Demanded, Feb. 23, 2010, Case No. 10 CV 1518, (Document 1).

Lawsuit by Island Intellectual Property LLC and Lids Capital LLC against Deutsche Bank Trust Company Americas and Total Bank Solutions, Complaint for Patent Infringement, Jury Trial Demanded, Mar. 16, 2010, Case No. 10 CV 2268.

Quest Cash Management Services Memorandum to Torn Duggan, Re: Quest Insure Account, Nov. 16, 1993.

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation, and Intrasweep LLC against Deutsche Bank Trust Company Americas, and Total Bank Solutions, LLC, Defendants' Preliminary Invalidity Contentions, Mar. 12, 2010, Civil Action No. 09 CV. 2675 (VM) (AJP).

Lawsuit by Island Intellectual Property LLC and Intrasweep LLC against Institutional Deposits Corp., Defendant Institutional Deposits Corp.'s Preliminary Invalidity Contentions, Case No. 09-CV-03079-JEC.

Exhibit 1, Invalidity Chart: IMA and Insurance Plus Service Agreement, U.S. Patent No. 7,509,286, 21 pgs.

Exhibit 2, Invalidity Chart: Investors Money Accounts*SM* System, U.S. Patent No. 7,509,286, 26 pgs.

Exhibit 3, Invalidity Chart: Insured Money Account System, U.S. Patent No. 7,509,286, 26 pgs.

Exhibit 4, Invalidity Chart: U.S. Patent No. 4,985,833 (Oncken), U.S. Patent 7,509,286, 21 pgs.

Exhibit 5, Invalidity Chart: First City Bank of Texas' Insured Savings Program, U.S. Patent No. 7,509,286, 39 pgs.

Exhibit 6, Invalidity Chart: Quest Insured Account, U.S. Patent No. 7,509,286, 19 pgs.

Exhibit 7, Invalidity Chart: CIBC World Markets—Insured Bank Deposit Account, U.S. Patent No. 7,509,286, 16 pgs.

Exhibit 8, Invalidity Chart: Merrill Lynch CMA/ISA Service, U.S. Patent No. 7,509,286, 72 pgs.

Exhibit 9, Invalidity Chart: 1983 Fed Letter, U.S. Patent No. 7,509,286, 16 pgs.

Exhibit 10, Invalidity Chart: Merrill Lynch Banking Advantage Program ("MLBA Program"), U.S. Patent No. 7,509,286, 22 pgs.

Exhibit 11, Invalidity Chart: Merrill Lynch & You + MLBA Information Statement, U.S. Patent No. 7,509,286, 18 pgs.

Exhibit 12, Invalidity Chart: Smith Barney Insured Deposit Account, U.S. Patent No. 7,509,286, 22 pgs.

Exhibit 13, Invalidity Chart: Smith Barney Bank Deposit Program, U.S. Patent No. 7,509,286, 18 pgs.

Exhibit 14, Invalidity Chart: Alliance Insured Account, U.S. Patent No. 7,509,286, 16 pgs.

Exhibit 15, Invalidity Chart: Reserve's American Express Presentation, U.S. Patent No. 7,509,286, 16 pgs.

Exhibit 16, Invalidity Chart: U.S. Patent No. 7,376,606 (Jacobsen), U.S. Patent No. 7,536,350, 6 pgs.

Exhibit 17, Obviousness Combinations Chart, U.S. Patent No. 7,509,286, 351 pgs.

Product Bulletin from Bill McCain, Subject: Insured Savings Product Announcement, May 8, 1999, 7 pgs.

Letter From William W. Wiles, Secretary of the Board, Board of Governors of the Federal Reserve System, Jun. 22, 1983, 6 Sheets.

Lawsuit by *Carlo DeBlasio* et al. v. *Merrill Lynch & Co., Inc.* et al., Second Amended Class Action Complaint, Jury Trial Demanded, Jun. 11, 2007, Civil Action No. 07 cv 318, 137 pgs.

Investors MoneyAccount*SM* and Insurance Plus Service Agreement, Schedule A, Mar. 1994; 3 sheets.

Investors MoneyAccount*SM* (an FDIC-insured money market account), Apr. 1996; 4 sheets.

Investors MoneyAccount*SM* The FDIC-Insured Money Market with an Important Plus, Apr. 1996; 2 sheets.

Investment Company Act of 1940—Section 3(a)(1), 2(a)(36); Securities Act of 1933—Section 2(1), Nov. 29, 1985, Kempter Financial Services, Inc., 9 pgs.

**US 8,386,383 B1**

Page 12

Insured Money Account Program Agreement and Disclosure Statement, Mar. 2000; 11 sheets.

First National Bank in Brookings, Certificates of Deposit; Jul. 17, 2009; 5 sheets.

Summary of Commentary on Current Economic Conditions by Federal Reserve Districts, Jan. 1985, 44 pgs.

The Insured Savings Account, Issuer Guide to Offering MMDAs through Merrill Lynch, Jul. 1986; 27 pgs.

Insured Savings Account Fact Sheet, The Merrill Lynch Cash Management Account Financial Service, Apr. 1987, 11 pgs.

CMA Insured Savings Account Fact Sheet, Jul. 1994, 9 pgs.

Adler, Joe, "Promontory to Roll Out Deposit Service Insuring Liquid Funds", American Banker, Feb. 22, 2010, 1 sheet.

Blackwell, "New Pitch: Deposit Insurance Sharing," American Banker Online, 4 Sheets, Jan. 21, 2003.

Litigation Notice After Payment of Issue Fee filed in Parent U.S. Appl. No. 10/382,946, Apr. 3, 2009, 6 pages.

Declaration of Mr. Bruce Bent II, Vice Chairman and Registrant of Applicant. (3 Sheets) and Exhibits A, B, C and D; Feb. 27, 2007; 6 Sheets.

Deutsche Bank Insured Deposit Program, Marketing Literature; 2007, 3 pages.

Dreyfus Insured Deposit Program, Disclosure Statement and Terms and Conditions, Dreyfus A BNY Mellon Company, Jan. 2008; 8 Sheets.

Dreyfus Insured Deposit Program, Multiple List Program—Effective May 11, 2009, 1 Sheet.

Federal Register: Oct. 9, 1997 (vol. 62, No. 196), pp. 52809-52868. http://www.fdic.gov/news/news/inactivefinancial/1997/fil97111b.html.

Lawsuit by Island Intellectual Property LLC and Lids Capital LLC against Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Deutsche Bank Trust Company answer to plaintiffs' Mar. 16, 2010 complaint and counterclaims, May 4, 2010, Civil Action No. 09 Civ. 2675 (VM) (AJP) (Document 113).

Lawsuit by Island Intellectual Property LLC and Lids Capital LLC against Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Total Bank Solutions, LLC's answer to plaintiffs' Mar. 16, 2010 complaint and counterclaims, May 4, 2010, Civil Action No. 09 Civ. 2675 (VM)(Documetn 114).



FIG. 1A



FIG. 1B



FIG. 2



FIG. 3

US 8,386,383 B1

**1**

## MONEY FUND BANKING SYSTEM WITH MULTIPLE BANKS AND/OR RATES

### CROSS-REFERENCE TO RELATED PATENT APPLICATIONS

This application is a Continuation of U.S. application Ser. No. 09/677,535, filed Oct. 2, 2000, which is incorporated herein by reference in its entirety, which is a Continuation-In-Part of U.S. application Ser. No. 09/176,340, filed Oct. 21, 1998, now U.S. Pat. No. 6,374,231, incorporated herein by reference in its entirety.

### BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention generally relates to the field of account transaction processing, and more specifically, an improved system for processing and administering a demand account or money market account in combination with an insured deposit account, and optionally where the accounts are distributed over a plurality of banking institutions.

2. The State of the Art

The Federal Deposit Insurance Corporation ("FDIC") is a federal governmental entity that provides insurance for deposits in most banks and savings institutions in the United States Bank; deposits are insured by the FDIC's Bank Insurance Fund ("BIF") and savings institutions' deposits are insured by the FDIC's Savings Association Insurance Fund ("SAIF"). The rules governing insurance of deposits of institutions insured by the BIF and the SAIF are the same. The FDIC bases insurance coverage on the concept of ownership rights and capacities: funds held in different ownership categories are insured separately from each other; and funds owned by the same entity but held in different accounts are subsumed under the same insurance coverage. The amount of insurance coverage provided to depositors of each institution insured by BIF and SAIF is the same: $100,000.00 to the owners(s) of the funds in the account(s), including principal and interest.

As disclosed in our prior application Ser. No. 09/176,340 referenced above, a system is provided for managing a plurality of demand accounts for multiple clients whose funds are held at a banking institution in a single insured deposit account. That system provides an entity with the ability to deposit funds into a demand account from various sources, and to make payments from the demand account via different instruments, without the limitation as to the number of transfers, and still earn interest on the funds in the clients' accounts because the funds are effectively maintained in a deposit account. Even with the above-mentioned innovative system, investors carrying amounts in excess of $100,000 in their accounts are disadvantaged because the FDIC insurance is limited to $100,000, so any amount over $100,000 is not protected by FDIC insurance. It was with this realization that the present invention was made.

### SUMMARY OF THE INVENTION

In one embodiment, a method is disclosed for managing a plurality of individual client deposits for multiple clients, comprising: accessing, by a computer, in the performance of one or more of the following steps, an electronic database, stored on one or more computer-readable media, comprising: aggregated account information for a plurality of Federal Deposit Insurance Corporation (FDIC)-insured and interest-bearing aggregated deposit accounts held in a plurality of

**2**

banking institutions, wherein funds from client deposits of a plurality of clients are aggregated with funds of other client deposits in the aggregated deposit accounts held in the banking institutions; client information for each of a plurality of the respective clients, i, comprising: (i) a total of a respective client's funds deposited across a plurality of the FDIC-insured interest-bearing aggregated accounts held in a plurality of the banking institutions; and (ii) a maximum deposit percentage of the respective client funds to be held in at least one of the banking institutions; maintaining funds for said individual clients in a plurality of the FDIC-insured, interest-bearing aggregated deposit accounts at a plurality of banking institutions, wherein each of the banking institutions has at least one of the aggregated deposit accounts; processing, by computer, client transaction data comprising data for each of one or more deposits/transfers and/or one or more withdrawals/transfers for one or more of said clients, with the data comprising a respective amount for each respective deposit/ transfer and each respective withdrawal/transfer; making needed deposits to, or needed withdrawals from one or more of said aggregated deposit accounts based on the data for one or more of the deposit/transfers and/or the withdrawals/transfers and based, at least in part, on the maximum deposit percentage in the database for one or more of the clients; and updating the database based on the client's deposits/transfers and/or withdrawals/transfers.

In a further embodiment, a method is disclosed for managing a plurality of individual client deposits for multiple clients, comprising: receiving from one or more respective clients a respective maximum amount that is less than a Federal Deposit Insurance Corporation (FDIC) insurance limit, which respective maximum amount is to be held in at least one of the banking institutions for that respective client, and storing this maximum amount associated with the respective client in an electronic database; accessing, by a computer, in the performance of one or more of the following steps, the electronic database, stored on one or more computer-readable media, comprising: aggregated account information for a plurality of Federal Deposit Insurance Corporation (FDIC)-insured and interest-bearing aggregated deposit accounts held in a plurality of banking institutions, wherein funds from client deposits of a plurality of clients are aggregated with funds of other client deposits in the aggregated deposit accounts held in the banking institutions; client information for each of a plurality of the respective clients, i, comprising: (i) a total of a respective client's funds deposited across a plurality of the FDIC-insured interest-bearing aggregated accounts held in a plurality of the banking institutions; and (ii) a respective maximum amount to be held in at least one of the respective banking institutions; maintaining funds for said individual clients in a plurality of the FDIC-insured, interest-bearing aggregated deposit accounts at a plurality of the banking institutions, wherein each of the banking institutions has at least one of the aggregated deposit accounts; processing, by computer, client transaction data comprising data for each of one or more deposits/transfers and/or one or more withdrawals/transfers for one or more of said clients, with the data comprising a respective amount for each respective deposit/ transfer and each respective withdrawal/transfer; making needed deposits to, or needed withdrawals from one or more of said aggregated deposit accounts based on the data for one or more of the deposit/transfers and/or one or more of the withdrawals/transfers and in compliance with the respective maximum amount specified in the database for one or more of the respective clients for one or more of the banking institutions; and updating the database based on the client's deposits/transfers and/or withdrawals/transfers.

US 8,386,383 B1

3

In one embodiment, a system is also disclosed for managing a plurality of demand accounts for multiple clients whose funds are held at a banking institution in a single insured deposit account.

In another embodiment, a system is disclosed for managing a plurality of demand accounts for multiple clients whose funds are held at one or more banking institutions in one or more single insured deposit accounts that, from the viewpoint of the investor, removes the $100,000 limitation of FDIC insurance for that individual investor.

In another embodiment, a system is disclosed for administering a plurality of accounts containing in excess of the FDIC or other insurance limit and continue to qualify for FDIC insurance.

In a further embodiment, a system is disclosed that administers individual client deposits to and withdrawals from each of their demand accounts. The system includes a database having each client's information for each account administered. The system monitors the use of the funds from each account by selectively authorizing or rejecting each demand payment request for each account of a particular client. Periodically, net transaction information is determined from the sum of the demand account deposits and withdrawals. The net transaction information is used to determine whether to deposit funds or to withdraw funds from a single deposit account to a client's demand account(s) while updating the database for each client's deposit and authorized demand payment. The system then determines whether each client's account contains more than a specified amount (e.g., $90,000) and distributes any amounts over the specified amount into another account at a preselected banking institution.

In practice, when an investor's account balance exceeds $90,000 in any one account, the excess funds are automatically moved to a second deposit account at another preselected bank. The client will maintain one insured deposit clearance account while the multiple deposit accounts will be transparent to the investor. All transactions to and from the accounts will post to the investor's insured deposit account, although they may be debited from multiple deposit accounts held at various banks. At the time an Insured Deposit Account is opened, the investor is given the option to choose a preferred bank, to choose a list of preferred banks in a desired (or random) order of preference, and to exclude one or more banks. The system will debit and credit the multiple deposit accounts on the investor's behalf, and in the event that the investor does not preselect a bank, the system will automatically designate a bank or banks. The client may also select the order of preference for deposits and withdrawals. For example, if the investor opened his Insured Deposit Account with $170,000, he could also indicate that his assets should be invested in Bank A and Bank C. He may also indicate that bank C is preferred. In this example, $90,000 would be deposited into Bank C and $80,000 into Bank A. If a check were written or the investor chose to redeem funds directly, the withdrawals would be made from Bank A. Withdrawals would not be made from Bank C until all funds had been redeemed from Bank A. Similarly, if the investor chose Bank C as preferred and chose to exclude Bank B, then $90,000 would be deposited into Bank C and $80,000 into Bank A. The investor also can choose the deposit cap for each of multiple banks selected, or can specify deposit caps for default banks chosen by the system (e.g., no bank to hold more than 40% of the investor's funds). Of course, the investor can also specify that all funds be held in a single bank, even if the amount exceeds $100,000. The report the investor receives may refer to all of the assets and transactions in the investor's Insured Clearance Account (a single account), or

4

the investor may be shown a report listing all of the sub-accounts (if any) where the funds are held and in which transactions occurred.

The choice of Banks is held on the investor's account and the system will read the Bank indicator and determine which bank deposit account should be debited or credited. The system will automatically group together all transactions for each bank. At the end of the business day the deposit accounts at the various banks will be either debited or credited. The debit or credit to the deposit account is the net transaction for all activity that occurred that day.

As a result of the present invention the investor earns interest on the balance in his Insured Deposit Account where the interest rate earned can be the same regardless of the bank(s) selected, or may vary depending on the banks selected, while continuing to qualify his account funds for FDIC insurance.

## BRIEF DESCRIPTION OF THE DRAWINGS

In the drawings, in which like references characters designate like or corresponding parts throughout the several views, the views are:

FIG. 1A is a flowchart depicting processing steps the system follows at the administrator's end.

FIG. 1B is a flow chart depicting additional processing steps according to the present invention.

FIG. 2 is a flowchart depicting processing steps regarding the determination of a available funds according to the present invention.

FIG. 3 is a flow chart depicting processing steps associated with the completion of the banking system process according to the present invention.

## DETAILED DESCRIPTION OF SPECIFIC EMBODIMENTS

The present invention will be described with reference to an administrator, which can be a brokerage firm, a bank, or another financial entity with which clients can institute financial transactions such as deposits and demand payments. The administrator appears to each client as if it were, at least in part, a bank, by accepting deposits for the client's accounts and by authorizing (and then making) payments demanded by the client from his or her account. The funds for all of the clients are pooled into a single deposit account that is maintained as an insured deposit account at a licensed banking institution.

Referring to FIG. 1A, the financial entity 100, which may be a bank, a brokerage or another entity where financial transactions take place or can be facilitated, creates transaction files 101 which are transmitted to Reserve 105; Reserve (or the Reserve System) is the administrator or other entity in charge of administering at least one of the deposit accounts. New account files 102 can be transmitted to Reserve; a new investor account may need to be opened; a new account means organizing and coordinating information to service a new investor for the present system, even though that investor may already be a client of a financial entity 100 for other investment vehicles. A new account 102 becomes part of an existing bank deposit account 129 that collects earned income 130 which transfers the client's income to the client's accounts 131; of course at some time the deposit account must be established with clients' funds. The transaction files represent the addition of funds by check (such as drawn on another institution, or a different demand account from the same institution), wire or electronic transfer, ACH, credits (such as from a debit or credit card merchant), or a sweep

US 8,386,383 B1

5

from one of the client's other accounts. Accordingly, encompassed in the transaction file are deposits 103 and withdrawals 104. A "sweep" includes the automatic transfer of funds, such as the automated transfer of interest from one account into the client's account, as well as the automated transfer of funds out of the client's account (such as for payment of a securities trade); thus, a sweep may be from one of the client's accounts to another. The responsibility for maintaining the deposit account can be assigned by the administrator to a third party.

Referring now to FIG. 1B, the Reserve System 50 contains an insured deposit database 75 where a position file for debit/credit card users is created 132 and transmitted to a bank for a debit/credit card network 133 where the bank then updates the network 134. The system updates the data base 75 and processes transactions 106 (from 105, FIG. 1A) and opens a new account 107 where application and check deposits are processed 110. The bank preference 107A is the list of banks and the order of preference for deposits and withdrawals held on the account, including a list of banks to be excluded (if any), and the maximum percentage and/or amount of funds to be held in each bank. The client's bank preference data is added to the account at 107B. If the client does not select values for any of these variables, the system can provide default values for the banks and their order at 107C sufficient for all of the client's funds. When possible the system will not assign a bank that is in the same state in which the client resides.

Referring to FIG. 2 it can be seen that when a deposit, either a check deposit 111, federal wire deposit 112, ACH deposit, sweep, or other deposit is credited to the client's account 108, the system will review where the existing funds of the accounts are deposited 108A. If the client's balance has reached the maximum allowable balance for the existing bank 108B, as shown in FIG. 3, the system will then select the next bank on the preference list attached to the account 108C. If the maximum allowable balance has not been reached in the existing bank, the system will credit the additional funds to that bank 108D.

Still referring to FIG. 2, the procedure for processing withdrawals can be seen. Various methods of withdrawing funds are debit withdrawal 109, processing debit or credit card transactions such as debit/credit card files 115, direct debit accounts 215, and processing of files 121. Processing of a debit/credit card file 115 utilizes data accumulated from debit/credit card transactions received from the banks 114. The processing of file 121 procedure utilizes one of various sources of data such as a check presented for payment 116, ACH debits 117, touch tone bill paying 118, and/or interne bill paying 119.

After processing the debit procedure, the system will review the bank preference list and select the appropriate bank to debit 125A. The system will sort all the daily transactions by the bank 125B (see FIG. 3). The activity for each bank will then be netted 126 and the appropriate deposit or withdrawals made.

The system will then determine whether funds are available 122, which function is also associated with other participant withdrawals 120. If the funds are available, the account is debited 225. If the funds are not available, however, the system determines whether a credit line is available 123. If a credit line is available, then funds are advanced 230 to cover the debit; if not the transaction is rejected 124.

Referring to FIG. 3, as previously stated the system determines whether the client's balance reaches its maximum 108B and if so the next bank on the list selected by the client is credited 108C. If the maximum is not reached the existing bank is credited 108D. Information and activities associated

6

with processed debits and credits of the client's accounts from 125A are sorted by the bank 125B and the net activity by the bank is determined 126. The system then determines whether the deposits and credits were greater than the withdrawals and debits 240 and if so, the excess funds are deposited into a deposit account 127. If the debits and withdrawals were greater than the credits the difference is redeemed from the deposit account 128.

Thus, by practicing this invention, the client is provided with FDIC insurance in excess of $100,000.00 because the client's holdings are maintained in multiple insured deposit accounts, which may be in multiple banks.

The foregoing description is meant to be illustrative and not limiting. Various changes, modifications, and additions may become apparent to the skilled artisan upon a perusal of this specification, and as such are meant to be within the scope and spirit of the invention as defined by the Claims.

What is claimed is:

1. A method for managing a plurality of individual client deposits for multiple clients, comprising:

accessing, by a computer, in the performance of one or more of the following steps, an electronic database, stored on one or more computer-readable media, comprising:

aggregated account information for a plurality of Federal Deposit Insurance Corporation (FDIC)-insured and interest-bearing aggregated deposit accounts held in a first plurality of banking institutions, wherein funds from client deposits of a plurality of clients are aggregated with funds of other client deposits in the aggregated deposit accounts held in the banking institutions;

client information for each of a plurality of the respective clients, comprising:

(i) a total of the respective client's funds deposited across a plurality of the banking institutions in one or more of the FDIC-insured interest-bearing aggregated accounts held therein; and

(ii) a maximum deposit percentage of the respective client funds to be held in at least one of the banking institutions;

allocating, by the computer, the client funds among a second plurality of the banking institutions in one or more aggregated deposit accounts held therein, based, at least in part, on the maximum deposit percentage in the database for one or more of the clients;

netting for at least one of the respective banking institutions, by the computer, client funds allocated to the one respective banking institution to obtain a net amount of funds for the at least one respective banking institution;

determining an amount of funds to be transferred to or from one or more of said aggregated deposit accounts based on data from the netting step; and

updating, by the computer, the database based on the allocation of client funds.

2. The method as defined in claim 1, further comprising:

receiving from one of the respective clients, for each respective one of a plurality of the banking institutions, a respective maximum deposit percentage to be held in the respective banking institution for funds of that respective client and storing this maximum deposit percentage associated with the respective client in the electronic database;

wherein in the determining step, one or more transfers to, or transfers from one or more of said aggregated deposit accounts in one or more of the banking institutions is

US 8,386,383 B1

7

determined, at least in part, based on one or more of the respective maximum deposit percentages for the respective one client.

**3**. The method as defined in claim **1**, further comprising:
receiving, from one or more of the respective clients, a respective maximum deposit percentage to be held in the respective banking institution for funds of that respective client and storing this respective maximum deposit percentage as the maximum deposit percentage for that respective client in the electronic database.

**4**. The method as defined in claim **1**, wherein the withdrawal data comprises data for one or more withdrawals/transfers by check, debit card, credit card or ACH.

**5**. The method as defined in claim **1**, further comprising:
receiving a selection of an order of preference of a third plurality of the banking institutions for deposit of funds of the client; and
wherein in the determining step, transfers to one or more of said aggregated deposit accounts are made to the third plurality of the banking institutions in the order of preference selected by the client.

**6**. The method as defined in claim **1**, further comprising:
receiving a selection of an order of preference of a third plurality of the banking institutions for withdrawal of funds of the client; and
wherein in the determining step, transfers from one or more of said aggregated deposit accounts are made from the third plurality of the banking institutions in the order of preference selected by the client.

**7**. The method as defined in claim **1**, further comprising:
receiving, by computer, client transaction data comprising data for each of one or more deposits/transfers and/or one or more withdrawals/transfers for one or more of said clients, with the data comprising a respective amount for each respective deposit/transfer and each respective withdrawal/transfer;
netting, by computer, on a regular basis, the data for the client deposits/transfers and/or the withdrawals/transfers from a plurality of the clients to obtain the net amount.

**8**. The method as defined in claim **7**,
wherein the transaction data for one of the clients comprises data for more than six withdrawals/transfers by one or more of check, debit card, credit card or ACH within a month.

**9**. The method as defined in claim **1**, further comprising:
determining a respective amount of interest owed to each of a plurality of the respective clients as a function of a total amount of funds of the client held in the FDIC-insured interest-bearing aggregated deposit accounts; and
distributing by crediting interest received from said FDIC-insured interest-bearing aggregated deposit accounts to said respective clients based on the respective amounts determined for the respective clients.

**10**. The method as defined in claim **1**, wherein the electronic database maintains aggregated transaction account information for a plurality of FDIC-insured and interest-bearing aggregated deposit accounts held in a fixed number of banking institutions in a program, and
wherein the steps are performed using the fixed number of banking institutions in the program.

**11**. The method as defined in claim **1**, wherein the allocating step further comprises:
(i) determining whether funds of the respective client account held in one of the banking institutions in the one

8

or more FDIC-insured interest bearing aggregated deposit accounts held therein is more than a specified amount; and
(ii) generating data for allocating any amount over said specified amount into at least one other FDIC-insured interest bearing aggregated deposit account held at least one other of the banking institutions in which the total of said client's funds will not exceed the specified amount.

**12**. A system for managing a plurality of client deposits for multiple clients, comprising:
one or more computers comprising memory wherein the memory stores computer-readable instructions that, when executed, cause the one or more computers to perform the steps:
accessing, by computer, in the performance of one or more of the following steps, an electronic database, stored on one or more computer-readable media, comprising:
aggregated account information for a first plurality of Federal Deposit Insurance Corporation (FDIC)-insured and interest-bearing aggregated deposit accounts held in a plurality of banking institutions, wherein funds from client deposits of a plurality of clients are aggregated with funds of other client deposits in the aggregated deposit accounts held in the banking institutions;
client information for each of a plurality of the respective clients, comprising:
(i) a total of the respective client's funds deposited across a plurality of the banking institutions in one or more of the FDIC-insured interest-bearing aggregated accounts held therein; and
(ii) a maximum deposit percentage of the respective client funds to be held in at least one of the banking institutions;
allocating, by the computer, the client funds among a second plurality of the banking institutions in one or more aggregated deposit accounts held therein, based, at least in part, on the maximum deposit percentage in the database for one or more of the clients;
netting for at least one of the respective banking institutions, by the computer, client funds allocated to the one respective banking institution to obtain a net amount for the at least one respective banking institution;
determining, by the computer, an amount of funds to be transferred to or from one or more of said aggregated deposit accounts based on data from the netting step; and
updating, by the computer, the database based on the allocation of client funds.

**13**. The system as defined in claim **12**, further comprising computer-readable instructions for configuring the one or more computers for:
receiving from one of the respective clients, for each respective one of a plurality of the banking institutions, a respective maximum deposit percentage to be held in the respective banking institution for funds of that respective client and storing this maximum deposit percentage associated with the respective client in the electronic database;
wherein in the determining step, one or more transfers to, or transfers from one or more of said aggregated deposit accounts in one or more of the banking institutions is determined, at least in part, based on one or more of the respective maximum deposit percentages for the respective one client.

**14**. The system as defined in claim **12**, further comprising computer-readable instructions for configuring the one or more computers for:

US 8,386,383 B1

9

receiving, from one or more of the respective clients, a respective maximum deposit percentage to be held in the respective banking institution for funds of that respective client and storing this respective maximum deposit percentage as the maximum deposit percentage for that respective client in the electronic database.

**15**. The system as defined in claim **12**, wherein the withdrawal data comprises data for one or more withdrawals/transfers by check, debit card, credit card or ACH.

**16**. The system as defined in claim **12**, further comprising computer-readable instructions for configuring the one or more computers for:

receiving a selection of an order of preference of a third plurality of the banking institutions for deposit of funds of the client; and

wherein in the determining step, transfers to one or more of said aggregated deposit accounts are made to the third plurality of the banking institutions in the order of preference selected by the client.

**17**. The system as defined in claim **12**, further comprising computer-readable instructions for configuring the one or more computers for:

receiving a selection of an order of preference of a third plurality of the banking institutions for withdrawal of funds of the client; and

wherein in the determining step, transfers from one or more of said aggregated deposit accounts are made from the third plurality of the banking institutions in the order of preference selected by the client.

**18**. The system as defined in claim **12**, further comprising computer-readable instructions for configuring the one or more computers for:

receiving, by computer, client transaction data comprising data for each of one or more deposits/transfers and/or one or more withdrawals/transfers for one or more of said clients, with the data comprising a respective amount for each respective deposit/transfer and each respective withdrawal/transfer; and

netting, by computer, on a regular basis, the data for the client deposits/transfers and/or the withdrawals/transfers from a plurality of the clients to obtain the net amount.

10

**19**. The system as defined in claim **18**, wherein the transaction data for one of the clients comprises data for more than six withdrawals/transfers by one or more of check, debit card, credit card or ACH within a month.

**20**. The system as defined in claim **12**, further comprising computer-readable instructions for configuring the one or more computers for:

determining a respective amount of interest owed to each of a plurality of the respective clients as a function of a total amount of funds of the client held in the FDIC-insured interest-bearing aggregated deposit accounts; and

distributing by crediting interest received from said FDIC-insured interest-bearing aggregated deposit accounts to said respective clients based on the respective amounts determined for the respective clients.

**21**. The system as defined in claim **12**, wherein the electronic database maintains aggregated transaction account information for a plurality of FDIC-insured and interest-bearing aggregated deposit accounts held in a fixed number of banking institutions in a program, and

wherein the steps are performed using the fixed number of banking institutions in the program.

**22**. The system as defined in claim **12**, further comprising computer-readable instructions for configuring the one or more computers of the allocating step for:

(i) determining whether funds of the respective client account held in one of the banking institutions in the one or more FDIC-insured interest bearing aggregated deposit accounts held therein is more than a specified amount; and

(ii) generating data for allocating any amount over said specified amount into at least one other FDIC-insured interest bearing aggregated deposit account held at least one other of the banking institutions in which the total of said client's funds will not exceed the specified amount.

\* \* \* \* \*

# Exhibit 10

US008612324B1

(12) **United States Patent**
Bent et al.

(10) **Patent No.:**   **US 8,612,324 B1**

(45) **Date of Patent:**   **Dec. 17, 2013**

(54) **SYSTEMS AND METHODS FOR ADMINISTERING RETURN SWEEP ACCOUNTS**

(71) Applicant: **Island Intellectual Property LLC**, Manhasset, NY (US)

(72) Inventors: **Bruce Bent**, Manhasset, NY (US); **Bruce Bent, II**, Manhasset, NY (US)

(73) Assignee: **Island Intellectual Property LLC**, Manhasset, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **13/651,932**

(22) Filed: **Oct. 15, 2012**

**Related U.S. Application Data**

(63) Continuation of application No. 13/052,696, filed on Mar. 21, 2011, now Pat. No. 8,311,916, which is a continuation of application No. 12/385,522, filed on Apr. 10, 2009, now Pat. No. 7,933,821, which is a continuation of application No. 10/071,053, filed on Feb. 8, 2002, now Pat. No. 7,519,551, which is a continuation-in-part of application No. 09/677,535, filed on Oct. 2, 2000, now Pat. No. 7,752,129, which is a continuation-in-part of application No. 09/176,340, filed on Oct. 21, 1998, now Pat. No. 6,374,231.

(51) **Int. Cl.**
*G06Q 40/00*   (2012.01)

(52) **U.S. Cl.**
USPC ........................................... **705/35**; 707/705

(58) **Field of Classification Search**
USPC ............ 705/30, 35, 38–40, 42; 707/607, 609, 707/705, 821–828; 902/24, 41
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,232,367 | A | 11/1980 | Youden et al. |
| 4,346,442 | A | 8/1982 | Musmanno |
| 4,376,978 | A | 3/1983 | Musmanno |
| 4,597,046 | A | 6/1986 | Musmanno et al. |
| 4,674,044 | A | 6/1987 | Kalmus et al. |
| 4,694,397 | A | 9/1987 | Grant et al. |
| 4,700,297 | A | 10/1987 | Hagel et al. |
| 4,751,640 | A | 6/1988 | Lucas et al. |
| 4,953,085 | A | 8/1990 | Atkins |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 10-049590 A | 2/1998 |
| WO | WO-95/23379 A1 | 8/1995 |
| WO | WO-02/42952 A1 | 5/2002 |
| WO | WO-03/012580 A2 | 2/2003 |

OTHER PUBLICATIONS

"Bank of Oak Ridge to Offer FDIC Insurance on up to $1.5 Million," Dialog Web Command Mode, 2 Sheets, Sep. 25, 2003, http://www.dialogweb.com/cgi/dwclient.
U.S. Appl. No. 12/794,448, filed Jun. 4, 2010, Bruce Bent et al.

(Continued)

*Primary Examiner* — Mary Cheung
(74) *Attorney, Agent, or Firm* — Foley & Lardner LLP

(57) **ABSTRACT**

A method, system, and program product, the method comprising: allocating client funds of respective client accounts among aggregated deposit accounts, determining client funds to be withdrawn from the aggregated deposit account held at one of the depository institutions more than six (6) times during a month while preserving an insured and interest-bearing status of the aggregated deposit account; generating instructions to transfer funds to or from one or more of the respective aggregated deposit accounts in the program through an aggregated demand deposit and making a withdrawal and/or transfer from the one aggregated deposit account more than six (6) times during the month period; and updating databases.

**13 Claims, 6 Drawing Sheets**



**US 8,612,324 B1**

Page 2

(56)            **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,985,833 | A | 1/1991 | Oncken |
| 5,126,936 | A | 6/1992 | Champion et al. |
| 5,206,803 | A | 4/1993 | Vitagliano et al. |
| 5,220,501 | A | 6/1993 | Lawlor et al. |
| 5,235,507 | A | 8/1993 | Sackler et al. |
| 5,262,942 | A | 11/1993 | Earle |
| 5,270,922 | A | 12/1993 | Higgins |
| 5,297,032 | A | 3/1994 | Trojan et al. |
| 5,644,727 | A | 7/1997 | Atkins |
| 5,649,116 | A | 7/1997 | McCoy et al. |
| 5,671,363 | A | 9/1997 | Cristofich et al. |
| 5,689,650 | A | 11/1997 | McClelland et al. |
| 5,710,889 | A | 1/1998 | Clark et al. |
| 5,765,144 | A | 6/1998 | Larche et al. |
| 5,774,880 | A | 6/1998 | Ginsberg |
| 5,781,654 | A | 7/1998 | Carney |
| 5,802,499 | A | 9/1998 | Sampson et al. |
| 5,806,048 | A | 9/1998 | Kiron et al. |
| 5,806,049 | A | 9/1998 | Petruzzi |
| 5,812,987 | A | 9/1998 | Luskin et al. |
| 5,826,243 | A | 10/1998 | Musmanno et al. |
| 5,848,400 | A | 12/1998 | Chang |
| 5,852,811 | A | 12/1998 | Atkins |
| 5,875,437 | A | 2/1999 | Atkins |
| 5,878,258 | A | 3/1999 | Pizi et al. |
| 5,878,405 | A | 3/1999 | Grant et al. |
| 5,884,285 | A | 3/1999 | Atkins |
| 5,890,141 | A | 3/1999 | Carney et al. |
| 5,893,078 | A | 4/1999 | Paulson |
| 5,903,881 | A | 5/1999 | Schrader et al. |
| 5,905,974 | A | 5/1999 | Fraser et al. |
| 5,940,809 | A | 8/1999 | Musmanno et al. |
| 5,941,996 | A | 8/1999 | Smith et al. |
| 5,946,667 | A | 8/1999 | Tull et al. |
| 5,950,175 | A | 9/1999 | Austin |
| 5,974,390 | A | 10/1999 | Ross |
| 5,978,779 | A | 11/1999 | Stein et al. |
| 6,014,642 | A | 1/2000 | El-Kadi et al. |
| 6,016,482 | A | 1/2000 | Molinari et al. |
| 6,026,438 | A | 2/2000 | Piazza et al. |
| 6,032,133 | A | 2/2000 | Hilt et al. |
| 6,044,371 | A | 3/2000 | Person et al. |
| 6,047,324 | A | 4/2000 | Ford et al. |
| 6,049,782 | A | 4/2000 | Gottesman et al. |
| 6,052,673 | A | 4/2000 | Leon et al. |
| 6,088,685 | A | 7/2000 | Kiron et al. |
| 6,092,056 | A | 7/2000 | Tull et al. |
| 6,105,005 | A | 8/2000 | Fuhrer |
| 6,108,641 | A | 8/2000 | Kenna et al. |
| 6,119,093 | A | 9/2000 | Walker et al. |
| 6,131,810 | A | 10/2000 | Weiss et al. |
| 6,154,770 | A | 11/2000 | Kostakos |
| 6,192,347 | B1 | 2/2001 | Graff |
| 6,226,623 | B1 | 5/2001 | Schein et al. |
| 6,317,783 | B1 | 11/2001 | Freishtat et al. |
| 6,324,523 | B1 | 11/2001 | Killeen et al. |
| 6,363,360 | B1 | 3/2002 | Madden |
| 6,374,231 | B1 | 4/2002 | Bent et al. |
| 6,408,336 | B1 | 6/2002 | Schneider et al. |
| 6,513,020 | B1 | 1/2003 | Weiss et al. |
| 6,970,843 | B1 | 11/2005 | Forte |
| 7,089,202 | B1 | 8/2006 | McNamar et al. |
| 7,124,101 | B1 | 10/2006 | Mikurak |
| 7,133,840 | B1 | 11/2006 | Kenna et al. |
| 7,203,845 | B2 | 4/2007 | Sokolic et al. |
| 7,321,874 | B2 | 1/2008 | Dilip et al. |
| 7,321,875 | B2 | 1/2008 | Dilip et al. |
| 7,328,179 | B2 | 2/2008 | Sheehan et al. |
| 7,376,606 | B2 | 5/2008 | Jacobsen |
| 7,383,223 | B1 | 6/2008 | Dilip et al. |
| 7,383,227 | B2 | 6/2008 | Weinflash et al. |
| 7,392,222 | B1 | 6/2008 | Hamilton et al. |
| 7,401,037 | B2 | 7/2008 | Arena et al. |
| 7,440,914 | B2 | 10/2008 | Jacobsen |
| 7,505,937 | B2 | 3/2009 | Dilip et al. |
| 7,509,286 | B1 | 3/2009 | Bent et al. |
| 7,519,551 | B2 | 4/2009 | Bent et al. |
| 7,529,709 | B2 | 5/2009 | Volchek et al. |
| 7,536,340 | B2 | 5/2009 | Dheer et al. |
| 7,536,350 | B1 | 5/2009 | Bent et al. |
| 7,596,522 | B1 | 9/2009 | Jacobsen |
| 7,603,307 | B2 | 10/2009 | Jacobsen |
| 7,640,199 | B1 | 12/2009 | Hyland |
| 7,657,761 | B2 | 2/2010 | Sokolic et al. |
| 7,668,771 | B1 | 2/2010 | Bent et al. |
| 7,668,772 | B1 | 2/2010 | Bent et al. |
| 7,672,886 | B2 | 3/2010 | Bent et al. |
| 7,672,901 | B1 | 3/2010 | Bent et al. |
| 7,672,902 | B1 | 3/2010 | Bent et al. |
| 7,680,716 | B1 | 3/2010 | Bent et al. |
| 7,680,734 | B1 | 3/2010 | Bent et al. |
| 7,716,131 | B2 | 5/2010 | Bent et al. |
| 7,720,755 | B1 | 5/2010 | Coyle |
| 7,729,987 | B1 | 6/2010 | Wakim et al. |
| 7,752,107 | B1 | 7/2010 | Bent et al. |
| 7,752,129 | B2 | 7/2010 | Bent et al. |
| 7,756,767 | B2 | 7/2010 | Cluse et al. |
| 7,769,688 | B1 | 8/2010 | Bent et al. |
| 7,788,235 | B1 | 8/2010 | Yeo |
| 7,797,207 | B1 | 9/2010 | Dilip et al. |
| 7,809,640 | B1 | 10/2010 | Bent et al. |
| 7,814,017 | B2 | 10/2010 | Vancini et al. |
| 7,837,100 | B2 | 11/2010 | Bonalle et al. |
| 7,849,003 | B2 | 12/2010 | Egnatios et al. |
| 7,860,771 | B2 | 12/2010 | Colvin |
| 7,873,571 | B1 | 1/2011 | Wehmer |
| 7,873,573 | B2 | 1/2011 | Realini |
| 7,873,677 | B2 | 1/2011 | Messing et al. |
| 7,886,969 | B2 | 2/2011 | Antoo et al. |
| 7,895,098 | B2 | 2/2011 | Beard |
| 7,895,099 | B2 | 2/2011 | Whiting et al. |
| 7,899,743 | B2 | 3/2011 | Jacobsen |
| 7,899,745 | B1 | 3/2011 | Jacobsen |
| 7,899,746 | B1 | 3/2011 | Jacobsen |
| 7,899,747 | B1 | 3/2011 | Jacobsen |
| 7,904,372 | B2 | 3/2011 | Whiting et al. |
| 7,917,433 | B2 | 3/2011 | Jacobsen |
| 7,921,057 | B1 | 4/2011 | Jacobsen |
| 7,945,511 | B2 | 5/2011 | O'Brien et al. |
| 7,996,308 | B1 | 8/2011 | Bent et al. |
| 8,015,085 | B2 | 9/2011 | Blagg et al. |
| 8,019,667 | B1 | 9/2011 | Bent et al. |
| 8,019,668 | B1 | 9/2011 | Bent et al. |
| 8,032,456 | B1 | 10/2011 | Bent et al. |
| 8,036,986 | B2 | 10/2011 | Jacobsen |
| 8,051,004 | B2 | 11/2011 | Jacobsen |
| 8,051,005 | B2 | 11/2011 | Jacobsen |
| 8,086,508 | B2 | 12/2011 | Dheer et al. |
| 8,090,651 | B2 | 1/2012 | Winslow et al. |
| 8,103,582 | B1 | 1/2012 | Zettner |
| RE43,246 | E | 3/2012 | Bent et al. |
| 8,150,766 | B1 | 4/2012 | Bent et al. |
| 8,191,156 | B2 | 5/2012 | Kubo |
| 8,239,321 | B1 | 8/2012 | Bent et al. |
| 8,260,697 | B1 | 9/2012 | Bent et al. |
| 8,260,705 | B1 | 9/2012 | Bent et al. |
| 8,290,859 | B1 | 10/2012 | Bent et al. |
| 8,290,860 | B1 | 10/2012 | Bent et al. |
| 8,290,861 | B1 | 10/2012 | Bent et al. |
| 8,311,916 | B1 | 11/2012 | Bent et al. |
| 8,311,939 | B1 | 11/2012 | Bent et al. |
| 8,352,342 | B1 | 1/2013 | Bent et al. |
| 8,355,985 | B1 | 1/2013 | Bent et al. |
| 8,359,267 | B1 | 1/2013 | Bent et al. |
| 8,370,236 | B1 | 2/2013 | Bent |
| 8,380,621 | B1 | 2/2013 | Bent et al. |
| 8,386,382 | B1 | 2/2013 | Bent |
| 8,386,383 | B1 | 2/2013 | Bent |
| 8,401,962 | B1 | 3/2013 | Bent |
| 8,452,702 | B1 | 5/2013 | O'Donnell |
| 8,458,089 | B1 | 6/2013 | Gareis |
| 2001/0023414 | A1 | 9/2001 | Kumar et al. |
| 2002/0046144 | A1 | 4/2002 | Graff |
| 2002/0082981 | A1 | 6/2002 | Madden |

**US 8,612,324 B1**

Page 3

(56)          **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2002/0087454 | A1 | 7/2002 | Calo et al. |
| 2002/0091637 | A1 | 7/2002 | Bent |
| 2002/0095592 | A1 | 7/2002 | Daniell et al. |
| 2002/0128951 | A1 | 9/2002 | Kiron et al. |
| 2002/0174048 | A1 | 11/2002 | Dheer et al. |
| 2002/0194099 | A1 | 12/2002 | Weiss |
| 2003/0023529 | A1 | 1/2003 | Jacobsen |
| 2003/0041003 | A1 | 2/2003 | Kayser, III |
| 2003/0065642 | A1 | 4/2003 | Zee |
| 2003/0080185 | A1 | 5/2003 | Werther |
| 2003/0135437 | A1 | 7/2003 | Jacobsen |
| 2003/0163403 | A1 | 8/2003 | Chen et al. |
| 2003/0200174 | A1 | 10/2003 | Star |
| 2003/0208438 | A1 | 11/2003 | Rothman |
| 2004/0138974 | A1 | 7/2004 | Shimamura et al. |
| 2004/0153398 | A1 | 8/2004 | Baumgartner et al. |
| 2004/0177036 | A1 | 9/2004 | Nutahara et al. |
| 2004/0249741 | A1 | 12/2004 | Understein |
| 2005/0044035 | A1 | 2/2005 | Scott |
| 2005/0108149 | A1 | 5/2005 | Bent et al. |
| 2005/0228733 | A1 | 10/2005 | Bent et al. |
| 2006/0004655 | A1 | 1/2006 | Alexander et al. |
| 2006/0047593 | A1 | 3/2006 | Naratil et al. |
| 2006/0212385 | A2 | 9/2006 | Bent et al. |
| 2006/0212389 | A2 | 9/2006 | Bent et al. |
| 2006/0213980 | A1 | 9/2006 | Geller et al. |
| 2006/0282356 | A1 | 12/2006 | Andres et al. |
| 2007/0083938 | A1 | 4/2007 | Aoki et al. |
| 2007/0118449 | A1 | 5/2007 | De La Motte et al. |
| 2007/0130065 | A1 | 6/2007 | Staab et al. |
| 2007/0143196 | A2 | 6/2007 | Colvin |
| 2007/0271174 | A2 | 11/2007 | Bent et al. |
| 2008/0077996 | A1 | 3/2008 | Kubo |
| 2008/0097899 | A1 | 4/2008 | Jackson et al. |
| 2008/0120228 | A1 | 5/2008 | Bent et al. |
| 2008/0133396 | A1 | 6/2008 | De La Motte |
| 2008/0195534 | A1 | 8/2008 | Landis et al. |
| 2008/0222053 | A1 | 9/2008 | Jacobsen |
| 2008/0288398 | A1 | 11/2008 | Maricondi |
| 2009/0006985 | A1 | 1/2009 | Fong et al. |
| 2009/0012899 | A1 | 1/2009 | Friesen |
| 2009/0024496 | A1 | 1/2009 | Balachandran et al. |
| 2009/0138412 | A1 | 5/2009 | Jacobsen |
| 2009/0241197 | A1 | 9/2009 | Troyansky |
| 2009/0327154 | A1 | 12/2009 | Van Vooren et al. |
| 2010/0268668 | A1 | 10/2010 | Burdette |
| 2010/0274687 | A1 | 10/2010 | Ghosh et al. |
| 2010/0274718 | A1 | 10/2010 | Ghosh et al. |
| 2011/0106703 | A1 | 5/2011 | Jay et al. |
| 2011/0208640 | A1 | 8/2011 | Geoghegan et al. |
| 2011/0246359 | A1 | 10/2011 | O'Brien et al. |
| 2011/0270720 | A1 | 11/2011 | Manohar |
| 2011/0276473 | A1 | 11/2011 | Blok |
| 2012/0078750 | A1 | 3/2012 | Watkins |
| 2013/0054429 | A1 | 2/2013 | Minor et al. |

OTHER PUBLICATIONS

U.S. Appl. No. 12/829,961, filed Jul. 2, 2010, Bruce Bent, et al.
"Man Bites Dog: Funds Move Into Banking," IBC's Money Fund Selector, 2 Sheets, Nov. 6, 1998.
"Reverse Ups Insurance Limit on Money Market Account," Thomson Financial Inc., Mutual Fund Market News, 1 Sheet, Aug. 26, 2002.
"The Bank of New York adds a $300,000 FDIC-Insured Money Market Account Option to its Dividend Income Checking Account," PR Newswire Associations, Inc., PR Newswire, 2 Sheets, Apr. 18, 2002.
"The Reverse Funds to Offer up to $600,000 of FDIC Insurance on Reserve Insured Deposits; Addressing Investor Needs for Increased Safety, Flexibility and a Competitive Yield," Business Wire, Inc. Business Wire, 2 Sheets, Aug. 13, 2002.
12 CFR Part 329—Interest on Deposit, Source: 51 FR 10808, Mar. 31, 1986, 5 Sheets.

AB 2011 Assembly Bill—Bill Analysis, Senate Amendments, http://www.leginfo.ca.gov/pub/bill/asm/ab_2001-2050/ab_2011_cfa_20060811_161755_asm_floor.html, 2006, pp. 1-3.
AB 2011 Assembly Bill—Bill Analysis, Senate Rules Committee, Third Reading, http://www.leginfo.ca.gov/pub/bill/asm/ab_2001-2050/ab_2011_cfa_20060705_161454_sen_floor.html, 2006, pp. 1-7.
AB 2011 Assembly Bill—Chaptered, http://www.leginfo.ca.gov/pub/bill/asm/ab_2001-2050/ab_2011_bill_20060925_chaptered.html, 2006, pp. 1-3.
AB 2011 Assembly Bill—Enrolled, http://www.leginfo.ca.gov/pub/bill/asm/ab_2001-2050/ab_2011_bill_20060816_enrolled.html, 2006, pp. 1-3.
AB 2011 Assembly Bill—History, Complete Bill History, http://www.leginfo.ca.gov/pub/bill/asm/ab_2001-2050/ab_2011_bill_20060925_history.html, 2006, p. 1.
About iMoneyNet, Inc., About iMoneyNet's Money Funds Division, 4 Sheets, Aug. 21, 2003. http://www.ibcdata.com/about.htm.
Adler, Joe, "Promontory to Roll Out Deposit Service Insuring Liquid Funds," American Banker, Feb. 22, 2010, 1 sheet.
An iMoneyNet Special Report, Brokerage Cash Sweep Options: The Shift from Money Funds to FDIC-Insured Bank Deposit Accounts, by Peter G. Crane & Michael F. Krasner, iMoneyNet, Nov. 2004, 66 pages.
Anderson et al. "Retail Sweep Programs and Bank Reserves," Federal Reserve Bank of St. Louis Review, Bell & Howell Information and Learning Company, vol. 83, Issue 1, 24 Sheets, Jan. 1, 2001.
Announcing Changes in Automatic "Sweep" Investment Options, LPL Financial Services, Linsco/Private Ledger, Member NASD/SIPC, 26 Sheets.
Bank Deposit Program, Online http://web.archive.org/web/20030620100115/http://www.smithbarney.com/products_servi, Jan. 19, 2001, 4 Sheets.
Bent, "Bruce Bent Makes Money Market Funds Act Like Bank Accounts," Equity BBDP, Oct. 5, 1998, 3 Sheets.
Blackwell, "ABA to Approve System for Sharing Deposit Coverage," American Banker, 2 Sheets, Feb. 11, 2003.
Blackwell, "New Pitch: Deposit Insurance Sharing," American Banker Online, 4 Sheets, Jan. 21, 2003.
Board of Governors of the Federal Reserve System, 1984 Fed. Res. Interp. Ltr. LEXIS 56, Nov. 16, 1984, 3 Sheets.
Board of Governors of the Federal Reserve System, 1988 Fed. Res. Interp. Ltr. LEXIS 141, Jun. 22, 1988, 3 Sheets.
Board of Governors of the Federal Reserve System, 1989 Fed, Res. Interp. Ltr. LEXIS 154, Jan. 21, 1989, 2 Sheets.
Board of Governors of the Federal Reserve System, 1989 Fed. Res. Interp. Ltr. LEXIS 77, Mar. 14, 1989, 2 Sheets.
Board of Governors of the Federal Reserve System, 1990 Fed. Res. Interp. Ltr. LEXIS 94, Feb. 1, 1990, 1 Sheet.
Board of Governors of the Federal Reserve System, 1991 Fed. Res. Interp. Ltr. LEXIS 232, Jan. 30, 1991, 2 Sheets.
Board of Governors of the Federal Reserve System, 1994 Fed. Res. Interp. Ltr. LEXIS 156, Jun. 24, 1994, 3 Sheets.
Board of Governors of the Federal Reserve System, 1994 Fed. Res. Interp. Ltr. LEXIS 314, Oct. 17, 1994, 2 Sheets.
Board of Governors of the Federal Reserve System, 1994 Fed. Res. Interp. Ltr. LEXIS 419, Oct. 14, 1994, 4 Sheets.
Britt, "Struggling with Sweep Accounts," America's Community Banker, vol. 6, No. 12, 11 Sheets, Dec. 1, 1997.
California Independent Bankers, ICBA Independent Community Bankers of America, Banker Bulletin, 2006, CIB 16th Annual Convention, vol. 4, issue 6, http://www.cib.org/banker_bulletin.htm.
Capital Briefs: Corporate Checking Account Relief Sought, American Banker, vol. 162, Jul. 28, 1997, 1 Sheet.
Certificate of Deposit Registry Service: Keeping Deposits in the Corn Patch, Banknews, 2 Sheets, Mar. 2003.
Chapelle et al. "Peering Into Tomorrow: At the Threshold of a New Century, Brokers and Others Discuss Where They were Going," Securities Data Publishing on Wall Street, 6 Sheets, Dec. 1, 1999.
Chapelle, "Merrill's Rivals Say They, Too. Offer Services Beyond Banking," Securities Data Publishing on Wall Street, 2 Sheets, Feb. 1, 2003.
CMA, Insured Savings Account Fact Sheet, Merrill Lynch, Pierce, Fenner & Smith Incorporated, 1997, pp. 49-57.

**US 8,612,324 B1**

Page 4

(56)        **References Cited**

OTHER PUBLICATIONS

CMA, Insured Savings Account Fact Sheet, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Jul. 1994, pp. 47-54.

CMA, The Investor Credit Line Service, Cost-Effective Financing for the '90s, Merrill Lynch, Peirce, Fenner & Smith Incorporated, 1997, pp. 36-46.

CMA, The Merrill Lynch Cash Management Account Financial Service, Insured Savings Account Participating Depository Institutions, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Mar. 1995, 2 Sheets.

CMA, The Merrill Lynch Cash Management Account Financial Service, Insured Savings Account Participating Depository Institutions, Merrill Lynch, Pierce, Fenner & Smith Incoporated, Nov. 1992, 2 Sheets.

CMA, The Merrill Lynch Cash Management Account Financial Service, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Jan. 1997, 35 Sheets.

Litigation Notice After Payment of Issue Fee filed in Parent U.S. Appl. No. 10/382,946, Apr. 3, 2009, 160 pages.

Coyle, "A Look at commercial Demand Deposit Options," America's Community Banker, vol. 9, Issue 2, Bell & Howell Information and Learning Company, 9 Sheets, Feb. 1, 2000.

Crockett, "Big Banks Found Stepping Up Marketing of 'Sweep' Accounts," American Banker, vol. 159, No. 198, American Banker Inc., 3 Sheets, Oct. 13, 1994.

Declaration of Mr. Bruce Bent II, Vice Chairman and Registrant of Applicant on the date of first commercial use of the service providing interest and FDIC insurance for a checking accounts by means of a system using money market deposit accounts (MMDA's) of Oct. 23, 1997.

Declaration of Mr. Bruce Bent II, Vice Chairman and Registrant of Applicant. (3 Sheets) and Exhibits A, B, C and D, Mar. 1, 2007, (6 Sheets).

Deposit Growth Strategies for Financial Institutions, New Sweep Account Helps Retain $40 Million in Business Deposits, vol. 7, No. 12, The Reserve Funds, May 2001, 1 Sheet.

Deutsche Bank Insured Deposit Program, Marketing Literature 2007, 3 pages.

DI 48, Excerpts of Transcript of Hearing, U.S. Dist. Ct., District of Delaware, Civil Action No. 82-680, Apr. 8, 1983, 5 sheets.

DI 56, Interrog. Response, U.S. Dist. Ct. District of Delaware, Civil Action No. 82-680, May 20, 1983, 15 Sheets.

DI 99, Suppl. Interrogatory Response, U.S. Dist. Ct., District of Delaware, Civil Action No. 82-630, May 30, 1984, 6 Sheets.

Dreyfus Insured Deposit Program, Disclosure Statement and Terms and Conditions, Dreyfus A BNY Mellon Company, Jan. 2008, 8 Sheets.

Dreyfus Insured Deposit Program, Multiple List Program—Effective May 11, 2009, 1 Sheet.

Email from Olivia Kim to Charles Macedo on Jun. 9, 2010 with attachment of Lawsuit by *Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation,* and *Intrasweep LLC* against *Deutshe Bank Trust Company Americas* and *Total Bank Solutions, LLC,* Defendant Deutsche Bank Trust Company America's responses to Intrasweep's common interrogatory Nos. 1-5, Confential-Attorneys only, Civil Action No. 09 Civ. 2675 (VM) (AJP).

Email from Olivia Kim to Charles Macedo on May 13, 2010 with attachment of Lawsuit by *Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation,* and *Intrasweep LLC* against *Deutshe Bank Trust Company Americas* and *Total Bank Solutions, LLC,* Defendant Deutsche Bank Trust Company America's responses to Double Rock's Common interrogatory Nos. 1-10 to defendants Reservation of Right, Civil Action No. 09 Civ. 2675 (VM) (AJP).

Email from Olivia Kim to Charles Macedo on May 13, 2010 with attachment of Lawsuit by *Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation,* and *Intrasweep LLC* against *Deutshe Bank Trust Company Americas* and *Total Bank Solutions, LLC,* Defendant Total Bank Solutions, LLC's responses to Double

Rock's Common interrogatory Nos. 1-10 to defendants, Reservation of Right, Civil Action No. 09 Civ. 2675 (VM) (AJP).

FDIC, Federal Deposit Insurance Corporation, Letter to Mr. Ronald Rexter, Feb. 28, 2003, From Michelle M. Borzillo, Counsel Supervision and Legislation Section, 2 Sheets.

Federal Register: Oct. 9, 1997 (vol. 62, No. 196), pp. 52809-52868. http://www.fdic.gov/news/news/inactivefinancial/1997/fil97111b. html.

Financial Services Industry, "Web Watch: Trading Company Bundles CDs for Better Rates," Community Banker, Jun. 2002, online, http:// findarticles.com/p/articles/mi_qa5344/is_200206/ai_n21313883/. Finistar Reg. No. 2,939,558, Registered Apr. 12, 2005.

Finistar, Providing FDIC Insured Funds as a Stable Source of Deposits to Commercial Banking Institutions, 16 Sheets, www.Finistar. com.

Fredrickson, "Rising Rates Rescue Money Fund Firm Reserve Profits by Picking Niches," Crain's New York Business, Crain Communications Inc., vol. 20, Issue 51, 2 Sheets, Dec. 20, 2004.

Frost Bank, Member FDIC, Checking Accounts, 1 Sheet, Sep. 19, 2003, https://www.frostbank.com/cgi-bin/ecomm/frost1/scripts/ products/product_detail.jsp?BV_ . . . .

Garmhausen, "Matching Small Banks with Large Muni Deposits," American Banker, Online The Financial Services Resource, Oct. 4, 2005, 4 pages, http://www.finstar.com/docs/AmericanBanker.html.

Heavyweight Funding, Bankers News, Mar. 4, 2003, vol. II, Issue No. 5, 2 Sheets.

Hencke, "New Rules for FDIC deposit Insurance", ABA Bank Compliance, vol. 20, No. 7, Jul./Aug. 1999, pp. 31-37.

Hoffman, "Reserve's FDIC-Insured Account Draws Regionals; But some see little need for insurance," Crain Communications Inc., Investment News, 2 Sheets, Jun. 4, 2001.

IDC Deposits, online, http://idcdeposits.com/ , 2009, 1 Sheet.

In The Know, Important Information About Your account, Smith Barney Citigroup, 2005, 6 Sheets.

Insured Bank Deposit Program Summary Information Statement, Information Statement, and list of Eligible Program Banks Effective Feb. 10, 2005, 11 pages.

Insured Cash Account Program Disclosure Booklet, LPL Financial Services, Linsco/Private Ledger, Member NASD/SIPC, Apr. 2006, 14 pages.

Jong et al., "The Valuation and Hedging of Variable Rate Savings Accounts," University of Amsterdam, Nov. 15, 2001, 23 Sheets.

Keenan, "Tapping Brokerages for Alternative to CDs," American Banker, The Financial Services Daily, 3 Sheets, Feb. 18, 2004.

Lake Forest Bank & Trust Company, Introducing MaxSafe Deposit Accounts with up to $3.75 Million FDIC Insurance, www. lakeforestbank.com/maxsafe, Nov. 21, 2008, 2 Sheets.

Lavine, "Check Out High-Yield Checking Accounts," Broward Daily Business Review, vol. 39, No. 102, 2 Sheets, Apr. 27, 1998.

Lawsuit by *Island Intellectual Property LLC, Lids Capital. LLC, Double Rock Corporation* and *Intrasweep LLC,* against *Promontory Interfinancial Network, LLC, Deutsche Bank AG, Deutsche Bank Trust Company Americas* and *Total Bank Solutions, LLC,* Complaint, Apr. 14, 2009, Case No. 09 CV 3750.

Lawsuit by *Carlo DeBlasio et al.* against *Merrill Lynch & Co., Inc. et al.,* Declaration of Andrew W. Stern, including Exhibits A, B, C, D, E and F, Nov. 12, 2007, Case No. 07-cv-318 (RJS) (Document 59).

Lawsuit by *Carlo DeBlasio et al.* against *Merrill Lynch & Co., Inc. et al.,* Declaration of Joel P. Laitman in Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Dismissal of the Second Amended Class Action Complaint, Including: "Client Commitment"; "Get Started Today"; "Total Merrill"; "Guideline for Business Conduct"; "Commitment to Clarity"; "Cash Management Account"; "Information Statement Regarding Changes to Interest Rates on Deposits in Merrill Lynch Banks", Feb. 5, 2008.

Lawsuit by *Carlo DeBlasio et al.* against *Merrill Lynch & Co., Inc. et al.,* Declaration of Joel P. Laitman in Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Dismissal of the Second Amended Class Action Complaint, Including: . . . Feb. 5, 2008 (Document 72).

Lawsuit by *Carlo DeBlasio et al.* against *Merrill Lynch & Co., Inc. et al.,* Declaration of Joel P. Laitman in Support of Plaintiffs' Memo-

**US 8,612,324 B1**

Page 5

(56)            **References Cited**

OTHER PUBLICATIONS

randum of Law in Opposition to Defendants' Motion for Dismissal of the Second Amended Class Action Complaint, Including: . . . Feb. 5, 2008 (Document 73).

Lawsuit by *Carlo DeBlasio et al.* against *Merrill Lynch & Co., Inc. et al.*, Declaration of Joel P. Laitman in Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Dismissal of the Second Amended Class Action Complaint, Including: . . . Feb. 5, 2008 (Document 74).

Lawsuit by *Carlo DeBlasio et al.* against *Merrill Lynch & Co., Inc. et al.*, Declaration of Joel P. Laitman in Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Dismissal of the Second Amended Class Action Complaint, Including: . . . Feb. 5, 2008 (Document 75).

Lawsuit by *Carlo DeBlasio et al.* against *Merrill Lynch & Co., Inc. et al.*, Declaration of Kenneth I. Schacter, including Exhibits A, B, C, D, F, G, H, J, K, L, M, N, O, P, Q and R, Nov. 14, 2007, Case No. 07-cv-318 (RJS) (Document 69).

Lawsuit by *Carlo DeBlasio et al.* against *Merrill Lynch & Co., Inc. et al.*, Declaration of Mathew J. Terry in Support of Motion to Dismiss by Defendants Wachovia Corporation, Wachovia Securities, LLC, Wachovia Bank, N.A., and Wahcovia Bank of Delaware, N.A., including Exhibits A, B, C, and D, Nov. 14, 2007, Case No. 07-318 (RJS) (Document 67).

Lawsuit by *Carlo DeBlasio et al.* against *Merrill Lynch & Co., Inc. et al.*, Declaration of Scott D. Musoff in Support of The Merrill Lynch Defendants' Motion to Dismiss The Second Amended Class Action Complaint, ECF Case, Nov. 12, 2007, Case No. 07-cv-318 (RJS) (Document 64).

Lawsuit by *Carlo DeBlasio et al.* against *Merrill Lynch & Co., Inc. et al.*, Reply Declaration of Kenneth Schacter including Exhibits S and T, Mar. 6, 2008, Case No. 07-318 (RJS) (Document 81).

Lawsuit by *Carlo DeBlasio et al.* against *Merrill Lynch & Co., Inc. et al.*, Second Amended Class Action Complaint, Jury Trial Demanded, Introduction and Summary of Allegations, Jun. 11, 2007, Case No. 07-cv-318-VM.

Lawsuit by *Carlo DeBlasio et al.* against *Merrill Lynch & Co., Inc. et al.*, Supplemental Declaration of Matthew J. Terry in Support of Motion to Dismiss by Defendants Wachovia LLC, Wachovia Securities, LLC, Wachovia Bank N.A., and Wachovia Bank of Delaware, N.A., including Exhibits A and B, Mar. 6, 2008 Case No. 07-cv-318 (RJS) (Document 79).

Lawsuit by *Carlo DeBlasio, et al.* against *Merrill Lynch & Co., Inc., et al.*, Opinion and Order Regarding Motions, Jul. 27, 2009, Case No. 07 CIV 318(RJS).

Lawsuit by Island *Intellectual Property LLC* and *Intrasweep LLC* against *Deutsche Bank Trust, Company Americas* and *Total Bank Solutions, LLC*, Deutsche Bank Trust Company Americas' answer to plaintiffs' Feb. 23, 2010 complaint and counterclaims, May 4, 2010, Civil Action No. 09 Civ. 2675 (VM) (AJP) (Document 111).

Lawsuit by Island *Intellectual Property LLC* and *Intrasweep LLC* against *Deutsche Bank Trust Company Americas* and *Total Bank Solutions, LLC*, Total Bank Solutions, LLC's answer to plaintiffs' Feb. 23, 2010 complaint and counterclaims, May 4, 2010, Civil Action No. 09 Civ. 2675 (VM) (AJP) (Document 112).

Lawsuit by *Island Intellectual Property LLC* and *Intrasweep LLC* against *Intsitutional Deposits Corp.* The Island Plaintiffs' Complaint against Defendant Institutional Deposits Corp., Nov. 4, 2009, Civil Action No. 1 09-CV-3079.

Lawsuit by *Island Intellectual Property LLC* and *Intrasweep LLC* against *Institutional Deposits Corp.*, Complaint for Patent Infringement, Jury Trial Demanded, Nov. 4, 2009, Civil Action No. 09 CV 3079.

Lawsuit by *Island Intellectual Property LLC* and *Intrasweep LLC* against *Institutional Deposits Corp.*, Consent Order, Apr. 21, 2010, Case No. 09-CV-3079 (Document 44).

Lawsuit by *Island Intellectual Property LLC* and *Intrasweep LLC*, Answer of Defendants Institutional Deposits Corp. to Complaint for Patent Infringement, Dec. 10, 2009, Case No. 09 CV 03079 (JEC), (Document 16).

Lawsuit by *Island Intellectual Property LLC* and *Lids Capital LLC* against *Deutsche Bank Trust Company Americas* and *Total Bank Solutions, LLC*, Deutsche Bank plaintiffs' Mar. 16, 2010 complaint and counterclaims, May 4, 2010, Civil Action No. 09 Civ. 2675 (VM) (AJP) (Document 113).

Lawsuit by *Island Intellectual Property LLC* and *Lids Capital LLC* against *Deutsche Bank Trust Company Americas* and *Total Bank Solutions, LLC*, Total Bank Solutions, LLC's answer to plaintiffs' Mar. 16, 2010 complaint and counterclaims, May 4, 2010, Civil Action No. 09 Civ. 2675 (VM)(Document 114).

Lawsuit by *Island Intellectual Property LLC et al.*, against *Deutsche Bank Trust Company Americas, et al.*; Expert Report of Richard T. Powers Concerning Invalidity of U.S. 7,536,350; 7,668,771; 7,668,772, 7,672,886; and 7,680,734; and Exhibits A-R; Civil Action No. 09 Civ.2675(VM)(AJP), Oct. 28, 2010; 1,119 pages.

Lawsuit by *Island Intellectual Property LLC, et al.* against *Deutsche Bank Trust Company Americas, et al.*, Defendant Deutsch Bank Trust Company Americas' Responses to Double Rock's Interrogatories Nos. 1-10; May 2010; Civil Action No. 09 Civ. 2675 (VM)(AJP).

Lawsuit by *Island Intellectual Property LLC, et al.* against *Deutsche Bank Trust Company Americas, et al.*; Expert Report of Ivan Zatkovich Regarding Validity and Enforceability of the Asserted Claims of the Patents-in-Suit; Civil Action No. 09 Civ. 2675 (VM)(AJP); Nov. 23, 2010; 192 pages. The redacted items were designated as confidential in a Protective Order in this case.

Lawsuit by *Island Intellectual Property LLC, et al.* against *Deutsche Bank Trust Company Americas, et al.*; Expert Report of the Honorable Gerald J. Mossinghoff and Exhibits A-E; Civil Action No. 09 Civ. 2675 (VM)(AJP); Nov. 23, 2010; 107 pages.

Lawsuit by *Island Intellectual Property LLC, et al.* against *Deutsche Bank Trust Company Americas*; Defendant Total Bank Solutions, LLC's Responses to Double Rock's Common Interrogatory Nos. 1-10 to Defendants; May 2010; Civil Action No. 09 Civ. 2675 (VM)(AJP).

Lawsuit by *Island Intellectual Property LLC, et al.*, against *Deutsche Bank Trust company Americas, et al.*; Defendant Deutsche Bank Trust Company Americas' Fifth Supplemental Responses to Island IP's First Set of Common Interrogatories to All Defendants (No. 7); Case no. 09 Civ. 2675 (VM)(AJP); Sep. 16, 2010; 9 pages.

Lawsuit by *Island Intellectual Property LLC, et al.*, against *Deutsche Bank Trust Company Americas, et al.*; Defendant Total Bank Solutions, LLC's Fifth Supplemental Responses to Island IP's First Set of Common Interrogatories to All Defendants (No. 7); Case No. 09 Civ. 2675 (VM)(AJP); Sep. 16, 2010; 9 pages.

Lawsuit by *Island Intellectual Property LLC, Intrasweep LLC* and *Double Rock Corporation* against *Deutsche Bank AG, Deutsche Bank Trust Company Americas* and *Total Bank Solutions, LLC*, Complaint for Patent Infringement, May 19, 2009, Case No. 09 CIV 4673.

Lawsuit by *Island Intellectual Property LLC, Lids Capital LLC*, and *Double Rock Corporation* against *Deutsche Bank AG, Deutsche Bank Trust Company Americas* and *Total Bank Solutions, LLC*, including Cover Sheet, Summons, Complaint and Rule 7.1 Statement, Mar. 24, 2009, Case No. 09 CV 2677.

Lawsuit by *Island Intellectual Property LLC, Lids Capital LLC*, and *Double Rock Corporation* against *Promontory Interfinancial Network, LLC* and *MBSC Securities Corporation*, including Cover Sheet, Summons, Complaint and Rule 7.1 Statement, Mar. 24, 2009, Case No. 09 CV 2675.

Lawsuit by *Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation* and *Intrasweep LLC* against *Deutsche Bank AG, Deutsche Bank Trust COmpany Americas* and *Total Bank Solutions, LLC*, Stipulated Dismissal of Deutsche Bank AG Without Prejudice, Nov. 19, 2009, Civil Action No. 09 CIV 2675 (VM) (AJP) (Document 79).

Lawsuit by *Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation* and *Intrasweep LLC* against *Deutsche Bank Trust Company Americas* and *Total Bank Solutions, LLC*, Deutsche Bank Trust Company Americas' First Amended Answer to Consolidated First Amended Complaint and Counterclaims, Dec. 4, 2009, Civil Action No. 09 CIV 2675 (VM) (AJP), (Document 86).

Lawsuit by *Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation* and *Intrasweep LLC* against *Deutsche Bank Trust Company Americas Total Bank Solutions, LLC*, Total

(56)                **References Cited**

OTHER PUBLICATIONS

Bank Solution, LLC's First Amended Answer to Consolidated Fist Amended Complaint and Counterclaims Dec. 4, 2009, Civil Action No. 09 CIV 2675 (VM) (AJP) (Document 87).

Lawsuit by *Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation* and *Intrasweep LLC* against *Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas* and *Total Bank Solutions, LLC*, Answer and Counter Claims, Answer of Defendant MBSC Securities Corporation, Jun. 25, 2009, Case No. 09 CV 2675.

Lawsuit by *Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation* and *Intrasweep LLC* against *Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas* and *Total Bank Solutions, LLC*, Answer and Counter Claims, Answer of Defendant Promontory Interfinancial Network, LLC, Jun. 25, 2009, Case No. 09 CV 2675.

Lawsuit by *Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation* and *Intrasweep LLC* against *Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas* and *Total Bank Solutions, LLC*, Consolidated First Amended Complaint, Jury Trial Demanded, Jun. 11, 2009, Civil Action No. 09 CIV 2675 (VM).

Lawsuit by *Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation* and *Intrasweep LLC* against *Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas* and *Total Bank Solutions, LLC*, Jury Trial Demanded, Deutsche Bank AG's Answer to Consolidated First Amended Complaint, Jun. 25, 2009, Civil Action No. 09 CIV 2675.

Lawsuit by *Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation* and *Intrasweep LLC* against *Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas* and *Total Bank Solutions, LLC*, Jury Trial Demanded, Deutsche Bank Trust Company Americas' Answer to Consolidated First Amended Complaint and Counter Claims, Jun. 25, 2009, Civil Action No. 09 CIV 2675.

Lawsuit by *Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation* and *Intrasweep LLC* against *Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas* and *Total Bank Solutions, LLC*, Jury Trial Demanded, Total Bank Solutions, LLC's Answer to Consolidated First Amended Complaint and Counterclaims, Jun. 25, 2009, Civil Action No. 09 CIV 2675.

Lawsuit by *Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation* and *Intrasweep LLC* against *Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas* and *Total Bank Solutions, LLC*, Stipulated Dismissal of Counts I-III of Defendant Promontory Interfinancial Counterclaim Network, LLC's, Counterclaim with Prejudice, Oct. 19, 2009, (Document 68).

Lawsuit by *Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation* and *Intrasweep LLC* against *Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas* and *Total Bank Solutions, LLC*, Stipulation and Order, Oct. 29, 2009, Case No. 09 Cv 2675 (VM)(AJP)(Document 73).

Lawsuit by *Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation* and *Intrasweep LLC* against *Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas* and *Total Bank Solutions, LLC*The Island Plaintiffs' Reply to Defendant Deutsche Bank Trust Company Americas' Counterclaims, Jul. 9, 2009, Civil Action No. 09 CIV 2675 (VM).

Lawsuit by *Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation* and *Intrasweep LLC* against *Promontory Interfinancial Network LLC, MBSC Securities Corporation,*

*Deutsche Bank AG, Deutsche Bank Trust Company Americas* and *Total Bank Solutions, LLC*, The Island Plaintiffs' Reply to Defendant MBSC Securities Corporation's Counterclaims, Jul. 9, 2009, Civil Action No. 09 CIV 2675 (VM).

Lawsuit by *Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation* and *Intrasweep LLC* against *Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas* and *Total Bank Solutions, LLC*, The Island Plaintiffs' Reply to Defendant Promontory Interfinancial Network LLC's Counterclaims, Jul. 9, 2009, Civil Action No. 09 CIV 2675 (VM).

Lawsuit by *Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation* and *Intrasweep LLC* against *Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas* and *Total Bank Solutions, LLC*, The Island Plaintiffs' Reply to Defendant Total Bank Solutions, LLC's Counterclaims, Jul. 9, 2009, Civil Action No. 09 CIV 2675 (VM).

Lawsuit by *Promontory Interfinancial Network, LLC* against *Double Rock Corporation p/k/a Reserve Management Corporation* and *Lids Capital LLC*, Amended Complaint, Mar. 27, 2009, Civil Action No. 1:09 CV 316.

Lawsuit by *Promontory Interfinancial Network, LLC* against *Deutsche Rock Corporation p/k/a Reserve Management Corporation*, Complaint, Mar. 24, 2009, Civil Action No. 1:09 CV 316.

Lawsuit by *Promontory Interfinancial Network, LLC* against *Double Rock Corporation p/k/a Reserve Management Corporation, Island Intellectual Property LLC, Lids Capital LLC* and *Intrasweep LLC*, Amended Complaint, Apr. 15, 2009, Civil Action No. 3:09 CV 217.

Lawsuit by *Promontory Interfinancial Network, LLC* against *Deutsche Rock Corporation p/k/a Reserve Management Corporation, Island Intellectual Property LLC, Lids Capital* and *Intrasweep LLC*, Complaint, May 19, 2009, Civil Action No. 3:09 CV 322.

Lawsuit by *Promontory Interfinancial Network, LLC* against *Deutsche Rock Corporation p/k/a Reserve Management Corporation, Island Intellectual Property LLC* and *Lids Capital LLC*, including Cover Sheet, Summons and Complaint, Apr. 14, 2009, Civil Action No. 3:09 CV 217.

Letter from Gilbert T. Schwartz, Skadden, Arts, Slate, Meagher & Flom to Oliver Ireland, Associate General Counsel, Board of Governors of the Federal Reserve System; Dec. 18, 1987; 19 sheets.

Letter From Jamey Basham, Attorney, LEXSEE 1990 FDIC Interp. Ltr., Lexis 1, Federal Deposit Insurance Corporation, FDIC-90-02, Jan. 3, 1990, 2 Sheets.

Letter From Joseph A. DiNuzzo, Counsel, Oct. 20, 1999, FDIC, Federal Deposit Insurance Corporation, 1 Sheet.

Letter From Merle Y. Waldman, LXSEE 1985 Sec No-Act., Lexis 1593, Securities Exchange Act of 1934—Section 15(a), Jan. 8, 1985, 11 Sheets.

Letter from Michael Bradfield, General Counsel, Board of Governors of the Federal Reserve System, Nov. 16, 1984, 4 Sheets.

Letter From Oliver I. Ireland, Associate General Counsel, Board of Governors of the Federal Reserve System, Jun. 22, 1988, 5 Sheets.

Letter From Roger A. Hood, Assistant General Counsel, Jul. 16, 1986, FDIC, Federal Deposit Insurance Corporation, Legal Division, 1 Sheet.

Letter from Roger M. Zaitzeff, Seward & Kissel to Gilbert T. Schwartz, Associate General Counsel, Board of Governors of the Federal Reserve System; May 10, 1983, 5 sheets.

Letter from Stephanie Martin, Assoc. General Counsel, Board of Governors of the Federal Reserve System, Apr. 22, 2004, 8 Sheets.

Letter From William W. Wiles, Secretary of the Board, Board of Governors of the Federal Reserve System, Jun. 22, 1983, 6 Sheets.

Letter to Mr. James E. Creekman, Group Vice President, From Oliver Ireland, Associate General Counsel, Aug. 1, 1995, 4 Sheets.

Letter to Mr. Jonathan L. Levin, Esq., From Oliver Ireland, Associate General Counsel, Oct. 18, 1996, 2 Sheets.

Letter to Mr, L.P. Fleming, Jr., Esq., From Oliver Ireland, Associate General Counsel, Oct. 18, 1995, 3 Sheets.

Letter to Ms. Brenda L. Skidmore, Senior Vice President, From Oliver Ireland, Associate General Counsel, Aug. 30, 1995, 4 Sheets.

Letter to William R. Burdette, CEO, Apr. 6, 2009, FDIC, Federal Deposit Insurance Corporation, 2 pages.

**US 8,612,324 B1**

Page 7

(56)        **References Cited**

OTHER PUBLICATIONS

Letter to William R. Burdette, CEO, Nov. 15, 2007, FDIC, Federal Deposit Insurance Corporation, 5 Sheets.

Liberman et al., MarketWatch, "How Important are Banks?" FDIC Insurance on Deposit Just One Continuing Advantage, Oct. 17, 2006, 3 Sheets.

McReynolds et al. "Unusual Products for Unusual Times," Securities Data Publishing on Wall Street, 6 Sheets, May 1, 2001.

McReynolds, "The Power of CASH: Ho-hum cash can be great product (and lead to more business) in troubled times," Securities Data Publishing on Wall Street, 3 Sheets, Jun. 1, 2002.

Merriam-Webster Online Dictionary, 10th Edition, Definition of "Associated", Jan. 30, 2009, 2 Sheets.

Merrill Lynch & You, "Financial Services the Way You Want, When You Want Them," Jan. 2000 4 Sheets.

Merrill Lynch Announces Beyond Banking, The Power of Advice for Smarter Cash Management, Jan. 8, 2000, 2 Sheets.

Merrill Lynch, Pierce, Fenner & Smith Incorporated, "Information Statement," 2000, 12 Sheets.

Merrill Moves CMA Cash to Bank, Street Talk, On Wall Street, Nov. 2000, p. 26.

Money Fund Report, Bank of New York Adds Insured Sweeps Option, Friday, May 3, 2002, The Reserve Funds, 1 Sheet.

Money Fund Report, IBC Financial Data, Inc., Nov. 6, 1998, 1 Sheet.

Money Fund Report, Insured Cash Sweep Options Proliferate, Friday, Jun. 1, 2001, The Reserve Funds, 1 Sheet.

Money Market Insight's, Goldman Sachs May Create Bank to Offer Insured Cash Sweeps, Aug. 2002 Issue, 3 Sheets.

Munk, Merrill Makes New Push Into Traditional Banking, Dow Jones Newswires, Jan. 3, 2003, 1 Sheet.

Mutual Fund Dealers Association, 1 page, (http://www.mfda.ca/.

Mutual Funds Magazine, Bargain Basement Funds, Oct. 1997, 1 Sheet.

Mutual Funds Magazine, Bargain Basement Funds, Oct. 1997, 2 Sheets.

News Article: "Regulators Support Demand Deposit Bill", Regulatory Compliance Watch—Mar. 9, 1998; 2 Sheets, vol. 9, No. 10.

Northbrook Bank & Trust Company, Introducing our MaxSafe CD with up to $700,000 of FDIC Insurance, 4 Sheets.

Northbrook Bank & Trust Company, Seven Times the Security of a Normal CD, Introducing our MaxSafe CD, Nov. 12, 2002, 4 Sheets.

O'Brian, "Money-Market Funds Suit Many Investors, But Proud Creator Frets About Extra Risk," Re-Printed From The Wall Street Journal, Monday, Nov. 6, 2000, Dow Jones & Company, Inc., Nov. 25, 2002, 2 Sheets.

On Wall Street, Helping Brokers Build a More Successful Business, The Power of CASH, Jun. 2002, 2 Sheets.

On Wall Street, Helping Brokers Build a More Successful Business, Unusual Products for Unusual Times, May 2001, 2 Sheets.

Online, www.usabancshares.com, Brave New World, 1999, 2 Sheets.

Part: 2, Monetary Policy and Reserve Requirements, Subpart—Regulation D, Board Interpretations of Regulation D, Transaction Accounts—Linked to Time Deposits, vol. 1, Federal Reserve Regulatory Service, 2 Sheets.

Potter, "As Sweep Accounts Continue to Grow, So do Community Bank Options," America's Community Banker, vol. 9, Issue 8, Bell & Howell Information and Learning Company, 3 Sheets, Aug. 1, 2000.

Promontory Interfinancial Network, Promontory Interfinancial Network Announces New Deposit Placement Service, Jan. 21, 2003, 3 Sheets.

Promontory Interfinancial Network: http://www.promnetwork.com/index.html, 2003.

Promontory Interfinancial Network: Frequently Asked Questions (FAQs), Feb. 5, 2003, 5 pages.

Promontory to Roll Out Deposit Service Insuring Liquid Funds, American Banker, by Joe Adler, Feb. 22, 2010, 2 Sheets.

Reserve Insured Deposits, United States Patent and Trademark Office, Reg. No. 2,694,910, Registered Mar. 11, 2003, 1 Sheet.

Reserve Management Corporation, Reserve Insured Deposits, U.S. Appl. No. 76/315,600, Issued.

Ring, National /Global, "Amex Spans The Globe in Retail Bank Buildup," Nov. 27, 2000, 1 Sheet.

Share, "New Service Skirts FDIC's $100K Limit," Dialog Web Command Mode, 2 Sheets, Jun. 13, 2003, http://www.dialogweb.com/cgi/dwclient.

Smith, "IBAA Won't Push Interest-Bearing Checking for Business; Says Too Few Members Want It," The American Banker, 2 Sheets, Apr. 18, 1996.

Stafford, "New Bank Program Allows $1 Million in Insured Deposits," Dialog Web Command Mode, 3 Sheets, Aug. 24, 2003, http://www.dialogweb.com/cgi/dwclient.

Sweeping Your Firm Into FDIC Insured Deposits, Harken Financial Services, Aug. 4, 2006, 8 Sheets.

Testimony of Bruce R. Bent, CEO of the Reserve Funds, Before the Financial Institutions and Consumer Credit Subcommittee House Financial Services Committee U.S. House of Representative, Hearing on H.R. 758 and H.R. 859, Mar. 5, 2003, 4 Sheets.

The Depository Trust Company, B#: 3875, Oct. 1, 2002, Settlement\Underwriting, From: Denise Russo, Director, Underwriting, 6 Sheets.

The Insured Savings Account, Issuer Guide to Offering MMDAs Through Merrill Lynch, Merrill Lynch Money Markets, Inc., "Operational Guide to the Merrill Lynch MMDA Program 1986", Sep. 1986 3 Sheets.

The Pershing Press, Dreyfus Insured Deposit Program, Issue 2, Aug. 2008, http://www.pershing.com/news/pershing_press/news_466244.html, 1 Sheet.

The Reserve Fund, Study of U.S. Patent No. 6,374,231, 1 Sheet.

The Reserve Funds Press Release, "The Reserve Funds and Frontier Bank Partner to Offer Revolutionary Banking Product," 5 Sheets, Aug. 1, 2000.

The Reserve Funds, Objectives, Observations & Strategies for American Enterprises Inv., Oct. 18, 2000, 11 Sheets.

The Reserve Funds, NJBA Endorses New Sweep Account Offers New Jersey Banks Deposit Growth, Retention, for Immediate Release, May. 23, 2011, 1 Sheet.

The Reserve Funds, Reserve Management and Irwin Union Bank Trust Company Partner to Offer The Reserve Return Sweep, for Immediate Release, Mar. 8, 2001, 2 Sheets.

The Reserve, "Company History," 3 Sheets, Oct. 4, 2006, http://www.ther.com/aboutus/history.shtml.

The Reserve, "Reserve Insured Deposits Program," 2 Sheets, Oct. 4, 2006, http://www.ther.com/bank/bank_insdep.shtml.

The Reserve, "Reserve Insured Deposits," 2 Sheets, Oct. 4, 2006, http://www.ther.com/ps/ps_fif.shtml.

The Reserve, "What Sets Us Apart," 2 Sheets, Oct. 4, 2006, http://www.ther.com/bank/bank_wsua.shtml.

The Unmatched Sweep Solution From the Cash Management Expert, 2 Sheets.

Total Bank Solutions, Bank Sweep FAQs http://www.totalbanksolutions.com/sweepbnkfaqs.htm, Sep. 23, 2005, 2 pages.

Total Bank Solutions, Bank Sweep FAQs, http://www.totalbanksolutions.com/sweepbnkfaqs.htm, Nov. 2, 2005, 3 pages.

Total Bank Solutions, Bank Sweep Products, Deutsche Bank, http://www.totalbanksolutions.com/banksweep.htm, Sep. 23, 2005, 1 page.

Total Bank Solutions, Bank Sweep Products, http://www.totalbanksolutions.com/banksweep.htm, Appendix 3, Oct. 18, 2005, 2 pages.

Total Bank Solutions, Bank Sweep Products, http://www.totalbanksolutions.com/banksweep.htm, Nov. 2, 2005, 2 pages.

Total Bank Solutions, Brokerage Sweep FAQs, http://www.totalbanksolutions.com/brokerfaqs.htm, Nov. 2, 2005, 3 pages.

Total Bank Solutions, Brokerage Sweep, http://www.totalbanksolutions.com/brokersweep.htm, Nov. 2, 2005, 1 page.

Total Bank Solutions, Deposit Bank FAQs, http://www.totalbanksolutions.com/depositbnkfaqs.htm, Nov. 2, 2005, 2 pages.

Total Bank Solutions, Deposits, Deutsche Bank, http://www.totalbanksolutions.com/deposits.htm, Sep. 23, 2005, 1 page.

Total Bank Solutions, Deposits, http://www.totalbanksolutions.com/deposits.htm, Nov. 2, 2005, 2 pages.

**US 8,612,324 B1**

Page 8

(56)        **References Cited**

OTHER PUBLICATIONS

Total Bank Solutions, Deutsche Bank Insured Deposit Program, DB Insured Deposit Program Features, http://www.totalbanksolutions.com/features.htm, Sep. 23, 2005, 2 pages.
Total Bank Solutions, Deutsche Bank Insured Deposit Program, http://www.totalbanksolutions.com/, Sep. 23, 2005, 1 page.
Total Bank Solutions, http://www.totalbanksolutions.com/, Mar. 16, 2007, 8 pages.
Total Bank Solutions, http://www.totalbanksolutions.com/overview.htm, Nov. 2, 2005, 1 page.
Total Bank Solutions, Insured Deposit Program Features, http://www.totalbanksolutions.com/features.htm, Nov. 2, 2005, 2 pages.
Total Bank Solutions, Insured Deposit Program, http://www.totalbanksolutions.com/Insureddeposits.htm, Nov. 2, 2005, 2 pages.
Total Bank Solutions, Partners & Affiliates, http://www.totalbanksolutions.com/partners.htm, Nov. 2, 2005, 3 pages.
Total Bank Solutions, Partners & Affiliates, http://www.totalbanksolutions.com/partners.htm, Oct. 25, 2005, 3 pages.
Total Bank Solutions, Strategic Partners, Nov. 2, 2005, 1 page.
Total Bank Solutions, TBS Deposit Account, About Our Broker Products, http://www.totalbanksolutions.com/brokerproducts.htm, Sep. 7, 2005, 2 pages.
Total Bank Solutions, TBS Management Team, http://www.totalbanksolutions.com/management.htm, Appendix 1, Oct. 18, 2005, 1 page.
Total Bank Solutions, TBS Management Team, http://www.totalbanksolutions.com/management.htm, Nov. 2, 2005, 2 pages.
Total Bank Solutions, TBS Management Team, http://www.totalbanksolutions.com/management.htm, Oct. 25, 2005, 2 pages.
TotalBank Solutions, TBS Bank Deposit Account, Oct. 2004, 7 pgs.
TotalBank Solutions, web.archive.org/web/20050126044216/http://totalbanksolutions.com, Jan. 26, 2005, 2 pgs.
USA Mutual Partners Insured Cash Shelter Account Terms and Conditions, 11 pages, 2009 USA Mutuals Partners, Inc.
Wachovia Securities, Important Information for Clients Concerning Changes in Automatic "Sweep" Arrangements, Oct. 1, 2003, 6 sheets.
Waddell, "Sweeping Clean," Advisor, The Advisor to Advisors, 2 Sheets.
Wilson, "How Cash Management Services Can Help Your Bank Cultivate New Relationships with Commercial Customers," America's Community Banker, vol. 10, Issue 5, Bell & Howell Information and Learning Company, 8 Sheets, May 1, 2001.
Memorandum from Ken Johnson re: Insured Deposit Products, Aug. 18, 1992, 3 pgs.
Memorandum from John E. Oncken re: Insured Savings Update, Jun. 15, 1990, 7 pgs.
Memorandum from John E. Oncken re: Brokered Deposit Issue vs. Insured Savings, Mar. 22, 1990, 8 pgs.
Memorandum from Ed Piner re: Insured Savings Product Update, Feb. 1, 1990, 4 pgs.
Insured Savings Correspondent Agreement with Exhibits A-D, 28 pgs.
First City, Texas Insured Savings Agency Agreement with Exhibits A-B and Insured Savings Program, 10 pgs.
Product Bulletin from Bill McCain, Subject: Insured Savings Product Announcement, May 8, 1989, 7 pgs.
Insured Savings Project Team Meeting, Feb. 2, 1989, 16 pgs.
Insured Savings Product Description, Product Name: Insured Savings, Product Description: U.S. Patent #4,985,833, 3 pgs.
Letter to Tim C. Lear, Sep. 20, 1988, 1 pg., with Memorandum from Ed Piner, re: Insured Savings Product, Nov. 9, 1988, and Letter from Tara L. Cyr, Dec. 9, 1988, 1pg.
Automatic Insured Deposit Method, Patent Application Information, Jul. 11, 1988, 17 pgs.
Insured Savings, Overview & Marketing Plan, Dec. 6, 1988, 23 pgs.
Memorandum from Dick Zinser, re: A First City-Austin deposit program to hold existing customers' deposits, Mar. 17, 1988, 7 pgs.
Insured Savings Remote Site Sweep Procedures, 3 pgs.

Letter to Malcolm L. Duke, Dec. 27, 1989 with Insured Savings Correspondent Agreement, Exhibits A-D, and Letter to Malcolm L. Drake, Nov. 21, 1989, 37 pgs.
Memorandum from Ken Johnson, re: Attached Insured Savings Letters, Jul. 5, 1990, 1 pg.
Letter to Jerry Crutsinger, Jul. 3, 1990, 1 pg.
Letter to Bill Goertz, Jul. 3, 1990, 1 pg.
Letter to Susan Goodwin, Jul. 3, 1990, 1 pg.
Insured Savings Rate Change Notice, Jul. 17, 1990, 1 pg.
Addendum to Insured Savings Agency Agreement, Jul. 17, 1990, 1 pg.
Letter to Paula Martin, Jul. 3, 1990, 1 pg.
Letter to John Lovell, Jul. 3, 1990, 1 pg.
Insured Savings Balance Limits form, 1 sheet.
Email from John Oncken re: Depository Levels at Insured Savings Depositories, Nov. 2, 1989, 1 pg.
Cash Management Balance Monitoring Agreement Form 1 sheet.
Memorandum from Ed Piner, Subject: Discontinuation of Automatic Balance Monitoring in conjunction with Insured Savings Accounts, May 21, 1991, 1 pg.
Blank form letter from Edward N. Piner, May 24, 1991, 1 pg.
Letter from First City National Bank of Austin, Sep. 20, 1982, 5 pgs.
First City, Texas—Austin, Special Products, Feb. 20, 1992, with Schedule A & Schedule B, 6 pgs.
Alliance Insured Account, Information Statement, Sep. 1999, 6 sheets.
Lawsuit by Carlo DeBlasio et al. and Merrill Lynch & Co., Inc. et al., Opinion and Order, Jul. 27, 2009, Civil Action No. 07 CIV. 318, 47 pgs.
Lawsuit by Carlo DeBlasio et al. and Merrill Lynch & Co., Inc. et al., Second Amended Class Action Complaint, Jury Trial Demanded, Jun. 11, 2007, Civil Action No. 07 cv 318, 137 pgs.
Investors MoneyAccountSM and Insurance Plus Service Agreement, Schedule A, 3 sheets.
Investors MoneyAccountSM (an FDIC-insured money market account), 4 sheets.
Investors MoneyAccountSM the FDIC-Insured Money Market with an Important Plus., 2 sheets.
Investment Company Act of 1940—Section 3(a)(1), 2(a)(36); Securities Act of 1933—Section 2(1), Nov. 29, 1985, Kempter Financial Services, Inc., 9 pgs.
Insured Money Account Program Agreement and Disclosure Statement, 11 sheets.
First National Bank in Brookings, Certificates of Deposit, Fuly 17, 2009, 5 sheets.
Summary of Commentary on Current Economic Conditions by Federal Reserve Districts, Jan. 1985, 44 pgs.
Board of Governors of the Federal Reserve System, Blank Form Letter, Apr. 22, 2004, 8 pgs.
FDIC Law, Regulations, Related Acts, 4000—Advisory Opinions, FDIC-93-35, Jun. 28, 1993, 2 sheets.
§204.134, 12 CFR Ch. 11 (Jan. 1, 2009 Edition), 2 sheets.
Money Fund $$ Moving to Bank Deposits, 6 FRC Monitor, Dec. 2003, 2 sheets.
Crane, P. & Krasner, Mike, An iMoney Net Special ReportTM , "Brokerage Cash Sweep Options: The Shift from Money Funds to FDIC-Insured Bank Deposit Accounts", Nov. 2004, 64 pgs.
The May 1998 Senior Financial Officer Survey, Board of Govenors of the Federal Reserve System, with Appendix A, 48 pgs.
Interest Rate Review© A Publication of Meyer Weekly Interest Rate Survey, A Look at Tiers, vol. II, No. 4, Apr. 1987, 6 pgs.
Interest Rate Review© A Publication of Meyer Weekly Interest Rate Survey, A Study of Historical Rates and Yields, vol. II, No. 6, Jun. 1987, 8 pgs.
Blank form letter to Oliver Ireland, Oct. 7, 1994, 1 pg.
Letter to L.P. Fleming, Jr. Esq., Feb. 7, 1995, 3 pgs.
Letter to James E. Creekman, Aug. 1, 1995, 4 pgs.
Letter to Brenda L. Skidmore, Aug. 30, 1995, 4 pgs.
Merrill Lynch & Co., Inc. Form 10-K405 (Annual Report (Regulation S-K, item 405)), filed Mar. 14, 2002 for the Period Ending Dec. 28, 2001, with Schedules, Exhibits, and 2001 Annual Report, 248 pgs.

**US 8,612,324 B1**

Page 9

(56)        **References Cited**

OTHER PUBLICATIONS

Merrill Lynch, Information Statement Regarding Changes to Interest Rates on Deposits in the Merrill Lynch Banks, Document 64-14, Nov. 12, 2007, Case 1:07-cv-00318, 2 sheets.
Street Talk, "Merrill Moves CMA Cash to Bank", On Wall Street, Nov. 2000, 1 sheet.
Quest Insured Account, QUESTessentials, 3 sheets.
Quest Insured Account, Information Statement, 5 sheets.
OCC Insured Bank Deposit Account, 3 sheets.
Insured Bank Deposit Account, Information Statement, Jul. 1, 2000, 2 sheets.
Letter from Marilyn J. Hensle, announcing Salomon Smith Barney Bank Deposit Program. SM, with Q&A, 14 sheets.
Bank Deposit program Disclosure Statement, Salomon Smith Barney, 3 sheets.
FDIC Law, Regulations, Related Acts, 4000—Advisory Opinions, FDIC-87-25, Oct. 22, 1987, 1 sheet.
FDIC Law, Regulations, Related Acts, 4000—Advisory Opinions, FDIC-86-21, Jul. 23, 1986, 2 sheets.
The Merrill Lynch Cash Management Account, Financial Service, 18 pgs.
The Insured Savings Account, Issuer Guide to Offering MMDAs through Merrill Lynch, 27 pgs.
Insured Savings Account Fact Sheet, The Merrill Lynch Cash Management Account Financial Service, 1987, 11 pgs.
CMA Insured Savings Account Fact Sheet, 1994, 9 pgs.
A Guide to Your CMA Account, 1995, 19 pgs.
Insured Savings Account Fact Sheet, The Merrill Lynch Cash Management Account Financial Service, 1985, 4 pgs.
CMA Insured Savings Account Fact Sheet, 1997, 13 pgs.
Blackwell, Rob, Salomon's Sweep Plan Raises FDIC Fund Alarm, American Banker, Dec. 6, 2000, 2 pgs.
Insured Deposit Account (IDA), May 21, 1996, 11 pgs.
An Introduction to the Smith Barney Insured Deposit Account, 1995, 8 pgs.
Memorandum from Ted Hamilton re: Insured Deposit Account, Oct. 10, 1995, 13 pgs.
The Insured Deposit Account: "Money in the Bank", 1997, 2 sheets.
Merrill Joins Money Market Account, CMA; Broker Begins Testing With 12 Institutions, Lexis Nexis, Sep. 23, 1983, 4 pgs.
Form 8-K Merrill Lynch & Co Inc—MER, Filed: Mar. 7, 2002, Report of unscheduled material events or corporate changes, 41 pgs.
Lawsuit by *Island Intellectual Property LLC* and *Intrasweep LLC* against *Deutsche Bank Trust Company Americas* and *Total Bank Solutions*, Complaint for Patent Infringement, Jury Trial Demanded, Feb. 23, 2010, Case No. 10 CV 1518, (Document 1).
Lawsuit by *Island Intellectual Property LLC* and *Lids Capital LLC* against *Deutsche Bank Trust Company Americas* and *Total Bank Solutions*, Complaint for Patent Infringement, Jury Trial Demanded, Mar. 16, 2010, Case No. 10 CV 2268.
Quest Cash Management Services Memorandum to Tom Duggan, Re: Quest Insure Account, Nov. 16, 1993.
Bank Services, AMVest Financial ability for banker's and their clients, 6 pgs.
Federally "Insured Deposit Program", AMVest Capital, 1 sheet.
Federally Insured Deposit Program for Banks, AMVest capital, Jan. 15, 2010, 2 sheets.
Flow Chart, AmVest Capital, Dec. 9, 2009, 1 sheet.
Flow of Business for Federally Insured Deposit Program "FIDP", Deutsche Bank & Trust company of the Americas, 1 sheet.
Participation Criteria for the FIDP, Federally Insured Deposit Program Participation Criteria, AmVest Capital, Jan. 15, 2010, 2 sheets.
Federally Insured Deposits/FAQ, Frequently Asked Questions on the Federally Insured Deposit Program, AmVest Capital, Jan. 15, 2010, 2 sheets.
Money Market Rates, Jan. 18, 2010, 2 sheets.
Money Market Rates, Jan. 6, 2010, 3 pgs.
Money Market Rates, Nov. 12, 2009, 3 pgs.
Scott & Stringfellow starts correspondent clearing business, News Release BB&T, Nov. 13, 2007, 3 sheets.

Curian Capital Introduces Custom Wealth Platform, Market Watch, Aug. 18, 2009, 3 pgs.
Ellie Behling, Curian Capital Introduces Custom Wealth Platform, Nov. 10, 2009, 3 sheets.
Curian Capital Introduces Custom Wealth Platform, Reuters, Aug. 18, 2009, 3 pgs.
Curian Capital Introduces Custom Wealth Platform, WSJ.com, Aug. 18, 2009, 3 pgs.
Curian Capital, LLC: Private Company Information, Business Week, Nov. 10, 2009, 3 pgs.
Curian Capital Introduces Custom Wealth Platform, Yahoo! Finance, Aug. 18, 2009, 3 pgs.
Bank Insured Deposit Program, D.A. Davidson & Co., Jan. 15, 2010, 2 sheets.
Bank Insured Deposit Program, D.A. Davidson & Co., Nov. 2, 2009, 2 sheets.
D.A. Davison & Co., Bank Insured Deposit Program, Disclosure Statement, Jan. sheets. 15, 2010, 4 sheets.
First Southwest Company, First Southwest Company Bank Insured Deposit Program, Sep. 28, 2009, 11 pgs.
Manage Cash in an Online Stock Portfolio: Folio Investing, Jan. 15, 2010, 2 sheets.
Folio Investing: Brokerage Features >> Cash Investments>> FDIC. Plus Program, Jan. 14, 2010, 3 pgs.
Folio Investing: Brokerage Features >> Cash Investments>> Cash Seep Rates, Jan. 14, 2010, 2 sheets.
Folio Investing: Brokerage Features >> Cash Investments>> Cash Seep Banks, Jan. 15, 2010, 3 pgs.
Folio Investing: Brokerage Features >> Cash Investments>> Cash Sweep FAQ, Jan. 14, 2010, 3 pgs.
Folio Investing: Brokerage Features >> Cash Investments>> Cash Sweep FAQ, Jan. 18, 2010, 2 sheets.
Folio Investing: Brokerage Features >> Cash Investments>> Cash Sweep FAQ, Jan. 15, 2010, 2 sheets.
Folio Investing: Brokerage Features >> Cash Investments>> Sweep Terms & Conditions, Jan. 14, 2010, 2 sheets.
H.C. Denision Company, Sheboygan, WI, 1 sheet.
The LYRA Program with H.C. Denison Company, Sheboygan Wisconsin, Jan. 15, 2010, 1 sheet.
Current LYRA Program Rates, H.C. Denison Co., Jan. 15, 2010, 1 sheet.
Current LYRA Program Rates, H.C. Denison Co., Nov. 2, 2009, 1 sheet.
Current LYRA Program Banks, H.C. Denison Co. Lyra Program, Nov. 2, 2009, 1 sheet.
Authorization Form, H.S. Denison Company's Liquidity Insured Reserve Access Program(LYRA Program), Oct. 2009, 1 sheet.
Frequently Asked Questions for the Lyra Program, H.C. Denison Co., Jan. 15, 2010, 3 pgs.
Terms & Conditions for H.C. Denison Company's Liquidity Insured reserve Access Program (LYRA Program), Jan. 15, 2010, 4 pgs.
Terms & Conditions for H.C. Denison Company's Liquidity Insured reserve Access Program(LYRA Program), Nov. 2, 2009, 4 pgs.
The Hilliard Lyons Insured Deposit Program Disclosure Document, Hilliard Lyons, 10 pgs.
Current Rates, http://currentrates.hillard.com/ Jan. 6, 2010, 1 sheet.
Current Rates, http://currentrates.hillard.com/ Nov. 2, 2009, 1 sheet.
Current Rates, Market Info, Hilliard Lyons, Nov. 2, 2009, 4 pgs.
Legent Insured Deposit, www.legentclearing.co/mmf/phf, Nov. 2, 2009, 2 sheets.
Legent Insured Deposit Program—Summary of Terms and Conditions, Nov. 2008, 4 pgs.
Investment Account Application, Cleared Through Legent Clearing, 2 sheets.
Customer Agreement, Cleared Through Legent Clearing, 3 pgs.
Cash Management, Mesirow Financial—B/D and IA Services, www.mesirowfinancial.com/bdia/cas_mgmt.jsp, Jan. 15, 2010, 2 sheets.
Frequent Asked Questions: FDIC Sweep Program, optionsXpress, www.optionsxpress.com/welcom/faq/aq/fdic.aspx#rate.
Terms & Conditions for optionsXpress' Bank Insured Deposit Program, optionXpress, 6 pgs.
Frequently Asked Questions: FDIC Sweep Program, optionsXpress, www.optionsxpress.com/welcom/faq/fdic.aspx, Jan. 6, 2010, 3 pgs.

(56) **References Cited**

OTHER PUBLICATIONS

Frequently Asked Questions: FDIC Sweep Program, www. optionsxpress.com/welcom/faq/fdic/aspx, Nov. 12, 2009, 2 sheets.
Money Fund and FDIC-Insured Bank Programs, Pershing, www. pershing.com/money_fund.htm, Jan. 15, 2010, 1 sheet.
Money Market Mutual Fund & FDIC-Insured Deposits Program Rates & Bank Lists, www.pershing.com/rates.html, Jan. 6, 2010m 6 pgs.
Money Market Mutual Fund and FDIC-Insured Deposits Program Rates & Bank List, www.pershing.com/rates.html, 1 sheet.
Clearing firms used by the top independent broker-dealers, Investment News, www.investmentnews/article/20081214/CHART/ 812119919, Jan. 15, 2010, 4 sheets.
Objective investment advice Building trust, Wayne Strout, www. waynestrout.com/more)info, Jan. 18, 2010, 5 pgs.
Eagle sweep disclosure, first republic Securities Company, Jun. 1, 2009, 12 pgs.
The financial organizer, ProCash Plus, 12 pgs.
Insured deposit account program disclosure booklet, 16 pgs.
Update New FDIC product at IPI: Deutsche Bank Deposit Program, Investment Professionals INC, Feb. 4, 2009, 11 pgs.
Insured cash account, http://lplfinancial.lpl.com/x68.xml, with LPL Financial insured cash account program disclosure booklet, LPL Financial Jan. 15, 2010, 23 pgs.
FAQs about the Deutsche Bank insured deposit program, Securities America, 3 pgs.
Insured deposit program, www.aigadvisorgroup.com/fdic/03.04.09. htm, Jan. 15, 2010, 3 pgs.
FlexInsured AccountSM, PrimeVest, http://primevest.com/ flexInsured_account.asp, Jan. 14, 2010, 1 sheet.
FlexInsuredSM Account disclosure statement, PrimeVest, 2009, 5 pgs.
An independent broker-dealer, Royal Alliance, http://www.royalal-liance.com, Jan. 15, 2010, 1 sheet.
Brokerage products and services, www.steerneagee.com/sali/pcg/ pages/products-services.aspx, Nov. 4, 2009, 2 sheets.
Terms and conditions for each cash sweep, sterne agee, 2 sheets.
Client account agreement to Sterne Agee Clearing, INC, Sterne, Agee & Leach, Inc and its authorized agents, Feb. 3, 2009, 5 pgs.
Valet a full service asset management account, http://valetaccount. com/visaTerms.php, Nov. 12, 2009, 6 pgs.
A sweet suite of business products brings our bank to you, AndroscogginBank, www.androscogginbank.com, 1 sheet.
We have your banking nees covered!, Greater Franklin, 2009, 2 sheets.
Insured MMA Seep Program, Circle Bank, www.circlebank.com/ personalbanking)mma.aspx, Jan. 14, 2010, 2 sheets.
Insured MMA agency sweep agreement with rate sheet, Circle Bank, Dec. 3, 2009, 6 pgs.
Personal Banking—East West student plus program, East West Bank, www.eastwestbank.com/english/FDIC.asp, Nov. 10, 2009, 1 sheet.
Safe sound secure insured deposit programs, East West Bank, www. eastweatbank.com/English/SS_SIDPrograms.asp, Jan. 15, 2010, 2 sheets.
Money market insured deposit program, East West Bank, www. eastweatbank.com/English/MMarket_Insured.asp, Nov. 10, 2009, 1 sheet.
Insured deposit program bank list, www.eastweatbank.com/Englis/ IDPB_list.htm, Nov. 10, 2009, 1 sheet.
FDIC information of United Commercial Ban, San Francisco, UCB, www.ibankunited.com/home.html, Nov. 12, 2009, 1 sheet.
Money market insured deposit program, Desert Community Bank, www.dck.org/MMarket_insured.html, Nov. 12, 2009, 1 sheet.
Insured deposit program bank list, www.dcbk.org/IDPB_list.htm, Nov. 12, 2009, 1 sheet.
Evolve and others team up with Deutsche Bank to provide higher FDIC coverage limits, www.insureddeposit online.com/content/ view/31/86/, Nov. 12, 2009, 1 sheet.
Protect your cash portfolio!, http://insureddepositsonline.com, Jan. 15, 2010, 1 sheet.

Protect your cash portfolio!, www.insureddepositsonline.com/component/option.com_frontpage/Itemid.1/, Nov. 2, 2009, 1 sheet.
Participating bank analysis, Insured Deposit Program, Evolve Bank & Trust, www.insureddepositsonline.com/content/view/45/ 113/, Nov. 15, 2010, 1 sheet.
Frequently asked questions, Evolve Bank & Trust, www.insured-depositsonline.com/content/view/38/120/, Jan. 15, 2010, 3 pgs.
Strategic Partners, Insured Deposit Program, Evolve Bank & Trust, www.insureddepositsonline.com/content/view/37/114/, Jan. 15, 2010, 1 sheet.
Who the program Benefits, Insured Deposit Program, Evolve Bank & Trust, www.insureddepositsonline.com/content/view/43/115/, Jan. 15, 2010, 1 sheet.
How the program works, Insured Deposit Program, Evolve Bank & Trust, www.insureddepositsonline.com/content/view/47/112/, Jan. 15, 2010, 1 sheet.
This new bank is over 80 years old, Insured Deposit Program, Evolve Bank & Trust, www.insureddepositsonline.com/content/view/44/ 116/, Nov. 2, 2009, 1 sheet.
Temporary liquidity guarantee program, Evolve Bank & Trust, www. getevolved.com/index.php?option=com_content&task=view& id=67&itemid=263, Nov. 2, 2009, 1 sheet.
Contact us, Insured Deposit Program, Evolve Bank & Trust, www. insureddepositsonline.com/content/view/40/119/, Nov. 2, 2009, 1 sheet.
Over $12,5 million of FDIC deposit insurance available, Insured Deposit Program, Deutsche Bank, www.insureddepositsonline.com, 1 sheet.
How the program works, Insured Deposit Program, Evolve Bank & Trust, www.insureddepositsonline.com/content/view/47/112/, Nov. 4, 2009, 11 pgs.
Over $11 million of FDIC deposit insurance available, Insured Deposit Program, Deutsche Bank, www.insureddepositsonline.com, 1 sheet.
Bank insured agency deposit account program custodial account agreement, Evolve Bank & Trust, 8 pgs.
Insured deposit online, Deutsche Bank Insured Deposit Program, list of program banks, 2 sheets.
Insured deposit online, The Insured Deposit Program, Evolve Bank & Trust, 2 sheets.
Insured deposit online, Frequently asked questions, Evolve Bank & Trust, www.insureddepositsonline.com/content/section/3/71, May 14, 2009, 3 pgs.
Insured deposit online, The Insured Deposit Program, Evolve Bank & Trust, Apr. 3, 2009, 2 pgs.
Personal Banking, Insured Deposit Program, Pulaski Bank, www. pulaskibankstl.com/personal/checkin-personalinsured.htm, Jan. 26, 2010, 1 sheet.
Personal Banking, Insured Deposit Program, Pulaski Bank, www. pulaskibankstl.com/personal/currentrates.htm, Jan. 26, 2010, 2 sheets.
Up to $10 million of FDIC deposit insurance available, Insured Deposit Program, Pulaski Bank, 1 sheet.
Personal Banking, Insured Deposit Program, Pulaski Bank, www. pulaskibankstl.com/personal/checking-personalinsured.htm, Dec. 8, 2009, 1 sheet.
Personal Banking, Insured Deposit Program, Pulaski Ban, www. pulaskibankstl.com/personal/checking-personalinsured.htm, Dec. 8, 2009, 1 sheet.
Up to $12.5 million of FDIC deposit insurance available, Insured Deposit Program, Pulaski Bank, 1 sheet.
Who can benefit from the insured deposit program?, Insured Deposit Program, Pulaski Bank, 2 sheets.
Insured agency deposit account terms and conditions, Pulaski Bank, 1 sheet.
Banks for DBTCA, 2 sheets.
Total Bank Solutions, Corporate overview, 1 sheet.
Total Bank Solutions, Deposit Institutions, www.totalbanksolutions. com/deposit.cfm, Jan. 15, 2010, 2 sheets.
Total Bank Solutions, Insured Deposit Program, www.totalbanksolu-tions.com/insured-deposit.cfm, Jan. 15, 2010, 3 pgs.
Total Bank Solutions, Source Institutions, www.totalbanksolutions. com/source.cfm, Jan. 15, 2010, 3 pgs.

US 8,612,324 B1

Page 11

(56)          **References Cited**

OTHER PUBLICATIONS

Total Bank Solutions, FAQs, www.totalbanksolutions.com/faqs.cfm, Jan. 15, 2010, 2 sheets.

Total Bank Solutions, Insured Deposit Program, TBS overview, www.totalbanksolutions.com/overview.htm, Nov. 3, 2009, 1 sheet.

Total Bank Solutions, Insured Deposit Program, Total Bank Solutions, www.totalbanksolutions.com, Nov. 3, 2009, 1 sheet.

Total Bank Solutions, Insured Deposit Program, Bank Sweep Program, www.totalbanksolutions.com/insured-deposit.cfm, Jan. 15, 2010, 3 pgs.

Total Bank Solutions, Insured Deposit Program, Bank Sweep Program, www.totalbanksolutions.com/banksweep.htm, Nov. 3, 2009, 2 sheets.

Total Bank Solutions, Insured Deposit Program, Brokerage Sweeps, www.totalbanksolutions.com/brokersweep.htm, Nov. 3, 2009, 2 sheets.

Total Bank Solutions, Insured Deposit Program, Deposits, www.totalbanksolutions.com/Deposits.htm, Nov. 3, 2009, 1 sheet.

Total Bank Solutions, Insured Deposit Program, Bank Sweep Program, www.totalbanksolutions.com/banksweep.htm, Mar. 6, 2009, 2 sheets.

Total Bank Solutions, Insured Deposit Program, Broker Sweep Program, www.totalbanksolutions.com/brokerween.htm, Mar. 6, 2009, 2 sheets.

Total Bank Solutions, Insured Deposit Program, Deposit, www.totalbanksolutions.com/deposit.htm, Mar. 6, 2009, 2 sheets.

Total Bank Solutions, Insured Deposit Program, www.totalbanksolutions.com, Mar. 6, 2002, 2 sheets.

Total Bank Solutions, Insured Deposit Program, Partners & Affiliates, www.totalbanksolutions.com/partners.htm, Sep. 11, 2009, 2 sheets.

Total Bank Solutions, Dennis C. Borecki, President, TBS Bank Deposit 7 pgs.

Christopher McCrum, LinkedIn, http://74.125.93.132/search?=cache:5hs9cebUSjgJ:www.linkedin.com/pub/christopher-mccrum/ . . . , Nov. 2, 2009, 2 sheets.

Kentucky Bankers Association, Alternative for excess deposit coverage Free Webinars, http://209.235.145/cgi-bin/websuite/tcsassnwebsuite.pl? . . . , Nov. 2, 2009, 2 sheets.

Kentucky Bankers Association Detailed listening, http://member.kybanks.com/source/members . . . , Nov. 2, 2009, 1 sheet.

Letter from Ballard W. Cassady, Jr. President and Chief Executive Officer, Kentucky Bankers Association, Mar. 31, 2009, 1 sheet.

Oklahoma bankers association seeks extra security for deposits, http://findarticles.com/p/articles/mi_qn4182/is_20081128/ai_n31055289/, Nov. 2, 2009, 2 sheets.

Fast fax-back reply, Kentucky Bankers Association, 1 sheet.

Deutsche Bank, Deutsche Bank insured deposit program, 3 pgs.

Deutsche Bank Insured Deposits, Bank list as of Dec. 18, 2009, 1 sheet.

DB Advisors, Deutsche Bank Group, Insured Deposit Program, 1 sheet.

Letter to Robert E. Feldman, Federal Deposit Insurance Corporation, re: Proposed rule on risk-based assessments (RIN#3064-AD35), Dec. 17, 2008, 4 pgs.

Deutsche Bank Alex. Brown insured deposit program (IDP), Dec. 1, 2009, 10 pgs.

CD's pass agencies as largest holding in MMFs: Repo plunges in sept., www.cranedata.us/archives/news/2009/10/, Nov. 3, 2009, 14 pgs.

Lawsuit by *Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation,* and *Intrasweep LLC* against *Deutsche Bank Trust Company Americas,* and *Total Bank Solutions, LLC,* Defendants' Preliminary Invalidity Contentions, Mar. 12, 2010, Civil Action No. 09 Civ. 2675 (VM) (AJP).

Lawsuit by *Island Intellectual Property LLC* and *Intrasweep LLC* against *Institutional Defendant Corp.,* Institutional Deposits Corp.'s Preliminary Invalidity Contentions, Case No. 09-CV-03079-JEC, received in Mar. 2010.

Exhibit 1, Invalidity Chart: IMA and Insurance Plus Service Agreement, U.S. Patent 7,509,286, 21 pgs.

Exhibit 2, Invalidity Chart: Investors Money AccountSM System, U.S. Patent No. 7,509,286, 26 pgs.

Exhibit 3, Invalidity Chart: Insured Money Account System, U.S. Patent No. 7,509,286, 26 pgs.

Exhibit 4, Invalidity Chart: U.S. Patent No. 4,985,833 (Oncken), U.S. Patent 7,509,286, 21 pgs.

Exhibit 5, Invalidity Chart: First City Bank of Texas' Insured Savings Program, U.S. Patent No. 7,509,286, 39 pgs.

Exhibit 6, Invalidity Chart: Quest Insured Account, U.S. Patent No. 7,509,286, 19 pgs.

Exhibit 7, Invalidity Chart: CIBC World Markets—Insured Bank Deposit Account, U.S. Patent No. 7,509,286, 16 pgs.

Exhibit 8, Invalidity Chart: Merrill Lynch CMA/ISA Service, U.S. Patent No. 7,509,286, 72 pgs.

Exhibit 9, Invalidity Chart: 1983 Fed Letter, U.S. Patent No. 7,509,286, 16 pgs.

Exhibit 10, Invalidity Chart: Merrill Lynch Banking Advantage Program ("MLBA Program"), U.S. Patent No. 7,509,286, 22 pgs.

Exhibit 11, Invalidity Chart: Merrill Lynch & You + MLBA Information Statement, U.S. Patent No. 7,509,286, 18 pgs.

Exhibit 12, Invalidity Chart: Smith Barney Insured Deposit Account, U.S. Patent No. 7,509,286, 22 pgs.

Exhibit 13, Invalidity Chart: Smith Barney Bank Deposit Program, U.S. Patent No. 7,509,286, 18 pgs.

Exhibit 14, Invalidity Chart: Alliance Insured Account, U.S. Patent No. 7,509,286, 16 pgs.

Exhibit 15, Invalidity Chart: Reserve's American Express Presentation, U.S. Patent No. 7,509,286, 16 pgs.

Exhibit 16, Invalidity Chart: U.S. Patent No. 7,376,606 (Jacobsen), U.S. Patent No. 7,536,350, 6 pgs.

Exhibit 17, Obviousness Combinations Chart, U.S. Patent No. 7,509,286, 351 pgs.

Garton, Thomas W.; Are LLC Banks in the Cards? Stay Tuned; Fredrikson & Byron, P.A.; Jun. 2003; http://www.fredlaw.com/articles/banking/bank_0306_twig.html; 2 pages.

Lawsuit by *Island Intellectual Property LLC* v. *Clearview Correspondent Sercies, LLC, et al;* Branch Banking & Trust Company's Answer to Complaint and Counterclaims; Civil Action No. 1:11-cv-448-LO-IDD; Jun. 20, 2011; 13 pages.

Lawsuit by *Island Intellectual Property LLC* v. *Clearview Correspondent Services, LLC;* Clearview Correspondent Services, LLC's Answer to Complaint and Counterclaims; Civil Action No. 1:11-cv-448-LO-IDD; Jun. 20, 2011; 12 pages.

Lawsuit by *Island Intellectual Property LLC* v. *Clearview Correspondent Services, LLC, et al.;* Scott & Stringfellow, LLC's Answer to Complaint and Counterclaims; Civil Action No. 1:11-cv-448-LO-IDD; Jun. 20, 2011; 12 pages.

Lawsuit by *Island Intellectual Property LLC* v. *First Southwest Company;* First Southwest Company's Answer to Complaint and Counterclaims; Civil Action 1:11-cv-371-SD; Jun. 20, 2011; 11 pages.

Lawsuit by *Island Intellectual Property LLC, et al.* v. *Deutsche Bank Trust Americas et al.;* Declaration of Olivia M. Kim in Support of Defendants' Motion for Summary Judgement of Invalidity Under 35 U.S.C. § 101; Oct. 6, 2011; Case 1:09-cv-02675-VM, Document 197.

Lawsuit by *Island Intellectual Property LLC, et al.* v. *Deutsche Bank Trust Company Americas, et al.;* Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgement of Invalidity Under 35 U.S.C. § 101; Nov. 2, 2011; Case 1:09-cv-02675-VM, Document 201.

Lawsuit by *Island Intellectual Property LLC, et al.* v. *Deutsche Bank Trust Company Americas, et al.;* Defendants Reply in Support of Their Motion for Summary Judgment of Invalidity Under 34 U.S.C. § 101; Nov. 15, 2011; Case 1:09-cv-02675-VM, Document 208.

Lawsuit by *Island Intellectual Property LLC, et al.* v. *Deutsche Bank Trust Company Americas, et al.;* Defendants' Response to Plaintiffs' Statement of Additional Material Facts in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment of Invalidity Under 35 U.S.C. § 101; Nov. 15, 2011; Case 1:09-cv-02675-VM, Document 209.

**US 8,612,324 B1**

Page 12

(56)　　　　　**References Cited**

OTHER PUBLICATIONS

Lawsuit by *Island Intellectual Property LLC, et al.* v. *Deutsche Bank Trust Company Americas, et al.*; Order; Case 1:09-cv-02675-VM, Document 212.

Lawsuit by *Island Intellectual Property LLC, et al.* v. *Deutsche Bank Trust Company Americas, et al.*; Supplemental Declaration of Olivia M. Kim in Support of Defendants' Opening and Reply Claim Construction Briefs; Nov. 15, 2011; Case 1:09-cv-02675-VM, Document 207.

Martens, Don W.; letter to Hon. Victor Marrero re. supplement to letter of Nov. 28, 2011 on tentative rulings on claim construction in *Island Intellectual Property LLC et al.* v. *Deutsche Bank Trust Co., et al.*; Nov. 28, 2011; Case 1:09-cv-02675-VM; Document 211.

Martens, Don W.; letter to Hon. Victor Marrero re. tentative rulings on construction in *Island Intellectual Property LLC et al.* v. *Deutsche Bank Trust Co., et al.*; Nov. 28, 2011; Case 1:09-cv-02675-VM, Document 210.

*Island Intellectual Property LLC et al.* v. *Deutsche Bank AG, et al.*; Memorandum and Order; Case 1:09-cv-02675-KBF; Doc. 289; Feb. 14, 2012; pp. 1-28.

*Island Intellectual Property LLC et al.* v. *Deutsche Bank AG, et al.*; Order; Case 1:09-cv-02675-KBF; Doc. 221; Feb. 14, 2012; pp. 1-34.

*Island Intellectual Property LLC et al.* v. *Deutsche Bank Trust Company Americas, et al.*; Declaration of Charles R. Macedo 2 in support of Plaintiffs' motions in limine Nos. 4-6; Case 1:09-cv-02675-KBF; Doc. 260; Feb. 3, 2012; pp. 1-3 and Exhibits.

*Island Intellectual Property LLC et al.* v. *Deutsche Bank Trust Company Americas et al.*; Defendants' opposition to Plaintiffs' motion in limine #3 to preclude Plaintiffs' expert Richard T. Powers from testifying that the Merrill Lynch CMA/ISA product includes omnibus accounts. Case 1:09-cv-0675-KBF; Doc. 269; Feb. 6, 2012; pp. 1-18.

*Island Intellectual Property LLC et al.* v. *Deutsche Bank Trust Company Americas et al.*; Defendants' opposition to Plaintiffs' motion in limine #4 to preclude evidence and argument regarding Plaintiffs' confidential Oct. 18, 2000 presentation to American Enterprises Investment Services at trial; Case 1:09-cv-02675-KBF; Doc. 284; Feb. 10, 2012; pp. 1-12.

*Island Intellectual Property LLC et al.* v. *Deutsche Bank Trust Company Americas et al.*; Memorandum and Order; Case 1:09-cv-02675-KBF; Doc. 265; Feb. 6, 2012; pp. 1-22.

*Island Intellectual Property LLC et al.* v. *Deutsche Bank Trust Company Americas, et al.*; Plaintiffs' in support of their motion in limine #3 to preclude defendants' expert Richard T. Powers that the Merrill Lynch CMA/ISA product includes omnibus accounts based on 17-year old double hearsay that is uncorroborated and in contravention of documentary and oral evidence of record; Case 1:09-cv-02675-KBF; Doc. 247; Jan. 30, 2012; pp. 1-20.

*Island Intellectual Property LLC et al.* v. *Deutsche Bank Trust Company Americas, et al.*; Plaintiffs' memorandum of law in support of motion in limine #4 to preclude evidence and argument Plaintiffs' confidential Oct. 18, 2000 presentation to American Enterprises Investment Services at trial; Case 1:09-cv-02675-KBF; Doc. 262; Feb. 6, 2012; pp. 1-10.

*Island Intellectual Property LLC et al.* v. *Deutsche Bank Trust Company Americas, et al.*; Plaintiffs' motion in limine #4 to preclude evidence and argument regarding Plaintiffs' confidential Oct. 18, 2000 presentation to American Enterprises Investment Services at trial; Case 1:09-cv-02675-KBF; Doc. 257; Feb. 3, 2012; pp. 1-10.

*Island Intellectual Property LLC et al.* v. *Deutsche Bank Trust Company Americas, et al.*; Plaintiffs' Notice of Motion and Motion in Limine #3 to preclude Defendants' expert Richard T. Powers from testifying that the Merrill Lynch CMA/ISA product includes omnibus accounts based on 17-year old double hearsay that is uncorroborated and in contravention of documentary and oral evidence of record; Case 1:09-cv-02675-KBF; Doc. 246; Jan. 30, 2012; pp. 1-2.

*Island Intellectual Property LLC et al.* v. *Deutsche Bank Trust Company Americas, et al.*; Plaintiffs' notice of motion and motion in limine #3 to preclude testimony of Gilbert Schwartz; Case 1:09-cv-02675-KBF; Doc. 259; Feb. 3, 2012; pp. 1-2.

*Island Intellectual Property LLC et al.* v. *Deutsche Bank Trust Company Americas, et al.*; Plaintiffs' notice of motion and motion in limine #4 to preclude evidence and argument regarding Plaintiffs' confidential Oct. 18, 2000 presentation to American Enterprises Investment Services at trial; Case 1:09-cv-02675-KBF; Doc. 256; Feb. 3, 2012; pp. 1-2.

Knight-Ridder; Money Matters, Tips you can use—Limits Apply as FDIC Insurence Covers Depositor, Not Account; Chicago Tribune; Feb. 4, 1998; 2 pages.

Lawsuit by *Island Intellectual Property LLC et al.* v. *Deutsche Bank Trsut Company Americas et al.*; Joint Statement of Claims and Defenses to be Presented at Trial Set for Feb. 27, 2012; Jan. 16, 2012; Case 1:09-cv-02675-KBF (Document 227).

Lawsuit by *Island Intellectual Property LLC, et al.* v. *Deutsche Bank Trust Company American, et al.*; Special Master's Report and Recommended Decision on Defendants' Summary Judgement Motion of Invalidity Under 35 U.S.C. § 101; Dec. 19, 2011.

Scottrade Bank Deposit Program—Terms, Conditions & Disclosures; Author unknown; Aug. 2011; pp. 1-3.

Lawsuit by *Island Intellectual Property LLC, et al.* v. *Deutsch Bank Trust Company Americas, et al.*; Defendant Deutsche Bank Trust Company Americas' Second Supplemental Responses to Double Rock's Interrogatories Nos. 2, 8 and 9, Jul. 20, 2010, 65 pages.

Exhibit 2, Invalidity Chart: U.S. Pat. No. 4,985,833 (Oncken)—U.S. Pat. 7,668,771, Jul. 2010, 14 pages.

Exhibit 5, Invalidity Chart: Merrill Lynch Business Advantage Program—U.S. Pat. No. 7668,772, Jul. 2010, 7 pages.

Exhibit 8, Invalidity Chart: Harken Financial Services Sweep Product—U.S. Pat. 7,668,771, Jul. 2010, 9 pages.

Exhibit 9, Invalidity Chart: Wayne Hummer—Insured Bank Deposit Program—U.S. Pat. No. 7,668,771, Jul. 2010, 12 pages.

Exhibit 10, Invalidity Chart: U.S. Patent Application Publication No. 2007/0043666 (Burdette), U.S. Pat. No. 7,668,771, Jul. 2010, 9 pages.

Letter to R.M. Zaitzeff, from W.W. Wiles, dated Jun. 22, 1983 (response to May 10, 1983 letter re: offering of MMDAs), 6 pages.

Letter to G.T. Schwartz, from O.I. Ireland, dated Jun. 22, 1988 (response to Dec. 18, 1987 letter re: proposed modifications to Merrill Lynch's CMA Program), 5 pages.

Information Statement, "Alliance Insured Account," Sep. 1999; 6 pages.

Investors MoneyAccountSM and Insurance Plus Service Agreement, attached Schedule A (List of Banks Participating in the Insurance Plus Service), IMAD Mar. 1994, 3 pages.

Investors Money AccountSM (an FDIC-insured money market account), IMA-1 (Mar. 1994), 4 pages.

Investors MoneyAccountSM, "The FDIC-Insured Money Market Investment with an Important Plus," IMA Oct. 1995, 2 pages.

1985 SEC No-Act. LEXIS 2756, Investment Company Act of 1940—Section 3(a)(1), 2(s)(36); Securities Act of 1933—Section 2(1), Nov. 29, 1985, Kemper Financial Services, Inc., 9 pages.

Insured Money Account Program Agreement and Disclosure Statement, (attached Schedule A—Deposit Account Terms), faxed Mar. 28, 2000; 10 pages.

First National Bank in Brookings, Certificates of Deposit [online] [retrieved on Jul. 17, 2009]. Retrieved from the Internet: Certificates of Deposit, <URL: http://web.archive.org/web/20000524121111/www.firstnb.com/cd.htm>; Multi-Bank CDs, <URL:http://web.archive.org/web/20000524132934/www.firstnb.com/mbcd.htm>, 5 pages.

Summary of Commentary on Current Economic Conditions by Federal Reserve Districts, Jan. 1985, 44 pages.

CFR Ch. II (Jan. 1, 2009 Edition), pp. 124-125.

Product Strategy, "Money Fund $$ Moving to Bank Deposits, Distributors Start to Install Bank Deposit Accounts to Replace Money Funds," 6 FRC Monitor, Dec. 2003, 2 pages.

Board of Governors of the Federal Reserve System, "The May 1998 Senior Financial Officer Survey," May 1998, (attached Appendix A: Survey Questions and Responses; Appendix B: Glossary; Appendix C: Examples of Key Reserve Concepts), 48 pages.

Interest Rate Review, A Publication of the Meyer Weekly Interest Rate Survey, "A Look et Tiers," Apr. 1987, 6 pages, vol. 11, No. 4.

**US 8,612,324 B1**

Page 13

(56)         **References Cited**

OTHER PUBLICATIONS

LexisNexis, The American Banker, "Merrill Joins Money Market Account, CMA; Broker Begins Testing With 12 Institutions," Sep. 23, 1983, 4 pages.

Bent et al., Office Action, U.S. Appl. No. 10/071,053, with attached SB08, date considered Mar. 10, 2009, 2 pages.

Merrill Lynch & You, "Financial Services The Way You Want, When You Want Them," Jan. 2000, 16 pages.

Exhibit 1, "FA/FB Account 1997 First Transactions, TRX Types: PU, PP, TA, PT," Aug. 2003, p. 1-2.

Advertisement: Where Your Interest is ?, Mutual Funds, Oct. 1997; 1 page.

Advertisement: It's 1997, Do You Know Where Your Interest Is?, Mutual Funds, Dec. 1993, p. 46.

USPTO Office Action, Interview Summary, U.S. Appl. No. 11/,767,827, Date Mailed Sep. 23, 2009, 4 pages.

USPTO Office Action, Office Action Summary, U.S. Appl. No. 11/767,827, Date Mailed Jun. 5, 2009, 35 pages.

Services Mark Application, Applicant: Reserve Management Corporation, Mark: Reserve Insured Deposits, (attached Power of Attorney, Declaration, Drawing Page, Sep. 21, 2001, 6 pages.

Letter to C.R. Macedo, from R.L. Rainey, Re: Promontory Interfinancial Network, LLC, dated Jul. 22, 2008, (attached Attachements A-E), 35 pages.

Letter to C.R. Macedo, from R.L. Rainey, Re: Promontory Interfinancial Network, LLC, dated Oct. 16, 2008, (attached Attachements A-C), 22 pages.

Letter to C.R. Macedo, from R.L. Rainey, Re: Promontory Interfinancial Network, LLC, dated Feb. 23, 2009, (attached Exhibit A-B), 21 pages.

Merrill Lynch & Co., Inc., Form 10-K405 (annual Report (Regulation S-K, item 405)), Filed Mar. 14, 2002 for the Period Ending Dec. 28, 2001, 248 pages.

Merrill Lynch, "Information Statement Regarding changes to Interest Rates on Deposits in the Merrill Lynch Banks," Nov. 12, 2007, 2 pages.

QUESTessentials, "Quest Insured Account," May 17, 1994, 3 pages.

Information Statement, "Quest Insured Account," (attached Appendix A), 5 pages. Assume 2010 or earlier. For purposes of prosecution, the Examiner should assume that these references are prior art, but Applicants reserve the right to challenge the prior art status of the references in litigation.

OCC Insured Bank Deposit Account (attached as p. 2 of Quest for Value Funds Daily Data, Jun. 1993; OCC Insured Account Rate Table), 3 pages.

CIBC World Markets, "Insured Bank Deposit Account," Information Statement, Jul. 1, 2000, 2 pages.

Letter to Client, from M.J. Hensle, Re: Salomon Smith Barney Bank Deposit ProgramSM, (attached Q&A: Important Information about the New Salomon Smith Barney Bank Deposit Program), Aug. 16, 2002, 14 pages.

Salomon Smith Barney, "Bank Deposit Program Disclosure Statement," 3 pages.

FDIC, FDIC Law, Regulations, Related Acts—4000—Advisory Opinions, Oct. 22, 1987, J. W. Via, Jr., Counsel [online] [Retrieved on Jan. 22, 2010]. Retrieved from the Internet: URL: <http://www.fdic.gov/regulations/laws/rules/4000-2560.html>, 1 page.

FDIC, FDIC Law, Regulations, Related Acts—4000—Advisory Opinions, Jun. 28, 1993, J. A. DiNuzzo, [online] [Retrieved on Jan. 22, 2010]. Retrieved from the Internet: URL: <www.fdic.gov/regulations/laws/rules/4000-8240.html>, 2 pages.

FDIC, FDIC Law, Regulations, Related Acts—4000—Advisory Opinions, Jul. 23, 1986, D H. Jones [online] [Retrieved on Jan. 22, 2010]. Retrieved from the Internet: URL: <www.fdic.gov/regulations/laws/rules/4000-2120.html#fdic400086-21>, 2 pages.

Merrill Lynch—Pierce, Fenner & Smith, Inc., "The Merrill Lynch Cash Management Account®," Financial Service, Jan. 1985, 18 pages.

Merrill Lynch, "Insured Savings™ Account Fact Sheet," The Merrill Lynch Cash Management Account® Financial Service, 1987; 11 pages.

CMA, "A Guide to Your CMA Account," Jan. 1995, 38 pages.

American Banker, Salomon's Sweep Plan Raises FDIC Fund Alarm [online], Dec. 6, 2000 [retrieved on Apr. 13, 2009]. Retrieved form the Internet: <URL: http://www.americanbanker.com/printthis.html?id=2000120603YJGEZD>, 2 pages.

The Insured Deposit Account: "Money in the Bank," p. 5; Three Little Letters. Three Big Ways to Save in 1998, p. 4.

LexisNexis, The American Banker, Sep. 23, 1983, Merrill Joins Money Market Account, CMA; Broker Begins Testing With 12 Institutions, Byline: A. Arvan, 4 pages.

Merrill Lynch & Co Inc—Mer, 10K Wizard, Form 8-K, "Report of Unscheduled MAterial Events or Corporate Changes," Filed Mar. 7, 2002, 51 pages.

Federal Reserve System, LEXSEE 51 FR 9632, "Definition of Deposit and Technical Amendments," Action: Final Rule, Mar. 20, 1986, 13 pages.

Federal Reserve System, LEXSEE 56 FR 15494, "Regulation D—Reserve Requirements of Depository Institutions," Action: Final Rule, Apr. 17, 1991, 5 pages.

Federal Reserve System, Part 201—Reserve Requirements of Depository Institutions (Regulation D)12 CFR Ch. II (Jan. 1, 2010 Edition), pp. 94-128, Pt. 204-Pt. 205.

Letter to G.T. Schwartz, from O.I. Ireland, dated Jun. 22, 1988, Re: response to letter of Dec. 18, 1987 regarding proposed modifications to Merrill Lynch's CMA Program, 5 pages.

Federal Reserve System, LEXSEE 47 FR 55207, "Reserve Requirements of Depository Institutions; Money Market Deposit Account," Dec. 8, 1982, Action: Fianal Rule, 5 pages.

Insured Bank Deposits™ Program Summary Information Statement, Feb. 2005; 11 pages.

Insured Bank Deposits™ Program Information Statement, (attached List of Eligible Program Banks, Effective May 9, 2002; New Account Application, Joint Account Agreement), 11 pages.

Wayne Hummer Investments, "Insured Bank Deposits™ Program, Frequently Asked Questions," 4 pages. Assume 2002 or earlier. For purposes of prosecution, the Examiner should assume that these references are prior art, but Applicants reserve the right to challenge the prior art status of the references in litigation.

Memorandum to M. Peterson, J. Whitt, R. Wroten, E. Naumes, E. Deal, B. McCain, From J.E. Oncken, Jun. 15, 1990, Re: Insured Savings Update (with attachments), 7 pages.

Insured Savings, "Correspondent Agreement," including Exhibits A-D, 1989; 28 pages.

Insured Savings, "Project Team Meeting," Feb. 2, 1989, 21 pages.

Insured Savings, "Overview & Marketing Plan," Presented by: J.E. Oncken, Dec. 6, 1988, (including Exhibit A), 23 pages.

Letter to V.J. Best, from J.E. Oncken, dated Apr. 18, 1988, 2 pages.

Letter to M.L. Duke from K. Johnson, dated Dec. 27, 1989, (attached Insured Savings Correspondent Agreement, Exhibits A-D, letter to M.L. Duke from K. Johnson dated Nov. 21, 1989 and Account Information Sheet), 39 pages.

Memorandum to J. Oncken, J. Scurlock, B. Standefer, E. Piner, T. Cyr, from K. Johnson, dated Jul. 5, 1990, Re: Attached Insured Savings Letters (with attachments), 9 pages.

E.D.S.—First City Action Electronic Mail, from J. Oncken, to T. Cyr, Re: Depository Levels at Insured Savings Depositories, Nov. 2, 1989, 1 page.

Cash Management Balance Monitoring Agreement and Memorandum from Ed Piner to Cash management Line of Business Representatives dated May 21, 1991(with attachements), 8 pages.

Merrill Lynch, Insured Savings Account Fact Sheet, The Merrill Lynch Cash Management Account® Financial Service, Jan. 1986, 4 pages.

Merrill Lynch Money Markets, Inc., Merrill Lynch Capital Markets, "The Insured Savings Account, Issuer Guide to Offering MMDAs through Merrill Lynch," Sep. 1986; 36 pages.

Merrill Lynch, The Merrill Lynch Capital BuilderSM Account Financial Service, Insured SavingsSM Account Participating Depository Institutions, 1996, 2 pages.

Insured Deposit Account, May 21, 1996, 14 pages.

# US 8,612,324 B1

Page 14

(56)                **References Cited**

OTHER PUBLICATIONS

The Insured Deposit Account: "Money in the Bank," p. 5; Three Little Letters, Three Big Ways to Save in 1998, p. 4.
An Introduction to the Smith Barney Insured Deposit Account, Sep. 1995; 8 pages.
Smith Barney Inc, Capital Markets, Debt Origination Group Memo, to J. Mandelbaum, from T. Hamilton, cc: R. Holloman, H. Bald, S. Becton, Re: Insured Deposit Account, Oct. 10, 1995; Smith Barney Inc. Capital Markets, Debt Origination Group Memo, to B. Holloman, from T. Hamilton, cc: W. Heinzerling, H. Morris, COPs, Re: New Product Proposal for Insured Deposit Account, Sep. 18, 1995, 2 pages.
Insured Deposit Account, Product Description for the Investor, Draft as of Sep. 20, 1995, 8 pages.
12 CFR Part 330; Simplification of Deposit Insurance Rules; Federal Register, vol. 63 Issue 90; May 11, 1998; pp. 1-31.
The Merrill Lynch Cash Management Account—Financial Service; Jan. 1985; 18 pages.
U.S. Appl. No. 12/453,387, filed May 8, 2009, Bruce Bent.
U.S. Appl. No. 12/453,388, filed May 8, 2009, Bruce Bent.
U.S. Appl. No. 12/622,979, filed Nov. 20, 2009, Bruce Bent.
U.S. Appl. No. 12/638,544, filed Dec. 15, 2009, Bruce Bent.
U.S. Appl. No. 12/794,448, filed Jun. 4, 2010, Bruce Bent.
U.S. Appl. No. 13/032,456, filed Feb. 22, 2011, David Edgar Gareis.
U.S. Appl. No. 13/032,467, filed Feb. 22, 2011, Thomas O'Donnell.
U.S. Appl. No. 13/228,031, field Sep. 8, 2011, Thomas O'Donnell.
U.S. Appl. No. 13/237,699, filed Sep. 20, 2011, Bruce Bent.
U.S. Appl. No. 13/248,647, filed Sep. 29, 2011, Bruce Bent.
U.S. Appl. No. 13/529,540, filed Jun. 21, 2012, Bruce Bent.

U.S. Appl. No. 13/562,961, filed Jul. 31, 2012, Bruce Bent.
U.S. Appl. No. 13/591,793, filed Aug. 22, 2012, Bruce Bent.
U.S. Appl. No. 13/591,818, filed Aug. 22, 2012, Bruce Bent.
U.S. Appl. No. 13/650,927, filed Oct. 12, 2012, David Edgar Gareis.
U.S. Appl. No. 13/651,932, filed Oct. 15, 2012, Bruce Bent.
U.S. Appl. No. 13/710,999, filed Dec. 11, 2012, Bruce Bent II.
U.S. Appl. No. 13/715,370, filed Dec. 14, 2012, Bruce Bent.
U.S. Appl. No. 13/733,645, filed Jan. 3, 2013, Bent.
U.S. Appl. No. 13/735,631, filed Jan. 7, 2013, Bent.
U.S. Appl. No. 13/736,515, filed Jan. 8, 2013, Bent.
U.S. Appl. No. 13/759,434, filed Feb. 5, 2013, Bent.
U.S. Appl. No. 13/801,501, filed Mar. 13, 2013, Bent.
U.S. Appl. No. 13/801,874, filed Mar. 13, 2013, Bent.
U.S. Appl. No. 13/828,468, filed Mar. 14, 2013, Gareis.
U.S. Appl. No. 13/828,929, filed Mar. 14, 2013, Gareis.
U.S. Appl. No. 13/829,309, filed Mar. 14, 2013, O'Donnell.
U.S. Appl. No. 13/829,747, filed Mar. 14, 2013, O'Donnell.
U.S. Appl. No. 13/829,974, filed Mar. 14, 2013, Bent.
U.S. Appl. No. 13/830,143, filed Mar. 14, 2013, Bent.
U.S. Appl. No. 13/839,890, filed Mar. 15, 2013, Bent.
U.S. Appl. No. 13/840,685, filed Mar. 15, 2013, Bent.
U.S. Appl. No. 13/841,778, filed Mar. 15, 2013, Bent.
U.S. Appl. No. 13/842,360, filed Mar. 15, 2013, Bent.
U.S. Appl. No. 13/842,630, filed Mar. 15, 2013, Bent.
Campbell, Andrew, et al.; A new standard for deposit insurance and government guarantees after the crisis; Journal of Financial Regulation and Compliance, vol. 17 No. 3, 2009; pp. 210-239.
Cynamon et al.; Redefining the Monetary Aggregates: A Clean Sweep; Eastern Economic Journal, vol. 32, No. 4, Fall 2006; pp. 661-672.
Hencke, Christopher; New Rules for FDIC Deposit Insurance; ABA Bank Compliance, Jul./Aug. 1999, pp. 31-37.



FIG. 1



FIG. 2



FIG. 3



## FIG. 4



FIG. 5



## FIG. 6

US 8,612,324 B1

1

# SYSTEMS AND METHODS FOR ADMINISTERING RETURN SWEEP ACCOUNTS

## CROSS-REFERENCE TO RELATED PATENT APPLICATIONS

This application is a Continuation of U.S. application Ser. No. 13/052,696 filed Mar. 21, 2011 which is a Continuation of U.S. application Ser. No. 12/385,522, filed Apr. 10, 2009, now U.S. Pat. No. 7,933,821, which is a Continuation of U.S. application Ser. No. 10/071,053, filed Feb. 8, 2002, now U.S. Pat. No. 7,519,551, which is a Continuation-In-Part of U.S. application Ser. No. 09/677,535, filed Oct. 2, 2000, now U.S. Pat. No. 7,752,129, which is a Continuation-In-Part of U.S. application Ser. No. 09/176,340, filed Oct. 21, 1998, now U.S. Pat. No. 6,374,231. All of the aforesaid applications are incorporated herein by reference in their entirety as if fully set forth herein.

## FIELD OF THE INVENTION

The invention relates generally to computerized banking techniques and, more specifically, to techniques by which deposits are kept on a bank's balance sheet while being administered as sweep account funds by a third party.

## BACKGROUND OF THE INVENTION

It would be desirable if investors could obtain fully-insured, interest-bearing bank accounts that offer an unlimited number of fund transfers per month. However, present statutory restrictions prevent banks and savings institutions from paying interest on certain types of deposit accounts. More specifically, Title 12, Part 329, of the Code of Federal Regulations (CFR) provides that "no bank shall, directly or indirectly, by any device whatsoever, pay interest on any demand deposit". (12 CFR 329.2). A "deposit" is any money placed into a checking account, savings account, Certificate of Deposit (CD), or the like. In a "demand" account, the owner can demand that funds be drawn and paid to another account (having the same or a different owner), or to a third party. These demand payments are typically implemented via bank drafts, checks, credit cards, and debit cards.

Not all bank accounts are considered to be demand accounts. If all, or a fixed amount, of the principal must be maintained in order to achieve the particular benefits afforded by that account, then the account is not a "demand" account. According to the CFR, a "demand deposit" includes any deposit for which the depositor is authorized to make more than six fund "transfers" during any month or statement cycle of at least four weeks. Not all fund transfers will be counted towards the allotted maximum of six; rather, it is necessary to examine the specific type of fund transfer under consideration. A deposit will be considered a "demand" deposit if the transfer takes place by means of a preauthorized, automatic, or telephonic order specifying the transfer of funds to another account of the depositor at the same bank, to the bank itself, or to a third party. Likewise, a deposit is a "demand" deposit if more than three of the six transfers are authorized to be made by check, draft or debit card (12 CFR 329.1(b)(3). On the other hand, an unlimited number of transfers is allowed between two accounts registered to the same person or entity, provided that the transfers are made by messenger, mail, telephone (but only via check mailed to the depositor), automated teller machine, or in person. Unless the funds of a

2

deposit are held in a money market account (18 USC 1832(a)), an account for which a depositor has the ability to make at least six transfers will be deemed a demand account, and no interest will be payable on the funds therein. Therefore, owners of demand accounts do not obtain interest on their funds.

One exemplary approach to offering investors fully-insured, interest-bearing accounts that provide up to an unlimited number of fund transfers was disclosed in U.S. patent application Ser. No. 09/176,340, referenced above. This application describes a system for managing a plurality of accounts for multiple clients. These accounts, which may originate from a variety of sources, banks, brokerage firms, and/or clients, are held at any of a plurality of savings institutions or banks. The system provides an aggregate insured money market deposit account at a bank or savings institution that is not necessarily an institution at which any of the client accounts are held. The aggregate insured deposit account is linked to each of the demand accounts in a manner so as to permit deposit funds to be placed into a demand account from various sources, and also so as to provide for the tendering of payments from the demand account via different instruments, without limitation as to the number of transfers. Interest is earned on deposits because funds are transferred from individual client accounts to the managed aggregate insured deposit account.

While a substantial advance over other prior art systems, the above noted system requires the transfer of oftentimes significant funds to comply with various banking regulations. This may be difficult in the case of smaller, community-based banks, as these institutions depend upon such funds as a source for loans. Moreover, some bank clients are not comfortable with arrangements that transfer client funds to unfamiliar third parties.

Pursuant to Regulation Q, banks are prohibited from paying interest on commercial accounts. However, banks have developed several approaches in an effort to compete with brokers who offer interest on cash balances for their commercial customers. These approaches, which include money fund sweeps and repo sweeps, are disadvantageous in that they involve a removal of commercial customer deposits from the bank's balance sheets.

A substantial market exists for an interest-bearing return sweep account that can be readily integrated into the existing infrastructure of a bank or savings institution, while, at the same time, permitting account funds to remain on the bank's balance sheet, with minimal disruption of existing bank-client relationships. It was with the foregoing realizations in mind that the present invention was developed.

## OBJECTS AND SUMMARY OF THE INVENTION

It is an object of the invention to provide bank and/or savings institution clients with the ability to implement up to an unlimited number of transfers while, at the same time, permitting the bank and/or savings institution to retain client-deposited funds.

It is another object of the invention to provide bank and/or savings institution clients with interest from funds on deposit while simultaneously providing the ability to implement up to an unlimited number of transfers.

It is a further object of the invention to permit the bank and/or savings institution to retain client-deposited funds on its books so that these funds can be used as a source for loans.

It is yet a further object of the invention to provide a banking method that enables clients to deposit funds into an account from any of various sources, and to make payments from the account via any of various instruments, without

US 8,612,324 B1

| 3 | 4 |

limitation as to the number of transfers, while still earning interest on the funds in the account.

It is another object of the present invention to provide a banking method that manages a plurality of demand accounts for multiple clients whose funds are held in an aggregate insured deposit account at the client's banking institution but managed by a third party agent.

It is another object of the invention to provide a money market banking method that has a minimal impact on presently-existing, bank-to-client relationships.

It is a further object of the invention to provide a money market banking method which is readily integrable into the existing infrastructure of a bank or savings institution.

These and other objects of the invention are realized in the form of novel systems and methods for managing a plurality of client demand accounts so as to allow a banking institution to retain client deposits on the bank's balance sheets while at the same time, providing the client with the capability of implementing up to an unlimited number of transactions per month and also providing the client with interest on their account balance. These objectives are achieved through the use of an aggregate money market deposit account and an aggregate demand deposit account. These accounts are held on the books of the client's savings institution or bank, but are managed by a third party agent for the client. In response to client deposits and withdrawals, the agent initiates a transfer of funds between the aggregate demand deposit account and the aggregate money market deposit account, If client deposits exceed client withdrawals, then all or some of the funds in the aggregate demand deposit account may be transferred to the aggregate money market deposit account. On the other hand, if client withdrawals exceed client deposits, then all or some of the funds in the aggregate money market deposit account are transferred to the aggregate demand deposit account. The aggregate money market deposit account is an interest-bearing deposit account, where the aggregate balances for all clients are deposited.

One purpose of the aggregate demand deposit account is to facilitate the movement of funds. On a regular, periodic, or recurring basis, the agent calculates a net transaction as the sum of individual client deposits and withdrawals from the plurality of individual client demand accounts. The net transaction calculation is used to determine an amount of funds that need to be deposited into the aggregate money market deposit account to cover client deposits, or an amount of funds that needs to be withdrawn from the aggregate money market deposit account to cover client withdrawals. Individual account management calculations are performed to determine whether to deposit or withdraw funds from the aggregate demand deposit account to each of a plurality of individual client return sweep and/or money market accounts. The agent updates its database for each client's deposit and withdrawal activities.

The individual client has two accounts, a client demand deposit account on the bank's books, and a return sweep account or money market account on the agent's books. Individual transactions for the client occur between these two client accounts.

The agent distributes all or a portion of the interest accrued from the aggregate deposit account to individual clients. The interest is distributed according to the relative proportions of each client's funds in the aggregate deposit account. The agent maintains a database that keeps track of deposits to, and withdrawals from, each of the client demand accounts, as well as each client's proportionate and/or monetary share in the aggregate money market deposit account.

The invention permits funds to be deposited into a demand account from various sources, and also provides for the tendering of payments from the demand account via different instruments, without limitation as to the number of transfers, and with accrual of interest on the deposited funds. Moreover, the deposited funds are retained at the client's bank or savings institution. Optionally, the debiting of funds from each of the client accounts is monitored, and debits are selectively authorized or rejected based upon the client's account balance and/or their current share in the aggregate deposit account.

BRIEF DESCRIPTION OF THE DRAWINGS

The following is a brief description of the drawings, in which:

FIG. 1 is an information flow diagram showing the transfer of client funds among a plurality of accounts pursuant to the techniques of the present invention;

FIG. 2 is a flowchart showing an illustrative operational sequence for implementing the techniques of the present invention; and

FIGS. 3-6 together comprise a flowchart depicting processing steps to be performed on behalf of an administrator pursuant to a further embodiment of the present invention.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Refer now to FIG. 1, which is a flow diagram showing the transfer of client funds among a plurality of accounts pursuant to the techniques of the present invention. A plurality of client demand accounts, including Client "A" DDA (Demand Deposit Account) 501 and Client "B" DDA Account 503 are managed through the use of an insured pooled deposit account at the client's savings institution or bank. In FIG. 1, this pooled deposit account is provided in the form of a Pooled MMDA (Money Market Deposit Account) 509. Excess funds are swept from client DDA accounts (Client "A" DDA 501 and Client "B" DDA 503, respectively) to corresponding client Money Market Accounts (Client "A" Money Market Account 505 and Client "B" Money Market Account 507, respectively). Excess funds may be calculated in terms of a desired or target minimum balance for each of the client DDA accounts. The same target minimum balance could be applied to all DDA accounts, or an account-specific target balance could be assigned to a certain account based upon the past history and/or the expected usage of that account. Alternatively, all funds could be swept from the client DDA accounts to the Money Market Accounts. After recording the amount of funds swept into a client Money Market Account, the funds are then transferred to the Pooled MMDA Account 509.

The net result of the aforementioned fund transfer activity is that funds are effectively transferred from individual client demand accounts, including Client "A" DDA 501 and Client "B" DDA 503, to a pooled insured deposit account (Pooled MMDA Account 509) at the client's bank or savings institution. This is advantageous in that the Pooled MMDA account 509 is an interest-bearing "nondemand" account pursuant to 12 CFR 329.2 et seq. Moreover, the Pooled MMDA Account is eligible for full FDIC insurance protection. This protection covers each client whose deposits are placed into the pooled account, up to a maximum of $100,000 per client. As the Pooled MMDA Account 509 accrues interest, all or a portion of this interest is distributed to individual clients. The interest

US 8,612,324 B1

5

may but need not, be distributed according to the relative proportions of each client's funds in the Pooled MMDA Account **509**.

A database keeps track of deposits to, and withdrawals from, each of the client demand accounts (Client "A" DDA Account **501** and Client "B" DDA Account **503**), as well as each client's proportionate and/or monetary share in the Pooled MMDA Account **509**. On a regular, periodic, or recurring basis, a net transaction is calculated as the sum of individual client deposits and withdrawals from the plurality of demand accounts. The net transaction calculation is used to determine an amount of funds, if any, that needs to be deposited into the Pooled MMDA Account **509** from the individual client Money Market Accounts (Client "A" Money Market Account **505** and/or Client "B" Money Market Account **507**) to cover client deposits. The net transaction calculation is also used to determine an amount, if any, of funds that need to be withdrawn from the Pooled MMDA Account **509** to cover client withdrawals from respective client DDA Accounts (Client "A" DDA Account **501** and/or Client "B" DDA Account **503**). In the event that fund withdrawals are required, the necessary funds are first transferred from the Pooled MMDA Account **509** to a Pooled DDA (Demand Deposit Account) **511** which is held at the same savings institution or bank as Pooled MMDA Account **509**. On an as-needed basis, funds are then transferred from the Pooled MMDA Account **509** to individual client DDA accounts (Client "A" DDA Account **501** or Client "B" DDA Account **503**) to cover checks written by these clients, as well as any fund withdrawals or transfers that clients wish to implement on behalf of their respective DDA Accounts.

Individual account management calculations are performed to determine whether to deposit or withdraw funds from the Pooled DDA Account **511** to each of a plurality of individual client demand accounts. The database is updated for each client's deposit and withdrawal activities. The invention permits funds to be deposited into a client demand account from various sources, and also provides for the tendering of payments from the client demand account via different instruments, without limitation as to the number of transfers, and with accrual of interest on the deposited funds. Optionally, the debiting of funds from each of the client demand accounts is monitored, and debits are selectively authorized or rejected based upon the client's demand account balance and/or their current share in the pooled deposit account.

The foregoing procedures are structured in a manner so as to permit banks and savings institutions to continue servicing their clients as they have done in the past. Moreover, if desired, these procedures could be implemented by an agent acting on behalf of one or more clients. In this manner, the invention would be virtually transparent to presently-existing banks and savings institutions. Bank personnel would not be burdened with the requirement to perform unfamiliar and potentially time-consuming procedures. Pursuant to this "agency" approach, the agent effectively provides a "sweep interface" between a client's existing DDA account (i.e., Client "A" DDA Account **501**) and a fully-insured, interest-bearing pooled account (i.e., the Pooled MMDA Account **509**). The agent opens up the Pooled MMDA Account **509** and the Pooled DDA Account **511** at the client's bank or savings institution. The agent is responsible for several administrative activities, including: (1) recordkeeping in connection with the individual Client Money Market accounts (Client "A" Money Market Account **505** and Client "B" Money Market Account **507**); (2) determining each client's proportionate share in the Pooled MMDA Account **509**; (3)

6

determining an appropriate balance for the Pooled DDA Account **511**; and (4) determining appropriate transfers from the Pooled DDA Account **511** to any of the client DDA accounts.

Although banks and savings institutions can provide DDA, MMDA and checking account services to clients without utilizing a third-party agent, under the current statutory scheme, these institutions cannot pay interest on account balances, and at the same time, allow for an unlimited number of transactions. Pursuant to Regulation D, banks and savings institutions are prohibited from automatically allowing unlimited fund transfers between DDAs and MMDAs on behalf of clients. A client could open up his own DDA and MMDA accounts, evaluate daily DDA activities, determine if funds should be moved between the DDA and the MMDA, and instruct the bank to transfer the appropriate funds. However, it would be time consuming and inefficient. The use of an agent provides administrative expediency, endering the entire operational scheme more attractive to the client as well as the banking institution.

Advantageously, the agent maintains the client's original DDA account number that uniquely identifies that client's account at his or her bank or savings institution. This account number is used as a cross-reference to keep track of each client's proportionate interest in the Pooled MMDA Account **509**. The client Money Market Account numbers (for Client "A" Money Market Account **505** and Client "B" Money Market Account **506**) are transparent to these clients, as is the account number for the Pooled MMDA Account **509**.

Effectively, a "sweep interface" exists between each of respective individual client DDA Accounts (Client "A" DDA Account **501** and Client "B" DDA Account **503**) and corresponding individual client Money Market Accounts (Client "A" Money Market Account **505** and Client "B" Money Market Account **507**). Excess funds in the individual client DDA accounts are swept to the individual client Money Market accounts to be further credited to the Pooled MMDA Account **509**. If funds are needed to pay for a check or handle a withdrawal, funds are redeemed via the Pooled DDA Account **511**. The sweep interface may be governed by any of a number of established or specified parameters. For example, the bank may choose to leave a certain dollar amount in each of the client DDA accounts to cover checks and only sweep funds in excess of that amount. Or the bank may decide to sweep everything and redeem funds based upon the checks presented for payment. From the standpoint of the bank or savings institution, no additional work is required. The bank merely maintains the client's existing individual DDA account along with the client's profile (name, address, check reorders, signature on file, stop payment orders, etc). Bank clients will be able to keep their existing checks, and to continue using their existing DDA accounts. Deposits are credited to these DDA accounts and then swept to the pooled MMDA account. Many of the required administrative activities are performed by the agent on behalf of designated client accounts. These administrative activities basically involve the monitoring of fund sweeping to and from individual client DDA accounts and corresponding individual Money Market accounts, as well as transfers among the individual Money Market, Pooled MMDA and Pooled DDA Accounts maintained by the agent. On a daily, regular, repeated, or periodic basis, the bank or savings institution transmits a transaction sweep data file to the agent that includes deposit and withdrawal information for each of a plurality of clients. The bank and the agent periodically or repeatedly reconcile the sweep data file and agree upon a net settlement figure. If the net settlement figure is a credit, the bank or savings institution

US 8,612,324 B1

7

credits the Pooled DDA Account **511**. During routine, day-to-day system operations, the only transactions that occur in the Pooled MMDA Account **509** are transfers either to or from the Pooled DDA Account. Pursuant to an optional alternative approach, the bank could allocate credits to the Pooled MMDA Account **509**. In any event, if the net settlement figure is a debit, the bank or savings institution debits the Pooled DDA Account **511**. The agent provides instructions by messenger to transfer funds from the Pooled MMDA Account **509** to the Pooled DDA Account **511** to cover the debit balance in the account. At the end of a predetermined period of time (such as a month), the agent can provide a monthly statement file to the bank or savings institution. This file may include activity for a client's individual money market account as maintained in an agent database. The bank or savings institution can then use this monthly statement file to generate month end statements for its clients. According to one preferred embodiment of the invention, activity pertaining to other accounts is tracked and maintained by the bank or savings institution. However, pursuant to an alternate embodiment, this statement file could optionally include Pooled MMDA, Pooled DDA, individual Money Market, and/or individual DDA account activity.

Refer now to FIG. **2**, which is a flowchart showing an illustrative operational sequence for implementing the techniques of the present invention. The procedure commences at block **701**, where a client makes a deposit to their individual DDA Account (i.e., Client "A" DDA **501**, FIG. **1**), or at block **703**, where a client makes a withdrawal from their individual DDA Account. Irrespective of whether the transaction is a withdrawal or a deposit, a sweep process is performed (block **707**) to sweep any excess account funds out of the client's individual DDA account, or to sweep required funds into this DDA account. A test is performed at block **709** to ascertain whether or not there are excess funds in the individual client's DDA account. If so, program control jumps ahead to block **713**, whereas if not, the program continues on to block **711**. At block **713**, the excess funds are swept to the agent, who then updates the individual client Money Market account (block **717**).

The negative branch from block **709** leads to block **711**, where a test is performed to ascertain whether or not there is an insufficient minimum balance in the individual client's DDA account. If not, the program exits. If so, program control advances to block **715** where funds are swept from the agent. The agent then updates the individual client Money Market account (block **717**). Next, on a periodic, repeated, or scheduled basis, the agent calculates the net sweep account activity (block **719**). A test is performed at block **721** to ascertain whether or not the net sweep activity is a credit. If so, program control advances to block **723** and, if not, program control continues to block **725**. At block **723**, the agent receives payment from the bank for the credit. Payment can be received, for example, in the form of a wire transfer or a credit to the pooled DDA account. Next, the agent instructs the bank to deposit the received funds into the pooled MMDA account (block **727**). Funds are transferred into the pooled MMDA account (block **731**), and the program exits.

The negative branch from block **721** leads to block **725** where a test is performed to ascertain whether or not the net sweep activity is a debit. If not, the program exits, and if so, the program continues to block **729**. At block **729**, a messenger is instructed to initiate a fund transfer from the pooled MMDA account to the pooled DDA account. The funds are transferred from the pooled MMDA to the pooled DDA

8

(block **733**), and the agent pays the bank or savings institution from the pooled DDA account for the sweep debit. The program then exits.

FIGS. **3** and **4** together comprise a flowchart depicting processing steps to be performed on behalf of an agent or administrator pursuant to a further embodiment of the present invention. This agent or administrator can be a brokerage firm, a bank, or another financial entity with which clients can institute financial transactions such as deposits, withdrawals and on-demand payments. The administrator or agent appears to each client as if it were, at least in part, a bank, by accepting deposits for the client's account, and, subsequently, by authorizing (and then implementing) payments demanded by the client from his or her account. The funds for all of the clients are pooled into a single deposit account that is maintained as an insured deposit account at a licensed bank or savings institution.

Referring to FIG. **3**, financial entity **100** may be a bank, savings institution, brokerage firm, or other entity where financial transactions take place or can be facilitated. This financial entity **100** creates transaction files **101** which are transmitted to Reserve **105**. Reserve **105** (or the Reserve System) is the administrator or other entity in charge of administering at least one of the deposit accounts. New account files **102** can be transmitted to Reserve **105**. For example, a new investor account may need to be opened. This activity necessitates organizing and coordinating information to service a new investor for the present system, even though that investor may already be a client of a financial entity **100** for other investment vehicles. A new account **102** effectively becomes part of an existing pooled bank deposit account **129** that collects earned income **130**, all or a portion of which is eventually conveyed to the client's accounts **131**. Of course, at some point in time, the deposit account must first be established with clients' fluids. The transaction files represent the addition of funds by check (to be drawn on another institution, or to be drawn from a different demand account at the same institution), wire or electronic transfer, ACH, credits (such as from a debit or credit card merchant), or a sweep from one of the client's other accounts. Accordingly, encompassed in the transaction file are deposits **103** and withdrawals **104**. A "sweep" includes the automatic transfer of funds, such as the automated transfer of interest from one account into the client's account, as well as the automated transfer of funds out of the client's account (such as for payment of a securities trade); thus, a sweep may be from one of the client's accounts to another. The responsibility for maintaining the deposit account can be assigned by the administrator to a third party.

Referring now to FIG. **4**, Reserve System **50** contains an insured deposit database **75** where a position file for debit/credit card users is created **132** and transmitted to a bank for a debit/credit card network **133** where the bank then updates the network **134**. The system updates the data base **75** and processes transactions **106** (from **105**, FIG. **3**) and opens a new account **107** where application and check deposits are processed **110**. The bank preference **107**A is the list of banks and the order of preference for deposits and withdrawals held on the account, including a list of banks to be excluded (if any), and the maximum percentage and/or amount of funds to be held in each bank. The client's bank preference data is added to the account at **107**B. If the client does not select values for any of these variables, the system can provide default values for the banks and their order at **107**C sufficient for all of the client's funds. When possible, the system can be configured to assign a bank that is in the state in which the client resides. Referring to FIG. **5**, it can be seen that when a deposit, either a check deposit **111**, federal wire deposit **112**,

US 8,612,324 B1

9

ACH deposit, sweep, or other deposit is credited to the client's account 108, the system will review where the existing funds of the accounts are deposited 108A. If the client's balance has reached the maximum allowable balance for the existing bank 108B, as shown in FIG. 6, the system will then select the next bank on the preference list attached to the account 108C. If the maximum allowable balance has not been reached in the existing bank, the system will credit the additional funds to that bank 108D.

Still referring to FIG. 5, the procedure for processing withdrawals can be seen. Various methods of withdrawing funds are debit withdrawal 109, processing debit or credit card transactions such as debit/credit card files 115, direct debit accounts 215, and processing of files 121. Processing of a debit/credit card file 115 utilizes data accumulated from debit/credit card transactions received from the banks 114. The processing of file 121 procedure utilizes one of various sources of data such as a check processed for payment 116, ACH debits 117, touch tone bill paying 118, and/or internet bill paying 119.

After processing the debit procedure, the system will review the bank preference list and select the appropriate bank to debit 125A. The system will sort all the daily transactions by the bank 125B (see FIG. 6). The activity for each bank will then be netted 126 and the appropriate deposit or withdrawals made.

The system will then determine whether funds are available 122, which function is also associated with other participant withdrawals 120. If the funds are available, the account is debited 225. If the funds are not available, however, the system determines whether a credit line is available 123. If a credit line is available, then funds are advanced 230 to cover the debit; if not the transaction is rejected 124.

Referring to FIG. 6, as previously stated, the system determines whether the client's balance reaches its maximum 108B. If so, the next bank on the list selected by the client is credited 108C. If the maximum is not reached, then the existing bank is credited 108D. Information and activities associated with processed debits and credits of the client's accounts from 125A are sorted by the bank 125B and the net activity by the bank is determined 126. The system then determines whether the deposits and credits were greater than the withdrawals and debits 240. If so, the excess funds are deposited into a deposit account 127. If the debits and withdrawals were greater than the credits, the difference is redeemed from the deposit account 128.

Thus, by practicing the embodiment of the invention described in connection with FIGS. 3-6, an individual client is effectively provided with FDIC insurance in excess of $ 100,000. This result is brought about because the individual client's holdings are maintained in multiple insured deposit accounts, which may be in multiple banks.

The foregoing description is intended to be illustrative and not limiting. Any of various changes, modifications, and/or additions may become apparent to the skilled artisan upon a perusal of this specification, and, as such, are intended to be within the scope and spirit of the invention as defined by the claims.

What is claimed is:

1. A system, comprising:
one or more computers, configured to perform the steps:
   (A) accessing, using one or more computers, one or more electronic databases, stored on one or more computers-readable media, the one or more databases comprising:
      (1) aggregated account information for a plurality of government backed-insured and interest-bearing

10

aggregated deposit accounts held in a plurality of financial institutions participating in a program including a first depository institution in infrastructure of a first financial institution of the plurality of the financial institutions and a second depository institution in infrastructure of a different financial institution of the plurality of the financial institutions, wherein funds from client accounts of a plurality of clients are aggregated with funds of other client accounts in the aggregated deposit accounts held in the financial institutions, with the aggregated deposit accounts providing non-penalized liquidity for the funds held therein, wherein the aggregated deposit account information comprises for respective of the aggregated deposit accounts a balance of funds held in the respective aggregated deposit account;

   (2) client account information for funds, for each of a plurality of respective client accounts, held in one or more of the plurality of the financial institutions, with funds accepted for deposit for respective ones of the clients accounts in the names of the respective clients at the first financial institution, with the client account information comprising a respective balance of funds, from the respective client account, held in each of one or more of the aggregated deposit accounts holding funds of the respective client account; and

   (B) allocating, using the one or more computers, for multiple of the client accounts, the client funds of these respective client accounts among more than one of the aggregated deposit accounts, so that at least a portion of these client funds are maintained in the aggregated deposit account in the first depository institution and at least a portion of the client funds are maintained in the aggregated deposit account held in the second depository institution in the different financial institution;

   (C) determining, using the one or more computers, client funds to be withdrawn from the aggregated deposit account held at one of the depository institutions of one of the financial institutions more than six (6) times during a month while preserving an insured and interest-bearing status of the aggregated deposit account held at the one depository institution;

   (D) generating one or more instructions to transfer funds to or from one or more of the respective aggregated deposit accounts in the respective depository institutions in the program through an aggregated demand deposit account based at least in part on the respective allocations determined for the respective depository institutions in the program, wherein the one or more instructions comprise making a withdrawal and/or transfer from the one aggregated deposit account more than six (6) times during the month period to correspond at least with the more than six (6) of the allocations determined over the month period that are withdrawals, while maintaining an insured and interest-bearing status of the aggregated deposit account held at the one depository institution; and

   (E) updating or having updated, using the one or more computers, the one or more electronic databases based at least in part on the allocation of client funds to or from the plurality of aggregated deposit accounts.

US 8,612,324 B1

11

**2**. The system as defined in claim **1**, wherein at least one of the one or more interest-bearing aggregated deposit accounts is insured by the Federal Deposit Insurance Corporation.

**3**. The system as defined in claim **2**, further comprising the one or more computers configured to perform the step:

transferring or having transferred or arranging for transfer of funds to or from one or more of the respective aggregated deposit accounts in the respective depository institutions in the program in accordance with the one or more instructions.

**4**. The system as defined in claim **3**, further comprising the one or more computers configured to perform the step:

processing, using the one or more computers, more than six (6) withdrawals and/or transfers from one or more of the client accounts during the month period.

**5**. The system as defined in claim **2**, further comprising the one or more computers configured to perform the step:

withdrawing or having withdrawn or arranging for withdrawal of funds from at least one of the FDIC-insured and interest-bearing aggregated deposit accounts more than six (6) times during the month period.

**6**. The system defined in claim **2**, further comprising the one or more computers configured to perform the steps:

causing distribution of interest, using the one or more computers, from said FDIC-insured interest-bearing aggregated deposit accounts to said client accounts; and

updating or having updated, using the one or more computers, one or more of the electronic databases with information about the interest distributed to said client accounts.

**7**. The system as defined in claim **2**, wherein the electronic database includes client preference and/or exclusion information comprising a client's one or more preferences and/or one or more exclusions of one or more banks to hold its funds; and wherein the one or more computers are configured to perform the step:

determining, using the one or more computers, one or more of the different banks in the program for allocating a portion of the client's funds, based at least in part on the client preference and/or exclusion information.

**8**. The system as defined in claim **2**, wherein at least one of the one or more FDIC-insured and interest-bearing aggregated deposit accounts is a money market deposit account.

12

**9**. The system as defined in claim **2**, wherein the one or more computers are configured to perform one or more of the following steps in the updating or having updated the one or more databases step:

accessing electronic check deposit data;

accessing electronic Fed wire deposit data;

accessing electronic ACH deposit data;

accessing electronic debit card transaction files;

accessing electronic credit card transaction files;

accessing electronic check presentment data;

accessing electronic ACH debit data;

accessing electronic touch tone bill paying data;

accessing electronic Internet bill paying data.

**10**. The system as defined in claim **2**, wherein the one or more computers are configured to perform the step of receiving client data for deposits and/or transfers to and withdrawals and/or transfers from each of their respective client accounts from an Internet telecommunications network.

**11**. The system of claim **2**, wherein the one or more computers are configured to perform the steps:

on a regular, periodic, or recurring basis, calculating or having calculated, using the one or more computers, a net transaction amount as the sum of individual client deposits and/or transfers to and withdrawals and/or transfers from each of a plurality of the client accounts; and,

determining, using the one or more computers, an amount or amounts of funds that need to be deposited into one or more of the aggregated deposit accounts to cover client deposits, or an amount or amounts of funds that needs to be withdrawn from one or more of the aggregated deposit accounts to cover client withdrawals, utilizing, the net transaction amount.

**12**. The system of claim **2**, wherein the client accounts comprise corporate client accounts.

**13**. The system of claim **2**, wherein the instruction for making a withdrawal and/or transfer from the one aggregated deposit account more than six (6) times during a month while preserving an insured and interest-bearing status of the aggregated deposit account held at the one depository institution comprises making requesting that the withdrawal and/or transfer be requested in one or more selected from the group of in person, by mail, by messenger, by telephone and distributed by mail, by automated teller machine.

\*   \*   \*   \*   \*

# Exhibit 11

(19) **United States**

(12) **Reissued Patent**
Bent et al.

(10) Patent Number:     **US RE43,246 E**
(45) Date of Reissued Patent:     **Mar. 13, 2012**

(54) **MONEY FUND BANK SYSTEM**

(75) Inventors: **Bruce Bent**, Manhasset, NY (US);
**Bruce Bent, II**, Manhasset, NY (US)

(73) Assignee: **Island Intellectual Property LLC**,
Manhasset, NY (US)

(21) Appl. No.: **10/825,440**

(22) Filed: **Apr. 14, 2004**

**Related U.S. Patent Documents**

Reissue of:
(64) Patent No.: **6,374,231**
    Issued: **Apr. 16, 2002**
    Appl. No.: **09/176,340**
    Filed: **Oct. 21, 1998**

(51) **Int. Cl.**
    **G06Q 40/00**      (2006.01)
(52) **U.S. Cl.** ............................ **705/36 R**; 705/37; 705/38
(58) **Field of Classification Search** .................. 705/35,
    705/36–40, 36 R
    See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,232,367 A | * 11/1980 | Youden et al. | .................. 705/38 |
| 4,346,442 A | 8/1982 | Musmanno | |
| 4,376,978 A | 3/1983 | Musmanno | |
| 4,597,046 A | 6/1986 | Musmanno | |
| 4,674,044 A | 6/1987 | Kalmus | |
| 4,694,397 A | 9/1987 | Grant | |
| 4,700,297 A | 10/1987 | Hagel | |
| 4,751,640 A | * 6/1988 | Lucas et al. | ..................... 705/36 |
| 4,774,663 A | 9/1988 | Musmanno | |
| 4,953,085 A | 8/1990 | Atkins | |
| 4,985,833 A | 1/1991 | Oncken | |
| 5,126,936 A | 6/1992 | Champion | |
| 5,206,803 A | 4/1993 | Vitagliano | |
| 5,220,501 A | 6/1993 | Lawlor et al. | |

| | | | |
|---|---|---|---|
| 5,235,507 A | 8/1993 | Sackler | |
| 5,262,942 A | * 11/1993 | Earle | ............................... 705/37 |
| 5,270,922 A | 12/1993 | Higgins | |
| 5,291,398 A | 3/1994 | Hagan | |
| 5,297,032 A | 3/1994 | Trojan | |
| 5,424,938 A | 6/1995 | Wagner et al. | |
| 5,631,828 A | 5/1997 | Hagan | |
| 5,644,727 A | 7/1997 | Atkins | |
| 5,671,363 A | 9/1997 | Cristofich | |
| 5,689,650 A | * 11/1997 | McClelland et al. | .......... 705/36 |

(Continued)

FOREIGN PATENT DOCUMENTS

JP          10049590          * 2/1998

(Continued)

OTHER PUBLICATIONS

Capital Briefs: Corporate Checking Account Relief Sought, American Banker v162, p2 Jul. 28, 1997.*

(Continued)

*Primary Examiner* — Jagdish Patel
(74) *Attorney, Agent, or Firm* — Foley & Lardner LLP

(57)          **ABSTRACT**

Providing interest to clients' deposited [finds] *funds* without the legal limitation on the number of demand withdrawals from deposit accounts is accomplished by an administration system that keeps all of the records for the clients' deposits and withdrawals, calculates the total of the deposits and withdrawals for all clients, and uses the calculation to determine whether funds are deposited to or withdrawn from a single deposit account in which all clients' deposit funds are kept. Clients can make unlimited withdrawals, such as by check, credit card, debit card, or electronic transfer, through the administrator. By placing the administrator as the holder of a single account, legal exemptions to the limitation on earning interest in demand accounts is *effectively* facilitated.

**13 Claims, 2 Drawing Sheets**



# US RE43,246 E
Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,710,889 | A | 1/1998 | Clark |
| 5,765,144 | A | 6/1998 | Larche |
| 5,774,880 | A | 6/1998 | Ginsberg |
| 5,781,654 | A | 7/1998 | Carney |
| 5,802,499 | A | 9/1998 | Sampson et al. |
| 5,806,048 | A | 9/1998 | Kiron et al. |
| 5,806,049 | A | 9/1998 | Petruzzi |
| 5,812,987 | A | 9/1998 | Luskin |
| 5,826,243 | A | 10/1998 | Musmanno |
| 5,852,811 | A | 12/1998 | Atkins |
| 5,864,685 | A | 1/1999 | Hagan |
| 5,875,437 | A | 2/1999 | Atkins |
| 5,878,258 | A | 3/1999 | Pizi |
| 5,878,405 | A | 3/1999 | Grant et al. |
| 5,884,285 | A | 3/1999 | Atkins |
| 5,890,141 | A | 3/1999 | Carney |
| 5,893,078 | A | 4/1999 | Paulson |
| 5,903,881 | A | 5/1999 | Schrader et al. |
| 5,905,974 | A | 5/1999 | Fraser |
| 5,940,809 | A | 8/1999 | Musmanno |
| 5,941,996 | A | 8/1999 | Smith |
| 5,946,667 | A | 8/1999 | Tull et al. |
| 5,950,175 | A | 9/1999 | Austin |
| 5,974,390 | A | 10/1999 | Ross |
| 5,978,779 | A | 11/1999 | Stein |
| 6,014,642 | A | 1/2000 | El-Kadi et al. |
| 6,016,482 | A | 1/2000 | Molinari |
| 6,026,438 | A | 2/2000 | Piazza |
| 6,041,314 | A | 3/2000 | Davis |
| 6,044,371 | A | 3/2000 | Person |
| 6,047,324 | A | 4/2000 | Ford |
| 6,049,782 | A | 4/2000 | Gottesman et al. |
| 6,052,673 | A | 4/2000 | Leon et al. |
| 6,088,685 | A | 7/2000 | Kiron et al. |
| 6,092,056 | A | 7/2000 | Tull et al. |
| 6,105,005 | A | 8/2000 | Fuhrer |
| 6,108,641 | A | 8/2000 | Kenna |
| 6,112,191 | A | 8/2000 | Burke |
| 6,119,093 | A | 9/2000 | Walker et al. |
| 6,131,810 | A | 10/2000 | Weiss |
| 6,154,770 | A | 11/2000 | Kostakos |
| 6,189,785 | B1 | 2/2001 | Lowery |
| 6,192,347 | B1 | 2/2001 | Graff |
| 6,226,623 | B1 | 5/2001 | Schein et al. |
| 6,317,783 | B1 | 11/2001 | Freishtat et al. |
| 6,324,523 | B1 | 11/2001 | Killeen et al. |
| 6,363,360 | B1 | 3/2002 | Madden |
| 6,374,231 | B1 | 4/2002 | Bent et al. |
| 6,513,020 | B1 | 1/2003 | Weiss et al. |
| 6,970,843 | B1 | 11/2005 | Forte |
| 7,089,202 | B1 | 8/2006 | McNamar et al. |
| 7,103,556 | B2 | 9/2006 | Del Rey et al. |
| 7,124,101 | B1 | 10/2006 | Mikurak |
| 7,133,840 | B1 | 11/2006 | Kenna et al. |
| 7,206,761 | B2 | 4/2007 | Colvin |
| 7,216,100 | B2 | 5/2007 | Elliott |
| 7,328,179 | B2 | 2/2008 | Sheehan et al. |
| 7,376,606 | B2 | 5/2008 | Jacobsen |
| 7,383,223 | B1 | 6/2008 | Dilip et al. |
| 7,401,037 | B2 | 7/2008 | Arena et al. |
| 7,440,914 | B2 | 10/2008 | Jacobsen |
| 7,509,286 | B1 | 3/2009 | Bent et al. |
| 7,519,551 | B2 | 4/2009 | Bent et al. |
| 7,536,350 | B1 | 5/2009 | Bent et al. |
| 7,596,522 | B1 | 9/2009 | Jacobsen |
| 7,603,307 | B2 | 10/2009 | Jacobsen |
| 7,640,199 | B1 | 12/2009 | Hyland |
| 7,668,771 | B1 | 2/2010 | Bent et al. |
| 7,668,772 | B1 | 2/2010 | Bent et al. |
| 7,672,886 | B2 | 3/2010 | Bent et al. |
| 7,672,901 | B1 | 3/2010 | Bent et al. |
| 7,672,902 | B1 | 3/2010 | Bent et al. |
| 7,680,716 | B1 | 3/2010 | Bent et al. |
| 7,680,734 | B1 | 3/2010 | Bent et al. |
| 7,716,131 | B2 | 5/2010 | Bent et al. |
| 7,752,107 | B1 | 7/2010 | Bent et al. |
| 7,752,129 | B2 | 7/2010 | Bent et al. |
| 7,769,688 | B1 | 8/2010 | Bent et al. |

| | | | |
|---|---|---|---|
| 7,809,640 | B1 | 10/2010 | Bent et al. |
| 7,933,821 | B1 | 4/2011 | Bent et al. |
| 8,032,456 | B1 | 10/2011 | Bent et al. |
| 8,036,986 | B2 | 10/2011 | Jacobsen |
| 8,051,005 | B2 | 11/2011 | Jacobsen |
| 2001/0032182 | A1 | 10/2001 | Kumar et al. |
| 2002/0007330 | A1 | 1/2002 | Kumar et al. |
| 2002/0046144 | A1 | 4/2002 | Graff |
| 2002/0069147 | A1 | 6/2002 | Sheehan et al. |
| 2002/0082981 | A1 | 6/2002 | Madden |
| 2002/0087454 | A1 | 7/2002 | Calo et al. |
| 2002/0091637 | A1 | 7/2002 | Bent et al. |
| 2002/0128951 | A1 | 9/2002 | Kiron et al. |
| 2002/0161707 | A1 | 10/2002 | Cole et al. |
| 2002/0165757 | A1 | 11/2002 | Lisser |
| 2002/0178098 | A1 | 11/2002 | Beard |
| 2002/0194099 | A1 | 12/2002 | Weiss |
| 2003/0023529 | A1 | 1/2003 | Jacobsen |
| 2003/0041003 | A1 | 2/2003 | Kayser, III |
| 2003/0135437 | A1 | 7/2003 | Jacobsen |
| 2003/0149646 | A1 | 8/2003 | Chen et al. |
| 2003/0163403 | A1 | 8/2003 | Chen et al. |
| 2003/0177092 | A1 | 9/2003 | Paglin |
| 2003/0191702 | A1 | 10/2003 | Hurley |
| 2003/0200174 | A1 | 10/2003 | Star |
| 2003/0208438 | A1 | 11/2003 | Rothman |
| 2003/0236728 | A1 | 12/2003 | Sunderji et al. |
| 2004/0039674 | A1 | 2/2004 | Coloma |
| 2004/0107157 | A1 | 6/2004 | Bleunven et al. |
| 2004/0111361 | A1 | 6/2004 | Griffiths et al. |
| 2004/0128229 | A1 | 7/2004 | Raines et al. |
| 2004/0128235 | A1 | 7/2004 | Kemper et al. |
| 2004/0138974 | A1 | 7/2004 | Shimamura et al. |
| 2004/0153398 | A1 | 8/2004 | Baumgartner et al. |
| 2004/0162773 | A1 | 8/2004 | Del Rey et al. |
| 2004/0177036 | A1 | 9/2004 | Nutahara et al. |
| 2005/0044038 | A1 | 2/2005 | Whiting et al. |
| 2005/0091137 | A1 | 4/2005 | Woeber |
| 2005/0102225 | A1 | 5/2005 | Oppenheimer et al. |
| 2005/0102226 | A1 | 5/2005 | Oppenheimer et al. |
| 2005/0108120 | A1 | 5/2005 | Malka et al. |
| 2005/0108149 | A1 | 5/2005 | Bent et al. |
| 2005/0114246 | A1 | 5/2005 | Coloma |
| 2005/0154662 | A1 | 7/2005 | Langenwalter |
| 2005/0228733 | A1 | 10/2005 | Bent et al. |
| 2006/0047593 | A1 | 3/2006 | Naratil et al. |
| 2006/0106703 | A1 | 5/2006 | Del Rey et al. |
| 2006/0155644 | A1 | 7/2006 | Reid et al. |
| 2006/0167773 | A1 | 7/2006 | Yang et al. |
| 2006/0213980 | A1 | 9/2006 | Geller et al. |
| 2006/0273152 | A1 | 12/2006 | Fields |
| 2007/0043666 | A1 | 2/2007 | Burdette |
| 2007/0118449 | A1 | 5/2007 | De La Motte et al. |
| 2007/0130065 | A1 | 6/2007 | Staab et al. |
| 2007/0143196 | A1 | 6/2007 | Colvin |
| 2007/0255655 | A1 | 11/2007 | Kemper et al. |
| 2007/0271174 | A2 | 11/2007 | Bent et al. |
| 2007/0276752 | A1 | 11/2007 | Whiting et al. |
| 2007/0288400 | A1 | 12/2007 | Menon |
| 2008/0015985 | A1 | 1/2008 | Abhari et al. |
| 2008/0046358 | A1 | 2/2008 | Holm-Blagg et al. |
| 2008/0065532 | A1 | 3/2008 | De La Motte |
| 2008/0097899 | A1 | 4/2008 | Jackson et al. |
| 2008/0120228 | A1 | 5/2008 | Bent et al. |
| 2008/0133280 | A1 | 6/2008 | Ziegler |
| 2008/0133396 | A1 | 6/2008 | De La Motte |
| 2008/0222053 | A1 | 9/2008 | Jacobsen |
| 2009/0006985 | A1 | 1/2009 | Fong et al. |
| 2009/0012899 | A1 | 1/2009 | Friesen |
| 2009/0138412 | A1 | 5/2009 | Jacobsen |

## FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| WO | 95/23379 | * | 8/1995 |
| WO | WO-99/18529 | | 4/1999 |
| WO | WO-02/42952 | | 5/2002 |
| WO | WO-03/012580 | | 2/2003 |
| WO | WO-2005/006111 | | 1/2005 |

**US RE43,246 E**

Page 3

## OTHER PUBLICATIONS

Bent, "Bruce Bent Makes Money Market Funds Act Like Bank Accounts," Equity BBDP, Oct. 5, 1998, 3 Sheets.

Anderson et al. "Retail Sweep Programs and Bank Reserves," Federal Reserve Bank of St. Louis Review, Bell & Howell Information and Learning Company, vol. 83, Issue 1, 24 Sheets, Jan. 1, 2001.

Blackwell, Aba to Approve System for Sharing Deposit Coverage, American Banker (Feb. 11, 2003).

Blackwell, "New Pitch: Deposit Insurance Sharing", American Banker Online, pp. 1-4, Jan. 21, 2003.

Certificate of Deposit Registry Service: Keeping deposits in the corn patch; Banknews, Mar. 2003.

Declaration of Mr. Bruce Bent II, Vice Chairman and Registrant of Applicant on the date of first commercial use of the service providing interest and FDIC insurance for checking accounts by means of a system using money market deposit accounts (MMDA's) of Oct. 23, 1997.

Ginovsky, Heavyweight Funding, Bankers News, vol. II, Issue 5, p. 1-2 Mar. 4, 2003.

Chapelle, "Merrill's Rivals Say They, Too. Offer Services Beyond Banking," Securities Data Publishing on Wall Street, 2 Sheets, Feb. 1, 2003.

Chapelle et al. "Peering Into Tomorrow: At the Threshold of a New Century, Brokers and Others Discuss Where They were Going," Securities Data Publishing on Wall Street, 6 Sheets, Dec. 1, 1999.

Coyle, "A Look at commercial Demand Deposit Options," America's Community Banker, vol. 9, Issue 2, Bell & Howell Information and Learning Company, 9 Sheets, Feb. 1, 2000.

Crockett, "Big Banks Found Stepping Up Marketing of 'Sweep' Accounts," American Banker, vol. 159, No. 198, American Banker Inc., 3 Sheets, Oct. 13, 1994.

Fredrickson, "Rising Rates Rescue Money Fund Firm Reserve Profits by Picking Niches," Crain's New York Business, Crain Communications Inc., vol. 20, Issue 51, 2 Sheets; Dec. 20, 2004.

Hoffman, "Reserve's FDIC-Insured Account Draws Regionals; But some see little need for insurance," Crain Communications Inc., Investment News, 2 Sheets, Jun. 4, 2001.

Keenan, "Tapping Brokerages for Alternative to CDs," American Banker, The Financial Services Daily, 3 Sheets, Feb. 18, 2004.

Lavine, "Check Out High-Yield Checking Accounts," Broward Daily Business Review, vol. 39, No. 102, 2 Sheets, Apr. 27, 1998.

McReynolds, "The Power of Cash: Ho-hum cash can be great product (and lead to more business) in troubled times," Securities Data Publishing on Wall Street, 3 Sheets, Jun. 1, 2002.

McReynolds et al. "Unusual Products for Unusual Times," Securities Data Publishing on Wall Street, 6 Sheets, May 1, 2001.

Potter, "As Sweep Accounts Continue to Grow, So do Community Bank Options," America's Community Banker, vol. 9, Issue 8, Bell & Howell Information and Learning Company, 3 Sheets, Aug. 1, 2000.

Share, "New Service Skirts FDIC's $100K Limit," Dialog Web Command Mode, 2 Sheets, Jun. 13, 2003, http://www.dialogweb.com/cgi/dwclient.

Smith, "IBAA Won't Push Interest-Bearing Checking for Business; Says Too Few Members Want It," The American Banker, 2 Sheets, Apr. 18, 1996.

Stafford, "New Bank Program Allows $1 Million in Insured Deposits," Dialog Web Command Mode, 3 Sheets, Aug. 24, 2003, http://www.dialogweb.com/cqi/dwclient.

Wilson, "How Cash Management Services Can Help Your Bank Cultivate New Relationships with Commercial Customers," America's Community Banker, vol. 10, Issue 5, Bell & Howell Information and Learning Company, 8 Sheets, May 1, 2001.

"Man Bites Dog: Funds Move Into Banking," IBC's Money Fund Selector, 2 Sheets, Nov. 6, 1998.

About iMoneyNet, Inc., About iMoneyNet's Money Funds Division, 4 Sheets, Aug. 21, 2003, http://www.ibcdata.com/about.htm.

"Reverse Ups Insurance Limit on Money Market Account," Thomson Financial Inc., Mutual Fund Market News, 1 Sheet, Aug. 26, 2002.

"The Reverse Funds to Offer up to $600,000 of FDIC Insurance on Reserve Insured Deposits; Addressing Investor Needs for Increased Safety, Flexibility and a Competitive Yield," Business Wire, Inc. Business Wire, 2 Sheets, Aug. 13, 2002.

"The Bank of New York adds a $300,000 FDIC-Insured Money Market Account Option to its Dividend Income Checking Account," PR Newswire Associations, Inc., PR Newswire, 2 Sheets, Apr. 18, 2002.

The Reserve Fund, Study of U.S. Appl. No. 6,374,231, 1 Sheet.

"Bank of Oak Ridge to Offer FDIC Insurance on up to $1.5 Million," Dialog Web Command Mode, 2 Sheets, Sep. 25, 2003, http://www.dialogweb.com/cgi/dwclient.

Reserve Management Corporation, Reserve Insured Deposits, U.S. Appl. No. 76/315,600, Issued.

The Reserve, "What Sets Us Apart", 2 Sheets, Oct. 4, 2006, http://www.ther.com/bank/bank_wsua.shtml.

The Reserve, "Reserve Insured Deposits," 2 Sheets, Oct. 4, 2006 http://www.ther.com/ps/ps_fif.shtml.

The Reserve, "Company History," 3 Sheets, Oct. 4, 2006 http://www.ther.com/aboutus/history.shtml.

The Reserve, "Reserve Insured Deposits Program," 2 Sheets, Oct. 4, 2006, http://www.ther.com/bank/bank_insdep.shtml.

Reserve Insured Deposits, United States Patent and Trademark Office, Reg. No. 2,694,910, Registered Mar. 11, 2003, 1 Sheet.

U.S. Appl. No. 09/677,535, filed Oct. 2, 2000, Bruce Bent et al.

U.S. Appl. No. 10/825,440, filed Apr. 14, 2004, Bruce Bent et al.

U.S. Appl. No. 11/641,046, filed Dec. 19, 2006, Bruce Bent et al.

U.S. Appl. No. 11/840,052, filed Aug. 16, 2007, Bruce Bent et al.

U.S. Appl. No. 11/840,060, filed Aug. 16, 2007, Bruce Bent et al.

U.S. Appl. No. 12/385,522, filed Aug. 10, 2009, Bruce Bent et al.

U.S. Appl. No. 12/408,507, filed Mar. 20, 2009, Bruce Bent et al.

U.S. Appl. No. 12/408,511, filed Mar. 20, 2009, Bruce Bent et al.

U.S. Appl. No. 12/408,523, filed Mar. 20, 2009, Bruce Bent et al.

U.S. Appl. No. 12/453,387, filed May 8, 2009, Bruce Bent et al.

U.S. Appl. No. 12/453,388, filed May 8, 2009, Bruce Bent et al.

U.S. Appl. No. 12/453,389, filed May 8, 2009, Bruce Bent et al.

U.S. Appl. No. 12/453,390, filed May 8, 2009, Bruce Bent et al.

U.S. Appl. No. 12/622,979, filed Nov. 20, 2009, Bruce Bent et al.

U.S. Appl. No. 12/794,448, filed Jun. 4, 2010, Bruce Bent et al.

U.S. Appl. No. 12/794,545, filed Jun. 4, 2010, Bruce Bent et al.

U.S. Appl. No. 12/816,092, filed Jun. 15, 2010, Bruce Bent, II et al.

U.S. Appl. No. 12/829,961, filed Jul. 2, 2010, Bruce Bent et al.

An iMoneyNet Special Report, Brokerage Cash Sweep Options: The Shift from Money Funds to FDIC-Insured Bank Deposit Accounts, by Peter G. Crane & Michael F. Krasner, iMoneyNet, Nov. 2004, 66 pages.

Email from Olivia Kim to Charles Macedo on Jun. 9, 2010 with attachment of Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation, and Intrasweep LLC against Deutshe Bank Trust Company Americas and Total Bank Solutions, LLC, Defendant Deutsche Bank Trust Company America's responses to Intrasweep's common interrogatory Nos. 1-5, Confidential–Attorneys only, Civil Action No. 09 Civ. 2675 (VM) (AJP).

Email from Olivia Kim to Charles Macedo on May 13, 2010 with attachment of Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation, and Intrasweep LLC against Deutshe Bank Trust Company Americas and Total Bank Solutions, LLC, Defendant Deutsche Bank Trust Company America's responses to Double Rock's Common interrogatory Nos. 1-10 to defendants Reservation of Right, Civil Action No. 09 Civ. 2675 (VM) (AJP).

Email from Olivia Kim to Charles Macedo on May 13, 2010 with attachment of Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation, and Intrasweep LLC against Deutshe Bank Trust Company Americas and Total Bank Solutions, LLC, Defendant Total Bank Solutions, LLC's responses to Double Rock's Common interrogatory Nos. 1-10 to defendants, Reservation of Right, Civil Action No. 09 Civ. 2675 (VM) (AJP).

IDC Deposits, online, http://idcdeposits.com/ , 2009, 1 Sheet.

Insured Bank Deposit Program Summary Information Statement, Information Statement, and list of Eligible Program Banks Effective Feb. 10, 2005, 11 pages.

Lawsuit by Island Intellectual Property LLC, et al., against Deutsche Bank Trust Company Americas, et al.; Defendant Deutsche Bank Trust Company Americas' Fifth Supplemental Responses to Island IP's First Set of Common Interrogatories to All Defendants (No. 7); Case No. 09 Civ. 2675 (VM)(AJP); Sep. 16, 2010; 9 pages.

## US RE43,246 E

Page 4

Lawsuit by Island Intellectual Property LLC, et al., against Deutsche Bank Trust Company Americas, et al.; Defendant Total Bank Solutions, LLC's Fifth Supplemental Responses to Island IP's First Set of Common Interrogatores to All Defendants (No. 7); Case No. 09 CV 2675 (VM)(AJP); Sep. 16, 2010; 9 pages.

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, and Double Rock Corporation against Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, including Cover Sheet, Summons, Complaint and Rule 7.1 Statement, Mar. 24, 2009, Case No. 09 CV 2677.

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, and Double Rock Corporation against Promontory Interfinancial Network, LLC and MBSC Securities Corporation, including Cover Sheet, Summons, Complaint and Rule 7.1 Statement, Mar. 24, 2009, Case No. 09 CV 2675.

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Stipulation and Order, Oct. 29, 2009, Case No. 09 CV 2675 (VM) (AJP) (Document 73).

Letter from Gilbert T. Schwartz, Skadden, Arts, Slate, Meagher & Flom to Oliver Ireland, Associate General Counsel, Board of Governors of the Federal Reserve System; Dec. 18, 1987; 19 sheets.

Letter from Roger M. Zaitzeff, Seward & Kissel to Gilbert T. Schwartz, Associate General Counsel, Board of Governors of the Federal Reserve System; May 10, 1983, 5 sheets.

Promontory Interfinancial Network, Promontory Interfinancial Network Announces New Deposit Placement Service, Jan. 21, 2003, 3 Sheets.

Promontory Interfinancial Network: Frequently Asked Questions (FAQs), Feb. 5, 2003, 5 pages.

Wayne Hummer Money Market Fund Brochure, Performance Data as of Mar. 31, 2003, including Commentary page (attached http://www.whummer.com/funds/money.asp and http://www.whummer.com/fund_dis.htm), 4 pages.

Wayne Hummer Money Market Fund, "Annual Financial Statements," Mar. 31, 2003, 12 pages.

Wayne Hummer Investment Trust, Investment Company Act File No. 811-3880, "Start Investing Today . . .," Prospectus, Jul. 31, 2002, 44 pages.

Wayne Hummer Management Company, retrieved from the Internet: "Organization & Clients," http://www.whmgmtco.com/ "Assets Under Management—Dec. 31, 2002," http://www.whmgmtco.com/asset.htm; "Equity & Mid Cap Growth Investment Philosophy," http://www.whmgmtco.com/qu-phil.htm; "Economic & Market Commentary—Jan. 2003," http://www.whmgmtco.com/commentary.htm; "Management Team," http://www.whmgmtco.com/team.htm; "Fixed Income Performance," http://www.whmgmtco.com/fixed-perf.htm; "Mid-Cap Equity Performance," http://www.whmgmtco.com/mid-perf.htm; "All Equity Performance," http://www.whmgmtco.com/all-perf.htm, 11 pages. [retrieved on Jul. 2, 2003].

Wayne Hummer Market Letter, Jul./Aug. 2003, 2 pages.

Wayne Hummer Investments, "Wintrust Financial Corporation Reports Second Quarter Earnings; Second Quarter Net Earnings Up 45%," Jul. 18, 1 page.

Weber Shandwick Worldwide, News: For Immediate Release, "Wayne Hummer Investments Names New President & CEO," Apr. 2003, 2 pages.

Wayne Hummer Investments, retrieved from the Internet: "Our People Focused on Your Investments," Jul. 2, 2003, http://www.whummer.com/; "Stocks & Bonds," http://www.whummer.com/stocks_bonds.htm; "Mutual Funds," http://www.whummer.com/mutual_funds.htm; "Morning Comments," http://www.whummer.com/morningcomments.asp, 6 pages. [retrieved on Jul. 2, 2003].

Wayne Hummer Investments, "Investment Executives," retrieved from the Internet: http://www.whummer.com/investment_executives.htm, 2 pages. [retrieved on Jul. 2, 2003].

Wayne Hummer Investments LLC, "Consolidated Statement of Financial Condition," with Report of Independent Auditors, Dec. 31, 2002, 12 pages.

Wintrust Financial Corporation, "Wintrust Financial Corporation Reports Record Earnings for the Fourth Quarter and Year; Fourth Quarter Net Earnings Up 53%," 22 pages.

Wayne Hummer Investments, "A Letter to Wayne Hummer Investments Clients & Friends," Jul. 18, retrieved from the Internet: http://www.whummer.com/wintrust2qEarnings.html, 1 page [retrieved on Jul. 3, 2003].

Wayne Hummer Investments; Insured Bank Deposits Program—Frequently Asked Questions; obtained Dec. 26, 2002; 4 pages.

Wayne Hummer Investments, "Contact Us," retrieved from the Internet: http://www.waynehummer.com/contact_us.htm, 6 pages [retrieved on Jan. 8, 2003].

Wayne Hummer Investments for Life, Booklet, 2003, 25 pages.

Wayne Hummer, "For Time-Proven Professionalism," Booklet, 2003, 13 pages.

Wayne Hummer, "Insured Bank Deposits™ Program Information Statement," obtained Dec. 26, 2002; 12 pages.

Lawsuit by Island Intellectual Property LLC, et al. v. Deutsch Bank Trust Company Americas, et al.; Defendant Deutsche Bank Trust Company Americas' Second Supplemental Responses to Double Rock's Interrogatories Nos. 2, 8 and 9, Jul. 2010, 65 pages.

Exhibit 2, Invalidity Chart: U.S. Appl. No. 4,985,833 (Oncken)—U.S. Pat. No. 7,668,771, Jul. 2010, 14 pages.

Exhibit 5, Invalidity Chart: Merrill Lynch Business Advantage Program—U.S. Pat. No. 7,668,772, Jul. 2010, 7 pages.

Exhibit 8, Invalidity Chart: Harken Financial Services Sweep Product—U.S. Pat. No. 7,668,771, Jul. 2010, 9 pages.

Exhibit 9, Invalidity Chart: Wayne Hummer—Insured Bank Deposit Program—U.S. Pat. No. 7,668,771, Jul. 2010, 12 pages.

Exhibit 10, Invalidity Chart: U.S. Patent Application Publication No. 2007/0043666 (Burdette), U.S. Pat. No. 7,668,771, Jul. 2010, 9 pages.

2 CDs (1) Non-Confidential Exhibits and Material regarding Deutsch Bank Trust Company Americas' (DBTCA) 2nd Supp Res to Double Rock's Interrogatory No. 2; (2) Prior Art for IC Non-Confidential Material—Bates-numbered documents for Exhibits 2, 5, 8, 9, and 10 Invalidity Charts, Jul. 2010.

Letter to R.M. Zaitzeff, from W.W. Wiles, dated Jun. 22, 1983 (response to May 10, 1983 letter re: offering of MMDAs), 6 pages.

Letter to G.T. Schwartz, from O.I. Ireland, dated Jun. 22, 1988 (response to Dec. 18, 1987 letter re: proposed modifications to Merrill Lynch's CMA Program), 5 pages.

Information Statement, "Alliance Insured Account," Sep. 1999; 6 pages.

Investors MoneyAccounts$^{SM}$ and Insurance Plus Service Agreement, attached Schedule A (List of Banks Participating in the Insurance Plus Service), IMAD Mar. 1994, 3 pages.

Investors Money Account$^{SM}$ (an FDIC-insured money market account), IMA-1 (Mar. 1994), 4 pages.

Investors Money Account$^{SM}$, "The FDIC-Insured Money Market Investment with an Important Plus," IMA Oct. 1995, 2 pages.

1985 SEC No-Act. Lexis 2756, Investment Company Act of 1940—Section 3(a)(1), 2(a)(36); Securities Act of 1933—Section 2(1), Nov. 29, 1985, Kemper Financial Services, Inc., 9 pages.

Insured Money Account Program Agreement and Disclosure Statement, (attached Schedule A—Deposit Account Terms), faxed Mar. 28, 2000; 10 pages.

First National Bank in Brookings, Certificates of Deposit [online] [retrieved on Jul. 17, 2009]. Retrieved from the Internet: Certificates of Deposit, <URL: http://web.archive.org/web/20000524121111/www.firstnb.com/cd.htm>; Multi-Bank CDs, <URL: http://web.archive.org/web/20000524132934/www.firstnb.com/mbcd.htm>, 5 pages.

Summary of Commentary on Current Economic Conditions by Federal Reserve Districts, Jan. 1985, 44 pages.

12 CFR Ch. II (Jan. 1, 2009 Edition), pp. 124-125.

Product Strategy, "Money Fund $$ Moving to Bank Deposits, Distributors Start to Install Bank Deposit Accounts to Replace Money Funds," 6 FRC Monitor, Dec. 2003, 2 pages.

Board of Governors of the Federal Reserve System, "The May 1998 Senior Financial Officer Survey," May 1998, (attached Appendix A: Survey Questions and Responses; Appendix B: Glossary; Appendix C: Examples of Key Reserve Concepts), 48 pages.

Interest Rate Review, A Publication of the Meyer Weekly Interest Rate Survey, "A Look at Tiers," Apr. 1987, 6 pages, vol. 11, No. 4.

LexisNexis, the American Banker, "Merrill Joins Money Market Account, CMA; Broker Begins Testing With 12 Institutions," Sep. 23, 1983, 4 pages.

Bent et al., Office Action, App. No. 10/071,053, with attached SB08, date considered Mar. 10, 2009, 2 pages.

Merrill Lynch & You, "Financial Services The Way You Want, When You Want Them," Jan. 2000, 16 pages.

Exhibit 1, "FA/FB Account 1997 First Transactions, TRX Types: PU, PP, TA, PT," Aug. 2003, p. 1-2.

Advertisement: Where Your Interest is?, Mutual Funds, Oct. 1997; 1 page.

Advertisement: It's 1997, Do You Know Where Your Interest Is?, Mutual Funds, Dec. 1993, p. 46.

USPTO Office Action, Interview Summary, U.S. Appl. No. 11,767,827, Date Mailed Sep. 23, 2009, 4 pages.

USPTO Office Action, Office Action Summary, U.S. Appl. No. 11,767,827, Date Mailed Jun. 5, 2009, 35 pages.

Service Mark Application, Applicant: Reserve Management Corporation, Mark: Reserve Insured Deposits, (attached Power of Attorney, Declaration, Drawing Page Sep. 21, 2001, 6 pages.

Letter to R.L. Kratzer, from T.J. Vezeau, Re: U.S. Appl. No. 6,374,231, dated Jan. 10, 2003, 1 page.

Letter to C.R. Macedo, from R.L. Rainey, Re: Promontory Interfinancial Network, LLC, dated Jul. 22, 2008, (attached Attachments A-E), 35 pages.

Letter to C.R. Macedo, from R.L. Rainey, Re: Promontory Interfinancial Network, LLC, dated Oct. 16, 2008, (attached Attachments A-C), 22 pages.

Letter to C.R. Macedo, from R.L. Rainey, Re: Promontory Interfinancial Network, LLC, dated Feb. 23, 2009, (attached Exhibit A-B), 21 pages.

Letter to R.L. Kratzer, from T.J. Vezeau, Re: U.S. Appl. No. 6,374,231, dated Jan. 10, 2003 (with various attachments), 128 pages.

Memo to Bruce Bent, from Bruce Bent II, Re: S&M Status, Oct. 15, 1997 (cc: Arthur, Mary, Marianne, Joe, Pat, Cathy, Michelle), 1 page.

Memo to Marianne, Ralph, Customer Service, from Bruce Bent II, Re: Reserve IDA, Sep. 4, 1997, 1 page.

Memo to Marianne, Pat, Bruce Bent, from Bruce Bent II, Re: Reserve Insured Deposit Account, Sep. 4, 1997, 1 page.

American Express—Meeting Notes, Sep. 26, 2000, 2 pages.

American Express Financial Advisors Customized FDIC Product with Tiered Balances, Jan. 24, 2001, 2 pages.

American Express Conference Call Minutes, Topic: Tiered Balances, Jan. 25, 2001 @ 3:00pm-4:00pm, 2 pages.

Letter to A.J. Bufalino, from C.R. Macedo, Re: Reserve Management Corporation, Wayne Hummer Investments LLC, May 8, 2007, (enclosing Jan. 3, 2006 letter to A.J. Bufalino, Feb. 23, 2006 letter to A.J. Bufalino, Mar. 16, 2006 letter to C. Macedo, U.S. Appl. No. 6,374,231, U.S. Publication No. 2002/0091637 A1, U.S. Publication No. 2005/0108149 A1, U.S. Publication No. 2005/0228733 A1, U.S. Publication No. 2006/0212385 A2, U.S. Publication No. 2006/0212389 A2), 510 pages.

Merrill Lynch & Co., Inc., Form 10-K405 (Annual Report (Regulation S-K, item 405)), Filed Mar. 14, 2002 for the Period Ending Dec. 28, 2001, 248 pages.

Merrill Lynch, "Information Statement Regarding changes to Interest Rates on Deposits in the Merrill Lynch Banks," Nov. 12, 2007, 2 pages.

QUESTessentials, "Quest Insured Account," May 17, 1994, 3 pages.

Information Statement, "Quest Insured Account," (attached Appendix A), 5 pages.

OCC Insured Bank Deposit Account (attached are p. 2 of Quest for Value Funds Daily Data, Jun. 1993; OCC Insured Account Rate Table), 3 pages.

CIBC World Markets, "Insured Bank Deposit Account," Information Statement, Jul. 1, 2000, 2 pages.

Letter to Client, from M.J. Hensle, Re: Salomon Smith Barney Bank Deposit Program^SM, (attached Q&A: Important Information about the New Salomon Smith Barney Bank Deposit Program), Aug. 16, 2020, 14 pages.

Salomon Smith Barney, "Bank Deposit Program Disclosure Statement," 3 pages.

FDIC, FDIC Law, Regulations, Related Acts—4000—Advisory Opinions, Oct. 22, 1987, J. W. Via, Jr., Counsel [online] [Retrieved on Jan. 22, 2010]. Retrieved from the Internet: URL: <http://www.fdic.gov/regulations/laws/rules/4000-2560.html>, 1 page.

FDIC, FDIC Law, Regulations, Related Acts—4000—Advisory Opinions, Jun. 28, 1993, J. A. DiNuzzo, [online] [Retrieved on Jan. 22, 2010]. Retrieved from the Internet: URL: <www.fdic.gov/regulations/laws/rules/4000-8240.html>, 2 pages.

FDIC, FDIC Law, Regulations, Related Acts—4000—Advisory Opinions, Jul. 23, 1986, D. H. Jones [online] [Retrieved on Jan. 22, 2010]. Retrieved from the Internet: URL: <www.fdic.gov/regulations/laws/rules/4000-2120.html#fdic400086-21>, 2 pages.

Merrill Lynch—Pierce, Fenner & Smith, Inc., "The Merrill Lynch Cash Management Account®," Financial Service, Jan. 1985, 18 pages.

Merrill Lynch, "Insured Savings™ Account Fact Sheet," The Merrill Lynch Cash Management Account® Financial Service, 11 pages.

CMA, "A Guide to Your CMA Account," Jan. 1995, 38 pages.

American Banker, Salomon's Sweep Plan Raises FDIC Fund Alarm [online], Dec. 6, 2000 [retrieved on Apr. 13, 2009]. Retrieved form the Internet: <URL: http://www.americanbanker.com/printthis.html?id=2000120603YJGEZD>, 2 pages.

The Insured Deposit Account: "Money in the Bank," p. 5; Three Little Letters. Three Big Ways to Save in 1998, p. 4.

LexisNexis, The American Banker, Sep. 23, 1983, Merrill Joins Money Market Account, CMA; Broker Begins Testing With 12 Institutions, Byline: A. Arvan, 4 pages.

Merrill Lynch & Co Inc—MER, 10k Wizard, Form 8-K, "Report of Unscheduled Material Events or Corporate Changes," Filed Mar. 7, 2002, 51 pages.

Federal Reserve System, Lexsee 51 FR 9632, "Definition of Deposit and Technical Amendments," Action: Final Rule, Mar. 20, 1986, 13 pages.

Federal Reserve System, Lexsee 56 FR 15494, "Regulation D--Reserve Requirements of Depository Institutions," Action: Final Rule, Apr. 17, 1991, 5 pages.

Federal Reserve System, Part 201—Reserve Requirements of Depository Institutions (Regulation D)12 CFR Ch. II (1-1-10 Edition), pp. 94-128, Pt. 204-Pt. 205.

Letter to G.T. Schwartz, from O.I. Ireland, dated Jun. 22, 1988, Re: response to letter of Dec. 18, 1987 regarding proposed modifications to Merrill Lynch's CMA Program, 5 pages.

Federal Reserve System, Lexsee 47 FR 55207, "Reserve Requirements of Depository Institutions; Money Market Deposit Account," Dec. 8, 1982, Action: Final Rule, 5 pages.

Insured Bank Deposits™ Program Summary Information Statement, 11 pages.

Insured Bank Deposits™ Program Information Statement, (attached List of Eligible Program Banks, Effective May 9, 2002; New Account Application, Joint Account Agreement), 11 pages.

Wayne Hummer Investments, "Insured Bank Deposits™ Program, Frequently Asked Questions," 4 pages.

American Express—Meeting Notes Sep. 26, 2000, 2 pages.

American Express Financial Advisors Customized FDIC Product with Tiered Balances, Jan. 24, 2001, 2 pages.

American Express Conference Call Minutes, Jan. 25, 2001 @ 3:00pm-4:00pm, Topic: Tiered Balances, 2 pages.

Memorandum to M. Peterson, J. Whitt, R. Wroten, E. Naumes, E. Deal, B. McCain, from J.E. Oncken, Jun. 15, 1990, Re: Insured Savings Update (with attachments), 7 pages.

Insured Savings, "Correspondent Agreement," including Exhibits A-D, 28 pages.

Insured Savings, "Project Team Meeting," Feb. 2, 1989, 21 pages.

Insured Savings, "Overview & Marketing Plan," Presented by: J.E. Oncken, Dec. 6, 1988, (including Exhibit A), 23 pages.

Letter to V.J. Best, from J.E. Oncken, dated Apr. 18, 1988, 2 pages.

Letter to M.L. Duke from K. Johnson, dated Dec. 27, 1989, (attached Insured Savings Correspondent Agreement, Exhibits A-D, letter to M.L. Duke from K. Johnson dated Nov. 21, 1989 and Account Information Sheet), 39 pages.

Memorandum to J. Oncken, J. Scurlock, B. Standefer, E. Piner, T. Cyr, from K. Johnson, dated Jul. 5, 1990, Re: Attached Insured Savings Letters (with attachments), 9 pages.

E.D.S.—First City Austin Electronic Mail, from J. Oncken, to T. Cyr, Re: Depository Levels at Insured Savings Depositories, Nov. 2, 1989, 1 page.

Cash Management Balance Monitoring Agreement and Memorandum from Ed Piner to Cash management Line of Business Representatives dated May 21, 1991(with attachments), 8 pages.

Merrill Lynch, Insured Savings Account Fact Sheet, The Merrill Lynch Cash Management Account® Financial Service, Jan. 1986, 4 pages.

Merrill Lynch Money Markets, Inc., Merrill Lynch Capital Markets, "The Insured Savings Account, Issuer Guide to Offering MMDAs through Merrill Lynch," Sep. 1986; 36 pages.

Merrill Lynch, The Merrill Lynch Capital Builders$^{SM}$ Account Financial Service, Insured Savings$^{SM}$ Account Participating Depository Institutions, 1996, 2 pages.

Insured Deposit Account, May 21, 1996, 14 pages.

An Introduction to the Smith Barney Insured Deposit Account, 8 pages.

Smith Barney Inc. Capital Markets, Debt Origination Group Memo, to J. Mandelbaum, from T. Hamilton, cc: R. Holloman, H. Bald, S. Becton, Re: Insured Deposit Account, Oct. 10, 1995; Smith Barney Inc. Capital Markets, Debt Origination Group Memo, to B. Holloman, from T. Hamilton, cc: W. Heinzerling, H. Morris, COPs, Re: New Product Proposal for Insured Deposit Account, Sep. 18, 1995, 2 pages.

Insured Deposit Account, Product Description for the Investor, Draft as of Sep. 20, 1995, 8 pages.

Promontory Interfinancial Network, 3, Sheets, http://www.promnetwork.com/index.html, (2003).

Mutual Funds Magazine, Bargain Basement Funds, Oct. 1997, 2 Sheets.

Mutual Funds Magazine, Bargain Basement Funds, Oct. 1997, 1 Sheet.

Mutual Funds Magazine, Bargain Basement Funds, Oct. 1997, 1 Sheet.

Money Fund Report, IBC Financial Data, Inc., Nov. 6, 1998, 1 Sheet.

Liberman et al., Market Watch, "How Important are Banks?" FDIC Insurance on Deposits Just One Continuing Advantage, Oct. 17, 2006, 3 Sheets.

Declaration of Mr. Bruce Bent II, Vice Chairman and Registrant of Applicant. (3 Sheets) and Exhibits A, B, C and D (6 Sheets).

Anderson et al. "Retail Sweep Programs and Bank Reserves," Federal Reserve Bank of St. Louis Review, Bell & Howell Information and Learning Company, vol. 83, Issue 1, 24 Sheets, Jan. 1, 2001.

Announcing Changes in Automatic "Sweep" Investment Options, LPL Financial Services, Linsco/Private Ledger, Member NASD/SIPC, 26 Sheets.

Insured Cash Account Program Disclosure Booklet, LPL Financial Services, Linsco/Private Ledger, Member NASD/SIPC, 14 Sheets.

California Independent Bankers, ICBA Independent Community Bankers of America, Banker Bulletin, 2006, CIB 16th Annual Convention, vol. 4, Issue 6, http://www.cib.org/banker_bulletin.htm 2 Shhets.

AB 2011 Assembly Bill—Chaptered, http://www.leginfo.ca.gov/pub/bill/asm/ab_2001-2050/ab_bill_20060925_chaptered.html, 2006, pp. 1-3.

AB 2011 Assembly Bill—Enrolled, http://www.leginfo.ca.gov/pub/bill/asm/ab_2001-2050/ab_2011_bill_20060816_enrolled.html, 2006, pp. 1-3.

AB 2011 Assembly Bill—History, Complete Bill History, http://www.leginfo.ca.gov/pub/bill/asm/ab_2001-2050/ab_2011_bill_20060925_history.html, 2006, p. 1.

AB 2011 Assembly Bill—Bill Analysis, Senate Amendments http://www.leginfo.ca.gov/pub/bill/asm/ab_2001-2050/ab_2011_cfa_20060811_161755_asm_floor.html, 2006, pp. 1-3.

AB 2011 Assembly Bill—Bill Analysis, Senate Rules Committee, Third Reading, http://www.leginfo.ca.gov/pub/bill/asm/ab_2001-2050/ab_2011_cfa_20060705_161454_sen_floor.html.2006, pp. 1-7.

The Reserve Funds Press Release "The Reserve Funds and Frontier Bank Partner to Offer Revolutionary Banking Product," 5 Sheets, Aug. 1, 2000.

U.S. Appl. No. 60/307,815, filed Jul. 27, 2001.

U.S. Appl. No. 60/323,865, filed Sep. 20, 2001.

Letter From William W. Wiles, Secretary of the Board, Board of Governors of the Federal Reserve System, Jun. 22, 1983, 6 Sheets.

DI 48, Excerpts of Transcript of Hearing, U.S. Dist. Ct., District of Delaware, Civil Action No. 82-680, Apr. 8, 1983, 5 sheets.

DI 56, Interrog. Response, U.S. Dist. Ct. District of Delaware, Civil Action No. 82-680, May 20, 1983, 15 Sheets.

DI 99, Suppl. Interrogatory Response, U.S. Dist. Ct., District of Delaware, Civil No. 82-630, May 30, 1984, 6 Sheets.

Letter from Michael Bradfield, General Counsel, Board of Governors of the Federal Reserve System, Nov. 16, 1984, 4 Sheets.

Board of Governors of the Federal Reserve System, 1984 Fed. Res. Interp. Ltr. LEXIS 56, Nov. 16, 1984, 3 Sheets.

Letter From Oliver I. Ireland, Associate General Counsel, Board of Governors of the Federal Reserve System, Jun. 22, 1988, 5 Sheets.

Board of Governors of the Federal Reserve System, 1988 Fed. Res. Interp. Ltr. LEXIS 141, Jun. 22, 1988, 3 Sheets.

Board of Governors of the Federal Reserve System, 1989 Fed. Res. Interp. Ltr. LEXIS 77, Mar. 14, 1989, 2 Sheets.

Board of Governors of the Federal Reserve System, 1989 Fed. Res. Interp. Ltr. LEXIS 154, Jan. 21, 1989, 2 Sheets.

Board of Governors of the Federal Reserve System, 1990 Fed. Res. Interp. Ltr. LEXIS 94, Feb 1, 1990, 1 Sheet.

Board of Governors of the Federal Reserve System, 1991 Fed. Res. Interp. Ltr. LEXIS 232, Jan. 30, 1991, 2 Sheets.

CMA, The Merrill Lynch Cash Management Account Financial Service, Insured Savings Account Participating Depository Institutions, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Nov. 1992, 2 Sheets.

Board of Governors of the Federal Reserve System, 1994 Fed. Res. Interp. Ltr. LEXIS 156, Jun. 24, 1994, 3 Sheets.

CMA, Insured Savings Account Fact Sheet, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Jul. 1994, pp. 47-54.

Board of Governors of the Federal Reserve System, 1994 Fed. Res. Interp. Ltr. LEXIS 314, Oct. 17, 1994, 2 Sheets.

Board of Governors of the Federal Reserve System, 1994 Fed. Res. Interp. Ltr. LEXIS 419, Oct. 14, 1994, 4 Sheets.

CMA, The Merrill Lynch Cash Management Account Financial Service, Insured Savings Account Participating Depository Institutions, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Mar. 1995, 2 Sheets.

Letter from Stephanie Martin, Assoc. General Counsel, Board of Governors of the Federal Reserve System, Apr. 22, 2004, 8 Sheets.

Bank Deposit Program, Online http://web.archive.org/web/2003062010011?http://www.smithbarney.com/products servi, Jan. 19, 2001, 4 Sheets.

Letter From Jamey Basham, Attorney, LEXSEE 1990 FDIC Interp. Ltr., Lexis 1, Federal Deposit Insurance Corporation, FDIC-90-02, Jan. 3, 1990, 2 Sheets.

Letter From Colleen Curran Harvey, Deputy Chief Counsel, Jan. 8, 1985; Letter From Merle Y. Waldman, Nov. 14, 1984; Letter From Merle Y. Waldman, Sep. 24, 1984; Letter From Merle Y. Waldman, Aug. 8, 1984, Lexsee 1985 Sec No- Act., Lexis 1593, Securities Exchange Act of 1934—Section 15(a), 11 Sheets.

The Insured Savings Account, Issuer Guide to Offering MMDAs Through Merrill Lynch, Merrill Lynch Money Markets, Inc., "Operational Guide to the Merrill Lynch MMDA Program 1986", Sep. 1986 3 Sheets.

FDIC Federal Register Citations: Email from Bert Ely to Comments, Mar. 8, 2006, Subject: Large-Bank Deposit Insurance Determination Proposal- RIN 3064-AC98—Regs@fdic.gov. Attached, also from FDIC Federal Register Citations: Email From American Banker, by Bert Ely, Feb. 24, 2006, Viewpoint: FDIC's Account-Link Plan a Pointless, Costly Threat.

Letter to Mr. Jonathan L. Levin, Esq., From Oliver Ireland, Associate General Counsel, Oct. 18, 1996, 2 Sheets.

Letter to Mr. L.P. Fleming, Jr., Esq., From Oliver Ireland, Associate General Counsel, Feb. 7, 1995, 3 Sheets.

## US RE43,246 E

Page 7

Letter to Mr. James E. Creekman, Group Vice President, From Oliver Ireland, Associate General Counsel, Aug. 1, 1995, 4 Sheets.

Letter to Ms. Brenda L. Skidmore, Senior Vice President, From Oliver Ireland, Associate General Counsel, Aug. 30, 1995, 4 Sheets.

Part: 2, Monetary Policy and Reserve Requirements, Subpart—Regulation D, Board Interpretations of Regulation D, Transaction Accounts—Linked to Time Deposits, vol. 1, Federal Reserve Regulatory Service, 2 Sheets.

12 C.F.R. Part 329—Interest on Deposit, Source: 51 FR 10808, Mar. 31, 1986, 5 Sheets.

Merriam-Webster Online Dictionary, 10th Edition, Definition of "Associated", 2 Sheets.

Merrill Lynch & You, "Financial Services The Way You Want, When You Want Them," Jan. 2000 4 Sheets.

Merrill Lynch, Pierce, Fenner & Smith Incorporated, "Information Statement," 2000, 12 Sheets.

Lawsuit by Island Intellectual Property LLC, Lids Capital. LLC, Double Rock Corporation and Intrasweep LLC, against Promontory Interfinancial Network, LLC, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Complaint, Apr. 14, 2009, Case No. 09 CV 3750.

Lawsuit by Promontory Interfinancial Network, LLC against Double Rock Corporation, p/k/a Reserve Management Corporation, Island Intellectual Property LLC and Lids Capital LLC, including Cover Sheet, Summons and Complaint, Apr. 14, 2009, Civil Action No. 3:09 CV 217.

Lawsuit by Promontory Interfinancial Network, LLC against Double Rock Corporation p/k/a Reserve Management Corporation, Island Intellectual Property LLC, Lids Capital LLC and Intrasweep LLC, Amended Complaint, Apr. 15, 2009, Civil Action No. 3:09 CV 217.

Capital Briefs: Corporate Checking Account Relief Sought, American Banker, vol. 162, Jul. 28, 1997, 1 Sheet.

CMA, Insured Savings Account Fact Sheet, Merrill Lynch, Pierce, Fenner & Smith Incorporated, 1997, pp. 49-57.

CMA, The Investor Credit Line Service, Cost-Effective Financing for the '90s, Merrill Lynch, Pierce, Fenner & Smith Incorporated, 1997, pp. 36-46.

CMA, The Merrill Lynch Cash Management Account Financial Service, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Jan. 1997, 35 Sheets.

Deposit Growth Strategies for Financial Institutions, New Sweep Account Helps Retain $40 Million in Business Deposits, vol. 7, No. 12, The Reserve Funds, May 2001, 1 Sheet.

FDIC, Federal Deposit Insurance Corporation, Letter to Mr. Ronald Rexter, Feb. 28, 2003, From Michelle M. Borzillo, Counsel Supervision and Legislation Section, 2 Sheets.

Financial Services Industry, "Web Watch: Trading Company Bundles CDs for Better Rates," Community Banker, Jun. 2002, online, http://findarticles.com/p/articles/mi_ga5344/is_200206/ai_n21313883/.

Finistar, Providing FDIC Insured Funds as a Stable Source of Deposits to Commercial Banking Institutions, 16 Sheets, www.Finistar.com.

Frost Bank, Member FDIC, Checking Accounts, 1 Sheet, Sep. 19, 2003, https://www.frostbank.com/cgi-bin/ecomm/frost1/scripts/products/product_detail.jsp?BV_ . . .

In The Know, Important Information About Your Account, Smith Barney Citigroup, 2005, 6 Sheets.

Letter From Joseph A. DiNuzzo, Counsel, Oct. 20, 1999, FDIC, Federal Deposit Insurance Corporation, 1 Sheet.

Letter From Roger A. Hood, Assistant General Counsel, Jul. 16, 1986, FDIC, Federal Deposit Insurance Corporation, Legal Division, 1 Sheet.

Merrill Lynch Announces Beyond Banking, The Power of Advice For Smarter Cash Management, Jan. 8, 2 Sheets.

Merrill Moves CMA Cash to Bank, Street Talk, on Wall Street, Nov. 2000, p. 26.

Money Fund Report, Bank of New York Adds Insured Sweeps Option, Friday, May 3, 2002, The Reserve Funds, 1 Sheet.

Money Fund Report, Insured Cash Sweep Options Proliferate, Friday, Jun. 1, 2001, The Reserve Funds, 1 Sheet.

Money Market Insight's, Goldman Sachs May Create Bank to Offer Insured Cash Sweeps, Aug. 2002 Issue, 3 Sheets.

Munk, Merrill Makes New Push Into Traditional Banking, Dow Jones Newswires, Jan. 3, 2003, 1 Sheet.

O'Brian, "Money-Market Funds Suit Many Investors, But Proud Creator Frets About Extra Risk," Re-Printed From the Wall Street Journal, Monday, Nov. 6, 2000, Dow Jones & Company, Inc., 2 Sheets.

On Wall Street, Helping Brokers Build A More Successful Business, The Power of Cash, Jun. 2002, 2 Sheets.

On Wall Street, Helping Brokers Build A More Successful Business, Unusual Products For Unusual Times, May 2001, 2 Sheets.

Online, www.usabancshares.com, Brave New World, 1999, 2 Sheets. Ring, National/Global, "Amex Spans The Globe in Retail Bank Buildup," Nov. 27, 2000, 1 Sheet.

Sweeping Your Firm Into FDIC Insured Deposits, Harken Financial Services, Aug. 4, 2006, 8 Sheets.

Testimony of Bruce R. Bent, CEO of The Reserve Funds, Before The Financial Institutions and Consumer Credit Subcommittee House Financial Services Committee U.S. House of Representative, Hearing On H.R. 758 and H.R. 859, Mar. 5, 2003, 4 Sheets.

The Depository Trust Company, B#: 3875, Oct. 1, 2002, Settlement/Underwriting, From: Denise Russo, Director, Underwriting, 6 Sheets.

The Reserve Funds, Objectives, Observations & Strategies for American Enterprises Inv., Oct. 18, 2000, 11 Sheets.

The Reserve Funds, NJBA Endorses New Sweep Account Offers New Jersey Banks Deposit Growth, Retention, for Immediate Release, May 23, 2001, 1 Sheet.

The Reserve Funds, Reserve Management and Irwin Union Bank and Trust Company Partner to Offer The Reserve Return Sweep, For Immediate Release, Mar. 8, 2001, 2 Sheets.

The Unmatched Sweep Solution From the Cash Management Expert, 2 Sheets.

Waddell, "Sweeping Clean," Advisor, The Advisor to Advisors, 2 Sheets.

Lawsuit by Island Intellectual Property LLC, Intrasweep LLC and Double Rock Corporation against Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Complaint for Patent Infringement, May 19, 2009, Case No. 09 CIV 4673.

Lawsuit by Promontory Interfinancial Network, LLC against Double Rock Corporation p/k/a Reserve Management Corporation, Island Intellectual Property LLC, Lids Capital LLC and Intrasweep LLC, Complaint, May 19, 2009, Civil Action No. 3:09 CV 322.

Lake Forest Bank & Trust Company, Introducing MaxSafe Deposit Accounts with up to $3.75 Million in FDIC Insurance, www.lakeforestbank.com/maxsafe, 2 Sheets.

Seven Times the Security of a Normal CD, Introducing our MaxSafe CD, 4 Sheets.

Introducing our MaxSafe CD with up to $700,000 of FDIC Insurance, 4 Sheets.

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Consolidated First Amended Complaint, Jury Trial Demanded, Jun. 11 2009, Civil Action No. 09 CIV 2675 (VM).

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Answer and Counterclaims, Answer of Defendant Promontory Interfinancial Network, LLC, Jun. 25, 2009, Case No. 09 CV 2675 (VM).

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Answer and Counterclaims, Answer of Defendant MBSC Securities Corporation, Jun. 25, 2009, Case No. 09 CV 2675 (VM).

**US RE43,246 E**

Page 8

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC's Answer to Consolidated First Amended Complaint and Counterclaims, Jun. 25, 2009, Civil Action No. 09 CIV 2675 (VM).

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Jury Trial Demanded, Deutsche Bank Trust Company Americas' Answer to Consolidated First Amended Complaint and Counterclaims, Jun. 25, 2009, Civil Action No. 09 CIV 2675 (VM).

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Jury Trial Demanded, Deutsche Bank AG's Answer To Consolidated First Amended Complaint, Jun. 25, 2009, Civil Action No. 09 CIV 2675 (VM).

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, The Island Plaintiffs' Reply to Defendant Promontory Interfinancial Network LLC's Counterclaims, Jul. 9, 2009, Civil Action No. 09 CIV 2675 (VM).

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, The Island Plaintiffs' Reply to Defendant MBSC Securities Corporation's Counterclaims, Jul. 9, 2009, Civil Action No. 09 CIV 2675 (VM).

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, The Island Plaintiffs' Reply to Defendant Deutsche Bank Trust Company Americas' Counterclaims, Jul. 9, 2009, Civil Action No. 09 CIV 2675 (VM).

Dreyfus Insured Deposit Program, Disclosure Statement and Terms and Conditions, Dreyfus A BNY Mellon Company, 8 Sheets.

Dreyfus Insured Deposit Program, Multiple List Program—Effective May 11, 2009, 1 Sheet.

Finistar Reg. No. 2,939,558, Registered Apr. 12, 2005.

The Pershing Press, Dreyfus Insured Deposit Program, Issue 2, Aug. 2008, http://www.pershing.com/news/pershing_press/news_466244.html, 1 Sheet.

Memorandum from Ken Johnson re: Insured Deposit Products, Aug. 18, 1992, 3 pgs.

Memorandum from John E. Oncken re: Insured Savings Update, Jun. 15, 1990, 7 pgs.

Memorandum from John E. Oncken re: *Brokered Deposit Issue* vs. *Insured Savings*, Mar. 22, 1990, 8 pgs.

Memorandum from Ed Piner re: Insured Savings Product Update, Feb. 1, 1990, 4 pgs.

Insured Savings Correspondent Agreement with Exhibits A-D, 28 pgs.

First City, Texas Insured Savings Agency Agreement with Exhibits A-B and Insured Savings Program, 10 pgs.

Product Bulletin from Bill McCain, Subject: Insured Savings Product Announcement, May 8, 1989, 7 pgs.

Insured Savings Project Team Meeting, Feb. 2, 1989, 16 pgs.

Insured Savings Product Description, Product Name: Insured Savings, Product Description: U.S. Appl. No. 4,985,833, 3 pgs.

Letter to Tim C. Lear, Sep. 20, 1988, 1 pg., with Memorandum from Ed Piner, re: Insured Savings Product, Nov. 9, 1988, and Letter from Tara L. Cyr, Dec. 9, 1988, 1 pg.

Automatic Insured Deposit Method, Patent Application Information, Jul. 11, 1988, 17 pgs.

Insured Savings, Overview & Marketing Plan, Dec. 6, 1988, 23 pgs.

Memorandum from Dick Zinser, re: A First City-Austin deposit program to hold existing customers' deposits, Mar. 17, 1988, 7 pgs.

Insured Savings Remote Site Sweep Procedures, 3 pgs.

Letter to Malcolm L. Duke, Dec. 27, 1989 with Insured Savings Correspondent Agreement, Exhibits A-D, and Letter to Malcolm L. Drake, Nov. 21, 1989, 37 pgs.

Memorandum from Ken Johnson, re: Attached Insured Savings Letters, Jul. 5, 1990, 1 pg.

Letter to Jerry Crutsinger, Jul. 3, 1990, 1 pg.

Letter to Bill Goertz, Jul. 3, 1990, 1 pg.

Letter to Susan Goodwin, Jul. 3, 1990, 1 pg.

Insured Savings Rate Change Notice, 1 pg.

Addendum to Insured Savings Agency Agreement, 1 pg.

Letter to Paula Martin, Jul. 3, 1990, 1 pg.

Letter to John Lovell, Jul. 3, 1990, 1 pg.

Insured Savings Balance Limits form, 1 sheet.

Email from John Oncken re: Depository Levels at Insured Savings Depositories, Nov. 2, 1989, 1 pg.

Cash Management Balance Monitoring Agreement Form 1 sheet.

Memorandum from Ed Piner, Subject: Discontinuation of Automatic Balance Monitoring in conjunction with Insured Savings Accounts, May 21, 1991, 1 pg.

Blank form letter from Edward N. Piner, May 24, 1991, 1 pg.

Letter from First City National Bank of Austin, Sep. 20, 1982, 5 pgs.

First City, Texas—Austin, Special Products, Feb. 20, 1992, with Schedule A & Schedule B, 6 pgs.

Letter From William W. Wiles, Secretary of the Board, Board of Governors of the Federal Reserve System, Jun. 22, 1983, 6 Sheets. (Previously disclosed).

Letter From Oliver I. Ireland, Associate General Counsel, Board of Governors of the Federal Reserve System, Jun. 22, 1988, 5 Sheets. (Previously disclosed).

Alliance Journal Account, Information Statement, Sep. 1999, 6 sheets.

Lawsuit by Carlo DeBlasio et al. And Merrill Lynch & Co., Inc. et al., Opinion and Order, Jul. 27, 2009, Civil Action No. 07 CIV. 318, 47 pgs.

Lawsuit by Carlo DeBlasio et al. And Merrill Lynch & Co., Inc. et al., Second Amended Class Action Complaint, Jury Trial Demanded, Jun. 11, 2007, Civil Action No. 07 cv 318, 137 pgs.

Investors MoneyAccount*SM* and Insurance Plus Service Agreement, Schedule A, 3 sheets.

Investors MoneyAccount*SM* (an FDIC-insured money market account), 4 sheets.

Investors MoneyAccount*SM* The FDIC-Insured Money Market with an Important Plus., 2 sheets.

Investment Company Act of 1940—Section 3(a)(1), 2(a)(36); Securities Act of 1933—Section 2(1), Nov. 29, 1985, Kempter Financial Services, Inc., 9 pgs.

Insured Money Account Program Agreement and Disclosure Statement, 11 sheets.

First National Bank in Brookings, Certificates of Deposit, 5 sheets.

Board of Governors of the Federal Reserve System, Blank Form Letter, Apr. 22, 2004, 8 pgs.

FDIC Law, Regulations, Related Acts, 4000—Advisory Opinions, FDIC-93-35, Jun. 28, 1993, 2 sheets.

§204.134, 12 CFR Ch. 11 (Jan. 1, 2009 Edition), 2 sheets.

Money Fund $$ Moving to Bank Deposits, 6 *FRC Monitor*, Dec. 2003, 2 sheets.

Crane, P. & Krasner, Mike, *An iMoney Net Special Report*, "Brokerage Cash Sweep Options: The Shift from Money Funds to FDIC-Insured Bank Deposit Accounts", Nov. 2004, 64 pgs.

The May 1998 Senior Financial Officer Survey, *Board of Govenors of the Federal Reserve System*, with Appendix A, 48 pgs.

Interest Rate Review© A Publication of *Meyer Weekly Interest Rate Survey*, A Look At Tiers, vol. II, No. 4, Apr. 1987, 6 pgs.

Interest Rate Review© A Publication of *Meyer Weekly Interest Rate Survey*, A Study of Historical Rates and Yields, vol. II, No. 6, Jun. 1987, 8 pgs.

Blank form letter to Oliver Ireland, Oct. 7, 1994, 1 pg.

Letter to L.P. Fleming, Jr. Esq., Feb. 7, 1995, 3 pgs.

Letter to James E. Creekman, Aug. 1, 1995, 4 pgs.

**US RE43,246 E**

Page 9

Letter to Brenda L. Skidmore, Aug. 30, 1995, 4 pgs.
Merrill Lynch & Co., Inc. Form 10-K405 (Annual Report (Regulation S-K, item 405)), Filed Mar. 14, 2002 for the Period Ending Dec. 28, 2001, with Schedules, Exhibits, and 2001 Annual Report, 248 pgs.
Merrill Lynch & You, "Financial Services The Way You Want, When You Want Them," Jan. 2000, 4 Sheets. (Previously disclosed.)
Merrill Lynch, Pierce, Fenner & Smith Incorporated, "Information Statement," 2000, 12 Sheets. (Previously disclosed.)
Merrill Lynch, Information Statement Regarding Changes to Interest Rates on Deposits in the Merrill Lynch Banks, Document 64-14, Nov. 12, 2007, Case 1:07-cv-00318, 2 sheets.
Street Talk, "Merrill Moves CMA Cash to Bank", *On Wall Street*, Nov. 2000, 1 sheet.
Quest Insured Account, *QUESTessentials,* 3 sheets.
Quest Insured Account, *Information Statement,* 5 sheets.
OCC Insured Bank Deposit Account, 3 sheets.
Insured Bank Deposit Account, *Information Statement,* Jul. 1, 2000, 2 sheets.
Letter from Marilyn J. Hensle, announcing Salomon Smith Barney Bank Deposit Program,*SM*, with Q&A, 14 sheets.
Bank Deposit program Disclosure Statement, *Salomon Smith Barney,* 3 sheets.
FDIC Law, Regulations, Related Acts, 4000—Advisory Opinions, FDIC-87-25, Oct. 22, 1987, 1 sheet.
FDIC Law, Regulations, Related Acts, 4000—Advisory Opinions, FDIC-86-21, Jul. 23, 1986, 2 sheets.
The Merrill Lynch Cash Management Account, Financial Service, 18 pgs.
The Insured Savings Account, Issuer Guide to Offering MMDAs through Merrill Lynch, 27 pgs.
Insured Savings Account Fact Sheet, The Merrill Lynch Cash Management Account Financial Service, 1987, 11 pgs.
CMA Insured Savings Account Fact Sheet, 1994, 9 pgs.
A Guide to Your CMA Account, 1995, 19 pgs.
Insured Savings Account Fact Sheet, The Merrill Lynch Cash Management Account Financial Service, 1985, 4 pgs.
CMA Insured Savings Account Fact Sheet, 1997, 13 pgs.
Blackwell, Rob, Salomon's Sweep Plan Raises FDIC Fund Alarm, *American Banker,* Dec. 6, 2000, 2 pgs.
Insured Deposit Account (IDA), May 21, 1996, 11 pgs.
An Introduction to the Smith Barney *Insured Deposit Account,* 1995, 8 pgs.
Memorandum from Ted Hamilton re: Insured Deposit Account, Oct. 10, 1995, 13 pgs.
The Insured Deposit Account: *"Money in the Bank",* 1997, 2 sheets.
Merrill Joins Money Market Account, CMA; Broker Begins Testing With 12 Institutions, *Lexis Nexis,* Sep. 23, 1983, 4 pgs.
Form 8-K Merrill Lynch & Co Inc—MER, Filed: Mar. 7, 2002, Report of unscheduled material events or corporate changes, 41 pgs.
Lawsuit by Island Intellectual Property LLC and Intrasweep LLC against Deutsche Bank Trust Company Americas and Total Bank Solutions, Complaint for Patent Infringement, Jury Trial Demanded, Feb. 23, 2010, Case No. 10 CV 1518, (Document 1).
Lawsuit by Island Intellectual Property LLC and Lids Capital LLC against Deutsche Bank Trust Company Americas and Total Bank Solutions, Complaint for Patent Infringement, Jury Trial Demanded, Mar. 16, 2010, Case No. 10 CV 2268.
Quest Cash Management Services Memorandum to Tom Duggan, Re: Quest Insure Account, Nov. 16, 1993.
Canada Deposit Insurance Corporation, 1 page, (http://www.cdic.ca/ e/index.html).
Canadian Payments Association, 2 pages, (http://www.cdnpay.ca/ home/home.asp).
Deutsche Bank Insured Deposit Program, Marketing Literature 2007, 3 pages.
Federal Register: Oct. 9, 1997 (vol. 62, No. 196), pp. 52809-52868. http://www.fdic.gov/news/news/inactivefinancial/1997/fil97111b. html.
Garnhausen, "Matching Small Banks with Large Muni Deposits," American Banker, Online The Financial Services Resource, Oct. 4, 2005, 4 pages, http://www.finstar.com/docs/AmericanBanker.html.

Hencke, "New Rules for FDIC deposit Insurance", ABA Bank Compliance, vol. 20, No. 7, Jul./Aug. 1999, pp. 31-37.
Jong et al., "The Valuation and Hedging of Variable Rate Savings Accounts," University of Amsterdam, Nov. 15, 2001, 23 Sheets.
Lawsuit by Carlo DeBlasio et al. against Merrill Lynch & Co., Inc. et al., Declaration of Andrew W. Stern, including Exhibits A, B, C, D, E and F, Nov. 12, 2007, Case No. 07-cv-318 (RJS) (Document 59).
Lawsuit by Carlo DeBlasio et al. against Merrill Lynch & Co., Inc. et al., Declaration of Joel P. Laitman in Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Dismissal of the Second Amended Class Action Complaint, Including: "Client Commitment"; "Get Started Today"; "Total Merrill"; "Guideline for Business Conduct"; "Commitment To Clarity"; "Cash Management Account"; "Information Statement Regarding Changes To Interest Rates On Deposits in Merrill Lynch Banks", . . .
Lawsuit by Carlo DeBlasio et al. against Merrill Lynch & Co., Inc. et al., Declaration of Joel P. Laitman in Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Dismissal of the Second Amended Class Action Complaint, Including: . . . Feb. 5, 2008 (Document 72).
Lawsuit by Carlo DeBlasio et al. against Merrill Lynch & Co., Inc. et al., Declaration of Joel P. Laitman in Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Dismissal of the Second Amended Class Action Complaint, Including: . . . Feb. 5, 2008 (Document 73).
Lawsuit by Carlo DeBlasio et al. against Merrill Lynch & Co., Inc. et al., Declaration of Joel P. Laitman in Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Dismissal of the Second Amended Class Action Complaint, Including: . . . Feb. 5, 2008 (Document 74).
Lawsuit by Carlo DeBlasio et al. against Merrill Lynch & Co., Inc. et al., Declaration of Joel P. Laitman in Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion For Dismissal of the Second Amended Class Action Complaint, Including: . . . Feb. 5, 2008 (Document 75).
Lawsuit by Carlo DeBlasio et al. against Merrill Lynch & Co., Inc. et al., Declaration of Kenneth I. Schacter, including Exhibits A, B, C, D, F, G, H, I, J, K, L, M, N, O, P, Q and R, Nov. 14, 2007, Case No. 07-cv-318 (RJS) (Document 69).
Lawsuit by Carlo DeBlasio et al. against Merrill Lynch & Co., Inc. et al., Declaration of Mathew J. Terry in Support of Motion to Dismiss by Defendants Wachovia Corporation, Wachovia Securities, LLC, Wachovia Bank, N.A., and Wachovia Bank of Delaware, N.A., including Exhibits A, B, C and D, Nov. 14, 2007, Case No. 07-318 (RJS) (Document 67).
Lawsuit by Carlo DeBlasio et al. against Merrill Lynch & Co., Inc. et al., Declaration of Scott D. Musoff in Support of The Merrill Lynch Defendants' Motion to Dismiss The Second Amended Class Action Complaint, ECF Case, Nov. 12, 2007, Case No. 07-cv-318 (RJS) (Document 64).
Lawsuit by Carlo DeBlasio et al. against Merrill Lynch & Co., Inc. et al., Reply Declaration of Kenneth Schacter including Exhibits S and T, Mar. 6, 2008, Case No. 07-cv-318 (RJS) (Document 81).
Lawsuit by Carlo DeBlasio et al. against Merrill Lynch & Co., Inc. et al., Second Amended Class Action Complaint, Jury Trial Demanded, Introduction and Summary of Allegations, Jun. 11, 2007, Case No. 07-cv-318-VM.
Lawsuit by Carlo DeBlasio et al. against Merrill Lynch & Co., Inc. et al., Supplemental Declaration of Matthew J. Terry in Support of Motion to Dismiss by Defendants Wachovia Corp., Wachovia Securities, LLC, Wachovia Bank N.A., and Wachovia Bank of Delaware, N.A., including Exhibits A and B, Mar. 6, 2008, Case No. 07-cv-318 (RJS) (Document 79).
Lawsuit by Carlo DeBlasio, et al. against Merrill Lynch & Co., Inc., et al., Opinion and Order Regarding Motions, Jul. 27, 2009, Case No. 07 CIV 318(RJS).
Lawsuit by Island Intellectual Property LLC and Intrasweep LLC against Institutional Deposits Corp., Complaint for Patent Infringement, Jury Trial Demanded, Nov. 4, 2009, Civil Action No. 09 CV 3079.

**US RE43,246 E**

Page 10

Lawsuit by Island Intellectual Property LLC and Intrasweep LLC, Answer of Defendant Institutional Deposits Corp. to Complaint for Patent Infringement, Dec. 10, 2009, Case No. 09 CV 03079 (JEC), (Document 16).

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Stipulated Dismissal of Deutsche Bank AG Without Prejudice, Nov. 19, 2009, Civil Action No. 09 CIV 2675 (VM) (AJP) (Document 79).

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Deutsche Bank Trust Company Americas' First Amended Answer to Consolidated First Amended Complaint and Counterclaims, Dec. 4, 2009, Civil Action No. 09 CIV 2675 (VM) (AJP), (Document 86).

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Total Bank Solutions, LLC's First Amended Answer to Consolidated First Amended Complaint and Counterclaims Dec. 4, 2009, Civil Action No. 09 CIV 2675 (VM) (AJP) (Document 87).

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation and Intrasweep LLC against Promontory Interfinancial Network LLC, MBSC Securities Corporation, Deutsche Bank AG, Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Stipulated Dismissal of Counts I-III of Defendant Promontory Interfinancial Network, LLC's, Counterclaim with Prejudice, Oct. 19, 2009, (Document 68).

Letter to William R. Burdette, CEO, Apr. 6, 2009, FDIC, Federal Deposit Insurance Corporation, 2 pages.

Letter to William R. Burdette, CEO, Nov. 15, 2007, FDIC, Federal Deposit Insurance Corporation, 5 Sheets.

Mutual Fund Dealers Association, 1 page, (http://www.mfda.ca/.

Total Bank Solutions, Bank Sweep FAQs http://www.totalbanksolutions.com/sweepbnkfaqs.htm, Sep. 23, 2005, 2 pages.

Total Bank Solutions, Bank Sweep FAQs, http://www.totalbanksolutions.com/sweepbnkfaqs.htm, Nov. 2, 2005, 3 pages.

Total Bank Solutions, Bank Sweep Products, Deutsche Bank, http://www.totalbanksolutions.com/banksweep.htm, Sep. 23, 2005, 1 page.

Total Bank Solutions, Bank Sweep Products, http://www.totalbanksolutions.com/banksweep.htm, Appendix 3, Oct. 18, 2005, 2 pages.

Total Bank Solutions, Bank Sweep Products, http://www.totalbanksolutions.com/banksweep.htm, Nov. 2, 2005, 2 pages.

Total Bank Solutions, Brokerage Sweep FAQs, http://www.totalbanksolutions.com/brokerfaqs.htm, Nov. 2, 2005, 3 pages.

Total Bank Solutions, Brokerage Sweep, http://www.totalbanksolutions.com/brokersweep.htm, Nov. 2, 2005, 1 page.

Total Bank Solutions, Deposit Bank FAQs, http://www.totalbanksolutions.com/depositbnkfaqs.htm, Nov. 2, 2005, 2 pages.

Total Bank Solutions, Deposits, Deutsche Bank, http://www.totalbanksolutions.com/deposits.htm, Sep. 23, 2005, 1 page.

Total Bank Solutions, Deposits, http://www.totalbanksolutions.com/deposits.htm, Nov. 2, 2005, 2 pages.

Total Bank Solutions, Deutsche Bank Insured Deposit Program, DB Insured Deposit Program Features, http://www.totalbanksolutions.com/features.htm, Sep. 23, 2005, 2 pages.

Total Bank Solutions, Deutsche Bank Insured Deposit Program, http://www.totalbanksolutions.com/, Sep. 23, 2005, 1 page.

Total Bank Solutions, http://www.totalbanksolutions.com/, Mar. 16, 2007, 8 pages.

Total Bank Solutions, http://www.totalbanksolutions.com/overview.htm, Nov. 2, 2005, 1 page.

Total Bank Solutions, Insured Deposit Program Features, http://www.totalbanksolutions.com/features.htm, Nov. 2, 2005, 2 pages.

Total Bank Solutions, Insured Deposit Program, http://www.totalbanksolutions.com/Insureddeposits.htm, Nov. 2, 2005, 2 pages.

Total Bank Solutions, Partners & Affiliates, http://www.totalbanksolutions.com/partners.htm, Nov. 2, 2005, 3 pages.

Total Bank Solutions, Partners & Affiliates, http://www.totalbanksolutions.com/partners.htm, Oct. 25, 2005, 3 pages.

Total Bank Solutions, Strategic Partners, Nov. 2, 2005, 1 page.

Total Bank Solutions, TBS Deposit Account, About Our Broker Products, http://www.totalbanksolutions.com/brokerproducts.htm, Sep. 7, 2005, 2 pages.

Total Bank Solutions, TBS Management Team, http://www.totalbanksolutions.com/management.htm, Appendix 1, Oct. 18, 2005, 1 page.

Total Bank Solutions, TBS Management Team, http://www.totalbanksolutions.com/management.htm, Nov. 2, 2005, 2 pages.

Total Bank Solutions, TBS Management Team, http://www.totalbanksolutions.com/management.htm, Oct. 25, 2005, 2 pages.

TotalBank Solutions, TBS Bank Deposit Account, Oct. 2004, 6 pgs.

TotalBank Solutions, web.archive.org/web/20050126044216/http://www.totalbanksolutions.com, Jan. 26, 2005, 2 pgs.

USA Mutual Partners Insured Cash Shelter Account Terms and Conditions, 11 pages, 2009 USA Mutuals Partners, Inc.

Wachovia Securities, Important Information for Clients Concerning Changes in Automatic "Sweep" Arrangements, Oct. 1, 2003, 6 sheets.

Amencan Express—Meeting Notes, Sep. 26, 2000, 2 pages.

Email to abufalino@vedderprice.com, from S. Johnson, Re: ReserveFunds and Wayne Hummer, dated Jul. 14, 2003 (attached email to S. Johnson, from abufalino@vedderprice.com on Jun. 26, 2003, Re: ReserveFunds and Wayne Hummer), 2 pages.

Fax to T. Vezeau, from L. Boone, Re: BBII's request to fax to you, dated Dec. 26, 2002 (attached Memo to K.A. Jacklin, from A. Rova, Re: Lert discovery, dated Dec. 23, 2002), 3 pages.

Letter to A.J. Bufalino, from C.R. Macedo, Re: Reserve Management Corporation, Wayne Hummer Investments LLC, Our File: 71297/80, dated Jan. 3, 2006, 2 pages.

Letter to A.J. Bufalino, from C.R. Macedo, Re: Reserve Management Corporation, Wayne Hummer Investments LLC, Our File: 71297/80, dated Feb. 23, 2006, 1 page.

Letter to A.J. Bufalino, from C.R. Macedo, Re: Reserve Management Corporation, Wayne Hummer Investments LLC, Our File: 71297/80, dated May 8, 2007, 2 pages.

Letter to A.J. Bufalino, from C.R. Macedo, Re: Reserve Management Corporation, Wayne Hummer Investments LLC, Our File: 71297/80, dated May 8, 2007 (attached Appendices 1-3) 6 pages.

Letter to A.J. Bufalino, from S. Johnson, Re: Response to May 29, 2003 letter/email correspondence, dated Aug. 5, 2003, 1 page.

Letter to A.J. Bufalino, from S. Johnson, Re: Response to May 29, 2003 letter/email correspondence dated Aug. 5, 2003 (enclosing Jul. 16, 2003 letter to T.M. McDonald, May 29, 2003 fax to B. Bent II, Jan. 10, 2003 letter to R.L. Kratzer, note page), 7 pages.

Letter to A.J. Bufalino, from S. Johnson, Re: U.S.P.N. 6,374,231, dated May 29, 2003, 2 pages.

Letter to A.J. Bufalino, from T.J. Vezeau, Re: U.S.P.N. 6,374,231, dated Feb. 11, 2003, 1 page.

Letter to C.R. Macedo, from A.J. Bufalino, Re: Reserve Management Corporation, Wayne Hummer Investments LLC, Our File: 71297/80, dated Mar. 16, 2006, 1 page.

Letter to C.R. Macedo, from A.J. Bufalino, Re: Reserve Management Corporation, Wayne Hummer Investments LLC, Our File: 71297/80, dated Mar. 16, 2006, 1 page.

Letter to J. Van De Graff, from R.L. Kratzer, Re: Reserve Management Corp. Assertion, dated Feb. 13, 2003, 1 page.

Letter to R.L., Kratzer, from T.J. Vezeau, Re: U.S.P.N. 6,374,231, dated Jan. 10, 2003, 1 page.

Letter to T.J. Vezeau, from A.J. Bufalino, Re: U.S.P.N. 6,374,231, dated Feb. 7, 2003, 1 page.

Letter to T.M. McDonald, from B. Bent II, Re: FDIC insured money market products, dated Jul. 16, 2003, 1 page.

Letter to T.M. McDonald, from B. Bent II, Re: FDIC insured money market products, dated Jul. 16, 2003 (enclosing Jul. 14, 2003 email to abufalino@vedderprice.com, May 29, 2003 letter to A.J. Bufalino, Feb. 13, 2003 letter to J. Van De Graaff, Feb. 11, 2003 letter to A.J. Bufalino, Feb. 7, 2003 letter to T.J. Vezeau, Jan. 10, 2003 letter to R.L. Kratzer), 9 pages.

Memo to Marianne, Pat, Bruce Bent, from Bruce Ben II, Re: Reserve Insured Deposit Account, Sep. 4, 1997, 1 page.

Case for "CORE" Deposits, Historic Degree of Stability, 2006, 1 page.

Lawsuit by Island Intellectual Property LLC, Lids Capital LLC, Double Rock Corporation, and Intrasweep LLC against Deutsche Bank Trust Company Americas, and Total Bank Solutions, LLC, Defendants' Preliminary Invalidity Contentions, Mar. 12, 2010, Civil Action No. 09 Civ. 2675 (VM) (AJP).

Lawsuit by Island Intellectual Property LLC and Intrasweep LLC against Institutional Deposits Corp., Defendant Institutional Deposits Corp.'s Preliminary Invalidity Contentions, Case No. 09-CV-03079-JEC.

Exhibit 1, Invalidity Chart: IMA and Insurance Plus Service Agreement, U.S. Patent No. 7,509,286, 21 pgs.

Exhibit 2, Invalidity Chart: Investors Money Account$^{SM}$ System, U.S. Patent No. 7,509,286, 26 pgs.

Exhibit 3, Invalidity Chart: Insured Money Account System, U.S. Patent No. 7,509,286, 26 pgs.

Exhibit 4, Invalidity Chart: U.S. Patent No. 4,985,833 (Oncken), U.S. Patent 7,509,286, 21 pgs.

Exhibit 5, Invalidity Chart: First City Bank of Texas' Insured Savings Program, U.S. Patent No. 7,509,286, 39 pgs.

Exhibit 6, Invalidity Chart: Quest Insured Account, U.S. Patent No. 7,509,286, 19 pgs.

Exhibit 7, Invalidity Chart: CIBC World Markets—Insured Bank Deposit Account, U.S. Patent No. 7,509,286, 16 pgs.

Exhibit 8, Invalidity Chart: Merrill Lynch CMA/ISA Service, U.S. Patent No. 7,509,286, 72 pgs.

Exhibit 9, Invalidity Chart: 1983 Fed Letter, U.S. Patent No. 7,509,286, 16 pgs.

Exhibit 10, Invalidity Chart: Merrill Lynch Banking Advantage Program ("MLBA Program"), U.S. Patent No. 7,509,286, 22 pgs.

Exhibit 11, Invalidity Chart: Merrill Lynch & You + MLBA Information Statement, U.S. Patent No. 7,509,286, 18 pgs.

Exhibit 12, Invalidity Chart: Smith Barney Insured Deposit Account, U.S. Patent No. 7,509,286, 22 pgs.

Exhibit 13, Invalidity Chart: Smith Barney Bank Deposit Program, U.S. Patent No. 7,509,286, 18 pgs.

Exhibit 14, Invalidity Chart: Alliance Insured Account, U.S. Patent No. 7,509,286, 16 pgs.

Exhibit 15, Invalidity Chart: Reserve's American Express Presentation, U.S. Patent No. 7,509,286, 16 pgs.

Exhibit 16, Invalidity Chart: U.S. Patent No. 7,376,606 (Jacobsen), U.S. Patent No. 7,536,350, 6 pgs.

Exhibit 17, Obviousness Combinations Chart, U.S. Patent No. 7,509,286, 351 pgs.

Adler, Joe, "Promontory to Roll Out Deposit Service Insuring Liquid Funds", American Banker, Feb. 22, 2010, 1 sheet.

Lawsuit by Island Intellectual Property LLC and Intrasweep LLC against Institutional Deposits Corp., Consent Order, Apr. 21, 2010, Case No. 09-CV-3079 (JEC).

Lawsuit by Island Intellectual Property LLC and Intrasweep LLC against Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC Deutsche Bank Trust Company Americas' answer to plaintiffs' Feb. 23, 2010 Complaint and Counterclaims, May 4, 2010, Civil Action No. 09. 2675 (VM) (AJP).

Lawsuit by Island Intellectual Property LLC and Intrasweep LLC against Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Total Bank Solutions, LLC's answer to plaintiffs' Feb. 23, 2010 Complaint and Counterclaims, May 4, 2010, Civil Action No. 09 Civ. 2675 (VM) (AJP).

Lawsuit by Island Intellectual Property LLC and Lids Capital LLC against Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Deutsche Bank Trust Company Americas' answer to plaintiffs' Mar. 16, 2010 Complaint and Counterclaims, May 4, 2010, Civil Action No. 09 Civ. 2675 (VM) (AJP).

Lawsuit by Island Intellectual Property LLC and Lids Capital LLC against Deutsche Bank Trust Company Americas and Total Bank Solutions, LLC, Total Bank Solutions LLC's answer to plaintiffs' Mar. 16, 2010 Complaint and Counterclaims, May 4, 2010, Civil Action No. 09 Civ. 2675 (VM).

Lawsuit by Island Intellectual Property LLC et al., against Deutsche Bank Trust Company Americas, et al.; Expert Report of Richard T. Powers Concerning Invalidity of U.S. Pat. Nos. 7,509,286; 7,519,551; 7,536,350; 7,668,771; 7,668,772, 7,672,886; and 7,680,734; and Exhibits A-R; Civil Action No. 09 Civ. 2675(VM)(AJP), Oct. 28, 2010; 1,119 pages.

Lawsuit by Island Intellectual Property LLC, et al. against Deutsche Bank Trust Company Americas, et al.; Expert Report of Ivan Zatkovich Regarding Validity and Enforceability of the Asserted Claims of the Patents-in-Suit; Civil Action No. 09 Civ. 2675 (VM)(AJP); Nov. 23, 2010; 192 pages. The redacted items were designated as confidential in a Protective Order in this case.

Lawsuit by Island Intellectual Property LLC, et al. against Deutsche Bank Trust Company Americas, et al.; Expert Report of the Honorable Gerald J. Mossinghoff and Exhibits A-E; Civil Action No. 09 Civ. 2675 (VM)(AJP); Nov. 23, 2010; 107 pages.

U.S. Appl. No. 12/025,402, filed Feb. 4, 2008, Bent.

Dreyfus Insured Deposit Program Disclosure Statement and Terms and Conditions, received Mar. 2008, 12 pages.

Lawsuit by Island Intellectual Property LLC against Clearview Correspondent Services, LLC, et al.; Complaint for Patent Infringement; Civil Action No. 1:11-cv-448 (LO/TRJ); Apr. 26, 2011; 55 pages.

Lawsuit by Island Intellectual Property LLC against First Southwest Company; Complaint for Patent Infringement; Civil Action No. 1:11-cv-00371-UNA; Apr. 26, 2011; 42 pages.

Lawsuit by *Island Intellectual Property LLC* v. *Clearview Correspondent Services, LLC, et al.;* Branch Banking & Trust Company's Answer to Complaint and Counterclaims; Civil Action No. 1:11-cv-448-LO-IDD; Jun. 20, 2011; 13 pages.

Lawsuit by *Island Intellectual Property LLC* v. *Clearview Correspondent Services, LLC, et al.;* Clearview Correspondent Services, LLC's Answer to Complaint and Counterclaims; Civil Action No. 1:11-cv-448-LO-IDD; Jun. 20, 2011; 12 pages.

Lawsuit by *Island Intellectual Property LLC* v. *Clearview Correspondent Services, LLC, et al.;* Scott & Stringfellow, LLC's Answer to Complaint and Counterclaims; Civil Action No. 1:11-cv-448-LO-IDD; Jun. 20, 2011; 12 pages.

Lawsuit by *Island Intellectual Property LLC* v. *First Southwest Company;* First Southwest Company's Answer to Complaint and Counterclaims; Civil Action 1:11-cv-371-SD; Jun. 20, 2011; 11 pages.

Garton, Thomas W.; Are LLC Banks in the Cards? Stay Tuned; Fredrikson & Byron, P.A.; Jun. 2003; http://www.fredlaw.com/articles/banking/bank_0306_twig.html; 2 pages.

Lawsuit by *Island Intellectual Property LLC, et al.* v. *Deutsche Bank Trust Company Americas et al.;* Declaration of Olivia M. Kim in Support of Defendants' Motion for Summary Judgment of Invalidity Under 35 U.S.C. § 101; Oct. 6, 2011; Case 1:09-cv-02675-VM, Document 197.

Lawsuit by *Island Intellectual Property LLC, et al.* v. *Deutsche Bank Trust Company Americas, et al.* Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment of Invalidity Under 35 U.S.C. § 101; Nov. 2, 2011; Case 1:09-cv-02675-VM, Document 201.

Lawsuit by *Island Intellectual Property LLC, et al.* v. *Deutsche Bank Trust Company Americas, et al.;* Defendants Reply in Support of Their Motion for Summary Judgment of Invalidity Under 35 U.S.C. § 101; Nov. 15, 2011; Case 1:09-cv-02675-VM, Document 208.

Lawsuit by *Island Intellectual Property LLC, et al.* v. *Deutsche Bank Trust Company Americas, et al.;* Defendants' Response to Plaintiffs' Statement of Additional Material Facts in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment of Invalidity Under 35 U.S.C. § 101; Nov. 15, 2011; Case 1:09-cv-02675-VM, Document 209.

Lawsuit by *Island Intellectual Property LLC, et al.* v. *Deutsche Bank Trust Company Americas, et al.;* Order; Dec. 7, 2011; Case 1:09-cv-02675-VM, Document 212.

Lawsuit by *Island Intellectual Property LLC, et al.* v. *Deutsche Bank Trust Company Americas, et al.;* Supplemental Declaration of Olivia M. Kim in Support of Defendants' Opening and Reply Claim Construction Briefs; Nov. 15, 2011; Case 1:09-cv-02675-VM, Document 207.

**US RE43,246 E**

Page 12

Martens, Don W.; letter to Hon. Victor Marrero re. supplement to letter of Nov. 28, 2011 on tentative rulings on claim construction in *Island Intellectual Property LLC et al.* v. *Deutsche Bank Trust Co., et al.*; Nov. 28, 2011; Case 1:09-cv-02675-VM; Document 211.

Martens, Don W.; letter to Hon. Victor Marrero re. tentative rulings on claim construction in *Island Intellectual Property LLC et al.* v. *Deutsche Bank Trust Co., et al.*; Nov. 28, 2011; Case 1:09-cv02675-VM, Document 210.

Lawsuit by *Island Intellectual Property LLC, et al.* v. *Deutsche Bank Trust Company Americas, et al.*; Special Master's Report and Recommended Decision on Defendants' Summary Judgment Motion of Invalidity Under 35 U.S.C. § 101; Dec. 19, 2011.

Britt, Phil; "Struggling with sweep accounts", America's Community Banker, v6, n12, p. 18-23, Dec. 1997.*

News article; "Regulators Support Demand Deposit Bill", Regulatory Compliance Watch—Mar. 9, 1998; p. 1; vol. 9, No. 10.*

* cited by examiner



FIG. 1

*FIG. 2*



US RE43,246 E

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# MONEY FUND BANK SYSTEM

**Matter enclosed in heavy brackets [ ] appears in the original patent but forms no part of this reissue specification; matter printed in italics indicates the additions made by reissue.**

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The novel system is in the field of account transaction processing and provides an administered money fund banking system that is integrated with an insured deposit account.

### 2. State of the Art

The Federal Deposit Insurance Corporation ("FDIC") is a federal governmental entity that provides insurance for deposits in most banks and savings institutions in the United States. Bank deposits are insured by the FDIC's Bank Insurance Fund ("BIF") and savings institutions' deposits are insured by the FDIC's Savings Association Insurance Fund ("SAIF"). The rules governing insurance of deposits of institutions insured by the BIF and the SAIF are the same. The FDIC bases insurance coverage on the concept of ownership rights and capacities: [finds] *funds* held in different ownership categories are insured separately from each other, and funds of the same ownership but held in different accounts are subsumed under the same insurance coverage. The amount of insurance covered provided to depositors of each institution insured by BIF and SAIF is the same: $100,000.00 to the owner(s) of the funds in the account(s), including principal and interest.

Title 12, Part 329, of the Code of Federal Regulations ("CFR") specifies that "no bank shall, directly or indirectly, by any device whatsoever, pay interest on any demand deposit."(12 C.F.R. § 329.2.) A "deposit" is any money put into a savings account, a checking account, or time account such as a certificate of deposit. A "demand" account is one from which the owner of the account can demand that funds be drawn and paid elsewhere, either to another account (of the same or a different owner) or to a third party. These payments are typically made via a bank draft or check, or a credit or debit card. A account different than a demand account is an account where all or a fixed amount of the principal must be maintained in the account for a period of time to achieve the particular benefits offered by that account. As stated in this section of the CFR, a "demand deposit" includes any deposit in account under which terms the depositor is authorized to make, during any month or statement cycle of at least four weeks, more than six transfers by means of a preauthorized or automatic transfer of telephone (including data transmission) agreement, order or instruction, which transfers are made to another account of the depositor at the same bank, to the bank itself, or to a third party provided that such an account will be deemed a demand deposit if more than three of the six authorized transfers are authorized to be made by check, draft, debit card or similar order made by the depositor. (12 C.F.R. § 329.1(b)(3).) On the other hand, withdrawals from a deposit account are not deemed to be included within the six transfers permitted for a nondemand account when the withdrawals are made by mail, messenger, telephone (via check mailed to the depositor), automated teller machine, or in person. In essence, unless the funds of a deposit are held in a NOW account (18 U.S.C. 1832(a)), an account in which a depositor has the ability to make at least six transfers will be deemed a demand account and no interest will be payable on the funds therein. Therefore, owners of demand accounts are denied interest on their funds.

## SUMMARY OF THE INVENTION

In light of this regulatory scheme, it would be beneficial to provide depositors of demand accounts with interest from the funds on deposit while simultaneously providing unlimited (or at least six) transfers of the funds therein. For example, it would be beneficial to provide such depositors with the ability to deposit funds into the demand account from various sources, and to make payments from the demand account via different instruments, without limitation as to the number of transfers, and still earn interest on the funds in the clients' accounts.

To accomplish these and other objectives, this invention provides a system for managing a plurality of accounts for multiple clients by administering at a banking institution a single insured deposit account in which all of the funds for the insured deposit accounts are held, providing a database having client information for each client's account, administering clients' deposits to and withdrawals from each of their accounts, authorizing whether funds in a particular clients account can be used for each payment requested from that client's account, determining as the net transaction of the sum of the insured money market account deposits and withdrawals from the plurality of insured money market accounts on a regular periodic basis, using the determination of the net transaction to deposit funds to or withdraw funds from the single insured deposit account, distributing interest earned on the single deposit account to each of the clients in proportion to their portion of funds in the deposit account, and updating the database for each client's deposits and authorized demand payments.

## BRIEF DESCRIPTION OF DRAWINGS

FIGS. **1** and **2** show flow chart depicting certain processing steps the system follows at the administrator's end.

## DESCRIPTION OF SPECIFIC EMBODIMENTS OF THE INVENTION

The present system will be described with reference to an administrator, which can be brokerage, a bank, or another entity with which clients can institute financial transactions such as deposits and demand payments. The administrator appears to each client as if it were, in part, a bank, by accepting deposits for the client's account and by authorizing (and then making) payments demanded by the client from his account. The funds for all of the clients are pooled into a single fund that is maintained as an insured deposit account at a licensed banking institution. This system is preferably implemented in combination with a brokerage account so that the client can centralize all of his financial needs: deposit of funds; demand orders for payment (checking); payment authorization by debit card; securities transactions; retirement plans; and the like.

The following description of the hardware and software is for exemplification of a working system; other architectures can be fashioned to make the systems and perform the methods claimed herein. The system has been implemented on a mainframe computer (e.g., an IBM Application Starterpac 3000 model A20, which is capable of processing 63 million instructions per second) with an operating system such as OS/390 and MVS/ESA running a relational database (e.g.,

US RE43,246 E

3

DB2 type database). The [programing] *programming* languages are IBM COBOL, CICS languages along with IBM's CSP screen generation language. For such a system, memory requirements are satisfied with 768 Gigabytes of storage (preferably, e.g., 1024G with a disk storage and recovery system, such as RAID). Communications generally are run on a mixed SNA and TCP/IP network. Communications with a local area network via a local control unit can be implemented using a token ring. Connection to an internal network has been made via an IBM open systems adapter (OSA) running TCP/IP, which allows File Transfer Protocol (ftp) via a firewall. Bisynchronous and synchronous file transfer protocols are made through various dial-up media. Terminal Access runs on an Ethernet local area network, using an SAA gateway, and other gateways (e.g., Cytrix and Netsoft) for remote access. Additionally, several lease lines for several applications and terminal access are supported by the system.

FIGS. 1 and 2 show flowchart depicting certain processing steps the system follows at the administrator's end. It should be understood that the order in which these steps are performed may be varied without impairing the achievement of the aforementioned objects of the invention. The client adds funds ("deposits") to his account typically via check 101, sweeps 103 of funds from another account (e.g., a broker/dealer account), and/or by wire and other transfers 105 (such as fed funds wire and direct deposit via ACH) for investment in an FDIC insured money fund account. These funds are deposited in a deposit account with a bank on behalf of the participant. The amount of each of the deposited items is summed 107 to determine the deposits for each client, preferably on a regular periodic basis (e.g., daily) or instantaneously. On the other side, the administrator provides the participant with access to his funds by various methods: payments can be made from funds drawn from the account by check 109; electronic funds transfer 110; debit card 111 authorized by the client (and ACH debit); sweeps of funds 113 to another account (e.g., a broker/dealer account); and electronic and voice access 114 (e.g., internet on-line banking, banking by telephone) for automated transaction requests; and transactions authorized by mail. A "sweep" is a an automated movement of funds between a client's other account (e.g., a broker/dealer account) and his insured deposits account (in either direction). The registration on the other account and the insured deposit account are identical; there is a one for one relationship between the brokerage account and the insured deposits account.

The sum of the deposits is processed 117 with information 119 from a database (described later) that stores information about the demand account for each client. Each client's account is credited 121 with the sum of the deposits for that particular account, which may amount to zero on a particular day. Similarly, the sum [and] of withdrawals are processed 123 to determine what should be debited from the account, which may also amount to zero on a particular day. The deposits and withdrawals for each account during a given period are compared 125 to determine whether sufficient [finds] *funds* are present in the client's account, including the added funds, to pay the withdrawals requested by the client. In other words, processing determines which client accounts to credit or debit for the various transactions (sweep, checks, debit cards, ACH, etc.) received each business period (e.g., daily). These transactions can be received from one or more sources, such as brokerage firms (sweep transactions), banks (deposits made by wire [trasfer] *transfer*, checks presented for payment, ACH, debit card transactions), the mail (check deposits, redemption requests), and telephone requests. "Telephone" requests can be performed by voice, conversing

4

with an operator/broker or a voice response system, or via a touch-tone phone using a menu system, or electronically via the internet using email or the World Wide Web (e.g., a web page, [preferrably] *preferably* secure, onto which users can log in and conduct on-line banking). The final step in the day's processing is to determine the net credit or debit for the deposit account at the bank; the net activity represents all transactions that were processed that day for all insured deposit accounts.

If sufficient funds are not available for drafts and other orders to pay, the requested withdrawal(s) are denied and the client's total account information is again accessed to determine 129 if the client has sufficiently available margin to cover the requested withdrawal(s) (other than, preferably, sweep transactions). If insufficient funds and insufficient margin are available, then the requested withdrawal is denied 131. The client's margin typically is determined by the value of the clients funds held in the client's broker/dealer (securities) account. When sufficient funds are available in the insured deposit account, or a sufficient margin is available in the client's securities account with the administrator, then a debit is made 133 to the client's insured deposit account in the amount of the withdrawal(s) allowed (based on the funds and margin then available) and the processed and authorized withdrawals are paid as directed by the client. The sum of the processed credits 121 and the processed debits 133 are determined for all of the administrator's clients to arrive at a net account activity determination 135. The order in which credits and debits are processed depends upon a subjective protocol and/or operation of law. For example, transactions that are pre-approved (such as authorized debit card transactions, and sweeps) are likely to be processed when received; transactions requiring authorization or acceptance by a third party (such as a bank draft or check) may be credited to the insured deposit account but not available for withdrawal until authorization or acceptance.

The net account activity determination 135 is then used to determine a net credit/debit 139 for the single deposit account held at the bank that contains all of the funds of all of the administrator's clients; the deposit account must be debited or credited to account for all clients' deposits and withdrawals during the period. If the net result is positive (e.g., amount of deposits processed minus amount of authorized withdrawals processed is positive), then the calculated amount is deposited 141 to the single account. If the net result is negative (e.g., amount of deposits processed minus amount of withdrawals processed is negative), then the calculated amount is withdrawn 143 from the single deposit account. An individual insured money market account is maintained for each client on a administrator's database. Each transaction received for an account is individually posted against the client's account on the database. Funds are exchanged between the appropriate parties to cover transactions (broker for sweep transactions; bank for debit cards, checks, ACH, etc.). These transactions are posted and settled prior to any activity taking place in the insured deposit account at the bank. In a preferred embodiment, the last movement of funds on each day is the net movement of funds (credit or debit) that takes place in the deposit account at the bank. The sum of the account balances (principle plus interest) for clients participating in this system equals the balance in the deposit account at the bank.

The information from the calculations of a net credit/debit 139 are used to implement the processing of the actual deposit or withdrawal (141, 143) to the deposit account, and that information (and funds, if required) is sent to the bank 145 to execute the actual deposit or withdrawal required. If the deposit account is to be credited, then deposits are transferred

US RE43,246 E

5

to the bank and credited to the deposit account 147; conversely, if funds are to be withdrawn from the deposit account, a bulk withdrawal is made from the deposit account to account for the withdrawals that have been authorized from the clients' accounts; in essence, the withdrawal from the deposit account need only make up the difference between the authorized withdrawals and the deposits. If the client wishes to use his excess margin buying power for overdraft protection, the broker/dealer transmits the client's available margin line to the administrator regularly (preferably daily). The available margin line will be taken into consideration when checks, debit card, and other draft and order to pay transactions (e.g., ACH debits, on-line banking withdrawals, and other electronic payments) are processed. If the client's margin line is used to process a check or debit card transaction, a loan will be created and transmitted to the broker dealer by the administrator. Preferably, the broker dealer maintains the margin loan on his system and will pay the administrator for all funds advanced. Using this methodology for margin accounts, there is no effect on the deposit account at the bank.

The bank pays interest 149 on the single deposit account to the administrator. Based on the amount of each client's funds in the deposit account as a function of the total amount in the deposit account, the administrator determines the interest amount (if any) each client is owed (based also on the period during which the interest was determined on a particular account balance). Because all of the clients' [finds] *funds* are in a single account under the name of the administrator, the administrator earns the interest and distributes the interest earned to each of the clients. Further, the limitation on transfers from [a] *an* interest-bearing account is inapplicable to the clients because their funds are held by the administrator in a demand account and interest for the client is determined only on that portion of those [finds] *funds* maintained in the bank's deposit account. Preferably, if necessary, the administrator makes any withdrawals from the deposit account in person.

After the deposit account has been credited or debited in accordance with the determination for that period of the sum of the deposits and withdrawals from clients, and the interest earned on the single deposit account, this information is transferred back to the administrator's database 151. This database includes information about each client (such as name, address, and other important or desired demographic and tax information about each client's account), as well as financial information regarding the client's holdings on deposit in the bank (i.e., that client's portion of the single deposit account) and holdings with the administrator (e.g., securities and the like).

As seen, the administrator maintains several relationships that provide services for the insured money market accounts. These various entities provide transaction data that is transmitted to the administrator and processed. Preferably, the administrator is its own transfer agent and provides a shareholder accounting system. Preferably, accounts may be opened through a broker dealer that is a client of the administrator, or directly with the administrator with an application and check.

The administrator may allow a client with an account under the present system to access his funds by check or with a debit card; in such a case, the administrator has arranged for these services and maintains these relationships which are separate and apart from the deposit account. Banks that provide check and card services will transmit a file each day to the administrator that contains the checks presented for payment and/or the debit card transactions. The transactions that apply to his account under the present system are out sorted and processed against the administrator's database. The administrator will settle with each bank for the transactions that were processed.

6

The administrator may accept direct deposit of payroll, social [security] *security*, or pensions for accounts. The clients' accounts are updated as these files are received and processed. The administrator may also accepts ACH debit transactions, which are initiated by the client's bank or a third party at the client's request.

The administrator may also provide the participants with automated bill paying services. Participants preferably provided with a touchtone bill paying system and/or an internet on line banking service. Bill payment requests may be downloaded each morning for processing.

The foregoing description is meant to be illustrative and not limiting. Various changes, modifications, and additions may become apparent to the skilled artisan upon a perusal of this specification, and such are meant to be within the scope and spirit of the invention as defined by the claims.

What is claimed is:

[1. A method for managing a plurality of demand accounts for multiple clients whose funds are held at a banking institution in a single insured money market deposit account, comprising:

providing a database having client information for each account;

administering clients' deposits to and withdrawals from each of their demand accounts;

authorizing or rejecting the use of funds in a particular client's demand account for each demand payment requested from that client's account;

determining the net transaction aggregated across all said demand account deposits and withdrawals on a regular periodic basis;

using the determination of the net transaction to deposit funds to or withdraw funds from said single insured money market deposit account;

distributing interest paid on said single money market deposit account to said clients' demand accounts; and

updating the database for each client's deposit and authorized demand payment.]

[2. The method of claim 1, wherein withdrawals are made by at least one method selected from the group consisting of drafts (checks), credit card, debit card, sweeps, electronic transfer, and combinations thereof.]

[3. The method of claim 1, wherein deposits are made by at least one method selected from the group consisting of drafts (checks), sweeps, electronic transfers, and combinations thereof.]

[4. A system for managing a plurality of demand accounts for multiple clients whose funds are held at a banking institution in a single insured money market deposit account, comprising:

a database having client information for each demand account;

a device for administering clients' deposits to and withdrawals from each of their demand accounts;

a device for authorizing or rejecting the use of funds in a particular client's demand account to be used for each demand payment requested to be paid drawn on funds from that client's demand account;

a device for determining the net transaction aggregated across all said demand account deposits and withdrawals on a regular periodic basis;

a comparison device for determining from the net transaction whether to deposit funds to or withdraw funds from said single insured money market deposit account;

a device for distributing interested earned on said money market deposit account among the clients; and

7

8

a device for updating the database for each client's; deposits and authorized demand payments.]

[5. The system of claim 4, wherein withdrawals are in the form of at least one type selected from the group consisting of drafts (checks), credit card, debit card, sweeps, electronic transfers, and combinations thereof.]

[6. The system of claim 1, wherein deposits are in the form of least one type selected from the group consisting of drafts (checks), sweeps, electronic transfers, and combinations thereof.]

[7. A data processing system for implementing and managing plural client transaction accounts providing a return to each of said clients, by aggregating the assets associated with said client transaction accounts for deposit in a corresponding insured deposit account and providing a return on assets held therein, said system comprising:

    a. transaction input processor for receiving transactions, including deposits and/or withdrawals to one or more of said plural client accounts;

    b. account computation processor responsive to said transactions and capable of calculating a corresponding balance for each said client transaction account, including determining and crediting said transaction account with a return associated with said balance of each said client accounts;

    c. memory module storing data on said plural client accounts, wherein account balances are periodically updated to include said corresponding return to each of said client accounts; and

    d. said computation processor assessing the aggregate activity of said plural client transaction accounts for a respective period, and calculating an asset adjustment to said insured deposit account, to permit adjustment of the amount in said insured deposit account by a method consistent with maintaining the insured and interest bearing status of said insured deposit account.]

[8. The system of claim 7, wherein said transaction input processor accesses a client account by one or more transaction methods selected from the group consisting of check, withdrawal, credit card, electronic fund transfer, debit card, sweep, internet communication, voice activation, and banking by telephone.]

[9. The system of claim 8, wherein said transaction input processor accesses said account by three or more of said methods.]

[10. The system of claim 8, wherein said transaction input processor accesses said account by five or more of said methods.]

[11. The system of claim 7, wherein said computational processor responds to withdrawal transactions for a client's account by assessing fund availability and based, in whole or in part, thereon approving or denying said withdrawal transaction.]

[12. The system of claim 11, wherein said computational processor applies margin requirements to said client's account in assessing a withdrawal transaction therefrom.]

[13. The system of claim 7, wherein the return for the insured deposit account is used to determine the returns for the plural client accounts.]

[14. The system of claim 8, wherein transactions further include automated bill paying.]

[15. The system of claim 7, wherein periodic deposits to a client's account include one or more of the following: direct automated payroll; direct social security; automated sweep from another of that client's accounts; electronic funds transfer; and manual check deposit.]

[16. A data processing method for tracking and managing a plurality of client transaction accounts and providing a return to each of said accounts, the funds associated with said accounts aggregated for deposit in a corresponding insured deposit account providing a return on assets held therein, comprising the steps of:

    a. creating one or more account memory ledgers and storing therein select data for one or more of said plurality of client transaction accounts;

    b. storing in said memory ledgers account data including a current or periodic account balance as well as an identification of an account owner or beneficiary;

    c. tracking deposits to and withdrawals from each of said client transaction accounts and adjusting the balance for each in response to such transactions;

    d. creating an insured deposit account in which funds from a plurality of said client transaction accounts are deposited, and managing said insured deposit account by assessing the aggregate activity of said plural client transaction accounts for a respective period and calculating an asset adjustment to said insured deposit account to permit adjustment of the amount in said insured deposit account by a method consistent with maintaining the insured and return bearing status of said insured deposit account; and

    e. calculating an aggregate transactional value for said client accounts having funds held in said insured deposit account over a selected period of time and determining a net asset adjustment for said insured account, to be implemented in a manner consistent with retaining its status as insured and providing a return on the assets.]

[17. The method of claim 16, wherein said transactions into or out of a client's transaction account include sweeps into or sweeps out of said account.]

[18. The method of claim 16, further comprising calculating a corresponding return for each client transaction account having funds maintained in said insured account based on the return on the assets held in the insured deposit account.]

[19. The method of claim 18, wherein withdrawal transactions resulting in a negative net balance for a client's account trigger a margin approval process for such account.]

*20. A method for managing plural transaction accounts for multiple clients, comprising:*

    *providing a database operatively connected to one or more computers, the database having (i) client information for each of a first plurality of the transaction accounts, and (ii) pooled account information associated with a single insured money market deposit account at a licensed banking institution holding funds from the first plurality of transaction accounts;*

    *processing, by the one or more computers, client account transaction data comprised from a second plurality of the transaction accounts, the client account transaction data for a respective transaction account comprising data associated with one or more deposits and/or transfers to and/or one or more withdrawals and/or transfers from the respective transaction account during a period of time, wherein during a month period client account transaction data for at least one respective transaction account comprises at least more than six (6) withdrawals and/or transfers by check and/or debit card and/or ACH debit and/or sweep from said respective transaction account;*

    *determining, by the one or more computers, a net transaction aggregated across all of said transaction data associated with at least the second plurality of the transac-*

US RE43,246 E

9

tion accounts for the period of time, where more than six (6) of the net transactions determined over the month period are negative;

determining, by the one or more computers, a net credit/debit amount based on at least in part the respective net transaction associated with the respective period of time, which corresponds to an amount of funds to deposit and/or transfer to or withdraw and/or transfer from the single insured money market deposit account at the licensed banking institution through a different bank, so that during the month period there are more than six (6) net credit/debit amounts that are negative and correspond to withdrawals and/or transfers from the single insured money market deposit account;

obtaining data, at the one or more computers, for an amount of interest earned in the licensed banking institution on funds held in said single insured money market deposit account;

obtaining data, at the one or more computers, for each of a respective third plurality of the transaction accounts, for a respective amount of interest to be credited to the respective transaction account from the interest earned in the single insured money market deposit account at the licensed banking institution;

distributing by crediting the transaction accounts, using the one or more computers, the interest from said single insured money market deposit account to said transaction accounts based at least in part on the respective amounts of interest obtained for the respective transaction accounts; and

updating, by the one or more computers, the client information and the pooled account information in the database, taking into consideration at least in part the client account transaction data, the net credit/debit amounts, and the amounts of interest credited to the respective transaction accounts.

21. The method of claim 20, wherein client transaction account data comprises withdrawal data associated with one or more withdrawals made by at least one method selected from the group consisting of drafts (checks), credit card, debit card, sweeps, electronic transfer, and combinations thereof.

22. The method of claim 20, wherein client transaction account data comprises deposit data associated with one or

10

more deposits made by at least one method selected from the group consisting of drafts (checks), sweeps, electronic transfers, and combinations thereof.

23. The method of claim 20, further comprising authorizing or rejecting the use of funds in a particular client's transaction account for each demand payment requested from that client's transaction account.

24. The method of claim 20, wherein one or more of the transfers and/or withdrawals from said single insured money market deposit account are requested in person.

25. The method of claim 20, wherein one or more of the transfers and/or withdrawals from said single insured money market deposit account are requested by mail.

26. The method of claim 20, wherein one or more of the transfers and/or withdrawals from said single insured money market deposit account are requested by messenger.

27. The method of claim 20, wherein one or more of the transfers and/or withdrawals from said single insured money market deposit account are requested by telephone and distributed by mail.

28. The method of claim 20, wherein one or more of the transfers and/or withdrawals from said single insured money market deposit account are requested by automated teller machine.

29. The method of claim 20, wherein for the step of determining a net transaction by aggregating across all transaction account deposits and withdrawals of the second plurality of the transaction accounts, one or more of the withdrawals are made by at least a debit card.

30. The method of claim 20, further comprising:

determining for each of the respective third plurality of the transaction accounts, via the one or more computers, a respective amount of interest owed to the respective transaction account as a function of a respective total amount of funds from the respective transaction account held in the single insured money market deposit account at the licensed banking institution.

31. The method of claim 20, wherein the second plurality is equal to the first plurality.

32. The method of claim 20, wherein the third plurality is equal to the first plurality.

*   *   *   *   *

# Exhibit 12

** Will print automatically! If it doesn't, click here. **



# The Reserve Fund saga, continued: Take a look at Bent family's rocky new venture



BRUCE BENT: Money market fund pioneer tries something else.

Redux

**Published: December 12, 2010 - 12:01 am**

It was the spring of last year, and the Bent family needed a big idea for making money. The folks who had invented the money market fund, spawning a $3.7 trillion industry, had seen their reputation trashed in September 2008 when their flagship $62 billion fund "broke the buck," triggering a full-scale global financial panic. Adding insult to injury, the Securities and Exchange Commission sued the Bents and their company, Reserve Management, alleging they had withheld key information from customers and board members during the darkest moments of the financial crisis.

Happily, patriarch Bruce Bent and son Bruce Bent II came up with a big idea. On May 15, 2009—10 days after the SEC unleashed its suit—Reserve filed trademark paperwork for a service called Landing Rock, which offered a twist on boring bank deposits. Customers could deposit up to $5 million in cash with Landing Rock and enjoy full protection from the Federal Deposit Insurance Corp. That, the firm proudly noted, was 20 times the standard FDIC limit of $250,000. Even better, it said, there was absolutely no risk because it was insured, unlike a money market fund investment.

It isn't clear how much money rolled in, but effective Dec. 31, Landing Rock is suspending operations. "Please know that we do not take this decision lightly," the firm says on its website.

It turns out Landing Rock's offer was actually quite mundane. All the company did was route deposits to 20 tiny-town banks around the country, such as Bank of Bolivar in Bolivar, Mo., or City Bank of Lubbock, Texas. The banks paid fees to Landing Rock, which offered customers daily access to their funds via a single account. Of course, savers with more than $250,000 can, and often do, deposit their money in different banks on their own.

A handful of other institutions, including Deutsche Bank and Promontory Interfinancial Network, offer something like Landing Rock's deposit-pooling service, says Peter Crane of research firm Crane Data.

Mr. Crane speculates that Landing Rock is closing due to push-back from banks struggling to profitably lend the money already in their vaults. "Banks don't want additional funding," he says.

Another school of thought holds that the FDIC and other regulators were unhappy with Landing Rock's business plan and, as part of an interagency procedure known as a "discovery review," quietly pressured the Bents to shut it down. An FDIC spokesman says the agency "did not make any demands or take any official action against the company."

Reserve says, "This is a strategic business decision specific to the direction we want to take the company and its product offerings."

With Landing Rock closing, and Reserve, which has changed its name to Double Rock Corp., out of the money market fund business, family members appear to be looking for alternative ways to raise cash as they fight the SEC charges and prepare for a civil trial. Reserve's president, Bruce Bent II, put his West Village penthouse on the market, but apparently no one met his $16.5 million asking price. A six-bedroom vacation house on the Delaware shore is for sale for $1.9 million, according to Zillow.com.

---

$62M

THE MINIMUM THAT BERNIE MADOFF allegedly paid Austrian banker Sonja Kohn for feeding fresh investors into his notorious Ponzi scheme, according to a lawsuit filed by trustee Irving Picard. The suit says Ms. Kohn was likely paid "far more," but Mr. Madoff destroyed records revealing the amount before confessing two years ago.



Entire contents ©2016 Crain Communications Inc.

# Exhibit 13

** Will print automatically! If it doesn't, click here. **



# NEW YORK BUSINESS

# Oh, those unbending Bents

Aaron Elstein




Buck Ennis

Bruce Bent Sr. and Bruce Bent II

Published: September 12, 2010 - 12:01 am

Someday, when the Encyclopedia of Wall Street Chutzpah is finally published, it will no doubt contain a lengthy entry about the Bents, the father-and-son team who are now trying to stick their money-market-fund customers with the bill after steering their investment company over the cliff—and nearly taking the global financial system with them—two years ago this week.

The Bents, as students of the 2008 financial crisis will recall, ran an enormous $62 billion money-market fund called the Reserve Primary Fund, which "broke the buck" after Lehman Brothers filed for bankruptcy. The fund's net asset value fell below the sacrosanct $1 a share because it held $785 million of Lehman debt that immediately had to be written down to zero. That is never supposed to happen at an ultra-secure money-market fund, so a full-scale panic was triggered throughout the financial world, forcing the U.S. government to guarantee all of the $3.7 trillion parked in money-market funds.

Way to go, Bents! In May 2009, the Securities and Exchange Commission sued Reserve Management Co.'s chief executive, Bruce Bent, and his son, President Bruce Bent II, alleging that they hid key information from customers and board members in the hours after the Lehman bankruptcy to stem a flood of redemptions (see "Inside the panic at Reserve Fund," May 11, 2009). More than a year later, the Bents still haven't settled the suit, even though the SEC rarely requires an admission of wrongdoing from anyone it charges. In fact, the unbending Bents told a federal judge last month that negotiations with the SEC have hit an impasse, and they're preparing for a civil trial.

Now for the chutzpah part.

As their legal costs pile up, the Bents are asking Reserve—whose name was changed to Double Rock Corp. after the buck-breaking debacle—to help pay their bills. The Bents claim that they are owed $32.5 million in unpaid fund-management fees accrued since September 2008 and seek another $13 million from their company to help cover legal costs. (A federal judge ruled last year that the Bents needed court approval to draw from a company-backed fund that covers Reserve-related expenses.)

The Bents can likely afford to pay their own bills. A 2008 prospectus shows that Reserve charged a median management fee equal to 0.46% of assets, which suggests that the Primary Fund and other Bent-owned investment vehicles were on pace to collect about $400 million in annual fees before the market crash. And remember, the Bents have run Reserve since pioneering the money-market fund in 1971.

It isn't clear what the Bents did with all of their money. But we do know that the younger Mr. Bent bought an enormous West Village penthouse apartment that he attempted to sell last year for $16.5 million. He has since

Case 1:16-cv-01085-GMS  Document 1-1  Filed 11/23/16  Page 208 of 237 PageID #: 249

taken the apartment off the market, according to Tracy Shepherd, a real estate agent at Tungsten Property.

Despite their apparent wealth, the Bents are insisting that it's unfair for them to cover their own legal expenses: "Forcing defendants to continue to litigate and incur ever-mounting unreimbursed defense costs ... is manifestly unjust and highly prejudicial," their lawyers at Dewey & LeBoeuf stated in a legal filing last month.

Christopher Clark, a lawyer for the Bents, didn't return calls.

The SEC shot back earlier this month with a motion urging the judge to reject the Bents' request, arguing that the family should be paid no management fees until the case is resolved. "Defendants do not claim indigence," the SEC said. "They simply claim the right to fund their defense with investor money."

———————————————————————

2
THE NUMBER OF FORMER WALL STREET DEALMAKERS who now run major European banks: Robert Diamond, a former Morgan Stanley and Credit Suisse First Boston executive, who was appointed CEO of Barclays plc last week, will join Credit Suisse Group's Brady Dougan, who got his start in derivatives.



Entire contents ©2016 Crain Communications Inc.

# Exhibit 14



2 of 2 DOCUMENTS

Copyright 1999 ALM Media Properties, LLC
All Rights Reserved
Further duplication without permission is prohibited



The National Law Journal

October 18, 1999 Monday

**SECTION:** Pg. 8 (col. 2) Vol. 22

**LENGTH:** 2010  words

**HEADLINE:** PATENT PROTECTION PROVIDES LONG-TERM NET STRATEGY;
STATE STREET;
Corporate Brief;
In Focus: E-Commerce

**BYLINE:** Gregory J. Maeir, Bradley D. Lytle and Keth DitthavongSpecial to the National Law Journal

**BODY:**

Corporate Brief

In Focus: E-Commerce

STATE STREET ALLOWS START-UPS TO PROTECT BUSINESS METHODS AND DEFEND MARKETING NICHES.

Mr. Maier is the managing partner of the electrical/mechanical department at Arlington, Va.'s Oblon, Spivak, McClelland, Maier & Neustadt P.C. He is also chair of the ABA Intellectual Property Law section. Mr. Lytle and Mr. Ditthavong are associates at Oblon Spivak, where they specialize in securing patent protection on communications, software and Internet-related technologies.

Electronic commerce is transforming the way modern business is being conducted and is leveraging international market forces for the benefit of consumers. The volume of e-commerce reached $301 billion last year in the U. S. market alone, according to some estimates.[1] Market analysts have projected that by 2003, e-commerce will produce

PATENT PROTECTION PROVIDES LONG-TERM NET STRATEGY; STATE STREET; Corporate Brief; In Focus: E-Commerce The National Law Journal October 18, 1999 Monday

revenue in excess of $3 trillion.[2]

From the vendor/service providers' point of view, Internet-based e-commerce is a race to attract customers so as to obtain a defensible, entrenched position in cyberspace. A strategy of early market dominance and continued legal posturing is necessary to lead the race and maintain an advantage in this virtual world with real consequences.

A lower-risk, higher-reward strategy, however, would be for pioneering e-commerce companies to limit competition in the mid term and long term by making it illegal for others to adopt those companies' proprietary computer-implemented business methods. A recent clarification of U.S. patent law has created an opportunity for e-commerce companies to adopt this strategy by seeking business-method patents that, if issued, will legally exclude others from using the methods for up to 20 years.

Access to the Internet as an e-commerce mechanism will have untold implications for how business is conducted in the future. After all, the Internet is not merely a new passage to new markets, but also an information resource that empowers people with instant, global access to information in the public domaini.e., mankind's virtual database of cumulative knowledge.

From a modern corporate perspective, how can a company stake a claim in the new world of e-commerce? After all, global access also means global competition. A key parameter is the creation and protection of a company's intellectual property, exclusive rights to which may capture the legal right-of-way to the new e-commerce world.

Conventional brick and mortar retailers likely will lose significant market share to upstart cyber-retailers such as Amazon.com, eBay, E*TRADE and the like, but brick-and-mortar shops will nonetheless maintain a local market for those who like to speak in person with a sales clerk or kick the tires before buying something. However, for those consumers driven by the lowest cost, the competitive market forces brought by the Net make the e-commerce environment the most compelling place to shop.

Pioneers are uniquely positioned to stake claims to new territory. The significance of their claims, however, can easily erode if they are not equipped to defend them. Market inroads may later be lost to 800-pound gorillas that elbow their way into proven markets. For example, while Amazon. com led the effort to provide an online book store, Barnes & Noble reacted by launching a competing Web site in the hope that its good name in the conventional brick-and-mortar retail sector will resonate sufficiently with consumers to give it an advantage in the e-commerce arena as well. Thus, the issue facing e-commerce companies is how to protect new territory, in the short term as well as in the mid term and long term, as the global retail market matures.

Short-term vs. long-term plans

One short-term strategy is for a new e-commerce company to scoop the inevitable competition by bringing the new product or service on the Web well before competing services or products are available. The objective of this gold rush approach is to secure enough of a lead on the competition to make it impractical for them to compete with similar business models. Early entrepreneurs using this approach were largely successful because they carved out a market position when the Net was not generally recognized as being a revolutionary business-enabling technology.

Now that the Internet is being taken seriously, it will be much more difficult for pioneering e-commerce companies to maintain any significant lead on the competition unless they erect some barriers to entry that impede newcomers. This is not to say that the short-term approach of a first-to-market strategy has no value for new e-commerce companies, but rather, that there remains a need for a mid-term to long-term follow-on strategy to protect and expand on a company's market share.

Patent protection is one barrier to entry, as it makes illegal the employment of patented e-commerce business methods. Fortunately, another development has emerged alongside the Internet. The U.S. Court of Appeals for the Federal Circuit explained in State Street Bank & Trust Co. v. Signature Financial Group Inc.[3] that it is possible to

obtain patents on methods of doing business.[4] In so ruling, the Federal Circuit definitively denounced the long-held business-method exception to patentability.[5]

E-commerce companies that are savvy to the U.S. and foreign patent systems stand to gain the most. Before State Street, e-commerce companies had only trade secret laws to protect their business practices, but because software code related to business processes is susceptible to reverse engineering, trade-secret protections were not always effective.

It is clear that some e-commerce companies already see the advantage of protecting their business methods, as is evident from the virtual boom in patent application filings for business method patents since State Street. The U.S. Patent & Trademark Office (PTO) has borne the brunt of this surge. According to Acting Commissioner Todd Dickinson, the PTO has experienced a 700% increase in the number of filings on software and business-method patents, attributing the dramatic increase directly to the State Street decision.[6]

The groundswell of new business-method patent applications has been so significant since State Street that the PTO does not typically examine a business-method application for the first time until about two years after the application is filed. Because patent rights do not vest until a patent is issued, seeking patent protection is a strategy that must be started early. A prudent business plan would not typically depend on securing patent protection before the market or service is fielded unless that time-to-market period is two or more years.

Power of patent protection

Once a patent is secured, the exclusive legal rights that vest in the inventor can be powerful. It is unlawful[7] for those who have not licensed the patented technology from the inventor or the proper assignee of the patent to make, use, sell, offer to sell or import into the United States any patented invention for the term of the patent.

E-commerce companies can use patent protection to defend a market niche by making it unlawful for others to compete with products, services or methods that employ a claimed invention. Of course, after a period of 20 years, the formerly patented business method would be free for all others to use, but then again, 20 years for computer-implemented inventions is approximately the equivalent of 10 generations of computer technology.

If the long-term strategy of an e-commerce company does not include obtaining a patent portfolio on its business methods, the company will be left with few or no legal options for protecting its niche. It must passively wait and respond reactively, possibly to a competitor armed with a portfolio of improvement patents, demanding royalties or even an injunction.

Some commentators have suggested that there is a high probability of successfully defending against a patent infringement suit involving business methods because of the abundance of prior art in the field.[8] In view of the possibility of another company's asserting an improvement patent against a pioneering company, however, the wait-and-see approach loses its attraction quickly, given that defending oneself in a patent infringement suit may cost millions of dollars and can last for years.

Therefore, it would be prudent for a fledgling e-commerce company to develop a patent portfolio that can be leveraged during licensing negotiations or during litigation. The cost of obtaining a patent, which varies depending on the complexity of the technology, pales in comparison with the cost of even the smallest litigation. Consequently, companies need to budget not only for securing intellectual property developed by the company, but also for bargaining with competing companies, which themselves may assert their patent portfolio.

In addition to securing market share, having patent protection can inject needed stability into the market volatility of e-commerce companies, particularly if a company is an Internet start-up. Internet start-ups, even the most successful ones, are viewed by the financial industry as extremely volatile, in part because of their virtual nature. That is, these companies lack tangible assets. One approach to dispelling this perception is to develop a patent portfolio that reflects, at a minimum, the core products and services of the Internet start-up. A well-targeted patent portfolio assures existing

PATENT PROTECTION PROVIDES LONG-TERM NET STRATEGY; STATE STREET; Corporate Brief; In Focus: E-Commerce The National Law Journal October 18, 1999 Monday

and prospective stockholders that the company is not without commercially valuable assets.

Thus, although patent protection may aptly address mid-term and long-term gaps in strategic business plans, the lack of timeliness in the patenting procedure precludes patent protection from offering a near-term solution to securing market share for new methods of doing business. Nonetheless, because of the time lag in obtaining a patent, a responsible business plan will emphasize the filing of patent applications early in the research-and-development phase to minimize the time between fielding a product or service and having a patent that covers the product or service.

All indications point to an ever-increasing recognition of, and need to protect, one's business practices. A well-orchestrated strategy for new, emerging or even established companies interested in e-commerce would therefore include a combination of a short-term strategy to obtain market share, followed by a mid-term and long-term strategy of obtaining exclusive legal rights by way of patent protection.

By encouraging inventors to disclose their inventions to others in exchange for exclusive rights to the invention for a limited time, current U. S. law offers business method patents as a mid-term-to-long-term strategic solution to young, pioneering companies that wish to stake a claim in the new world of e-commerce.

1. Q. Todd Dickinson, The USPTOOur Challenges for the New Millennium, Remarks at the 11th Annual Fall CLE Weekend Seminar, Intellectual Property Law Section of the Virginia State Bar, Sept. 10, 1999.

2. Linda Himelstein et al., Why They're Nuts About the Net, Bus. Wk., Nov. 23, 1998, at 51.

3. 149 F.3d 1368, 1374-75 (Fed. Cir. 1998), cert. denied, 119 S. Ct. 851 (1999).

4. State Street is also famous in intellectual property circles for its clarification of patent laws regarding the patentability of software-related inventions. Under State Street, software is now freely patentable as long as it provides a useful, concrete and tangible result.

5. State Street, 49. F.3d at 1375.

6. Q. Todd Dickinson, The USPTOOur Challenges for the New Millennium, Remarks at the 11th Annual Fall CLE Weekend Seminar, Intellectual Property Law Section of the Virginia State Bar, Sept. 10, 1999.

7. Title 35 U.S.C. 271 defines what constitutes patent infringement, and 35 U.S.C. 281 provides patentees with remedy by civil action for infringement of the patent.

8. Bill Roberts, Trouble on the Road to Electronic Commerce: Are Business Method Patents a Mere Nuisance or a Major Roadblock?, Electronic Business, November 1998, at 30.

**LOAD-DATE:** April 30, 2011

# Exhibit 15

**From:** Michael Lydon <<u>MLydon@RNT.com</u>>
**Date:** May 7, 2015 at 6:25:35 PM EDT
**To:** Bruce Bent II <<u>bbentii@doublerockcorp.com</u>>
**Subject: RE: Q1 Royalty Payment**

Bruce,

In response to your first question, you'll recall that Bruce Wexler mentioned in a prior meeting Alice Corp and the Federal Circuit's November 14, 2014 opinion in Ultramercial, to which you had previously equated your patents.  Within that decision, it was explained:

*Addressing section 101 at the threshold will thwart attempts—some of which bear the "'indicia of extortion'". . . .  Subject matter eligibility challenges provide the most efficient and effective tool for clearing the patent thicket, weeding out those patents that stifle innovation and transgress the public domain.. . . The need for early resolution of eligibility is even more compelling. See Pope Mfg. Co. v. Gormully, 144 U.S. 224, 234 (1892) ("It is as important to the public that competition should not be repressed by worthless patents, as that the patentee of a really valuable invention should be protected in his monopoly.").*

As for your question re payment, we may be prepared to make a payment as part of a completion of a negotiation.  If you would like to discuss settlement, we are willing to continue these discussions.  I suggest that your lawyer work with our lawyer (Beni Surpin) to come to an agreement.  Outside the context of a settlement, we do not wish to engage in further discussions about this matter.

Mike

---

**From:** Bruce Bent II [<u>mailto:bbentii@doublerockcorp.com</u>]
**Sent:** Wednesday, May 6, 2015 3:33 PM
**To:** Michael Lydon
**Subject:** Re: Q1 Royalty Payment

Mike, I don't understand what you mean our "patents are violative of public policy and void under Supreme Court precedent."

My last e-mail to you dated April 21 as part of our confidential settlement communications, invited continued settlement discussions, but you did not respond.

Most importantly, you did not answer my question in my most recent e-mail as to when we will receive the Q1 payment under our existing agreement which is still in force. The payment is now six days late. Is it your intention to remit payment to us that is due and owing or not?

On May 5, 2015, at 1:39 PM, Michael Lydon <MLydon@RNT.com> wrote:

> Bruce,
> We had informed you in some detail about the fact that your patents are violative of public policy and void under Supreme Court precedent.  We sought to reach a settlement but you have not continued to cooperate. If you would like to continue that discussion, please let us know.
> Mike

**&** | **Michael P. Lydon** |Chief Executive Officer | Reich & Tang | 1411 Broadway, 28th Floor | New York, NY | 10018-3450 | 212.830.5444| www.reichandtang.com Follow us on Twitter: **@ReichAndTang** | Find us on LinkedIn

**From:** Bruce Bent II [mailto:bbentii@doublerockcorp.com]
**Sent:** Monday, May 4, 2015 12:30 PM
**To:** Michael Lydon
**Subject:** Q1 Royalty Payment

Mike, we have not received the payment yet for the 1st quarter of 2015. We have sent two e-mails to Joe and Christine but they have not responded.  When will we receive the payment?

Bruce

--
Bruce Bent II
President
Double Rock Corporation
PO Box 1220
Manhasset, NY 11030
Phone  646-261-9091
Fax      914-663-5146

*****************************************************************
********************************

2

This message is intended only for the personal and confidential use of the designated recipient(s) named above. If you are not the intended recipient of this message you are hereby notified that any review, dissemination, distribution or copying of this message is strictly prohibited. Please notify the sender that you have received this email in error by replying to the email or by telephoning 212-830-5200. Please then delete the email and any copies of it. This communication is for information purposes only. It should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product, an official confirmation of any transaction, or as an official statement of Reich & Tang Asset Management, LLC, or any of its affiliates. We reserve the right to monitor, review and retain the content of all email communications sent or received.
************************************************************************
******************************

# Exhibit 16

EXHIBIT C

**Execution Copy**

## AMENDED AND RESTATED LICENSE AGREEMENT

This AMENDED AND RESTATED LICENSE AGREEMENT ("Agreement") is entered into, as of this 3ʳᵈ day of January, 2011 (the "Effective Date"), by and among Reich & Tang Deposit Solutions, LLC, a Delaware limited liability company ("Licensee"), and Island Intellectual Property LLC, a Delaware limited liability company ("Licensor"). Licensee and Licensor are referred to herein collectively as the "Parties" and each individually as a "Party."

### RECITALS

WHEREAS, as of October 8, 2009, Licensee entered into a LIDs Insured Deposits Agreement with LIDs Capital LLC, an Affiliate (as that term is defined, below) of Licensor; and

WHEREAS, Licensor owns certain patents, patent applications and invention disclosures, and, on or about October 8, 2009, Licensee entered into a License Agreement with Licensor (the "License Agreement", as that term is defined herein), pursuant to which Licensor granted a non-exclusive license to Licensee under such patents, patent applications and invention disclosures; and

WHEREAS, Licensee granted to Licensor a cross-license, on a non-exclusive basis of certain patents, patent applications and invention disclosures of Licensee under the License Agreement; and

WHEREAS, on or about December 22, 2010, Licensee entered into a certain Asset Purchase Agreement with Seller (as defined herein), pursuant to which Licensee acquired certain of the assets of Seller, and the LIDs Insured Deposits Agreement was terminated; and

WHEREAS, Licensor and Licensee wish to amend and restate the License Agreement in order to, among other things, expand the field of use referred to in the License Agreement to include certain other products and services so that Licensee shall have the ability to use its non-exclusive license to solicit clients and customers that it previously was restricted from soliciting.

NOW, THEREFORE, in consideration of the mutual covenants and conditions contained herein and intending to be legally bound, the Parties hereby agree that the License Agreement shall be amended and restated in its entirety as follows:

### ARTICLE I.
### DEFINITIONS

Section 1.1. Certain Defined Terms. The following terms shall have the meanings set forth below:

472355.2

"Affiliate" means, with respect to any Person (as hereinafter defined), any other Person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, such Person. For the purposes of this definition, "control," when used with respect to any specified Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of equity interests in such Person, by contract or otherwise; and the terms "controlling" and "controlled" have correlative meanings to the foregoing. For purposes of this definition, a general partner or managing member of a Person shall always be considered to control such Person.

"Agreement" has the meaning set forth in the introductory paragraph hereof.

"Asset Purchase Agreement" means the Asset Purchase Agreement dated as of December 22, 2010 by and among the Sellers, on the one hand, and Licensee, Reich & Tang Asset Management, LLC and Natixis Global Asset Management, L.P., on the other hand.

"Bank Business" means the offering by Licensee or its Affiliates of a deposit sweep product or service to banks (a) in connection with money market deposit accounts and demand deposit accounts, which facilitates the transfer of bank customer funds between money market deposit accounts and demand deposit accounts, or (b) by which excess deposits in a customer bank may be swept to or from other participating network banks. For the avoidance of doubt, the Bank Business shall be deemed to include those products and business services provided by Licensor Affiliate Demand Deposit Marketplace LLC, and the on-balance sheet core deposit solution provided by Licensor Affiliate Intrasweep LLC, as of the Effective Date.

"Bank Business Revenue" means Licensee's gross revenue from the conduct of the Bank Business.

"Business Field" means the provision of any cash sweep or other deposit investment products or services, including without limitation any Federal Deposit Insurance Corporation (or government backed-insured) and interest bearing deposit programs, offered directly or indirectly by Licensee to their customers or by Licensee through any intermediaries to their customers, including by way of example and not limitation: (i) broker dealers, (ii) investment advisers, (iii) financial advisers, (iv) financial planners, (v) trust companies, (vi) banks and (vii) clearing firms.

"Business Day" means any day other than a Saturday, Sunday or any other day on which banks are authorized or required by law or other governmental action to close in the State of New York.

"Business Know-how" means Know-how owned or Controlled by Licensor, Parent and/or their respective Affiliates as of the Effective Date that Licensor, Parent and/or their respective Affiliates use in connection with, or is otherwise useful to, in the Business Field, as provided to Licensee pursuant to the Asset Purchase Agreement.

2

"Control", "Controlled" or "Controlling", when used in reference to Intellectual Property, means the legal authority or right of a Party hereto (or any of its Affiliates) to grant a license or sublicense of Intellectual Property to the other Party, or to otherwise disclose proprietary or trade secret information to such other Party, without breaching the terms of any agreement with a third party, or misappropriating the proprietary or trade secret information of a third party.

"Effective Date" has the meaning set forth in the introductory paragraph hereof.

"Governmental Authority" means any nation, state, territory, province, county, city or other unit or subdivision thereof or any entity, authority, agency, department, board, commission, instrumentality, court or other judicial body authorized on behalf of any of the foregoing to exercise legislative, judicial, regulatory or administrative functions of or pertaining to government, and any governmental or non-governmental self-regulatory organization.

"Intellectual Property" means any and all intellectual property rights and other similar proprietary rights in any jurisdiction, whether registered or unregistered, whether owned or held for use under license, including all rights and interests in, pertaining to or deriving from any patents or patent applications (including continuations, continuations-in-part, divisions, reissues and reexaminations), Software, or works of authorship, copyrights, know-how and trade secrets, and all documentation related to any of the foregoing, including in each case any registrations of, applications to register, and renewals and extensions of, any of the foregoing.

"Know-how" means any and all technical, scientific, trade, quality assurance, quality control, financial and business information, know-how, trade secrets, materials, Software and other Intellectual Property (other than Patent Rights), including without limitation all methods, protocol, results, analyses, conclusions and other information, data, discoveries, inventions, improvements, processes, regulatory documentation, information and submissions and formulae, whether patentable or unpatentable.

"License" has the meaning set forth in Section 2.1 herein.

"License Agreement" means the License Agreement dated as of October 8, 2009 by and between Licensor and Licensee.

"Licensed Patents" means and includes all worldwide Patent Rights relating to the Business Field owned or Controlled during the Term of this Agreement by Licensor, Parent and/or any Affiliate of Licensor and/or Parent, including for the avoidance of doubt, the Patent Rights set forth on Exhibit A attached hereto as well as any Patent Rights claiming priority in whole or part to any Patent Rights set forth on Exhibit A, and any other Patent Rights owned or Controlled during the Term of this Agreement by Licensor, Parent or any Affiliate of Licensor or Parent, whether now in existence or created in the future, that claim an invention relating to the Business Field. Licensed Patents shall also include any Patent Rights licensed to Licensee hereunder as contemplated under Section 2.3. For the avoidance of doubt, Licensed Patents shall

3

not include any patents owned or Controlled by Access Control Advantage, Inc. and not related to deposit sweep and deposit investment products within the Business Field, including, by way of example and not limitation, Patent Rights relating to systems and methods for providing loan management from cash or deferred income arrangements or with variable security arrangements.

"Licensee" has the meaning set forth in the introductory paragraph hereof.

"Licensee-managed accounts" means any account within the Business Field managed, directly or indirectly, by or through Licensee and/or its Affiliates.

"Licensor" has the meaning set forth in the introductory paragraph hereof.

"LIDs Business" means the provision by Licensee of any cash sweep or other deposit investment products or services, including without limitation any Federal Deposit Insurance Corporation (or government backed-insured) and interest bearing deposit programs, offered directly or indirectly by Licensee through any intermediaries to their customers, including by way of example and not limitation: (i) broker dealers, (ii) investment advisers, (iii) financial advisers, (iv) financial planners, (v) trust companies and (vii) clearing firms.

"Order" means any judicial, administrative or arbitral judgment, order, award, writ, decree, injunction, lawsuit, proceeding or stipulation of any Governmental Authority.

"Parent" means Double Rock Corporation, a New Jersey corporation and parent of Licensor. For the avoidance of doubt, Parent and Licensor are Affiliates.

"Party" and "Parties" have the meaning set forth in the introductory paragraph hereof.

"Patent Rights" means patents and patent applications, including all foreign counterparts, reissues, divisions, renewals, reexaminations, extensions, provisionals, continuations, continuing prosecution applications and continuations-in-part thereof.

"Person" means any natural person, corporation, company, limited liability company, partnership (limited or general), joint venture, association, trust, unincorporated organization or other entity.

"Profits" has the meaning set forth in Section 3.1(2) herein.

"Sellers" means, collectively, each of Double Rock Corporation, LIDs Capital LLC, Intrasweep LLC, Demand Deposit Marketplace LLC, Stable Custody Group LLC and Stable Custody Group II LLC, each an Affiliate of Licensor.

"Software" means computer programs (both source code and object code), firmware, application programs, operating systems, scripts, animation sequences, interfaces, programming code, applets, executables, formats or page descriptions, computer architecture or

4

472355.2

hierarchies, files and utilities, together with all files required for proper operation of the forgoing and all associated tools and utilities; supporting documentation for any of the foregoing, including input and output formats, listings, narrative descriptions, operating instructions and training documentation; and all tangible media upon which any of the foregoing are recorded, including disks, compact discs, tapes, chips or photographs.

"Term" means the period commencing on the Effective Date and concluding upon termination of this Agreement pursuant to Article VI herein.

"Transition Services Agreement" means the Transition Services Agreement entered into concurrently herewith by and among Double Rock Corporation, LIDs Capital LLC, Demand Deposit Marketplace LLC, Intrasweep LLC, Stable Custody Group LLC, and Stable Custody Group II LLC, on the one hand, and Licensee, on the other hand.

"U.S. Bankruptcy Code" means Title 11 of U.S. Code or any applicable federal or state bankruptcy, insolvency, reorganization or other similar law or analogous foreign law for the relief of debtors.

All terms used herein and not otherwise defined will have the meaning set forth in the Asset Purchase Agreement.

Section 1.2. Rules of Construction and Interpretation.

(a)     The definitions of the terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". The word "any" shall mean "any and all" unless otherwise clearly indicated by context. Where either Party's consent is required hereunder, except as otherwise specified herein, such Party's consent may be granted or withheld in such Party's sole discretion.

(b)     Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or therein), (ii) any reference to any laws herein shall be construed as referring to such laws as from time to time enacted, repealed or amended, (iii) any reference herein to any person shall be construed to include the person's successors and assigns, (iv) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, and (v) all references herein to Articles, Sections or Exhibits, unless otherwise specifically provided, shall be construed to refer to Articles, Sections and Exhibits of this Agreement.

472355.2

## ARTICLE II.
## GRANT OF LICENSE

Section 2.1. <u>License</u>. In consideration for the payments set forth herein and other good and valuable consideration, Licensor hereby grants as of the Effective Date, and Licensee hereby accepts, (a) a non-exclusive, worldwide, right and license under and to the Licensed Patents, and (b) a non-exclusive, worldwide, right and license under and to the Business Know-how, in each case to practice any and all methods claimed or disclosed therein, and to make, have made, use, distribute, lease, sell, offer for sale, import, export, develop and otherwise dispose of and exploit any and all products and services within the Business Field ("<u>License</u>"). Licensee shall be permitted, on an unrestricted basis but subject to the confidentiality acknowledgement in Section 2.8 hereof, to develop, adapt, modify, improve upon, create derivative works of or otherwise develop the Licensed Patents and licensed Business Know-how, alone or in conjunction with others. For the avoidance of any doubt, the have made rights of the Licensee hereunder shall extend to suppliers of products or services of Licensee with respect to the Business Field, solely for the purpose of providing such products or services to or on behalf of Licensee or its Affiliate (as contemplated in Section 2.2).

Section 2.2. <u>Affiliate License</u>. Licensee may extend the License in Section 2.1 to any Affiliate of Licensee under the same terms and conditions as set forth herein, upon written notification to Licensor of such Affiliate License grant, and such Affiliate agreeing to be bound in writing by the terms of this Agreement as if it were a party hereto, including without limitation payment by such Affiliate of royalties in accordance with Article III.

Section 2.3. <u>Future Patent Rights</u>. In the event that, following the Effective Date, Licensor files or acquires any Patent Rights not listed in Exhibit A attached hereto or which claim priority in whole or part to any Patent Rights listed in Exhibit A, which such Patent Rights may be useful or helpful to Licensee in the provision of products or services in the Business Field, but that would not otherwise constitute Licensed Patents, it shall inform Licensee of the filing or acquisition of such Patent Rights, and provide to Licensee in such notice a reasonably detailed description of the inventions described or claimed in such Patent Rights (it being understood that to the extent any such details relate to unpublished patent applications, the content of such unpublished patent applications are to be treated as confidential information of Licensor under Section 2.8). Licensor shall cooperate reasonably with requests by Licensee for additional information related to such Patent Rights. Licensee may elect, by written notice to Licensor, to include such future developed or acquired Patent Rights within the Licensed Patents and upon such election, such Patent Rights shall be deemed Licensed Patents hereunder.

Section 2.4. <u>Cross-License</u>. In consideration for the License granted in Section 2.1 and 2.2 hereto and other good and valuable consideration, Licensee hereby grants as of the Effective Date, and Licensor and its Affiliates hereby accept, a non-exclusive, worldwide, fully paid up and royalty free, right and license under any Patent Rights filed, obtained or otherwise acquired or owned by Licensee during the Term hereof that relate to the Business Field (provided, however, that nothing in the foregoing shall be deemed to grant to Licensor any

6

license under any Patent Rights acquired by Licensee where such acquisition prevents Licensee from granting such a license).  Licensor shall be permitted to practice any and all methods claimed or disclosed therein, and to make, have made, use, distribute, lease, sell, offer for sale, import, export, develop and otherwise dispose of and exploit any and all products and services within the Business Field.  Licensor may not license, sublicense or otherwise grant to any third party, directly or indirectly, any right to practice under the Patent Rights cross licensed hereunder, it being understood, however, (i) that the have made rights of this cross-license may be extended to suppliers of products or services to Licensor solely for the purpose of providing such products or services to or on behalf of Licensor or its Affiliates in the Business Field, and (ii) Licensor shall be permitted to assign the cross-license granted hereunder to any acquirer of the business of Licensor to which the cross-license relates.  Licensee represents and warranties that, as of the Effective Date, it possesses no Patent Rights that would be subject to the cross-license hereunder.  Licensee shall provide notice to Licensor upon the issuance or acquisition of any patent subject to the cross-license hereunder.

Section 2.5.  Licensor's Deliveries.  Licensor shall execute and/or deliver or cause to be executed and/or delivered to Licensee all of the following at or prior to the Effective Date:

(a)    an incumbency and specimen signature certificate with respect to the officers of Licensor executing this Agreement on behalf of Licensor;

(b)    a certified copy of resolutions of Licensor's board of directors, authorizing the execution, delivery and performance of this Agreement; and

(c)    such other documents from Licensor as may reasonably be required in order to effectuate the transactions contemplated by this Agreement, including an incumbency and specimen signature certificate with respect to the officers of Licensor executing this Agreement on behalf of Licensor.

Section 2.6.  Delivery.  Licensor shall further deliver and/or cause to be delivered to Licensee, to the extent it has not already done so, on or promptly after the Effective Date (but in no event commencing more than thirty (30) days after the Effective Date): (a) a copy of all Software comprised within the Business Know-how, including without limitation the Software set forth on Exhibit B attached hereto, and (b) other tangible embodiments of the Business Know-how.

Section 2.7.  Standstill and Further Delivery Obligations.  Licensor acknowledges and agrees that pursuant to the terms of the Transition Services Agreement, it shall not, during the period commencing on the Effective Date and concluding upon the expiration or termination of the Transition Services Agreement, without the prior consent of Licensee, alter, modify, delete or otherwise change, disable or reprogram, in any material respect, any of the Software, and, in addition, Licensor shall, in the event it determines to make any bug fixes, patches or error corrections, or other non-material modifications to the Software, notify Licensee in writing of the modifications and deliver to Licensee, at Licensee's request, any such modifications in

7

source code format (and Licensor shall use commercially reasonable efforts to so notify Licensee of such modifications prior to their implementation or installation). Licensor further agrees that, to the extent any Software (including any modified Software developed by Licensor prior or subsequent to the Effective Date hereof) or Business Know-how has not been delivered to Licensee pursuant to the obligations set forth in Section 2.5 of the License Agreement, and that is in the possession or control of Licensor or any of its Affiliates, Licensor shall promptly deliver to Licensee such Software and Business Know-how in a form and format to be mutually determined by the Parties.

Section 2.8. Acknowledgements. (a) Licensee acknowledges that all title and Intellectual Property rights in and to the Software included in the Business Know-how are and remain owned by Licensor and/or any of its Affiliates; and (b) Licensee agrees to maintain the Software included in the Business Know-how and related materials in confidence using no less care than that used to maintain and protect the confidentiality of Licensee's similar confidential information.

Section 2.9. Further Cooperation. At the reasonable request of any Party, the other Party or Parties will execute and deliver such other instruments and do and perform such other acts and things as may be necessary or desirable for effecting completely the consummation of the transactions contemplated hereby, including execution, acknowledgment, and recordation of other such papers, and using commercially reasonable efforts to obtain the same from the respective inventors, as necessary or desirable for fully perfecting and conveying unto the requesting Party the benefit of the transactions contemplated hereby.

Section 2.10. Further License. Subject to the restrictions set forth in this Section 2.10, Licensee acknowledges that Licensor has the right to grant or not grant other licenses both within the Business Field and outside the Business Field to the Licensed Patents, the Intellectual Property rights in and to the Software and other tangible embodiments to third parties and/or any of its Affiliates without the consent or knowledge of Licensee. Notwithstanding the non-exclusive nature of the License granted hereunder, Licensor acknowledges and agrees that it shall not for a one (1) year period following the Effective Date, affirmatively market or promote the licensing to Federated Investors, Inc. or any of its Affiliates, or The Dreyfus Corporation or any of its Affiliates (each, a "Restricted Party") of the Licensed Patents or Software for use in the Business Field,. Notwithstanding the foregoing, Licensor shall not, during the above-referenced periods, be barred from granting to any third party, including a Restricted Party, a license within or outside of the Business Field to the Licensed Patents, or the Intellectual Property rights embodied in the Software, in settlement of any dispute, claim, suit or demand made by Licensor in respect of the alleged infringement or other violation by such third party of any Intellectual Property rights in the Licensed Patents or Software (it being the agreement of the parties hereto that no litigation need be brought by Licensor against a third party prior to such a license being granted by Licensor). Following the expiration of the above-referenced period, nothing herein shall be construed as prohibiting Licensor from marketing or promoting the licensing to any third parties, including a Restricted Party, of the Licensed Patents or Software for use in the Business

8

472355.2

Field.  Licensor agrees to advise Licensee within thirty (30) days of the execution of any such license to a third party of the fact of such license.

## ARTICLE III.
## ROYALTY

Section 3.1.  Royalty Payments.  In consideration of the rights, licenses, privileges, releases, non-assertions and immunities granted by the Licensor under this Agreement:

1. LIDs Business Royalty.  Beginning on the Effective Date, Licensee shall pay to Licensor, on a quarterly basis as provided in Section 3.2, a royalty equal to the greater of (a) Fifteen Percent (15%) of Licensee's gross revenue from the conduct of the LIDs Business, or (b) the product of one-half (.5) of one basis point (i.e., two (2) basis points on an annualized basis) multiplied by the average daily balance of deposits in the Licensee-managed accounts for the immediately preceding quarterly reporting period as set forth in Section 3.2.  Notwithstanding the foregoing the total royalty due for any quarterly reporting period hereunder shall not exceed the product of 1.25 basis points (i.e., five (5) basis points, on an annualized basis) multiplied by the average daily balance of deposits in the Licensee-managed accounts for the applicable reporting quarter.

2. Bank Business and Other Business.  Beginning on the Effective Date, Licensee shall pay to Licensor, on a quarterly basis as provided in Section 3.2, a royalty equal to Fifteen Percent (15%) of Licensee's gross revenue from the conduct of the Bank Business for the immediately preceding quarterly reporting period as set forth in Section 3.2.

   With respect to Bank Business solely, during the quarterly reporting periods ending on or before December 31, 2012, to the extent that the annualized Bank Revenues for the calendar year are less than $7.5 million for the Bank Business, the total annual royalty payment due for the Bank Business over the calendar year shall not exceed the Profits for the Bank Business during such calendar year.  In no event shall (i) the royalty payment due with respect to Bank Business be reduced below zero, or (ii) the reductions described in this Section 3.1(2) have effect for any quarterly reporting period occurring after the second anniversary of the Effective Date.  For the avoidance of any doubt, with respect to royalty payments for the Bank Business for quarterly reporting periods ending on or before December 31, 2012, to the extent that there are Profits for the Bank Business, the Profits shall always be applied first toward the royalty payment due to Licensor for the Bank Business.

472355.2

For purposes herein, the term "Profit" shall mean Bank Revenues less the direct, incremental costs of operating the business (excluding costs such as royalty expenses, interest, taxes, depreciation, amortization and allocated costs such as rent and staffing and non-staffing overhead costs shared with other businesses).

In addition, during 2011, Bank Revenues, Profit and royalty expenses for the Bank Business shall be annualized and calculated prospectively by using quarterly information as it becomes available for the quarterly periods ending March 31, 2011, June 30, 2011, September 30, 2011 and December 31, 2011, respectively.  During 2012, Bank Revenues, Profit and royalty expenses for the Bank Business shall be annualized and calculated prospectively by using quarterly information as it becomes available for the quarterly periods ending March 31, 2012, June 30, 2012, September 30, 2012 and December 31, 2012, respectively.

For purposes of illustration of the parties intent with respect to Bank Business royalties only, for the relevant cumulative calendar year ending on or before December 31, 2012, if annualized Bank Revenues are $7.0 million, the Profit is $1.0 million, the royalty expenses for the Bank Business are $1.05 million, Licensor shall be paid a royalty payment of $1.0 million.  As a second illustration for a cumulative calendar year ending on or before December 31, 2012, if annualized Bank Revenues are $6.0 million, the Profit is $1.0 million and the royalty expenses for the Bank Business are $.9 million, Licensor shall be paid a royalty payment of $.9 million.

Section 3.2.  Payment.  Royalties shall be paid within thirty (30) days of the conclusion of each calendar quarter during the Term of this Agreement.  In the event of a termination or expiration of this Agreement, royalties shall be calculated as of the effective date of termination or expiration and paid within thirty (30) days thereof.  Licensee shall deliver to Licensor a written report contemporaneous with the payments setting forth, for the immediately preceding reporting quarter, a summary of (a) Licensee's gross revenues from the conduct of the Business, the average daily collected balance in Licensee-managed accounts for the reporting period for the Business, and a calculation of the royalty due pursuant to Sections 3.1a., (b) Licensee's gross revenue from the conduct of the Bank Business or other business for the immediately preceding quarter, and a calculation of the royalty due (or forgiven, as applicable) thereon pursuant to Section 3.1b.  Licensee shall also deliver such other information to Licensee as it shall reasonably require in order to complete the calculations set forth in Section 3.1 above.

Section 3.3.  Books and Records.  Licensee shall prepare and maintain books of account and other records with respect to the provision of products and services under this

10

472355.2

Agreement; provided, however, that Licensee shall not be required to keep such books and records for longer than three (3) years after the later date of the expiration or termination of this Agreement.

Section 3.4. Audits. Licensor shall, during the Term of this Agreement and thereafter for a period of one (1) year, have the right, no more than once in any given twelve (12) month period, during regular business hours and on reasonable notice of at least ten (10) Business Days to Licensee, to examine, through a third party accounting firm reasonably acceptable to Licensee, Licensee's books of account and records relating to Licensee's performance of its obligations under this Agreement. Notwithstanding the foregoing, in the event any such examination discloses an underpayment to Licensor of more than $100,000, Licensor shall have the right to conduct up to four (4) examinations, subject to the notice, timing and other provisions set forth in the first sentence of this Section 3.4, in any given twelve (12) month period. Such audit shall be restricted to such records and books of account of Licensee as are reasonably necessary to calculate and confirm such royalties. Any such accounting firm shall enter into a confidentiality and non-disclosure agreement reasonably acceptable to Licensee obligating such accounting firm to maintain in confidence any confidential or proprietary information of Licensee or its clients or customers. Licensee will pay within twenty business (20) days of receipt of the auditor's report, any amounts appropriately determined by any audit to be due to Licensor; and Licensor shall refund to Licensee any amounts appropriately determined by an audit to have been overpaid by Licensee for the audited period. Licensor shall pay the cost of any such audits unless an audit establishes that Licensee has underpaid the royalties for a period being audited by an amount exceeding ten percent (10%) or $100,000 (whichever is lesser), in which case, Licensee shall pay the reasonable and documented costs of such audit.

## ARTICLE IV.
### REPRESENTATIONS AND WARRANTIES

Section 4.1. Title and Contest. Licensor represents and warrants that it owns all right, title, and interest in and to the Licensed Patents and Business Know how (including, for the avoidance of doubt, the Software included therein), and has the right and ability to grant the License, in each case free and clear of any liens or encumbrances. Licensor is the owner of record with the U.S. Patent and Trademark Office and all other applicable patent offices of the Licensed Patents.

Section 4.2. Non-contravention. Each Party represents and warrants that the execution of this Agreement and the grant of the License and the Cross-License hereunder will not conflict with, or result in any breach of or constitute a default under any contract by which that Party is bound, or violate or conflict with any Order.

Section 4.3. Status of Licensed Patents. Licensor represents and warrants that, as of the Effective Date: all maintenance fees, annuities, and the like due or payable on the Licensed Patents have been or will be timely paid.

11

### ARTICLE V.
### PROSECUTION AND MAINTENANCE; ENFORCEMENT;
### MARKING; IMPROVEMENTS

Section 5.1. <u>Prosecution and Maintenance</u>.  Licensor shall have sole responsibility and discretion with respect to prosecution, issuance and maintenance of the Licensed Patents.

Section 5.2. <u>Enforcement.</u>  During the Term, Licensee shall promptly provide written notice to Licensor of any infringement within the Business Field of any Licensed Patents of which it becomes aware, including in such notice a reasonable level of detail regarding such infringement.

Section 5.3. <u>Right to Prosecute Litigation</u>.  Licensor shall have the sole right, but not the obligation, at all times, to prosecute, at its own expense and utilizing counsel of its choice, any infringement of the Licensed Patents.

Section 5.4. <u>Cost of Action</u>.  Unless the Parties otherwise agree, the total cost of any such action commenced by Licensor, shall be borne by Licensor (but excluding fees and expenses charged by separate counsel, if any, engaged by Licensee).  Except as the Parties may otherwise agree in writing, any damages or settlement payments resulting from any such action commenced as set forth above, whether in an out-of-court settlement or through legal adjudication of such action, and at any time, shall be retained by Licensor.

Section 5.5. <u>Cooperation</u>.  In any infringement action Licensor may institute pursuant to this Article 5 during the Term of this Agreement, Licensee hereto shall, at the request of Licensor and at Licensor's sole cost, cooperate reasonably in the prosecution of such action.

Section 5.6. <u>Marking</u>.  In connection with Licensee's exercise of its rights under the License during the term hereof, Licensee shall comply with applicable patent marking laws with respect to the Licensed Patents, and as otherwise reasonably instructed by Licensor.  Licensee further agrees to comply and require that any and all of its Affiliates and sublicensees of the Licensed Patents to comply with the foregoing marking requirements, and to monitor and enforce compliance of such marking requirements by any such Affiliates and sublicensees.

Section 5.7. <u>Improvements</u>.  With respect to any and all new developments and improvements in connection with the Licensed Patents and Business Know-how pursuant to this Agreement that are developed or conceived solely by or on behalf of Licensee or any Affiliate of Licensee or sublicensee, as between Licensor and Licensee, Licensee shall be the sole owner of such developments and improvements.

## ARTICLE VI.
## TERM; TERMINATION

Section 6.1. Term. The term of this Agreement shall commence on the Effective Date and, unless terminated in accordance with the provisions of this Article VI, shall, continue indefinitely, provided that it is understood that the License granted hereunder relating to the Licensed Patents shall expire on the date of the last to expire of the Licensed Patents. For the avoidance of doubt, Licensee shall have no obligation of payment to Licensor hereunder upon and in the event all of the Licensed Patents expire, are abandoned, nullified or become subject to a final, unappealable Order invalidating all such Licensed Patents.

Section 6.2. Termination.

(a)     Subject to the provisions of subsection 6.2(b), either Party may terminate this Agreement in the event the other Party breaches any material condition of this Agreement, and fails to substantially remedy such breach within sixty (60) days of the allegedly breaching Party's receipt of written notice from the other Party specifying in reasonable detail the nature of such breach, such termination to become effective sixty (60) days after delivery of written notice to the allegedly breaching Party of the other Party's determination that such breach has not been substantially remedied.

(b)     In the event that a Party delivers to the other Party a notice of its determination to terminate this Agreement because of an unremedied material breach hereof, and the allegedly breaching Party in good faith disputes either the occurrence of such breach or that Party's failure to remedy such breach ("Termination Dispute"), then the Parties shall first submit the Termination Dispute for resolution to senior executives of each Party who have decision-making authority with respect to the subject matter hereof. The Party asserting breach shall set out in a notice of a Termination Dispute its reasons for disputing termination. Such writing shall briefly and clearly state the substance and scope of the Termination Dispute, that Party's relative position thereto and include any legal or factual justifications of which the Party is aware. The allegedly breaching Party shall respond to such writing within fifteen (15) days of its receipt thereof and set forth its positions with respect to each item included in the notice. Within thirty (30) days of the allegedly breaching Party's response, senior executives of each Party who have decision-making authority shall meet at a mutually agreeable place and time to seek, in good faith, an amicable settlement to the Termination Dispute.  All reasonable requests for information from one Party shall be honored by the other Party.

(c)     If (i) the Termination Dispute is not resolved within forty-five (45) days after receipt of the Termination Dispute notice, or (ii) the meeting is not held within the 30-day period as provided in subsection 6.2(b), either Party may elect to submit such dispute to arbitration. Such arbitration shall be conducted pursuant to the Commercial Arbitration Rules of the American Arbitration Association by a single arbitrator sitting in New York, NY. The arbitrator shall be a lawyer knowledgeable and experienced in patent licensing. In the event the arbitrator determines that (x) the allegedly breaching Party has materially breached this

13

472355.2

Agreement and (y) has not substantially cured such breach, then the allegedly breaching Party shall, within sixty (60) days of such determination cure such breach in accordance with the arbitrator's findings, or, if the breach shall not be cured by the end of such sixty (60) day period, the Agreement shall terminate.

Section 6.3. Effect of Termination. Upon the effective date of termination of this Agreement under Section 6.2, the licenses and cross licenses granted hereunder shall immediately cease, and each of the Parties shall, and shall cause its Affiliates licensed hereunder to, cease using or practicing the subject matter licensed to it hereunder.

Section 6.4. No Challenge. During the Term of this Agreement, Licensee agrees not to challenge or assist others in challenging the validity and/or enforceability of the Licensed Patents before any Governmental Authority.

## ARTICLE VII.
## INDEMNIFICATION

Section 7.1. By Licensor. Licensor agrees to defend, indemnify and hold Licensee harmless from and against all claims, damages, losses, costs and expenses, including reasonable attorneys' fees, arising based on any third party claim against Licensee (a) arising as a result of Licensor's breach of any representation, warranty or covenant of this Agreement, and (b) any claim that the exercise by Licensee of the rights granted under this Agreement infringes any Person's copyright or constitutes a misappropriation of any Person's trade secrets, other than claims that would not have arisen but for Licensee's (or Licensee's agent's) modification of the Intellectual Property licensed hereunder, or the combination of the Intellectual Property licensed hereunder with other software, hardware, middleware or firmware not provided by Licensor and provided further that the indemnification pursuant to subparagraph (b) shall terminate upon the conclusion of the Transition Services Agreement.

Section 7.2. By Licensee. Except with respect to Licensor's indemnification of Licensee pursuant to Section 7.1, Licensee agrees to defend, indemnify and hold Licensor harmless from and against all claims, damages, losses, costs and expenses, including reasonable attorneys' fees, arising based on any third party claim against Licensor arising as a result of (a) a breach of any representation, warranty or covenant of Licensee under this Agreement, and (b) the gross negligence or willful misconduct of Licensee, its Affiliates and permitted sublicensees in the conduct of the Business.

Section 7.3. Procedures. A claim to which indemnification applies under Sections 7.1 or 7.2 shall be referred to herein as an "Indemnification Claim". If any Party hereto intends to claim indemnification hereunder ("Indemnitee"), the Indemnitee shall notify the other Party ("Indemnitor") in writing promptly upon becoming aware of any claim that may be an Indemnification Claim (it being understood and agreed, however, that the failure by an Indemnitee to give such notice shall not relieve the Indemnitor of its indemnification obligation

14

under this Agreement except and only to the extent that the Indemnitor is actually prejudiced as a result of such failure to give notice).

Section 7.4. Assumption by Indemnitor. At its option, the Indemnitor may assume the defense of any Indemnification Claim by giving written notice to the Indemnitee within thirty (30) days after the Indemnitor's receipt of a notice of claim for indemnification, provided however that (i) the Indemnitor has sufficient financial resources, in the reasonable judgment of the Indemnitee, to satisfy the amount of any adverse monetary judgment that is sought, (ii) the claim solely seeks monetary damages and (iii) the Indemnitor expressly agrees in writing that as between the Indemnitor and the Indemnitee, the Indemnitor shall be solely obligated to satisfy and discharge the Indemnification Claim in full (the matters described in (i), (ii) and (iii), the "Litigation Conditions"). The Indemnitee may, at any time, assume all such defense if the Litigation Conditions are not satisfied at any time.  Upon assuming the defense of an Indemnification Claim in accordance with the foregoing, the Indemnitor shall be entitled to appoint lead counsel in the defense of the Indemnification Claim.  Should the Indemnitor assume the defense of an Indemnification Claim, except as otherwise set forth in this Section 7.4), the Indemnitor will not be liable to the Indemnitee for any legal expenses subsequently incurred by such Indemnitee in connection with the analysis, defense or settlement of the Indemnification Claim.  Without limiting the foregoing, any Indemnitee will be entitled to participate in, but not control, the defense of an Indemnification Claim for which it has sought indemnification hereunder and to employ counsel of its choice for such purpose; provided, however, that such employment will be at the Indemnitee's own expense unless (a) the employment thereof has been specifically authorized by the Indemnitor in writing, or (b) the Indemnitor has failed to assume and actively further the defense and employ counsel in accordance with the foregoing (in which case the Indemnitee will control the defense), or (c) the Indemnitor no longer satisfies the Litigation Conditions.

Section 7.5. Claims Involving Money Damages, Only.  With respect to any losses relating solely to the payment of money damages in connection with an Indemnification Claim that will not result in the Indemnitee's becoming subject to injunctive or other relief or otherwise adversely affect the business of the Indemnitee in any manner, and as to which the Indemnitor will have acknowledged in writing the obligation to indemnify the Indemnitee hereunder, and subject to the Litigation Conditions being satisfied, the Indemnitor will have the sole right to consent to the entry of any judgment, enter into any settlement or otherwise dispose of such loss, on such terms as the Indemnitor, in its reasonable discretion, will deem appropriate (provided, however that such terms shall include a complete and unconditional release of the Indemnitee from all liability with respect thereto), and will transfer to the Indemnitee all amounts which said Indemnitee will be liable to pay prior to the time of the entry of judgment.  Regardless of whether the Indemnitor chooses to defend or prosecute any Indemnification Claim for indemnification, no Indemnitee will admit any liability with respect to, or settle, compromise or discharge, any Indemnification Claim without first offering to the Indemnitor the opportunity to assume the defense of the Indemnification Claim in accordance with Section 7.4.

15

472355.2

Section 7.6. <u>Set-off of Proceeds</u>.  Notwithstanding anything contained herein to the contrary, the amount of any losses incurred or suffered by an Indemnitee shall be calculated after giving effect to any direct cash recoveries obtained by such Indemnitee (or any of its Affiliates) from any third party.  Each Indemnitee shall exercise commercially reasonable efforts to obtain such proceeds, benefits and recoveries.  If any such cash recoveries are received by an Indemnitee (or any of its Affiliates) with respect to any losses after an Indemnitor has made a payment to the Indemnitee with respect thereto, the Indemnitee (or such Affiliate) shall pay to the Indemnitor the amount of such cash recoveries (up to the amount of the Indemnitor's payment).  With respect to any losses incurred or suffered by an Indemnitee, no liability shall attach to the Indemnitor in respect of any losses to the extent that the same losses have been recovered by the Indemnitee from the Indemnitor, accordingly, the Indemnitee may only recover once in respect of the same loss

Section 7.7. <u>No Subrogation</u>.  The Parties hereto understand and agree that any subrogation of rights is disclaimed in its entirety. The Parties shall use reasonable commercial efforts to mitigate any losses; <u>provided that</u> no Party shall be required to use such efforts if they would be demonstrably detrimental in any material respect to such Party.

16

## ARTICLE VIII.
## MISCELLANEOUS

Section 8.1. <u>Publicity</u>. Except as otherwise required by law, legal process or stock exchange rules, neither Party shall issue any press release or make any public announcement or disclosure related to the Agreement or the transactions contemplated hereunder without the prior agreement of Licensor and Licensee, including with respect to the content of such release, announcement or disclosure (and, with respect in any legally required announcement, Licensor and Licensee shall use all reasonable efforts to consult and agree with each other with respect to the content of any such required press release or other publicity).

Section 8.2. <u>Notices</u>. All notices and other communications hereunder shall be in writing and shall be deemed given and effective (a) when delivered, if delivered in person, (b) when transmitted by telecopy (with confirmation of transmission received), (c) three (3) Business Days after mailing, if mailed by certified or registered mail (return receipt requested and obtained) or (d) one (1) Business Day after transmitted, if transmitted by a nationally recognized overnight courier to the parties at the following addresses (or at such other address for a party as shall be specified by like notice):

If to Licensee:

Reich & Tang Deposit Solutions, LLC
1411 Broadway
New York, NY 10018
Attention: Richard De Sanctis, Chief Operating Officer
Facsimile:  212 830 5467

With a copy (which shall not constitute notice) to:

Dechert LLP
1775 I Street, NW
Washington, DC
Attention:  Jane A. Kanter, Esq.
Facsimile: 202 261 3333

If to Licensor:

Island Intellectual Property LLC
1250 Broadway
New York, NY 10001
Attention: General Counsel
Facsimile:  212 401 5950

17

With a copy (which shall not constitute notice) to:

Amster, Rothstein & Ebenstein LLP
90 Park Avenue
New York, NY 10016
Attention: Charles R. Macedo, Esq.
Facsimile: 212 336 8001
E-Mail: cmacedo@arelaw.com

With a copy (which shall not constitute notice) to:

Finn Dixon & Herling LLP
177 Broad Street
Stamford, CT 06901
Attention: David Albin, Esq.
Facsimile: 203-325-5031

and/or to such other respective addresses and/or addressees as may be designated by notice given in accordance with the provisions of this Section 8.2.

Section 8.3. <u>Expenses</u>. Except as otherwise expressly set forth in this Agreement, each Party hereto shall bear all fees and expenses incurred by such Party in connection with, relating to or arising out of the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby and thereby, including financial advisors', attorneys', accountants' and other professional fees and expenses.

Section 8.4. <u>Entire Agreement</u>. This Agreement, the Asset Purchase Agreement executed concurrently herewith, and the Transition Services Agreement constitute the entire agreement between the Parties and their Affiliates with respect to the subject matter hereof. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective legal representatives, successors and permitted assigns. Each exhibit hereto shall be considered incorporated into this Agreement. No information or knowledge, whether obtained by Licensee, any of Licensee's Affiliates or any of their officers, directors, stockholders, members, partners, affiliates, employees, agents or representations in an investigation conducted by any of them shall affect or be deemed to modify any representation or warranty of any Party contained herein or the conditions to the obligations of the Parties to consummate the transactions contemplated hereby.

Section 8.5. <u>Non-Waiver</u>. The failure in any one or more instances of a Party to insist upon performance of any of the terms, covenants or conditions of this Agreement, to exercise any right or privilege in this Agreement conferred, or the waiver by said Party of any breach of any of the terms, covenants or conditions of this Agreement, shall not be construed as a subsequent waiver of any such terms, covenants, conditions, rights or privileges, but the same shall continue and remain in full force and effect as if no such forbearance or waiver had

18